Robert C. Morgan (SBN 46348)
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York 10036-8704
Tel.: (212) 596-9000
Fax: (212) 596-9090
robert.morgan@ropesgray.com

Clinton L. Conner (SBN 244244)
ROPES & GRAY LLP
525 University Avenue
Palo Alto, California 94301
Tel.: (650) 617-4000
Fax: (650) 617-4090
clinton.conner@ropesgray.com

Terry Kearney (SBN 160054)
Matthew A. Argenti (SBN 240954)
WILSON SONSINI GOODRICH & ROSATI
650 Page Mill Road
Palo Alto, California 94303
Tel.: (650) 493-9300
Fax: (650) 493-6811
tkearney@wsgr.com
margenti@wsgr.com

Attorneys for Defendant
LUXIM CORPORATION

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CERAVISION, LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>LUXIM CORPORATION,<br><br>Defendant. | Civil Action No. CV 08-2575-SI<br><br>DECLARATION OF MATTHEW A. ARGENTI IN SUPPORT OF LUXIM'S MOTION TO DISMISS CLAIMS OF THE FIRST AMENDED COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION<br><br>Date: Oct. 10, 2008<br>Time: 9:00 a.m.<br>Judge: Honorable Susan Illston |

I, Matthew A. Argenti, declare:

1.      I am an attorney at the law firm of Wilson Sonsini Goodrich & Rosati in Palo Alto, California.  I am admitted to practice before the courts of the State of California and before the Northern District of California.  I have personal knowledge regarding, and if called as a witness could testify to, the facts contained in this declaration.

2.      Attached as Exhibit A is a true and correct copy of an April 8, 2008 press release available on Ceravision's website at http://www.ceravision.com/news/news_luxim-apr-08.php.

3.      Attached as Exhibit B is a true and correct copy of Paper No. 2 entered in Interference No. 105,393 on January 24, 2006, entitled "Standing Order."

4.      Attached as Exhibit C is a true and correct copy of Paper No. 1 entered in Interference No. 105,393 on January 24, 2006, entitled "Notice to Declare Interference."

5.      Attached as Exhibit D is a true and correct copy of Paper No. 6 entered in Interference No. 105,393 on February 4, 2006, entitled "Notice of Related Proceedings."

6.      Attached as Exhibit E is a true and correct copy of Paper No. 25 entered in Interference No. 105,393 on March 20, 2006, entitled "Espiau Revised List of Proposed Motions."

7.      Attached as Exhibit F is a true and correct copy of Paper No. 26 entered in Interference No. 105,393 on March 20, 2006, entitled "Guthrie Amended Motions List Before Conference."

8.      Attached as Exhibit G is a true and correct copy of Paper No. 27 entered in Interference No. 105,393 on March 23, 2006, entitled "Order Motion Times Bd.R. 104(a)."

9.      Attached as Exhibit H is a true and correct copy of Paper No. 28 entered in Interference No. 105,393 on March 31, 2006, entitled "Espiau Motion 1 for Rehearing."

10.     Attached as Exhibit I is a true and correct copy of Paper No. 29 entered in Interference No. 105,393 on April 4, 2006, entitled "Decision–Rehearing–Bd.R. 125(c)."

11.     Attached as Exhibit J is a true and correct copy of Paper No. 83 entered in Interference No. 105,393 on February 27, 2007, entitled "Decision–Motions–Bd.R. 125(a)."

12.     Attached as Exhibit K is a true and correct copy of Paper No. 88 entered in Interference No. 105,393 on March 13, 2007, entitled "Miscellaneous Motion 6 (Request for Rehearing)."

13.     Attached as Exhibit L is a true and correct copy of Paper No. 89 entered in Interference No. 105,393 on March 20, 2007, entitled "Decision–On Rehearing–Bd.R. 125(c)."

14.     Attached as Exhibit M is a true and correct copy of Paper No. 109 entered in Interference No. 105,393 on June 15, 2007, entitled "Guthrie Priority Motion 7."

15.     Attached as Exhibit N is a true and correct copy of Paper No. 118 entered in Interference No. 105,393 on August 2, 2007, entitled "Espiau Substitute Motion 7 for Priority."

16.     Attached as Exhibit O is a true and correct copy of Paper No. 254 entered in Interference No. 105,393 on January 7, 2008, entitled "Record of Oral Hearing."

16.     Attached as Exhibit P is a true and correct copy of Paper No. 256 entered in Interference No. 105,393 on March 24, 2008, entitled "Decision on Priority Bd.R. 125(a)."

17.     Attached as Exhibit Q is a true and correct copy of the transcript of a telephonic conference before Administrative Patent Judge Medley, held on March 21, 2006, in the matter of Interference No. 105,393.

18.     Attached as Exhibit R is a true and correct copy of Paper No. 86 entered in Interference No. 105,393 on March 13, 2007, entitled "Decision–Interlocutory Motions–Bd.R. 125(b)."

19.     Attached as Exhibit S is a true and correct copy of Paper No. 223 entered in Interference No. 105,393 on September 20, 2007, entitled "Decision–Interlocutory Motions."

20.     Attached as Exhibit T is a true and correct copy of Paper No. 51 entered in Interference No. 105,393 on July 18, 2007, entitled "Guthrie Opposition to Espiau Motion 3."

21.     Attached as Exhibit U is a true and correct copy of Paper No. 222 entered in Interference No. 105,393 on September 12, 2007, entitled "Hearing Transcript September 11, 2007 Espiau Claims."

22. Attached as Exhibit V is a true and correct copy of the transcript of a telephonic conference before Administrative Patent Judge Medley, held on March 8, 2008, in the matter of Interference No. 105,393.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 15th day of August, 2008.

/s/ Matthew A. Argenti
Matthew A. Argenti

# EXHIBIT A



Ceravision® Brighter Cleaner Longer

**Ceravision steps up legal action against Luxim to recover IP**

- *Litigation against Luxim to go to full trial in London High Court and US District Court*
- *Ceravision takes a 'zero tolerance' approach to protecting its IP*
- *Luxim patent remains suspended in Europe*
- *Pending actions relate to non-essential part of Ceravision's IP; no impact on revolutionary Continuum® 2.4 and Ecolumination™ technology ranges*

**Bletchley Park Science and Innovation Centre, UK**

**4 April 2008**

It has been announced today that litigation against Luxim Corporation's core patents by Ceravision Limited will go to a full trial in both the United States and the United Kingdom.

Both disputes relate to technologies developed during a joint venture partnership between Ceravision Limited and Digital Reflection Inc (DRI) in 1999. Ceravision partnered with DRI to bring its ceramics expertise to DRI's light source technologies. Ceravision's first patent filing in this field (now granted US patent number 6,666,739) dates back to December 1999, many months before the creation of Luxim.

As described in Ceravision's High Court pleadings, Luxim's founders signed a consultancy agreement in April 2000 to provide engineering support to DRI. As further detailed in its US and UK filings, after being paid in excess of $230,000 by DRI during a four-month period, and having information disclosed to them under a Non Disclosure Agreement, the Luxim founders filed the disputed patent application covering aspects of the work previously conceived of by DRI.

Ceravision purchased DRI's assets in 2004 in order to acquire full legal title to the technology that it had jointly developed in conjunction with DRI and to complement its existing patented intellectual property.

Tim Reynolds, CEO of Ceravision said:

*"The origins of Luxim's core patent filings have always been disputed and we will continue to do so until the grave concerns that we hold have been fully tested. We expect that a full trial before both the High Court in London, and the US District Court will properly examine for the very first time the fundamental matters affecting the integrity of Luxim's core intellectual property. Pending the outcome of the Entitlement proceedings, Luxim's core international patent application will remain suspended in Europe. We would like to take this opportunity to correct any misapprehension that either of the patent proceedings has been fully determined or that Luxim has prevailed, or ultimately will prevail, in this dispute.*

*The enforcement of our intellectual property rights is of paramount importance to Ceravision and we look forward to addressing these issues before the relevant courts and are delighted that this matter is now in the public domain."*

**Media contacts**

| Tim Williamson | Sarah West |
|---|---|
| Brunswick Group LLP | Brunswick Group LLP |
| +44 207 404 5959 | +44 207 404 5959 |

**About Ceravision**

Ceravision Ltd is the inventor of the Continuum® 2.4 and Ecolumination™ technology ranges and the holder of all the related intellectual property, patented worldwide. A research and licensing company with full sub contract manufacturing capabilities; Ceravision is based in Bletchley Park, UK.

Ceravision is backed by a number of large investors including Saad Investments and ASA Consultants.

Ceravision is bringing several major new lighting technologies to market which give long life, excellent stable spectrum, energy efficiency, environmental friendliness, low cost, high brightness and small size.

[ Back ]

© Ceravision 2008

# EXHIBIT B

Paper ____

UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE BOARD OF PATENT APPEALS AND INTERFERENCES

---

ENTERED: 3 January 2006

---

# STANDING ORDER

This Standing Order is entered in, and governs, contested cases assigned to the Trial Division of the Board of Patent Appeals and Interferences. Parties are expected to be familiar with it. The rules reproduced in the Standing Order are current as of the issue date of the Standing Order, but are subject to change. In the event of a change to a rule, the changed rule will control, the Standing Order notwithstanding.

## CONTENTS

**¶ 1 Applicability of 37 CFR part 1** . . . . . . . . . . 1

**¶ 2 Board organization** . . . . . . . . . . 1
- ¶ 2.1 Trial Division . . . . . . . . . . 1
- ¶ 2.2 Trial Procedures Section . . . . . . . . . . 1
- ¶ 2.3 Trial Merits Section . . . . . . . . . . 2
- ¶ 2.4 Board staff . . . . . . . . . . 2

**¶ 3 Petitions** . . . . . . . . . . 2
- ¶ 3.1 Procedural relief sought through miscellaneous motion . . . . . . . . . . 2
- ¶ 3.2 Petition affecting the merits in a contested case . . . . . . . . . . 3
- ¶ 3.3 Petitions under 35 U.S.C. 135(c) . . . . . . . . . . 3

**¶ 4 Good cause requirement for untimeliness** . . . . . . . . . . 3
- ¶ 4.1 High standard . . . . . . . . . . 3
- ¶ 4.2 Settlement . . . . . . . . . . 3

**¶ 5 Pro hac vice** . . . . . . . . . . 4

**¶ 6 Publication of opinions** . . . . . . . . . . 4
- ¶ 6.1 Most opinions are publicly available . . . . . . . . . . 4
- ¶ 6.2 Notice of confidential information . . . . . . . . . . 4

¶ 7 Record management . . . . . 5
¶ 7.1 Letters between counsel not to be filed . . . . . 5
¶ 7.2 No duplicate papers . . . . . 5
¶ 7.3 Reference to earlier filed paper . . . . . 5

¶ 8 Mandatory notices . . . . . 6
¶ 8.1 Real party-in-interest . . . . . 6
¶ 8.2 Related proceedings . . . . . 6
¶ 8.3 Notice of judicial review . . . . . 6

¶ 9 Ownership determined from Office assignment record . . . . . 7

¶ 10 Communications with the Board . . . . . 7
¶ 10.1 Default mode - electronic mail . . . . . 7
¶ 10.2 Any United States Postal Service, including EXPRESS MAIL . . . . . 8
¶ 10.3 Hand filing . . . . . 8
¶ 10.4 Overnight delivery services . . . . . 9
¶ 10.5 Telephone calls . . . . . 10
¶ 10.6 Facsimile . . . . . 10

¶ 11 Ex parte communications . . . . . 10
¶ 11.1 Papers . . . . . 10
¶ 11.2 Other forms of communications . . . . . 11
¶ 11.3 Permissible contacts . . . . . 11
¶ 11.4 Refusal to participate . . . . . 11

¶ 12 Citation of authority . . . . . 12
¶ 12.1 Copies of authority cited . . . . . 12
¶ 12.2 Parallel citation . . . . . 12
¶ 12.3 Binding authority . . . . . 12
¶ 12.4 Primary authority . . . . . 13

¶ 20 Fees . . . . . 13

¶ 100 Days and times . . . . . 14
¶ 100.1 Business day . . . . . 14
¶ 100.2 Time standard . . . . . 14

¶ 101 Notice of proceeding . . . . . 14
¶ 101.1 Declaration of interference . . . . . 14
¶ 101.2 Maintaining proper address . . . . . 14

**¶ 102 Completion of examination** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**

**¶ 103 Jurisdiction over related files** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**
¶ 103.1 Access to related files . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**
¶ 103.2 Action in related files . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**

**¶ 104 Modification of the Standing Order** . . . . . . . . . . . . . . . . . . . . . . . . . **15**
¶ 104.1 Modification of Standing Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**
¶ 104.2 Times for motions phases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16**

**¶ 105 Electronic filing** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**
¶ 105.1 Filing in paper . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**
¶ 105.2 Electronic filing procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**
¶ 105.3 Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**
¶ 105.4 Format . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**
¶ 105.5 Signature . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**
¶ 105.6 Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

**¶ 106 Filing and service generally; in paper** . . . . . . . . . . . . . . . . . . . . . . **20**
¶ 106.1 General format of papers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**
¶ 106.2 Combined papers and incorporation not permitted . . . . . . . . . . . . . . . . **22**
¶ 106.3 Transmittal sheets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**
¶ 106.4 Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**
¶ 106.5 Filing in paper . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

**¶ 108 Lead and backup counsel** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

**¶ 109 Request for file copies** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**
¶ 109.1 Filing the request . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**
¶ 109.2 Filling record requests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**
¶ 109.3 Notification on non-receipt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**
¶ 109.4 Record of contested case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**
¶ 109.5 Access to paper files at Board . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

**¶ 110 Copies of claims** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **28**

**¶ 120 Types of notices of basis for requesting relief** . . . . . . . . . . . . . . . **28**

**¶ 121 Motions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**
¶ 121.1 Title and numbering of motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**
¶ 121.2 Page limits in motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**
¶ 121.3 Burden of proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**

¶ 121.4 Format . . . . . . . . . . 31
¶ 121.5 Appendices . . . . . . . . . . 31
¶ 121.6 Claim chart alternative . . . . . . . . . . 33

**¶ 122 Oppositions and replies** . . . . . . . . . . **33**
¶ 122.1 Numbering oppositions and replies . . . . . . . . . . 33
¶ 122.2 Page limits . . . . . . . . . . 33
¶ 122.3 Format . . . . . . . . . . 34
¶ 122.4 Appendices . . . . . . . . . . 35
¶ 122.5 New issues in replies . . . . . . . . . . 36

**¶ 123 Miscellaneous motions** . . . . . . . . . . **37**
¶ 123.1 Mandatory conference . . . . . . . . . . 37
¶ 123.2 Timeliness . . . . . . . . . . 37
¶ 123.3 Recording conference calls . . . . . . . . . . 37

**¶ 124 Oral argument** . . . . . . . . . . **37**
¶ 124.1 Request for oral argument . . . . . . . . . . 37
¶ 124.2 Attendance; special needs . . . . . . . . . . 38
¶ 124.3 Security; access . . . . . . . . . . 38
¶ 124.4 Demonstrative exhibits . . . . . . . . . . 38
¶ 124.5 Transcription of oral argument . . . . . . . . . . 39

**¶ 125 Rehearing of decisions** . . . . . . . . . . **39**
¶ 125.1 Time for filing . . . . . . . . . . 39
¶ 125.2 Format for request for rehearing . . . . . . . . . . 40
¶ 125.3 Number of requests . . . . . . . . . . 40
¶ 125.4 New evidence on rehearing . . . . . . . . . . 40

**¶ 126 Settlement discussions required** . . . . . . . . . . **40**
¶ 126.1 Last-named party initiates . . . . . . . . . . 40
¶ 126.2 Initial conference . . . . . . . . . . 41
¶ 126.3 Subsequent conferences . . . . . . . . . . 41
¶ 126.4 Filing notice of conferences . . . . . . . . . . 42

**¶ 127 Estoppel; rehearing of judgment** . . . . . . . . . . **42**
¶ 127.1 Estoppel . . . . . . . . . . 42
¶ 127.2 Rehearing . . . . . . . . . . 42

**¶ 128 Sanctions** . . . . . . . . . . **43**

**¶ 150 Discovery** . . . . . . . . . . **43**

¶ 150.1 Automatic discovery . . . . . 43
¶ 150.2 Requesting additional discovery . . . . . 44

**¶ 151 Challenging admissibility . . . . . 44**

**¶ 152 Rules of evidence . . . . . 45**
¶ 152.1 Official notice not automatic . . . . . 45
¶ 152.2 Hearsay . . . . . 45

**¶ 153 Certification of Office records . . . . . 46**

**¶ 154 Form of evidence . . . . . 46**
¶ 154.1 Records of the Office . . . . . 46
¶ 154.2 Exhibit labels . . . . . 47
¶ 154.3 Filing of exhibits . . . . . 47
¶ 154.4 Exhibit list . . . . . 48
¶ 154.5 Evidence on DVD digital disc . . . . . 48

**¶ 155 Challenging admissibility . . . . . 50**
¶ 155.1 Objections . . . . . 50
¶ 155.2 Motion to exclude evidence; motion in limine . . . . . 51
¶ 155.3 Time to file objections and motions to exclude . . . . . 51

**¶ 156 Compelled testimony and production . . . . . 51**
¶ 156.1 Form of motion . . . . . 51
¶ 156.2 Alternative procedures for compelled testimony . . . . . 52
¶ 156.3 Admissibility of compelled testimony and production . . . . . 52

**¶ 157 Direct testimony; cross examination . . . . . 52**
¶ 157.1 Direct testimony as affidavit . . . . . 52
¶ 157.2 Required paragraph for affidavits . . . . . 52
¶ 157.3 Cross examination . . . . . 53
¶ 157.4 Order of cross examination . . . . . 54
¶ 157.5 Cross examination guidelines . . . . . 54
¶ 157.6 Transcript . . . . . 55
¶ 157.7 Observations on cross examinations . . . . . 55

**¶ 158 Expert testimony; tests and data . . . . . 56**
¶ 158.1 Expert testimony . . . . . 56
¶ 158.2 Tests and data . . . . . 56

**¶ 200 Interference procedure . . . . . 57**

¶ 200.1 Patent claim scope . . . . . . . . . . 57
¶ 200.2 Pendency . . . . . . . . . . 57

**¶ 203 Suggesting another interference; adding an application or a patent . . . . . . . . . . 57**
¶ 203.1 Suggesting another interference . . . . . . . . . . 57
¶ 203.2 Adding an application or a patent . . . . . . . . . . 57

**¶ 204 Motions list . . . . . . . . . . 58**

**¶ 205 Settlement agreements . . . . . . . . . . 58**
¶ 205.1 Notice under 35 U.S.C. 135(c) . . . . . . . . . . 58
¶ 205.2 Petitions under 35 U.S.C. 135(c) . . . . . . . . . . 59

**¶ 206 Common interests in the invention . . . . . . . . . . 59**

**¶ 207 Applicability of prior art . . . . . . . . . . 59**

**¶ 208 Specific substantive motions . . . . . . . . . . 60**
¶ 208.1 Obviousness . . . . . . . . . . 60
¶ 208.2 Adding or substituting a count . . . . . . . . . . 60
¶ 208.3 Claim correspondence . . . . . . . . . . 61
¶ 208.4 Benefit motions . . . . . . . . . . 62
¶ 208.5 Responsive motions . . . . . . . . . . 63
¶ 208.6 Priority . . . . . . . . . . 65
¶ 208.7 Inequitable conduct . . . . . . . . . . 66

**Appendix of Forms . . . . . . . . . . 68**

Form 1. Standard caption for an interference . . . . . . . . . . 68

Form 2. Typical schedule for motions other than interference priority . . . . . . . . . . 69

Form 3. Typical schedule for priority motions in an interference . . . . . . . . . . 70

Form 4. File copy request . . . . . . . . . . 71

**Cross Examination Guidelines . . . . . . . . . . 72**

**Index of Times . . . . . . . . . . 75**

## ¶ 1 Applicability of 37 CFR part 1

Part 1 of 37 CFR was drafted principally with patent prosecution in mind, while 37 CFR Part 41 is directed to proceedings before the Board. If Part 41 or the Standing Order expressly requires different procedure than Part 1, then Part 41 or the Standing Order, respectively, will govern. A party that perceives a conflict between Part 1 and either Part 41 or the Standing Order must promptly raise the issue with the Board.

## ¶ 2 Board organization

### ¶ 2.1 Trial Division

The Chief Administrative Patent Judge has designated administrative patent judges to constitute the Trial Division, who decide most contested cases, as well as appeals involving patent reexaminations and reissue applications or applications relating to interferences. The Trial Division consists of two sections—

# the Trial Procedures Section and

# the Trial Merits Section.

### ¶ 2.2 Trial Procedures Section

Within the Trial Division, the Chief Administrative Patent Judge has designated administrative patent judges to constitute the Trial Procedures Section. The principal function of the Trial Procedure Section is to ready interference cases for a merits decision on substantive motions, including interference priority motions. Accordingly,

administrative patent judges will handle all interlocutory matters in contested cases, including but not limited to—

# declaration of interferences,

# setting times for taking action, and

# administering discovery.

### ¶ 2.3 Trial Merits Section

Within the Trial Division, the Chief Administrative Patent Judge has designated administrative patent judges to constitute the Trial Merits Section. The principal function of the Trial Merits Section is to prepare opinions on the merits of substantive motions, including interference priority motions.

### ¶ 2.4 Board staff

Board staff other than administrative patent judges may administer some tasks during contested cases. For instance, Trial Division paralegal assistants enter orders authorizing access to files under Bd.R. 109 and authorizing the filing of facsimile transmissions in excess of the five pages permitted under SO ¶ **10.6**. Staff actions are controlling unless countermanded by an administrative patent judge or a Board panel.

## ¶ 3 Petitions

### ¶ 3.1 Procedural relief sought through miscellaneous motion

A request for a procedural remedy must be made in the form of a miscellaneous motion. Bd.R. 121(a)(3); SO ¶ **123**. A petition is not appropriate. No fee is required.

### ¶ 3.2 Petition affecting the merits in a contested case

Any relief affecting the merits of a contested case must be sought in the form of a motion. Bd.R. 121. If the relief would otherwise require the granting of a petition, the petition, including any required fee, must be filed with the motion. Bd.R. 121(c)(2). A party filing a petition in violation of this subparagraph may be subject to sanctions. Bd.R. 128.

### ¶ 3.3 Petitions under 35 U.S.C. 135(c)

Petitions based on 35 U.S.C. 135(c) are not part of a contested case. Bd.R. 3(b) and Bd.R. 205.

## ¶ 4 Good cause requirement for untimeliness

### ¶ 4.1 High standard

The standard for showing good cause under Bd.R. 4(a) is high. Times are set to facilitate the rendering of timely decisions. There are few, if any, circumstances where good cause can be based on the press of other business arising after a time is set by a Board order, particularly where a time period is set or maintained after a conference with counsel.

### ¶ 4.2 Settlement

An attempt to settle will rarely constitute good cause. Settlement is encouraged, and the administrative patent judge designated to handle a contested case is available to assist in settlement efforts where appropriate, but parties should expect either to settle the contested case or, in the absence of settlement, to meet each deadline.

## ¶ 5 Pro hac vice

Contested cases can be technically, legally, and procedurally complex. Consequently, a motion to appear pro hac vice will rarely be granted unless the counsel is an experienced litigating attorney and has an established familiarity with the subject matter at issue in the contested case.

The Board may authorize a person other than a registered practitioner to appear as counsel in a specific proceeding.

## ¶ 6 Publication of opinions

### ¶ 6.1 Most opinions are publicly available

Most opinions in contested cases will be available for publication during the proceeding.  Virtually all become available at the end of the proceeding.  The recent experience in contested cases is that redactions are almost never requested.

### ¶ 6.2 Notice of confidential information

Some opinions are selected for publication to promote public understanding of Trial Division practice or to create uniform practices.  If a party believes that its application contains information not otherwise publicly available that should be redacted from any opinion, the party must **within two (2) months** of the initiation of the contested case file as a separate paper a notice specifically identifying such information.

If additional information not otherwise publicly available is introduced into a contested case that a party believes should be redacted from any opinion, the party must promptly file a notice specifically identifying the information.

If, after filing such notice, specifically identified information becomes publicly available (for example, through publication of a collateral application), the party must promptly notify the Board of this change in the status of the information.

## ¶ 7 Record management

### ¶ 7.1 Letters between counsel not to be filed

No letter between counsel may be filed unless it is filed as an exhibit cited—

# in a motion, opposition, or reply, or

# during cross-examination.

### ¶ 7.2 No duplicate papers

A party may not file (not even as an appendix or exhibit) a copy of a paper previously filed in the same contested case.

### ¶ 7.3 Reference to earlier filed paper

A party referring to an earlier filed paper should identify the paper by title and paper number or, if the paper number is not known, by the filing date.

## ¶ 8 Mandatory notices

### ¶ 8.1 Real party-in-interest

Within **fourteen (14) days** of the date of the Declaration, each party must file as a separate paper a notice of any and all right, title, or interest in any application or patent involved in the contested case.

### ¶ 8.2 Related proceedings

Within **fourteen (14) days** of the initiation of a contested case, each party must file and serve as a separate paper a notice identifying the application or patent number of every United States application or patent claiming, or which may claim, the benefit of priority of the filing date of the party's involved patent or application. If there are no such applications or patents the notice must state this fact. If, during the course of the proceeding, a party files an application claiming, or which may claim, the benefit of the filing date of an involved application or patent, a notice of the filing, including the application number, must be promptly served and filed. The Board may order a party to serve on an opponent a copy of any application or patent identified under this paragraph.

### ¶ 8.3 Notice of judicial review

A party seeking judicial review must notify the Board of the complaint or notice of appeal within 20 days. Bd.R. 8(b). After a contested case ends, administrative tasks remain for the United States Patent and Trademark Office [Office] generally and for the Board particularly. Files need to be distributed, applications need to be allowed or abandoned, and notices of patent claim cancellation need to be published. If the Board

does not receive timely, effective notice of judicial review, it proceeds on the assumption that no review has been sought. The Office may deem an application abandoned or may issue a patent to the opponent.  At best, this leaves the litigant with a problem to correct.  Failure to provide adequate notice may result in sanctions under Bd.R. 128.

## ¶ 9 Ownership determined from Office assignment record

In the absence of an assignment of record, the inventor is the presumptive owner of an involved patent or application.  It is the responsibility of each party to ensure that its assignments are properly recorded at the Office.  Failure to record an assignment can lead to adverse judgment in a contested case.

Cases involving a United States government interest may be referred to the Civil Division of the United States Department of Justice.  28 C.F.R. § 0.45(f).

## ¶ 10 Communications with the Board

### ¶ 10.1 Default mode - electronic mail

Electronic mail is the default mode of filing papers in a contested case.  See SO ¶ **105**.  Papers authorized to be filed electronically must be electronically mailed as an attachment to:  **BoxInterferences@USPTO.GOV**.  No papers unrelated to the contested case may be filed at this address.  Papers relating to the contested case must not be mailed to any other **USPTO.GOV** address.

The subject line may contain only the case number and the assigned administrative patent judge's initials in parentheses, e.g., in Patent Interference 105,000 before Administrative Patent Judge John Doe the subject line would be "105,000 (JD)".

**¶ 10.2 Any United States Postal Service, including EXPRESS MAIL**

If mailed correspondence is authorized in a contested case, it must be addressed:

Mail Stop INTERFERENCE
Board of Patent Appeals and Interferences
United States Patent and Trademark Office
PO Box 1450
Alexandria Virginia 22313-1450

*Caveat*: Any delay resulting from an improper address (including any address provided in SO ¶¶ **10.3** & **10.4**) will be attributed to the party.

**¶ 10.3 Hand filing**

If hand-filed correspondence is authorized in a contested case, the filer must bear in mind that the delivery point lies inside the security zone on the first floor of:

Madison East Building
600 Dulany Street
Alexandria, Virginia

The courier must pass through a magnetometer, and the correspondence must pass through an X-ray sensor.  For authorized hand-filed correspondence other than boxes, the correspondence may be deposited in a drop-off box inside the security zone at the first floor lobby of the Madison East Building.

**¶ 10.3.1 Boxes**

Boxed correspondence cannot be deposited in the drop-off box. Instead, it must be delivered to Madison East, Room 9B55-A. Access to Room 9B55-A is available on business days from 8:30 a.m to 4:45 p.m. (Eastern Time, SO ¶ **100.2**) only.

The courier should approach the security guard station on the first floor of Madison East (near the elevators) and ask the security guard to call the Board at 571-272-9797 to obtain authorization to enter the building for a delivery to Room 9B55-A.

**¶ 10.3.2 Correspondence filed after 4:45 p.m.**

Authorized hand-filed correspondence filed after 4:45 p.m. (Eastern Time, SO ¶ **100.2**) will receive the next business day's filing date. If the Board receives the paper by 10 a.m. that next business day, it will be deemed to have been timely filed provided the paper was properly served the previous business day.

**¶ 10.3.3 Stamped receipt**

If a stamped return receipt is required, the courier must personally deliver the correspondence and postcard receipt to Room 9B55-A between 8:30 a.m to 4:45 p.m. (Eastern Time, SO ¶ **100.2**) only, or leave the postcard with the correspondence in the drop-off box. If the postcard is left in the drop-off box, it must include correct postage and the address where the postcard is to be mailed.

**¶ 10.4 Overnight delivery services**

Papers authorized to be filed using a commercial overnight delivery service (see SO ¶ **10.2** for United States Postal Service) must be addressed:

Board of Patent Appeals and Interferences
Madison Building East, 9th Floor
600 Dulany Street
Alexandria, Virginia 22313

Properly addressed papers filed are deemed filed on the date they are delivered to the overnight delivery service.

**¶ 10.5 Telephone calls**

Telephone calls to the Board regarding a contested case must be directed to 571-272-9797. A telephone call requesting a conference call must be directed to Trial Division support staff. When arranging a conference call, be prepared to discuss with a Trial Division paralegal why the call is needed and what materials should be before the Board participant during the call.

**¶ 10.6 Facsimile**

The facsimile number for contested cases is 571-273-0042. Do not send papers exceeding five (5) pages in length without prior permission from Trial Division support staff. Do not file a confirmation copy. Such copies tend to cause duplicate entries (in violation of Bd.R. 7(b)) among other problems.

## ¶ 11 Ex parte communications

The prohibition on ex parte communications is strictly enforced.

**¶ 11.1 Papers**

A properly served paper should not result in an ex parte communication.

**¶ 11.2 Other forms of communications**

Improper communications typically arise in telephone calls, electronic mail messages, or public meetings. Telephone calls should be conference calls with each opposing party included. Electronic mail messages, when authorized, should include the opposing party in the "To" line or the "Cc" line. Discussion of specific pending contested cases should not occur at public meetings.

**¶ 11.3 Permissible contacts**

The following types of contacts are not ex parte communications—

# contact of a ministerial nature directed to support staff,

# contact of a general nature directed to Board management, or

# contact under a rule requiring reference to a different contested case, provided the contact does not involve the merits of the other contested case.

A call to a Trial Division paralegal to arrange a telephone conference is a typical example of a ministerial contact with support staff. SO ¶ **10.5**. A general comment, made apart from a particular contested case, on a Board rule with examples drawn from actual experiences is an example of the second kind of permissible contact. Identification of a related case pursuant to Bd.R. 8(b) and SO ¶ **8.2** is an example of the third kind of contact.

**¶ 11.4 Refusal to participate**

The Board may permit a hearing or conference call to take place even if a party refuses to participate. In such instances, the Board may require additional safeguards,

such as the recording of the communication and the entry of the recording into the record.

## ¶ 12 Citation of authority

### ¶ 12.1 Copies of authority cited

A party must file and serve a copy of any authority on which it relies. A party must not assume that the opponent or the Board has access to the authority.

An authority reported in (1) United States Reports or West Publishing Company's Supreme Court Reporter, (2) the second or third series of West's Federal Reports, or (3) the Bureau of National Affairs' United States Patents Quarterly is exempt from the requirement to file and serve a copy.

### ¶ 12.2 Parallel citation

Examples of proper parallel citation as required under Bd.R. 12(a)(2)—

# *Aelony v. Arni*, 547 F.2d 566, 192 USPQ 486 (CCPA 1977).

# *In re Deckler*, 977 F.2d 1449, 24 USPQ2d 1448 (Fed. Cir. 1992).

### ¶ 12.3 Binding authority

The following types of decisions are binding precedent—

# Decisions of the United States Supreme Court.

# Decisions of the Federal Circuit, the former Court of Customs and Patent Appeals and the former Court of Claims announced before the close of business on 30 September 1982.

# Decisions of the Director of the United States Patent and Trademark Office (formerly the Commissioner of Patents and Trademarks).

    # Decisions of the Board of Patent Appeals and Interferences that have been determined to be binding precedent in accordance with established Board procedures.

# Trial Division decisions that have been designated as precedential.

Decisions of other federal courts and non-precedential decisions of the Board may be cited, but are not binding precedent.

**¶ 12.4 Primary authority**

Only primary authority should be cited. Secondary authorities summarizing primary authority are never binding and are inherently less persuasive. Primary authority includes: (1) the United States Code, (2) the Code of Federal Regulations, (3) notices published in the Federal Register or the Official Gazette, and (4) binding precedent.

The Manual of Patent Examining Procedure, a guide for patent examiners prepared by the Office of the Commissioner for Patents, is not itself primary authority except as a statement of patent examining practices.

## ¶ 20 Fees

No fees are charged for papers filed in the ordinary course of a contested case. Occasionally, a paper filed in a contested case must also comply with another rule. Bd.R. 121(c)(2). Compliance with the other rule may require payment of a fee. If so, then payment must be made at the time the paper is filed.

## ¶ 100 Days and times

### ¶ 100.1 Business day

The Board is officially open for business on business days. Occasionally the Board may act or may expressly require a party to act on a day that is not a business day.

### ¶ 100.2 Time standard

All times stated in the Standing Order and other Board orders (except as expressly provided) are for Eastern Time, the local time for the Board of Patent Appeals and Interferences–either Eastern Standard Time or Eastern Daylight Savings Time, as appropriate.

## ¶ 101 Notice of proceeding

### ¶ 101.1 Declaration of interference

The notice initiating an interference is called a Declaration. See 35 U.S.C. 135(a) ("an interference may be declared").

### ¶ 101.2 Maintaining proper address

While the Board is authorized to provide notice by means other than mailing to the correspondence address of record, it is ultimately the responsibility of the application or patent owner to maintain a proper correspondence address. *Ray v. Lehman*, 55 F.3d 606, 610, 34 USPQ2d 1786, 1788 (Fed. Cir. 1995).

## ¶ 102 Completion of examination

In most cases the public interest is best served by completion of examination before any contested case is initiated.  Exceptions may occur on a case-by-case basis, but the Board may then require parties to address such issues.  For example, an applicant might be required to cancel and refile claims that do not correspond to an interference count because such claims are not entitled to a patent term adjustment.

## ¶ 103 Jurisdiction over related files

### ¶ 103.1 Access to related files

The Board temporarily may restrict public access to related files, such as paper files for accorded benefit applications, to ensure that the parties can obtain timely copies of such files.  See SO ¶ **109**.

### ¶ 103.2 Action in related files

The Board does not ordinarily take action in a file not involved in the proceeding, but occasionally a decision on a motion will require action in a related file.

## ¶ 104 Modification of the Standing Order

### ¶ 104.1 Modification of Standing Order

An administrative patent judge may modify the terms of the Standing Order.

**¶ 104.2 Times for motions phases**

The Board generally initiates a conference call to set times for the motion periods. For interferences, the date and time for the conference call typically appear in Part D of the Declaration.

**¶ 104.2.1 Motions list**

A list of proposed motions (see Bd.R. 204(c) and SO ¶ **204**) must typically be filed no later than **four business days** prior to the conference call to set dates. This requirement improves the administration of justice by—

- # helping the Board and counsel arrive at an appropriate schedule for taking action,
- # permitting the Board to determine whether the listed motions are both necessary and sufficient to resolve the issues raised, and
- # revealing the possibility that there may be a dispositive motion, see, e.g., Bd.R. 201 (threshold issue).

With prior Board approval a party may be permitted to file an unlisted motion, but the set times are not likely to be changed to accommodate the unlisted motion.

Sample orders setting times for the preliminary motion (Form **2**) and priority motion (Form **3**) phases of an interference are reproduced in the **Appendix of Forms**. The parties should discuss the appropriate order prior to the conference call and try to agree on dates for taking action. Note that in each order, the parties may usually stipulate changes to the first six times, but not to the last three times.

#### ¶ 104.2.2 Additional discovery

If additional discovery will be needed to support a proposed motion, the movant should include a miscellaneous motion for such discovery in the list of proposed motions. Bd.R. 121(a)(3); SO ¶ **123**.

## ¶ 105 Electronic filing

### ¶ 105.1 Filing in paper

Filing in paper is not permitted unless expressly authorized. A party that is unable to comply with the electronic filing requirement must promptly arrange a telephone conference using the procedure for an opposed miscellaneous motion, Bd.R. 123(b)(1)(ii); SO ¶ **123**.

### ¶ 105.2 Electronic filing procedures

#### ¶ 105.2.1 Time to file

A paper must be filed no later than 5:00 p.m. (Eastern Time, SO ¶ **100.2**) on the day the paper is due.

#### ¶ 105.2.2 Separate files

Each paper (not each page) must be a separate ADOBE® portable document format [pdf] file.

#### ¶ 105.2.3 Papers as an attachment no greater than 1 megabyte

A paper that is not larger than 1 megabyte in size must be electronically mailed as an attachment to: **BoxInterferences@USPTO.GOV**.

No information other than the title of the attachment may appear in the message body, for example, "Jones Motion 1".

The file name of the attachment must concisely identify the document, for example, "Jones Motion 1.pdf".

**¶ 105.2.4 Sender**

A paper may only be filed from an address at the domain name of the party's counsel of record (or, if no counsel is appointed, the electronic mail address of record for the party).

**¶ 105.2.5 Paper larger than 1 megabyte; collections of exhibits**

A paper larger than 1 megabyte, or a collection of exhibits, may not be electronically mailed as provided above. Instead, it must be delivered as provided in SO ¶¶ **10.2**-**10.4** on a compact disc or a 3¼ inch diskette that is compatible with MICROSOFT® WINDOWS XP®. If a hearing has been requested, four copies of the disc or diskette must be filed.

**¶ 105.3 Service**

A paper must be served via electronic mail.

**¶ 105.3.1 Simultaneous filing and service**

If, when the paper is electronically filed with the Board, the opposing party is included as an addressee, then no additional certificate of service is required. The electronic mail message will function as the certificate of service.

**¶ 105.3.2 Delayed service**

If the paper is not served via the electronic mail message in which the paper is filed, then the paper must be served in a separate electronic mail message no later than 6:00 p.m. (Eastern Time SO ¶ **100.2**) the day the paper is due. The paper as filed must include a certificate of service stating the time of service in addition to the date and manner of service. Bd.R. 106(f)(3).

**¶ 105.4 Format**

**¶ 105.4.1 Portable document format required**

All papers, excluding exhibits, must be filed in ADOBE® portable document format [pdf]. Papers must be filed in **text-searchable** pdf whenever reasonably possible. Each party is responsible for the accuracy of its pdf files.

**¶ 105.4.2 Paper size**

Each paper created for the contested case should be formatted for printing on 8½ inch × 11 inch paper.

**¶ 105.4.3 Waiver of requirements**

The following paper formatting requirements in the Board rules are waived for electronically filed papers—

- Bd.R. 106(b)(2) - two-hole punch; and
- Bd.R. 106(c) - working copy.

### ¶ 105.5 Signature

#### ¶ 105.5.1 Papers other than exhibits

A paper other than an exhibit must be signed using an S-signature (see 37 C.F.R. § 1.4(d)(2)). Board papers will only be signed using an S-signature.

### ¶ 105.6 Exhibits

An exhibit with a handwritten signature in the exhibit must be scanned to preserve the appearance of the signature even if other portions of the exhibit are converted to a text-searchable format. An affidavit must have an original signature.

## ¶ 106 Filing and service generally; in paper

A paper or exhibit that is not timely filed and properly served will not ordinarily be considered. One consequence may be that the relief sought is not granted for failure to move or for failure to prove. Cf. SO ¶ **121.3**.

### ¶ 106.1 General format of papers

#### ¶ 106.1.1 Caption

The heading shown in Part G of the Declaration must be used in all papers other than non-affidavit exhibits. Affidavits other than deposition transcripts must use the heading, but other exhibits do not need to use the heading. Form **1** in the **Appendix of Forms** shows a sample caption for an interference.

**¶ 106.1.2 Style**

The style of each paper must appear on a single line and must not use the words "et al". Styles for papers other than motions, oppositions, and replies must be simple and descriptive. Examples for papers other than motions, oppositions and replies include—

- JONES DESIGNATION OF LEAD ATTORNEY
- SMITH DESIGNATION OF REAL PARTY IN INTEREST
- JONES REQUEST FOR FILE COPIES
- SMITH PRIORITY STATEMENT
- JONES SERVICE OF REFERENCES
- SMITH CLEAN COPY OF CLAIMS (with drawing numerals)
- SMITH CLEAN COPY OF CLAIMS (means-plus-function annotation)

**¶ 106.1.3 Paper size**

The Board's facilities for maintaining paper records are designed to work best with 8½" x 11" paper. Occasionally an exhibit must be reproduced on a larger paper size to preserve detail. In such instances, a larger paper format is permitted, but the paper should be folded to permit entry as a 8½" x 11" paper.

**¶ 106.1.4 Line Numbering**

For papers other than exhibits, every page (not including the cover sheet, any table of contents, any table of authorities, required appendices, and the certificate of service) must have line numbering to facilitate precise citation between papers. See, e.g., SO **¶ 122.3**.

**¶ 106.1.5 Footnotes**

The use of footnotes is discouraged. Footnotes must be double-spaced.

**¶ 106.2 Combined papers and incorporation not permitted**

An opposition must respond to only a single motion and a reply must respond to only a single opposition. Incorporation by reference and combined papers are prohibited to reduce the chance risk of overlooking an argument and to improve the efficiency of decision making. Incorporation of arguments by reference amounts to a self-help increase in the length of the brief and a pointless imposition on the Board's time. Each motion, opposition, and reply must make all arguments accessible to readers, rather than ask them to play archeologist with the record. *DeSilva v. DiLeonardi*, 181 F.3d 865, 866-67 (7th Cir 1999).

The ban on incorporation by reference does not mean that relief in a paper cannot be made expressly contingent on some result arising out of another paper. Indeed, noting such contingencies is strongly encouraged.

**¶ 106.3 Transmittal sheets**

Do not file a transmittal sheet listing papers being filed *except* an exhibit list may be filed when more than one exhibit is being filed.

**¶ 106.4 Service**

**¶ 106.4.1 Certificate of service**

Each paper (other than an exhibit) must have a separate certificate of service, incorporated as the last page of the paper, to permit the Board to verify that each paper has been served.

**¶ 106.4.2 Alternatives to EXPRESS MAIL**

For service in paper or of electronic media, any mode of service that accomplishes same-day or overnight delivery of the paper (e.g., by hand, facsimile, or a commercial overnight delivery service) may be substituted for EXPRESS MAIL service.

**¶ 106.4.3 Papers served but not filed**

The following papers must be served on an opponent, but should not be filed with the Board at the time of service—

- An objection to the admissibility of evidence,
- A notice requesting cross-examination, and
- Automatic discovery pursuant to Bd.R. 150(b)(1).

Such papers may be filed later as exhibits if a dispute arises with respect to the paper served. For instance, an objection to the admissibility of evidence may be filed as an exhibit for a motion to exclude. Bd.R. 155(c).

**¶ 106.5 Filing in paper**

Electronic filing is the default filing mode. SO ¶¶ **10.1** & **105**. The following provisions apply only in the unusual situation that paper filing is authorized—

- The first page of each paper must be pink. Bd.R. 106(b)(1)(ii).
- The paper must have the two holes required in Bd.R. 106(b)(2).
- A working copy must also be filed and must be marked "APJ COPY" at the top first page. Bd.R. 106(c).

## ¶ 108 Lead and backup counsel

The notice identifying counsel under Bd.R. 108(b) must identify both a lead counsel and a backup lead counsel, and must provide for each the contact information specified in Bd.R. 108(b)(1)-(b)(5).

If lead counsel or backup counsel are not counsel of record (37 CFR §§ 1.32 and 1.34) in the involved application or patent, then a power of attorney must be filed with the Board for entry in the involved patent or application file within the **fourteen (14) day** period of Bd.R. 108(b).

## ¶ 109 Request for file copies

### ¶ 109.1 Filing the request

#### ¶ 109.1.1 Time for filing request

A party seeking copies of an involved or benefit file mentioned in the Declaration must, within **fourteen (14) days** of the date of the Declaration, file with the Board (not another part of the Office) a separate paper styled [Name of party] REQUEST FOR FILE COPIES to which is attached a completed FILE COPY REQUEST. See Form **4** in the **Appendix of Forms**. Failure to request copies of files at the beginning of the contested case will rarely constitute a basis for granting an extension of time (Bd.R. 4(a)). Thus, a party should not expect an extension of time based on non-receipt of a requested file if the party did not timely place an order for copies or timely advise the Board of non-receipt of a file.

**¶ 109.1.2 Deposit Account**

A party may charge the cost of the file request against its deposit account. If so, the party should keep the following points in mind.

**¶ 109.1.2.1 Authorization to charge Deposit Account**

The individual requesting the file must be authorized to charge a fee to the identified deposit account. "Authorized" means authorized by the records of the Office. "Authorized" to charge a deposit account is *not* the same thing as being an attorney of record in the case—

# the authorized individual does not have to be a registered practitioner, and

# a registered practitioner is not automatically authorized to charge a deposit account.

If the individual is not authorized, the Office of Public Records [OPR] will not fill an order even if the Deposit Account has sufficient funds.

**¶ 109.1.2.2 Adequate Deposit Account balance**

If the balance in a Deposit Account is not sufficient to cover the costs of the requested copies, the order will not be filled. 37 C.F.R. § 1.25.

**¶ 109.2 Filling record requests**

There are at least three kinds of records—

# Image File Wrappers [IFW], which are downloaded to a disk and sent to the individual who requested a file copy.

# Paper files, which are copied and sent in paper form to the individual who requested a file copy.

# "Artifacts", which includes such things as colored documents, plant patent drawings, or video tapes.

Paper files are copied in one part of OPR and IFW files are downloaded to disks in another part of OPR. An order is considered "filled" when—

- # An IFW is downloaded, or
- # A paper file is copied.

Consequently, for the same "file", an IFW portion, an artifact portion, and a paper file portion of the same order may be filled at different times. A party receiving a record from the Office should not be surprised if, for instance, the IFW portion arrives before the paper file portion or the artifact portion.

*Patent Cooperation Treaty [PCT] applications*

If a benefit or potential benefit application is a PCT application that was filed in the Office, there may be a paper file, but no IFW at this time. If there is a paper file and it is transmitted to OPR, they will copy the PCT paper file and fill an order. The Office does not have copies (IFW or paper) of PCT applications filed elsewhere in the world.

*Foreign benefit applications*

Foreign benefit applications generally appear as a certified copy in an involved or benefit file. The Office generally does not maintain a separate file for the foreign benefit application. Consequently, before notifying the Board that it has not received a foreign benefit application, a party should first confirm that the application has not been delivered as part of an involved or benefit file.

*Copies of a United States patent mentioned in an IFW file*

The IFW files generally do not include copies of U.S. Patents cited by the examiner or the applicant. A party receiving a copy of an IFW file should not be surprised that

copies of any U.S. patent cited in the IFW record are not included. Copies of any U.S. patent may be obtained through the PTO's website:

**http://www.uspto.gov/patft/index.html**

**¶ 109.3 Notification on non-receipt**

Within **twenty-one (21) days** of the date of the Declaration, the Board forwards all timely requests and necessary files to the Office of Public Records [OPR]. The Trial Division enters an order notifying the parties that their respective orders have been transmitted to OPR. OPR makes the copies, which are shipped via overnight commercial courier within fourteen days of receipt of the order. The shipment may be separated into more than one package. See SO ¶ **109.2**. The transmittal order instructs parties to advise the Board promptly if complete copies are not received consistent with this schedule.

**¶ 109.4 Record of contested case**

The record for the contested case does not include any involved application or patent or any accorded benefit files, all of which are maintained as separate files. Ordering the record for the contested case will not result in receipt of copies of the involved files. There should rarely be any need for a party to order the record for the contested case during the pendency of the contested case before the Board.

**¶ 109.5 Access to paper files at Board**

During the pendency of a contested case, involved files (other than files that are maintained as Image File Wrapper records) may be inspected only at the Board. Moreover, paper files are unavailable while OPR is making copies.

## ¶ 110 Copies of claims

A movant seeking to add a claim must comply with the requirements of Bd.R. 110(c) for the proposed claim.

A movant seeking to have a claim designated as corresponding to a count must provide a clean copy, and where applicable an annotated copy, of the claim as an appendix to the motion unless such copies have already been filed for the claim.

Clean copies of claims and of biotechnology sequences are required because claims and sequences are often spread throughout an application file. In patents, there are often certificates of correction. The filing also provides an early opportunity to identify any divergence between what the party believes its claims to be and what the record actually shows. Annotated copies of the involved claims allow all parties and the Board to understand the precise meaning of limitations in the claims. An example follows:

> An apparatus comprising
> a first valve { **Fig. 2, item 25** },
> means for printing { **page 5, line 8 through page 6, line 1; Fig. 3, items 45 and 46** }, and
> a second valve { **Fig. 3, item 98** } * * *.

## ¶ 120 Types of notices of basis for requesting relief

The principal types of notices under Bd.R. 120 in interferences are priority statements and motions lists. More detail is provided in Bd.R. 204 and SO ¶ **204**. The Trial Procedures Section will be more flexible in accepting changes in the motions list

than in the priority statement; however, the practice under Bd.R. 120 is intended to be more rigorous than it was prior to the adoption of the current rules on 13 September 2004. An accurate motions list is necessary to provide the Board and the opposing parties adequate notice to plan for the proceeding. Facially inadequate motions lists can no longer be cured by filing whatever motion a party may please whether it was listed or not.

## ¶ 121 Motions

Relief on the merits of a case must be sought through a substantive or responsive motion. Miscellaneous motions are for seeking procedural relief. All motions require prior Board authorization except unopposed miscellaneous motions, SO ¶ **123**.

### ¶ 121.1 Title and numbering of motions

Each motion of each party must be numbered consecutively, starting with one, regardless of the type of motion. The title of each motion should state the name of the party, the type of motion, and the motion number. The title of a motion may include a second parenthetical line specifying the nature of the motion. For example—

- JONES MISCELLANEOUS MOTION 1
  (for additional discovery)
- JONES SUBSTANTIVE MOTION 2
  (for judgment based on prior art)
- JONES RESPONSIVE MOTION 3
  (to correct inventorship)
- JONES SUBSTANTIVE MOTION 4
  (for judgment based on lack of enablement)

**¶ 121.2 Page limits in motions**

The following page limits (not including a table of contents, a table of authorities, required appendices, and the certificate of service) apply—

- # priority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30 pages
- # miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10 pages
- # other motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20 pages

**¶ 121.3 Burden of proof**

In addition to complying with any procedural requirements of the rules and the Standing Order, a movant bears a burden to establish its right to any substantive relief requested in the motion. A motion that fails to comply with applicable procedural requirements may be dismissed without reaching the merits, in which case the issue sought to be raised by the motion is deemed not to have been properly presented for decision by the Board. A motion that, while complying with applicable procedural requirements, nevertheless fails to make out a substantive case may be denied on the merits. A motion may be dismissed or denied without considering any opposition, or may be granted without considering a reply. In an interference, the movant should note the presumptions stated in Bd.R. 207.

While the ultimate burden remains with the movant, the burden of production may shift to the opponent after the movant has made out a facially sufficient case. Similarly, the opponent may bare the initial burden with respect to an issue first propounded in the opposition. For example, a movant seeking judgment of anticipation over a reference bears the ultimate burden of establishing anticipation, but the opponent

arguing that the reference is not enabling will have the initial burden of proof on the issue of enablement.

**¶ 121.4 Format**

Each motion must set out in the following order the precise relief requested and an argument setting out the reasons why relief should be granted. Two examples of a precise statement of relief—

# Jones moves to be accorded the benefit for count 1 of the filing date of application X, filed 22 January 1993.

# Jones moves for judgment against Smith on the ground that all of Smith's involved claims are unpatentable under 35 U.S.C. 103 over the combined disclosures of U.S. Patent No. Y and French Patent Z.

**¶ 121.5 Appendices**

**¶ 121.5.1 Appendix 1: List of exhibits**

Each motion must include a list of the exhibits cited in the motion. The list must appear as "Appendix 1" to the motion. The list must be ordered by exhibit number. Each exhibit must be listed on a separate line. The listing of each exhibit number should state the exhibit number followed by a concise description of the exhibit. For example:

1048 - Second declaration of Prof. John Doe.

In deciding a motion, the Board ordinarily will not consider an exhibit not listed as provided in this paragraph.

**¶ 121.5.2 Appendix 2: Statement of material facts**

The statement of material facts for each motion, opposition, or reply must be set forth as "Appendix 2" to the motion, opposition, or reply, respectively. Bd.R. 121(d)(2).

Each fact must be set out as a single, short, numbered declaratory sentence that is capable of being admitted or denied. Citation to the evidence must be specific, for example, by—

- column and line of a patent,
- page, column, and paragraph of a journal article,
- page and line of a deposition transcript,
- page and paragraph of an affidavit (other than a deposition transcript), and
- title and chapter number of a DVD.

A motion may be denied if the facts alleged in Appendix 2 are insufficient to state a claim for which relief may be granted. Facts set out only in the argument portion of a motion may be overlooked and may result in a motion being denied. Citations to an entire document or numerous pages of a cross-examination deposition transcript do not comply with the requirement for a specific citation to the record. The Board will not take on the role of advocate for a party, trying to make out a case the party has not adequately stated.

### ¶ 121.6 Claim chart alternative

As an alternative to a claim chart, a party may reproduce the complete claim in an appendix. Following each limitation in the claim, and within braces { }, insert in bold a specific citation to the information to be compared to the limitation (such as where a prior art reference describes the limitation). Braces { } must be used instead of brackets [ ] because brackets are used to indicate amended portions of claims in reissue applications.

## ¶ 122 Oppositions and replies

### ¶ 122.1 Numbering oppositions and replies

Each opposition must use the same number as the motion it opposes (skipping the number of any motion not opposed), but does not need a descriptive second line. For example (with reference to the examples in SO ¶ **121.1**):

SMITH OPPOSITION 1.

Each reply must use the same number as the opposition to which it replies (again, skipping the number of any opposition for which no reply is filed). For example (with reference to the examples in SO ¶ **121.1**):

JONES REPLY 4.

### ¶ 122.2 Page limits

As with motions, the page limits for oppositions and replies do not include a table of contents, a table of authorities, required appendices, or a certificate of service.

**¶ 122.2.1 Opposition**

The page limits for oppositions are the same as those for corresponding motions—

- # priority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30 pages
- # miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10 pages
- # other motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20 pages

**¶ 122.2.2 Reply**

For replies, the pages limits are—

- # priority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12 pages
- # miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5 pages
- # other motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10 pages

**¶ 122.3 Format**

**¶ 122.3.1 Opposition**

An argument stating the reason why relief is opposed must be made in the following manner:

> On page x, lines y-z of the motion, it is argued (or stated factually) that _. The response is _.

**¶ 122.3.2 Reply**

The argument responsive to statements in the opposition must be made in the following manner:

> On page x, lines y- z of the opposition, it is argued (or stated factually) that _. The response is _.

## ¶ 122.4 Appendices

### ¶ 122.4.1 Appendix 1: List of exhibits

Each opposition and reply must include as "Appendix 1" an exhibit list formatted like the list required for motions, SO ¶ **121.5.1**.

### ¶ 122.4.2 Appendix 2: Statements of material fact

Each opposition and reply must include as "Appendix 2" a statement of material facts formatted like the statement required for motions, SO ¶ **121.5.2**.

As provided in the following paragraphs, the statement of material fact is a compilation of all the facts stated for the motion. That is—

# The statement of facts in an opposition will include the statement of facts from the motion, and

# The statement of facts in a reply will include the statement of facts from the motion and the opposition.

Since papers should ordinarily be submitted in text-readable, electronic format, the burden associated with creating the compilation should be relatively small. The statements appear in appendices and thus do not count toward the page limits. The last statement of material facts submitted should be a complete compilation of all facts (and admissions, denials, etc.) relating to the motion.

#### ¶ 122.4.2.1 Opposition

Appendix 2 for the opposition must include a statement of material facts in which,

# Each material fact alleged in the motion is repeated with concise statement admitting, denying, or stating that the opponent is unable to admit or deny the fact.

# Any additional material fact upon which the opposition relies, with a citation to the evidence. Any additional material fact must be

consecutively numbered beginning with the next number after the last numbered material fact.

**¶ 122.4.2.2 Reply**

Appendix 2 for the reply must include a statement of material facts in which,

- # All the material facts stated in the motion are repeated with the opponent's concise statement admitting, denying, or otherwise addressing the motion fact.
- # Each material fact alleged in the opposition is repeated with concise statement admitting, denying, or stating that the movant is unable to admit or deny the fact.
- # Any additional material fact upon which the movant relies, with a citation to the evidence. Any additional material fact must be consecutively numbered beginning with the next number after the last numbered material fact.

**¶ 122.5 New issues in replies**

A reply that raises a new issue or belatedly presents evidence will not be considered and may be returned. The Board will not attempt to sort proper from improper portions of the reply. Examples of indications that a new issue has been raised in a reply include—

- # new evidence that is necessary to make out a *prima facie* case for the relief requested in the motion,
- # new evidence that could have been included with the motion, and
- # a reply that is longer than the corresponding motion or opposition.

## ¶ 123 Miscellaneous motions

### ¶ 123.1 Mandatory conference

Before filing a miscellaneous motion, a party must confer with all opponents and, if agreement cannot be reached, arrange a conference call to the Board official administering the contested case.

### ¶ 123.2 Timeliness

The movant must explain why the motion is timely.

### ¶ 123.3 Recording conference calls

The parties, at their expense, may retain the services of a court reporter to record any conference call.  A written record is often desirable inasmuch as an oral decision may be made with respect to issues raised during the conference call.

## ¶ 124 Oral argument

### ¶ 124.1 Request for oral argument

The time for requesting an oral argument on substantive and responsive motions is normally specifically set in an order.  Note that the time set in the order controls over the five-day period set in Bd.R. 124(a).  See Bd.R. 104(c).

A precise statement of the issues for which oral argument is requested is helpful in determining whether to authorize a hearing at all and in determining the times to allot to the parties.  A request may be granted or denied in whole or in part.

**¶ 124.2 Attendance; special needs**

A party that does not expect to attend must promptly notify the Board. Such notice must be served on opposing party.

A party should advise the Board as soon as possible before an oral hearing of any special need. Examples of such needs include additional space for a wheel chair or for a stenographer, an easel for posters, or an overhead projector. Parties should not make assumptions about the equipment the Board may have on hand. Such requests should be directed in the first instance to a Trial Division paralegal at 571-272-9797. Ultimately, any special equipment needed for oral argument is the responsibility of the party needing the equipment.

**¶ 124.3 Security; access**

The parties should consult the Board web page for information regarding parking and security processing:

**http://www.uspto.gov/web/offices/dcom/bpai/docs/contacts/visitation_info.htm**

Attendees must report to the security station in the lobby of the Madison Building East and present the order setting the hearing along with photo identification to security personnel.

**¶ 124.4 Demonstrative exhibits**

Four copies (one copy for the record and one working copy for each judge) of each demonstrative exhibit must be filed before, or presented at, oral argument. Demonstrative exhibits must be served at least five business days in advance. Bd.R. 124(d).

Elaborate demonstrative exhibits are more likely to impede than help an oral argument. The most effective demonstrative exhibits tend to be a handout or binder containing the demonstrative exhibits. The pages of each demonstrative exhibit should be numbered to facilitate identification of the exhibits during the hearing, particularly if the hearing is recorded.

### ¶ 124.5 Transcription of oral argument

Transcription of oral argument is strongly encouraged. The party requesting transcription must arrange for the transcription and pay the costs. Parties are encouraged to share the costs.

When an argument is to be transcribed, the party should notify a Trial Division paralegal assistant (571-272-9797) as soon as possible, but at least one business day prior to oral argument, so that arrangements may be made in the hearing room for the reporter.

The transcriber must use a stenography machine, but may also use a tape recording device as a backup. Microphones at individuals' locations are not authorized.

## ¶ 125 Rehearing of decisions

### ¶ 125.1 Time for filing

A request for rehearing must be filed within fourteen (14) days of the decision, Bd.R. 125(c)(1), *unless* a judgment accompanies the decision in which case the request must be filed within thirty (30) days of the judgment, Bd.R. 127(d).

### ¶ 125.2 Format for request for rehearing

A request for rehearing is, in form, a miscellaneous motion, but no prior conference call is required. The argument responsive to the decision must be made with particularity in the following manner:

> On page _, lines _-_, the opinion states _. The opinion is believed to have overlooked [or misapprehended] _. This point was set forth in _ Motion [or Opposition or Reply] _ at page _, lines _-_.

The request must include as an appendix an evidence list setting forth a list (in numerical order by exhibit number) of each exhibit that the party believes was overlooked or misapprehended.

### ¶ 125.3 Number of requests

A party may file no more than one request for rehearing per motion decision.

### ¶ 125.4 New evidence on rehearing

Evidence not already of record at the time of the decision will not be admitted absent a showing of excusable neglect for the belated submission. Bd.R. 4(a).

## ¶ 126 Settlement discussions required

### ¶ 126.1 Last-named party initiates

The party named last in the caption set in the declaration is responsible for—

- initiating any settlement discussions,
- initially drafting any document, and
- initiating any conference call required by this paragraph.

The parties may agree to permit another party to undertake the obligations placed upon the last-named party.

The Office encourages settlement of contested cases and has designed this process to facilitate settlement. The last named party in the contested case is required to initiate the mandatory settlement discussion to avoid the perception that initiation of settlement talks indicates weakness.

**¶ 126.2 Initial conference**

Within **three (3) months** of the date of the Declaration, the parties must conduct a settlement conference and must initiate a conference call with the Board official assigned to the case. During the call, the parties should be prepared to report—

- the outcome of the settlement discussion;
- whether the parties are actively engaged in settlement negotiations and, if so, what steps have already been taken toward settlement;
- whether any settlement negotiations are directed toward obviating the need for filing motions;
- any issues that are not subject to settlement negotiations; and
- the status of any settlement negotiations, including how much time might be needed to conclude those negotiations.

The Board official assigned to the contested case is available to facilitate settlement discussions.

**¶ 126.3 Subsequent conferences**

Unless a different time is set in an order, within **two (2) months** after a panel decision on substantive motions, the parties must conduct another settlement

conference and initiate another conference call with the Board on the conference as provided in the preceding paragraph, SO ¶ **126.2**.

### ¶ 126.4 Filing notice of conferences

Prior to initiating any conference call required by this paragraph, the parties must file (in cases without electronic filing, preferably by facsimile, SO ¶ **10.6**) a joint statement indicating that a good faith effort has been made to settle the contested case.

## ¶ 127 Estoppel; rehearing of judgment

### ¶ 127.1 Estoppel

A substantively or procedurally inadequate motion does not avoid estoppel under Bd.R. 127(a)(1).

### ¶ 127.2 Rehearing

The rehearing practice under SO ¶¶ **125.2**-**125.4** applies to rehearing of judgments as well. The judgment implementing a decision does not provide a second opportunity to request a rehearing of the underlying decision, SO ¶ **125.3**.

*Concurrent decision and judgment*

Often a judgment implementing a decision is entered with or shortly after entry of the decision itself such that the fourteen (14) day period for requesting rehearing of a decision (Bd.R. 125(c)(1)) runs concurrently with the thirty (30) day period for requesting rehearing of the judgment (Bd.R. 127(d)). In this situation, a single request for rehearing should be filed within the thirty (30) day period set in Bd.R. 127(d). See SO ¶ **125.1**.

## ¶ 128 Sanctions

As with other procedural remedies, a party seeks a sanction by filing a miscellaneous motion. SO ¶ **123**.

Examples of conduct likely to lead to sanctions—

# filing a petition affecting the merits of a pending contested case with a part of the agency other than the Board (SO ¶ **3.2**), and

# failing to file adequate notice of judicial review with the Board (SO ¶ **8.3**),

# exceeding the Board-authorized scope for compelled testimony or production (SO ¶ **156.3**),

# failing to comply with the **Cross Examination Guidelines** (SO ¶ **157.5**),

# failure to notify the Board promptly of a common interest (SO ¶ **206**), and

# filing a facially insufficient motion alleging inequitable conduct against an opponent (SO ¶ **208.2**).

## ¶ 150 Discovery

### ¶ 150.1 Automatic discovery

Automatic discovery (1) places the parties on a level playing field and (2) reduces any difficulty authenticating documents when a party would like to rely on a document cited in an opponent's specification. A party should have access to documents cited in its opponent's specification, but it may be difficult for the party to locate those documents. The parties should be prepared to promptly file copies of the materials served under Bd.R. 150(b).

### ¶ 150.2 Requesting additional discovery

Discovery before the Board is significantly different than discovery under the Federal Rules of Civil Procedure.  A request for additional discovery must be in the form of a miscellaneous motion.  Bd.R. 121(a)(3); SO ¶ **123**.  The standard for granting such requests is high and requires specific bases for expecting that the discovery will be productive.  Bd.R. 150(a) & (c)(1).  Additional discovery is rarely authorized because in contested cases, the party usually has equal or better access to relevant information compared to any other source.  Additional discovery is most commonly authorized in the context of cross examination.  Bd.R. 150(c)(2).  Other situations in which additional discovery might be required include proving an on-sale or public-use bar and proving inequitable conduct intent, but these situations require a solid basis for believing the discovery will be productive.

## ¶ 151 Challenging admissibility

As with other procedural remedies, a party may seek to prevent the entry of evidence (motion in limine) or to exclude entered evidence by filing a miscellaneous motion.  See Bd.R. 121(a)(3); SO ¶¶ **123** & **155**.

## ¶ 152 Rules of evidence

### ¶ 152.1 Official notice not automatic

The Board may exercise its discretion to take official notice of the records of the United States Patent and Trademark Office. Bd.R. 152; Fed. R. Evid. 201(c). No party should proceed on the assumption that the Board will take notice of Office records sua sponte. As with other procedural remedies, a party may seek official notice by filing a miscellaneous motion. Bd.R. 121(a)(3); SO ¶ **123**.

### ¶ 152.2 Hearsay

#### ¶ 152.2.1 Specification

A specification of an involved application or patent is admissible as evidence only to prove what the specification or patent describes. If there is data in the specification upon which a party intends to rely to prove the truth of the data, an affidavit by an individual having first-hand knowledge of how the data was generated (i.e., the individual who performed an experiment reported as an example in the specification) must be filed. This individual may be cross examined.

#### ¶ 152.2.2 Laboratory notebooks

Lab notebooks generally do not fall within the business records exception or the catchall exception. *Chen v. Bouchard*, 347 F.3d 1299, 1308 & n.2, 68 USPQ2d 1705, 1711 & n.2 (Fed. Cir. 2003).

## ¶ 153 Certification of Office records

Records of the United States Patent and Trademark Office are deemed to be self-authenticating within the meaning of Fed. R. Evid. 902(4), provided the record is available to each party in the proceeding. Parties generally have an opportunity to obtain copies of the involved and benefit files for the contested case.

## ¶ 154 Form of evidence

### ¶ 154.1 Records of the Office

#### ¶ 154.1.1 Must be submitted as an exhibit

Records of the United States Patent and Trademark Office, including affidavits filed during examination, are not automatically part of the record before the Board. The first party seeking to rely on the record must submit a copy of the record as an exhibit. As with other exhibits, the opponent will have an opportunity to object to the exhibit. In the case of an affidavit filed during examination, the opponent may cross examine the affiant.

#### ¶ 154.1.2 Reliance on a portion of a file

If a motion (or opposition or reply) relies on any document in the file of a patent or application (including a specification), the entire document must be made an exhibit in the contested case. Each document, however, should be a separate exhibit. Do not submit an entire application file as a single exhibit. A document that is not discussed in the motion (or opposition or reply) must not be filed.

**¶ 154.2 Exhibit labels**

**¶ 154.2.1 Unique and consecutive**

Each exhibit from a party must be uniquely and consecutively numbered within the range the Board assigns to the party for the proceeding.

Unless otherwise provided in an order, the party named last in the caption set in the declaration is assigned the range 1001-1999, while the first-named party is assigned 2001-2999.

**¶ 154.2.2 Material covered on first page**

If an exhibit label covers important material on the first page of an exhibit, a copy of the first page of the exhibit must be reproduced and presented as page 1-a of the exhibit.

**¶ 154.3 Filing of exhibits**

**¶ 154.3.1 Electronically**

See SO ¶ **105.2**.

**¶ 154.3.2 In paper**

A set of original exhibits must be filed in a box, an accordion folder, or a comparable folder containing the exhibits in numerical order, separated by a divider that conspicuously identifies each exhibit by number.

If any party requests oral argument, three (3) separate additional sets of exhibits must also be filed; otherwise, one (1) additional set of exhibits must be filed.

**¶ 154.3.3 Repeated submission of the same exhibit**

Multiple copies of the same exhibit with different exhibit numbers from the same party are prohibited. Bd.R. 7(b).

**¶ 154.4 Exhibit list**

A current list must be served whenever evidence is served.

The exhibit list must be filed with the exhibits.

**¶ 154.5 Evidence on DVD digital disc**

Use of a DVD digital disc [DVD] may be appropriate to present some evidence, such as video of a deposition or of an experiment. The Board may also require live testimony before the Board.

**¶ 154.5.1 Transcript of deposition**

A DVD of a deposition may be filed in addition to, but not instead of, a text transcript of the deposition. Ordinarily the proponent of the direct testimony is responsible for filing the transcript regardless of which party is filing the DVD. Bd.R. 157(f).

**¶ 154.5.2 Format**

**¶ 154.5.2.1 MPEG-2 encoded DVD R media**

The Board will not consider a DVD that does not operate on Board equipment. The Board has equipment to operate a DVD properly encoded in MPEG-2 format on DVD R media. The DVD must be indexed (e.g., title and chapter numbers) so that reference to and viewing of a particular portion of the video may be made. Any references to a DVD exhibit must specifically refer to a particular portion in the DVD (e.g., title number and chapter number), analogous to citing a specific particular page and line number in a text

transcript. Four copies of the DVD must be filed. One copy of the DVD must be served on all opponents.

**¶ 154.5.2.2 Deposition DVD**

A deposition DVD must show only the head and upper torso of the witness. Except for breaks, the DVD must contain the entire deposition of the witness. For example, the DVD should show whether the witness took a long time to answer a particular question or had to review documents unless review of documents takes place off the record during a break.

**¶ 154.5.3 Costs**

A party recording an experiment or other event, including a deposition, is responsible for all costs of preparing the DVD. The proponent of the direct testimony remains responsible for the other reasonable costs of the deposition, including any court reporter and required transcripts. Bd.R. 157(f). If a party records a deposition, but subsequently decides not to file the DVD prepared, another party may cause the DVD to be prepared and must assume responsibility for the costs of having the DVD prepared. The parties may agree to divide the costs of preparing a DVD in any proportion.

**¶ 154.5.4 Notice of intent to video-record cross examination**

A party that intends to prepare a DVD of cross-examination must file and serve a notice of intent to prepare a DVD on each opponent before the date of the cross examination. The timing of the notice depends on which party intends to video-record the cross examination—

- # If the proponent of the direct testimony, notice must be served at least five (5) business days before the cross examination; else
- # If the opponent, notice must be served at least three (3) business days before the cross examination.

## ¶ 155 Challenging admissibility

### ¶ 155.1 Objections

#### ¶ 155.1.1 Objecting to served evidence

An objection to the admissibility of evidence must not be filed except as part of a motion to exclude.

#### ¶ 155.1.2 Waiver of untimely objections

If an objection could have been made before the filing of supplemental evidence and an objection was not made, the objection is waived.

#### ¶ 155.1.3 Responding to an objection

No immediate response to an objection is required other than the filing of supplemental evidence in response to the objection if the proponent of the evidence chooses to do so. Any attack on the correctness of an objection must come in response to a motion to exclude based on the objection. Any other response to an objection is neither necessary nor desirable.

#### ¶ 155.1.4 Serving supplemental evidence

Supplemental evidence responding to an objection to the admissibility of evidence must not be filed until it is used as an exhibit.

### ¶ 155.2 Motion to exclude evidence; motion in limine

#### ¶ 155.2.1 Form of motion

As with other motions seeking a procedural remedy, motions to exclude and in limine are miscellaneous motions. Bd.R. 121(a)(3); SO ¶ **123**.

#### ¶ 155.2.2 Content

A motion to exclude evidence must—

# identify where in the record the objection was originally made,

# identify where in the record the evidence to be excluded was relied upon by an opponent, and

# address objections to exhibits (in whole or in part) in exhibit numerical order.

When a timely objection has been made (see SO ¶ **155.1**), no conference call is necessary to file a motion to exclude.

### ¶ 155.3 Time to file objections and motions to exclude

Times for filing objections and for filing and serving motions to exclude are set in the order setting times for motions. Generally, the order will set a later date for filing of objections and motions to exclude than the default time for a miscellaneous motion set in the rule because supplemental evidence may cure any defect in the evidence.

## ¶ 156 Compelled testimony and production

### ¶ 156.1 Form of motion

A miscellaneous motion under Bd.R. 156(a) must comply with the requirements for a miscellaneous motion, Bd.R. 121(a)(3), SO ¶ **123**, and must be filed sufficiently in

advance that any authorized testimony can be served with the motion, opposition or reply it is intended to support.

**¶ 156.2 Alternative procedures for compelled testimony**

If a motion to compel testimony is granted, testimony may be—

- *ex parte*, subject to subsequent cross examination, or
- *inter partes*.

In moving for, or opposing, such testimony, the parties should discuss which procedure is appropriate.

**¶ 156.3 Admissibility of compelled testimony and production**

Compelled testimony and production will only be admitted to the extent the Board has authorized. Significant deviation from the Board-authorized scope may result in sanctions.

## ¶ 157 Direct testimony; cross examination

**¶ 157.1 Direct testimony as affidavit**

Direct testimony, other than compelled testimony, must be in the form of an affidavit. Bd.R.157(a). "Affidavit" is defined to include a declaration or ex parte deposition. Bd.R. 2.

**¶ 157.2 Required paragraph for affidavits**

Affiants have been known to announce belatedly that appearing for cross examination at a reasonable time and place in the United States might not be possible. Consequently, the following paragraph must be included on the signature page of all

affidavits to prevent surprise and hardship to the party relying on the testimony of the witness:

> In signing this [affidavit], I understand that the [affidavit] will be filed as evidence in a contested case before the Board of Patent Appeals and Interferences of the United States Patent and Trademark Office. I acknowledge that I may be subject to cross examination in the case and that cross examination will take place within the United States. If cross examination is required of me, I will appear for cross examination within the United States during the time allotted for cross examination.

**¶ 157.3 Cross examination**

The party relying on an affiant must make the affiant available for cross examination; otherwise, the affidavit may be excluded. The parties must confer to reach agreement on reasonable times, dates, and locations for cross examination of witnesses.

**¶ 157.3.1 Start date**

Unless the parties otherwise agree, cross examination of an affiant may begin no earlier than twenty-one (21) days after service of the affidavit.

**¶ 157.3.2 End date**

Unless the parties otherwise agree,

# Cross examination of an affiant relied upon in a motion other than a miscellaneous motion must occur at least ten (10) days before the opposition to the motion is due.

# Cross examination of an affiant relied upon in an opposition to a motion other than a miscellaneous motion must take place at least ten (10) days before a reply is due.

**¶ 157.3.3 Notice of cross examination**

Since cross examination builds on testimony that has already been served, the notice requirement is simplified.

The party seeking the cross examination (rather than the proponent of the testimony) prepares the notice requesting cross examination. The notice must be served at least two business days before cross examination, but must not be filed (except as an exhibit to a miscellaneous motion, SO ¶ **123**, in the event of a dispute). The notice must identify the time and place of the deposition, but not the other items required under Bd.R. 157(c)(4).

**¶ 157.3.4 Live testimony**

Cross-examination might be ordered to take place in the presence of an administrative patent judge. Examples of where such testimony has been ordered include contested cases where inventorship, derivation, or inequitable conduct has been an issue; where testimony has been given through an interpreter; or where close supervision is warranted.

**¶ 157.4 Order of cross examination**

While a party requesting cross examination may choose the order of the witnesses, Bd.R.157(c)(2), the order must be reasonable.

**¶ 157.5 Cross examination guidelines**

The **Cross Examination Guidelines** appended to the Standing Order apply to all cross examination in this contested case.

**¶ 157.6 Transcript**

**¶ 157.6.1 Proponent responsible**

The proponent of the direct testimony is responsible for securing the services of a court reporter and providing a copy of any transcript to every opponent.

**¶ 157.6.2 Filing transcript**

An uncertified copy of each deposition transcript must be filed as an exhibit. A certified transcript of testimony need not be filed unless required by the Board.

**¶ 157.7 Observations on cross examinations**

Cross examination may occur after a party has filed its last substantive paper on an issue (e.g., after the reply). Such cross examination may result in testimony that should be called to the Board's attention but does not merit a motion to exclude. The Board may authorize the filing of observations to identify such testimony and responses to observations. In practice, few parties file observations.

The party taking the cross examination files the observations. The opposing party may file a response to an observation. The opposing party may not file observations without express prior authorization.

An observation must be a concise statement of the relevance of precisely identified testimony to a precisely identified argument or portion of an exhibit (including another part of the same testimony). Any response should be equally concise. An observation (or response) is not an opportunity to raise new issues, to re-argue issues, or to pursue objections. Each observation should be in the following form:

> In exhibit _, on page _, lines_, the witness testified _. This testimony is relevant to the _ on page _ of _. The testimony is relevant because _.

The entire observation should not exceed one short paragraph. The Board might refuse entry of excessively long or argumentative observations (or responses).

## ¶ 158 Expert testimony; tests and data

### ¶ 158.1 Expert testimony

#### ¶ 158.1.1 Basis for testimony must be provided

Each affidavit expressing an opinion of an expert must disclose the underlying facts or data upon which the opinion is based. Bd.R. 152; Fed. R. Evid. 705. Opinions expressed without disclosing the underlying facts or data may be given little, or no, weight.

#### ¶ 158.1.2 Expert testimony on patent law

Affidavits of patent law experts on issues of law generally will not be admitted in evidence.

### ¶ 158.2 Tests and data

#### ¶ 158.2.1 Explanation

Explanation of tests or data must come in the form of an affidavit, preferably accompanied by citation to relevant pages of standard texts (which should be filed as exhibits). In addition to providing the explanation required in Bd.R. 158(b), the proponent of the test evidence should provide any other information it believes would assist the Board in understanding the significance of the test or the data.

# ¶ 200 Interference procedure

## ¶ 200.1 Patent claim scope

Every claim before the Board, including a patent claim, is given the broadest reasonable scope consistent with the disclosure with which the claim appears.

## ¶ 200.2 Pendency

Requests for a stay or an extension are viewed with strong disfavor. Delay in one part of an interference may result in shortening of another part of an interference. An applicant may be required to disclaim patent term for a period related to the delay.

# ¶ 203 Suggesting another interference; adding an application or a patent

## ¶ 203.1 Suggesting another interference

Occasionally the declaration of another interference between the same parties or a subset of the parties may be appropriate, for instance, because it would be more faster, less expensive, or more fair. A suggestion to declare another interference must be in the form of a miscellaneous motion. Bd.R. 121(a)(3); SO ¶ **123**. The motion must comply with the requirements of Bd.R. 202(a). The motion must certify that each opponent has been served with a copy of the application file for the applications or patents that would be involved in the new interference.

## ¶ 203.2 Adding an application or a patent

A suggestion to add an application or patent to an interference must be in the form of a miscellaneous motion. Bd.R. 121(a)(3); SO ¶ **123**. The motion must—

- # Identify the application or patent to be added;
- # Certify that a complete copy of the application file for the application or patent has been served on all opponents;
- # Indicate which claims of the patent or application should be designated as corresponding to the count (and if there is more than one count, which count); and
- # Explain whether there are alternative remedies; if so, why alternative remedies are not adequate; and what attempts, if any, have been made to have the examiner recommend declaration of another interference involving the application or patent sought to be added to the interference.

## ¶ 204 Motions list

The motions list is a tool for planning the course of the proceeding, eliminating unnecessary costs and delay, and avoiding abusive practices. All substantive and anticipated responsive motions must be listed on the motions list. No substantive motions or responsive motions may be filed without prior Board authorization. If the need for an unlisted motion arises, the movant should initiate a conference call to obtain such authorization.

## ¶ 205 Settlement agreements

### ¶ 205.1 Notice under 35 U.S.C. 135(c)

Notice is hereby given of the requirement of 35 U.S.C. 135(c) for filing in the Office a copy of any agreement "in connection with or in contemplation of the termination of the interference."

**¶ 205.2 Petitions under 35 U.S.C. 135(c)**

The Chief Administrative Patent Judge decides petitions for acceptance of untimely filed agreements and petitions for access to agreements.  A petition under § 135(c) must be formatted as a miscellaneous motion, Bd.R. 121(a)(3), SO ¶ **123**, and served on all parties, Bd.R. 106(e), but no prior Board authorization is required.

## ¶ 206 Common interests in the invention

The Board generally relies on assignment records of the United States Patent and Trademark Office (SO ¶ **9**) and notices of real parties-in-interest to determine whether common interests in involved cases may require judgment under Bd.R. 206.  Failure to notify the Board promptly of a common interest may lead to sanctions, including adverse judgment.  Bd.R. 128.

## ¶ 207 Applicability of prior art

Prior art asserted against an opponent's involved claims is presumed to render the movant's involved claims unpatentable as well.  Even if the movant does not adequately contest the presumption, however, the Board may exercise its discretion not to hold the movant's claims unpatentable if in deciding the motion the Board determines the presumption is not appropriate.

## ¶ 208 Specific substantive motions

The following subparagraphs provide procedural guidance on the necessary content of substantive and responsive motions. Motions must, however, also be substantively sufficient. Thus, even perfect compliance with this guidance does not assure that a movant will satisfy its burden of proof.

### ¶ 208.1 Obviousness

When obviousness (35 U.S.C. 103) is the basis for a motion for judgment, if a reference does not teach or suggest a limitation, that fact must be explicitly identified as a difference in the statement of material facts. The argument portion of the motion must account for the difference.

An explanation must be made in the body of the motion (not an appendix) why the subject matter of the claim, as a whole, would have been obvious to a person having ordinary skill in the art notwithstanding any difference.

*Proving subject matter is not obvious*

Proving that subject matter is not obvious may require a negative proof: that no prior art in combination with the subject matter of the count render the claimed subject matter obvious. A party may be able to satisfy its burden of production with testimony from a knowledgeable witness certifying that there is no known prior art that would have overcome the differences between the subject matter of the count and the subject matter of the claim.

### ¶ 208.2 Adding or substituting a count

A motion to add or substitute a count must—

# Propose a new count.

# Show why the new count is patentably distinct from every other count the movant believes should remain.

# For each of movant's claims, show why the claim does or does not correspond to the proposed new count. Bd.R. 207(b)(1). If none of movant's claims would correspond, then contingently move to add no more than one claim that would correspond (SO ¶ **208.5.1**).

# For each opponent's claim that movant believes should correspond to the count, show why the claim corresponds to the proposed new count. If no claim of an opponent would correspond, then contingently move to add no more than one claim to the opponent's involved application or patent.

*Accorded benefit*

The motion must show why the movant should be accorded any benefit for the proposed count.

The opponent will be presumed to be entitled to its earliest accorded benefit for a proposed count. The movant may overcome this presumption by showing in the motion why the opponent should not be accorded benefit of an earlier application with respect to the proposed count.

**¶ 208.3 Claim correspondence**

A change in claim correspondence requires comparison of the claim to a count. See Bd.R. 121(e).

**¶ 208.3.1 Designating a claim as corresponding**

A motion to have a claim designated as corresponding to a count must show why the subject matter of the count, if treated as prior art, would have anticipated or rendered obvious the subject matter of the claim. Bd.R. 207(b)(2).

If no clean or annotated copy of the claim has been filed, then a clean copy, and where applicable an annotated copy, of the claim must be filed as an appendix to the motion. SO ¶ **110**.

A movant seeking to have its own claim designated as corresponding to a count may stipulate that the claim corresponds to the count. The Board is not bound to accept the stipulation. For instance, a stipulation of correspondence that constitutes the sole basis for maintaining an interference-in-fact might be viewed with some skepticism.

**¶ 208.3.2 Designating a claim as not corresponding**

A motion to have a claim designated as not corresponding to a count must show why the subject matter of the count, if treated as prior art, would not have anticipated or rendered obvious the subject matter of the claim. Bd.R. 207(b)(2).

A movant may not seek to have all of a party's claims designated as not corresponding to the count. Instead, such relief should be sought by way of a motion for judgment of no interference-in-fact.

**¶ 208.4 Benefit motions**

**¶ 208.4.1 For additional accorded benefit**

A motion to be accorded the benefit of an application for a particular count must—

- # Certify that a copy of the application has been served on each opponent. See Bd.R. 154(b) (requiring certified translation of documents not in English).

- # If the application was originally filed in the United States Patent and Trademark Office, certify that a complete copy of the application file has been served on each opponent.

# Show that the application includes at least one constructive reduction to practice of the count. Bd.R. 201 ("Constructive reduction to practice").

**¶ 208.4.2 Attacking accorded benefit**

A motion to attack the benefit of an application accorded for a count must explain why the application does not provide a constructive reduction to practice for the count. Bd.R. 201 ("Constructive reduction to practice").

**¶ 208.5 Responsive motions**

**¶ 208.5.1 Adding a claim**

The claim may only be added to an involved application or patent. Note the requirement under Bd.R. 110(c) to provide clean and annotated copies of the claim. Adding a patent claim generally requires the filing of a reissue application. If the claim is to be added to the movant's application or patent, an amendment (or if necessary a reissue application, see SO ¶ **208.5.4**) must be filed with the motion. A motion to add a claim must—

# Show the written description for the claim in the disclosure of the involved application or patent to which it would be added.

# Certify that the movant is not aware of any reason why the claim is not patentable.

A certification that is inconsistent with the prosecution history of an involved or benefit file will be accorded no weight unless the inconsistency is explained. Similarly, if a claim is added to overcome a patentability problem raised in a motion, the motion to add the claim must explain why the proposed claim would overcome the problem.

A motion to add a claim must also comply with the requirements of 37 C.F.R. § 1.75 to the extent they are consistent with the Standing Order. No more than one claim may

be added in response to a motion unless the Board expressly authorizes the addition of more claims.

A claim will not be added if it does not correspond to a count. Correspondence may be stipulated for the movant's claim, but must be shown for an opponent's claim. A showing of claim correspondence requires comparison of the claim to a count. See Bd.R. 121(e).

*Opposing a motion to add a claim to an opponent's involved application or patent*

If the movant is seeking to add a claim to an opponent's involved application or patent, the opponent may oppose on the basis that the claim is not patentable to the opponent. If the motion is granted, the opponent must add the claim. Failure to add the claim will be treated as a concession that the subject matter of the claim is not patentable to the opponent. Cf. *In re Ogiue*, 517 F.2d 1382, 1390, 186 USPQ 227, 235 (CCPA 1975) (refusal to add claim to permit interference treated as concession).

**¶ 208.5.2 Amending a claim**

To ensure clarity in the record, amendment of claims is not permitted. Instead, a party may cancel the existing claim and add a new claim as provided above. SO ¶ 208.5.1.

**¶ 208.5.3 Substituting an application of the movant**

Occasionally it may be necessary to substitute an application for an involved application or patent. For example, the application may be necessary to support an added claim or to provide a better basis for seeking an earlier accorded benefit. A motion to substitute an application must—

    # Identify the application.

# Certify that a complete copy of the application file has been served on each opponent.

**¶ 208.5.4 Adding a reissue application**

A motion to add the movant's own reissue application must stipulate that every added claim (compared to the original patent) corresponds to a count in the interference. If the reissue application has not been filed in the Office, it must be filed directly with the Board. The Board will see that a filing receipt is promptly issued. Filing directly with the Board avoids processing delays that might prevent consideration of the motion to add the reissue application. The motion must—

# Certify that a complete copy of the reissue application file has been served on each opponent.

# Make the showings required for adding a claim (SO ¶ **208.5.1**).

Ordinarily, the filing of a reissue application in itself will not precipitate a change in the accorded benefit. If the movant believes that addition of the reissue application would entitle it to different accorded benefit, it should file a contingent motion to change the accorded benefit (SO ¶ **208.4**).

**¶ 208.6 Priority**

A party seeking judgment on the basis of priority must file a substantive motion seeking such relief. Bd.R. 121(a)(1)(iii).

When diligence is an issue in priority, the priority motion must include as an appendix a diligence chart. The diligence chart must (1) list all days from the beginning of diligence through the end of diligence, (2) state what happened on each day, and

(3) cite the page and line of the motion on which the listed day is discussed. In a case where the invention is "B", an example would be:

| | | |
|---|---|---|
| Monday, April 5, 2004 | Ordered chemical C | p. 17, lines 4-7 |
| Tuesday, April 6, 2004 | Waited for chemical C | p. 17, lines 4-7 |
| Wednesday, April 7, 2004 | Chemical C arrived | p. 17, lines 4-7 |
| Thursday, April 8, 2004 | Used chemical C to make "A" | p. 17, lines 7-8 |
| Friday, April 9, 2004 | Sick--not at work | p. 17, lines 18-24 |
| Saturday, April 10, 2004 | Weekend | p. 18, lines 2-8 |
| Sunday, April 11, 2004 | Weekend | p. 18, lines 2-8 |
| Monday, April 12, 2004 | Scheduled vacation | p. 18, lines 2-8 |
| Tuesday April 13, 2004 | Scheduled vacation | p. 18, lines 2-8 |
| Wednesday, April 14, 2004 | Used "A" to make "B" | p. 17, lines 9-15 |

Every date gap in the diligence showing must be explained. The fact that there is a gap does not per se establish lack of reasonable diligence. The fact that there is no gap does not per se establish reasonable diligence.

**¶ 208.7 Inequitable conduct**

A motion alleging inequitable conduct must make out a facially sufficient case of inequitable conduct or fraud. Additional discovery (Bd.R. 150(c)) or a request to take testimony (Bd.R. 156), asserted to be necessary to make out a facially sufficient case, will rarely be authorized. An allegation of inequitable conduct or fraud that fails to make out a facially sufficient case may result in sanctions or a referral to the Office of Enrollment and Discipline.

/Michael R. Fleming/
Chief Administrative Patent Judge

/Marc L. Caroff/
Administrative Patent Judge

/William F. Pate, III/
Administrative Patent Judge

Board of Patent Appeals
and Interferences

Trial Division

/John C. Martin/
Administrative Patent Judge

/Fred E. McKelvey/
Senior Administrative Patent Judge

/Richard E. Schafer/
Administrative Patent Judge

/Teddy S. Gron/
Administrative Patent Judge

/Jameson Lee/
Administrative Patent Judge

/Adriene Lepiane Hanlon/
Administrative Patent Judge

/Richard Torczon/
Administrative Patent Judge

/Hubert C. Lorin/
Administrative Patent Judge

/Carol A. Spiegel/
Administrative Patent Judge

/Romulo H. Delmendo/
Administrative Patent Judge

/Sally Gardner Lane/
Administrative Patent Judge

/Sally C. Medley/
Administrative Patent Judge

/Michael P. Tierney/
Administrative Patent Judge

/James T. Moore/
Administrative Patent Judge

/Linda M. Gaudette/
Administrative Patent Judge

/Mark Nagumo/
Administrative Patent Judge

# APPENDIX OF FORMS

**Form 1. Standard caption for an interference**

Filed on behalf of:
[Name of filing party] Paper No. [leave blank]
By: [Name of lead counsel]
[Name of backup counsel]
[Street address]
[City, State, and ZIP Code]
[Telephone number]
[Facsimile number]
[Electronic mail address]

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES

---

[Name of junior party]
([Involved application or patent number])
Junior Party,

v.

[Name of Senior party]
([Involved application or patent number])
Senior Party.

---

Patent Interference [interference number] ([APJ initials])

---

[TITLE OF PAPER]

**Form 2. Typical schedule for motions other than interference priority**

Times shown from date of order.

---

*The parties may typically change these six times by stipulation*

TIME PERIOD 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Week 6
File substantive motions
File (but serve one week later) priority statements

TIME PERIOD 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Week 9
File responsive motions to motions
filed in TIME PERIOD 1

TIME PERIOD 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Week 15
File oppositions to all motions

TIME PERIOD 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Week 21
File replies

TIME PERIOD 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Week 27
File request for oral argument
File motions to exclude
File observations

TIME PERIOD 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Week 30
File oppositions to motions to exclude
File response to observations

---

*The parties cannot change these three times by stipulation*

TIME PERIOD 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Week 32
File replies to oppositions to motions to exclude

TIME PERIOD 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Week 33
File exhibits
File sets of motions

TIME PERIOD 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Week 35
Present oral argument

**Form 3. Typical schedule for priority motions in an interference**

Times shown from date of order.

*The parties may typically change these six times by stipulation*

TIME PERIOD 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Week 6
Junior party only file priority brief and serve
(but do not file) priority evidence

TIME PERIOD 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Week 12
Senior party only file priority brief and serve
(but do not file) priority evidence

TIME PERIOD 13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Week 18
File opposition to priority briefs
Serve (but do not file) opposition evidence

TIME PERIOD 14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Week 24
File reply
Serve (but do not file) reply evidence

TIME PERIOD 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Week 30
Request hearing
File list of issues to be considered
File observations
File motion to exclude

TIME PERIOD 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Week 33
File response to observations
File opposition to motion to exclude

*The parties cannot change these three times by stipulation*

TIME PERIOD 17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Week 35
File reply to opposition to motion to exclude

TIME PERIOD 18 (Last Time) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Week 36
File and serve the exhibits
File sets of priority motions

TIME PERIOD 19 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Week 38
Present oral argument

**Form 4. File copy request**

FILE COPY REQUEST
Contested Case No. [Contested Case number]

Attach a copy of sections E and F of the DECLARATION to this REQUEST. On the copy, circle each patent and application that you are requesting.

Include the following information to facilitate processing of this REQUEST:

1. Charge fees to USPTO Deposit Account No. ______________________________

2. Complete address, including street, city, state, zip code and telephone number (do not list a Post Office box because file copies are sent by commercial overnight courier).

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

3. Telephone, including area code: ________________________________________

# APPENDIX: CROSS EXAMINATION GUIDELINES

**Introduction**

Cross examination can be a useful tool for determining the facts in a case. In contested cases, direct testimony is usually presented by affidavit, Bd.R. 157(a), while cross examination occurs by oral deposition. Bd.R. 157(b).

Cross examination should be a question-and-answer conversation between the examining lawyer and the witness. The defending lawyer must not act as an intermediary, interpreting questions, deciding which questions the witness should answer and helping the witness formulate answers. The witness comes to the cross examination to be questioned. It is the witness, and not the lawyer, who is testifying.

The cross-examination guidelines below are essentially the deposition guidelines set out in *Hall v. Clifton Precision*, 150 F.R.D. 525 (E.D. Pa. 1993) (Gawthrop, J.) The only significant difference, which results from Bd.R. 157(e)(4), is that certain objections must be noted on the record.

Failure to adhere strictly to these guidelines may be a basis for a sanction under Bd.R. 128, which could include a requirement that the witness, on very short notice, may be directed to appear before the Board or elsewhere, as may be appropriate, coupled with any appropriate award of compensatory damages under Bd.R. 128(b)(6). In addition, cross examination undertaken contrary to these guidelines may result in exclusion of an affidavit from evidence or in the assignment of little, if any weight, to the direct testimony of a witness who was cross examined.

**Guideline [1]**

At the beginning of a cross examination, the party conducting the cross examination must instruct the witness on the record to ask deposing counsel, rather than the witness's own counsel, for clarifications, definitions or explanations of any words, questions or documents presented during the cross examination. The witness must follow these instructions.

**Guideline [2]**

A party may not direct or request that a witness not answer a question unless:

(a) a party has objected to the question on the ground that the answer would:

- (1) reveal privileged material or
- (2) violate a limitation the Board has imposed and

(b) counsel immediately places a conference call to the Board official assigned to the contested case asking for a ruling on the objection.

Under these circumstances, (i) the cross examination shall be suspended, (ii) the conference call immediately shall be placed to the Board official assigned to the contested case, and (iii) all counsel must be prepared to explain their respective positions during the call. The court reporter for the cross examination shall be available to record the conference call and to read back questions to which an objection has been made.

If the Board cannot be reached, then the party directing a witness not to answer shall within **two (2) business days** file with the Board (and not to the Office Mail Room or any other part of the Office) a miscellaneous motion seeking relief. Bd.R. 121(a)(3), SO ¶ **123**. Any opposition must be filed within **two (2) business days** of service of the motion. While a reply can be filed, the motion will likely be decided before the reply is filed.

**Guideline [3]**

Counsel must not make objections or statements that even remotely suggest an answer to a witness. Any objection to evidence during cross examination must be stated concisely and in a non-argumentative and non-suggestive manner and must include the legal basis for the objection. Examining counsel must not address the correctness of an objection, but may instead continue with questions to the witness, the objection having been noted on the record as required under Bd.R. 157(e)(4).[1]

**Guideline [4]**

Counsel and their witness-clients shall not engage in private, off-the-record conferences during cross examinations or during breaks or recesses, except for the purpose of deciding whether to assert a privilege.[2]

---

[1] With respect to this guideline, the following observation by Judge Gawthrop, 150 F.R.D. at 530 n.10, is highly relevant:

> I also note that a favorite objection or interjection of lawyers is, "I don't understand the question; therefore the witness doesn't understand the question." This is not a proper objection. If the witness needs clarification, the witness may ask the deposing lawyer for clarification. A lawyer's purported lack of understanding is not a proper reason to interrupt a deposition. In addition, counsel are not permitted to state on the record their interpretations of questions, since those interpretations are irrelevant and often suggestive of a particularly desired answer.

By way of example, the following comments by defending counsel generally are viewed as suggesting an answer to a witness:

(a) Objection, vague.
(b) Objection to the form of the question.
(c) Take your time in answering the question.
(d) Look at the document before you answer.
(e) Counsel, do you want to show the witness the document?

[2] The term "witness-clients" in the context of this guideline includes all witnesses who are employed by, or otherwise under the control of, the real party-in-interest, including retained expert witnesses, as well as the individual or individuals named in the caption of the contested case. With respect to this guideline, the following observation by Judge Gawthrop, 150 F.R.D. at 528, is highly relevant:

> The fact that there is no judge in the room to prevent private conferences does not mean that such conferences should or may occur. The underlying reason for preventing private conferences is still present: they tend, at the very least, to give the appearance of obstructing the truth.

**Guideline [5]**

Any conferences that occur pursuant to, or in violation of, guideline [4] are a proper subject for inquiry by deposing counsel to ascertain whether there has been any witness-coaching and, if so, the nature of that coaching.

**Guideline [6]**

Any conferences that occur pursuant to, or in violation of, guideline [4] shall be noted on the record by the counsel who participated in the conference. The purpose and outcome of the conference shall also be noted on the record.

**Guideline [7]**

Counsel taking cross-examination shall provide to defending counsel a copy of all documents shown to the witness during the cross examination. The copies shall be provided either before the cross examination begins or contemporaneously with the showing of each document to the witness. The witness and defending counsel do not have a right to discuss documents privately before the witness answers questions about the documents.

# APPENDIX: INDEX OF TIMES

**Times running from initiation/declaration**

| Item | Time |
|---|---|
| Notice of lead and backup counsel (Bd.R. 108(b)) | 14 days |
| Clean copy of claims (Bd.R. 110(a)) | 14 days |
| Notice of real party-in-interest (SO ¶ **8.1**) | 14 days |
| Notice of related proceedings (SO ¶ **8.2**) | 14 days |
| Request for file copies (SO ¶ **109.1**) | 14 days |
| Annotated copy of claims (Bd.R. 110(b)) | 28 days |
| Notice of confidential information (SO ¶ **6.2**) | 2 months |
| Initial settlement conference (SO ¶ **126.2**) | 3 months |

**Default times before a triggering event**

| Item | Time |
|---|---|
| Filing of motions list (SO ¶ **104.2.1**) before conference | 4 business days |
| Service of demonstrative exhibit before oral argument (Bd.R. 124(d)) | 5 business days |
| Notice of transcription before oral argument (SO ¶ **124.5**) | 1 business day |
| End of cross examination before opposition or reply (SO ¶ **157.3.2**) | 10 days |
| List of documents and things for cross examination before conference call (Bd.R. 157(c)(3)) | 3 business days |
| Notice of deposition before deposition (Bd.R. 157(c)(4)) | 2 business days |
| Conference call regarding interpreter before deposition (Bd.R. 157(d)) | 5 business days |

**Default times after a triggering event**

Notice of change in real party-in-interest (Bd.R. 8(a)(1)) . . . . . . . . . . . . . . . . . . 20 days

Notice of change in related proceedings (Bd.R. 8(a)(2)) . . . . . . . . . . . . . . . . . . 20 days

Notice of missing or incomplete copies (Bd.R. 109(c)) . . . . . . . . . . . . . . . . . . . . 21 days

Notice of change in counsel (SO ¶ **108**) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14 days

Service of requested automatic discovery materials (Bd.R. 150(b)(1)) . . . . . . . 21 days

Objection to admissibility of evidence (Bd.R. 155(b)(1)) . . . . . . . . . . . . 5 business days

Service of supplemental evidence (Bd.R. 155(b)(2)) . . . . . . . . . . . . . 10 business days

Start of cross examination of affiant after service of affidavit (SO ¶ **157.3.1**) . . . 21 days

Opposition to motion (other than miscellaneous motion) (Bd.R. 123(a)(1)) . . . . 30 days

Reply to opposition (other than miscellaneous motion) (Bd.R. 123(a)(2)) . . . . . 30 days

Responsive motion (Bd.R. 123(a)(3)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30 days

Opposition to miscellaneous motion (Bd.R. 123(b)(2)(i)) . . . . . . . . . . . 5 business days

Reply to opposition to miscellaneous motion (Bd.R. 123(b)(2)(ii)) . . . . 3 business days

Request oral argument (Bd.R. 124(a)) . . . . . . . . . . . . . . . . . . . . . . . . 5 business days

Request for rehearing of decision (Bd.R. 125(c)(1)) . . . . . . . . . . . . . . . . . . . . . . 14 days

Identification of arbitrator after arbitration agreement (Bd.R. 126(a)(3)(iii)) . . . . 30 days

Copy of executed arbitration agreement (Bd.R. 126(b)(4)) . . . . . . . . . . . . . . . . . 20 days

Arbitration award after date of award (Bd.R. 126(d)(4)) . . . . . . . . . . . . . . . . . . . 20 days

Settlement conference after substantive motions decision (SO ¶ **126.3**) . . . . . 2 months

Request for rehearing of judgment (Bd.R. 127(d)) . . . . . . . . . . . . . . . . . . . . . . . 30 days

Notice of judicial review (Bd.R. 8(b)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20 days

# EXHIBIT C

Paper 1

Mail Stop Interference
P.O. Box 1450
Alexandria Va 22313-1450
Tel: 571-272-9797
Fax: 571-273-0042

Filed 24 January 2006

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES

---

CHARLES **GUTHRIE**, EDMUND SANDBERG,
DONALD WILSON, GREGORY PRIOR, and DAVID SMOLER
Junior Party
(Application 09/818,092),

v.

FREDERICK M. **ESPIAU**, CHANDRASHEKHAR J. JOSHI,
and YIAN CHANG
Senior Party
(Patent 6,737,809).

---

Patent Interference No. 105,393 (SCM)
(Technology Center 2800)

---

**DECLARATION - Bd.R. 203(d)**[1]

**Part A. Declaration of interference**

An interference is declared (35 U.S.C. § 135(a)) between the above-identified parties. Details of the application(s), patent (if any), reissue application (if any), count(s) and claims designated as corresponding or as not corresponding to the count(s) appear in Parts E and F of this DECLARATION.

**Part B. Judge managing the interference**

---

[1] "Bd.R. x" may be used as shorthand for "37 C.F.R. § 41.x". 69 Fed. Reg. 49960, 49961 (12 Aug. 2004).

Administrative Patent Judge Sally Medley has been designated to manage the interference. Bd. R. 104(a).

**Part C. Standing order**

A Trial Section STANDING ORDER [SO] (Paper 2) accompanies this DECLARATION. The STANDING ORDER applies to this interference.

**Part D. Initial conference call**

A telephone conference call to discuss the interference is set for **2:00 p.m. on 21 March 2006** (the Board will initiate the call).

No later than **four business days** prior to the conference call, each party shall file and serve (SO ¶¶ 10.1 & 105) a list of the motions (Bd. R. 120; Bd. R. 204; SO ¶¶ 104.2.1, 120 & 204) the party intends to file.

A sample schedule for taking action during the motion phase appears as Form 2 in the STANDING ORDER[2]. Counsel are encouraged to discuss the schedule prior to the conference call and to agree on dates for taking action. A typical motion period lasts approximately eight (8) months. Counsel should be prepared to justify any request for a shorter or longer period.

**Part E. Identification and order of the parties**

Junior Party

Named inventors: CHARLES GUTHRIE, San Jose, California
EDMUND SANDBERG, Mote Sereno, California
DONALD WILSON, San Jose, California
GREGORY PRIOR, San Jose, California
DAVID SMOLER, Morgan Hill, California

---

[2] Default times for time periods 1-10 are attached.

Involved Application: 09/818,092, filed 26 March 2001

Title: High intensity light source

Assignee: Ceravision Limited

Senior Party

Named Inventors: FREDERICK M. ESPIAU, Topanga, California
CHANDRASHEKHAR J. JOSHI, Santa Monica, California
YIAN CHANG, Los Angeles, California

Involved Patent: 6,737,809, granted 18 May 2004, based on application 09/809,718, filed 15 March 2001

Title: Plasma lamp with dielectric waveguide

Assignee: Luxim Corporation

The senior party is assigned exhibit numbers 1001-1999. The junior party is assigned exhibit numbers 2001-2999. Bd. R. 154(c)(1); SO ¶ 154.2.1. The senior party is responsible for initiating settlement discussions. SO ¶ 126.1.

**Part F. Count and claims of the parties**

Count 1

Claim 109 of Guthrie 09/818,092 application

or

Claim 1 of Espiau 6,737,809 patent

or

Claim 129 of Guthrie 09/818,092 application

or

Claim 32 of Espiau 6,737,809 patent

The claims of the parties are:

Guthrie: 109-131

Espiau: 1-35

The claims of the parties which correspond to Count 1 are:

Guthrie: 109-131

Espiau: 1-35

The claims of the parties which do not correspond to Count 1, and therefore are not involved in the interference, are:

Guthrie: none

Espiau: none

The parties are accorded the following benefit for Count 1:

Guthrie: 60/224,059, filed 9 August 2000
60/224,298, filed 10 August 2000
60/224,290, filed 10 August 2000
60/224,291, filed 10 August 2000
60/224,257, filed 10 August 2000
60/224,289, filed 10 August 2000
60/224,866, filed 11 August 2000
60/234,415, filed 21 September 2000

Espiau: 60/222,028, filed 31 July 2000

**Part G. Heading to be used on papers**

The following heading must be used on all papers filed in this interference, see SO ¶ 106.1.1:

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES

---

CHARLES **GUTHRIE**, EDMUND SANDBERG,
DONALD WILSON, GREGORY PRIOR, and DAVID SMOLER
Junior Party
(Application 09/818,092),

v.

FREDERICK M. **ESPIAU**, CHANDRASHEKHAR J. JOSHI,
and YIAN CHANG
Senior Party
(Patent 6,737,809).

---

Patent Interference No. 105,393 (SCM)

---

**Part H. Order form for requesting file copies**

When requesting copies of files, use of SO Form 4 will greatly expedite processing of the request. Please attach a copy of Parts E and F of this DECLARATION with a hand-drawn circle around the patents and applications for which a copy of a file wrapper is requested.

/Sally C. Medley/
Administrative Patent Judge

Enc:
Copy of STANDING ORDER
Copy U.S. Patent 6,737,809
Copy of claims of 09/818,092

Revised 3 January 2006

cc (via overnight delivery):

Attorney for Guthrie:

      LUCE, FORWARD, HAMILTON & SCRIPPS LLP
      11988 El Camino Real
      Suite 200
      San Diego, CA 92130

Attorney for Espiau:

      Edward Gray
      3123 Butler Avenue
      Los Angeles, CA 90066-1301

      Tel: 310-398-4504

# EXHIBIT D

Filed on behalf of: Paper No. ____
Party: ESPIAU
Lead Counsel: Richard Neifeld
Neifeld IP Law, PC
4813-B Eisenhower Avenue
Alexandria VA 22304
Tel: 703-415-0012
Fax: 703-415-0013
Email: rneifeld@neifeld.com

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES
(Administrative Patent Judge Sally C. Medley)

---

CHARLES **GUTHRIE**, EDMUND SANDBERG,
DONALD WILSON, GREGORY PRIOR, and DAVID SMOLER
Junior Party
(Application 09/818,092)

v.

FREDERICK M. **ESPIAU**, CHANDRASHEKHAR J. JOSHI,
and YIAN CHIANG
Senior Party
(Patent 6,737,809).

---

Patent Interference 105,393 (SCM)
(Technology Center 2800)

---

ESPIAU NOTICE OF RELATED PROCEEDINGS

Pursuant to Paragraph 8.2 of the Standing Order, Espiau notes the following applications and patents either claim or may claim the benefit of the filing date of Espiau's involved U.S. Patent No. 6,737,809.

Applications Claiming Benefit of Application 09/809,718

| Serial Number | Filing date | Patent Number |
|---|---|---|
| 09/809,718 | 3/15/2001 | 6,737,809 |
| 10/356,340 | 1/31/2003 | 6,922,021 |
| 10/771,788 | 02/04/2004 | N/A |
| 10/947,800 | 09/23/2004 | N/A |
| 11/010,093 | 12/11/2004 | N/A |
| 11/135,047 | 05/23/2005 | N/A |
| 11/084,177 | 03/18/2005 | N/A |
| 11/084,069 | 03/18/2005 | N/A |
| 11/083,552 | 03/18/2005 | N/A |
| 11/083,557 | 03/18/2005 | N/A |
| 11/083,558 | 03/18/2005 | N/A |
| 11/083,559 | 03/18/2005 | N/A |

Applications which might subsequently claim the benefit of application 09/809,718: None.

2/3/2006 /RichardNeifeld#35,399/

Date Richard Neifeld, Lead Counsel for Espiau

Registration No: 35, 299

**RAN**

**Date/time code: February 3, 2006 (3:36pm)**

**Y:\Clients\Luxim\LUXI0001\Interference\Drafts\EspiauNoticeOfRelatedProceedings.wpd**

# EXHIBIT E

Filed on behalf of:
Party: ESPIAU
Lead Counsel: Richard Neifeld
Neifeld IP Law, PC
4813-B Eisenhower Avenue
Alexandria VA 22304
Tel: 703-415-0012
Fax: 703-415-0013
Email: rneifeld@neifeld.com

Paper No. ____

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES
(Administrative Patent Judge Sally C. Medley)

---

CHARLES **GUTHRIE**, EDMUND SANDBERG,
DONALD WILSON, GREGORY PRIOR, and DAVID SMOLER
Junior Party
(Application 09/818,092)

v.

FREDERICK M. **ESPIAU**, CHANDRASHEKHAR J. JOSHI,
and YIAN CHIANG
Senior Party
(Patent 6,737,809).

---

Patent Interference 105,393 (SCM)
(Technology Center 2800)

---

ESPIAU REVISED LIST OF PROPOSED MOTIONS

ESPIAU LIST OF PROPOSED MOTIONS

1. Motion for judgment that all Guthrie claims are invalid, for failure to name in Guthrie's application inventors Espiau and Joshi, see for example: (1) EX 2019 (disclosure) and 2051 (provisional); (2) 2021 (disclosure) and 2027 (provisional); and (3) 2023 (disclosure) and 2029 (provisional).

2. Motion for judgment of unpatentability due to Guthrie's conduct of knowingly failing to name, as inventors in its involved application, Smoler, Espiau, and/or Joshi (see for example: (1) EX 2019 (disclosure) and 2051 (provisional); (2) 2021 (disclosure) and 2027 (provisional); (3) 2023 (disclosure) and 2029 (provisional); (4) 2014 (disclosure) and 2049 (provisional); and (5) 2015 (disclosure) and 2054 (provisional)) including Guthrie's initially filing a defective inventors' declaration in the involved Guthrie application (no jurat statement complying with 37 CFR 1.63 declaring the inventors' belief that they are the original and first inventors of what is claimed, and that knowing false statements are punishable by fine and imprisonment 18 USC 1001).

3. Motion to correct inventorship by adding Espiau and Joshi to the inventorship of the Guthrie application. See for example: (1) EX 2019 (disclosure) and 2051 (provisional); (2) 2021 (disclosure) and 2027 (provisional); and (3) 2023 (disclosure) and 2029 (provisional).

4. Motion to deny Guthrie benefit of all provisional applications to which Guthrie was accorded benefit in the declaration of the interference (60/224,059, 8/9/2000; 60/224,298,8/10/2000; 60,224,290 8/10/2000; 60/224,291 8/10/2000; 60/224,257 8/10/2000; 60/224,289 8/10/2000; 60/224,866 8/11/2000; 60/234,414, 9/21/2000) due to their failure to disclose a waveguide body comprising a ceramic dielectric material of a preselected shape and

preselected dimensions designed to resonate at a predetermined frequency, and providing in the corresponding resonant mode at that frequency an electric field maxima at the location of the bulb.

5. Contingent upon denial of motion 4 with respect to provisional application 60/224,289, motion to accord Espiau benefit for provisional application 60/224,289 (since 60/224,289 names party Espiau's inventors, Espiau and Joshi, as inventors) and entry of a certificate of correction to amend Espiau's specification to contain the specific reference required by 35 USC 120. See miscellaneous motion 10, in case the APJ determines that a miscellaneous motion is required to amend the specification via certificate of correction.

6. Motion (1) to de-designate Espiau claims 16, 22, 26, 28, 29, 30, 31, 35 (since these claims are not copied by Guthrie and for which Guthrie has no support or suggestive disclosure) and (2) to de-designate Espiau claims 2, 3, 20, 21, 25, 27 and Guthrie claims 110 and 125-128 as not corresponding to count 1 (since these claims define separately patentable inventions and proposed counts; see motion 7).

7. Motion (1) to add counts 2-6 identically worded to dependent Espiau claims 2, 20, 21, 25, and 27, and substantively identical to dependent Guthrie claims 110, 125-128 and (2) to designate Espiau/Guthrie claims 2, 3/110 to count 2; claims 20/125 to count 3; claims 21/126 to count 4; claims 25/127 to count 5; and claims 27/128 to count 6. Given the anticipated length of the motion, Espiau requests a 25 page extension of the motion page limit.

8. Contingent upon grant of motion 7, motion for benefit of Espiau's existing accorded benefit application, provisional application 60/222,028, for counts 2-6.

9. Motion for judgment based upon priority.

10. Miscellaneous motion for entry of a certificate of correction to amend Espiau's specification to contain the specific reference required by 35 USC 120 for newly discovered applications naming Espiau and Joshi: 60/224,061 and 60/224,503, and for application 60/224,289 (also filed originally by DRI without party Espiau's knowledge). Motion 5 requests some of the same relief.

11. Miscellaneous motion for additional discovery relating to inventorship and inequitable conduct issues. The basis for the requested discovery is that the listed witnesses are in the best position to have discoverable knowledge and documents on the issue of whether the inventorship in the involved Guthrie application was incorrect when filed, and/or was incorrect at any time thereafter, and/or is now incorrect, and whether Guthrie's failing to name Smoler, Espiau, and/or Joshi at the time Guthrie filed their involved application, or when Guthrie copied party Espiau's claims, was intentional.

REQUESTED DISCOVERY

Depositions of:

Eric Hoover - Attorney responsible for DRI provisional and involved patent filings, who filed the involved Guthrie application having an inventor declaration lacking the required jurat.

Timothy Lohse - Supervisory partner attorney to Eric Hoover at the Gray Cary firm, who signed off on filing the involved Guthrie application having an inventor declaration lacking the required jurat.

Arthur Berman - Patent Coordinator for DRI.

Michael Stallman - Supervisory partner attorney to Eric Hoover at the Limbach firm.

Lana I. Brenner - Staff person at Limbach firm.

Don Wilson - Named inventor on involved Guthrie application.

Charles Guthrie - Named inventor on involved Guthrie application.

Edmund Sandberg - Named inventor on involved Guthrie application.

Greg Prior - Named inventor on involved Guthrie application.

Derek J. Westberg, Reg. No. 40,872 - Former attorney of record for Guthrie's involved application that signed a substantive amendment in response to an office action.

Nicola Pisano - Attorney of record for Guthrie that copied Espiau's claims 11/29/2004.

Document requests:

All documents party Guthrie possesses relating to the preparation and filing and prosecution of the DRI provisionals already listed as exhibits by the party Guthrie and the party Guthrie's involved non provisional application including all drafts of those applications, claims & figures, and correspondence.

Copies of the DRI provisional applications identified in the category "Light source" in schedule K to the Reply Declaration of Joseph Kafka in Support of Motion For Change of Venue listing DRI patent applications in the DRI bankruptcy proceeding (In re Digital Reflections, Inc., Case No. 02-54152, C.D. Cal., Bk. No. ND 01 11132 RR) that have not yet been listed as exhibits by the party Guthrie: 60/224,866; 60/234,415; 60/285,650; 60/262,537; 60/241,198; 60/224,704; 60/254,727; 60/246,662; 60/253,261; 60/262,536; 60/262,536; 60/262,538; 60/265,945; and 60/270,857.

All documents that the third parties identified in the list of deponents above possess relating to the preparation and filing and prosecution of the DRI provisionals and DRI involved non provisional application including all drafts of those applications, claims & figures, and

correspondence.

All correspondence party Guthrie possesses relating to inventorship of the DRI provisionals and DRI involved non provisional application.

All correspondence that the third parties identified above possess relating to inventorship of the DRI provisionals and DRI involved non provisional application.

A complete copy of the DGTL file archive maintained by the Limbach firm's wind down partner.

12. Miscellaneous motion for appearance on behalf of party Espiau pro hac vice of the following attorneys from the law firm of Wilson, Sonsini, Goodrich, and Rosatti, PC, including:

Ron Shulman; and

Terry Kearney.

These two attorneys in particular are both experienced patent litigators and familiar with the voluminous record and evidence relevant to this case, and they are located on the west coast (California) where substantially all of the relevant witnesses and evidence reside.

13. Miscellaneous motion for a 25 page extension for motion 7, if necessary.

14. Motion for judgement based upon derivation.

15. *Unopposed* miscellaneous motion, if necessary, for consideration at the telephone hearing on proposed motions, of this belated list of motions.

16. Espiau motion for judgement based upon unpatentability of all of Guthrie's claims under 35 USC 112, first paragraph, because Guthrie's disclosure fails to provide an enabling written description of locating gas at a location of an E-field maxima of a resonating mode.

3/20/2006 /RichardNeifeld #35,399/

Date Richard Neifeld, Lead Counsel for Espiau

Registration No: 35, 299

**Date/time code: March 20, 2006 (3:50pm)**

**\\SRV04\Shared_Data\Clients\Luxim\LUXI0001\Guthrie_v_EspiauInterference105393\Drafts\EspiauRevisedListOfProposedMotions_060317.wpd**

# EXHIBIT F

Filed on behalf of:
Charles GUTHRIE, Edmund Sandberg, Donald Wilson, Gregory Prior, and David Smoler
By: Nicola A. Pisano, Esq.
Luce, Forward, Hamilton & Scripps LLP
11988 El Camino Real, Suite 200
San Diego, California 92130
Tel: 858-720-6320
Fax: 858-523-4326
Email: npisano@luce.com

Paper No. _________

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES

---

CHARLES **GUTHRIE**, EDMUND SANDBERG,
DONALD WILSON, GREGORY PRIOR, and DAVID SMOLER
Junior Party
(Application 09/818,092),

v.

FREDERICK M. **ESPIAU**, CHANDRASHEKHAR J. JOSHI,
and YIAN CHANG
Senior Party
(Patent 6,737,809).

---

Patent Interference No. 105,393 (SCM)
(Technology Center 2800)

---

GUTHRIE AMENDED MOTIONS LIST BEFORE CONFERENCE

Charles Guthrie, Edmund Sandberg, Donald Wilson, Gregory Prior, and David Smoler ("GUTHRIE") hereby file this amended motions list before the conference scheduled for March 21, 2006. Counsel for the parties have conferred and agreed that the parties each may submit an amended motions list.

The following is a list of preliminary motions that GUTHRIE anticipates will be filed on GUTHRIE's behalf during the Interference:

**1. Miscellaneous Motion To Add Other ESPIAU Patent and Applications**

(To request under SO 203.2 that one or more claims of ESPIAU U.S. Patent. No. 6,922,021 and ESPIAU U.S. patent application Serial Nos. 10/771,788, 10/947,800, 11/010,093, 11/084,177 and 11/135,047 be added to as corresponding to the Count)

**2. Substantive Motion to be Accorded Additional Benefit**

(Based on Filing Date of Provisional Application 60/192,731)

**3. Substantive Motion for Judgment of Unpatentability of ESPIAU's Involved Patent(s)**

(Under 102(f) for omission of Donald Wilson and Charles Guthrie as co-inventors; improper assignment)

**4. Miscellaneous Motion for Additional Discovery Relating to Motion 3**

(For discovery, e.g., production of Espiau documents created between March 1, 2000 and July 31, 2000, admissions, and depositions of David Turner, Frederick Espiau, Chadrashekar Joshi and Yian Chang in support of joint inventorship claim of Donald Wilson and Charles Guthrie in ESPIAU invention)

**5. Substantive Motion for Judgment of Unpatentability of ESPIAU's Involved Patent(s)**

(For anticipation or obviousness over the prior art DRI plasma lamp (depicted on page A30 of Exhibit 2037) under 102(a))

**6. Miscellaneous Motion for Additional Discovery Relating to Motion 5**

(For discovery, e.g., production of Espiau documents created between March 1, 2000 and July 31, 2000, admissions, and depositions of David Turner, Frederick Espiau, Chadrashekar Joshi and Yian Chang, relating to communications between DRI and Tenco/Luxim concerning features/operation of DRI's waveguide plasma lamp)

**7. Substantive Motion for Priority**

(Based on prior invention by GUTHRIE under 102(g))

**8. Substantive Motion for Priority**

(Based upon derivation by ESPIAU from GUTHRIE under 102(f))

**9. Miscellaneous Motion for Additional Discovery Relating to Motion 8**

(For discovery, e.g., production Espiau documents created between March 1, 2000 and July 31, 2000, admissions, and depositions of David Turner, Frederick Espiau, Chadrashekar Joshi and Yian Chang between DRI and Tenco/Luxim between March 1 and July 31, 2000, concerning DRI's integrated waveguide plasma lamp)

**10. Miscellaneous Motion for Official Notice**

(Of the contents of the involved application and patent)

**11. Responsive Motion(s)**

(In pre-filing communications, ESPIAU has not referred to motions as to which responsive motions are anticipated; responsive motions will be identified at the March 21 conference once the parties have exchanged their respective motions lists)

**12. Miscellaneous Motion for Additional Discovery and to Exclude Evidence**

(For access to evidence obtained in violation of 37 CFR 10.87)

**13. Contingent Miscellaneous Motion to Disqualify Counsel**

(To exclude ESPIAU counsel, including the Neifeld firm, if provided access to evidence obtained in violation of 37 CFR 10.87)

**14. Contingent Substantive Motion to Add Guthrie Inventor(s) to Espiau Patent**

(Contingent upon finding of nonjoinder without deceptive intent).

**15. Substantive Motion to be Accorded Additional Benefit and Authorize Petition to Correct Priority Under 119(e)**

(To accord involved Guthrie application the benefit of U.S. provisional applications 60/224,061, 60/224,503, 60/224,961 and 60/224,617)

**16. Substantive Motion for Unpatentability of Espiau Patent**

(Under 35 USC 132 for introduction of new matter)

**17. Contingent Responsive Motion to Address §112, ¶1 Issue(s) Raised by ESPIAU**

(ESPIAU has not yet specifically identified the basis of its proposed motion)

The foregoing list of motions is respectively submitted for the Board's approval.

DATED: March 20, 2006

Respectfully submitted,

LUCE, FORWARD, HAMILTON & SCRIPPS LLP

By: /Nicola A. Pisano#34,408/
Nicola A. Pisano
Attorneys for GUTHRIE

2161349.3

# EXHIBIT G

Paper 27

Mail Stop Interference
P.O. Box 1450
Alexandria Va 22313-1450
Tel: 571-272-9797
Fax: 571-273-0042

Filed 23 March 2006

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES

---

CHARLES **GUTHRIE**, EDMUND SANDBERG,
DONALD WILSON, GREGORY PRIOR, and DAVID SMOLER
Junior Party
(Application 09/818,092),

v.

FREDERICK M. **ESPIAU**, CHANDRASHEKHAR J. JOSHI,
and YIAN CHANG
Senior Party
(Patent 6,737,809).

---

Patent Interference No. 105,393 (SCM)
(Technology Center 2800)

---

**Order - Motion Times - Bd.R. 104(c)**

**A. Conference call**

A telephone conference call was held on 21 March 2006 at approximately 2:00 p.m., involving:

1. Mr. Pisano, counsel for Guthrie,
2 Mr. Neifeld, counsel for Espiau, and
3. Sally Medley, Administrative Patent Judge[1].

**B. Relevant discussion during conference call**

The principal purpose of the conference call was to set times for taking action on motions (other than miscellaneous motions) in the interference.

---

[1] The conference call was recorded by a court reporter.

**The following motions are authorized:**

Guthrie motion to add to the interference Espiau patent 6,922,021 ('021) and to designate certain claims from the '021 patent as corresponding to the count.

Guthrie motion to be accorded benefit for the purpose of priority of 60/192,731.

Guthrie motion that at least Espiau claim 1 is unpatentable based on the written description requirement of 35 USC § 112 ¶ 1.

Espiau motion to deny Guthrie benefit of those Guthrie provisional applications for which Guthrie has been accorded benefit.

Espiau motion to add a new count 2 and to designate Espiau claims 2, 3 and Guthrie claim 110 to the proposed count 2 and for benefit of Espiau's application 60/222,028 with respect to the new count[2].

Espiau motion to add a new count 3 and to designate Espiau claim 20 and Guthrie claim 125 as corresponding to count 3 and for benefit of Espiau's application 60/222,028 with respect to the new count.

Espiau motion to add a new count 4 and to designate Espiau claim 21 and Guthrie claim 126 as corresponding to count 4 and for benefit of Espiau's application 60/222,028 with respect to the new count.

Espiau motion to add a new count 5 and to designate Espiau claim 25 and Guthrie claim 127 as corresponding to count 5 and for benefit of Espiau's application 60/222,028 with respect to the new count.

Espiau motion to add a new count 6 and to designate Espiau claim 27 and Guthrie claim 128 as corresponding to count 6 and for benefit of Espiau's application 60/222,028 with respect to the new count.

Espiau motion that all of Guthrie's involved claims are unpatentable based on the enablement requirement of 35 USC § 112 ¶ 1.

---

2 Upon further consideration, Espiau should move for benefit of its new counts in the corresponding motion seeking addition of the new count.

**No other motions, other than those listed above are authorized, including responsive motions not discussed.**

**Motions on priority issues, including all 102(f) issues and Guthrie's motion for judgment under 102(a) are not authorized at this time. Espiau's motion to undesignate Espiau claims 16, 22, 26, 28-31 and 35 is also not authorized at this time. After a decision on motions, but prior to the commencement of the priority phase, the board will initiate a conference call with the parties to further discuss the priority issues and the undesignation of certain Espiau claims.**

Espiau seeks authorization to file a miscellaneous motion for appearance pro hac vice of Ron Shulman and Terry Kearney of Wilson, Sonsini, Goodrich, and Rosatti, PC (Wilson-Sonsini). Mr. Pisano, counsel for Guthrie indicated that Guthrie would oppose.

Upon consideration of the matter, Espiau is not authorized to file a miscellaneous motion for the Wilson-Sonsini attorneys to appear pro hac vice. Nor is Guthrie authorized to file a miscellaneous motion for additional discovery to ascertain what Wilson-Sonsini may have obtained in alleged violation of 37 CFR 10.87 or whether any information was passed onto the Neifeld firm.

Upon further consideration, Guthrie is not authorized to file a miscellaneous motion seeking official notice of the contents of the involved application and patent (Paper 26 at 3, item 10). Mr. Pisano failed to articulate a reason for filing such motion. If a specific issue arises where a party believes that a ruling by the board to take official notice is warranted, then the party requesting leave to file such miscellaneous motion shall schedule a conference call to discuss the issue.

**C. Time periods associated with motions**

In accordance with discussion during the telephone conference call, the TIME PERIODS described below are set out in an Appendix to this ORDER. Action specified for each TIME PERIOD must be completed by the date specified for the TIME PERIOD.

The parties are authorized to stipulate different times (earlier or later, but not later than TIME PERIOD 7) for TIME PERIODS 1 through 6.[3] A notice of the stipulation must be promptly filed. The notice must be in the form of a photocopy of the Appendix attached to this ORDER with old dates crossed out and new dates inserted by hand. <u>The parties may not stipulate an extension of TIME PERIODS 7-9</u>.

**1. TIME PERIOD 1**

a. File and serve all authorized motions and

b. Serve <u>but do not file</u> evidence in support of these motions.

If no party files a motion, the SENIOR PARTY must arrange a conference call with the parties and the Board so that appropriate adjustments to the schedule may be made.

**2. TIME PERIOD 2**

a. File and serve responsive motions (Bd.R. 121(a)(2)) in response to an opponent's motion filed during TIME PERIOD 1 and

b. Serve <u>but do not file</u> evidence in support of these responsive motions.

**3. TIME PERIOD 3**

a. File and serve oppositions to all motions, including responsive motions and

b. Serve <u>but do not file</u> evidence in support of these oppositions.

**4. TIME PERIOD 4**

a. File and serve replies to all oppositions and

b. Serve <u>but do not file</u> evidence in support of these replies.

**5. TIME PERIOD 5**

a. File and serve any request for oral argument on motions,

[3] In stipulating different times, the parties should consider the effect of the stipulation on times (1) to object to evidence (5 business days, Bd.R. 155(b)(1)), (2) to supplement evidence (10 business days, Bd.R. 155(b)(2)), (3) to begin cross examination (no earlier than 21 days after service, SO ¶ 157.3.1) and (4) to conclude cross examination (at least 10 days before opposition or reply is due, SO ¶ 157.3.2).

b. File and serve motions to exclude evidence (Bd.R. 155(c); SO ¶ 155.2), and

c. File and serve observations on cross examination (SO ¶ 157.7) of reply testimony.

**6. TIME PERIOD 6**

a. File and serve oppositions to an opponent's motion to exclude evidence and

b. File and serve any response to observations.

**7. TIME PERIOD 7**

File and serve replies to oppositions to motions to exclude evidence.

**D. Deposition transcripts**

Transcripts of cross examinations and depositions taken under 35 U.S.C. 24 must be served, but not filed until the exhibits are filed.

**E. Serving exhibits relied upon in motions**

An exhibit, including an affidavit, cited in connection with a motion, opposition, reply, or affidavit, must be served, but not filed,[4] with the motion, opposition, reply or affidavit in which the exhibit is first mentioned.

**F. TIME PERIOD 8: Filing the record for decision on motions**

1. File an original set of your exhibits and one working copy of your exhibits;

2. For each of your motions, file one folder (or three folders if an oral argument is set each) containing:

a. The motion,

b. Any corresponding opposition,

c. Any corresponding reply,

d. Any corresponding observations, and

---

[4] Except when the Board sets an expedited schedule for a particular motion, in which case, all exhibits mentioned in that motion or the corresponding opposition or reply must be filed with the motion, opposition, reply, or affidavit in which the exhibit is first mentioned.

e. Any corresponding response to the observations.

3. File CD-ROM a party elects to file.

**G. TIME PERIOD 9: Default oral argument date**

If a request for oral argument (Bd.R. 124(a); TIME PERIOD 5) is granted, the default date for such argument is TIME PERIOD 9. No oral argument will occur if either no argument is requested or granted.

**H. Priority statements**

1. At TIME PERIOD 1:

a. File but do not serve a priority statement (Bd.R. 120; Bd.R. 204(a)).

b. File and serve a notice advising each opponent of the filing of the priority statement.

2. A junior party who does not file a priority statement shall not have access to the priority statement of any other party.

3. **Within one (1) week** after TIME PERIOD 1, serve a copy of the priority statement upon each opponent (except for a junior party barred under ¶ H.2 above).

/ss/ Sally C. Medley
Administrative Patent Judge

cc (via e-mail):

rneifeld@neifeld.com
npisano@luce.com

**Appendix--ORDER - RULE 123(a)**
**(Times for substantive motions; priority deferred)**

Interference 105,393 (SCM)

TIME PERIOD 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2 May 2006**
File motions
File (but serve one week later) priority statements

TIME PERIOD 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23 May 2006**
File responsive motions to motions
filed in TIME PERIOD 1

TIME PERIOD 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5 July 2006**
File oppositions to all motions

TIME PERIOD 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15 August 2006**
File all replies

TIME PERIOD 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26 September 2006**
File request for oral argument
File motions to exclude
File observations

TIME PERIOD 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17 October 2006**
File oppositions to motions to exclude
File response to observations

TIME PERIOD 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **31 October 2006**
File replies to oppositions to motions to exclude

TIME PERIOD 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7 November 2006**
File exhibits
File sets of motions
File any CD-ROMs

TIME PERIOD 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5 December 2006**
Default oral argument date (if ordered)

# EXHIBIT H

Filed on behalf of: Paper No. ____

Party: ESPIAU
Lead Counsel: Richard Neifeld
Neifeld IP Law, PC
4813-B Eisenhower Avenue
Alexandria VA 22304
Tel: 703-415-0012
Fax: 703-415-0013
Email: rneifeld@neifeld.com

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES
(Administrative Patent Judge Sally C. Medley)

---

CHARLES **GUTHRIE**, EDMUND SANDBERG,
DONALD WILSON, GREGORY PRIOR, and DAVID SMOLER
Junior Party
(Application 09/818,092)

v.

FREDERICK M. **ESPIAU**, CHANDRASHEKHAR J. JOSHI,
and YIAN CHIANG
Senior Party
(Patent 6,737,809).

---

Patent Interference 105,393 (SCM)
(Technology Center 2800)

---

ESPIAU MOTION 1 FOR REHEARING

Standing Order specifies that a request for rehearing on any decision be in the form of a miscellaneous motion. The Standing Order also specifies that a request for rehearing requires no prior conference with opposing counsel. Standing Order numbered page 39 section 125.2.

Espiau requests rehearing for that part of the decision on proposed motions, paper No. 27, e-mailed March 23, 2006, limiting Espiau's proposed motion for judgement based upon lack of an ***enabling written description***, to lack of ***enablement***.

On page 2, lines 24-45, paper No. 27, the opinion states that Espiau is authorized to file a motion that all of Guthrie's involved claims are unpatentable "based upon the enablement requirement" of 35 USC 112, first paragraph. Paper No. 27, at page 2 lines 24-25, is believed to misapprehend Espiau's proposed motion identified in Espiau's list of proposed motions. That proposed motion stated "Espiau motion for judgement based upon unpatentability of all of Guthrie's claims under 35 USC 112, first paragraph, because Guthrie's disclosure fails to provide an ***enabling written description*** ...." Espiau Revised List of Proposed Motions page 6 lines 19-21.

Near the conclusion of the March 21, 2006 teleconference discussion on proposed motions, the Court asked Espiau: "Number 16, is this written description or enablement?" Espiau responded that "It is enablement, your Honor." Transcript page 114 lines 13-17. However, the proposed motion was not limited to enablement. To the extent that Espiau's response to the Court's question appears to be an election of one legal theory over another, that was error.

In fact, Espiau believes that substantially the same facts that show lack of enablement also show lack of written description for all of Guthrie's claims. However, the legal tests for

enablement and written description differ, and Espiau should be entitled to present both legal theories.

Accordingly, Espiau believes the Court's order misapprehended the motion that Espiau proposed. Espiau requests that the Court reconsider and issue an order revising the prior order to authorize Espiau to present arguments directed to both lack of enablement and lack of written description.

3/31/2006 /RichardNeifeld #35,399/

Date Richard Neifeld, Lead Counsel for Espiau

Registration No: 35, 299

APPENDIX 1 - LIST OF EXHIBITS RELIED UPON IN THE MOTION, ORDERED BY EXHIBIT NUMBER

There are no such exhibits.

APPENDIX 2 - LIST OF MATERIAL FACTS RELIED UPON IN THE MOTION; NUMBERS SINGLE NON-COMPOUND SENTENCE FOLLOWED BY POINT CITE. FACTS IN APPENDIX 2 MUST BE SUFFICIENT TO STATE A CLAIM FOR WHICH RELIEF MAY BE GRANTED.

1. The standing order numbered page 39 section 125.2 specifies that a request for rehearing on any decision be in the form of a miscellaneous motion, and specifies that a request for rehearing requires no prior conference with opposing counsel.

2. Court stated that Espiau was authorized to file a motion that all of Guthrie's involved claims are unpatentable "based upon the enablement requirement" of 35 USC 112, first paragraph. Paper No. 27 page 2 lines 24-25.

3. That proposed motion stated "Espiau motion for judgement based upon unpatentability of all of Guthrie's claims under 35 USC 112, first paragraph, because Guthrie's disclosure fails to provide an ***enabling written description*** ...." Espiau Revised List of Proposed Motions page 6 lines 19-21.

4. Near the conclusion of the March 21, 2006 teleconference discussion on proposed motions, the Court asked Espiau: "Number 16, is this written description or enablement?" Espiau responded that "It is enablement, your Honor." Transcript page 114 lines 13-17.

**RAN**

**Date/time code: March 31, 2006 (4:16pm)**

**Y:\Clients\Luxim\LUXI0001\Guthrie_v_EspiauInterference105393\Drafts\ESPIAU MOTION 1 FOR REHEARING.wpd**

# EXHIBIT I

Paper 29

Filed 4 April 2006

Mail Stop Interference
P.O. Box 1450
Alexandria Va 22313-1450
Tel: 571-272-9797
Fax: 571-273-0042

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES

---

CHARLES **GUTHRIE**, EDMUND SANDBERG,
DONALD WILSON, GREGORY PRIOR, and DAVID SMOLER
Junior Party
(Application 09/818,092),

v.

FREDERICK M. **ESPIAU**, CHANDRASHEKHAR J. JOSHI,
and YIAN CHANG
Senior Party
(Patent 6,737,809).

---

Patent Interference No. 105,393 (SCM)
(Technology Center 2800)

---

**Decision - Rehearing - Bd. R. 125(c)**

On 31 March 2006, the board received from Espiau "ESPIAU MOTION 1 FOR REHEARING" (Paper 28), in which Espiau requests rehearing of the board's decision authorizing Espiau to file a motion based on the enablement requirement only (Paper 27 at 2). Espiau argues that the board misapprehended counsel for Espiau's affirmative response during the 21 March 2006 teleconference to the board's inquiry that enablement was the sole basis for

attacking Guthrie's claims. Espiau seeks authorization to additionally attack Guthrie's claims based on the § 112, ¶ 1 written description requirement (Paper 28 at 2).

Upon consideration of the request, Espiau is authorized to file a single motion against Guthrie's involved claims on the basis that Guthrie's claims lack written descriptive support and that the claims are not enabled. Guthrie is not prejudiced by this decision, since motions have not yet been filed, and Guthrie was given full notice of Espiau's proposed motion through Espiau's motions list (Paper 25 at ¶ 16), for which counsel for Guthrie did not object during the 21 March 2006 teleconference.

For these reasons, "ESPIAU MOTION 1 FOR REHEARING" is granted.

/Sally C. Medley/
Administrative Patent Judge

cc (via e-mail):

Counsel for GUTHRIE:

npisano@luce.com

Counsel for ESPIAU:

rneifeld@neifeld.com

# EXHIBIT J

The opinion in support of the decision being entered today
is not binding precedent of the Board.

Filed by:
Trial Division Merits Panel
Mail Stop Interference, Madison East, Room 9D20
P.O. Box 1450
Alexandria, VA 22313-1450
Tel: 571-272-9797
Fax: 571-273-0042

Paper 83

Filed 27 February 2007

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES

---

CHARLES ***GUTHRIE***, EDMUND SANDBERG,
DONALD WILSON, GREGORY PRIOR, and DAVID SMOLER
(CERAVISION LTD.),
Junior Party
(Application 09/818,092),

v.

FREDERICK M. **ESPIAU**, CHANDRASHEKHAR J. JOSHI,
and YIAN CHANG (LUXIM CORP),
Senior Party
(Patent 6,737,809 B2).

---

Patent Interference No. 105,393
(Technology Center 2800)

---

**Decision – Motions – Bd. R. 125(a)**

Before LEE, DELMENDO, and MEDLEY, *Administrative Patent Judges*.

DELMENDO, *Administrative Patent Judge*.

We have the following motions before us in this interference.

***Guthrie's Motions***:

I. *Guthrie Preliminary Motion 1* – Junior party Guthrie moves to be accorded benefit with respect to the count based on United States Provisional Application 60/192,731 ('731 provisional application; Exhibit 2045), filed March 27, 2000 (paper 38 filed May 2, 2006);

II. *Guthrie Miscellaneous Motion 2* – Guthrie moves to add United States Patent 6,922,021 B2 ('021 patent; Exhibit 2091), issued to Frederick M. Espiau and Yian Chang on July 26, 2005 from Application 10/356,340 filed January 31, 2003, to the interference and to designate claims 1-46 of the '021 patent as corresponding to the count (paper 39 filed May 2, 2006);

III. *Guthrie Preliminary Motion 3* – Guthrie moves for judgment that all of Espiau's involved claims (claims 1-35 of Espiau's United States Patent 6,737,809 B2, hereinafter '809 patent) are unpatentable as failing to comply with the written description requirement of 35 U.S.C. § 112, ¶1 (paper 40 filed May 2, 2006);

IV. *Guthrie Contingent Responsive Motion 4* – In the event we grant Espiau's Motion 4 to add Count 2 (listed below), Guthrie moves to be accorded benefit with respect to Count 2 based on each of the '731 provisional application (Exhibit 2045), United States Provisional Application 60/224,503 filed August 10, 2003 ('503 provisional application; Exhibit 2102), and United States Provisional Application 60/224,617 filed August 11, 2000 ('617 provisional application; Exhibit 2103) (paper 43 filed May 23, 2006); and

V. *Guthrie Miscellaneous Motion 5* – Guthrie moves to exclude from evidence Exhibits 1037, 1040, 1056-58, 1066, and 1078-85 "as unsupported by any consistent definition of one of ordinary skill in the art" and to strike portions of the Espiau's Replies 2-4 "[which] introduce new evidence rather than address Guthrie's Oppositions" (paper 66 filed October 16, 2006).

***Espiau's Motions***:

VI. *Espiau Motion 2* – Senior party Espiau moves for judgment that all of Guthrie's involved claims (claims 109-131 of Application 09/818,092, hereinafter '092 application, Exhibit

2033), which Espiau asserts were copied from Espiau's involved claims, are unpatentable as failing to comply with the enablement and written description requirements of 35 U.S.C. § 112, ¶1 (paper 34 filed May 2, 2006);

VII. *Espiau Motion 3* – Espiau moves for a determination that Guthrie is not entitled to benefit with respect to Count 1 or proposed Count 2 based on any of the provisional applications for which benefit has been accorded or the '731 provisional application (paper 35 filed May 2, 2006);

VIII. *Espiau Motion 4* – Espiau moves to (1) add Count 2 and to designate Espiau claims 2 and 3 and Guthrie claim 110 as corresponding thereto; (2) to be accorded benefit with respect to Count 2 based on Provisional Application 60/222,028 filed July 31, 2000 (Exhibit 1012); and (3) to deny benefit to Guthrie with respect to Count 2 for all of Guthrie's accorded benefit applications (paper 36 filed May 2, 2006); and

IX. *Espiau Miscellaneous Motion 5* – Espiau moves to exclude from evidence all of Exhibits 2086, 2092-94, and 2102-03 and portions of 2089, 2105, 2120, and 2124 (paper 67 filed October 16, 2006).

We ***DENY*** Guthrie Motions 1-3 and Espiau Motions 2 and 4. We ***GRANT*** Espiau Motion 3. We ***DISMISS*** Guthrie Contingent Motion 4 and Miscellaneous Motion 5. We ***DISMISS IN PART*** and ***DENY IN PART*** Espiau Miscellaneous Motion 5.

We make the following findings of fact, supported by a preponderance of the evidence, and conclusions of law.

<u>*Background*</u>

This interference was declared on January 24, 2006. (Declaration of Interference, Paper 1.) Oral arguments were heard on December 7, 2006, a transcript of which has been placed in the record. (Paper 81 entered December 14, 2006.)

Guthrie is involved on the basis of United States Patent Application 09/818,092 filed March 26, 2001. (Paper 1 at 3; Exhibit 2033.)

The real party in interest for Guthrie's involved application is *CERAVISION LTD*. (Paper 1 at 3.)

Guthrie was accorded benefit (i.e., a 37 CFR § 41.201 constructive

reduction to practice) with respect to the sole count (Count 1) in this interference based on:

> 60/224,059 filed August 9, 2000 ('059 application, Exhibit 2049);
>
> 60/224,298 filed August 10, 2000 ('298 application, Exhibit 2054);
>
> 60/224,290 filed August 10, 2000 ('290 application, Exhibit 2052);
>
> 60/224,291 filed August 10, 2000 ('291 application, Exhibit 2053);
>
> 60/224,257 filed August 10, 2000 ('257 application, Exhibit 2050);
>
> 60/224,289 filed August 10, 2000 ('289 application, Exhibit 2051);
>
> 60/224,866 filed August 11, 2000 ('866 application, Exhibit 2055); and
>
> 60/234,415 filed September 21, 2000 ('415 application, Exhibit 1006).

(Paper 1 at 4.)

Espiau, on the other hand, is involved on the basis of United States Patent 6,737,809 B2, which issued on May 18, 2004 from Application 09/809,718 filed March 15, 2001. (Paper 1 at 3; Exhibit 1007.)

The real party in interest for Espiau's involved patent is LUXIM CORP. (Paper 1 at 3.)

Espiau was accorded benefit with respect to the count based on United States Provisional Application 60/222,028 filed July 31, 2000 (‘028 provisional application). (Paper 1 at 4.)

*The Count*

The interference involves one count, Count 1. (Paper 1 at 3.) Count 1 reads:

Claim 109 of Guthrie 09/818,092 application

[A lamp comprising:

(a) a waveguide having a body comprising a ceramic dielectric material of a preselected shape and preselected dimensions, the body having a first side determined by a first waveguide outer surface;

(b) a first feed positioned within and in intimate contact with the waveguide body, adapted to couple energy into the body from a source having an output and operating at a preselected frequency and intensity, the feed connected to the source output, said frequency and intensity and said body shape and dimensions selected such that the body resonates in at least one resonant mode having at least one electric field maximum;

(c) an enclosed first cavity depending from said first surface into the waveguide body; and

(d) a first bulb positioned in the cavity at a location corresponding to an electric field maximum during operation, the bulb containing a gas-fill which when receiving energy from the resonating waveguide body forms a light-emitting plasma.]

or

Claim 1 of Espiau 6,737,809 patent

[A lamp comprising:

(a) a waveguide having a body comprising a ceramic dielectric material of a preselected shape and preselected dimensions, the body having a first side determined by a first waveguide outer surface;

(b) a first microwave feed positioned within and in intimate contact with the waveguide body, adapted to couple microwave energy into the body from a micro-wave source having an output and an input and operating within a frequency range from about 0.5 to about 30 GHz at a preselected frequency and intensity, the feed connected to the source output, said frequency and intensity and said body shape and dimensions selected such that the body resonates in at least one resonant mode having at least one electric field maximum;

(c) an enclosed first cavity depending from said first surface into the waveguide body; and

(d) a first bulb positioned in the cavity at a location corresponding to an electric field maximum during operation, the bulb containing a gas-fill which when receiving microwave energy from the resonating waveguide body forms a light-emitting plasma.]

or

Claim 129 of Guthrie 09/818,092 application

[A method for producing light comprising the steps of:

(a) coupling energy characterized by a frequency and intensity into a waveguide having a body comprising a ceramic dielectric material of a preselected shape and preselected dimensions, the body having a side determined by an outer waveguide surface and a cavity depending from said surface into the body, said frequency and intensity and said body shape and dimensions selected such that the body resonates in at least one resonant mode having at least one electric field maximum;

(b) directing resonant energy into an envelope determined by the cavity and a window, the envelope containing a gas-fill; and

(c) creating a plasma by interacting the resonant energy with the gas-fill, thereby causing emission of light.]

or

Claim 32 of Espiau 6,737,809 patent

[A method for producing light comprising the steps of:

(a) coupling microwave energy characterized by a frequency and intensity into a waveguide having a body comprising a ceramic dielectric material of a preselected shape and preselected dimensions, the body having a side determined by an outer waveguide surface and a cavity depending from said surface into the body, said frequency and intensity and said body shape and dimensions selected such that the body resonates in at least one resonant mode having at least one electric field maximum;

(b) directing resonant microwave energy into an envelope determined by the cavity and a window, the envelope containing a gas-fill; and

(c) creating a plasma by interacting the resonant energy with the gas-fill, thereby causing emission of light.].

*The Claims of the Parties*

The claims of the parties corresponding to Count 1 are as follows:

Guthrie: 109-131

Espiau: 1-35

*The Guthrie Invention*

Guthrie's invention is said to be "directed generally to high intensity light sources and more particularly to plasma light sources for use in applications such as projection systems based on reflective microdisplays." (Exhibit 2033, ¶[0002].) According to Guthrie's '092 application, one aspect of the invention is to a plasma lamp comprising a gas housing

containing a plasma discharge forming medium, and a source of radio frequency energy coupled to the plasma discharge medium, wherein the gas housing is constructed of a ceramic material and has a window transparent to visible light. (*Id*. at ¶0010.) Specifically, the ‘092 application states that the window may be a sapphire window and that this “greatly extends the operating life expectancy of the plasma lamp as compared with prior art lamps which use quartz because the problems of quartz devitrification at high temperatures and quartz gas permeability are eliminated.” (*Id*. at ¶0011.)

According to another aspect, the ‘092 application states that “the RF structure used for the radio wave radiation and the envelope used to house the gas fill are formed so as to constitute a single, integrated ceramic structure.” (*Id*. at ¶0012.) According to a further aspect, the ‘092 application explains that a solid material such as ceramic rather than air is used as the dielectric and that the gas-fill is contained by a combination of solid ceramic and a sapphire window. (*Id*. at ¶0013.)

The ‘092 application further describes the invention as providing “unprecedented operating life expectancy as compared with the prior art” and also characterizes the integrated design of the invention as “enabl[ing] a

much higher proportion of the radio wave radiation energy to be focused onto the gas fill," thus resulting in increased efficiency. (*Id*. at ¶0014-15.)

*The Espiau Invention*

Espiau's '809 patent specification states that the invention described therein "provides distinct advantages over the electrodeless plasma lamps in the background art, such as brighter and spectrally more stable light, greater energy efficiency, smaller overall lamp sizes, and longer useful life spans." (Exhibit 1007 at column 2, lines 41-45.) The '809 patent explains that "[r]ather than using a waveguide with an air-filled resonant cavity, embodiments of the invention use a waveguide having a body consisting essentially of at least one dielectric material [e.g., ceramics] having a dielectric constant greater air approximately 2 [sic]." (*Id*. at column 2, lines 45-51.)

One aspect of the invention is described as a lamp including a waveguide having a body of a ceramic dielectric material, and a side determined by a waveguide outer surface, wherein the lamp further includes a microwave feed positioned within and in intimate contact with the body which couples energy into the body from a microwave source operating at a frequency within a range of about 0.5 to about 30 GHz and the source

operating frequency and intensity and body shape and dimensions are selected such that the body resonates in at least one resonant mode having at least one electric field maximum. (*Id*. at column 2, lines 56-66.) It is said that "[t]he lamp further includes an enclosed first cavity depending from the waveguide outer surface into the body" and that a bulb is positioned within the cavity, "[t]he bulb contain[ing] a gas-fill which when receiving microwave energy from the resonating waveguide body forms a light-emitting plasma." (*Id*. at column 2, line 66 to column 3, line 4.)

Another aspect of the invention is described as a method for producing light including the steps of: (a) coupling microwave energy into a waveguide having a body including a ceramic dielectric material and a side determined by a waveguide outer surface with a cavity depending therefrom into the body, the body resonating with at least one resonant mode having at least one electric field maximum; (b) directing the resonant energy into an envelope containing a gas-fill; and (c) creating a plasma by interacting the resonant plasma with the gas-fill, thereby causing light emission. (*Id*. at column 3, lines 5-15.)

*Discussion of the Motions*

Espiau's Motion 2, which contends that all of Guthrie's involved claims are copied claims and are unpatentable to Guthrie as failing to comply with the enablement and written description requirements of 35 U.S.C. § 112, ¶1, involves a threshold issue within the meaning of 37 CFR § 41.201. If we grant Espiau's motion on the basis that Guthrie's claims are copied claims that lack written description in the disclosure of the '092 application as originally filed, Guthrie would lack standing to continue in this interference. Accordingly, we consider the merits of this motion first before taking up any of the other motions.[1]

*Espiau Motion 2: 35 U.S.C. § 112, ¶1(Lack of Written Description & Enablement against Guthrie's Claims)*

To prevail on this motion, Espiau had the burden of proving by a preponderance of the evidence that Guthrie's involved claims 109-131 fail to comply with the written description and enablement requirements of 35 U.S.C. § 112, ¶1. For reasons discussed more fully below, Espiau failed to meet its burden of proof as to either requirement.

[1] 37 CFR § 41.125(a) provides that we may take up the motions in any order.

**Written Description:**

We start with written description. The test for determining whether later presented claims comply with the written description requirement of 35 U.S.C. § 112, ¶1, is whether the disclosure of the application, as originally filed, reasonably conveys to a person skilled in the art that the inventors had possession of the claimed subject matter at the time of filing of the application. *Bilstad v. Wakalopulos*, 386 F.3d 1116, 1123, 72 USPQ2d 1785, 1790 (Fed. Cir. 2004). The descriptive text that must be present in the original disclosure to satisfy the written description requirement "varies with the nature and scope of the invention at issue, and with the scientific and technologic knowledge already in existence." *Capon v. Eshhar*, 418 F.3d 1349, 1357, 76 USPQ2d 1078, 1084 (Fed. Cir. 2005). Compliance with the written description requirement "is a question of fact, judged from the perspective of one of ordinary skill in the art as of the relevant filing date." *Falkner v. Inglis*, 448 F.3d 1357, 1363, 79 USPQ2d 1001, 1005 (Fed. Cir. 2006).

Espiau's theory seems to be that two of its inventors disclosed the invention to three of Guthrie's inventors on April 20, 2000 but that the Guthrie inventors failed to comprehend the invention. Espiau believes that, as a result, Guthrie's involved application "conveys such a fundamental

misunderstanding of the subject matter of the copied claims that a person of ordinary skill in the art (a) would not conclude that Guthrie had invented that subject matter, and (b) would not be able to make and use that subject matter based on Guthrie's disclosure." (Espiau Motion 2 at 2.) Specifically, Espiau contends that the disclosure of Guthrie's '092 application, as originally filed, merely provides "lip service" to resonance and thus does not describe a resonating waveguide as now specified in Guthrie's involved claims. (Espiau Motion 2 at 5.) In support, Espiau relies on the declarations of its experts, Drs. David O. Wharmby and David M. Pozar. (Espiau Motion 2 at 4-6; Exhibits 1040 and 1037.)

Dr. Wharmby holds a PhD in Physics and has extensive experience "in the science and technology of light sources," including electrodeless lamps. (Exhibit 1040 at ¶¶1-5.) Dr. Wharmby states (Exhibit 1040, ¶54):

> Although *the authors pay lip-service to resonance* in the '092 Application (in strong contrast to the Provisionals described above), they do not understand resonance or its significance in electrodeless plasma lamp applications. Had they understood its significance, they would not have written the '092 Application in they [sic] manner that they did, as I describe below. The confusion and misdirection in the '092 Application is so great that one of ordinary skill in the art cannot be expected to conclude that these authors had invented the subject matter of claims 109, 110 and 129. In my opinion, any one ordinary skill in the art (and this applies to me as well) would have been so confused by this Application that they would not have even tried to implement the subject matter of those claims. [Emphasis added.]

Dr. Pozar, who is a Research Professor and Professor Emeritus at the University of Massachusetts at Amherst with extensive experience in microwave engineering, provides similar testimony. (Exhibit 1037, ¶38.)

Dr. Wharmby further declares (Exhibit 1040, ¶62.):

> Paragraphs [0036] and [0037] [of Guthrie's '092 application] describe a "cylindrical resonant waveguide structure" that is identical to Figure 2.3 of the '059 Provisional and Figure 8.1 of the '289 Provisional. As with those provisionals, *one of ordinary skill would not know how to dimension a resonant waveguide of this geometry and would not know whether there is a suitable mode in this geometry for placing the electric field maximum near the bul*b. The Espiau '809 patent, on the other hand, provides the kind of guidance that one of ordinary skill in the art would need to construct a cylindrical resonant waveguide defined by claims 109, 110 or 129 (EX 2046, Figures 5A-C; column 8, lines 7 to 37 and column 5, line 64 to column 6, line 7). *The fact that the authors of the '092 Application do not provide similar guidance leads me to conclude that they do not understand the subject matter of those claims*. [Emphasis added.]

We find the relied upon arguments and evidence insufficient to make out Espiau's case. Even Espiau's own expert, Dr. Wharmby, acknowledges that Guthrie's '092 application expressly describes resonating waveguides at, e.g., paragraphs [0033] and [0036]. (Exhibit 1040, ¶¶ 54, 61, and 62.) While Dr. Wharmby characterizes this express disclosure of resonance as "lip-service," "lip-service" is nonetheless still a description of the allegedly missing claim limitation. Espiau does not contend that at the time Guthrie

gave that description the words used in the specification had a different meaning in the art than they did at the time the claims at issue were copied. During oral argument, Espiau's counsel argued that in the specification Guthrie merely "mouthed" the words of the claimed invention, without comprehension, but the written description requirement is merely a requirement for description, not comprehension. If Guthrie obtained the invention from Espiau, as Espiau asserts, the issue is not written description, but derivation of invention, something to be taken up in conjunction with a motion for judgment based on priority of invention. Espiau has not identified any legal authority requiring an inventor to comprehend in detail how or why the invention works in order to satisfy the written description requirement of 35 U.S.C. § 112, ¶1. As discussed above, Espiau concedes that Guthrie's original disclosure expressly describes a resonating waveguide. Espiau has not successfully demonstrated why this express disclosure is insufficient to satisfy the written description requirement.

Furthermore, Dr. Wharmby believes that Guthrie's original disclosure reflects confusion because "one of ordinary skill would not know how to dimension a resonant waveguide...and would not know whether there is a suitable mode...for placing the electric field maximum near the bulb." But these observations, even if true, pertain to "how to make and use" the

invention (i.e., enablement) and not to whether the original disclosure reasonably conveys to one skilled in the relevant art that the inventors had possession of the now claimed subject matter (i.e., written description). As acknowledged by Espiau, "[w]ritten description and enablement are *separate and independent* requirements for patentability." (Espiau Motion 2 at 2.) *Univ. of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 921, 69 USPQ2d 1886, 1891 (Fed. Cir. 2004), *reh'g denied*, 375 F.3d 803, *cert. denied*, 543 U.S. 1015 (2004).

Dr. Wharmby also believes that Guthrie lacked understanding of the invention because the amount of guidance in Guthrie's application is said to be not similar to that in the Espiau patent. (Exhibit 1037, ¶62; "The fact that the authors of the '092 Application do not provide similar guidance [as in the Espiau patent] leads me to conclude that they do not understand the subject matter of those claims."). The amount of guidance, however, relates to enablement, not written description. Moreover, neither Espiau nor its experts satisfactorily explain why the description in paragraph [0033] of the '092 application is insufficient. There, Guthrie's inventors disclose:

> For example, it is well-known that for a rectangular waveguide cavity containing a dielectric with permeability and permittivity constants μ and ε, and having length, width and depth dimensions a, b, and d and metal boundaries, the frequencies w(m,n,p) for the resonant modes are given by the following equation:

$$w(m,n,p)=(\mu\varepsilon)-½(m^2\pi^2/a^2+n^2\pi^2/b^2+p^2\ \pi^2/d^2)^{½}$$

In characterizing this formula as "misleading," Dr. Wharmby asserts that this formula only applies to waveguides having metal boundaries, which are not disclosed for the invention, and that the formula relates to angular frequencies, not RF frequencies. (Exhibit 1040, ¶61; *see also* Exhibit 1037, ¶39.) The '092 application, however, *does describe* the use of metal boundaries for rectangular waveguides and that this formula is applicable for such devices. As to angular versus RF frequencies, Espiau has failed to explain the significance of this distinction as it relates to the issues before us. Accordingly, we do not find them to be helpful to our analysis.

Regarding Espiau's position on this matter, we think the following discussion in *Falkner*, 448 F.3d at 1368, 79 USPQ2d at 1008, is instructive.

> Indeed, a requirement that patentees recite known DNA structures, if one existed, would serve no goal of the written description requirement. It would neither enforce the quid pro quo between the patentee and the public by forcing the disclosure of new information, nor would it be necessary to demonstrate to a person of ordinary skill in the art that the patentee was in possession of the claimed invention. As we stated in *Capon*, "[t]he 'written description' requirement states that the patentee must describe the invention; it does not state that every invention must be described in the same way. As each field evolves, the balance also evolves between what is known and what is added by each inventive contribution." *Id.* at 1358. Indeed, the forced recitation of known sequences in patent disclosures would only add unnecessary bulk to the specification. Accordingly we hold that where, as in this case,

> accessible literature sources clearly provided, as of the relevant date, genes and their nucleotide sequences (here "essential genes"), satisfaction of the written description requirement does not require either the recitation or incorporation by reference[] (where permitted) of such genes and sequences. [Emphases added; footnote omitted.]

Finally, Espiau urges, based on the testimonies of its experts, that Guthrie describes other embodiments such as the inductive coil embodiments or transmission line waveguides, which are said to be different from the devices recited in the involved claims. (Espiau Motion 2 at 6-9.) According to Espiau, "[t]he disclosure of inductive coil lamps in the '092 application does not suggest that Guthrie were in possession...of the subject matter of Espiau's [sic, Guthrie's claimed] invention." (*Id*. at 8.) Even if inductive coil or transmission line waveguide embodiments differ from the devices recited in Guthrie's involved claims, this fact alone is insufficient to prove lack of written description as to a resonating waveguide. At issue here is whether Guthrie's application, for example paragraphs [0033] and [0036], describes a resonating waveguide as recited in Guthrie's involved claims. That Guthrie's application may describe alternative types of devices has not been shown to be dispositive or even relevant to the written description issue. While Dr. Wharmby criticizes the comprehensiveness of Guthrie's original disclosure and states that this comprehensiveness leads to confusion (Exhibit 1040, ¶63; Espiau Motion 2 at 10), it is also clear from Dr.

Wharmby's testimony, on its face, that one of ordinary skill in the art would readily discern the scope of Guthrie's original disclosure and the differences among the various embodiments.

For these reasons, Espiau's contention that Guthrie's '092 application fails to describe a resonating waveguide is not well taken.

**Enablement**:

To show non-enablement, Espiau had to prove that one skilled in the relevant art would have been subjected to undue experimentation to make and/or use the invention as recited in Guthrie's involved claims. The question of whether making and using the invention would have required "undue experimentation" depends on several underlying factual inquiries including: (1) the quantity of experimentation necessary; (2) the amount of direction or guidance presented; (3) the presence or absence of working examples; (4) the nature of the invention; (5) the state of the prior art; (6) the relative skill of those in the art; (7) the predictability or unpredictability of the art; and (8) the breadth of the claims. *In re Wands*, 858 F.2d 731, 735, 736-37, 8 USPQ2d 1400, 1402, 1404 (Fed. Cir. 1988).

Neither Espiau nor its experts discuss, with any reasonable degree of specificity, *why* one skilled in the relevant art would have been subject to

undue experimentation. While Espiau argues that the amount of guidance in Guthrie's application is less than that in the Espiau patent, there is no meaningful discussion, based on factual evidence, on why the amount of guidance would have *necessarily* resulted in undue experimentation. Furthermore, Dr. Wharmby provides no credible basis to conclude that the amount of guidance necessary to satisfy 35 U.S.C. § 112, ¶1, must be the same or similar as that provided in the Espiau patent. That is, neither expert has proffered sufficient evidence that the disclosure in Espiau's patent represents the minimum required to satisfy 35 U.S.C. § 112, ¶1, for the subject matter of Guthrie's claims. Further on this point, neither Espiau nor its experts satisfactorily explain why the disclosure in paragraph [0033] of the '092 application (reproduced above in our discussion of written description) is insufficient to provide the allegedly missing guidance.

As to the alleged "confusion and misdirection" resulting from errors or inaccuracies in Guthrie's '092 application, experimentation that is otherwise reasonable is not rendered undue merely because there are technical errors in the specification easily detectible by one skilled in the relevant art. *PPG Industries, Inc. v. Guardian Industries Corp.*, 75 F.3d 1558, 1564, 37 USQP2d 1618, 1623 (Fed. Cir. 1996).

While Dr. Wharmby asserts that “one of ordinary skill would not know how to dimension a resonant waveguide of this geometry [as described in the Guthrie application] and would not know whether there is a suitable mode” to facilitate resonance, Espiau’s motion and the relied upon evidence provide insufficient information as to the possibility or impossibility of resonance and, if possible, *the amount and nature of any experimentation* required to facilitate resonance, given the relatively high skill of a person having ordinary skill in the art armed with all of the relevant scientific and technologic knowledge already available in the prior art.

Dr. Wharmby criticizes the comprehensiveness of Guthrie’s original disclosure and states that this comprehensiveness leads to confusion. (Exhibit 1040, ¶63; Espiau Motion 2 at 10.) It is clear from Dr. Wharmby’s testimony, however, that one of ordinary skill in the art would have understood the technology disclosed in the available prior art literature, including the differences between “inductively coupled” and “microwave discharge” lamps and “would have had a basic understanding of microwave engineering principles.” (Exhibit 1040 at ¶¶ 6-7.) Thus, we see no basis to hold that Guthrie’s comprehensive disclosure compels a conclusion of lack of enablement.

For these reasons, Espiau's motion based on lack of enablement also fails.

We do not reach Guthrie's opposition or Espiau's reply, because Espiau has not made out its case in its motion in the first instance.

For the foregoing reasons, Espiau Motion 2 is *DENIED*.

*Guthrie Preliminary Motion 3: 35 U.S.C. 112, ¶1(Lack of Written Description against Espiau's Claims)*

To prevail on this motion, Guthrie had the burden of proving by a preponderance of the evidence that Espiau's involved claims (claims 1-35 of the '809 patent) fail to comply with the written description requirement of 35 U.S.C. § 112, ¶1. Like Espiau, Guthrie failed to meet its burden of proof as to lack of written description.

As stated in our discussion of Espiau's Motion 2, the test for determining whether later presented claims comply with the written description requirement of 35 U.S.C. § 112, ¶1, is whether the disclosure of the application, as originally filed, reasonably conveys to a person skilled in the art that the inventors had possession of the claimed subject matter at the time of filing of the application. *Bilstad*, 386 F.3d at 1123, 72 USPQ2d at 1790.

Guthrie's position is that Espiau's claims, which were amended to be limited to resonating waveguides during prosecution to avoid prior art, fail to comply with the written description requirement of 35 U.S.C. § 112, ¶1, because the supporting disclosure of application 09/809,718 (which matured into the '809 patent) does not describe any "criticality" for the resonant mode but instead discloses alternative waveguides that do not operate in resonant mode. (Guthrie Preliminary Motion 3 at 1.)

We find no merit in Guthrie's position. Guthrie does not contend that the original disclosure of Espiau's '718 application fails to describe the waveguide now recited in Espiau's claims. Indeed, Guthrie concedes that '718 application describes resonant mode as an embodiment of Espiau's invention. (Guthrie Preliminary Motion 3 at 4.) Rather, Guthrie argues that the '718 application was amended to delete references to non-resonant mode waveguides and that this is impermissible unless the application describes "criticality" for the resonant mode.

Guthrie, however, does not point to any authority for the proposition underlying its motion. The cases cited at page 2 of Guthrie's motion are inapposite, as none of them relate to limiting the invention to a certain embodiment where the original disclosure described that embodiment separately in addition to other alternative embodiments. While narrowing

amendments made during patent prosecution may give rise to estoppel in the context of applying the doctrine of equivalents during patent enforcement,[2] we are unaware of any legal authority holding that limiting an invention to one of two alternatively disclosed embodiments violates the written description requirement of 35 U.S.C. § 112, ¶1.

We do not reach Espiau's opposition or Guthrie's reply, because Guthrie did not make out a case in the first instance.

For the foregoing reasons, Guthrie Preliminary Motion 3 is *DENIED*.

*Guthrie Preliminary Motion 1: To Be Accorded Benefit of U.S. Provisional Application 60/192,731*

Guthrie moves to be accorded benefit of United States Provisional Application 60/192,731 (hereinafter '731 provisional application) filed March 27, 2000 with respect to the subject matter of the count. (Paper 38.) To prevail on this motion, Guthrie must prove by a preponderance of the evidence that the '731 provisional application contains a constructive reduction to practice (i.e., an anticipation under 35 U.S.C. § 102(g)(1)) of the subject matter of the count. 37 CFR § 41.201.

[2] *See, e.g., Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002).

Guthrie did not meet its burden of proof of demonstrating that the '731 provisional application is a constructive reduction to practice of the count.

Here, Guthrie does not assert that the '731 provisional application expressly describes a 35 U.S.C. § 102(g)(1) anticipation of a lamp with a waveguide body "such that the body resonates in at least one resonant mode having at least one electric field maximum," as recited in the count. Rather, it is Guthrie's position that "[o]ne of ordinary skill reading the '731 application, and having knowledge of the relevant art, would have immediately recognized that in the plasma lamp of Figure 4.12, the ceramic housing replaces, and serves the function of, the air waveguide and resonant cavity of prior art devices." (Guthrie Preliminary Motion 1 at 5.)

In support, Guthrie relies on its expert, Dr. Madhu S. Gupta. (Exhibit 2089.) Dr. Gupta is a Professor of Electrical and Computer Engineering at San Diego State University as well as an Adjunct Professor at University of California, San Diego. (*Id*. at ¶1.) While Dr. Gupta's focus is said to have been primarily "in the theory and design of RF electronics and microwave circuits," Dr. Gupta also states: "I am intimately familiar with the theory and operation of waveguides and resonant cavities, and have taught a variety of graduate and undergraduate courses concerning such devices." (*Id*. at ¶3.)

With respect to the '731 provisional application, Dr Gupta states (Exhibit 2089 at ¶¶41-43):

> 41. One of ordinary skill reading the '731 application, having knowledge of the relevant prior art, would have immediately recognized that in the plasma lamp of Figure 4.12, the ceramic housing constitutes a part of the waveguide and resonant cavity, replacing the air waveguide and resonant cavity of prior art devices, such as described in the '755, '625 and '303 patents. This substitution would have achieved the stated objectives of the '731 application, namely improving lamp brightness and energy efficiency while reducing the size of the lamp package. Given that the prior art plasma lamps of the '755, 625 [sic, '625] and '303 patents all describe a resonant cavity in which the bulb is located at the electric field maximum, one of ordinary skill would have understood this to be the case for the device of Figure 4.12 as well. This is consistent with placement of the bulb chamber in Figure 4.12 at the center of the ceramic housing, which is where the electric field would be a maximum in the dominant mode.
>
> 42. One of ordinary skill likewise would have understood that to be operated as a plasma bulb, the RF electronics integrated into the lamp package of Figure 4.12 should operate at a frequency above 100 MHz, since all of the systems described in the '755, '625 and '303 patents operate at 2.45 GHz. Based upon the teaching of the prior art, e.g., of the '940 publication, as discussed above, one of ordinary skill further would have understood that the RF coil of Figure 4.12, when operated at high frequency, would act as a microwave exciter, causing microwave discharge in the plasma.
>
> 43. I therefore find that the '731 application would have conveyed to one of ordinary skill that the ceramic housing of Figure 4.12 acts as a dielectric-filled resonator, or waveguide as defined in the '809 patent...

We find Dr. Gupta's testimony insufficient to establish that one of ordinary skill in the art would have viewed the device of Figure 4.12 to be

*necessarily* operating in resonant mode. Dr. Gupta seems to believe that the ceramic housing of Figure 4.12 is *necessarily* a substitution for the air waveguide and resonant cavity of various prior art such as U.S. Patent 4,954,755 (Exhibit 2080), U.S. Patent 4,975,625 (Exhibit 2081), and U.S. Patent 5,594,303 (Exhibit 2082) discussed in Espiau's '809 patent. (Exhibit 2089 at ¶¶31-33.) These prior art patents, however, are not even mentioned in Guthrie's '731 provisional application. Furthermore, Dr. Gupta never rules out the possibility that the device of Figure 4.12 could be operated in a mode other than resonant mode. Indeed, at oral argument, Guthrie candidly conceded that the device described in the '731 provisional application could be operated in a mode other than resonant mode. (Paper 81 at page 8, line 10 to page 17, line 25.)

While it may have been obvious to a person having ordinary skill in the art to modify the device of Figure 4.12 to operate in resonant mode as suggested in the prior art to obtain known advantages, obviousness based on "knowledge of the relevant prior art" (Exhibit 2089 at ¶41) is the wrong test in determining whether an earlier disclosure contains a described anticipation.

Because Guthrie failed to sufficiently demonstrate that the '731 provisional application expressly describes the device of Figure 4.12 as

operating in resonant mode or that one of ordinary skill in the art would have viewed the device as necessarily operating in such resonant mode, Guthrie's motion is *DENIED* on this basis.[3]

We do not reach Espiau's opposition or Guthrie's reply because Guthrie did not make out a case in the first instance.

*Guthrie Miscellaneous Motion 2: To Add Espiau's U.S Patent 6,922,021 to the Interference*

Guthrie moves to add United States Patent 6,922,021 B2 issued to Frederick M. Espiau and Yian Chang on July 26, 2005 (Exhibit 2091, hereinafter "'021 patent") to this interference and to designate claims 1-46 of the '021 patent as corresponding to the count. (Paper 39.) To prevail, Guthrie had to make the showings required under 37 CFR § 41.202(a). *See* 37 CFR § 41.203(d). Guthrie did not do this.

Guthrie contends that "[c]laim 1 of the '809 patent (and claim 109 of the '092 application), directly anticipates or renders obvious claim 1 of the '021 patent, and vice versa, as illustrated in the claim chart attached...as Appendix 3." (Paper 39 at 2.) According to Guthrie, "[t]he differences

[3] We do not need to address enablement because the '731 provisional application lacks written description of a constructive reduction to practice.

between the corresponding elements are slight, and unquestionably do not arise to the level of patent distinctions." (*Id*.)

37 CFR § 41.203(d) provides that a party may suggest the addition of a patent to the interference by making the showings required under 37 CFR § 41.202(a). 37 CFR § 41.202(a) states in relevant part:

> (a) *Applicant*. An applicant, including a reissue applicant, may suggest an interference with another application or a patent. The suggestion must:
>
> (1) Provide sufficient information to identify the application or patent with which the applicant seeks an interference,
>
> (2) Identify all claims the applicant believes interfere, propose one or more counts, and show how the claims correspond to one or more counts,
>
> (3) For each count, provide a claim chart comparing at least one claim of each party corresponding to the count and ***show why the claims interfere within the meaning of §41.203(a)***...[Emphasis added.]

37 CFR § 41.203(a), in turn, states:

> (a) *Interfering subject matter*. An interference exists if the subject matter of a claim of one party would, if prior art, have anticipated or rendered obvious the subject matter of a claim of the opposing party and vice versa.

The requirements in these rules reflect the basic principle of an interference, which is to resolve a conflict between the claims of *opposing* parties. Specifically, 37 CFR § 41.202(a)(3) requires a showing "why the claims [of the opponent's patent that the applicant seeks to add] interfere" with the claims of the applicant.

While Guthrie's motion does include some analysis pertaining to whether the claims of the '021 patent are anticipated by or obvious to a person having ordinary skill in the art over the claims of the '809 patent (i.e., whether the claims of the '021 patent correspond to the count, which encompasses the subject matter of claim 1 of the '809 patent), it does not include any meaningful discussion on whether the subject matter of Guthrie's involved claims (i.e., the claims of Guthrie's '092 application) interfere with the subject matter of the opponent's '021 patent claims within the meaning of 37 CFR § 41.203(a). Thus, Guthrie's motion fails because it fulfills only part of the requirements as defined in 37 CFR §§ 41.202 and 41.203.

Even if we assume that claim correspondence alone is sufficient, Guthrie's motion fails. Guthrie did not adequately demonstrate that claim 1 of the '809 patent anticipates or would have rendered obvious to a person having ordinary skill in the art the subject matter of claims 1-46 of the '021 patent. For example, element (b) of the '021 patent recites: "a lamp chamber depending from said first side and having an aperture at said waveguide outer surface generally opposed to a lamp chamber bottom, the waveguide body and lamp chamber comprising an integrated structure." By contrast, the corresponding element, element (c), in claim 1 of the '809 patent recites:

"an enclosed first cavity depending from said first surface into the waveguide body." In its motion, Guthrie does not satisfactorily account for all differences, such as the "generally opposed to a lamp chamber bottom" or "integrated structure" limitation. (Paper 39 at 3.) Guthrie's Appendix 3 does refer to the specification (column 1, lines 30-40 and 53-62) of the '021 patent as establishing the inherency of these characteristics in the invention recited in claim 1 of the '809 patent. (Paper 39 at A3-1.) Guthrie, however, failed to adequately explain why the cited portions of the '021 specification, which discuss "preferred" or "typical" embodiments of the '809 patent, necessarily establish the inherency of the limitations in question in the claimed invention of the '809 patent.

We need not address Espiau's opposition or Guthrie's reply, because Guthrie has not made out a prima facie case.

For these reasons, we *DENY* Guthrie's Miscellaneous Motion 2 to add the '021 patent into this interference.

*Espiau Motion 4: To Add Count 2*

Espiau moves to (1) add Count 2 and to designate Espiau claims 2 and 3 and Guthrie claim 110 as corresponding thereto; (2) to be accorded benefit with respect to Count 2 based on Provisional Application 60/222,028 filed

July 31, 2000 (Exhibit 1012); and (3) to deny benefit to Guthrie with respect to Count 2 for all of Guthrie's accorded benefit applications. (Paper 36.)

Guthrie filed a timely opposition (paper 52) to which Espiau filed a timely reply (paper 62).

To be successful in this motion, Espiau had to demonstrate, *inter alia*, that Count 2 is patentably distinct from Count 1. 37 CFR § 41.201. Espiau failed to do this.

Count 2 reads: "The lamp of claim 1 [i.e., Espiau '809 patent claim 1], wherein the waveguide has an outer coating of a metallic material."[4]

Espiau concedes that persons having ordinary skill in the art "probably would know that adding a metallic coating (providing a dielectric-

---

[4] Claim 1 of the Espiau '809 patent reads:
A lamp comprising:
(a) a waveguide having a body comprising a ceramic dielectric material of a preselected shape and preselected dimensions, the body having a first side determined by a first waveguide outer surface;
(b) a first microwave feed positioned within and in intimate contact with the waveguide body, adapted to couple microwave energy into the body from a micro-wave source having an output and an input and operating within a frequency range from about 0.5 to about 30 GHz at a preselected frequency and intensity, the feed connected to the source output, said frequency and intensity and said body shape and dimensions selected such that the body resonates in at least one resonant mode having at least one electric field maximum;
(c) an enclosed first cavity depending from said first surface into the waveguide body; and
(d) a first bulb positioned in the cavity at a location corresponding to an electric field maximum during operation, the bulb containing a gas-fill which when receiving microwave energy from the resonating waveguide body forms a light-emitting plasma.

metallic interface) to an interface originally between dielectric material and air, would impact resonant modes, coupling, and impedance." (Paper 36 at 3.) Espiau contends, however, that "generally, they would not know qualitatively or quantitatively, what that impact would be." (*Id*.) Relying on the declaration of Dr. Wharmby, Espiau asserts that "one of ordinary skill in the lamp arts would have no motivation to modify the surface of a waveguide body designed to resonant [sic, resonate] in a specific mode at a specified frequency in order to ignite a plasma in a bulb in a cavity in the waveguide, by providing a coating of metallic material on that surface." (*Id*. at 4.)

Guthrie, on the other hand, asserts that "the use of metal coatings on dielectric resonators was old in the art" and "that one of ordinary skill would have recognized the advantages that arise in applying a metal boundary to the exterior of an electrodeless lamp comprising a dielectric block: to contain RF energy within the cavity, suppress electromagnetic interference ('EMI') emissions and improve heat removal from the device." (Paper 52 at 8.) In support, Guthrie relies on the testimony of Dr. Gupta, who refers to Exhibit 2086. (*Id*.) Guthrie further argues that the cross-examinations of Drs. Wharmby and Pozar (Espiau's experts) undercut Espiau's position on this matter. (*Id*. at 8-9.) Additionally, Guthrie argues that "Espiau's experts

further conceded that Espiau's involved patent nowhere teaches how to qualitatively or quantitatively assess the effect of applying a metallic coating..." (*Id*. at 1.)

We agree with Espiau (paper 62 at 2) that the question of whether Espiau's '809 patent teaches the qualitative or quantitative effect of a metallic coating bears no relevance to whether one of ordinary skill in the art would have found it obvious in view of the knowledge of the prior art to apply a metallic coating to the waveguide specified in Count 1. Nevertheless, Espiau never denies Dr. Gupta's statement that "the use of metal coatings on dielectric resonators was old in the art." (Guthrie Material Fact 269; Exhibit 2089, ¶37; Exhibit 2105, ¶¶6, 30; Exhibit 2086.) Nor does Espiau specifically explain why a person having ordinary skill in the art would not have combined the subject matter of Count 1 with the teachings of the prior art, such as Exhibit 2086, to arrive at the subject matter of proposed Count 2 to obtain the known advantages of a metallic coating. To the contrary, Espiau concedes that persons having ordinary skill in the art "probably would know that adding a metallic coating (providing a dielectric-metallic interface) to an interface originally between dielectric material and air, would impact resonant modes, coupling, and impedance," as we pointed out above.

Thus, the only issue here is whether Espiau has proven that one of ordinary skill in the art would not have been led to use a metallic coating because the metallic coating's qualitative or quantitative effect is uncertain. We do not think that the evidence supports Espiau's position.

We credit Dr. Gupta's testimony over those of Espiau's experts. While Espiau's experts state that the qualitative or quantitative effect of a metallic is "generally" unknown, they also acknowledge on cross-examination that the effects can be readily determined by a person having ordinary skill in the art using knowledge available in the prior art. (Exhibit 1061 at 106-108; Exhibit 1063 at 84, lines 9-17.) Moreover, even Espiau's own experts agree that a person having ordinary skill in the art would have needed a "good reason" for *not* using a metallic coating because a non-coated device would have been considered less desirable. (Exhibit 1061 at 109, lines 5-14; Exhibit 1063 at 84, lines 18-21.)

Under these circumstances, Espiau has failed to prove that a person having ordinary skill in the art would have been led away from using a metallic coating on the waveguide recited in Count 1. Because Espiau did not demonstrate that Count 2 is separately patentable over Count 1 (in combination with the knowledge in the prior art), Espiau's Motion 4 is *DENIED*.

*Espiau Motion 3: To Deny Benefit of Guthrie's Provisional Applications*

Espiau moves to deny Guthrie the benefit of the following provisional applications with respect to Count 1 and proposed Count 2.[5]

60/224,059 filed August 9, 2000 ('059 application, Exhibit 2049);

60/224,298 filed August 10, 2000 ('298 application, Exhibit 2054);

60/224,290 filed August 10, 2000 ('290 application, Exhibit 2052);

60/224,291 filed August 10, 2000 ('291 application, Exhibit 2053);

60/224,257 filed August 10, 2000 ('257 application, Exhibit 2050);

60/224,289 filed August 10, 2000 ('289 application, Exhibit 2051);

60/224,866 filed August 11, 2000 ('866 application, Exhibit 2055); and

60/234,415 filed September 21, 2000 ('415 application, Exhibit 1006).

---

[5] We denied Espiau's motion to add Count 2 above, so we do not have to address it for purposes of deciding this motion. In addition, Espiau's Motion 3 (pp. 9-12) seeks to deny benefit to Guthrie of the '731 provisional application. We have, however, denied Guthrie's Preliminary Motion 1 to be accorded benefit of the '731 provisional application. Accordingly, we do not address the '731 provisional application here.

Guthrie was preliminarily accorded benefit (within the meaning of 37 CFR § 41.201) of each of the above-identified provisional applications. (Paper 1 at 4.) The burden of proof is on Espiau to show that each of Guthrie's provisional applications do not contain at least one constructive reduction to practice. We think that Espiau satisfied its burden of proof and Guthrie did not successfully rebut Espiau's case.

Espiau asserts that it disclosed the invention to Guthrie but Guthrie failed to comprehend the invention. Espiau contends that, as a result, Guthrie never described or enabled a constructive reduction to practice in any of the provisional applications. (Paper 35 at 2-4.) With respect to Count 1, Espiau contends that the disclosures of Guthrie's provisional applications do not reasonably convey to one skilled in the relevant art that the inventors had possession of a constructive reduction to practice having the following:

(1) "said frequency and intensity, and said body shape and dimensions selected such that the body resonates in at least one resonant mode having at least one electric field maximum";

(2) "the bulb containing a gas-fill which when receiving energy from the resonating waveguide body forms a light-emitting plasma"; and

(3) "the first bulb positioned in the cavity at a location corresponding to an electric field maximum during operation." (Paper 35 at 8.)

Guthrie does not dispute Espiau's contention that the disclosures of the provisional applications fail to expressly describe a constructive reduction to practice of a waveguide body operating in at least one resonant mode having at least one electric field maximum. Thus, Guthrie must demonstrate that the limitations missing in the express disclosures of the provisional applications are inherently or necessarily present. In an attempt to do so, Guthrie relies on Dr. Gupta's declaration (Exhibit 2120). Specifically, with respect to the '059 provisional application, Dr. Gupta states (Exhibit 2120, ¶45):

> 45. ***In my view***, the waveform shown, for example, in Figure 2.1 of Exhibit 2049 is used only to place the dimensions in perspective with respect to wavelength as is common practice in the microwave literature. There is no evidence to suggest that the authors of the '059 application intended the waveform to represent the electric field. ***The most reasonable assumption*** is that the waveform was intended to show only that the distance C between the lamp and the antennae is one wavelength, and that the distances of each of the lamp and antenna from the ends of the device are one-quarter wavelength. ***When so interpreted***, one of ordinary skill would have understood that Figure 2.1 depicts a resonant cavity similar to that shown in Figure 115 of Exhibit 2104, and corresponds to cavity in which the antenna is placed one-quarter wavelength from one end and 5/4 wavelength from the other (the device of line 4 of the table on page 82 of Exhibit 2104***). Given this***

> ***interpretation***, one of ordinary skill further would have recognized that the antenna and lamp are positioned at the electric field maxima. Indeed, ***there is no a priori reason why the wavelength should not be assumed*** to be magnetic field intensity, for which the maxima do occur at the ends of the cavity, and the minima occur where the electric field as maximum. As further described in ¶¶ 16 and 28, ***my view*** is that use of a metal coating on the dielectric block is inherently disclosed by devices of the kind depicted in Figures 2.1 to 2.2 of Exhibit 2049. I therefore conclude that one of ordinary skill, upon even a cursory review of Exhibit 2049, would have concluded that it discloses resonant cavity. [Emphases added.]

Dr. Gupta further avers that "[a]s would have been known from the prior art, the microwave source should operate in one of the ISM bands (915 MHz) for regulatory, manufacturability and cost and [sic] reasons." (Exhibit 2120, ¶49.) Dr. Gupta makes similar comments regarding the other provisional applications at issue. (Exhibit 2120, ¶¶52-53, 55, 58, 61, 64, 69, 71.)

We find that Dr. Gupta's testimony fails to support Guthrie's position. Dr. Gupta's testimony is not persuasive because Dr. Gupta's testimony is equivocal on whether the same assumptions and interpretations would have been made by a person of ordinary skill in the art. As is evident, Dr. Gupta possesses a level of skill significantly higher than that of a person of ordinary skill in the art. (Exhibit 2120, ¶1, 8.) Dr. Gupta repeatedly qualifies his testimony with "[i]n my view" and/or "assumptions" but does

not clearly say that a person having ordinary skill in the art would have had the same views and assumptions.

Even if we assume that a person having ordinary skill in the art would have had the same views and assumptions, Dr. Gupta's testimony supports Espiau, not Guthrie. In order to support Guthrie's theory that the devices described in these applications inherently or necessarily operates in resonant mode, Dr. Gupta assumed certain facts. Absent evidence that these assumptions are the only plausible assumptions or realm of possibilities, they actually establish that the missing description is not necessarily inherent.

Furthermore, Dr. Gupta never rules out the possibility that the devices described in these provisional applications could be operated in a mode other than resonant mode. Indeed, at oral argument, Guthrie candidly conceded that the device described in the '731 provisional application, which is similar to the ones described in the other provisional applications, could be operated in a mode other than resonant mode. (Paper 81 at page 8, line 10 to page 17, line 25.)

Finally, Dr. Gupta's repeated use of the language "[a]s would have been known from the prior art, the microwave energy should operate in one of the ISM bands (>915 MHz)..." (Exhibit 2120, ¶¶49, 55, 61, 69) indicates

that the declarants misapprehended the correct standard for assessing written description under 35 U.S.C. § 112, ¶1. While it may have been obvious to a person having ordinary skill in the art to modify the devices described in the provisional applications to operate in resonant mode as suggested in the prior art to obtain known advantages, obviousness based on what is "known from the prior art" is the wrong test.

We do not have to address enablement under 35 U.S.C. § 112, ¶1, because we have concluded that the provisional applications lack adequate written description of a constructive reduction to practice within the scope of Count 1.

For these reasons, we *GRANT* Espiau's Motion 3.

*Guthrie Contingent Responsive Motion 4: To Be Accorded Benefit of U.S. Provisional Applications 60/192,731, 60/224,503, and 60/224,617 (Contingent on Grant of Espiau Motion 4 to Add Count 2)*

Guthrie's Responsive Motion 4 is contingent on our grant of Espiau Motion 4 to add Count 2. Because we denied Espiau's motion to add Count 2, we *DISMISS* Guthrie's Contingent Motion 4 as moot.

*Guthrie Miscellaneous Motion 5: To Exclude from Evidence Exhibits 1037, 1040, 1056-58, 1066, and 1078-85 and to Strike Portions of Espiau's Replies 2-4*

Guthrie moves to "exclude from evidence Exhibits 1037, 1040, 1056-1058, 1066, 1078, 1081 and 1083 [sic, 1078-85] as unsupported by any consistent definition of one of ordinary skill in the art." (Paper 66 at 1.) Guthrie specifically seeks exclusion of: (1) certain portions of Exhibits 1040, 1066, and 1078-85 referring to "ByteLight" (paper 66 at 5); (2) Dr. Wharmby's testimony in Exhibits 1040, 1058, 1081, and 1084 (paper 66 at 5-7 and 9-10); and (3) Dr. Pozar's testimony in Exhibits 1037, 1056, 1057, 1078, and 1085 (paper 66 at 9).

Even if Guthrie's motion were based on sound legal authority, we dismiss it as to Exhibits 1056-1058, 1066, and 1078-85 because we have not relied on them. Espiau did not rely on these exhibits in any of its Motions 2-4. Espiau did rely on them in its oppositions, but we did not have to reach Espiau's oppositions.

With respect to Exhibits 1037 and 1040, Espiau has relied on them in support of its Motion 2, and we have considered them. But Guthrie's motion as to Exhibits 1037 and 1040 must also be dismissed as moot because we have denied Espiau Motion 2.

Guthrie also moves to strike portions of Espiau's Replies 2-4 as referring to "ByteLight," which was not discussed in Espiau Motions 2-4. Even if Guthrie is correct, we have not relied on "ByteLight" in making our rulings here today because we did not have to reach Espiau's Replies 2-4.

Guthrie Miscellaneous Motion 5 is *DISMISSED* as moot.

*Espiau Miscellaneous Motion 5: To Exclude from Evidence Exhibits 2086, 2089, 2092-94, 2102, 2103, 2105, 2120, and 2124*

Espiau moves to exclude (in part or whole) from evidence Exhibits 2086, 2089, 2092-94, 2102, 2103, 2105, 2120, and 2124. (Paper 67.)

**A. Exhibits 2086:**

Espiau's motion with respect to Exhibit 2086 focuses on Guthrie's reliance of the evidence in support of Guthrie Preliminary Motion 1. (Paper 67 at 5.) We have considered this evidence. Nevertheless, because we have denied Guthrie Preliminary Motion 1, we dismiss Espiau's motion to exclude as moot.

**B. Exhibit 2089**:

Espiau motion with respect to Exhibit 2089 focuses on Guthrie's reliance of Exhibit 2089 in support of Guthrie Preliminary Motion 1. (Paper 67 at 5-6.) We have considered this evidence. Nevertheless, because we

have denied Guthrie Preliminary Motion 1, we dismiss Espiau's motion as moot.

Espiau also argues that "Dr. Gupta is not one of skill in the art of electrodeless plasma lamps" and "has no basis to opine as an expert...or on what the person of ordinary skill in the art would know." (Paper 67 at 6.) We deny this objection. Dr. Gupta does not have to be "one of skill in the art of electrodeless plasma lamps" to be a qualified expert witness. Here, Dr. Gupta is eminently qualified through professorships (San Diego State University, University of California, San Diego, Massachusetts Institute of Technology, University of Illinois, and Florida State University) as well as professional experience. (Exhibit 2089, ¶¶1-9.) In particular, Dr. Gupta has states: "I am intimately familiar with the theory and operation of waveguides and resonant cavities, and have taught a variety of graduate and undergraduate courses concerning such devices." (*Id*. at ¶3.)

Espiau also seeks to exclude Exhibit 2089 on the basis that Dr. Gupta's opinions are speculative and lack foundation. (Paper 67 at 7.) Specifically, Espiau contends that "Dr. Gupta's paragraphs 34, 36-57, 61-63, and 65-66 lack foundation in any personal knowledge about electrodeless plasma lamps." We deny this aspect of Espiau's motion because Espiau fails to identify any basis for alleging that Dr. Gupta's statements are not

based on personal knowledge. To the extent that Dr. Gupta's statements are not presented as absolute certainties or are not entirely consistent with other testimony, such an observation would go to weight, not admissibility, of the evidence.

**C. Exhibits 2092-94, 2102, and 2103**:

We dismiss Espiau's objection with respect to Exhibits 2092-94, 2102, and 2103 because we have not relied on any of them. Guthrie relied on Exhibits 2092-94 in its Motion 2, which we denied, but these exhibits were irrelevant to our analysis. Guthrie relied on Exhibits 2102 and 2103 in its Contingent Motion 4, but we never reached this motion.

**D. Exhibits 2105, 2120, and 2124**:

Espiau's motion against these declarations of Dr. Gupta mirror those made against Exhibit 2089. Suffice it to say, we find them equally unpersuasive.

Espiau's Miscellaneous Motion 5 is *DISMISSED IN PART* and *DENIED IN PART*.

***ORDER***

In sum, it is:

ORDERED that

*Guthrie Preliminary Motion 1* to be accorded benefit with respect to the count based on United States Provisional Application 60/192,731 is ***DENIED***;

*Guthrie Miscellaneous Motion 2* to add United States Patent 6,922,021 B2 to the interference and to designate claims 1-46 of the ‘021 patent as corresponding to the count is ***DENIED***;

*Guthrie Preliminary Motion 3* for judgment that all of Espiau’s involved claims are unpatentable as failing to comply with the written description requirement of 35 U.S.C. § 112, ¶1 is ***DENIED***;

*Guthrie Responsive Motion 4*, contingent on our grant Espiau’s Motion 4 to add Count 2, to be accorded benefit with respect to Count 2 based on each of the ’731, ‘503, and ’617 provisional applications is ***DISMISSED***;

*Guthrie Miscellaneous Motion 5* to exclude from evidence Exhibits 1037, 1040, 1056-58, 1066, 1078-85 “as unsupported by any consistent definition of one of ordinary skill in the art” and to strike

portions of the Espiau's Replies 2-4 "[which] introduce new evidence rather than address Guthrie's Oppositions" is ***DISMISSED***;

*Espiau Motion 2* for judgment that all of Guthrie's involved claims are unpatentable as failing to comply with the enablement and written description requirements of 35 U.S.C. § 112, ¶1, is ***DENIED***;

*Espiau Motion 3* for a determination that Guthrie is not entitled to benefit with respect to Count 1 on any of the provisional applications for which benefit has been accorded is ***GRANTED***;

*Espiau Motion 4* to (1) add Count 2 and to designate Espiau claims 2 and 3 and Guthrie claim 110 as corresponding thereto, (2) to be accorded benefit with respect to Count 2 based on the '028 provisional application, and (3) to deny benefit to Guthrie with respect to Count 2 for all of Guthrie's accorded benefit applications is ***DENIED***; and

*Espiau Miscellaneous Motion 5* to exclude from evidence all of Exhibits 2086, 2092-94, and 2102-03 and portions of 2089, 2105, 2120, and 2124 ***DISMISSED IN PART and DENIED IN PART***.

/Jameson Lee/
JAMESON LEE
Administrative Patent Judge

/Romulo H. Delmendo/
ROMULO H. DELMENDO
Administrative Patent Judge

/Sally C. Medley/
SALLY C. MEDLEY
Administrative Patent Judge

BOARD OF PATENT APPEALS AND INTERFERENCES

cc (via electronic mail):

Attorney for ***GUTHRIE***:
npisano@luce.com

Attorney for ***ESPIAU***:
rneifeld@neifeld.com

# EXHIBIT K

Filed on behalf of:
Charles Guthrie, Edmund Sandberg, Donald Wilson, Gregory Prior, and David Smoler
By: Nicola A. Pisano, Esq.
Jones Day
12265 El Camino Real, Suite 200
San Diego, California 92130-4096

Paper No. _________

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES

---

CHARLES **GUTHRIE**, EDMUND SANDBERG,
DONALD WILSON, GREGORY PRIOR, and DAVID SMOLER
Junior Party
(Application 09/818,092),

v.

FREDERICK M. **ESPIAU**, CHANDRASHEKHAR J. JOSHI,
and YIAN CHANG
Senior Party
(Patent 6,737,809).

---

Patent Interference No. 105,393 (SCM)

---

GUTHRIE MISCELLANEOUS MOTION 6

(Request for Rehearing)

**I. RELIEF REQUESTED**

Junior Party Guthrie et al. ("Guthrie") requests rehearing of the Board's February 27, 2007 Decision ("Decision") denying Guthrie's Miscellaneous Motion 2 to add United States Pat. No. 6,922,021 ("the '021 Patent") into this interference. Guthrie further requests rehearing of the Board's grant of Espiau's Motion 3, which denied Guthrie the benefit of any of the filing dates of Guthrie's U.S. provisional patent application Ser. Nos.: 60/224,059 ("the '059 application"); 60/224,298 ("the '298 application"); 60/224,290 ("the '290 application"); 60/224,291 ("the '291 application"); 60/224,257 ("the '257 application"); 60/224,289 ("the '289 application"); 60/224,866 ("the '866 application"); and 60/234,415 ("the '415 application") (collectively, "the provisional applications").

**II. ARGUMENT**

Guthrie respectfully submits that the Board, in reaching its Decision on Guthrie's Motion 2 and Espiau's Motion 3, overlooked or misapprehended key evidence, as more fully set forth herein below.

A. The '021 Patent Interferes With Guthrie's Claimed Invention

On page 30, line 7 to page 33, line 15, the Decision states that Guthrie's motion fails because it fulfills only part of the requirements of 37 CFR §§ 41.202 and 41.203. In particular, the Board observed that Guthrie's chart did not explicitly compare a claim of the '021 Patent to a claim of the '092 Application. The opinion is believed to have overlooked Guthrie's statement that claim 109 of United States Pat. App. No. 09/818,092 ("the '092 Application") corresponds to claim 1 of the '809 Patent, which was in the chart of Appendix 3, as recited in Guthrie's Miscellaneous Motion 2 at page 2, lines 20-22.

Guthrie's Appendix 3 of its Motion 2 included a chart that compared the claims of the '021 Patent to the count, as well as to the specification of the '092 Application. In Guthrie's chart, claim 1 of the '809 Patent was listed in the column representing the count. Although the chart of Appendix 3 did not explicitly compare claim 109 of the '092 Application to claim 1 of the '021 Patent, claim 109 of the '092 Application corresponds to claim 1 of the '809 Patent, and both form the basis for the count in this interference. See Paper No. 1 at 3. Guthrie specifically addressed this fact in its Motion 2 at page 2, lines 20-22, and accordingly the column of the chart at Appendix 3 corresponding to claim 1 of the '809 Patent also corresponds to claim 109 of the '092 Application. Guthrie therefore respectfully submits that the chart of Appendix 3 of Guthrie Motion 2 fully complies with the requirements of 37 CFR §§ 41.202 and 41.203.

On page 32, lines 12, to page 33, line 11, the Decision states that Guthrie's motion failed to adequately explain why the cited portions of the '021 Patent specification necessarily establish the inherency of the limitations in question of the claimed invention. The Board states that Guthrie did not satisfactorily account for all differences, such as the "generally opposed to a lamp chamber bottom" or "integrated structure" limitations. Guthrie respectfully submits that the Decision misapprehended the discussion of these limitations as set forth in Appendix 3 to Guthrie's Motion 2.

In particular, Appendix 3 to Guthrie's Miscellaneous Motion 2, at page A3-1, second column, explains the inherency of the "generally opposed to a lamp chamber bottom" limitation. Page A3-1, second column, notes that with respect to the "lamp chamber" limitation, the '809 Patent describes "an enclosed first cavity depending from said first surface into the waveguide body." The second column further states that:

> It is inherent that a cavity, described as "an open receptacle in a waveguide body having an aperture in a body surface," would have a bottom that is generally opposed to the aperture. See, the '021 patent at col. 1, lines 30 – 40.
>
> Guthrie Motion 2 at A3-1, second column.

The above-cited portion of the '021 Patent recites that the '809 Patent disclosed preferred embodiments of a plasma lamp, and states that, "[a] lamp chamber is an open receptacle in a waveguide body having an aperture in a body surface which typically is coplanar with a waveguide surface exposed to the environment."

The Board notes that because the '021 Patent characterizes the '809 Patent as "discuss[ing] 'preferred' or 'typical' embodiments" that there is no evidence that a lamp chamber inherently has a "lamp chamber bottom" or constitutes "an integrated structure." While the cited portion of the '021 Patent does state that the '809 Patent discloses preferred embodiments of a plasma lamp, there is no such qualifier used in the text defining the "lamp chamber." Rather, cited portion of the '021 Patent states unequivocally that: "A lamp chamber is an open chamber …." This lack of qualifying language shows that Espiau intended the discussion of the lamp chamber to refer to all lamp chambers, not just those of a preferred embodiment. Hence, the Board's interpretation that Espiau was only referring to preferred embodiments of the lamp chamber is erroneous.

Moreover, the Board misapprehended the use of the word "typically" in the sentence: "[a] lamp chamber is an open receptacle in a waveguide body having an aperture in a body surface which ***typically*** is coplanar with a waveguide surface exposed to the environment." The term "typically" is used to describe the orientation of the ***aperture*** in a body surface vis-à-vis the waveguide surface exposed to the environment. The Board, however, appears to interpret this sentence as suggesting that the specification describes "'typical' embodiments", as indicated on

page 3, lines 7-11 of the opinion. Hence, the language of the ‘021 Patent cited by Guthrie, stating “A lamp chamber is an open receptacle in a waveguide body having an aperture in a body surface” is neither merely a “preferred” nor a “typical” embodiment, but rather applies to all embodiments of lamp chambers. Moreover, Guthrie cannot conceive of a configuration in which an aperture that extends from a surface into a body does not have a “bottom” as required by claim 1 of the ‘021 Patent. Guthrie therefore respectfully submits that because a “lamp chamber” as defined by Espiau must necessarily have “a lamp chamber bottom,” the Board’s Decision to deny Guthrie’s Motion 2 should not be based upon this alleged defect in Guthrie’s proofs.

Similarly, the Board stated that Guthrie failed to explain why the “integrated structure” limitation was inherent. Claim 1 of the ‘021 Patent includes the limitation “the waveguide body and lamp chamber comprising an integrated structure.” Guthrie cited language in the ‘021 Patent that in describing the disclosure of the ‘809 Patent states, “The waveguide body and bulb(s) are integrated into a unitary structure.” Guthrie Motion 2, Appendix 3, at A3-1, second column, citing the ‘021 Patent at column 1, lines 53-62. Guthrie respectfully submits that the plain language meaning of “unitary” is “integral”, as can be established using any dictionary or thesaurus. Because the ‘021 Patent recites that the “waveguide body and bulb(s) are integrated into a unitary structure” – without qualifying language suggesting that the embodiments are merely “preferred” or “typical” – no further explanation is required to clarify why integrating components into a “unitary structure” results in an “integrated structure.”

Moreover, “an enclosed first cavity depending from said first surface into the waveguide body”, as recited in the interfering claims, inherently is an “integrated structure” because the cavity cannot exist but for the surrounding waveguide material that defines the cavity.

In view of the foregoing, Guthrie respectfully requests that the Board reconsider the portion of the Decision denying Guthrie's Motion 2, and grant Guthrie's Motion 2.

B. Guthrie's '092 Application Should Be Accorded Benefit

On page 38, line 2 to page 43, line 11, the Decision grants Espiau's Motion 3, stating that Guthrie failed to demonstrate that limitations missing in the provisional applications are inherently or necessarily present. As support for this aspect of the Decision, the Board found that Dr. Gupta's testimony, as set forth in his third declaration (Exhibit 2120), was equivocal as to whether Dr. Gupta's views would have been held by a person of ordinary skill in the art. The Decision does not address the merits of the arguments regarding each of the Guthrie provisional applications, but instead denies the benefit of all of the applications based upon alleged general defects in Dr. Gupta's testimony.

Guthrie respectfully submits that the Decision overlooked or misapprehended key portions of Dr. Gupta's testimony (Exhibit 2120), and particularly, to have misapprehended Dr. Gupta's use of phrases such as "in my view." This point was specifically addressed in Guthrie's Opposition 3 at page 6, line 18 to page 7, line 4 and during oral argument. When read in context, Dr. Gupta's testimony plainly is based upon his understanding of ***how a person of ordinary skill in the art*** would have interpreted the Guthrie provisional applications at the time they were filed.

Dr. Gupta sets forth his understanding of the relevant legal tests at ¶¶ 16-19 of Exhibit 2089 and at ¶¶ 11-16 of Exhibit 2120, and states unequivocally that his testimony reflects how ***one of ordinary skill in the art*** would have understood the Guthrie provisionals. Phrases such as "in my view" appearing at the beginning of paragraph 17 or in paragraph 45 of Exhibit 2120 must be read in context to include all of the preceding testimony, not as a disembodied "personal" opinion of Dr. Gupta. Guthrie respectfully submits that the Board has seized upon

phrases such as "in my view" while overlooking or misapprehending that Dr. Gupta's testimony, as set forth at length in ¶¶ 16-19 of Exhibit 2089 and ¶¶ 11-16 of Exhibit 2120, is fully informed by the appropriate legal tests.

Dr. Gupta's testimony is "in his view" only so much as it sets forth his view as to ***what one of ordinary skill in the art would have understood*** from reading the Guthrie provisional applications, and by way of differentiating his expert testimony from that of Espiau's experts. For example, paragraph 44 of Exhibit 2120 begins "Both Dr. Wharmby (¶¶ 22, 24) and Dr. Pozar (¶¶ 11, 14) state that …." In contrast, paragraph 45 which follows immediately thereafter begins "In my view …." Read in context, Dr. Gupta's use of qualifying language is intended to distinguish his expert testimony as to what one of ordinary skill would have understood from that of Espiau's experts or from other evidence of record.

Further evidence that Dr. Gupta's testimony is directed to the understanding of one of ordinary skill in the art is found by referring to paragraphs 16 and 28, which are directly referred to in paragraph 45 of Dr. Gupta's report. Paragraph 16 of Exhibit 2120 states in part:

> I therefore agree with Dr. Wharmby's statement that one would need "a good reason" not to employ a metal boundary on a dielectric-filled waveguide or resonator. In my view, ***one of ordinary skill would have known this to be the case, and would have considered the use of a metal boundary to be inherently desirable***. (emphasis added).

This excerpt demonstrates that it is Dr. Gupta's expert opinion that it is ***one of ordinary skill***, and not merely Dr. Gupta, who would have found the use of a metal boundary to be inherent. Likewise, paragraph 28 of Dr. Gupta's third declaration states in part "However, as discussed at ¶ 16 above, and as confirmed by the testimony of both Dr. Wharmby and Dr. Pozar, ***one of ordinary skill would have considered the use of metal boundaries inherent***…" (emphasis added). Accordingly, Guthrie respectfully submits that the Board misapprehended Dr. Gupta's

testimony and overlooked other relevant portions of Exhibits 2089 and 2120 when concluding that Dr. Gupta "does not clearly say that a person having ordinary skill in the art would have had the same views" as expressed by Dr. Gupta.

The Board further faults Dr. Gupta's testimony for failing to indicate whether the assumptions he attributes to a person of ordinary skill were the only plausible assumptions or only some amongst a realm of possibilities. As discussed below, the assumptions referenced in Dr. Gupta's testimony would have been made by one of ordinary skill in the art because they are the only plausible assumptions that can be made. Guthrie respectfully submits that the Board overlooked or misapprehended this testimony in deciding otherwise.

The Board cites paragraph 45 of Exhibit 2120 to demonstrate that Dr. Gupta references certain assumptions, but does not state whether those assumptions would be made by one of ordinary skill in the art. Any question as to this issue is quickly resolved by referring to paragraph 66 of Exhibit 2120, in which Dr. Gupta's discussion of the '298 Application states in part:

> As discussed at ¶ 45 above, ***one of ordinary skill would, without delay, realize*** that the waveform depicted in Figure 3.1 of Exhibit 2054 is intended to show that the distance C between the lamp and the antennae is one wavelength, and that the distances of each of the lamp and antenna from the ends of the device are one-quarter wavelength. ***He thus would have understood*** that the waveform does not represent the electric field. ***When so interpreted, one of ordinary skill would have understood that Figure 3.1 shows a resonant cavity similar to that shown of Exhibit 2104, in which the antenna and lamp are located at the electric field maxima***. (emphasis added).

Thus, it is clear that Dr. Gupta's testimony as set forth in paragraph 45 of Exhibit 2120 refers to assumptions that would have been made by one of ordinary skill in the art, and that those assumptions could lead to only a single conclusion - that Figure 3.1 of Exhibit 2054 shows a resonant cavity in which the antenna and lamp are located at the electric field maxima. It is

based of the inevitability of this result that Dr. Gupta concluded that the ‘298 Application discloses at least claim 1 of the ‘809 Patent or claim 109 of the ‘092 Application. Exhibit 2120 at ¶¶ 69 and 70.

Espiau argued that the provisional applications fail to describe the count because they lack three features, as discussed by the Board at page 39, line 10 to page 40, line 9. In reaching its opinions as to the parties’ motions, it appears that the Board relied on Espiau’s mischaracterization of the count. In particular, Espiau contended that the count required that “the first bulb [be] positioned in the cavity at a location corresponding to an electric field maximum during operation” as noted in the Board’s opinion at page 40, lines 1-3. However, claim 32 of the ‘809 Patent and claim 129 of the ‘092 Application, both of which define the count, ***do not require that limitation***. Thus, it appears that the Board misapprehended the requirements for the count based on reliance on Espiau’s contentions.

On page 42, at lines 11-17, the Decision further states that Dr. Gupta never ruled out the possibility that the devices described in the provisional applications could be operated in a mode other than resonant mode. Guthrie respectfully submits that the Board misapprehended the requirements of the claims defining the count. Neither claims 1 or 32 of the ‘809 Patent nor claims 109 or 129 of the ‘092 Application require that a device operate ***only*** in a resonant mode. Instead, the claims merely require that the claimed devices be able to operate in ***at least one*** resonant mode. Hence, it is irrelevant to consider whether the devices disclosed in the provisional applications can also operate in modes other than resonant mode.

One of ordinary skill in the art would not have understood the device disclosed in the ‘298 Application to be anything other than a resonant cavity, and would have further understood that the antenna and lamp of that device are located at the electric field maxima. Exhibit 2120 at

¶¶ 64 and 66. Hence, because a resonant cavity inherently operates in at least one resonant mode, it is immaterial whether the device disclosed in the '298 Application also operates in a mode other than a resonant mode.

As explained above, that Dr. Gupta's testimony unequivocally states that one of ordinary skill in the art would have understood that at least the '298 Application discloses the invention of the count. Guthrie respectfully submits that the Board should not have granted Espiau's Motion 3 without analyzing each of the Guthrie provisional applications for which benefit is claimed. If it had done so, the Board would have determined that at least some of the Guthrie provisional applications, such as '298 Application, meet the written description requirement of 35 U.S.C. 112, ¶ 1.

In addition, Guthrie respectfully submits that if the Board were inclined to strike Guthrie's accorded benefit claims, it should have considered whether Guthrie was entitled to the benefit of the other provisional applications discussed in Guthrie's Opposition papers. In particular, Dr. Gupta discusses in Exhibit 2105 at ¶¶ 24-34 and Exhibit 2120 at ¶ 10, his conclusion that one of ordinary skill would have interpreted U.S. provisional patent application Serial No. 60/224,503 ("the '503 Application") (Exhibit 2031) as describing and enabling the invention of Count 1 (even as narrowly construed by Espiau).[1] Inasmuch as the '503 Application indisputably shows a resonant cavity (*see, e.g.*, Exhibit 2105 at ¶¶ 24-34), and the Board actually considered Dr. Gupta's testimony as set forth in Exhibit 2105 (*see, e.g.* Decision at 36, line 11), Guthrie respectfully submits that the Board should have considered the '503 Application in

[1] Guthrie had originally sought permission to file a motion claiming the benefit of the '503 Application, but withdrew its request during the March 21, 2006 telephonic conference because the Board indicated that the motion was unnecessary. Exhibit 1069, page 56, lines 4-16.

connection with Espiau's Motion 2. In any event, since the parties have already briefed the issue (*see*, Guthrie Opposition 4 at page 16-17; Espiau Reply 4 at pages 8-10), the Board properly may address whether Guthrie is entitled to the benefit of the '503 Application based on the papers already on file.

Guthrie respectfully submits that it satisfied its burden in demonstrating that the limitations missing in the express disclosures of at least some of its provisional applications are inherently or necessarily present, and that one of ordinary skill would have understood that to be the case.

## III. CONCLUSION

Guthrie respectfully requests that the Board reconsider its rulings denying Guthrie's Miscellaneous Motion 2 to add the '021 Patent into this interference and granting Espiau's Motion 3, which denied Guthrie the benefit of any filing dates of any of its provisional applications.

DATED: March 13, 2007

Respectfully submitted,

JONES DAY

By: /Nicola A. Pisano#34,408/
Nicola A. Pisano
Attorneys for Junior Party Guthrie et al.

# EXHIBIT L

The opinion in support of the decision being entered today is *not* binding precedent of the Board.

Paper 89

Filed by:
Trial Division Merits Panel
Mail Stop Interference, Madison East, Room 9D20
P.O. Box 1450
Alexandria VA 22313-1450
Tel: 571-272-4683
Fax: 571-273-0042

Filed: 20 March 2007

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES

---

CHARLES ***GUTHRIE***, EDMUND SANDBERG,
DONALD WILSON, GREGORY PRIOR, and DAVID SMOLER
(CERAVISION LTD.),
Junior Party
(Application 09/818,092),

v.

FREDERICK M. ***ESPIAU***, CHANDRASHEKHAR J. JOSHI,
and YIAN CHANG (LUXIM CORP.),
Senior Party
(Patent 6,737,809 B2).

---

Patent Interference No. 105,393
(Technology Center 2800)

---

Before LEE, DELMENDO, and MEDLEY, *Administrative Patent Judges*.

DELMENDO, *Administrative Patent Judge*.

**DECISION – ON REHEARING – Bd. R. 125(c)**

Junior party Guthrie has filed Miscellaneous Motion 6 (paper 88), requesting rehearing of certain parts of our February 27, 2007 Decision on Preliminary Motions (paper 83). Specifically, Guthrie's request for rehearing is limited to our rulings on two matters: (i) denial of Guthrie's Miscellaneous Motion 2 to add United States Patent 6,922,021 B2 issued to Espiau et al. on July 26, 2005 ('021 patent) to the interference; and (ii) grant of Espiau's Motion 3 to deny Guthrie the benefit of provisional applications 60/224,059 (filed August 9, 2000), 60/224,298 (filed August 10, 2000), 60/224,290 (filed August 10, 2000), 60/224,291 (filed August 10, 2000), 60/224,257 (filed August 10, 2000), 60/224,289 (filed August 10, 2000), 60/224,866 (filed August 11, 2000), and 60/234,415 (filed September 21, 2000). (Paper 83 at 30-33 and 38-43.)

For reasons discussed more fully below, we ***DENY*** Guthrie's request to modify our decision as to these matters.

I. Denial of Guthrie Miscellaneous Motion 2 to Add Espiau's U.S. Patent 6,922,021 B2 to the Interference

We denied Guthrie's motion to add Espiau's '021 patent to the interference because Guthrie did not discharge its burden to make the showings required under 37 CFR § 41.202(a). *See* 37 CFR § 41.203(d). (Paper 83 at 30.) In particular, we pointed out that "37 CFR § 41.202(a)(3)

requires a showing 'why the claims [of the opponent's patent that the applicant seeks to add] interfere' with the claims of the applicant," but that Guthrie failed to "include [in its motion] any meaningful discussion on whether the subject matter of Guthrie's involved claims (i.e., the claims of Guthrie's '092 application) interfere with the subject matter of the opponent's '021 patent claims within the meaning of 37 CFR § 41.203(a)." (Paper 83 at 31-32.)

In its request for rehearing, Guthrie contends that we "overlooked Guthrie's statement that claim 109 of United States Pat. App. No. 09/818,092 ('the '092 Application') corresponds to claim 1 of the '809 Patent, which was in the chart of Appendix 3, as recited in Guthrie's Miscellaneous Motion 2 at page 2, lines 20-22." (Paper 88 at 1.) We did not overlook this statement. Rather, we found it inadequate.

The statement in question is reproduced as follows:

> Claim 1 of the '809 patent (and claim 109 of the '092 application), directly anticipates or renders obvious claim 1 of the '021 patent, and vice versa, as illustrated in the claim chart attached hereto as Appendix 3. [Guthrie Miscellaneous Motion 2, paper 39, at 2.]

Nowhere in the "ARGUMENT' section of Guthrie's Miscellaneous Motion 2 is there any meaningful discussion on whether the subject matter of Guthrie's involved claims (i.e., the claims of Guthrie's '092 application)

anticipates or renders obvious the subject matter of Espiau's '021 patent claims and *vice versa*, as required under 37 CFR § 41.203(a).

Guthrie's chart identified as Appendix 3 is of no help. We have not been directed to anything in the chart that compares the *claims* of the '092 application to the claims of the '021 patent.

Guthrie's belief that we should draw inferences and make speculations based on the mere correspondence of the '809 patent claims and the '092 application claims is in error because it is not in accordance with our pertinent rules, which are rooted in the principle that an interference is declared to resolve a conflict between the claims of *opposing* parties. It is insufficient to compare the claims of Espiau's '809 patent claims to the claims of Espiau's '021 patent and then conclude, without any further meaningful explanation, that the claims of Espiau's '021 patent interferes with Guthrie's involved claims.

In any event, granting a party's motion to add another party's patent to the interference is the same as declaring an interference because it places the additional patent in interference with the moving party's application. The statutory basis for declaring an interference, 35 U.S.C. § 135(a), reads in pertinent part as follows:

> Whenever an application is made for patent which, in the opinion of the Director, would interfere with any pending application, or with any unexpired patent, an interference may be declared...

Our reviewing court has explained that the plain meaning of this statute indicates that the Director of the United States Patent and Trademark Office has discretion in deciding whether to declare an interference. *Barton v. Adang*, 162 F.3d 1140, 1144, 49 USPQ2d 1128, 1132 (Fed. Cir. 1998)("The plain meaning of this statute is clear from the use of the permissive term 'may' that the [Director] has discretion whether to declare an interference."); *Louis v. Okada*, 57 USPQ2d 1430, 1434-36 (BPAI 2000)(expanded panel)(explaining that the Board's decision not to add a patent into an interference is discretionary) .

We have considered Guthrie's arguments concerning Guthrie's reliance in Miscellaneous Motion 2 of the '021 patent specification disclosure at column 1, lines 53-62 and column 1, lines 30-40 but find them unpersuasive. (Paper 88 at 3-5.) We find that Guthrie did not sufficiently demonstrate that the claims of the '809 patent should be construed in the manner as asserted. Even assuming that Guthrie did do so, a comparison of the claims of Espiau's '809 patent to the claims of Espiau's '021 patent, for the purpose of establishing the existence of an interference between the

claims of Espiau's '021 patent and the claims of Guthrie's '092 application, is inadequate to discharge Guthrie's burden of proof on this matter.

II. Grant of Espiau's Motion 3 to Deny Benefit of Guthrie's Provisional Applications

We granted Espiau's motion to deny Guthrie the benefit of certain of its provisional applications because: (1) the provisional applications did not expressly describe a constructive reduction to practice of a waveguide operating in at least one resonant mode; and (2) Guthrie did not successfully rebut by demonstrating that the missing limitation (operation of the waveguide in at least one resonant mode) is inherently or necessarily present in the waveguides of the provisional applications. (Paper 83 at 40-43.)

In its request for rehearing, Guthrie contends that we overlooked or misapprehended key portions of Dr. Madhu S. Gupta's testimony (Exhibit 2120). (Paper 88 at 5.) According to Guthrie, Dr. Gupta's testimony was, contrary to our observation (paper 83 at 40-42), "based upon his understanding of *how a person of ordinary skill in the art* would have interpreted the Guthrie provisional applications at the time they were filed." (Paper 88 at 5-6.) Guthrie further asserts that the assumptions discussed in Dr. Gupta's testimony (Exhibit 2120, ¶45) "are the only plausible assumptions that can be made [by one skilled in the relevant art]."

Even assuming that Dr. Gupta's testimony is interpreted to address the understanding of one of ordinary skill in the art (as opposed to Dr. Gupta's personal views based on a highly qualified expert's perspective), Dr. Gupta does not unequivocally say that one of ordinary skill in the art could not possibly have viewed the disclosures of the provisional applications with alternative reasonable assumptions. While Dr. Gupta states that "[t]he *most reasonable* assumption is that the waveform was intended to show only that the distance C between the lamp and the antennae is one wavelength, and that the distances of each of the lamp and antenna from the ends of the device are one-quarter wavelength," the Board is not in the business of making assumptions of fact, whatever they may be. (Exhibit 2120, ¶45; emphasis added.) The moving party has the burden to demonstrate entitlement to relief. There is no place in that endeavor to ask the Board to make certain assumptions. The moving party must establish each fact that is necessary for relief. Because Dr. Gupta does not rule out the possibility of other reasonable interpretations and the statement "there is no a priori reason why the wavelength should not be assumed..." (Exhibit 2120, ¶45) merely establishes a possible or probable assumption, as opposed to a fact, the moving party failed to make out its case. *Cf. MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365, 52 USPQ2d 1303, 1305 (Fed. Cir.

1999)(reaffirming the principle that anticipation cannot be established by mere possibilities or probabilities).

Moreover, Guthrie has not proven that the devices described in the provisional applications could not be operated in a mode other than in at least one resonance mode. As we discussed in our February 27, 2007 Decision (page 42), Guthrie has conceded that the device described in Guthrie's 60/192,731, which is similar to the ones described in the provisional applications at issue, can be operated in modes other than a resonant mode. Also, Dr. Gupta repeatedly stated; "*As would have been known from the prior art*, the microwave energy should operate in one of the ISM bands (>915 MHz)..." (Exhibit 2120, ¶¶49, 55, 61, 69; emphasis added.) Thus, the relied upon evidence may be sufficient to establish that it have been obvious to one of ordinary skill in the art to select conditions (e.g., frequency) and thus arrive at a waveguide encompassed by the count based on each of the disclosures of the provisional applications. The obviousness standard, however, is not appropriate for determining whether there is an anticipation under 35 U.S.C. § 102(g)(1).

Guthrie argues that "the claims merely require that the claimed devices be <u>able</u> to operate in *at least one* resonant mode" (underscoring added) and that, therefore, "it is irrelevant to consider whether the devices

disclosed in the provisional applications can also operate in modes other than resonant mode." (Paper 88 at 8.) This argument lacks merit. The count is claim 109 of Guthrie's '092 application, claim 1 of Espiau's '809 patent, claim 129 of Guthrie's '092 application, or claim 32 of Espiau's '809 patent. Claim 109 of the '092 application recites in part:

> (b) a first feed positioned within and in intimate contact with the waveguide body, adapted to couple energy into the body *from a source having an output and operating at a preselected frequency and intensity, the feed connected to the source output*, said frequency and intensity and said body shape and dimensions selected such that the body *resonates* in at least one resonant mode having at least one electric field maximum

Similarly, Claim 1 of Espiau's '809 patent recites in part:

> (b) a *first microwave feed positioned* within and in intimate contact with the waveguide body, adapted to couple microwave energy into the body from *a micro-wave source having an output and an input and operating within a frequency range from about 0.5 to about 30 GHz at a preselected frequency and intensity*, the feed connected to the source output, said frequency and intensity and said body shape and dimensions selected such that *the body resonates* in at least one resonant mode having at least one electric field maximum

Claim 129 of Guthrie's '092 application and claim 32 of Espiau's '809 patent are method claims including the steps of coupling a specified microwave energy and directing resonating energy into a specified envelope. Thus, contrary to Guthrie's suggestion, the count requires the devices to be in a state of at least one resonant mode. That is, the count requires more

than merely an ability to operate in at least one resonant mode. A disclosed device, even if capable of operating in at least one resonant mode, would not anticipate if it is not in a *state* of at least one resonant mode.

Guthrie argues that claim 32 of the '809 patent and claim 129 of the '092 application, both of which are alternatives of the count, do not require that "the first bulb [be] positioned in the cavity at a location corresponding to an electric field maximum." (Paper 88 at 8.) As discussed, these claims are method claims including the steps of coupling specified microwave energy and directing resonating energy into a specified envelope. Guthrie has not proven that a method within the scope of either of these claims is inherent or necessarily present in the disclosures of the provisional applications.

Guthrie asserts that "if the Board were inclined to strike Guthrie's accorded benefit claims, it should have considered whether Guthrie was entitled to the benefit of the other provisional applications discussed in Guthrie's Opposition papers." (Paper 88 at 9.) Guthrie further argues (*id*.):

> In particular, Dr. Gupta discusses in Exhibit 2105 at ¶¶24-34 and Exhibit 2120 at ¶10, his conclusion that one of ordinary skill would have interpreted U.S. provisional patent application Serial No. 60/224,503 ("the '503 application")(Exhibit 2031 [sic, 2029]) as describing and enabling the invention of Count 1 (even as narrowly construed by Espiau).

We find these contentions without merit for a number of reasons. Consideration of whether a party is entitled to benefit of an earlier application is made by way of an authorized motion, not an opposition to the other party's unrelated motion.[1] Also, Guthrie has identified its Opposition 4 as the relevant opposition requesting benefit of the '503 provisional application. (Paper 88 at 10.) To the extent that we considered this opposition, we did so to determine whether Espiau's proposed Count 2 was separately patentable from Count 1, not "whether Guthrie was entitled to the benefit of the other provisional applications discussed in Guthrie's Opposition papers." We decline to do so now.

Conclusion

We have reconsidered our decision as to our rulings on Guthrie's Miscellaneous Motion 2 and Espiau's Motion 3 in light of the arguments advanced in Guthrie's request for rehearing. Having done so, we detect no reason to modify our decision in any respect.

[1] Guthrie states that it "had originally sought permission to file a motion claiming the benefit of the '503 Application, but withdrew its request during the March 21, 2006 telephonic conference because the Board indicated that the motion was unnecessary." (Paper 88 at 9, n. 1.) This issue has already been addressed in the Decision on Interlocutory Motions dated March 13, 2007, and we need not discuss it any further.

***ORDER***

In sum, it is:

ORDERED that Guthrie's request for rehearing to modify our decision as to Guthrie's Miscellaneous Motion 2 and Espiau's Motion 3 is *DENIED*.

/Jameson Lee/
JAMESON LEE
Administrative Patent Judge

/Romulo H. Delmendo/
ROMULO H. DELMENDO
Administrative Patent Judge

/Sally C. Medley/
SALLY C. MEDLEY
Administrative Patent Judge

BOARD OF PATENT APPEALS AND INTERFERENCES

cc (via electronic mail):

Attorney for ***GUTHRIE***:
napisano@JonesDay.com

Attorney for ***ESPIAU***:
rneifeld@neifeld.com

# EXHIBIT M

Filed on behalf of:
Charles Guthrie, Edmund Sandberg, Donald Wilson, Gregory Prior, and David Smoler
By: Nicola A. Pisano, Esq.
JONES DAY
12265 El Camino Real, Suite 2000
San Diego, California 92130

Paper No. __________

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES

---

CHARLES **GUTHRIE**, EDMUND SANDBERG,
DONALD WILSON, GREGORY PRIOR, and DAVID SMOLER
Junior Party
(Application 09/818,092),

v.

FREDERICK M. **ESPIAU**, CHANDRASHEKHAR J. JOSHI,
and YIAN CHANG
Senior Party
(Patent 6,737,809).

---

Patent Interference No. 105,393 (SCM)

---

GUTHRIE PRIORITY MOTION 7

TABLE OF CONTENTS

Page

I. STATEMENT OF RELIEF………………………………………………………… 1

II. ARGUMENT……………………………………………………………………….. 1

A. The Background, The Parties And Summary Of The Evidence…………. 1

B. Guthrie Was The First To Complete Conception Of The Invention…….. 6

C. Guthrie Was The First To Actually Reduce The Invention To Practice…13

D. Espiau Derived The Invention Of The Count From Guthrie…………… 19

E. Any Reduction To Practice By Espiau Inures To Guthrie's Benefit…… 22

F. Espiau's Efforts To Distort The Record Should Be Rejected…………... 28

III. CONCLUSION……………………………………………………………… 30

Appendix 1………………………………………………………………………….A1-1

Appendix 2………………………………………………………………………….A2-1

Appendix 3…………………………………………………………………………..A3.1-1

TABLE OF AUTHORITIES

Case Law Page

*Barnet v. Wied*,

195 F.2d 311, 93 USPQ 161 (C.C.P.A. 1952)……………………………19, 23

*Burroughs Wellcome Co. v. Barr Laboratories Inc.*,

40 F.3d 1223, 32 USPQ2d 1915 (Fed. Cir. 1994)……………………………..6

*Cooper v. Goldfarb*,

154 F.3d 1321, 47 USPQ2d 1896 (Fed. Cir. 1998)…………………...13, 19, 23

*Gambro Lundia AB v. Baxter Healthcare Corp.*,

110 F.3d 1573, 42 USPQ2d 1378 (Fed. Cir. 1997)…………………………...19

*Henkel Corp. v. The Procter & Gamble Co.*,

__ F.3d __, 82 USPQ2d 1784 (Fed. Cir. 2007)……………………………… 13

*Maxwell v. Kmart Corp.*,

880 F. Supp. 1323 (D. Minn. 1995).………………………………………………7

*Pandrol USA LP v. Airboss Railway Products Inc.*,

424 F.3d 1161, 76 USPQ2d 1524 (Fed. Cir. 2005)…………………………...30

*Price v. Symsek*,

988 F.2d 1187, 26 USPQ2d 1031 (Fed. Cir. 1993)……………………...6, 7, 19

*Townsend v. Smith*,

4 USPQ 269 (C.C.P.A. 1929)……………………………………………………..6

*Vancil and Jenkins v. Arata*,

202 USPQ 58 (Bd. Pat. App. & Int. 1977)…………………………………… 7

Rules Page

37 C.F.R § 1.56 .......... 29

37 C.F.R. § 10.87 .......... 28, 29

37 C.F.R. § 10.92 .......... 28, 29

37 C.F.R. 41.207(b) .......... 5

## I. STATEMENT OF RELIEF

Junior Party Guthrie et al. ("Guthrie") hereby sets forth its basis for entitlement to priority of invention of the Count on the grounds that: (1) Guthrie was the first to conceive the invention of the Count and the first to actually reduce it to practice; (2) Senior Party Espiau et al. ("Espiau") derived the invention from Guthrie; and (3) any reduction to practice by Espiau, constructive or actual, inures to Guthrie's benefit.

## II. ARGUMENT

### A. <u>The Background, The Parties And Summary Of The Evidence</u>

Ceravision Limited ("Ceravision") is the owner by assignment of the involved Guthrie application, U.S. patent application Serial No. 09/818,092 ("the '092 application"). (Facts 1-4). The '092 application was filed by Digital Reflection, Inc. ("DRI") on March 26, 2001, and discloses a plasma lamp comprising an enclosed gas cavity disposed in a dielectric resonator, as recited in the Count. (Fact 5). That invention was conceived by DRI employees Ed Sandberg ("Sandberg"), Greg Prior ("Prior"), Don Wilson ("Wilson"), Charles Guthrie ("C. Guthrie") and DRI consultant David Smoler ("Smoler") no later than March 31, 2000. (Facts 11-47).

Guthrie's conception arose from research that DRI began actively pursuing in late 1999 to develop a new light source for its new projection television system. (Fact 7). In late 1999 and early 2000, DRI was collaborating with International Technology Works ("ITW"), at that time a subsidiary of Ceravision, to develop a ceramic bulb, and manufacturing methods therefore, for the DRI light source. (Fact 39). Former ITW employees Anthony Cooper and Floyd Pothoven corroborate the March 2000 conception of the DRI inventors. (Fact 46). Former DRI consultant, Tim Russell ("Russell"), also was present during the conception of the invention of the Count and his testimony corroborates that conception. (Fact 47).

By late March 2000, DRI had lost the services of its RF consultants, Smoler and Russell and retained a company owned by David Turner ("Turner"), Turner Engineering Co. ("Tenco"), to work on the DRI plasma lamp and RF exciter package. (Facts 48-50). Tenco represented that it would use the services of a consulting company, Betadot, initially consisting of UCLA professors Chandrashekhar Joshi ("Joshi") and Matt Espiau ("M. Espiau"). (Fact 12). By May 7, 2000, Yian Chang ("Chang"), another professor at UCLA, began working on the DRI plasma lamp project for Betadot. (Facts 56-58). At that time, the Tenco and Betadot employees had no experience in plasma lamps, gas-filled bulbs or ceramic components and no idea how to design or make such devices. (Facts 67-68).

Within the last two weeks of March 2000, Turner met with Prior to discuss the proposed scope of services that Tenco would provide for DRI. (Fact 51). During that initial meeting, Prior provided Turner with an overview of the DRI development status, including the existing loop-type plasma lamp prototype and a second generation dielectric resonator plasma lamp design under development. (Fact 52). DRI signed an Engineering Services Agreement with Tenco on April 4, 2000. (Fact 61).

A meeting was held at the offices of ITW in Escondido on April 11, 2000 to discuss the development schedule for DRI's plasma lamp. (Fact 63). Attendees at this meeting included DRI representatives (C. Guthrie, Prior, Wilson), Tenco/Betadot representatives (Turner, M. Espiau, Joshi), and at various times several of the ITW personnel. (Facts 63-66). Early during DRI's presentation, M. Espiau suggested the use of a waveguide to couple the bulb and printed wiring board. (Fact 69). Prior immediately explained that DRI had already developed a plasma lamp based on a dielectric waveguide resonator design. (Fact 70). Because DRI and Tenco/Betadot concluded that the dielectric resonator design would simplify the RF electronics,

and could benefit from the DRI/ITW ceramic technology development, they agreed that Tenco/Betadot would support DRI in advancing development of the ceramic waveguide resonator plasma lamp. (Facts 73-74). On April 17, 2000, C. Guthrie and Wilson met with Joshi and M. Espiau at ITW's Bellflower facility to begin transferring technical information to Betadot regarding ceramics and DRI's ceramic bulb development program with ITW. (Fact 83).

On April 20, 2000, after their initial technical discussions with C. Guthrie and Wilson, Tenco and Betadot prepared a simplistic overview of the purported advantages, issues and next steps involved in developing DRI's dielectric resonator concept for the benefit of DRI's founder, Wayne Catlett ("Catlett"). (Facts 87-88). That presentation was attended by Prior, Sandberg and Wilson, who learned nothing that they had not already known regarding the proposed resonator plasma lamp design ***before the collaboration with Tenco and Betadot began***. (Facts 89-90). Neither Tenco nor Betadot ever expressed the view that the proposed dielectric resonator was ***not*** invented by DRI or that it constituted Tenco proprietary information. (Facts 92-93). That day, DRI and Tenco signed a Statement of Work providing a budget of $375,000 for the proposed DRI/Tenco/Betadot collaboration. (Fact 91). Unbeknowst to DRI, Turner, Espiau and Joshi had already begun scheming to claim DRI's dielectric resonator plasma lamp as their own and to form their own new company to commercialize it. (Fact 94). As admitted by Espiau, "[s]hortly after the meeting on 11th April 2000 Mr. Turner , Dr. Joshi and Mr. Espiau resolved to form a new company [Luxim] to develop and exploit the [ceramic waveguide] concept referred to above." *Id.*

Over the course of the next three months, DRI provided Tenco/Betadot with: daily technical, engineering and design services of its bulb experts, C. Guthrie and Wilson; access to the ceramic technology and ceramic bulb design developed by DRI and ITW; access to, and a

loan of, the existing DRI plasma lamp embodiment and RF equipment; a supply of DRI's proprietary gas-filled metal halide quartz bulbs; numerous dielectric resonator samples, supplies and electronics components paid for entirely by DRI; a research grant for Joshi's laboratory at UCLA; installation of high voltage service in Espiau's basement laboratory; and access and paid visits to DRI's ceramics and component suppliers. (Facts 95-161; 180-188). Despite DRI's payment to Tenco/Betadot of several hundred thousand dollars for their assistance in developing DRI's plasma lamp, Tenco/Betadot provided no deliverables to DRI except for a single Powerpoint presentation on May 22, 2000 and a stream of e-mailed progress reports. (Fact 127).

On May 12, 2000, unknown to any of the DRI inventors, Turner reported to Catlett that the dielectric resonator plasma lamp was solely the invention of Tenco/Betadot. (Facts 117-118). Turner also informed Catlett that Tenco/Betadot would form a new company, Luxim, to take title to the patent application he intended to file on the dielectric resonator plasma lamp, and that ***if DRI invested up to another $2 million dollars in Luxim***, it could receive a license limited to "reflective microdisplay TV and monitor uses." (Facts 119-120)(emphasis added).

Catlett, who was subsequently adjudged to have misused DRI's finances for his personal benefit, did not alert his engineers to Tenco's claim of inventorship or demands. (Fact 125). Perhaps having sized up Catlett as a fellow thief, Turner concluded that Espiau could steal DRI's invention with impunity, since Catlett eventually did bankrupt DRI. Luxim Corporation was founded on June 6, 2000 with an initial capitalization of as little as $4000 and the "contribution" by Turner, M. Espiau, Joshi and Chang of the intellectual property for the DRI dielectric resonator plasma lamp (which was acquired solely at DRI's expense). (Facts 123-124, 198).

A July 10-12, 2000 trip was arranged by Wilson – and paid for entirely by DRI – so that Wilson, M. Espiau and Joshi could visit DRI's ceramic suppliers in Colorado, Maryland and

Pennsylvania. (Facts 158-159). Shortly thereafter, Wilson, Guthrie and Espiau prepared a list of candidate waveguide designs and sent it to CoorsTek, the Colorado supplier, for a quote. (Facts 184-186). Following an August 1, 2000 e-mail from Turner stating a quote was expected from CoorsTek the following day, Tenco/Luxim ceased all further exchange of technical information with DRI about the dielectric resonator plasma lamp. (Facts 187-188).

By early July of 2000, DRI had obtained prototype ceramic blocks, assembled one those ceramic blocks into a waveguide resonator plasma lamp and successfully lit that device in DRI's laboratory, thereby actually reducing to practice the invention of the Count. (Facts 161-177).

Unbeknownst to DRI or the Guthrie inventors, the provisional patent application to which the involved Espiau '809 patent claims priority was filed by Turner, Espiau, Joshi and Chang on July 31, 2000. (Fact 197). Purportedly filed by Espiau because DRI had not paid for Tenco/Betadot/Luxim's services, Turner's own e-mail of October 27, 2000 and the records obtained from the bankruptcy court establish that Espiau had indeed been paid for all of its services connected with the plasma lamp project through the ***end*** of July 2000. (Facts 201-202). Realizing that it had "jumped the gun" in its patent filing, Turner later contended that – despite the huge sums that DRI paid to Tenco to assist in assembling and testing components of the plasma lamp (and notwithstanding that DRI had itself made the invention) – DRI had ***never*** been entitled to any rights under the "Luxim" patent. (Facts 128, 203).

As the junior party in this interference, and having filed a ***copending*** application with Espiau, Guthrie has the burden of establishing priority by a preponderance of the evidence. 37 C.F.R. § 41.207(b). Here, Guthrie's evidence meets and exceeds that standard.

The evidence conclusively establishes that Guthrie had a complete and corroborated conception of the invention of the Count, including the necessary gas-fill characteristics, no later

than March 31, 2000. (Facts 11-47). It also shows that a roomful of people heard the DRI inventors communicate their conception of the invention of the Count to the Espiau inventors, thereby establishing that Espiau derived its alleged invention from the DRI inventors. (Facts 52, 70-75). The evidence further establishes that DRI's first actual reduction to practice of the invention of the Count occurred before Espiau's filing date of July 31, 2000. (Facts 161-177). Finally, the evidence shows that Espiau's constructive reduction to practice (and to the extent it ever had one, Espiau's actual reduction to practice) inures to the Guthrie inventors' benefit because Tenco/Betadot were under contract to work on the plasma lamp project for DRI, and Espiau's work was done in consultation with, and funded entirely by, DRI. (Facts 202, 204).

The first party to reduce an invention to practice is entitled to priority, unless the other party can prove that it was the first to conceive the invention and that it exercised reasonable diligence in later reducing that invention to practice. *Price v. Symsek*, 988 F.2d 1187, 1190, 26 USPQ2d 1031, 1033 (Fed. Cir. 1993). Guthrie has the earlier corroborated conception, while Espiau has none. Guthrie also has the earlier corroborated actual reduction to practice. Guthrie is entitled to an award of the priority of the invention of the Count.

**B. <u>Guthrie Was The First To Complete Conception Of The Invention</u>**

The test for conception is whether the inventor had an idea definite and permanent enough that it could be understood by one of ordinary skill in the art. *Burroughs Wellcome Co. v. Barr Laboratories Inc.*, 40 F.3d 1223, 1227-28, 32 USPQ2d 1915, 1919 (Fed. Cir. 1994). A conception is complete when the inventor has completed the mental part of the inventive act, such that all that remains is construction, not invention. *Townsend v. Smith*, 4 USPQ 269, 271 (C.C.P.A. 1929). The test for conception is whether sufficient disclosure is made such that one of ordinary skill in the art could construct the invention without extensive research or

experimentation. *Vancil and Jenkins v. Arata*, 202 USPQ 58 (Bd. Pat. App. & Int. 1977).

In proving conception, an inventor's testimony must be corroborated; documentary evidence need not. *Price*, 988 F.2d at 1195, 26 USPQ2d at 1037 ("'[C]orroboration' is not necessary to establish what a physical exhibit before the board includes. Only the inventor's testimony requires corroboration before it can be considered.") In determining whether corroboration exists, a "rule of reason" analysis is conducted that evaluates "all pertinent evidence." *Id.* It is not necessary that a single piece of evidence in and of itself establish conception, but only that the evidence taken as a whole show that the inventor possessed the invention. *Maxwell v. Kmart Corp.*, 880 F. Supp. 1323, 1332 (D. Minn. 1995). Here, completion of Guthrie's conception is corroborated both by the documentary evidence and the testimony of independent witnesses. That evidence is set forth below.

In October 1999, Wilson, Prior and Sandberg were employed by DRI, which at the time was developing a projection television, including an entirely new display engine and light source. (Facts 6-7). DRI had evaluated and rejected a number of commercially available and developmental stage light sources as unsuitable. (Facts 8-10). That month, DRI hired Smoler as a consultant to assist DRI in designing a robust light source that could be rapidly prototyped to support development of other components of DRI's display engine. (Fact 11). DRI also retained Russell, of Logical Services, Inc., as a consultant to further assist Smoler and DRI with the light source and RF electronics to drive that light source. (Fact 12).

Shortly after beginning his engagement with DRI on October 13, 1999, Smoler met with Sandberg, the DRI employee with primary responsibility for designing the light source to be used in DRI's display engine. (Fact 13). During their initial discussions, Sandberg described to Smoler a light source in which an RF-driven loop was disposed surrounding a gas-filled bulb,

which formed a plasma when energized ("the loop-type plasma lamp"). (Fact 14). Sometime prior to October 25, 1999, Smoler recorded in his project notebook a schematic of Sandberg's initial light source design. (Fact 16). On October 25, 1999, Smoler recorded his original alternative solutions to loop-type plasma lamp circuitry described by Sandberg, including coupling the loop disposed around the bulb to an air-dielectric cavity; coupling the bulb to a $\lambda/4$ line, and placing the quartz bulb within a solid ceramic coaxial transmission line. (Fact 17).

In early November 1999, Smoler attended a "brainstorming" meeting with Sandberg, Russell and Prior to discuss proposed designs for the light source and development paths for those concepts. (Fact 18). During that meeting, the group initially discussed revising the loop-type lamp, and assigned Russell responsibility for development of the RF-electronics for that light source. (Fact 19). Smoler then reviewed the concepts recorded on October 25, 1999 in his notebook, which led to discussion of using an air waveguide to couple the RF source to the quartz bulb, but this approach was rejected as impracticable. (Facts 20-21). Perhaps inspired by Smoler's dielectric coaxial transmission line concept, the group then envisioned a solid ceramic waveguide concept as offering the best avenue for achieving its goals, and Smoler was assigned responsibility for further developing that concept. (Fact 22).

Soon after the November 1999 brainstorming meeting, Smoler prepared and recorded in his notebook some preliminary calculations for a dielectric resonator that coupled an RF probe to a gas-filled cavity. (Fact 23). Smoler's notebook depicts a rectangular block of ceramic having a width of 1.0 inch, a height of 0.5 inch and a length of 1.46 inches, where the length nominally was selected as being equal to the wavelength of a 900 MHz RF signal in alumina. (Fact 24). By selecting relative proportions so that the antenna was located one-quarter wavelength (0.365 inch) from one end of the ceramic block and the gas-filled cavity one-quarter wavelength (0.365

inch) from the other end of the ceramic block, and so that the antenna was located one-half wavelength (0.73 inch) from the gas-filled cavity, Smoler demonstrated that he appreciated and taught his fellow inventors that the gas-filled cavity and antenna should be located at the electric field maxima of the dielectric resonator. (Fact 27). After subsequent discussions with Prior and Sandberg, Smoler sent an e-mail dated December 16, 1999 to them providing further details describing how the waveguide resonator plasma lamp could be constructed. (Facts 28-29).

As observed by Dr. Gupta, Exhibit 2146, page A19 and Exhibit 2147 indisputably would have been understood by one of ordinary skill in the art to describe a classic waveguide resonator. (Fact 33). In particular, one of ordinary skill would have understood (as did Smoler, Prior and Sandberg) that the description in Exhibit 2147 of placing a metal covering on the waveguide section, to form a closed box having shorted ends, ***is*** the classic definition of a resonant cavity taught, for example, in Dr. Pozar's textbook. (Fact 34). One of ordinary skill further would have understood that the precise placement of the RF probe and lamp cavity in Exhibits 2146 and 2147 ensured that the probe and lamp were located at the electric field maxima of the standing wave formed within the dielectric resonator. (Fact 35).

Later in December 1999, Sandberg described the dielectric resonator plasma lamp embodiment to Wilson, who was responsible for the bulb characteristics of the DRI light source. (Fact 36). At that time, Wilson was developing a gas-filled quartz bulb and a ceramic bulb having a sapphire window, the latter in collaboration with ITW. (Facts 37-39). In late January 2000, DRI hired C. Guthrie to assist Wilson in the lamp development effort. (Fact 40). In early February 2000, Wilson informed C. Guthrie of the dielectric resonator plasma lamp concept, and they together determined the gas-fill characteristics required for the bulb portion of that plasma lamp. (Fact 42). Also in February, 2000, Wilson and C. Guthrie discussed the bulb gas-fill

characteristics for a dielectric resonator embodiment with Prior and Sandberg, and in particular that the existing DRI proprietary quartz bulb and ceramic bulb were suitable for use in the dielectric resonator plasma lamp, thereby completing conception of the dielectric resonator plasma lamp of the Count. (Fact 43).

From February through mid-July 2000, Wilson and C. Guthrie worked in offices located at ITW's facility in Escondido, California. (Fact 41). During February through March 2000, Wilson and C. Guthrie discussed the DRI plasma lamp, including the dielectric resonator plasma lamp of the Count, with ITW personnel, including Anthony Cooper ("Cooper") and Floyd Pothoven ("Pothoven"). (Fact 44). Cooper and Pothoven describe in their declarations the dielectric resonator plasma lamp as described to them by C. Guthrie and Wilson, as well as some of the initial attempts by DRI to build that device, thus independently corroborating the Guthrie inventors' conception of the invention of the Count. (Fact 46).

The testimony of Guthrie inventors Smoler, Prior, Wilson and Guthrie regarding conception of the invention of the Count is corroborated by Russell, Cooper and Pothoven. (Facts 18, 19, 46). In addition, conception of key features of the invention, including the dielectric resonator waveguide body and the gas-fill characteristics, are corroborated by the physical exhibits, including Smoler's notebook page (Exhibit 2146, page A19), the December 16, 1999 e-mail (Exhibit 2147) and DRI's proprietary gas-filled quartz bulbs, the existence of which were acknowledged by Espiau's inventors (Exhibit 2115, page 15). As set forth in Dr. Gupta's declaration, Exhibit 2182 and in Appendix 3.1, the limitations of the resonator portion of the Count are expressly set forth in Exhibit 2147 and on page A19 of Exhibit 2146.

Exhibits 2146 and 2147, taken together, describe ***"a lamp"***: {Exhibit 2147 expressly discloses a lamp, which one of ordinary skill would have understood to be illustrated on page

A19 of Exhibit 2146. }. (Exhibit 2182, ¶ 21).

Both Exhibits 2146 and 2147 describe ***"a waveguide having a body of a preselected shape and preselected dimensions …"***: {Exhibit 2147 identifies that the proposed loaded waveguide is constructed from a machinable alumina block having a length of 1.46", a width of 1.00", and a height of 0.5" and with holes for the probe and lamp cavity drilled in the 1.0" wide x 1.46" long face. One of ordinary skill would have understood the configuration described in Exhibit 2147 to be illustrated on page A19 of Exhibit 2146 as a rectangular block as having a top surface with two holes – a smaller hole for the probe closer to the left end and a larger hole forming a lamp cavity closer to the right end.} *Id.*

Both Exhibits 2146 and 2147 teach the use of "***a first microwave feed positioned within and in intimate contact with the waveguide body, adapted to couple microwave energy into the body from a microwave source…***": {Exhibit 2147 expressly describes an E-field probe, coupled to a 900 MHz source, and disposed in intimate contact within a hole located 0.365" from an end of the body so as to match the 50 ohms impedance of most RF sources. One of ordinary skill would have understood Exhibit 2147 as teaching that the probe need be intimately coupled to the alumina block to reduce reflection of power to the RF source and that care must be taken in sizing the probe to avoid impedance mismatch. The RF source coupled to the probe must necessarily have an output and an input.} *Id.*

As further required by the Count, Exhibits 2146 and 2147 describe that ***"said frequency and intensity and said body shape and dimensions [are] selected such that the body resonates in at least one resonant mode having at least one electric field maximum"***: {One of ordinary skill would have understood that the device described in Exhibit 2147, as illustrated on page A19 of Exhibit 2146, has the waveguide body length, and lamp cavity and probe placement selected

with the bulb and probe each one-quarter of the overall length from the ends of the body, and separated by a distance of one-half of the length of the waveguide body. One of ordinary skill further would have understood that the dimensions for the body and probe and lamp cavity placement were selected so that the waveguide body resonates at the preselected intensity and preselected resonant frequency (as computed by Mr. Smoler, 900 MHz), to provide electric field maxima at the probe and bulb locations.} *Id.*

Exhibits 2146 and 2147 teach one of ordinary skill ***"an enclosed first cavity depending from said first surface into the waveguide body"***: {Exhibit 2147 describes a hole drilled in the 1.0" wide face to accept the bulb and which defines an enclosed cavity depending from the 1.0" wide x 1.46" long face; this is schematically illustrated on page A19 of Exhibit 2146, with the lamp cavity depending from the top surface into and surrounded by the waveguide body.} *Id.*

Exhibits 2146 and 2147 also teach to one of ordinary skill ***"a first bulb positioned in the cavity at a location corresponding to an electric field maximum during operation, the bulb containing a gas-fill which … forms a light-emitting plasma"***: {As described in each of Exhibits 2146 and 2147, the bulb is positioned in a lamp cavity that is located one-quarter of the length from the shorted end of the waveguide, with the body dimensions selected so that when excited by the source at the preselected frequency (900 MHz as computed by Mr. Smoler), the waveguide wavelength of the applied RF signal equals the length of the waveguide body and the waveguide resonates with the electric field maximum located at the bulb location. One of ordinary skill further would have understood that the gas-fill (the characteristics of which were defined by Guthrie and Wilson as described in Exhibit 2180, ¶ 3 and Exhibit 2182, ¶ 10), formed a light-emitting plasma when receiving microwave energy from the resonating waveguide body.} *Id.*

The foregoing evidence establishes that Guthrie had a complete, corroborated conception of the invention of the Count, including the necessary gas-fill characteristics, no later than March 31, 2000.

**C. Guthrie Was The First To Actually Reduce The Invention To Practice**

Actual reduction to practice requires that the inventor prove that an embodiment was constructed that met all limitations of the Count and also that the inventor determined that the invention would work for its intended purpose. *Cooper v. Goldfarb*, 154 F.3d 1321, 1327, 47 USPQ2d 1896, 1901 (Fed. Cir. 1998). The inventor also must have a contemporaneous appreciation that the embodiment worked and that it met all the limitations of the interference count. *Id.* A junior party in an interference need only demonstrate that it recognized the subject matter of the invention; it does need not demonstrate that it recognized the exact language of the count. *Henkel Corp. v. The Procter & Gamble Co.*, __ F.3d __, 82 USPQ2d 1784, 1787 (Fed. Cir. 2007). Proof that an embodiment of the invention was produced and met all the limitations of the Count may be admitted through evidence of subsequent testing. *Cooper*, 154 F.3d at 1331, 47 USPQ2d at 1904.

In establishing an actual reduction to practice, a “rule of reason” analysis is conducted to determine whether an inventor’s testimony is sufficiently corroborated by independent evidence. *Id.* 154 F.3d at 1330, 47 USPQ2d at 1903. This rule requires an evaluation of all pertinent evidence, and may be satisfied by an over-the-shoulder observer, merely circumstantial evidence, or both. *Id.* Corroboration need not occur for every contended factual issue, nor is it necessary to prove each individual act in the reduction to practice in detail by an unbroken chain of corroboration. *Id.*

On April 20, 2000, Turner, Espiau and Joshi traveled to DRI's office in Los Gatos to meet with Catlett, Prior, Sandberg and Wilson. (Fact 85). One purpose of the visit was for Tenco/Betadot to present a simplistic overview of the dielectric resonator project that DRI, Tenco and Betadot had agreed to pursue at the conclusion of the April 11, 2000 meeting. (Facts 87-88). Although the Tenco presentation purported to discuss the advantages, potential issues and next steps required by DRI and Tenco to implement the ceramic waveguide concept, it provided no new information about the dielectric resonator plasma lamp of the Count not already known to Prior, C. Guthrie and Wilson. (Facts 89-90). Having no basis for suspecting that Tenco would later claim the invention as its own, DRI signed Statement of Work DRI-00-02 providing a budget of $375,000 for Tenco's assistance in implementing the dielectric resonator plasma lamp. (Facts 91-92).

The following Monday, April 24, 2000, C. Guthrie and Wilson began the first in a series of weekly meetings with M. Espiau and Joshi, usually at Joshi's lab at UCLA to: discuss the design and construction of the dielectric resonator; develop methods for sealing the sapphire window to the body of the dielectric resonator; identify potential ceramic suppliers and order waveguide samples; provide ceramic materials data and gas-fill characteristics in support of numerical modeling efforts; specify and prepare engineering drawings for the device; and specify assembly processes. (Facts 95-116, 129-161, 180-188). On May 3-4, 2000, C. Guthrie drove to San Jose to collect the existing DRI plasma lamp set-up and associated equipment from Sandberg's laboratory and delivered that equipment, including at least ten of DRI's proprietary quartz bulbs, to Joshi's laboratory at UCLA. (Facts 111-113).

In the course of the collaboration between DRI and Tenco/Betadot, C. Guthrie prepared numerous drawings of the dielectric resonator plasma lamp, including a series of drawings

labeled WGC003, each of which depicts a dielectric resonator substantially identical to that depicted in Smoler's project notebook from November 1999. (Fact 116). On Monday, May 15, 2000, Turner sent an e-mail to C. Guthrie, Wilson, Joshi, Chang and M. Espiau requesting that he be sent the most up-to-date information prepared by the each member of the group, which information would be included in a "Concept Design Presentation" for DRI management. (Facts 129-130). On May 16, 2000, C. Guthrie forwarded to Turner a set of slides, which C. Guthrie had prepared together with Wilson, providing drawings, materials properties information and assembly processes. (Fact 131). Turner incorporated those materials into a Powerpoint presentation entitled "Plasma Lamp Exciter and Waveguide Development – Conceptual Design – Discussion Draft," which was finalized and presented at DRI on May 22, 2000. (Facts 133-136).

In the following weeks, from late May to mid-July 2000, C. Guthrie and Wilson met with M. Espiau, Joshi and Chang at UCLA frequently to further the purpose of the collaboration, including identifying additional materials for testing, defining additional features of the plasma lamp design and specifying appropriate dimensions, to be used in obtaining quotes from ceramic vendors, for prototype rectangular and circular waveguide resonators. (Facts 137-161). In an email dated July 6, 2000, Turner reported that Wilson, M. Espiau and Joshi were scheduled to visit three ceramic suppliers, CoorsTek, Transtech and Fredericks, leaving on July 9, 2000. (Fact 158). Wilson had set up that trip using the contacts he had established with those companies in December 1999, and DRI paid for all expenses for Wilson, Joshi and M. Espiau in connection with that trip. (Facts 159).

In early July, 2000, Wilson contacted CoorsTek to inquire about the expected manufacturing time for ceramic waveguide parts. (Fact 165). After learning from Kathy Hilfer, the CoorsTek sales representative, that CoorsTek would need 4-6 weeks to manufacture the parts

on the existing order, Wilson obtained authorization to make a small number of parts with local vendors. (Facts 166-167). Prior to taking the scheduled trip of July 10-12, 2000, Wilson contracted with Ceramic Tech, Inc., of Fremont, California ("Ceramic Tech"), and asked them to make a few samples of a rectangular waveguide substantially as shown on page 2 of Exhibit 2137. (Fact 167). Ceramic Tech agreed to machine a small number of parts on a cash basis, thus providing immediate turnaround. (Facts 168-169).

Ceramic Tech did not metallize the parts it made for Wilson; the parts instead were coated in DRI's laboratory by Wilson and Joe Bennett ("Bennett"), a DRI lab technician. (Fact 170). Bennett recalls that the half-wavelength waveguide parts were hand-painted with silver paint prior July 8, 2000. (Fact 171). A coated half-wavelength waveguide was connected to a coaxial cable by splitting the inner conductor into two leads, which were soldered into two antenna holes on the back surface of the waveguide, and a DRI quartz bulb containing a noble gas and metal halide was packed into the lamp cavity on the front surface of the waveguide using alumina powder. (Fact 172). During the week of July 17, 2000, the assembled waveguide reasonator plasma lamp was coupled to a variable frequency RF generator in DRI's laboratory, and the RF generator was powered on to light the bulb. (Fact 173).

Bennett recalls that he and Sandberg lit the waveguide plasma lamp in newly-leased space at 646 University Avenue, Los Gatos, California, just a day or two after Guthrie had relocated to DRI's Los Gatos facility on July 20, 2000, thus confirming the date of actual reduction to practice as occurring during the week of July 17, 2000. (Facts 174). Bennett's recollection is confirmed by DRI's part-time facilities manager, Dennis Nunes ("Nunes"). *Id.* Bennett further recalls that he was looking directly at the light when Sandberg powered on the RF generator to light the lamp, that he was surprised by brightness of the light emitted by the

plasma lamp, and that he saw purple spots for days after the test. (Fact 175).

Dr. Gupta has examined a device constructed in accordance with page 2 of Exhibit 2137, and as depicted in 2041 ("the Sample"), and confirmed by numerical computation that the device is a waveguide resonator and when assembled with a DRI bulb constitutes a plasma lamp in accordance with the Count. (Exhibit 2182, ¶¶ 31-34). The Sample has been identified by Bennett, Nunes and Wilson as having the same dimensions and virtually identical construction to the dielectric resonator lamp lit by Bennett and Sandberg, and witnessed by Nunes, during the week of July 17, 2000. (Fact 168). With a DRI bulb inserted in the lamp cavity of the Sample, as depicted in Exhibit 2178, the device meets all of the limitations of the Count, as it did when witnessed by Bennett and Nunes during the week of July 17, 2000. (Fact 177, Appendix 3.2).

As described in the Bennett, Nunes, Wilson and Guthrie declarations, the Sample with bulb constitutes ***"a lamp"***: {The device described by Messrs. Bennett and Nunes as having been tested in July 2000, and as being substantially identical to that depicted in Exhibit 2041, was described as emitting a very bright light.}. Exhibit 2137, page 2; Exhibit 2140; Exhibit 2178; Exhibit 2180, ¶ 33; Exhibit 2181, ¶ 53; Exhibit 2182, ¶ 34; Exhibit 2186, ¶ 4; Exhibit 2199, ¶ 3.

The Sample comprises ***"a waveguide having a body of a preselected shape and preselected dimensions …"***: {The device described by Messrs. Bennett and Nunes, depicted on page 2 of Exhibit 2137 and in Exhibit 2041, comprises a body of ceramic dielectric material having a rectangular shape with dimensions of approximately 34.3 mm by 27.7 mm by 13.0 mm. Those dimensions of the body were pre-selected so that the body would resonate at a corresponding pre-selected frequency, computed to be about 2.3 GHz. The device has a first side determined by a first waveguide outer surface, which is identified as the side opposite the side to which the microwave feeds are attached.} Exhibit 2137, page 2; Exhibit 2140; Exhibit

2181, ¶ 53; Exhibit 2182, ¶ 34; Exhibit 2186, ¶ 6; Exhibit 2199, ¶ 4.

The Sample includes ***"a first microwave feed positioned within and in intimate contact with the waveguide body, adapted to couple microwave energy into the body from a microwave source … said frequency and intensity and said body shape and dimensions selected such that the body resonates in at least one resonant mode having at least one electric field maximum"***: {The device described by Messrs. Bennett and Nunes, depicted on page 2 of Exhibit 2137 and in Exhibit 2041, includes a first microwave feed positioned within and in intimate contact with the waveguide body, namely a solder core that was inserted into the two smaller holes on the bottommost surface of the device. Mr. Bennett describes that these feeds were coupled to an output of a microwave source to supply microwave energy into the waveguide body. The computed resonant frequency of 2.3 GHz falls within the specified frequency range of the Count, and was supplied at sufficient intensity to cause light to be emitted from the bulb. As Mr. Bennett testified, the feed was configured to, and in fact did, connect to the source output.} Exhibit 2137; Exhibit 2181, ¶ 53; Exhibit 2182, ¶ 34; Exhibit 2186, ¶ 10; Exhibit 2199, ¶ 4.

The Sample also has ***"an enclosed first cavity depending from said first surface into the waveguide body"***: {The device described by Messrs. Bennett and Nunes, depicted on page 2 of Exhibit 2137 and in Exhibit 2041, had a first cavity depending from the first surface into the waveguide body, so that the interior surface surrounded and enclosed the first cavity.} Exhibit 2137, page 2; Exhibit 2140; Exhibit 2181, ¶ 53; Exhibit 2182, ¶ 34; Exhibit 2186, ¶ 10; Exhibit 2199, ¶ 4.

Finally, the Sample is described by Bennett, Nunes, Wilson and Guthrie, and as depicted in Exhibit 2178, the Sample is designed to accept ***"a first bulb positioned in the cavity at a location corresponding to an electric field maximum during operation, the bulb***

***containing a gas-fill which … forms a light-emitting plasma”***: {When the device described by Messrs. Bennett and Nunes, depicted on page 2 of Exhibit 2137 and in Exhibit 2041 was operated using a variable frequency RF source to create an electric field maximum at the bulb location. As shown in Exhibit 2178, and as Messrs. Bennett and Nunes testified occurred in mid-July 2000, a bulb inserted into the cavity formed a bright, light emitting plasma.} Exhibit 2137, page 2; Exhibit 2140; Exhibit 2178; Exhibit 2181, ¶ 53; Exhibit 2182, ¶ 34; Exhibit 2186, ¶¶ 11-12; Exhibit 2199, ¶ 5.

Bennett and Sandberg’s assembly of the half-wavelength waveguide into a plasma lamp and lighting that plasma lamp during the week of July 17, 2000, as witnessed by Nunes, constitutes a corroborated actual reduction to practice of the invention of the Count.

**D. <u>Espiau Derived The Invention Of The Count From Guthrie</u>**

A party in an interference proceeding wishing to prove derivation must establish prior conception of the claimed subject matter and communication of the conception to the adverse party. *Cooper*, 154 F.3d at 1332, 47 USPQ2d at 1905; *Price*, 988 F.2d at 1190, 26 USPQ2d at 1037. Derivation focuses on the communication of information between the parties. *Cooper*, 154 F.3d at 1332, 47 USPQ2d at 1905.

The difficulties in establishing derivation by direct evidence are well known, and therefore derivation is generally only established from the circumstances of the case. *Barnet v. Wied*, 195 F.2d 311, 318, 93 USPQ 161, 167 (C.C.P.A. 1952). In evaluating the sufficiency of the communication, the correct standard is whether the communication enabled one of ordinary skill in the art to make the invention. *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1577-78, 42 USPQ2d 1378, 1382-83 (Fed. Cir. 1997).

By early March 2000, James Legge ("Legge") had been hired by DRI as a Vice-President of Manufacturing, and suggested that Tenco be retained by DRI as RF consultants to assist in implementing the light source and RF exciter package. (Facts 49-50). On or about March 21, 2000, Turner visited DRI's office in Los Gatos, California, during which visit he met with Legge, Catlett and Prior and was given a demonstration of DRI's prototype HDTV and an overview of the status of the DRI development program. (Fact 51). During that meeting at DRI's office, Prior described the current and next generation DRI light sources to Turner, including the current generation loop-type and future generation ceramic waveguide versions of the DRI light source under development. (Fact 52).

In letter a letter accompanying a March 31, 2000 e-mail to Prior, Turner thanked Prior "for the introduction to the Digital Reflection product and development status and the update today" and stated that "the demo units in your conference room show that the work you've done has brought you close to the production stage." (Fact 55). Turner's March 31, 2000 letter states that "[w]e at Turner Engineering Company (Tenco) have organized a team with the resources and experience to help in two areas: … [the second being d]evelopment of a packaged exciter and plasma lamp" and notes that "Tenco and Betadot will work together to develop and provide the plasma lamp package. … Dr. Chan Joshi, Professor of Electrical Engineering and Director of the Center for High Frequency Electronics at UCLA and R&D Director of Betadot, will direct the electrical design. …" (Facts 56-57).

On April 11, 2000 ("the April 11 meeting"), Turner, Joshi and M. Espiau attended a meeting at the ITW facility in Escondido, California. (Fact 63). Various portions of the meeting were attended at various times by Cooper, Pothoven, and a number of ITW's ceramic experts, while Wilson, Prior and C. Guthrie attended on behalf of DRI. (Facts 64-66).

One purpose of the April 11 meeting was to introduce Turner, M. Espiau and Joshi to the DRI and ITW group, and to discuss the development schedule for DRI's plasma lamp having a ceramic bulb coupled to RF electronics disposed on a ceramic printed wiring board ("ceramic PWB"). (Fact 63). As of the April 11 meeting, M. Espiau, Joshi and Turner had no experience in designing plasma lamps, gas-filled bulbs, ceramic technology nor any knowledge of how to make such devices, and that fact immediately became apparent to the DRI and ITW personnel in attendance. (Facts 67-68).

Early during the course of the April 11 meeting, while C. Guthrie and Wilson were presenting an improved design of the loop-type plasma lamp, M. Espiau interrupted to suggest that a waveguide structure could be used to couple the ceramic bulb to the ceramic PWB. (Fact 69). Prior immediately informed M. Espiau that DRI had already considered and rejected the use of an air waveguide as impractical, and instead had conceived of an embodiment in which a gas-fill or bulb was directly integrated into a ceramic waveguide configured as a resonator. (Fact 70). Prior then sketched out the ceramic waveguide resonator design for the Tenco people, including a ceramic block having a gas cavity located near one end and an RF antenna inserted near the other end. (Fact 71). As demonstrated, *supra*, the Guthrie inventors had a complete conception of that invention before Tenco or Betadot had ever heard of plasma lamps. (Fact 48).

It was agreed at the April 11 meeting that DRI's ceramic resonator design would simplify the design of the RF electronics and permit DRI to use the ceramic bulb technology it was developing with ITW. (Fact 73). DRI and Tenco agreed at the April 11 meeting to advance the development schedule for the dielectric resonator plasma lamp. (Fact 74). Wilson and Prior recounted the course of the dielectric resonator discussion at the April 11 meeting to Cooper after the Tenco/Betadot people had departed. (Fact 75). DRI communicated its conception of

the invention of the Count in interference to Turner, Joshi and M. Espiau at the April 11 meeting, and that communication is independently corroborated by both Cooper and Pothoven. (Fact 76).

On April 16, 2000, Turner sent an e-mail to Prior, Wilson and Legge enclosing a letter dated April 14, 2000 ("the April 14 Letter") and Statement of Work DR-00-02 ("SOW"), in which Turner provided written confirmation of the shift in project emphasis to the ceramic waveguide agreed by DRI and Tenco at the April 11 meeting, and as confirmed by Turner and Prior during a telephone conversation on April 13, 2000. (Fact 77). The April 14 Letter recounts that at the April 11 meeting, DRI and Tenco personnel "discussed a design concept [Plasma Lamp Exciter and Waveguide – 'LEW'] which uses a ceramic printed circuit board with directional coupler and RF antenna, matched to a ceramic waveguide which couples rf energy in the DRI plasma bulb." (Fact 78). Turner's April 14 Letter demonstrates that he had misunderstood the discussion at the April 11 meeting between Prior, Wilson and C. Guthrie, on the one hand, and Joshi and M. Espiau, on the other hand, regarding the dielectric resonator. (Fact 79)**.** Prior did not describe just a "ceramic waveguide" to Turner, M. Espiau and Joshi at the April 11 meeting, but a ***ceramic waveguide resonator***. (Fact 70)**.**

DRI's conception of the invention of the Count was communicated by the Guthrie inventors to Espiau during the April 11 meeting, as corroborated by independent eyewitnesses. Tenco's and Betadot's alleged "re-creation" of the DRI invention – only three days after the April 11 meeting and resulting in the specification of the near-identical invention that Guthrie already possessed – simply is not credible.

**E. <u>Any Reduction To Practice By Espiau Inures To Guthrie's Benefit</u>**

The concept of inurement enables the activities of another party to accrue to the benefit of an inventor as a matter of law; inurement is established by showing that the other party was

working either explicitly or implicitly at the inventor's request. *Cooper*, 154 F.3d at 1331-32, 47 USPQ2d at 1905. Inurement focuses on the relationship between the inventor and the other party. *Id.* Communication of the conception from the inventor to the other party is not necessary, and the other party's reduction to practice could inure to the inventor even if the other party independently conceived of the invention while acting at the inventor's request. *Id.*

Here, Guthrie was in a contractual relationship with Tenco and Betadot, and under Section 5 of the Engineering Services Agreement, Tenco and Betadot were ***required*** to assign to DRI rights to any invention arising from the work performed under the Agreement that was not based on proprietary information of Tenco. (Fact 59). Turner's communications to DRI establish that Tenco and Betadot were paid for their work ***on DRI's packaged exciter and plasma lamp*** through the day that Espiau filed the application claiming the invention as Espiau's own. (Facts 56, 201-202, 204). Under such circumstances, Espiau must rebut the presumption that work it performed fell within the scope of its contract with DRI. *See Barnet,* 195 F.2d at 313, 93 USPQ at 163 ("Where the employer who is junior party prima facie proves such an employer-employee relationship, although the burden of proof is not shifted to the employee senior party, the latter had the duty to go forward with proof to overcome the prima facie case made by the junior party.")

At the April 11 meeting between DRI, Tenco/Betadot and ITW, it was agreed between DRI and Tenco that the ceramic waveguide presented a simpler and faster development path to a commercial embodiment. (Fact 73). On April 16, 2000, Turner sent an e-mail to Prior, Wilson and Legge enclosing the April 14 Letter and SOW. (Fact 77). Turner confirmed in the SOW that the shift in project emphasis was to the ceramic waveguide discussed by DRI and Tenco at the April 11 meeting, as agreed by Turner and Prior during a telephone conversation on April 13,

2000. (Facts 77-78). At the conclusion of the April 20, 2000 meeting between DRI and Tenco/Betadot, Prior signed the SOW attached to the April 14 Letter which provided a budget of $375,000 for Tenco's assistance in implementing the dielectric resonator plasma lamp for DRI. (Fact 91).

As discussed, *supra*, the following Monday, April 24, 2000, C. Guthrie and Wilson began the first in a series of weekly meetings with M. Espiau and Joshi to: discuss the design and construction of the dielectric resonator; develop methods for sealing the sapphire window to the body of the dielectric resonator; identify potential ceramic suppliers and order waveguide samples; provide ceramic materials data and gas-fill characteristics in support of numerical modeling efforts; specify and prepare engineering drawings for the device; and specify assembly processes. (Facts 95-116, 129-161, 180-188). C. Guthrie also brought the existing DRI plasma lamp set-up and associated equipment from Sandberg's laboratory to Joshi's laboratory at UCLA, along with a supply of DRI's proprietary quartz bulbs. (Facts 111-113).

In the course of the collaboration with Tenco, C. Guthrie also prepared numerous drawings of the dielectric resonator plasma lamp concepts discussed with M. Espiau and Joshi – all including a dielectric resonator component substantially identical to that depicted in Smoler's project notebook from November 1999. (Fact 116). C. Guthrie also prepared with Wilson, and forwarded to Turner, a set of slides providing drawings of the dielectric resonator plasma lamp, ceramic materials properties information, and assembly processes. (Facts 131-132). Turner incorporated those materials into a Powerpoint presentation that was presented at DRI on May 22, 2000. (Facts 133-136).

From April 20, 2000 to mid-July 2000, C. Guthrie and Wilson met at least weekly with M. Espiau, Joshi and Chang (usually at UCLA) to further the purpose of the collaboration by

identifying additional materials for testing, defining additional features of the plasma lamp design and specifying appropriate dimensions for prototype rectangular and circular waveguide resonators to be used in obtaining quotes from ceramic vendors. (Facts 137-161). DRI also shared with Tenco/Betadot communications exchanged with its ceramics suppliers, even arranging and funding a visit by Wilson, M. Espiau and Joshi to three ceramic suppliers. (Facts 158-159).

In an April 26, 2000 e-mail, Turner further suggested that DRI make a gift of $10,000 to UCLA so that UCLA could do some “research into the basic question of laser brazing,” to be followed by the Tenco team “propos[ing] a task to develop a laser system capable of sealing a lens to a lamp body.” (Facts 101). Pursuant to Turner’s request, DRI made a $10,000 donation to UCLA to support Joshi’s work. (Fact 102). Neither Joshi nor UCLA ever provided any report or other results to DRI in exchange for DRI’s sponsorship. (Fact 103).

Turner also proposed that DRI set up a deposit account for lamp development expenses, and lease space in Southern California for a joint laboratory for the use of DRI and Tenco personnel. (Fact 137-138). As reported in Turner’s later e-mails, DRI did set-up an expense account for Tenco/Betadot purchases, but refused to lease space for a joint laboratory/office, instead opting to pay for the installation of 240 volt service in the basement of M. Espiau’s home, which was supposedly to be used by Joshi and M. Espiau to support the DRI plasma lamp project. (Facts 139, 201).

In an e-mail dated July 17, 2000, Turner reported to Catlett regarding the results of M. Espiau, Joshi and Wilson’s trip that Wilson had arranged to visit CoorsTek, Transtech and Fredericks on July 10-12, 2000. (Fact 180). Turner’s July 17, 2000 e-mail notes that the purpose of the trip “was to establish working relationships in the ceramics materials area.” (Fact

181). That e-mail further states that "Coors has excellent alumina technology … but its dielectric constant is too low to work well at 1 GHz. … We will send them some drawings, and we may be able to build a higher frequency alumina lamp in a relatively short time-frame." (Fact 182). Turner's July 17, 2000 e-mail suggests that the group "[w]ork with Coors to make alumina waveguide lamps in the next 6 weeks and test them." (Fact 183).

Following the July 10-12, 2000, visit to the ceramic suppliers, Wilson, C. Guthrie, Joshi and M. Espiau developed dimensions for a number of variants of the full-wavelength and half-wavelength embodiments of the metal-coated ceramic resonators, with which C. Guthrie prepared the drawings depicted in Exhibit 2137. (Fact 184). In an August 1, 2000 e-mail to Catlett, Turner reported that a request for a quote on "ten variants on a higher frequency lamp waveguide design using Alumina" had been sent to CoorsTek, for which a quote was expected the following day. (Fact 187). Turner's August 1, 2000 e-mail was his last communication to DRI regarding the dielectric resonator plasma lamp that included any of the DRI inventors (Prior, Sandberg, C. Guthrie or Wilson). (Fact 188).

On July 31, 2000, Espiau filed U.S. provisional patent application Serial No. 60/222,029 ("the '029 application"), from which the involved Espiau '809 patent claims benefit. (Fact 197). Pursuant to the March 31, 2000 Engineering Services Agreement between DRI and Tenco, the invention disclosed in the '029 application constituted the confidential and proprietary information of DRI. (Fact 198). In stark contrast to their daily communications with DRI to obtain technical information relating to DRI's plasma lamp development, Joshi, M. Espiau and Chang engaged in ***no further communications*** with DRI personnel following the filing of the '029 application on July 31, 2000 – ***presumably because by then Luxim believed it had all the information it needed from DRI***. (Fact 199). Even though they had ceased communicating with

DRI about the dielectric resonator plasma lamp, Turner and Tenco continued to consult for DRI regarding other aspects of electronics for DRI's projection television. (Fact 200).

In an e-mail dated October 27, 2000, from Turner to Catlett, Turner demanded to know "[w]hat is the status of our business deal. …. We haven't received payment for our August and September invoices, totaling $84,385, and the expense account is spent down. The lack of clarity on the business side and the delay in payment are hobbling our efforts to work together on this lamp project…" (Fact 201). That e-mail establishes that as of October 27, 2000, Tenco and Luxim had been paid for all of the services rendered relating to the dielectric resonator plasma lamp through the end of July 2000, the month that Espiau filed the application that matured into the '809 patent. (Fact 202). Because the Espiau inventors' work indisputably was undertaken at the request and direction of Guthrie, ***all*** of Espiau's activities toward reduction to practice (both constructive and actual) inure to Guthrie's benefit, whether or not (as Espiau has argued in the entitlement action pending in the United Kingdom) Guthrie can still pursue a legal action for breach of contract.

As discussed *supra*, Luxim was founded by Turner, Joshi, M. Espiau and Chang in June 2000 with a capitalization of a mere $4000 and the contribution by the founders of the intellectual property relating to the dielectric resonator plasma lamp. (Fact 123). Espiau's purported rationale for filing the '029 application was that neither Betadot nor Luxim had ever signed any agreements with DRI with respect to their work on the DRI dielectric resonator plasma lamp, or the ownership of their contributions, if any, to that project. (Fact 203). However, Joshi, M. Espiau and Chang had billed their time on the DRI plasma lamp project through Tenco and Betadot/Luxim, and were paid by DRI for their time spent on the plasma lamp project. (Fact 204).

At the time DRI and Tenco/Betadot undertook their collaboration to produce a commercial embodiment of the dielectric resonator plasma lamp, Guthrie had a complete conception of the invention. As further detailed above, and as set forth in the accompanying declarations of Guthrie's inventors and chronicled in Turner's status reports, ***the work undertaken by Tenco/Betadot was requested by, paid for and carried out in close collaboration and consultation with DRI and the Guthrie inventors***. The Tenco/Betadot work was explicitly undertaken at DRI's request, as directed by Prior and in close cooperation with Wilson and C. Guthrie. To the extent that Espiau achieved any reduction to practice, either constructive or actual, such reduction to practice was in furtherance of the work contracted for and funded entirely by DRI and inures to DRI's benefit.

**F. <u>Espiau's Efforts To Distort The Record Should Be Rejected</u>**

Since the inception of this interference, Guthrie has been playing "catch-up" to the efforts of Espiau's attorneys to "refashion" the factual record in Espiau's favor. Espiau's activities have dramatically increased the expense for Guthrie in preparing its case, and the burden for the Board to sift through the seemingly inconsistent statements elicited by Espiau's counsel from certain of the Guthrie inventors and former DRI consultants and employees. Specifically with respect to its contacts with the Guthrie inventors, Guthrie submits that such interference was unjustified, and in violation of 37 C.F.R. §§ 10.87 and 10.92.

For example, Prior and Sandberg communicated with Guthrie's counsel at least as early as November 2004, as evidenced by Exhibits 2004 and 2005. In connection with a Petition to Correct Inventorship filed on December 22, 2004, each of the Guthrie inventors executed a power of attorney appointing the undersigned counsel as its attorney of record, Exhibit 2166. Moreover, in assigning the involved Guthrie application to Ceravision, C. Guthrie and Wilson

each gave an irrevocable attorney-in-fact to Ceravision to conduct business with respect to the involved application and to "perform such acts as requested by the Assignee in order to maintain, prosecute, protect, and/or enforce any of Assignee's rights relating to the Property [including the involved Guthrie application]." Exhibit 2037, Schedule 2 at page A4.

Espiau's counsel was fully aware of the status of the Guthrie inventors as ***adverse parties*** to a pending contested case. Moreover, at the time that Espiau's counsel asked Wilson to execute the "Technical Consulting Agreement" in October 2005 to "possibly testify[] as a witness in legal proceedings between Luxim and CeraVision" (Exhibit 1105), Espiau's counsel was in possession of Wilson's assignment and ***knew*** that Wilson was subject to conflicting legal obligations. Espiau's contention that "Luxim counsel had no doubt that Mr. Wilson was not represented by counsel" (Espiau Opposition 6, page 8) is untrue.

Throughout this interference, Guthrie has felt compelled by 37 C.F.R. § 1.56 to submit the various sworn and unsworn witness declarations created (but not filed) by Espiau's counsel after those statements came to light, even though (as with Tim Russell), they contained statements that were misleading or incorrect on their face. In its Opposition 6, Espiau assailed the integrity and credibility of Wilson, even though Wilson was scarcely mentioned in Guthrie's Motion 6. In view of Espiau's unseemly conduct, the contention at page 10 of Espiau's Opposition 6 that its concocted and misleading witness statements and declarations provide an "unfiltered, pre-litigation … baseline with which the Board can assess the credibility of the obviously attorney-drafted, post-litigation motivated and contradictory statements relied on in this proceeding by Guthrie" is meritless.

Espiau's unsworn "statements" from Wilson, Exhibits 2034 and 1007, should be excluded because they: (1) were obtained by improper means (including in violation of 37 C.F.R.

§§ 10.87 and 10.92 and by inducing Wilson unwittingly to breach his legal obligations to his assignee); (2) are inadmissible under the doctrine of assignor estoppel, and (3) are simply inaccurate. *See, Pandrol USA LP v. Airboss Railway Products Inc.*, 424 F.3d 1161, 1166-67, 76 USPQ2d 1524, 1527-1528 (Fed. Cir. 2005). As set forth in Exhibit 2181, Wilson has provided a detailed recounting of his participation in the DRI plasma lamp project leading to the invention of the Count which is fully corroborated by both his co-inventors, independent witnesses, and the contemporaneous documentation. Accordingly, Guthrie respectfully requests that the Board accord Wilson's testimony, as set forth in Exhibit 2181, full credit.

## III. CONCLUSION

Guthrie's corroborated conception of the invention of the Count occurred no later than March 30, 2000. Guthrie's corroborated actual reduction to practice occurred no later than the week of July 17, 2000. Because Guthrie communicated the invention to Espiau on April 11, 2000, any work conducted by Espiau from that point onward constitutes derivation from Guthrie. Moreover, because Espiau acted at Guthrie's direction, any actual or constructive reduction to practice claimed by Espiau inures to Guthrie's benefit. Thus, priority must be awarded to Guthrie.

DATED: June 15, 2007

Respectfully submitted,

JONES DAY

By: /Nicola A. Pisano, Reg. No. 34,408/
Nicola A. Pisano
Attorneys for Junior Party Guthrie et al.

APPENDIX 1

EXHIBITS TO GUTHRIE PRIORITY MOTION 7

| Exhibit No. | Description |
| --- | --- |
| 2003 | Amendment and Request for Interference filed November 29, 2004 |
| 2004 | Declaration of Edmund Sandberg executed November 19, 2004 |
| 2005 | Declaration of Gregory Prior executed November 22, 2004 |
| 2006 | Declaration of Charles Guthrie |
| 2034 | Wilson Declaration of December 12, 2005 |
| 2037 | Ceravision filing in U.K. Entitlement Action |
| 2038 | Luxim Response in U.K. Entitlement Action |
| 2039 | Declaration of Don Wilson executed February 18, 2006 |
| 2040 | Photographs of full wavelength waveguide |
| 2041 | Photographs of half wavelength waveguide |
| 2042 | Photograph of gas-filled quartz bulbs |
| 2048 | Half wavelength waveguide drawing (CTS010) |
| 2059 | Turner e-mail of April 16, 2000 |
| 2060 | LWG001 Engineering Drawing |
| 2061 | SPL002 Engineering Drawing |
| 2062 | WGC003 Engineering Drawing – Ceramic Block |
| 2063 | WGC003 Engineering Drawing – Waveguide Package |
| 2064 | WGC003 Engineering Drawing – Waveguide with Heat Sink |
| 2065 | Turner e-mail of May 15, 2000, 10:19 p.m. |
| 2066 | Turner e-mail of May 15, 2000, 10:38 p.m. |
| 2067 | DRI Presentation |
| 2068 | Turner e-mail of May 17, 2000 |

| Exhibit No. | Description |
|---|---|
| 2069 | Turner e-mails of May 18, 2000, with Attached PowerPoint Presentation |
| 2070 | Final PowerPoint Presentation |
| 2073 | Declaration of Milan Patel |
| 2074 | Declaration of David E. Smoler |
| 2089 | Declaration of Madhu S. Gupta, Ph.D. |
| 2090 | Curriculum vitae of Madhu S. Gupta, Ph.D. |
| 2104 | TM 11-673, June 1953, cover page and pages 81-91 |
| 2115 | Dr. Joshi's laboratory notebook entries |
| 2136 | Declaration of David Smoler executed December 5, 2005 |
| 2137 | Engineering sketches faxed to CoorsTek |
| 2138 | Manufacturing quote from CoorsTek |
| 2139 | Manufacturing Order documentation from CoorsTek dated August 8, 2000 |
| 2140 | Invoice from CoorsTek dated October 13, 2000 |
| 2141 | Invoice from CoorsTek dated October 17, 2000 |
| 2142 | CoorsTek engineering drawings numbered 516133 through 516138 |
| 2143 | Chapter 6.3 from David M. Pozar, Microwave Engineering, Second Edition, John Wiley & Sons, Inc. (1998) |
| 2144 | Declaration of Shelby Katz |
| 2145 | Declaration of Tim Russell dated February 1, 2006 prepared by Wilson Sonsini Goodrich & Rosati |
| 2146 | David Smoler notebook entries dated October 25, 1999 |
| 2147 | December 16, 1999 e-mail from David Smoler to Greg Prior and Ed Sandberg |
| 2148 | Amended Assignment and Bill of Sale dated January 12, 2007 |
| 2149 | June 27, 2000 e-mail from David Smoler to Charles Guthrie |

| Exhibit No. | Description |
|---|---|
| 2150 | Second Declaration of David E. Smoler dated May 21, 2007 |
| 2151 | April 16, 2000 e-mail from David Turner to Greg Prior, Jim Legge and Don Wilson enclosing proposal dated April 14, 2000 |
| 2152 | April 24, 2000 e-mail from David Turner |
| 2153 | April 26, 2000 e-mail from David Turner to Greg Prior |
| 2154 | DRI Drawing SPL001 |
| 2155 | DRI Drawing SPL002 |
| 2156 | April 28, 2000 e-mail from David Turner to Greg Prior |
| 2157 | June 28, 2000 e-mail from David Turner to Greg Prior |
| 2158 | July 6, 2000 e-mail from David Turner to Wayne Catlett |
| 2159 | July 6, 2000 e-mail from David Turner attaching updated contact list |
| 2160 | July 17, 2000 e-mail from David Turner to Wayne Catlett |
| 2161 | August 1, 2000 e-mail to from David Turner to Wayne Catlett |
| 2162 | Photographs of full wavelength waveguide made by Coorstek |
| 2163 | Collection of correspondence after August 1 between Tenco and DRI |
| 2164 | Declaration of Vivek Gandhi |
| 2165 | April 10, 2000 e-mail from David Turner to Greg Prior re: DRI Tasks |
| 2166 | Petition to Correct Inventorship filed December 22, 2004 |
| 2167 | April 28, 2000 e-mail correspondence between Charles Guthrie and CT Lee |
| 2168 | May 7, 2000 e-mail from David Turner to Charles Guthrie |
| 2169 | Collection of waveguide drawings labeled WGC003 |
| 2170 | DRI drawing WGC006 |
| 2171 | DRI drawing SMPL004 |
| 2172 | Collection of irregularly shaped waveguides |

| Exhibit No. | Description |
| --- | --- |
| 2173 | DRI drawings WGC008, WGC009 and WGC010 |
| 2174 | DRI drawings RFCD001 and RFCD002 |
| 2175 | DRI drawing WGC003 including spring-loaded probe |
| 2176 | July 10, 2000 e-mail from Joe Bennett to Charles Guthrie |
| 2177 | July 13, 2000 e-mail from Chan Joshi to Charles Guthrie |
| 2178 | 2002 photograph of lighted half-wavelength waveguide resonator |
| 2179 | March 23, 2000 e-mail from Charles Guthrie re: Meeting at ITW – Escondido |
| 2180 | Declaration of Charles Guthrie dated June 14, 2007 |
| 2181 | Declaration of Don Wilson dated June 14, 2007 |
| 2182 | Declaration of Madhu Gupta dated June 14, 2007 |
| 2183 | Declaration of Floyd Pothoven |
| 2184 | Declaration of Anthony Cooper |
| 2185 | Declaration of Greg Prior dated June 15, 2007 |
| 2186 | Declaration of Joe Bennett |
| 2192 | Draft of Charles Guthrie’s May 10, 2000 expense report |
| 2193 | May 31, 2000 e-mail from David Turner to Wayne Catlett and Greg Prior |
| 2194 | June 1, 2000 e-mail from David Turner to DRI re: Lamp Project Budget |
| 2195 | June 2, 2000 e-mail from David Turner |
| 2196 | June 26, 2000 e-mail from David Turner to DRI |
| 2197 | June 28, 2000 e-mail from David Turner to Don Wilson and Charles Guthrie |
| 2198 | Transcript of June 6, 2007 deposition of Tim Russell |
| 2199 | Declaration of Dennis Nunes |

APPENDIX 2

STATEMENT OF MATERIAL FACTS

1. Charles Guthrie ("C. Guthrie") and Don Wilson ("Wilson"), two of the named inventors on U.S. patent application Serial No. 09/818,092 (the '092 application), acquired title to the '092 application by virtue of an Assignment and Bill of Sale from the Trustee in bankruptcy of debtor Digital Reflection, Inc. ("DRI"), dated March 23, 2004 and a corrected Assignment and Bill of Sale dated January 12, 2007. (Exhibit 2006, ¶ 5; Exhibit 2037, Schedule 2; Exhibit 2148).

2. DRI filed for bankruptcy in March 2002. (Exhibit 2006, ¶ 3).

3. Ceravision Limited ("Ceravision") is a start-up company with offices in Milton Keynes, United Kingdom. (Exhibit 2073, ¶ 1).

4. Ceravision is the assignee of the involved '092 application by virtue of an assignment from Charles Guthrie ("C. Guthrie") and Don Wilson ("Wilson") dated April 29, 2004. (*Id.*; Exhibit 2037, Schedule 2; Exhibit 2039, ¶ 3).

5. The '092 application was filed by DRI on March 26, 2001, and discloses a plasma lamp comprising an enclosed gas cavity disposed in a dielectric resonator. (Exhibit 2033; Paper No. 83, page 17, lines 12-14).

6. In October 1999, Don Wilson ("Wilson"), Greg Prior ("Prior") and Edmund Sandberg ("Sandberg") were employed by DRI. (Exhibit 2004, ¶ 3; Exhibit 2034, ¶ 2; Exhibit 2185, ¶ 2).

7. Beginning in late 1999, DRI was actively pursuing development of a new light source for its new projection television system. (Exhibit 2181, ¶ 13; Exhibit 2185, ¶ 2).

8. By October 1999, DRI had evaluated a number of commercially available and developmental stage light sources, including those under development by Fusion Lighting, Inc. (Exhibit 2181, ¶ 14; Exhibit 2185, ¶ 3).

9. By October 1999, DRI had concluded that there were no commercially available or developmental stage light sources that were suitable for use in DRI's proposed HDTV. (Exhibit 2181, ¶ 14; Exhibit 2185, ¶ 3).

10. The developmental stage light sources available from Fusion Lighting, Inc. were deemed unsuitable due to the unreliability of the electronics, which were believed to suffer frequent failures due to excessive reflection of power from the lamp. (Exhibit 2181, ¶ 14).

11. In October 1999, DRI hired David Smoler ("Smoler") as a consultant to assist DRI in designing a robust prototype light source that could be rapidly prototyped for use in developing other components of DRI's display engine. (Exhibit 2037, Schedule 3; Exhibit 2074, ¶¶ 4-6; Exhibit 2150, ¶ 4; Exhibit 2181, ¶ 15; Exhibit 2185, ¶ 4).

12. In October 1999, DRI also retained Tim Russell ("Russell"), of Logical Services, Inc., as a consultant to further assist Smoler and DRI in designing a prototype light source and RF electronics to drive that light source. (Exhibit 2150, ¶ 5; Exhibit 2181¶ 15; Exhibit 2185, ¶ 5).

13. Shortly after beginning his consulting engagement with DRI on October 13, 1999, Smoler met with Sandberg, the DRI employee with primary responsibility for designing the light source to be used in DRI's HDTV. (Exhibit 2004, ¶ 7; Exhibit 2150, ¶ 6).

14. During his initial discussions with Smoler, Sandberg described a light source comprising an RF-driven loop disposed surrounding a gas-filled quartz bulb source to

deposit energy into the bulb to form a plasma. (Exhibit 2136, ¶ 5; Exhibit 2146, page A17; Exhibit 2150, ¶¶ 6-8).

15. The goal for DRI's prototype light source was to provide a robust concept that could be used to support development work on other aspects of the display engine, while permitting a path for further light source development and refinement. (Exhibit 2150, ¶ 7; Exhibit 2185, ¶ 4).

16. Sometime prior to October 25, 1999, Smoler recorded in his project notebook a schematic of Sandberg's initial light source design. (Exhibit 2136, ¶ 5; Exhibit 2146, page A17; Exhibit 2150, ¶ 8).

17. On October 25, 1999, Smoler recorded in his notebook his original alternative solutions to the circuitry described to him by Sandberg, including coupling the loop disposed around the bulb to an air-dielectric cavity, coupling the bulb to a λ/4 line, and placing the quartz bulb within a solid ceramic coaxial transmission line. (Exhibit 2136, ¶¶ 7-9; Exhibit 2146, pages A17-A18; Exhibit 2150, ¶ 9; Exhibit 2185, ¶ 5).

18. In November 1999, Smoler attended a "brainstorming" meeting with Sandberg, Russell and Prior to discuss proposed designs for the light source and development paths for those concepts. (Exhibit 2004, ¶¶ 7-8; Exhibit 2136, ¶ 10; Exhibit 2150, ¶ 10; Exhibit 2185, ¶ 5; Exhibit 2198, page 12, line 12 to page 13, line 21; page 30, line 3).

19. During the November 1999 brainstorming meeting ("the November 1999 meeting"), the group initially discussed revising the loop-type lamp, with Russell being assigned responsibility for development of the RF-electronics for that light source. (Exhibit 2136, ¶ 10; Exhibit 2150, ¶ 10; Exhibit 2185, ¶ 5; Exhibit 2198, page 31, line 12 to page 32, line 2).

20. At the November 1999 meeting, Smoler reviewed with the group the concepts recorded on October 25, 1999 in his notebook, regarding coupling the quartz bulb to a strip line or disposing it within a solid dielectric transmission guide. (Exhibit 2136, ¶ 10; Exhibit 2150, ¶ 11; Exhibit 2185, ¶ 5).

21. At the November 1999 meeting, the group also discussed use of an air waveguide to couple the RF source to the quartz bulb, but concluded that an air waveguide would be too bulky to be practicable. (Exhibit 2004, ¶ 7; Exhibit 2150, ¶ 11; Exhibit 2185, ¶ 5; Exhibit 2198, page 33, line 12-16).

22. At the November 1999 meeting, the group concluded that by replacing air with a material having a higher dielectric constant in a waveguide, such as a solid ceramic, the overall size of the waveguide could be significantly reduced, with Smoler being assigned responsibility for investigating such an embodiment. (Exhibit 2004, ¶ 8; Exhibit 2136, ¶ 11; Exhibit 2150, ¶ 11; Exhibit 2185, ¶¶ 5-6; Exhibit 2198, page 57, line 5 to page 58, line 11).

23. Shortly after the November 1999 brainstorming meeting, Smoler collected information for standard commercially-available air waveguides and performed some preliminary calculations for a dielectric resonator that would directly couple an RF probe to a gas-filled cavity, and recorded those calculations in his project notebook. (Exhibit 2136, ¶ 11; Exhibit 2146, page A19; Exhibit 2150, ¶ 12; Exhibit 2185, ¶ 6).

24. Smoler's notebook depicts a rectangular block of ceramic having a width of 1.0 inch, a depth of 0.5 inch and a length of 1.46 inches, where the length nominally was selected as being equal to the wavelength of a 900 MHz RF signal in alumina. (Exhibit 2146, page A19; Exhibit 2150, ¶¶ 12-13; Exhibit 2182, ¶¶ 9, 14).

25. Smoler computed the length of the ceramic block using the formula for the wavelength of an electromagnetic wave in a dielectric material, computed as $\lambda_{free}$ = (300 Mm/sec x 39.37 in/m)/(frequency (in MHz) x sqrt(dielectric constant)). (Exhibit 2146, page A19; Exhibit 2150, ¶ 13, Exhibit 2182, ¶¶ 14-16 and 26-28).

26. In this formula, Smoler used a frequency of 900 MHz and inadvertently used the dielectric constant of ceramic (~ 9), rather than the square root of that value, to compute a wavelength in the dielectric material of 1.46 inches. (Exhibit 2146, page A19; Exhibit 2150, ¶ 13; Exhibit 2182, ¶¶ 14, 23).

27. By selecting relative proportions so that the antenna was located one-quarter wavelength (0. 365 inch) from one end of the ceramic block and the gas-filled cavity one-quarter wavelength (0.365 inch) from the other end of the ceramic block, and that the antenna should be located one-half wavelength from the gas-filled cavity, Smoler demonstrated that he appreciated and taught his fellow inventors that the gas-filled cavity and antenna should be located at the electric field maxima of the dielectric resonator. (Exhibit 2146, page A19; Exhibit 2150, ¶¶ 14-15; Exhibit 2185, ¶ 6; Exhibit 2182, ¶¶ 13-15).

28. Throughout November 1999 and into December 1999, Smoler, Prior and Sandberg communicated regarding the resonator concept set forth in this project notebook, culminating in an e-mail dated December 16, 1999 from Smoler to Sandberg and Prior, in which Smoler provided further details of a resonator formed from a block of alumina. (Exhibit 2147; Exhibit 2150, ¶ 14; Exhibit 2185, ¶ 6).

29. Smoler's December 16, 1999 e-mail states that the lateral dimensions (width and depth) of the ceramic block are not critical. (Exhibit 2147; Exhibit 2150, ¶ 17).

30. In recognition that the dimension between the lamp and the probe could be varied in one-half wavelength increments, Smoler's December 16, 1999 e-mail further states that the dimension between the lamp and the probe are not critical, and recommends that the distance be one-half wavelength. (Exhibit 2147; Exhibit 2150, ¶¶ 16-19; Exhibit 2182, ¶ 15).

31. Smoler's December 16, 1999 e-mail further states that the dimensions between the lamp, the probe and the shorted ends of the waveguide are fixed and not easily changeable, and thus it may be necessary to vary the frequency of applied RF signal to obtain resonant operation. (Exhibit 2147; Exhibit 2150, ¶ 19).

32. Smoler's December 16, 1999 e-mail further states that the ceramic block should be covered with a copper foil, which was intended to reduce electromagnetic emissions from the device. (Exhibit 2147; Exhibit 2150, ¶ 14; Exhibit 2182, ¶ 8).

33. Page A19 of Smoler's notebook, Exhibit 2146, and his December 16, 1999 e-mail to Prior and Sandberg (Exhibit 2147) indisputably would have been understood by one of ordinary skill in the art to describe a classic waveguide resonator. (Exhibit 2146, page A19; Exhibit 2147; Exhibit 2150, ¶ 16; Exhibit 2182, ¶¶ 8, 15-16; Exhibit 2185, ¶¶ 6, 10-11).

34. As was understood by Smoler, Prior and Sandberg, and as acknowledged in Dr. Pozar's textbook, a resonator can be constructed from a waveguide which is "shorted at both ends, thus forming a closed box or cavity." (Exhibit 2070, page 7; Exhibit 2143; Exhibit 2150, ¶ 19; Exhibit 2182, ¶¶ 8, 15-16; Exhibit 2185, ¶ 6).

35. One of ordinary skill would have understood that the precise placement of the RF probe and lamp cavity in Exhibits 2146 and 2147 ensured that the probe and lamp were

located at the electric field maxima of the standing wave formed within the dielectric resonator. (Exhibit 2146, page A19; Exhibit 2147; Exhibit 2150, ¶¶ 16-19; Exhibit 2182 ¶¶ 15-18; Exhibit 2185 ¶¶ 6, 10-11).

36. Later in December 1999, Sandberg informed Wilson, who was responsible for the bulb characteristics of the DRI light source, of the proposed dielectric resonator design for the light source. (Exhibit 2150, ¶¶ 20-21; Exhibit 2180, ¶ 3; Exhibit 2181, ¶ 17; Exhibit 2185, ¶ 8).

37. By December 1999, Wilson had developed some preliminary designs for a self-contained quartz bulb and had begun talking to suppliers regarding a design for a ceramic bulb having a sapphire window. (Exhibit 2181, ¶ 17).

38. By December 1999, DRI had developed a working prototype of its projection television using Sandberg's loop-type RF-driven light source, and had begun demonstrating that device in confidence to potential suppliers and corporate partners. (Exhibit 2181, ¶ 18; Exhibit 2185, ¶ 7).

39. In early 2000, Ceravision's former subsidiary, International Technology Works, Inc. ("ITW"), was working with DRI to develop a gas-filled metal halide bulb for a plasma lamp, and methods for making same, in which a sapphire window was sealed to a ceramic body. (Exhibit 2180, ¶ 4; Exhibit 2181, ¶ 20; Exhibit 2183, ¶¶ 3-4; Exhibit 2184, ¶¶ 3-5).

40. In late January 2000, DRI hired Charles Guthrie ("C. Guthrie") to assist Wilson in the lamp development effort; C. Guthrie began work at DRI in early February 2000. (Exhibit 2180, ¶ 3; Exhibit 2181, ¶ 19; Exhibit 2185, ¶ 8).

41. From February through mid-July 2000, Wilson and C. Guthrie had their offices located at ITW in Escondido, California, which was participating with DRI in designing and developing DRI's ceramic bulb. (Exhibit 2180, ¶ 3; Exhibit 2181, ¶ 20; Exhibit 2183, ¶¶ 3-4; Exhibit 2184, ¶¶ 3-5).

42. In early February 2000, Wilson informed C. Guthrie of the dielectric resonator version of the DRI light source, and they together determined the gas-fill characteristics required for a self-contained quartz bulb and a ceramic bulb to be used with the dielectric resonator. (Exhibit 2180, ¶ 3; Exhibit 2181, ¶ 19).

43. Also in February 2000, Wilson and C. Guthrie discussed with Sandberg and Prior the gas-fill characteristics for a dielectric resonator embodiment of the DRI light source, and communicated that DRI's existing proprietary quartz bulb and the ceramic bulb were suitable for use in the dielectric resonator plasma lamp, completing conception of the dielectric resonator plasma lamp of the Count. (Exhibit 2180, ¶ 3; Exhibit 2181, ¶ 19; Exhibit 2185, ¶ 8).

44. The invention of the Count was conceived by DRI employees Sandberg, Prior, Wilson, C. Guthrie and DRI consultant Smoler no later than March 31, 2000. (Exhibit 2150, ¶¶ 10-20; Exhibit 2180, ¶ 3; Exhibit 2181, ¶ 19; Exhibit 2182, ¶¶ 20-21; Exhibit 2183, ¶¶ 4-5; Exhibit 2184, ¶¶ 6-7; Exhibit 2185, ¶ 8).

45. During February through March 2000, while located at ITW's facility in Escondido, Wilson and C. Guthrie discussed the DRI light source development plan, including the dielectric resonator embodiment, with ITW personnel, including Anthony Cooper ("Cooper") and Floyd Pothoven ("Pothoven"). (Exhibit 2181, ¶ 20; Exhibit 2183, ¶¶ 4-5; Exhibit 2184, ¶¶ 6-7).

46. Former ITW employees Anthony Cooper ("Cooper") and Floyd Pothoven ("Pothoven") corroborate the conception of the DRI inventors as occurring no later than March 31, 2000. (Exhibit 2183, ¶¶ 4-5; Exhibit 2184, ¶¶ 6-7).

47. Former DRI consultant, Tim Russell ("Russell"), also was present during the conception of the invention of the Count and his testimony corroborates that conception. (Exhibit 2198, page 12, line 12 to page 13, line 21; page 29, line 8 to page 31, line 3; page 44, line 4 to page 46, line 11; page 52, lines 6 – 10; page 59, line 9 to page 61, line 18; page 64, line 20 to page 66, line 16; page 70, line 7 to page 73, line 10).

48. By mid-March 2000, DRI had lost the services of its RF consultants, Smoler and Russell, and began a search for a new RF consultant to assist in developing the light source for the DRI display engine. (Exhibit 2180, ¶ 4; Exhibit 2181, ¶ 21; Exhibit 2185, ¶ 12).

49. By mid-March 2000, James Legge ("Legge") had been hired by DRI as a Vice-President of Manufacturing. (Exhibit 2039, ¶ 17; Exhibit 2181, ¶ 22; Exhibit 2185, ¶ 12).

50. Legge suggested that DRI retain a company owned by David Turner ("Turner"), Turner Engineering Co. ("Tenco"), to work on the DRI plasma lamp and RF exciter package. (Exhibit 2038, ¶ 9; Exhibit 2180, ¶ 4; Exhibit 2181, ¶ 22; Exhibit 2185, ¶ 12).

51. On or about March 21, 2000, Turner met with Prior, Legge and DRI's founder, Wayne Catlett ("Catlett"), at DRI's Los Gatos, California facility to discuss the proposed scope of services that Tenco would provide for DRI. (Exhibit 1067, page 56, lines 16-24; Exhibit 2038, ¶ 13; Exhibit 2185, ¶ 12).

52. During that initial meeting, Prior provided Turner with an overview of the DRI development status, including the existing loop-type plasma lamp prototype and a next

generation dielectric resonator plasma lamp design under development, and requested Tenco's assistance in developing commercially producible designs for the RF exciter package and plasma lamp. (Exhibit 2038; Schedule 3; Exhibit 2185, ¶ 12).

53. On March 23, 2000, C. Guthrie alerted the DRI light source development team of a scheduling meeting to be held on April 11, 2000 at ITW, which would include DRI's new RF consultant. (Exhibit 2179; Exhibit 2180, ¶ 4; Exhibit 2183, ¶ 6; Exhibit 2184, ¶ 8; Exhibit 2185, ¶¶ 15-16).

54. On April 1, 2000, Turner sent an e-mail to Prior including a draft contract for the proposed work. (Exhibit 2037, Schedule 9; Exhibit 2038, Schedule 3; Exhibit 2185, ¶ 13).

55. In a letter dated March 31, 2000 that accompanied Turner's April 1, 2000 e-mail, Turner thanked Prior "for the introduction to the Digital Reflection product and development status and the update today" and stated that "the demo units in your conference room show that the work you've done has brought you close to the production stage." (Exhibit 2037, Schedule 9; Exhibit 2038, Schedule 3).

56. Turner's March 31, 2000 letter states that "[w]e at Turner Engineering Company (Tenco) have organized a team with the resources and experience to help in two areas: … [the second of which is d]evelopment of a packaged exciter and plasma lamp." (Exhibit 2037, Schedule 9; Exhibit 2038, Schedule 3).

57. Turner's March 31, 2000 letter represented that Tenco would use the services of a consulting company, Betadot, stating that "Tenco and Betadot will work together to develop and provide the plasma lamp package. … Dr. Chan Joshi, Professor of Electrical Engineering and Director of the Center for High Frequency Electronics at UCLA and

R&D Director of Betadot, will direct the electrical design. …" (Exhibit 2037, Schedule 9; Exhibit 2038, Schedule 3; Exhibit 2185, ¶ 13).

58. Betadot initially consisted of UCLA professors Chandrashekhar Joshi ("Joshi") and Matt Espiau ("M. Espiau"); by May 7, 2000, Yian Chang ("Chang"), another UCLA professor, also was working on the DRI plasma lamp project for Betadot. (Exhibit 2038, Schedule 3; Exhibit 2151; Exhibit 2168; Exhibit 2180, ¶¶ 6, 15; Exhibit 2181, ¶¶ 24-25, 36; Exhibit 2185, ¶¶ 13, 20).

59. Section 5 of the draft Engineering Service Agreement ("ESA") attached to Turner's March 31, 2000 letter, states that "All Client designs, drawings, and other technical information ("Technical Information") relating to the services, and the intellectual property rights therein shall be and remain the property of Client." (Exhibit 2038, Schedule 3; Exhibit 2185, ¶ 13).

60. Section 5 of the draft Engineering Service Agreement attached to Turner's March 31, 2000 letter, further provides that "Work performed under this agreement for which the client has paid Tenco which is not based on proprietary information of Tenco is the property of Client." (Exhibit 2038, Schedule 3, Exhibit 2185, ¶ 13).

61. DRI signed the Engineering Services Agreement ("ESA") with Tenco on April 4, 2000. (Exhibit 2038, Schedule 3, Exhibit 2185, ¶ 13).

62. On April 10, 2000, Turner sent Prior an e-mail confirming that he and Dr. Chandrashekhar Joshi ("Joshi") would be attending the April 11, 2000 meeting at ITW. (Exhibit 2165).

63. On April 11, 2000 ("the April 11 meeting"), Turner, Joshi and Matthew Espiau ("M. Espiau") attended a meeting at the ITW facility in Escondido, California, to

introduce Tenco/Betadot's capabilities and to discuss the schedule for DRI's ceramic plasma lamp prototype. (Exhibit 2038, ¶ 17; Exhibit 2180, ¶ 6; Exhibit 2181, ¶ 25; Exhibit 2184, ¶ 9; Exhibit 2185, ¶¶ 15-16).

64. Attendees at the April 11, 2000 meeting between DRI, Tenco/Betadot and ITW included DRI representatives (C. Guthrie, Prior, Wilson), Tenco/Betadot representatives (Turner, M. Espiau, Joshi), and at various times a number of ITW's ceramics and manufacturing process experts. (Exhibit 2038, ¶ 17; Exhibit 2180, ¶ 5; Exhibit 2181, ¶ 24; Exhibit 2183, ¶ 7; Exhibit 2184, ¶¶ 10-11; Exhibit 2185, ¶ 15).

65. Cooper, Pothoven, Randy Regan ("Regan"), Paul Maye ("Maye"), Ingemar Rodriguez ("Rodriguez"), Abe Able ("Able") and Bill Bischoff ("Bischoff") attended various portions of the April 11 meeting on behalf of ITW. (Exhibit 2180, ¶ 5; Exhibit 2180, ¶ 24; Exhibit 2183, ¶ 7; Exhibit 2185, ¶ 15).

66. Wilson, Prior and C. Guthrie attended the April 11 meeting on behalf of DRI. (Exhibit 2180, ¶ 5; Exhibit 2181, ¶ 24; Exhibit 2183, ¶ 7; Exhibit 2184, ¶ 8; Exhibit 2185, ¶ 15).

67. As of the time they began their consulting work for DRI, M. Espiau, Joshi and Turner had no experience in designing plasma lamps, gas-filled bulbs or ceramic components and no idea how to design or make such devices. (Exhibit 1068, page 26, lines 17-24; Exhibit 2181, ¶ 47; Exhibit 2183, ¶ 8; Exhibit 2184, ¶¶ 8-9).

68. M. Espiau, Joshi and Turner's lack of experience in designing plasma lamps, gas-filled bulbs, ceramic technology immediately became apparent to the DRI and ITW personnel in attendance in the April 11 meeting. (Exhibit 2180, ¶ 7; Exhibit 2183, ¶ 8; Exhibit 2184, ¶¶ 8-9. Exhibit 2185, ¶ 18).

69. Early during the course of the April 11 meeting, while C. Guthrie and Wilson were presenting an improved design of the loop-type plasma lamp, M. Espiau suggested that a waveguide structure could be used to couple the ceramic bulb to the ceramic PWB. (Exhibit 2180, ¶ 6; Exhibit 2181, ¶ 25; Exhibit 2183, ¶ 10; Exhibit 2185, ¶ 16).

70. Prior immediately informed M. Espiau that the DRI had already considered and dismissed the use of an air waveguide as too large to be practical in the plasma lamp application, and instead had conceived of an embodiment in which a gas-fill or bulb was directly integrated into a ceramic waveguide ***configured as a resonator***. (Exhibit 2180, ¶ 6; Exhibit 2181, ¶ 25; Exhibit 2183, ¶¶ 1; Exhibit 2185, ¶ 16)(emphasis added).

71. Prior then sketched out the ceramic waveguide resonator design for the Tenco people, including a ceramic block having a gas cavity located near one end and an RF antenna inserted near the other end. (Exhibit 2183, ¶¶ 11; Exhibit 2185, ¶ 16).

72. DRI communicated its conception of the invention of the Count in interference to Joshi and M. Espiau at the April 11 meeting. (Exhibit 2180, ¶¶ 6-7; Exhibit 2181, ¶¶ 25-26; Exhibit 2183, ¶ 11; Exhibit 2184, ¶ 11; Exhibit 2185, ¶¶ 16-17).

73. After further discussion during the April 11 meeting, it was agreed between the DRI and Tenco/Betadot personnel that the dielectric resonator design presented a simpler and faster development path to a commercial, would simplify the RF electronics design and benefit from the DRI/ITW ceramic technology development. (Exhibit 2180, ¶ 7; Exhibit 2181, ¶ 27; Exhibit 2183, ¶ 11; Exhibit 2185, ¶ 17).

74. At the April 11, 2000 meeting, DRI and Tenco/Betadot agreed that Tenco/Betadot would support DRI in advancing development of the ceramic waveguide resonator

plasma lamp. (Exhibit 2038, Schedule 7; Exhibit 2151; Exhibit 2180, ¶ 7; Exhibit 2181, ¶ 27; Exhibit 2183, ¶ 11; Exhibit 2185, ¶¶ 17-18).

75. Wilson and Prior discussed with Cooper, after Turner, Joshi and Espiau had departed, the decision by DRI and Tenco to advance development of ceramic resonator design. (Exhibit 2181, ¶ 27; Exhibit 2184, ¶ 11; Exhibit 2185, ¶ 17).

76. DRI inventors Smoler, Sandberg, Prior, Wilson and C. Guthrie had a corroborated, completed conception of the invention of the Count on or before April 11, 2000 and communicated that conception to alleged Espiau inventors Joshi and M. Espiau at the April 11 meeting. (*supra*, Facts 7-47).

77. On April 16, 2000, Turner sent an e-mail to Prior, Wilson and Legge enclosing a letter dated April 14, 2000 ("the April 14 Letter") and Statement of Work DR-00-02 ("SOW"), in which Turner confirmed the shift in project emphasis to the ceramic waveguide discussed by DRI and Tenco at the April 11 meeting, as further agreed by Turner and Prior during a telephone conversation on April 13, 2000. (Exhibit 2038, Schedule 7; Exhibit 2151; Exhibit 2181, ¶ 28; Exhibit 2185, ¶ 18).

78. The April 14 Letter recounts that at the April 11 meeting DRI and Tenco personnel "discussed a design concept [Plasma Lamp Exciter and Waveguide – 'LEW'] which uses a ceramic printed circuit board with directional coupler and RF antenna, matched to a ceramic waveguide which couples rf energy in the DRI plasma bulb." (Exhibit 2038, Schedule 7; Exhibit 2151; Exhibit 2181, ¶¶ 28-29; Exhibit 2185, ¶ 18).

79. The April 14 Letter from Turner demonstrates that he had misunderstood the discussion at the April 11 meeting between Prior, Wilson and C. Guthrie, on the one hand, and Joshi and M. Espiau, on the other hand, that the ceramic waveguide was not

merely intended by DRI to serve as a conduit to transmit energy from the ceramic PWB to the lamp, but instead functioned as a resonator. (Exhibit 2181, ¶ 29).

80. The April 14 Letter further states that Tenco planned "to work closely with Don Wilson and Charles Guthrie, particularly on the selection of ceramic materials and fabrication of the prototype waveguides. … We'll plan to meet with Don, Charles and Jim Legge for a technical and schedule meeting Monday, we'll meet with you for a business meeting Thursday morning." (Exhibit 2038, Schedule 7; Exhibit 2151; Exhibit 2181, ¶¶ 29-30; Exhibit 2185, ¶ 18).

81. In stark contrast to the arrangement set forth in the draft ESA sent on March 31, 2000, the April 14 Letter states the "[w]e've discussed the idea of taking partial compensation for this work in stock or options, and that is appealing to us. Finally, we think there may be a family of products which can benefit from the ideas we are pursuing for the LEW [Light Emitting Waveguide], and we would like to discuss with you the idea of a joint development" – thus foreshadowing Espiau's efforts to misappropriate the invention of the Count. (Exhibit 2038, Schedules 3 and 7; Exhibit 2151; Exhibit 2185, ¶ 18).

82. Turner's April 16, 2000 e-mail reiterates that Tenco would "meet[] with Don [Wilson], Charles [Guthrie] and Jim [Legge] on Monday morning [April 17] to discuss the technical aspects [of the LEW project]." (Exhibit 2151; Exhibit 2181, ¶ 28; Exhibit 2185, ¶ 18).

83. On April 17, 2000, C. Guthrie and Wilson provided technical information to Turner, M. Espiau and Joshi regarding potential dielectric candidate materials for making the dielectric resonator, processes for making the dielectric resonator, and information

regarding the DRI bulb design and characteristics. (Exhibit 2151; Exhibit 2180, ¶ 8; Exhibit 2181, ¶ 31; Exhibit 2183, ¶ 13).

84. Throughout the collaboration between DRI and Tenco, the dielectric resonator design was jointly and interchangeably referred to as the "ceramic waveguide". (Exhibit 2151; Exhibit 2180, ¶ 8; Exhibit 2181, ¶ 12).

85. On Thursday, April 20, 2000, Turner, Espiau and Joshi traveled to DRI's office in Los Gatos to meet with Catlett, Prior, Sandberg and Wilson to learn further details of the current embodiment of DRI's light source and to provide a presentation regarding Tenco's thoughts on implementing the ceramic resonator embodiment of DRI's light source ("the April 20 visit"). (Exhibit 2038, ¶ 23; Exhibit 2181, ¶¶ 32-33; Exhibit 2185, ¶¶ 19-20)

86. During the April 20 visit, Joshi, Turner and M. Espiau met with Sandberg in his laboratory to witness a demonstration of DRI's loop-type plasma lamp. (Exhibit 2115, pages 15-16; Exhibit 2181, ¶ 32; Exhibit 2185, ¶ 19)

87. Also during the April 20 visit, Joshi, Turner and M. Espiau gave a Powerpoint presentation entitled "Dielectric Resonator Concept for Plasma Lamps" for the benefit of DRI's founder, Catlett. (Exhibit 2038, Schedule 8; Exhibit 2181, ¶ 33; Exhibit 2185, ¶ 20).

88. The Powerpoint presentation provided by Tenco/Betadot during the April 20 visit was a simplistic overview of the purported advantages, issues and next steps required by DRI and Tenco to implement DRI's dielectric resonator. (Exhibit 2038, Schedule 8; Exhibit 2181, ¶ 33; Exhibit 2185, ¶ 20).

89. The Powerpoint presentation made by Tenco on April 20, 2000 provided no new information about the invention of the Count not already known to Prior and Wilson. (Exhibit 2038, Schedule 8; Exhibit 2146, page A19; Exhibit 2147; Exhibit 2181, ¶ 33; Exhibit 2185, ¶ 20).

90. Comparison of Smoler's December 16, 1999 e-mail to the Tenco Powerpoint presentation of April 20, 2000 demonstrates that the Tenco presentation provided substantially less information to DRI than was already known to Sandberg, Prior, C. Guthrie, Wilson and Smoler regarding making a plasma lamp using a dielectric resonator. (Exhibit 2038, Schedule 8; Exhibit 2146, page A19; Exhibit 2147; Exhibit 2181, ¶ 33; Exhibit 2185, ¶ 20).

91. At the conclusion of the April 20 visit, Prior signed the SOW attached to the April 14 Letter, providing a budget of $375,000 for the proposed DRI/Tenco/Betadot collaboration. (Exhibit 2038, Schedule 7, page 4; Exhibit 2181, ¶ 34; Exhibit 2185, ¶ 20).

92. During the April 20, 2000 visit with DRI, neither Tenco nor Betadot expressed the view that the dielectric resonator proposed in the presentation had not been invented by DRI or that it constituted Tenco proprietary information. (Exhibit 2181, ¶ 33; Exhibit 2185, ¶ 20).

93. DRI never agreed that Tenco was entitled to any remuneration for its work on the DRI dielectric resonator project other than the $375,000 budget set forth in the SOW (Exhibit 2185, ¶¶ 20, 27).

94. By the time of the April 20 visit, Turner, Espiau and Joshi had already begun scheming to claim ownership to DRI's dielectric resonator plasma lamp and to form their

own new company to commercialize it. (Exhibit 1067, page 102, lines 1-3; Exhibit 2038, ¶ 32).

95. On the following Monday, April 24, 2000, C. Guthrie and Wilson again met with M. Espiau and Joshi, this time at UCLA ("the April 24 meeting"), to further discuss the design and construction of the dielectric resonator, including methods for sealing the sapphire window to the body of the ceramic resonator. (Exhibit 2153; Exhibit 2180, ¶¶ 9-12; Exhibit 2181, ¶¶ 35-38; Exhibit 2183, ¶ 13; Exhibit 2185, ¶ 21).

96. The April 24, 2000 meeting was the first in a series of meetings between the Guthrie inventors and Espiau that were held at least weekly and usually at Joshi's lab at UCLA. (Exhibit 2153; Exhibit 2180, ¶ 9; Exhibit 2181, ¶ 35; Exhibit 2183, ¶ 13; Exhibit 2185, ¶ 21).

97. During the April 24 meeting, C. Guthrie and Wilson also discussed with Joshi and Espiau their near-term efforts to obtain ceramic samples from a number of suppliers so that the parties could test and characterize the available materials. (Exhibit 2153; Exhibit 2180, ¶ 12; Exhibit 2181, ¶ 38; Exhibit 2185, ¶¶ 21-22).

98. Also on April 24, 2000, Turner sent out an e-mail to the DRI and Tenco/Betadot personnel that included an address list for the various personnel and consultants working on the DRI Plasma Lamp project. (Exhibit 2152; Exhibit 2180, ¶ 10; Exhibit 2181, ¶ 36; Exhibit 2185, ¶ 22).

99. The address list circulated by Turner on April 24, 2000, identified Joshi and M. Espiau as personnel of the Betadot consulting company, but did not identify Dr. Yian Chang ("Chang") as being associated with Tenco, Betadot or the DRI Plasma Lamp project. (Exhibit 2152; Exhibit 2180, ¶ 10; Exhibit 2181, ¶ 36; Exhibit 2185, ¶ 22).

100. In an e-mail dated April 26, 2000, Turner reported to Prior on the progress of the DRI and Tenco/Betadot group in outlining methods for making a ceramic waveguide having a sapphire window, stating that "[d]uring our Monday meeting with Don and Charlie, we discussed the possibilities for brazing the sapphire lens to the ceramic lamp body/waveguide." (Exhibit 2153; Exhibit 2180, ¶ 11; Exhibit 2181, ¶ 37).

101. In his April 26, 2000 e-mail, Turner further suggested that DRI make a gift of $10,000 to UCLA so that UCLA could do some "research into the basic question of laser brazing," to be followed by the Tenco team "propos[ing] a task to develop a laser system capable of sealing a lens to a lamp body." (Exhibit 1107, page 1, last two lines; Exhibit 2153; Exhibit 2181, ¶ 37).

102. Pursuant to Turner's request, DRI made a $10,000 donation to UCLA to support Joshi's work. (Exhibit 1107, page 1, last two lines; Exhibit 2181, ¶ 37).

103. Neither Joshi nor UCLA ever provided any report or other results to DRI in exchange for DRI's sponsorship. (Exhibit 2180, ¶ 34; Exhibit 2181, ¶ 37; Exhibit 2185, ¶ 23).

104. On April 26, 2000, after consultation with Wilson, C. Guthrie prepared drawing SPL001 for a sample of ceramic tubing to be used to assess the feasibility of the proposed sapphire-ceramic laser brazing work discussed in Turner's April 26, 2000 e-mail to Prior. (Exhibit 2154, ¶ 34; Exhibit 2180, ¶ 12; Exhibit 2181, ¶ 38).

105. Also on April 26, 2000, C. Guthrie sent drawing SPL001 to a number of suppliers, who had been contacted earlier that day by Wilson requesting quotations for high dielectric ceramic materials. (Exhibit 2154; Exhibit 2180, ¶ 12; Exhibit 2181, ¶ 38).

106. On April 27, 2000, C. Guthrie also prepared drawing LWG001 depicting how a ceramic waveguide could be integrated into the DRI light source, and drawing SPL002 depicting ceramic test samples for use as the waveguide body. (Exhibit 2060; Exhibit 2155; Exhibit 2180, ¶ 13; Exhibit 2181, ¶ 38).

107. On April 28, 2000, C. Guthrie forwarded drawing SPL002 to a number of ceramic suppliers who had previously been contacted by Wilson for quotations. (Exhibit 2155; Exhibit 2180, ¶ 13; Exhibit 2181, ¶ 38).

108. Also on April 28, 2000, Turner e-mailed Prior to inform DRI that Tenco had revised the Plasma Lamp schedule to extend the duration of the concept phase for the waveguide and to take into account the schedule impact of the proposed Laser Brazing System for sealing the sapphire window to the ceramic waveguide. (Exhibit 2156; Exhibit 2180, ¶ 13).

109. Turner's April 28, 2000 e-mail also states that a further meeting was scheduled for Monday, May 1, to further consider whether the existing DRI plasma bulbs could be used with the ceramic waveguide and how soon those bulbs could be obtained for testing. (Exhibit 2156; Exhibit 2180, ¶ 13).

110. C. Guthrie and Wilson drove to UCLA to attend meetings on May 1 and 2, 2000 with Joshi and M. Espiau, at which the DRI personnel provided some of the detailed ceramic materials information they had obtained from some of the ceramic suppliers. (Exhibit 2180, ¶ 15; Exhibit 2181, ¶ 39).

111. In connection with the meetings held at UCLA on May 1 and 2, Joshi and M. Espiau requested that the equipment used for the current DRI plasma lamp embodiment

be brought to Joshi's laboratory at UCLA for further study. (Exhibit 2180, ¶ 15; Exhibit 2181, ¶ 39; Exhibit 2185, ¶ 23; Exhibit 2190).

112. On May 3-4, 2000, C. Guthrie drove to San Jose to collect the equipment from Sandberg's laboratory and then delivered that equipment, with at least ten of DRI's proprietary quartz bulbs, to Joshi's laboratory at UCLA. (Exhibit 1067, p. 82, line 22 to p. 83, line 2; Exhibit 2168; Exhibit 2180, ¶ 16; Exhibit 2181, ¶ 39; Exhibit 2185, ¶ 23; Exhibit 2190).

113. In an e-mail to C. Guthrie dated May 7, 2000, Turner acknowledged receipt of the DRI equipment, which states "thanks for bringing the setup from DRI. Matt [Espiau] and Yian [Chang] has already had some really good and useful results with it." (Exhibit 2168; Exhibit 2180, ¶ 16).

114. Although Tenco later returned the equipment borrowed from DRI's lab, it never returned the DRI quartz bulbs supplied by DRI for the UCLA experiments. (Exhibit 2180, ¶ 16; Exhibit 2181, ¶ 39).

115. On Wednesday, May 10, 2000, C. Guthrie and Wilson attended another meeting at UCLA with Joshi and M. Espiau where the group discussed a number of concepts for implementing the ceramic waveguide resonator using high dielectric materials. (Exhibit 2180, ¶ 17; Exhibit 2181, ¶ 40).

116. On May 10, 2000, after returning to his office location at ITW's facility in Escondido, and on May 11, 2000, C. Guthrie prepared drawings for a number of the implementations discussed with M. Espiau and Joshi in a series of drawings labeled WGC003, each of which depicts a dielectric resonator substantially identical to that

depicted in Smoler's project notebook from November 1999. (Exhibit 2146, page A-19; Exhibit 2169; Exhibit 2180, ¶ 17; Exhibit 2181, ¶ 40).

117. In an e-mail dated May 12, 2000, unknown to any of the DRI inventors, Turner reported to Catlett that the dielectric resonator plasma lamp was solely the invention of Tenco/Betadot. (Exhibit 2038, Schedule 10, page 5; Exhibit 2180, ¶ 35; Exhibit 2181, ¶¶ 41-42; Exhibit 2185, ¶ 24).

118. In a document entitled "Plasma Lamp Development Plan" attached to his May 12, 2000 e-mail, Turner falsely claimed that "[t]he Tenco team, consisting of Chan Joshi, Matt Espiau, Yian Chang and David Turner have, in the course of an engineering assignment for Digital Reflection, Inc. invented a new integrated dielectric wave guide/exciter design for plasma lamps…" (Exhibit 2038, Schedule 10, page 5; Exhibit 2180, ¶ 35; Exhibit 2181, ¶¶ 42-43; Exhibit 2185, ¶ 24).

119. In his May 12, 2000 e-mail, Turner proposed a business model for the continued relationship between DRI and the new lamp development company, tentatively named "Luxim Corporation," that Tenco/Betadot had decided to form. (Exhibit 2038, Schedule 10, page 5; Exhibit 2185, ¶ 24).

120. Turner's May 12, 2000 email also informed Catlett that Luxim would take title to the patent application he intended to file on the dielectric resonator plasma lamp, and that ***if DRI invested up to another $2 million dollars in Luxim***, DRI could receive a license limited to "reflective microdisplay TV and monitor uses" under Luxim's patent. (Exhibit 2038, Schedule 10, pages 5-6)(emphasis added).

121. The "Plasma Lamp Development Plan" attached to Turner's May 12, 2000 e-mail further states that "[t]he inventors will apply for patent protection for the new lamp

design and will assign their patent rights to Luxim. DRI will fund the expenses of applying for and prosecuting the patent in the US and abroad, as circumstances warrant" – in return for which "DRI will receive an exclusive, world-wide, royalty-free license to exploit the new lamp technology for reflective microdisplay TV and monitor uses." *Id.*

122. Turner's May 12, 2000 e-mail further reports that using the equipment and quartz bulbs supplied by DRI, Joshi and Espiau had succeeded in lighting a quartz bulb at 1 GHz and 10 GHz. (Exhibit 2038, Schedule 10, page 1; Exhibit 2185, ¶ 24).

123. Luxim Corporation was founded on June 6, 2000 with an initial capitalization of as little as $4000 and the "contribution" by Turner, M. Espiau, Joshi and Chang of the intellectual property for the DRI dielectric resonator plasma lamp. (Exhibit 1067, page 28, line 10 to page 29, line 23).

124. The "contribution" to Luxim Corporation by Turner, M. Espiau, Joshi and Chang of the intellectual property for the DRI dielectric resonator plasma lamp was itself acquired solely at DRI's expense. (Exhibit 2181, ¶ 63).

125. Mr. Catlett, who was subsequently adjudged to have misused DRI's finances for his personal benefit, did not alert his engineers to Tenco's claim of inventorship or demands. (Exhibit 2038, Schedule 2; Exhibit 2180, ¶ 35; Exhibit 2181, ¶¶ 42-43; Exhibit 2185, ¶ 24).

126. None of Prior, C. Guthrie, Wilson or Sandberg learned of Turner's deception regarding the inventorship of the ceramic waveguide until May 22, 2001, when Turner informed DRI that DRI was not "authorized" to file a patent application naming Joshi and M. Espiau as co-inventors of any of the concepts jointly developed with DRI personnel. (Exhibit 2180, ¶ 35; Exhibit 2181, ¶ 43; Exhibit 2185, ¶ 24).

127. Despite DRI's payment to Tenco/Betadot of several hundred thousand dollars for their assistance in developing DRI's plasma lamp, Tenco/Betadot provided no deliverables to DRI except for a single Powerpoint presentation on May 22, 2000 and a stream of e-mailed progress reports. (Exhibit 2180, ¶ 34; Exhibit 2185, ¶ 23).

128. During his deposition, Turner contended that – despite a $375,000 development budget that DRI was to pay to Tenco to assist in assembling and testing components of the plasma lamp invention – DRI had never been entitled to any rights under the "Luxim" patent:

> Q. Okay. So just - - is it your testimony that DRI was being asked to pay $375,000 to develop a product that they would not own when this work was done?
>
> * * *
>
> THE WITNESS: That's correct.

(Exhibit 1067, page 105, line 22 to page 106, line 2).

129. On Monday, May 15, 2000, Turner sent an e-mail to C. Guthrie, Wilson, Joshi, Chang and M. Espiau requesting he be sent the most up to date information prepared by each member of the group, which information would be included in a "Concept Design Presentation" for DRI management, Catlett and Prior. (Exhibit 2065; Exhibit 2180, ¶ 18; Exhibit 2181, ¶ 44).

130. Turner's May 15, 2000 e-mail identifies that Joshi would explain how the waveguide works, Chang would describe the results of the numerical simulations, M. Espiau would provide a schematic description of the exciter circuitry, and Wilson and Guthrie would describe the material selection, package configuration and assembly techniques. (Exhibit 2065; Exhibit 2180, ¶ 18; Exhibit 2181, ¶ 44).

131. On May 16, 2000, C. Guthrie forwarded a set of slides prepared together with Wilson regarding the topics requested in Turner's May 15, 2000 e-mail, which Turner acknowledged receiving in a return e-mail to C. Guthrie on May 17, 2000. (Exhibit 2067; Exhibit 2180, ¶ 19; Exhibit 2181, ¶ 44).

132. The set of slides that C. Guthrie forwarded to Turner on May 16, 2000 provided drawings, materials properties information and assembly processes. (Exhibit 2067; Exhibit 2180, ¶ 19; Exhibit 2181, ¶ 44).

133. On Wednesday, May 17, 2000, Turner sent Prior an e-mail confirming that he would present the Concept Review Presentation at DRI the following Monday, May 22, 2000. (Exhibit 2068; Exhibit 2180, ¶ 19; Exhibit 2181, ¶ 44).

134. In an e-mail dated May 18, 2000, Turner circulated to Joshi, M. Espiau, Chang, Wilson and Guthrie a Powerpoint presentation entitled "Plasma Lamp Exciter and Waveguide Development – Conceptual Design – Discussion Draft" ["Discussion Draft"]. (Exhibit 2069; Exhibit 2180, ¶ 19; Exhibit 2181, ¶ 45).

135. The Discussion Draft incorporated the drawings, materials properties information and assembly processes supplied by DRI employees C. Guthrie and Wilson, as well as some results of RF and thermal simulations prepared at UCLA and high level schematics of the proposed exciter circuitry. (Exhibit 2069; Exhibit 2180, ¶ 19; Exhibit 2181, ¶ 45).

136. The Discussion Draft was finalized as by Turner and presented at DRI on May 22, 2000. (Exhibit 2070, Exhibit 2180, ¶ 19; Exhibit 2185, ¶ 23).

137. On May 31, 2000, Turner sent a e-mail to Catlett and Prior suggesting that DRI set up a deposit account for lamp development expenses, and suggesting that DRI lease

space in Southern California for a joint laboratory for the use of DRI and Tenco personnel. (Exhibit 2181, ¶ 46; Exhibit 2185, ¶ 23; Exhibit 2191).

138. In a further e-mail sent to Catlett and other DRI personnel dated June 1, 2000, Turner submitted a budget for the DRI plasma lamp project for the remainder of 2000, including the costs for a projected joint DRI/Tenco lab/office to be located in Culver City, California. (Exhibit 2181, ¶ 46; Exhibit 2185, ¶ 23; Exhibit 2192).

139. DRI refused to lease space for a joint laboratory/office and instead paid for the installation of 240 volt service in the basement of M. Espiau's home, which was subsequently used by Joshi and M. Espiau for further work on the DRI plasma lamp project. (Exhibit 2181, ¶ 46).

140. On June 2, 2000, Turner sent Joshi, M. Espiau, Chang, Wilson and C. Guthrie an e-mail suggesting another meeting of the group on June 5, 2000, stating that "[h]opefully, Don [Wilson] will have donut samples for testing," referring to the ceramic tube samples to be used for testing the ability to laser braze a sapphire window to ceramic. (Exhibit 2180, ¶ 20; Exhibit 2181, ¶ 47; Exhibit 2193).

141. Throughout June and July 2000, Joshi and M. Espiau met with C. Guthrie and Wilson at UCLA on several occasions to discuss additional aspects of the DRI plasma lamp design, to select specific additional ceramic materials for testing, to define additional features of the resonator design, and to specify appropriate dimensions for prototype rectangular and circular waveguide resonators to be used in obtaining quotes from ceramic vendors. (Exhibits 2157-2163, Exhibit 2180, ¶ 21; Exhibit 2181, ¶ 47; Exhibits 2191-2193).

142. During early June 2000, C. Guthrie also consulted with other DRI personnel to define proposed configurations for integrating DRI's dielectric resonator plasma lamp into the display engine of DRI's projection television, for example, as shown in drawing WGC006, dated June 14, 2000. (Exhibits 2170-2171, Exhibit 2180, ¶ 21).

143. Drawing WGC006 depicts three dielectric resonator plasma lamps disposed within a heat sink so as to illuminate a separate color filter of the display engine. (Exhibits 2170, Exhibit 2180, ¶ 21).

144. Drawing SMPL004, prepared by C. Guthrie on June 19, 2000, depicts a design for a ceramic substrate on which the dielectric resonator plasma lamps could be mounted, for example, as shown in drawing WGC006. (Exhibit 2171, Exhibit 2180, ¶ 21).

145. By about mid-June 2000, Joshi and Espiau had obtained an air waveguide, configured it as a resonant cavity at UCLA's laboratory, and used that structure to light and characterize the light emitted from a DRI bulb using a 10 GHz RF source. (Exhibit 2180, ¶ 22; Exhibit 2181, ¶ 47; Exhibit 2194).

146. Turner reported on the air waveguide experiment in an e-mail dated June 26, 2000 to Catlett, which was copied to DRI and Betadot personnel and consultants working on the DRI plasma bulb project. (Exhibit 2180, ¶ 22; Exhibit 2181, ¶ 47; Exhibit 2194).

147. Turner's June 26, 2000 e-mail also states that Tina Alton, a DRI employee had ordered additional ceramic samples from Kyocera Corp, and that Tenco was "going to order another set of sample directly from here, as soon as we receive the expense deposit account." (Exhibit 2194).

148. On or about June 26, 2000, Prior spoke to Smoler about DRI's development progress, and gave him an update on the status of DRI's dielectric resonator plasma lamp

project and told Smoler DRI planned to file provisional patent applications on the dielectric resonator plasma lamp. (Exhibit 2150, ¶ 21).

149. In an e-mail dated June 27, 2000, Smoler sent Prior and C. Guthrie some sketches of ridged and ramped resonator configurations, which Smoler suggested may be useful in matching the impedance of the ceramic waveguide to the RF source. (Exhibit 2149; Exhibit 2150, ¶ 21; Exhibit 2180, ¶ 23).

150. The sketches attached to Smoler's June 27, 2000 e-mail depict the probe and lamp each located one-quarter wavelength from the shorted ends of the waveguide. (Exhibit 2149; Exhibit 2180, ¶ 23).

151. On June 27, 2000, C. Guthrie prepared drawings WGC005, WGC006 and WGC007, which depict, respectively stepped, ramped and ridged versions of ceramic waveguides pursuant to Smoler's suggestion. (Exhibit 2172; Exhibit 2180, ¶ 23).

152. As reported in an e-mail dated June 28, 2000 from Turner to Prior, others at DRI, Joshi, M. Espiau and Chang, a further meeting between C. Guthrie, Wilson, Joshi and M. Espiau was held at UCLA on Tuesday, June 27, 2000, at which a number of further actions were discussed, including obtaining a kiln for conducting thermal testing of prospective ceramic materials and planning for a trip by Joshi, M. Espiau and Wilson to a variety of ceramic suppliers to discuss the materials needed. (Exhibit 2157; Exhibit 2180, ¶ 24).

153. In an e-mail dated June 28, 2000, Turner also sent C. Guthrie and Wilson an updated schedule for DRI Plasma Waveguide and Exciter Development project. (Exhibit 2195; Exhibit 2180, ¶ 24).

154. Also on June 28, 2000, C. Guthrie prepared drawings for additional configurations of the dielectric resonator plasma lamp, drawings WGC008, WGC009 and WGC010. (Exhibits 2173; Exhibit 2180, ¶ 25).

155. The following Monday, C. Guthrie prepared drawings RFCD001 and RFCD002, which depict spring-loaded arrangements for coupling an RF probe to the dielectric resonator plasma lamp. (Exhibit 2174; Exhibit 2180, ¶ 25).

156. On July 3, 2000, C. Guthrie further prepared a revised version of drawing WGC003, including a spring-loaded probe coupling structure as shown in RFCD001. (Exhibit 2175; Exhibit 2180, ¶ 25).

157. In an e-mail dated July 6, 2000, Turner summarized the status of discussions on "the Waveguide project," stating that Tenco had calculated the efficiency of converting electrical power into light using the 10 GHz air waveguide set up and the DRI bulb. (Exhibit 2158; Exhibit 2181, ¶ 49).

158. Turner's July 6, 2000 e-mail also reported that Wilson, M. Espiau and Joshi were scheduled to visit three ceramic suppliers, Coorstek, Transtech and Fredericks, leaving July 9, 2000, and attached an action item list indicating that Joshi would "[d]evelop waveguide design using Superior material and "[f]ollow up with Kyocera and Superior." (Exhibit 2158; Exhibit 2181, ¶ 49).

159. Using the contacts he had established in December 1999, Wilson arranged a July 10-12, 2000 trip, paid for entirely by DRI, so that he, M. Espiau and Joshi could visit DRI's ceramic suppliers: CoorsTek in Colorado, Trans Tech in Maryland, and Fredericks in Pennsylvania. (Exhibit 2181, ¶ 49; Exhibit 2185, ¶ 27; Exhibit 2158; Exhibit 2160).

160. Also on July 6, 2000, Turner sent an e-mail to Wilson and C. Guthrie attaching an updated contact list, in which Turner no longer listed Joshi and M. Espiau as members of "Betadot," but instead listed them (along with Chang) as being associated with "Luxim". (Exhibit 2159; Exhibit 2180, ¶ 26; Exhibit 2181, ¶ 49).

161. At the late June and early July 2000 meetings between DRI and Tenco/Betadot personnel, Wilson and C. Guthrie communicated with Joshi and M. Espiau regarding appropriate dimensions for half- and full-wavelength rectangular waveguides and circular waveguides. (Exhibit 2180, ¶ 27; Exhibit 2181, ¶ 50).

162. In early July, 2000, C. Guthrie sent Eric Ness at Vispro (a ceramics company that had recently been acquired by Kyocera) sketches of drawings for rectangular and circular alumina waveguide samples. (Exhibit 2180, ¶ 28; Exhibit 2181, ¶ 50).

163. On Monday, July 10, 2000, Joe Bennett ("Bennett"), a DRI employee who worked as a lab technician, forwarded to C. Guthrie a quote from Kyocera for alumina waveguide samples "[e]ither the rectangular or circular puck with blind hole." (Exhibit 2176; Exhibit 2180, ¶ 28; Exhibit 2186, ¶ 7).

164. On Tuesday, July 11, 2000, C. Guthrie forwarded the Kyocera quote to Joshi, who responded on July 13, 2000 that DRI should "[j]ust ignore it at the moment. We will probably go with Coorstek." (Exhibit 2177; Exhibit 2180, ¶ 28).

165. At about the same time that C. Guthrie requested the quote from Vispro, and in connection with scheduling the visit to Coorstek, Wilson called Kathy Hilfer ("Hilfer"), a CoorsTek salesperson with whom Wilson had had prior dealings, to inquire about the expected manufacturing time for parts that DRI would be seeking Coorstek to make. (Exhibit 2181, ¶¶ 50-51).

166. After learning from Hilfer that Coorstek would need 4-6 weeks to manufacture the parts after the order was placed, Wilson contacted Catlett seeking authorization to have a limited number of samples made by a local ceramics supplier. (Exhibit 2181, ¶ 51).

167. Catlett authorized Wilson to purchase prototype waveguides from a local supplier, and prior to taking the scheduled trip of July 10-12, 2000, Wilson contracted with Ceramic Tech, Inc., located in Fremont, California, to make a small number of rectangular half wavelength waveguides on a cash basis. (Exhibit 2164, ¶ 3; Exhibit 2181, ¶ 51; Exhibit 2186, ¶ 8).

168. In early July 2000, Ceramic Tech made a small number of half wavelength waveguides using substantially the same dimensions as set forth on sketch #2 later submitted to Coorstek in connection with DRI's July 20, 2000 request for quotation. (Exhibit 2137, page 2; Exhibit 2164, ¶¶ 4-6; Exhibit 2181, ¶ 52; Exhibit 2186, ¶ 8).

169. Because Ceramic Tech machined only a small number of parts from ceramic ingots on a cash basis, it was able to provide immediate turnaround. (Exhibit 2164, ¶ 6; Exhibit 2181, ¶ 52).

170. Ceramic Tech did not metallize the parts it made for Wilson; those parts instead were coated in DRI's laboratory by Wilson and Bennett. (Exhibit 2164, ¶ 4; Exhibit 2181, ¶ 52; Exhibit 2186, ¶ 8).

171. Bennett recalls that the half wavelength waveguides obtained by Wilson from Ceramic Tech were hand-painted with silver paint, and that this was done before DRI acquired the plasma asher to clean the surfaces of the ceramic block. (Exhibit 2181, ¶ 52; Exhibit 2186, ¶ 9).

172. The coated half-wavelength waveguide was connected to a coaxial cable by splitting the inner conductor into two leads, which were soldered into the two antenna holes on the back surface of the waveguide, and a DRI quartz bulb containing a noble gas and metal halide was packed into the lamp cavity on the front surface of the waveguide using alumina powder. (Exhibit 2181, ¶ 53; Exhibit 2186, ¶ 10; Exhibit 2199, ¶ 5).

173. No later than the week of July 17, 2000, the assembled waveguide plasma lamp was coupled to a variable frequency RF generator in DRI's laboratory, and RF generator was powered on to light the bulb. (Exhibit 2180, ¶ 33; Exhibit 2181, ¶ 53; Exhibit 2186, ¶ 11; Exhibit 2199, ¶¶ 3-5).

174. Bennett and Sandberg lit the waveguide plasma lamp shortly after DRI leased its new space at 646 University Avenue, Los Gatos, California, just after Guthrie had relocated to DRI's Los Gatos facility, and this reduction to practice was witnessed by Dennis Nunes, DRI's part-time facilities manager ("Nunes"). (Exhibit 2181, ¶ 54; Exhibit 2186, ¶¶ 11, 14; Exhibit 2199, ¶¶ 2-3, 5).

175. Bennett further recalls that he was looking directly at the light when Sandberg powered on the RF generator to lit the lamp, that he was surprised by brightness of the light emitted by the plasma lamp, and that he saw purple spots for days after the test. (Exhibit 2186, ¶ 11)..

176. Bennett recalls that DRI left the lamp burning in the laboratory for the entire day and that, contrary to his expectation that the bulb would shatter, the plasma lamp remained intact and gave off a very bright light. (Exhibit 2186, ¶ 12).

177. The dielectric resonator plasma lamp assembled by Bennett, Wilson and Sandberg from the prototype waveguides machined by Ceramic Tech and operated during the week

of July 17, 2000, as witnessed by Bennett and Nunes, constitutes a corroborated actual reduction to practice of the invention of the Count. (Exhibit 2178; Exhibit 2180, ¶¶ 32-33; Exhibit 2181, ¶¶ 52-54; Exhibit 2182, ¶¶ 31-34; Exhibit 2186, ¶¶ 8-11; Exhibit 2199, ¶¶ 2-5).

178. During the week of July 17, 2000, C. Guthrie prepared specifications for various assembly processes to be used in manufacturing the dielectric resonator plasma lamp, filling the gas cavity, sealing the sapphire window and assembling and testing of the plasma lamp. (Exhibit 2180, ¶ 29).

179. During that same period, C. Guthrie and Berman began preparing provisional patent application disclosures for various inventive aspects of the DRI dielectric resonator plasma lamp, as set forth in ¶¶ 17-39 of C. Guthrie's declaration of February 20, 2006, Exhibit 2006. (Exhibit 2071, *passim*; Exhibit 2180, ¶ 29).

180. In an e-mail dated Monday, July 17, 2000, Turner reported to Catlett, with a copy to Prior and the other participants of the DRI plasma lamp project, regarding the results of M. Espiau, Joshi and Wilson's trip that Wilson had arranged to visit Coorstek in Colorado, Trans-Tech in Maryland and Fredericks in Pennsylvania on July 10-12, 2000. (Exhibit 2160; Exhibit 2181, ¶ 57; Exhibit 2185, ¶ 27).

181. Turner's July 17, 2000 e-mail states that the purpose of the trip "was to establish working relationships in the ceramics materials area" and summarized the groups conclusions for each of the companies visited. (Exhibit 2160).

182. Turner's July 17, 2000 e-mail states that "Coors has excellent alumina technology … but its dielectric constant is too low to work well at 1 GHz. … We will send them

some drawings, and we may be able to build a higher frequency alumina lamp in a relatively short time-frame." (Exhibit 2160; Exhibit 2181, ¶ 57).

183. Turner's July 17, 2000 e-mail suggests that the group "[w]ork with Coors to make alumina waveguide lamps in the next 6 weeks and test them." (Exhibit 2160; Exhibit 2181, ¶ 57).

184. Shortly after returning from the July 10-12 trip, Wilson, Guthrie and Espiau developed dimensions for a number of variants of the full-wavelength and half-wavelength embodiments of the metal-coated ceramic resonators, with which C. Guthrie prepared drawing #1 and drawing # 2 using a computer-aided drawing package. (Exhibit 2137; Exhibit 2144, ¶ 3; Exhibits 2160-2161; Exhibit 2180, ¶ 30; Exhibit 2180, ¶ 58).

185. Each of drawing #1 and drawing #2 includes ten variants of the waveguide in which the depths of the holes that receive the RF probe(s) or sensing probes varies. (Exhibit 2137; Exhibit 2144, ¶ 3; Exhibit 2161; Exhibit 2180, ¶ 30; Exhibit 2180, ¶ 58).

186. Drawings #1 and #2 were provided by C. Guthrie to Wilson and Wilson in turn forwarded the drawings (with a note to Hilfer) to M. Espiau for review, and on July 20, 2000, M. Espiau faxed the drawings on to Hilfer at Coorstek for preparation of a quote. (Exhibits 2137-2138; Exhibit 2144, ¶ 3; Exhibit 2180, ¶ 30; Exhibit 2180, ¶ 58).

187. In an August 1, 2000 e-mail to Catlett, with a copy to Prior and others participating in the DRI plasma lamp project, Turner reported that a request for a quote on "ten variants on a higher frequency lamp waveguide design using Alumina" had been sent to Coorstek, for which a quote was expected the following day. (Exhibits 2137-2138; Exhibit 2144, ¶ 3; Exhibit 2161; Exhibit 2180, ¶ 30; Exhibit 2180, ¶ 58; Exhibit 2185, ¶ 27).

188. Turner's August 1, 2000 e-mail was his last communication to any of the Guthrie inventors regarding the dielectric resonator plasma lamp; thereafter Tenco/Luxim ceased all further exchange of technical information with DRI about the dielectric resonator plasma lamp. (Exhibit 2161; Exhibit 2180, ¶ 31; Exhibit 2181, ¶ 59; Exhibit 2185, ¶ 27).

189. Coorstek prepared a quote responsive to the July 20, 2000 fax, and faxed that quote to Wilson at DRI on August 2, 2000, indicating a 4-5 week production time. (Exhibit 2138; Exhibit 2144, ¶ 3; Exhibit 2181, ¶ 60).

190. DRI submitted Purchase Order 1827 to Coorstek on August 8, 2000, in which it reduced the total number of pieces to 50 consisting of six different designs, ordering proportionately more pieces with shallow holes with the intention of subsequently deepening the holes as may be needed in accordance with initial test results. (Exhibit 2181, ¶ 60).

191. Coorstek scheduled the manufacturing order on August 15, 2000, with a projected delivery date of September 6, 2000. (Exhibit 2139; Exhibit 2144, ¶ 3).

192. On August 10, 2000, Coorstek's engineers re-drew the parts depicted on drawings #1 and #2 to provide the dimensions in inches for the Coorstek manufacturing department and to provide further details regarding the layer of metallization applied to the parts. (Exhibit 2142; Exhibit 2144, ¶ 3; Exhibit 2181, ¶ 60).

193. Coorstek delivered the half wavelength waveguides to DRI in a Federal Express shipment sent on October 13, 2000 and delivered the full wavelength waveguides to DRI via Federal Express on October 17, 2000. (Exhibits 2140-2141; Exhibit 2144, ¶ 3; Exhibit 2181, ¶ 60).

194. A photograph of an example of the half-wavelength waveguide part manufactured by Coorstek and delivered on October 16, 2000 is depicted in Exhibit 2041; a photograph of an example of the full wavelength waveguide part manufactured by Coorstek and delivered on October 18, 2000 is depicted in Exhibit 2162. (Exhibit 2041; Exhibit 2162; Exhibit 2181, ¶ 60).

195. Immediately upon receiving the half wavelength waveguide parts from Coorstek, Wilson packed a DRI quartz plasma bulb into the lamp opening, soldered RF probes into the antenna openings in the rear face of the waveguide (as depicted in Exhibit 2041). (Exhibit 2041; Exhibit 2181, ¶ 61).

196. Wilson assisted Sandberg in coupling the plasma lamp of Exhibit 2041 to DRI's variable frequency RF generator in late October 2000 and together they operated that lamp, thereby constituting a further actual reduction to practice the invention of the Count. (Exhibit 2041; Exhibit 2181, ¶ 61, Exhibit 2182, ¶ 34).

197. Unbeknownst to DRI or the Guthrie inventors at the time, on July 31, 2000, Luxim filed U.S. provisional patent application Serial No. 60/222,029 ("the '029 application"), from which the involved Espiau '809 patent claims benefit. (Exhibit 1012; Exhibit 2038, Schedule 13).

198. Pursuant to the March 31, 2000 ESA between DRI and Tenco, the invention disclosed in '029 application constituted the confidential and proprietary information of DRI. (Exhibit 2038, Schedule 3, page 5; Exhibit 2181, ¶ 62).

199. Following filing of the '029 application, none of Joshi, M. Espiau or Chang engaged in further communications with DRI personnel regarding the dielectric resonator plasma lamp. (Exhibit 2180, ¶ 31; Exhibit 2181, ¶ 59; Exhibit 2185, ¶ 27).

200. Notwithstanding that Tenco had breached the ESA by disclosing DRI confidential information in the '029 application and discontinued further communication with DRI regarding the dielectric resonator plasma lamp, Turner and Tenco continued to provide consulting services to DRI regarding other aspects of electronics for DRI's projection television. (Exhibit 2163; Exhibit 2181, ¶ 63; Exhibit 2185, ¶ 27).

201. In an e-mail dated October 27, 2000, from Turner to Catlett, Turner demanded to know "[w]hat is the status of our business deal. After our 10/2 LA meeting, we sent you a revised Joint Venture MOU…. We haven't received payment for our August and September invoices, totaling $84,385, and the expense account is spent down. The lack of clarity on the business side and the delay in payment are hobbling our efforts to work together on this lamp project…" (Exhibit 2038, ¶ 34 and Schedule 11).

202. Turner's e-mail of October 27, 2000, and the records obtained from the bankruptcy court, establish that Luxim had been paid for all of its services connected with the plasma lamp project through the end of July 2000. (Exhibit 2038, Schedule 11; Exhibit 2181, ¶ 63).

203. Luxim's purported rationale for filing the '029 application was that neither Betadot nor Luxim had ever signed any agreements with DRI with respect to their work on the DRI dielectric resonator plasma lamp, or the ownership of their contributions, if any, to that work. Exhibit 1067, p. 49, lines 6-24; p. 88, line 13 to p. 89, line 14.

204. Joshi, M. Espiau and Chang billed their time on the DRI plasma lamp project through Tenco and Luxim, and were paid by DRI for their time spent on the plasma lamp project. (Exhibit 2181, ¶ 63).

APPENDIX 3.1

COMPARISON OF GUTHRIE'S CONCEPTION TO THE COUNT

| **The Count: Claim 1 of U.S. Patent 6,737,809** | **Teachings of Page A19 of Exhibit 2146 and Exhibit 2147** |
|---|---|
| A lamp comprising: | Exhibit 2147 expressly discloses a lamp, which one of ordinary skill would have understood to be illustrated on page A19 of Exhibit 2146. Exhibit 2182, ¶ 21. |
| (a) a waveguide having a body comprising a ceramic dielectric material of a preselected shape and preselected dimensions, the body having a first side determined by a first waveguide outer surface; | Exhibit 2147 identifies that the proposed loaded waveguide is constructed from a machinable alumina block having a length of 1.46", a width of 1.00", and a height of 0.5" and with holes for the probe and lamp cavity drilled in the 1.0" wide face. One of ordinary skill would have understood to the configuration described in Exhibit 2147 to be illustrated on page A19 of Exhibit 2146 as a rectangular block as having a top surface with two holes – a smaller hole for the probe closer to the left end and a larger hole forming a lamp cavity closer to the right end. Exhibit 2182, ¶ 21. |
| (b) a first microwave feed positioned within and in intimate contact with the waveguide body, adapted to couple microwave energy into | Exhibit 2147 expressly describes an E-field probe, coupled to a 900 MHz source, and disposed in intimate contact within a hole located 0.365" from an end of the body so as to match the 50 ohms impedance of most RF sources. One of ordinary skill would have understood Exhibit 2147 as teaching that the probe need be intimately coupled to the alumina block to |

| | |
|---|---|
| the body from a microwave source having an output and an input and operating within a frequency range from about 0.5 to about 30 GHz at a preselected frequency and intensity, the feed connected to the source output, said frequency and intensity and said body shape and dimensions selected such that the body resonates in at least one resonant mode having at least one electric field maximum; | reduce reflection of power to the RF source and that care must be taken in sizing the probe to avoid impedance mismatch. The RF source coupled to the probe must necessarily have an output and an input. One of ordinary skill would have understood that the device described in Exhibit 2147, as illustrated on page A19 of Exhibit 2146, has the waveguide body length, and lamp cavity and probe placement selected with the bulb and probe each one-quarter of the overall length from the ends of the body, and separated by a distance of one-half of the length of the waveguide body. One of ordinary skill further would have understood that the dimensions for the body and probe and lamp cavity placement were selected so that the waveguide body resonates at the preselected intensity and nominal resonant frequency of 900 MHz, to provide electric field maxima at the probe and bulb locations. Exhibit 2182, ¶ 21. |
| (c) an enclosed first cavity depending from said first surface into the waveguide body; and | Exhibit 2147 describes a hole drilled in the 1.0" wide face to accept the bulb and which defines an enclosed cavity depending from the 1.0" wide face; this is schematically illustrated on page A19 of Exhibit 2146, with the lamp cavity depending from the top surface into and surrounded by the waveguide body. Exhibit 2182, ¶ 21. |

| | |
|---|---|
| (d) a first bulb positioned in the cavity at a location corresponding to an electric field maximum during operation, the bulb containing a gas-fill which when receiving microwave energy from the resonating waveguide body forms a light-emitting plasma. | As described in each of Exhibits 2146 and 2147, the lamp is positioned in a lamp cavity that is located one-quarter of the length from the shorted end of the waveguide, with the dimensions selected so that when excited by the source at the preselected frequency (900 MHz as computed by Mr. Smoler), the waveguide wavelength of the applied RF signal equals the length of the waveguide body and the waveguide resonates with the electric field maximum located at the bulb location.  One of ordinary skill further would have understood that the gas-fill (the characteristics of which were defined by Guthrie and Wilson as described in Exhibit 2180, ¶ 3 and Exhibit 2182, ¶ 10), formed a light-emitting plasma when receiving microwave energy from the resonating waveguide body.  Exhibit 2182, ¶ 21. |

APPENDIX 3.2

COMPARISON OF GUTHRIE'S REDUCTION TO PRACTICE TO THE COUNT

| **The Count: Claim 1 of U.S. Patent 6,737,809** | **Device Operated the week of July 17, 2000** |
|---|---|
| A lamp comprising: | The lamp described by Messrs. Bennett and Nunes as having been tested in July 2000, and as being substantially identical to that depicted in Exhibit 2041, was described as emitting a very bright light. Exhibit 2137, page 2; Exhibit 2140; Exhibit 2178; Exhibit 2180, ¶ 33; Exhibit 2181, ¶ 53; Exhibit 2182, ¶ 34; Exhibit 2186, ¶ 4; Exhibit 2199, ¶ 3. |
| (a) a waveguide having a body comprising a ceramic dielectric material of a preselected shape and preselected dimensions, the body having a first side determined by a first waveguide outer surface; | The lamp described by Messrs. Bennett and Nunes, depicted on page 2 of Exhibit 2137 and in Exhibit 2041, comprises a body of ceramic dielectric material having a rectangular shape with dimensions of approximately 34.3 mm by 27.7 mm by 13.0 mm. Those shape and dimensions of the body were pre-selected so that the body would resonate at a corresponding pre-selected frequency of about 2.3 GHz. The lamp has a first side determined by a first waveguide outer surface, which is identified as the side opposite |

| | |
|---|---|
| | the side to which the microwave feeds are attached. Exhibit 2137, page 2; Exhibit 2140; Exhibit 2181, ¶ 53; Exhibit 2182, ¶ 34; Exhibit 2186, ¶ 6; Exhibit 2199, ¶ 4. |
| (b) a first microwave feed positioned within and in intimate contact with the waveguide body, adapted to couple microwave energy into the body from a microwave source having an output and an input and operating within a frequency range from about 0.5 to about 30 GHz at a preselected frequency and intensity, the feed connected to the source output, said frequency and intensity and said body shape and dimensions selected such that the body resonates in at least one resonant mode having at least one electric field maximum; | The lamp described by Messrs. Bennett and Nunes, depicted on page 2 of Exhibit 2137 and in Exhibit 2041, includes a first microwave feed positioned within and in intimate contact with the waveguide body, namely a solder core that was inserted into the two smaller holes on the bottommost surface of the device. Mr. Bennett describes that these feeds were coupled to an output of a microwave source to supply microwave energy into the waveguide body. The computed resonant frequency of 2.3 GHz falls within the specified frequency range of the Count, and was supplied at sufficient intensity to cause light to be emitted from the bulb. As Mr. Bennett testified, the feed was configured to, and in fact did, connect to the source output. Exhibit 2137; Exhibit 2181, ¶ 53; Exhibit 2182, ¶ 34; Exhibit 2186, ¶ 10; Exhibit 2199, ¶ 4. |

| | |
|---|---|
| (c) an enclosed first cavity depending from said first surface into the waveguide body; and | The lamp described by Messrs. Bennett and Nunes, depicted on page 2 of Exhibit 2137 and in Exhibit 2041, had a first cavity depending from the first surface into the waveguide body, so that the interior surface surrounded and enclosed the first cavity. Exhibit 2137, page 2; Exhibit 2140; Exhibit 2181, ¶ 53; Exhibit 2182, ¶ 34; Exhibit 2186, ¶ 10; Exhibit 2199, ¶ 4. |
| (d) a first bulb positioned in the cavity at a location corresponding to an electric field maximum during operation, the bulb containing a gas-fill which when receiving microwave energy from the resonating waveguide body forms a light-emitting plasma. | When the lamp described by Messrs. Bennett and Nunes, depicted on page 2 of Exhibit 2137 and in Exhibit 2041 was operated using a variable frequency RF source, an electric field maximum was created at the location of the cavity, causing the bulb to emit a very bright light. Exhibit 2178 is described by Mr. Bennett as fairly depicting the operation of the lamp that occurred in mid-July 2000, in which a bulb inserted into the cavity formed a bright, light emitting plasma. Exhibit 2137, page 2; Exhibit 2140; Exhibit 2178; Exhibit 2181, ¶ 53; Exhibit 2182, ¶ 34; Exhibit 2186, ¶¶ 11-12; Exhibit 2199, ¶ 5. |

# EXHIBIT N

Filed on behalf of:
Party: ESPIAU
Lead Counsel: Richard Neifeld
Neifeld IP Law, PC
4813-B Eisenhower Avenue
Alexandria VA 22304
Tel: 703-415-0012
Fax: 703-415-0013
Email: rneifeld@neifeld.com
Backup Counsel: Robert Morgan
Ropes & Gray LLP
Tel: 212-596-9133
Email: robert.morgan@ropesgray.com

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES
(Administrative Patent Judge Sally C. Medley)

---

CHARLES **GUTHRIE**, EDMUND SANDBERG,
DONALD WILSON, GREGORY PRIOR, and DAVID SMOLER
Junior Party
(Application 09/818,092)

v.

FREDERICK M. **ESPIAU**, CHANDRASHEKHAR J. JOSHI,
and YIAN CHANG
Senior Party
(Patent 6,737,809).

---

Patent Interference 105,393 (SCM)
(Technology Center 2800)

---

SUBSTITUTE ESPIAU MOTION 7 FOR PRIORITY

**TABLE OF CONTENTS**

**Page**

I. PRECISE STATEMENT OF RELIEF REQUESTED ....................2

II. REASONS WHY RELIEF SHOULD BE GRANTED ....................2

III. ESPIAU'S MAKING OF THE INVENTION OF THE COUNT....................3

A. The April 11, 2000 Meeting With DRI ....................3

B. Espiau Was The First To Conceive The Invention Of The Count ....................5

C. Espiau Diligently Reduced To Practice The Invention Of The Count ....................8

D. Espiau's Constructive And Actual Reduction To Practice....................14

E. Espiau Was The First To Reduce To Practice The Invention Of The Count ..........15

F. Guthrie Derived The Invention From Espiau ....................16

G. Espiau's Work Does Not Inure To Guthrie's Benefit ....................17

IV. CONCLUSION ....................18

## I. PRECISE STATEMENT OF RELIEF REQUESTED

Party Espiau moves for judgment under 35 U.S.C. § 102(g) based on its entitlement to priority of the invention of the Count or, in the alternative, under 35 U.S.C. § 102(f) based on derivation by Guthrie from Espiau of the invention of the Count.

## II. REASONS WHY RELIEF SHOULD BE GRANTED

Espiau was the first to conceive of the subject matter of the Count, the first to communicate that conception so that one of ordinary skill could reduce it to practice, and the first to both constructively and actually reduce that conception to practice. Accordingly, Espiau is entitled to priority.

Espiau has throughout this Interference consistently laid out the same facts of its invention, supported by non-inventor witness testimony and contemporaneous documents.

The contemporaneous documents, the testimony of the Espiau inventors and witnesses and the "unevolved" testimony of Guthrie's witnesses show that: (1) Matt Espiau and Chan Joshi conceived the invention of the count no later than April 14, 2000, after several days of inventive activity and analysis; (2) Joshi, Espiau and David Turner communicated that conception to the Guthrie applicants first on April 20, 2000 and in increasing detail thereafter; (3) Joshi, Espiau and Turner repeatedly made clear that Espiau's resonant waveguide plasma lamp concept was proprietary to them, (4) the Espiau inventors were diligent in reducing their invention to practice both constructively and actually; (5) Espiau constructively reduced its invention to practice no later than July 31, 2000; and (6) Espiau actually reduced the invention to practice on August 11-14, 2000.

That evidence also establishes that any work the DRI applicants did relating to the invention was at the request of and under the direction of Luxim and the Luxim inventors.

Even if Guthrie had conceived the invention of the Counts before Espiau (and they had not), Espiau independently conceived the invention and constructively and actually reduced it to practice first. Accordingly, Espiau has priority.

Likewise, even if Guthrie could prove an actual reduction to practice before Espiau's constructive reduction to practice (and they cannot), Espiau conceived the invention of the Count first, on April 14, 2000, and diligently worked to reduce it to practice from that day until Espiau's constructive reduction to practice on July 31, 2000 and their actual reduction to practice on August 11-14, 2000. Accordingly, Espiau has priority under that circumstance.

## III. ESPIAU'S MAKING OF THE INVENTION OF THE COUNT

### A. The April 11, 2000 Meeting With DRI

David Turner's consulting company, Tenco, was hired to solve a problem. DRI's VP of manufacturing, Jim Legge said DRI had a lamp, and needed production engineering for a high frequency lamp driver circuit and packaging for the circuit. DRI did not volunteer much about the lamp, except to call it a "plasma fusion lamp." (EX1158 ¶¶ 3-9; EX1128; EX1129).

Turner naturally thought of Professor Chan Joshi, head of the UCLA high frequency laboratory and an expert in plasmas and high frequency electronics. (EX1034 ¶ 4; EX1160 ¶¶ 2-4). Turner put together a proposal on March 31 for a brief, $25K engineering study involving himself and Prof. Joshi. (EX1158 ¶¶ 7-9; EX1130, page 8 of attachment). Greg Prior, as DRI's VP of engineering, signed that proposal on April 4. (Schedule 3 of EX2038, pp. 6-7).

A consultation meeting was set up for April 11 with DRI personnel and Tenco's working team. (EX1158 ¶ 10). Joshi asked the manager of the high frequency lab he directed, Matt Espiau, to come to the meeting. (EX1160 ¶ 4). Mr. Espiau had more than 13 years' experience in high frequency technology, including ceramic dielectric waveguides. (EX1168 ¶ 3).

The only thing DRI presented at the April 11 meeting was an inductive coil plasma lamp for which it needed Tenco to design the driver electronics and packaging. (EX1158 ¶¶ 12-14; EX1160 ¶ 5-6; EX 1168 ¶¶ 5-7). During that presentation, Matt Espiau concluded that the design DRI presented was not a good one. (EX1168 ¶ 6). Drawing on his years of experience working with high frequency systems, including dielectric waveguides, Mr. Espiau suggested using an alumina dielectric waveguide containing the bulb and providing an enclosure for the electromagnetic field. (EX1168 ¶ 6). Dr. Joshi and Mr. Espiau described to the meeting the distribution of the electric field in the dielectric waveguide by referring to sine, cosine and Bessel functions. (EX 1158; EX1131, p. 4).

Espiau drew on a white board a sketch of his idea of an integrated dielectric waveguide lamp, reproduced in David Turner's meeting notes, and explained it. (EX1168 ¶ 6; EX1131, p. 4). The meeting broke up shortly thereafter and Don Wilson sought out Espiau, shook his hand and said, in words or substance, that Mr. Espiau's idea was a good one, that he was a very smart young man and that this was just what they needed. (EX1158 ¶ 14; EX1168 ¶ 7; EX1160 ¶ 6; EX1068, p. 28, ll. 10-15).

No one from DRI said that DRI had already thought of a dielectric waveguide lamp. No one from DRI said anything about having already thought of a resonating dielectric waveguide lamp. (EX1158 ¶ 14; EX1168 ¶ 7; EX1160 ¶ 6; EX1068, p. 28, ll. 10-15; EX1131, p. 4).

**B. Espiau Was The First To Conceive The Invention Of The Count**

"Conception exists when a definite and permanent idea of an operative invention, including every feature of the subject matter sought to be patented, is known." *Sewell v. Walters*, 21 F.3d 411, 415, 30 USPQ2d 1356, 1358-59 (Fed. Cir. 1994); *Coleman v. Dines*, 754 F.2d 353, 359, 224 USPQ 857, 862 (Fed. Cir. 1985). "The conception analysis necessarily turns on the inventor's ability to describe his invention with particularity. Until he can do so, he cannot prove possession of the complete mental picture of the invention." *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1228, 32 USPQ2d 1915, 1919 (Fed. Cir. 1994). Espiau's April 14, 2000 conception of the invention of the Count was well documented at the time in Dr. Joshi's notebook and corroborated by Dr. Pobanz's detailed April 27, 2006 declaration recounting his April 14 discussions with Dr. Joshi and Matt Espiau. (EX1125, p. 8; EX1030 ¶¶ 8-14).

Dr. Carl Pobanz, an experienced designer of microwave circuits, testified that on that day, "Matt asked me to meet with him in Chan's office at UCLA to discuss a microwave-excited plasma lamp." (EX1030 ¶ 8). The problem to be solved at the meeting was the result of Dr. Joshi's and Matt Espiau's analyses since the April 11 meeting, recorded in Dr. Joshi's notebook. (EX1030 ¶ 9; EX1125, pp. 1-7; EX1068, page 55, lines 4-22; EX 1160 ¶ 9; EX1168 ¶ 8). By April 13, Dr. Joshi – a high frequency plasma expert – had concluded that the power required for the plasma was more than the anticipated power of the RF circuit he was considering. As Dr. Joshi testified at his deposition, "we needed some way of increasing the power from 100 watts to one kilowatt without actually increasing the power of the source. We need a power multiplier; temporary, but we needed a power multiplier." (EX1125, p. 6; EX1068, p. 55, ll.13-17).

As Carl Pobanz testified, Matt Espiau solved the power problem by changing the nature of the design. Rather than treating the "gas/plasma [as] the load for a microwave waveguide" (EX1030 ¶ 9), Mr. Espiau suggested "using a resonant cavity with the plasma located inside it" (EX1030 ¶ 10). Dr. Joshi recorded this inspiration with an exclamation point in his notebook: "Matt suggests a resonant cavity. Good idea!" (EX1125).

The inventive concept of the April 14 meeting is thus recorded in Dr. Joshi's notebook, and described by Dr. Pobanz, by Dr. Joshi and by Mr. Espiau. The lamp comprised ***"a waveguide having a body comprising a ceramic dielectric material of a preselected shape and preselected dimensions, the body having a first side determined by a first waveguide outer surface"***: { Page 8 of Joshi's notebook dated April 14 shows a waveguide with a dielectric material with a preselected shape and dimensions (though numerical dimensions are not specified). To one of ordinary skill in the art, discussion of a resonant waveguide requires that the dimensions be preselected in relation to the resonant frequency to obtain the resonant condition. The waveguide body illustrated has a first side determined by a first waveguide outer surface.}. (EX1183 ¶ 23; EX1125, p. 8; EX1030 ¶¶ 8-14; EX1160 ¶¶ 10-13; EX1168 ¶¶ 8-9).

The April 14 waveguide lamp had ***"a first feed positioned within and in intimate contact with the waveguide body, adapted to couple energy into the body from a source having an output and operating at a preselected frequency and intensity, the feed connected to the source output, said frequency and intensity and said body shape and dimensions selected such that the body resonates in at least one resonant mode having at least one electric field maximum"***: { A feed is shown on page 8 of EX1125 (indicated by the "100W" input port on the bottom of the waveguide body), positioned within and in intimate contact with the waveguide body. Its

function is to couple energy into the body from a source having an output and operating at a preselected frequency and intensity, the feed connected to the source output. Together, the combination of the illustrated waveguide and the suggestion from Mr. Espiau of a resonant cavity indicate that the frequency, intensity, body shape and dimensions are selected such that the body resonates in at least one resonant mode. The waveform illustrated on page 8 indicates that the resonant mode has at least one electric field maximum. Dr. Pobanz also recalls discussion of a feed ("*e.g.*, probe or aperture") and "how it could be located in the resonator". The discussion included how to couple the feed to the microwave source, and suggestions of possible sources. Furthermore, as illustrated in Dr. Joshi's notebook, Dr. Pobanz recalls that "[i]t was noted that a full-wave resonator would provide two locations of field maxima, one of which would be used as the location of the plasma and the other used as the input port for exciting the resonator, whereas the half-wave resonator would have the advantage of smaller relative size" while providing only one electric field maximum.}. (EX1183 ¶ 23; EX1125, p. 8; EX1030 ¶¶ 8-14; EX1160 ¶¶ 10-13; EX1168 ¶¶ 8-9).

The dielectric resonator concept for plasma lamps of April 14 also comprised ***"an enclosed first cavity depending from said first surface into the waveguide body"***: {The illustration on page 8 of EX1125 shows an open cavity in the top first surface of the waveguide body enclosed by the dielectric material and a cap on top. Dr. Pobanz also recalls that "boring a hole in the ceramic and capping it with a transparent lid such as a quartz disc" was discussed (EX1030 ¶ 11).}. (EX1183 ¶ 23; EX1125, p. 8; EX1030 ¶¶ 8-14; EX1160 ¶¶ 10-13; EX1168 ¶¶ 8-9).

The concept of April 14 also comprised ***"a first bulb positioned in the cavity at a location corresponding to an electric field maximum during operation, the bulb containing a gas-fill which when receiving energy from the resonating waveguide body forms a light-emitting plasma"***: { Dr. Joshi's notes indicate that first bulb is positioned in the cavity of (c), positioned at an electric field maximum during operation. The bulb contains a gas fill which forms a light-emitting plasma when receiving energy from the resonating waveguide. Dr. Pobanz corroborates locating the plasma at an electric field maximum during operation of various resonant modes "and also to get the light out" was discussed. (EX1183 ¶ 23; EX1125, p. 8; EX1030 ¶¶ 8-14; EX1160 ¶¶ 10-13; EX1168 ¶¶ 8-9).

As of the April 14, 2000 meeting, therefore, the Espiau inventors Chan Joshi and Matt Espiau had formed in their minds a definite and permanent idea of the complete and operative invention, including every element of the Count. They described it with particularity at the time both to Dr. Carl Pobanz in the meeting and in the contemporaneously written Joshi notebook. The recognition of the invention is recorded both in Dr. Joshi's exclamation mark punctuation and in what Dr. Pobanz recalls as "enthusiasm." (EX1125, pp. 8-9).

The weight of the evidence supports the conclusion that the complete invention had not been conceived until April 14, 2000, and certainly had not been communicated to Dr. Joshi and Mr. Espiau by anyone, including DRI. The Espiau inventors were first to conceive the invention of the Count.

**C. Espiau Diligently Reduced To Practice The Invention Of The Count**

A table detailing Espiau's diligence is attached as Appendix 4.

After the April 11 meeting, David Turner drafted a new proposal to DRI. (EX1158 ¶¶ 14-16). Espiau's conception had changed everything. Turner proposed to develop a "Plasma Lamp Exciter and Waveguide (LEW)." Turner's letter to Prior of Sunday April 16, proposed $375K of work – 15 times the scope of the initial agreement. (EX2151). The proposal clearly stated to Prior – consistent with what occurred at the April 11 meeting and the subsequent work of Espiau and Joshi – that "***we proposed*** a design concept" and "***we investigated*** the technical feasibility of this concept." (EX2151, p. 2 of attachment). Turner's letter closes by laying out the Espiau inventors' strategy going forward with their invention, stating "Finally, ***we think*** that there may be a family of products which can benefit from the ***ideas we are pursuing*** for the LEW, and ***we would like to discuss*** with you the idea of a joint development. Can we discuss these business matters Thursday?" – April 20, 2000. (EX2151, p. 2 of attachment)

On Monday, April 17, Turner, Joshi and Espiau met in a coffee shop with Legge, Wilson and Guthrie. As Dr. Joshi's notebook entry about the meeting states, nothing technical was discussed. The meeting was to tell Legge about the new proposal. As Joshi noted, Legge seemed "OK" with the idea of an integrated dielectric waveguide/lamp design. (EX1125, p. 10).

Dr. Joshi, Matt Espiau and David Turner then spent two days laying out the complete concept of their invention in a presentation entitled "Dielectric Resonator Concept for Plasma Lamps." (EX1160 ¶ 16; EX1158 ¶¶ 18-20; EX1168 ¶¶ 11-12; EX1138; EX1183 ¶¶ 24-25). David Turner marked the presentation "Proprietary." (EX1138; EX1158 ¶ 19; EX1160 ¶ 16). They presented the presentation at an April 20, 2000 meeting. Prior and Legge, CEO Wayne Catlett, Don Wilson, Charles Guthrie and Sandberg attended for DRI. (EX1137; EX1158 ¶ 18).

Don Mullen, who had been retained by Turner to do thermal analysis for developing the invention, also attended the meeting.

Turner, Matt Espiau and Joshi went through the presentation and discussed the Espiau invention in detail. (EX1137; EX1139; EX1158 ¶ 20; EX1160 ¶ 16; EX1168 ¶¶ 11-12). No one at that meeting disputed that the resonant waveguide lamp invention was Joshi and Espiau's invention. There was no mention of any previous waveguide design at DRI. (EX1158 ¶ 21; EX1160 ¶ 18 ; EX1168 ¶ 13). Prior signed Turner's new statement of work, which explicitly stated that the design concept was something that "we" – Joshi and Espiau –proposed. (EX1134; EX1158 ¶ 21).

Mullen wrote in an e-mail to David Turner that night about the two approaches discussed at the April 20 meeting – the DRI inductive coil approach and the Espiau resonant waveguide approach. He saw the Espiau approach, what he called "your original plans/scope for the project" in stark contrast to the DRI approach, which he noted "still is in the lab queen stage" in Sandberg's lab. (EX1139; EX1158 ¶ 22).

Promptly after the April 20 meeting, Espiau and Joshi brought in Yian Chang (now deceased), experienced in HFSS (High Frequency Structure Simulator) computer analysis, to do computer studies of the resonant waveguide lamp designs Espiau and Joshi were developing. (EX1168 ¶ 14; EX1160 ¶ 20). Chang began work immediately, with first results by April 23. (EX1160 ¶ 20; EX1125, p. 17).

Espiau, Joshi and Turner met with Wilson and Guthrie on April 24. Ceramic samples for materials testing by Espiau was the subject of the meeting. (EX1141; EX1158 ¶ 26; EX1168 ¶ 15). Wilson and Guthrie were assigned to obtain ceramic dielectric samples, based on shapes

and dimensions requested by Joshi and Espiau. Turner also assigned Guthrie the task of drafting drawings per the directions of Espiau. (EX1158, ¶ 24). David Turner's notes of the meeting show one of the requested samples, an "air line" sample that Joshi and Espiau asked DRI to obtain. (EX1141).

The "air-line" sample Espiau requested was to be sized to fit inside a standard metal "air line" waveguide. (EX1168 ¶ 15). Espiau also requested another sample be obtained, sized to fit inside a standard X-band waveguide. (EX1168 ¶ 16). Samples this size would enable Matt Espiau and Yian Chang to test the samples inside the air line and X-band waveguides to determine their precise dielectric constants and loss tangents – tests they subsequently carried out when the samples were received. (EX1168 ¶ 15-16 and 21; EX1127, p. 3).

Charles Guthrie then made drawings of the samples Espiau had requested, for submission to vendors, for example SPL001 (EX2154) and SPL002 (EX2155). Thus, the drawings Mr. Guthrie prepared show dimensions just slightly smaller than the air line and X-band waveguide dimensions, with tolerances that did not permit them to be any larger, *e.g.*, .398 +.000, −.005, to fit inside a .4 inch X-band waveguide. (EX2155, SP1002).

The first page of Yian Chang's notebook, dated April 27, 2007, shows an illustration of an X-band (WR-90) waveguide that he and Matt Espiau were using at their lab. (EX1126, p. 1). The interior dimensions of that X-band waveguide are 0.4 by 0.9 inches, or 10.16 by 22.86 mm. (EX1168 ¶ 16; EX1126, pp. 1-3). Yian Chang used that waveguide to check the accuracy of the HFSS computer studies he was running for the dielectric resonator. (EX1126, p. 3).

Turner decided to pull together a more lengthy presentation of the Espiau invention and the development work for presentation to DRI's president, Catlett. (EX1158 ¶¶ 31-32). Turner

asked the various people working on the project to provide him materials for the presentation. Consistent with their assigned roles, Joshi provided the description of "How does it work." Turner asked Guthrie, whose assignment had been to make drawings and to deal with vendors, to provide that information. (EX1158 ¶¶ 31-32; EX2065). In the drawings Guthrie subsequently provided, he used the X-band dimensions which Espiau and Chang had been using in the HFSS simulations and testing. (EX2067; EX1126).

On May 22, 2000, Tenco presented to DRI its "Proprietary and Confidential" Conceptual Design. The May 22 presentation was attended by at least Catlett, Wilson, Charles Guthrie and Sandberg. (EX1158 ¶ 32). The slides Turner presented were clearly labeled "Tenco Proprietary and Confidential." (EX2070). They were presented as Joshi and Espiau's invention. No one from DRI suggested that anyone from DRI had made the invention. (EX1158 ¶ 32).

While they waited for the original requested material to test (which was provided by Wilson on June 6), Yian Chang and Matt Espiau continued their waveguide tests and HFSS simulations that would allow them to preselect the frequency, intensity, body shape and dimensions of the dielectric resonator. These tests and simulations continued throughout the diligence period. (EX1126; EX1127).

Dr. Joshi did calculations and Chang did HFSS simulations to design a puck or cylindrical shaped resonant waveguide lamp, with a diameter of 3.2 cms (1.27 inches). (EX1160 ¶ 32; EX1125, p. 74). Chang made AUTOCAD drawings of the design. Espiau sent these drawings out for quote from Kyocera on June 6. (EX1125, pp. 88-89; EX1172; EX1160 ¶ 32)

Dr. Joshi requested quotes of fabrication costs for waveguide designs drawn by Yian Chang. Beginning June 6, they began testing materials samples provided by Wilson. Also, Matt

Espiau and Chang began tests of an air waveguide to determine the suitability of the available plasma bulbs on June 18 that would continue into July. (EX1168 ¶ 21; EX1126; EX1127).

When Don Wilson had not acted for nearly two weeks on Joshi's request that he obtain Kyocera samples, the Espiau inventors sought and received approval from CEO Catlett to place an order for rectangular and circular puck waveguide samples on June 23, and also purchased samples on June 28 from PM Industries for testing of the variation of dielectric constant with temperature. (EX1172; EX1158 ¶¶ 41-42; EX1160 ¶ 36; EX1125, pp. 87-91).

At the time, reflecting the role Wilson and Guthrie had been assigned in the development work, Catlett asked Turner if Wilson and Guthrie were proving to be a "resource" to the Espiau inventors, or whether he should "put them on another program." (EX1158 ¶ 40; EX1171).

Wilson set up a trip for Joshi and Espiau to Coorstek and other suppliers on July 10, 11 and 12. On the visit to Coorstek, Joshi and Matt Espiau noticed discarded pieces of alumina grinding material – some puck shaped, some nearly spherical – in a bin. Joshi and Espiau did a quick calculation, based on dimensions they had earlier developed, and determined that with some machining the material could have the dimensions required to form a good resonating dielectric waveguide for the Espiau lamp. (EX1158 ¶¶ 43-44; EX1168 ¶ 23; EX1160 ¶¶ 38-39). After being told they could take as many as they liked, they returned home with pieces that would ultimately allow the Espiau inventors to actually reduce their invention to practice on August 11-14, 2000. (EX1168 ¶ 23-27; EX1160 ¶ 39-44).

On July 14, Yian Chang designed ten variants of two designs, and simulated them on HFSS. The variations were in the depth of the contact hole, as Espiau wanted to determine what depth would be optimal for coupling. (EX1168 ¶ 24). Chang drew the design on AUTOCAD.

(EX1168 ¶ 24; EX1160 ¶ 40; EX1180). On July 20, Matt Espiau faxed Chang's AUTOCAD drawings of those designs to Wilson for Wilson to use in obtaining quotes from Coorstek. (EX1168 ¶ 24). Espiau continued their design, analyses and testing. This activity by the Espiau inventors was reported in David Turner's email to Catlett of August 1, 2000 (EX2161).

Coorstek responded to DRI's request for quotation in less than a week. According to both copies of the August 2 quotation by Coorstek (with and without Kathy Hilfer's handwritten amendments), the quotation responds to a July 27 fax. (EX1197; EX2138). That fax was from DRI, after Wilson made his notes on Matt Espiau's July 20 fax to him of Chang's drawings.

**D. Espiau's Constructive And Actual Reduction To Practice**

Beginning in June, while continuing to carry out simulations and tests, the Espiau inventors, assisted by their attorney Mr. Ted Maceiko, diligently put together what would be filed on July 31, 2000 as US Provisional Patent Application No. 60/222,028. (EX1168 ¶ 25; EX1160 ¶ 42; Paper 1 at 4). By the filing of that application, the benefit of which Espiau has been granted, Espiau constructively reduced its invention to practice.

Following the constructive reduction to practice, Matt Espiau completed making alumina waveguide resonators using the Coorstek grinding samples, to the dimensions Joshi and Chang had earlier determined, 3.2cms (1.27 inches) in diameter. Espiau used these waveguide resonators to actually reduce the invention of the Count to practice on August 11-14, 2000. (EX1168 ¶¶ 27-28; EX1160 ¶¶ 43-44). Exhibit 1211 is a narrated video of that reduction to practice. Chang recorded this work and the reduction to practice in his notebook. (EX1126). Espiau confirmed by tests that the lamp was a dielectric resonant waveguide lamp and that it produced a plasma light emission. The inventors measured the light output of the tested lamp,

the power reflection, resonant frequency, and the Q quality factor of the resonant waveguide and recorded the results in Chang's notebook. (EX1211; EX1126, pp. 51-53; EX1125, p. 140).

As Chang's notebook, the testimony of Joshi and Espiau, and the video establish, that reduction to practice included a lamp and a waveguide body comprising a ceramic dielectric material, alumina. Its shape and dimensions had been preselected by Espiau based on their earlier analyses and tests. It had waveguide outer surfaces. An RF feed was positioned in intimate contact with the dielectric body and it coupled RF energy into the body from an RF source. The lamp operated at the frequency and intensity preselected by Espiau and the frequency (2.45 GH), intensity (125-135 watts), body shape (cylinder) and dimensions (1.27 inches diameter) selected by Espiau such that the waveguide resonated in at least one resonant mode having at least one electric field maximum. The waveguide had an enclosed cavity depending from one wall (the top) and a bulb in the cavity at the location of an electric field maximum during operation. The bulb had a gas/metal halide-fill so that when receiving energy from the resonating waveguide it formed light-emitting plasma, as shown in the video. (EX1211; EX1126, pp. 46-53; EX1125, pp. 130-140; EX1168 ¶¶ 27-28; EX1160 ¶¶ 43-44). Attached as Appendix 3.3 is a comparison of that lamp to the Count.

After August 14, Espiau demonstrated the working resonant waveguide lamp of the Count to Mr. Catlett. Mr. Catlett did not suggest that DRI had ever made or tested such a lamp. (EX1168 ¶ 29).

**E. Espiau Was The First To Reduce To Practice The Invention Of The Count**

The act of filing a United States patent application that meets the statutory requirements for patentability "has the legal effect of being, constructively at least, a simultaneous conception

and reduction to practice of the invention." *Kawai v. Metlesics*, 480 F.2d 880, 885, 178 USPQ 158, 162 (C.C.P.A. 1973). Espiau has been granted the benefit for priority of the filing date of Provisional Application No. 60/222,028, filed July 31, 2000 (Paper 1, page 4, lines 11-21). Espiau therefore constructively reduced the invention of the Count to practice on July 31, 2000. Because Guthrie has not and cannot prove by a preponderance of the evidence that it achieved either a constructive or an actual reduction to practice earlier than that date, Espiau was the first to reduce the invention of the Count to practice.

In addition, Espiau's actual reduction to practice of August 11-14, 2000 pre-dates any actual or constructive reduction to practice by Guthrie. Espiau is first to reduce to practice for that reason, also.

**F. Guthrie Derived The Invention From Espiau**

As discussed above, on April 20, 2000, Chan Joshi, Matt Espiau and David Turner gave a presentation to Guthrie applicants Greg Prior, Don Wilson, Charles Guthrie and Ed Sandberg. That presentation communicated to the Guthrie applicants the invention of the Count (EX1183 ¶¶ 24-25; EX1168 ¶ 11-12) (Appendix 3.2):

> A lamp comprising:
>
> (a) a waveguide {page 3: "Dielectric Waveguide Design"} having a body comprising a ceramic dielectric material {page 3: "Need high dielectric constant ceramic"} of a preselected shape and preselected dimensions {page 3: "1. Rectangular resonator 2. Cylindrical resonator"}, the body having a first side determined by a first waveguide outer surface;
>
> (b) a first feed positioned within and in intimate contact with the waveguide body, adapted to couple energy into the body from a source having an output {page 4: "Antenna to waveguide coupling"; page 5: "waveguide structure including antenna coupling"} and operating at a preselected frequency and intensity {page 3: "want wavelength less than 5cm"}, the feed connected to the source output, said frequency and intensity and said body shape and dimensions selected such that the body resonates in at

least one resonant mode having at least one electric field maximum {pages 1-3: "Use $TM_{mnp}$ mode in both cases for efficient coupling to plasma"};

(c) an enclosed first cavity depending from said first surface into the waveguide body {page 4: "air breakdown between waveguide and lamp"}; and

(d) a first bulb positioned in the cavity at a location corresponding to an electric field maximum during operation {page 3: "Use $TM_{mnp}$ mode in both cases for efficient coupling to plasma"}, the bulb containing a gas-fill which when receiving energy from the resonating waveguide body forms a light-emitting plasma {page 3: "Design to obtain fairly high (>1000) Q at operating frequency"}.

This presentation, in itself, was a complete and operative description of the invention that would enable one of ordinary skill to reduce the invention to practice without undue experimentation.

In addition, on May 22, 2000, Tenco presented to DRI its "Proprietary and Confidential" Conceptual Design, which likewise detailed the invention of the Count. (EX2070).

There is no credible evidence that the Guthrie applicants had mental possession of the complete and operative invention at any time before receiving the disclosure of the invention from Espiau.

**G. Espiau's Work Does Not Inure To Guthrie's Benefit**

No part of Espiau's work inures to Guthrie. Even if the Espiau invention had been made in the course of an engineering assignment for DRI (it was not), Guthrie could not claim inurement.

Indeed, if there is any inurement here, it is that any Guthrie alleged reduction to practice, whenever it may have happened, inures to the benefit of Espiau. The purported reduction to practice by Guthrie was with a waveguide made according to an Espiau design that Espiau sent to DRI to enable DRI to obtain quotes from vendors. If DRI had someone build the waveguide

to that design and used it to reduce the invention to practice, that work inures to the benefit of Espiau. *Hogue v. Cowling*, 101 F.2d 541, 549-50, 40 USPQ 492, 500 (C.C.P.A. 1939).

**IV. CONCLUSION**

For the foregoing reasons, Espiau is entitled to priority of invention of the Count. Espiau's relief should be granted.

July 30, 2007 /Robert C. Morgan #30,199/

Date

Robert C. Morgan
Backup Counsel for Espiau
Registration No: 30,199

# APPENDIX 1

| EXHIBIT NUMBER | DESCRIPTION |
|---|---|
| EX1007 | USP 6737809 to Issued From 09809718 to Espiau |
| EX1012 | FWH Of 60222028 to Espiau |
| EX1025 | UCLA 164AL Winter 1991 Handout for Experiment 3:Cavity Resonator |
| EX1026 | UCLA 164AL Winter 1995 Handout for Experiment 3:Cavity Resonator |
| EX1027 | Pobanz April 7, 2000 MasterCard statement |
| EX1030 | Pobanz Declaration |
| EX1031 | Joshi Handwritten "Integrated Lamp-Waveguide Concept" with attached Turner note |
| EX1032 | Simon July 11, 2000 email with attached "Integrated Lamp waveguide Concept.doc" |
| EX1034 | Turner Declaration |
| EX1051 | Espiau Declaration of Chandrashekhar J. Joshi |
| EX1054 | Espiau Declaration of Carl W. Pobanz |
| EX1063 | Transcript of the June 19, 2006 Deposition of David M. Pozar |
| EX1068 | Transcript of the Deposition of Chandrashekhar J. Joshi, Ph.D. |
| EX1125 | Notebook pages from Chan Joshi |
| EX1126 | Notebook pages from Yian Chang |
| EX1127 | Notebook pages from Matt Espiau |
| EX1128 | Turner notes from March 6, 2000 |
| EX1129 | Turner notes from March 8, 2000 |

| | |
|---|---|
| EX1130 | Turner March 31, 2000 e-mail to Greg Prior, with attached Turner Engineering Company Proposal to Provide Production Engineering |
| EX1131 | Turner notes from April 11, 2000 |
| EX1134 | Proposal to Development a Plasma Lamp Exciter and Waveguide |
| EX1135 | Turner notes from April 17, 2000 |
| EX1137 | Turner notes from April 20, 2000 |
| EX1138 | Presentation of Dielectric Resonator Concept for Plasma Lamps |
| EX1139 | Mullen April 20, 2000 e-mail to Turner |
| EX1141 | Turner notes from April 24, 2000 |
| EX1143 | Turner April 25, 2000 e-mail to Joshi |
| EX1144 | Guthrie May 6, 2000 forward of amplifier e-mail to Turner |
| EX1148 | Turner notes from May 1, 2000 |
| EX1150 | Plasma Lamp Concept drawing |
| EX1151 | Mullen May 1, 2000 e-mail to Espiau, Joshi and Turner, with attached diagram |
| EX1152 | Notes from Yian Chang |
| EX1155 | Graph with handwritten notes |
| EX1156 | Guthrie May 6, 2000 e-mail to Turner regarding visit |
| EX1157 | Turner May 6, 2000 e-mail to Mullen |
| EX1158 | Espiau Second Declaration of David Turner |
| EX1159 | Turner notes from May 9, 2000 |
| EX1160 | Espiau Second Declaration of Chandrashekhar J. Joshi |
| EX1161 | Turner May 12, 2000 e-mail to Catlett, with attached development plan and budget |

| | |
|---|---|
| EX1162 | Quote from Channel Microwave Corporation |
| EX1163 | Turner May 22, 2000 e-mail to Catlett |
| EX1165 | Turner June 8, 2000 e-mail to Espiau, Joshi and Chang |
| EX1166 | Drawings of Puck |
| EX1167 | Turner June 9, 2000 e-mail to Espiau, Joshi and Chang, with attached e-mail from Guthrie and attached Material Specification |
| EX1168 | Espiau Declaration of Frederick Matthew Espiau |
| EX1171 | Turner notes from June 21, 2000 |
| EX1172 | June 22, 2000 request for Purchase Order to Kyocera |
| EX1173 | June 23, 2000 drawing from Chang |
| EX1177 | Chang July 5, 2000 e-mail to Turner, with attached monthly invoice |
| EX1178 | Joshi July 13, 2000 e-mail to Espiau, forwarding July 11, 200 N. Simon e-mail |
| EX1179 | Espiau July 13, 2000 e-mail to Joshi and Chang |
| EX1180 | July 14, 2000 Drawings |
| EX1181 | Chang July 16, 2000 e-mail to Espiau |
| EX1182 | Espiau July 16, 2000 e-mail to Joshi, Chang and Turner, with attached patent write-up |
| EX1183 | Espiau Fifth Declaration of David M. Pozar |
| EX1190 | Turner July 28, 2000 e-mail |
| EX1191 | Espiau July 24, 2000 e-mail to Joshi, Chang and Turner |
| EX1192 | Chang July 24, 2000 e-mail to Espiau, Joshi and Turner |
| EX1193 | Chang July 25, 2000 e-mail to Espiau |
| EX1194 | Chang July 25, 2000 e-mail to Espiau |

| | |
|---|---|
| EX1195 | Espiau July 26, 2000 e-mail to Joshi, Chang and Turner |
| EX1196 | Chang July 26, 2000 e-mail to Espiau, Joshi and Turner |
| EX1197 | August 2, 2000 quotation from CoorsTek |
| EX1198 | Chang July 27, 2000 e-mail to Espiau, Joshi and Turner |
| EX1199 | Espiau July 25, 2000 e-mail to Chang |
| EX1200 | Chang July 30, 2000 e-mail to Espiau, Joshi and Turner |
| EX1204 | Chang August 1, 2000 e-mail to Turner, with attached monthly invoice |
| EX1206 | Turner August 2, 2000 e-mail to Brougher, Wilson, Espiau, Joshi |
| EX1208 | Presentation, A ceramic Wave-guide Lamp, From a Concept to a Reality |
| EX1211 | Video Of Reduction To Practice |
| EX1219 | Chang June 6, 2000 Fax to Turner, with attached monthly invoice |
| EX2004 | Declaration of Edmund Sandberg executed November 19, 2004 |
| EX2005 | Declaration of Gregory Prior executed November 22, 2004 |
| EX2006 | Declaration of Charles Guthrie |
| EX2008 | Declaration of Tony Thomas |
| EX2010 | Declaration of Edmund Sandberg executed February 20, 2006 |
| EX2034 | Wilson Declaration of December 12, 2005 |
| EX2035 | Sandberg Declaration of December 12, 2005 |
| EX2038 | Luxim Response in U.K. Entitlement Action |
| EX2039 | Declaration of Don Wilson executed February 18, 2006 |
| EX2041 | Photographs of half wavelength waveguide |
| EX2048 | Half wavelength waveguide drawing (CTS010) |
| EX2061 | SPL002 Engineering Drawing |

| | |
|---|---|
| EX2062 | WGC003 Engineering Drawing – Ceramic Block |
| EX2063 | WGC003 Engineering Drawing – Waveguide Package |
| EX2064 | WGC003 Engineering Drawing – Waveguide with Heat Sink |
| EX2065 | Turner e-mail of May 15, 2000, 10:19 p.m |
| EX2067 | DRI Presentation |
| EX2069 | Turner e-mails of May 18, 2000, with Attached PowerPoint Presentation |
| EX2070 | Final PowerPoint Presentation |
| EX2136 | Declaration of David Smoler executed December 5, 2005 |
| EX2137 | Engineering sketches faxed to CoorsTek |
| EX2138 | Manufacturing quote from CoorsTek |
| EX2146 | David Smoler notebook entries dated October 25, 1999 |
| EX2147 | December 16, 1999 e-mail from David Smoler to Greg Prior and Ed Sandbe |
| EX2149 | June 27, 2000 e-mail from David Smoler to Charles Guthrie |
| EX2150 | Second Declaration of David E. Smoler dated May 21, 2007 |
| EX2151 | April 16, 2000 e-mail from David Turner to Greg Prior, Jim Legge and Don Wilson enclosing proposal dated April 14, 2000 |
| EX2153 | April 26, 2000 e-mail from David Turner to Greg Prior |
| EX2154 | DRI Drawing SPL001 |
| EX2155 | DRI Drawing SPL002 |
| EX2156 | April 28, 2000 e-mail from David Turner to Greg Prior |
| EX2157 | June 28, 2000 e-mail from David Turner to Greg Prior |
| EX2158 | July 6, 2000 e-mail from David Turner to Wayne Catlett |
| EX2160 | July 17, 2000 e-mail from David Turner to Wayne Catlett |

| | |
|---|---|
| EX2161 | August 1, 2000 e-mail to from David Turner to Wayne Catlett |
| EX2181 | Declaration of Don Wilson dated June 14, 2007 |
| EX2185 | Declaration of Greg Prior dated June 15, 2007 |
| EX2193 | May 31, 2000 e-mail from David Turner to Wayne Catlett and Greg Prior |
| EX2195 | June 2, 2000 e-mail from David Turner |
| EX2196 | June 26, 2000 e-mail from David Turner to DRI |
| EX2198 | Transcript of June 6, 2007 deposition of Tim Russell |

**APPENDIX 2**

**STATEMENT OF MATERIAL FACTS**

<u>Material Facts Relied on in Substitute Espiau Motion 7 For Priority,</u>

1. On July 31, 2000, party Espiau filed an application to which the USPTO associated application number 60/222,028. (EX1012).

2. On March 15, 2001, party Espiau filed an application to which the USPTO associated application number 09/809,718. (EX1007).

3. Espiau's involved U.S. Patent No. 6,737,809 issued from application number 09/809,718. (EX1007)

4. Espiau has been granted the benefit for priority of its involved application of the filing date of application number 60/222, 028. (Paper 1 at 4).

5. David Turner's consulting company, Tenco was hired to solve a problem. (EX1158 ¶¶ 3-4).

6. DRI's Vice President, Mr. Legge said DRI had a lamp, and needed production engineering for a high frequency lamp driver circuit and packaging for the circuit. (EX1158 ¶¶ 3-4).

7. In their March discussions with Mr. Turner, Mr. Legge and Mr. Prior did not volunteer much information about the lamp, except to call it a "plasma fusion lamp." (EX1158 ¶¶ 3-9; EX1128; EX1129).

8. Turner naturally thought of Professor Chan Joshi, head of the UCLA high frequency laboratory and an expert in plasmas and high frequency electronics. (EX1034 ¶ 4; EX1160 ¶¶ 2-4).

9. Turner put together a proposal on March 31 for a brief engineering study involving himself and Prof. Joshi costing less than $25,000. (EX1158 ¶¶ 7-9; EX1130, page 8 of attachment).

10. Greg Prior, as DRI's vice president of engineering, signed that proposal on April 4. (Schedule 3 of EX2038, pp. 6-7).

11. A consultation meeting was set up for April 11 with DRI personnel and Tenco's working team. (EX1158 ¶ 10).

12. Joshi asked the manager of the high frequency lab he directed, Matt Espiau, to come along to the meeting. (EX1160 ¶ 4).

13. Mr. Espiau had more than 13 years' experience in high frequency technology, including work with ceramic dielectric waveguides. (EX1168 ¶ 3).

14. The only thing DRI presented at the April 11 meeting was an inductive coil plasma lamp for which it needed Tenco to design the driver electronics and packaging. (EX1158 ¶¶ 12-14; EX1160 ¶ 5-6; EX 1168 ¶¶ 5-7).

15. During that presentation, Matt Espiau concluded that the design that DRI presented was not a good one. (EX1168 ¶ 6).

16. Espiau suggested using a dielectric waveguide, drawing on his years of experience working with high frequency systems, including work with dielectric waveguides. (EX1168 ¶ 6).

17. As Turner's notes reflect, someone at the meeting may have expressed concern that such a "guiding structure might" be big. (EX1158 ¶ 13; EX1131, p. 4).

18. Mr. Espiau and Dr. Joshi explained that the waveguide could be made small. (EX1158 ¶ 13).

19. Espiau and Joshi described to the meeting the distribution of the electric field in the dielectric waveguide by referring to sine, cosine and Bessel functions.  (EX 1158; EX1131, p. 4).

20. Espiau sketched his idea of an integrated dielectric waveguide lamp on a white board, reproduced in David Turner's notes made during the meeting, and explained it.  (EX1168 ¶ 6; EX1131, p. 4).

21. The meeting broke up shortly thereafter and Don Wilson sought out Espiau, shook his hand and said, in words or substance, that Mr. Espiau's idea was a good one, that he was a very smart young man and that this was just what they needed.  (EX1158 ¶ 14; EX1168 ¶ 7; EX1160 ¶ 6; EX1068, p. 28, ll. 10-15).

22. By April 13, Dr. Joshi – a high frequency plasma expert – had concluded that the power required to ignite the plasma was more than the anticipated power of a small RF circuit.  (EX1125, pp. 1-7; EX1068, p. 55, ll. 4-22).

23. Dr. Joshi had concluded by April 13 that "we needed some way of increasing the power from 100 watts to one kilowatt without actually increasing the power of the source. We need a power multiplier; temporary, but we needed a power multiplier."  (EX1125, p. 6; EX1068, p. 55, ll. 13-17).

24. Dr. Joshi's insight led the Espiau inventors to arrive on April 14, 2000 at the complete conception of the invention.  (EX1030 ¶¶ 9-10).

25. Dr. Carl Pobanz is an experienced designer of microwave circuits.  (EX1030 ¶ 2)

26. On April 14, 2000 Matt Espiau asked Dr. Pobanz to meet with him in Dr. Chan Joshi's office at UCLA to discuss a microwave-excited plasma lamp.  (EX1030 ¶ 8).

27. The problem to be solved at the meeting on April 14 was the result of Dr. Joshi's and

Matt Espiau's analyses since the April 11 meeting, recorded in Dr. Joshi's notebook, that more power was needed to ignite plasma in the waveguide. (EX1030 ¶ 9; EX1125, pp. 1-7; EX1068, page 55, lines 4-22; EX 1160 ¶ 9; EX1168 ¶ 8).

28. Rather than treating the "gas/plasma [as] the load for a microwave waveguide" (EX1030 ¶ 9), Mr. Espiau suggested "using a resonant cavity with the plasma located inside it" (EX1030 ¶ 10).

29. Matt Espiau solved the power problem by changing the nature of the design. (EX1030 ¶¶ 9-10; EX1168 ¶ 8).

30. Dr. Joshi recorded this inspiration with an exclamation point in his notebook: "Matt suggests a resonant cavity. Good idea!" (EX1125, p. 8).

31. Dr. Joshi's remark "Good idea!" is a recognition of the utility of the dielectric resonator concept.

32. The recognition of the invention is recorded both in Dr. Joshi's exclamation mark punctuation and in what Dr. Pobanz recalls as "enthusiasm." (EX1125, pp. 8-9).

33. The inventive concept of the April 14 meeting is recorded in Dr. Joshi's notebook, described by Dr. Pobanz, by Dr. Joshi and by Mr. Espiau. (EX1125, p. 8; EX1030 ¶¶ 8-14; EX1160 ¶¶ 10-13; EX1168 ¶¶ 8-9).

34. The waveguide lamp conceived on April 14, 2000 comprised "a waveguide having a body comprising a ceramic dielectric material of a preselected shape and preselected dimensions, the body having a first side determined by a first waveguide outer surface." (EX1183 ¶ 23; EX1125, p. 8; EX1030 ¶¶ 8-14; EX1160 ¶¶ 10-13; EX1168 ¶¶ 8-9).

35. Page 8 of Joshi's notebook (EX1125) dated April 14 shows a waveguide with a dielectric material with a preselected shape and dimensions. (EX1183 ¶ 23; EX1125, p. 8; EX1030

¶¶ 8-14; EX1160 ¶¶ 10-13; EX1168 ¶¶ 8-9)..

36. To one of ordinary skill in the art, discussion of a resonant waveguide requires that all three dimensions be preselected in relation to the resonant frequency to obtain the resonant condition. (EX1183 ¶ 23).

37. The waveguide body illustrated on page 8 of Dr. Joshi's notebook has a first side determined by a first waveguide outer surface. (EX1183 ¶ 23; EX1125, p. 8; EX1030 ¶¶ 8-14; EX1160 ¶¶ 10-13; EX1168 ¶¶ 8-9)..

38. The waveguide lamp conceived on April 14, 2000 comprised "a first feed positioned within and in intimate contact with the waveguide body, adapted to couple energy into the body from a source having an output and operating at a preselected frequency and intensity, the feed connected to the source output, said frequency and intensity and said body shape and dimensions selected such that the body resonates in at least one resonant mode having at least one electric field maximum." (EX1183 ¶ 23; EX1125, p. 8; EX1030 ¶¶ 8-14; EX1160 ¶¶ 10-13; EX1168 ¶¶ 8-9).

39. A feed is shown on page 8 of EX1125 (indicated by the "100W" input port on the bottom of the waveguide body), positioned within and in intimate contact with the waveguide body. (EX1183 ¶ 23; EX1125, p. 8; EX1160 ¶¶ 10-13).

40. The function of the feed shown on page 8 of EX1125 is to couple energy into the body from a source having an output and operating at a preselected frequency and intensity, the feed connected to the source output. (EX1183 ¶ 23; EX1125, p. 8)..

41. Together, the combination of the illustrated waveguide and the suggestion from Mr. Espiau of a resonant cavity indicate that the frequency, intensity, body shape and dimensions are selected such that the body resonates in at least one resonant mode.

(EX1183 ¶ 23; EX1125, p. 8; EX1030 ¶¶ 8-14; EX1160 ¶¶ 10-13; EX1168 ¶¶ 8-9).

42. The waveform illustrated on page 8 indicates that the resonant mode has at least one electric field maximum. (EX1183 ¶ 23; EX1125, p. 8; EX1160 ¶¶ 10-13).

43. Dr. Pobanz also recalls discussion on April 14, 2000 of a feed ("e.g., probe or aperture") and "how it could be located in the resonator" (EX1030 ¶ 12).

44. The discussion included how to couple the feed to the microwave source, and suggestions of possible sources. (EX1183 ¶ 23; EX1125, p. 8; EX1030 ¶¶ 8-14; EX1160 ¶¶ 10-13; EX1168 ¶¶ 8-9).

45. Dr. Pobanz recalls that on April 14, 2000, "[i]t was noted that a full-wave resonator would provide two locations of field maxima, one of which would be used as the location of the plasma and the other used as the input port for exciting the resonator, whereas the half-wave resonator would have the advantage of smaller relative size" while providing only one electric field maximum. (EX1030 ¶ 12).

46. The waveguide lamp conceived on April 14, 2000 comprised "an enclosed first cavity depending from said first surface into the waveguide body." (EX1183 ¶ 23; EX1125, p. 8; EX1030 ¶¶ 8-14; EX1160 ¶¶ 10-13; EX1168 ¶¶ 8-9).

47. The illustration on page 8 of Dr. Joshi's notebook (EX1125) shows an open cavity in the top first surface of the waveguide body enclosed by the dielectric material and a cap on top. (EX1183 ¶ 23; EX1125, p. 8).

48. Dr. Pobanz also recalls that "boring a hole in the ceramic and capping it with a transparent lid such as a quartz disc" was discussed on April 14, 2000. (EX1030 ¶ 11).

49. The waveguide lamp conceived on April 14, 2000 comprised "a first bulb positioned in the cavity at a location corresponding to an electric field maximum during operation, the

bulb containing a gas-fill which when receiving energy from the resonating waveguide body forms a light-emitting plasma." (EX1183 ¶ 23; EX1125, p. 8; EX1030 ¶¶ 8-14; EX1160 ¶¶ 10-13; EX1168 ¶¶ 8-9).

50. Dr. Joshi's notes indicate that first bulb is positioned in the cavity of (c), positioned at an electric field maximum during operation. (EX1183 ¶ 23; EX1125, p. 8).

51. The bulb contains a gas fill which forms a light-emitting plasma when receiving energy from the resonating waveguide. (EX1183 ¶ 23; EX1125, p. 8; EX1030 ¶¶ 8-14; EX1160 ¶¶ 10-13; EX1168 ¶¶ 8-9).

52. Dr. Pobanz corroborates that locating the plasma at an electric field maximum of during operation of various resonant modes "and also to get the light out" was discussed. (EX1030 ¶ 12).

53. As of the April 14, 2000 meeting, the Espiau inventors Chan Joshi and Matt Espiau had formed in their minds a definite and permanent idea of the complete and operative invention, including every element of the Count. (EX1183 ¶ 23; EX1125, p. 8; EX1030 ¶¶ 8-14; EX1160 ¶¶ 10-13; EX1168 ¶¶ 8-9).

54. Espiau and Joshi described it with particularity at the time both to Dr. Carl Pobanz in the meeting and in the contemporaneously written Joshi notebook. (EX1125, p. 8; EX1030 ¶¶ 8-14).

55. Matt Espiau and Chan Joshi conceived the invention of the count no later than April 14, 2000, after several days of inventive activity and analysis.

56. Realizing that the project scope had changed significantly in the April 11 meeting, David Turner drafted a new proposal to inform DRI. (EX1158 ¶¶ 14-16).

57. Though Turner had been hired to provide "Production Engineering" to "fit the exciter

electrical design . . . to the lamp you are developing" – the inductive coil lamp – Espiau's conception had changed the scope to developing a "Plasma Lamp Exciter and Waveguide (LEW)." (EX1130; EX2151; EX1158 ¶ 16).

58. Turner's letter to Prior of Sunday April 16, proposed $375K of work – 15 times the scope of the initial agreement. (EX2151; EX1158 ¶ 16).

59. The proposal clearly stated to Prior – consistent with what occurred at the April 11 meeting and the subsequent work of Espiau and Joshi – that "we proposed a design concept" and "we investigated the technical feasibility of this concept." (EX2151, p. 2 of attachment; EX1158 ¶ 15).

60. Turner's letter closes by laying out the Espiau inventors' strategy going forward with their invention, stating "Finally, we think that there may be a family of products which can benefit from the ideas we are pursuing for the LEW, and we would like to discuss with you the idea of a joint development. Can we discuss these business matters Thursday?" (EX2151, p. 2 of attachment; EX1158 ¶ 15).

61. The next Thursday after Turner's April 16 email was April 20, 2000. (EX1158 ¶ 18).

62. On April 15, 2000, Matt Espiau and Dr. Chan Joshi worked on the waveguide and resonant cavity, and sought vendors for ceramics. (EX1125).

63. On April 17, Turner, Joshi and Espiau met in a coffee shop with Jim Legge, Wilson and Guthrie. (EX1158 ¶ 17; EX1168 ¶ 10; EX1135).

64. Nothing technical was discussed at the April 17, 2000 meeting. (EX1125, p. 10).

65. At the meeting, Legge seemed "OK" with the idea of an integrated dielectric waveguide/lamp design. (EX1125, p. 10).

66. On April 18, 2000, Dr. Chan Joshi prepared for a presentation, noted advantages of

dielectric waveguide, dielectric waveguide design, problem issues, and posed "critical question" of whether DRI can supply bulbs on time for testing. (EX1125).

67. On April 19, 2000, Dr. Chan Joshi reviewed of three U.S. patents related to lamp technology and prepared slides for presentation. (EX1125).

68. Dr. Joshi, Matt Espiau and David Turner laid out the complete concept of their invention on April 20, 2000, in a presenation entitled "Dielectric Resonator Concept for Plasma Lamps." (EX1160 ¶ 16; EX1158 ¶¶ 18-20; EX1168 ¶¶ 11-12; EX1138; EX1183 ¶¶ 24-25).

69. The Dielectric Resonator Concept presentation conveyed to the Guthrie applicants what one of ordinary skill in the art would consider a complete and operative description of the invention that would enable a reduction to practice without undue experimentation. (EX1183 ¶¶ 24-25; EX1168 ¶ 11-12).

70. David Turner marked the April 20, 2000 presentation "Proprietary." (EX1138; EX1158 ¶ 19; EX1160 ¶ 16).

71. At the meeting, Prior and Legge were joined by CEO Wayne Catlett, as well as Don Wilson, Charles Guthrie and Edmund Sandberg. (EX1137; EX1158 ¶ 18).

72. Turner, Matt Espiau and Joshi went through the PowerPoint presentation and discussed the Espiau invention in detail. (EX1137; EX1139; EX1158 ¶ 20; EX1160 ¶ 16; EX1168 ¶¶ 11-12).

73. Joshi, Espiau and David Turner communicated that conception to the Guthrie applicants first on April 20, 2000 and in increasing detail thereafter.

74. There was no mention at the April 20, 2000 meeting of any previous waveguide design at DRI. (EX1158 ¶ 21; EX1160 ¶ 18 ; EX1168 ¶ 13).

75. No one at the April 20, 2000 meeting disputed that the resonant waveguide lamp invention was Joshi and Espiau's invention. (EX1158 ¶ 21; EX1160 ¶ 18 ; EX1168 ¶ 13).

76. There is no credible evidence of record that the Guthrie applicants had mental possession of the complete and operative invention at any time before receiving the disclosure of the invention from Espiau.

77. With Catlett's implicit approval of the much increased expense, Prior signed Turner's new statement of work, which explicitly stated that the design concept was something that "we" – Joshi and Espiau –proposed. (EX1134; EX1158 ¶ 21).

78. Don Mullen, who saw the concept at the meeting for the first time, wrote in an e-mail to David Turner that night about the two approaches discussed at the April 20 meeting – the DRI inductive coil approach and the Espiau resonant waveguide approach. (EX1139; EX1158 ¶ 22).

79. Mullen saw the Espiau approach, what he called "your original plans/scope for the project" in stark contrast to the DRI approach, which he noted "still is in the lab queen stage" in Sandberg's lab. (EX1158 ¶ 22; EX1139).

80. Promptly after the April 20 meeting, Espiau and Joshi brought in Yian Chang, experienced in HFSS (High-Frequency Structure Simulator) computer analysis of waveguides, to do computer studies of the designs Espiau and Joshi were developing. (EX1168 ¶ 14; EX1160 ¶ 20).

81. Chang began work immediately, with first results by April 23. (EX1160 ¶ 20; EX1125, p. 17).

82. Espiau, Joshi and Turner met with Wilson and Guthrie on April 24. (EX1141; EX1158

¶ 26; EX1168 ¶ 15).

83. Ceramic samples for materials testing were the first order of business and the subject of the meeting on April 24. (EX1158 ¶ 26; EX1168 ¶ 15).

84. Wilson and Guthrie were assigned the role of obtaining ceramic dielectric samples, based on shapes and dimensions provided by Joshi and Espiau. (EX1158 ¶¶ 24, 26 and 40; EX1168 ¶ 10; EX1160 ¶ 14).

85. Turner also assigned them the task of drafting drawings per the directions of Espiau. (EX1158 ¶ 24).

86. David Turner's notes of the meeting show one of the requested samples, an "air line" that Joshi and Espiau asked DRI to obtain. (EX 1141).

87. The "air-line" sample Espiau requested was to be sized to fit inside a standard metal "air line" waveguide. (EX1168 ¶ 15).

88. Espiau also requested another sample be sized to fit inside a standard X-band waveguide. (EX1168 ¶ 16).

89. Samples of the sizes requested would enable Matt Espiau and Yian Chang to test the samples inside the air line and X-band waveguides to determine their precise dielectric constants and loss tangents – tests they subsequently carried out when the samples were received. (EX1168 ¶ 15-16 and 21; EX1127, p. 3).

90. Charles Guthrie then made drawings of the samples Espiau had requested, for submission to vendors, for example SPL001 (EX2154) and SPL002 (EX2155).

91. The drawings Mr. Guthrie prepared show dimensions just slightly smaller than the air line and X-band waveguide dimensions, with tolerances that did not permit them to be any larger, e.g., .398 +.000, −.0005, to fit inside a .4 inch X-band waveguide. (EX2155,

SP1002; EX1168 ¶ 16).

92. EX2155, drawing SPL002, was dimensioned to fit inside the X-band (WR-90) waveguide being used by Matt Espiau and Yian Chang for their initial conceptual testing. (EX1168 ¶ 16).

93. The first page of Yian Chang's notebook, dated April 27, 2007, shows an illustration of an X-band (WR-90) waveguide that he and Matt Espiau were using at their lab. (EX1126, p. 1).

94. The interior dimensions of that X-band waveguide are 0.4 by 0.9 inches, or 10.16 by 22.86 mm. (EX1168 ¶ 16; EX1126, pp. 1-3).

95. Yian Chang used the X-band waveguide to check the accuracy of the HFSS computer studies he was running for the dielectric resonator. (EX1126, p. 3).

96. From April 21, 2000 to April 23, 2000, Matt Espiau, Yian Chang and Chan Joshi performed HFSS simulations, discussed HFSS and coupling. (EX1125).

97. From April to May, 2000, Dr. Joshi put together a Technical Note. (EX1152).

98. While they waited for the original requested material to test (which was provided by Wilson on June 6), Yian Chang and Matt Espiau continued their tests and HFSS simulation begun on April 27, that would allow them to preselect the frequency, intensity, body shape and dimensions of the dielectric resonator. (EX1126; EX1127).

99. On April 27, 2000, Charles Guthrie indicated that Matt Espiau found a more suitable amplifier than one located at DRI. (EX1144).

100. On the same day, Dr. Chan Joshi received an email detailing DRI Plasma Lamp Schedule Update, with small change in duration of concept phase, and larger change in laser brazing system. (EX2156).

101. On April 30, 2000, Dr. Chan Joshi, Dr. Yian Chang and Matt Espiau held a status meeting, discussing design update, exciter structure and microwave sealing concept. (EX1125).

102. On May 1, 2000, Dr. Chan Joshi worked on temperature coefficient of high dielectric constant materials. (EX1125; EX1219).

103. On May 1, 2000, Matt Espiau met with Don Wilson and Charles Guthrie to discuss technical aspects of selecting dielectric material, with consideration of temperature, ceramic seal and thermal gradient. (EX1127; EX 1148).

104. On May 1, 2000, Don Mullen e-mailed Dr. Chan Joshi, Matt Espiau, and David Turner regarding plasma lamp geometry. (EX1150; EX1151).

105. From May 1, 2000 to May 4, 2000, Dr. Yian Chang worked on HFSS of waveguide frequency. (EX1126; EX1219).

106. On May 2, 2000, Dr. Chan Joshi worked on selection of waveguide materials. (EX1125).

107. On May 4, 2000, Matt Espiau and Dr. Chan Joshi worked on inductive coil lamp testing. (EX1156).

108. From May 5, 2000 to May 6, 2000, Dr. Chan Joshi worked on HFSS simulations, wavelength selection, transmission at the antenna, and resonance. (EX1125).

109. On May 5, 2000, Dr. Yian Chang and Matt Espiau performed testing of the DRI inductive coil lamp setup (EX1126; EX1127; EX1219).

110. On May 5, 2000, Dr. Yian Chang and Matt Espiau created frequency graphs with handwritten notes. (EX1155).

111. On May 6, 2000, Matt Espiau and Dr. Chan Joshi received an e-mail from David Turner regarding dielectric properties of TransTek materials. (EX1157).

112. On May 7, 2000, Dr. Chan Joshi performed work on microwave circuit and plasma. (EX1125).

113. On May 7, 2000, Dr. Yian Chang performed work on analytical equations for waveguide and cavities. (EX1126; EX1219).

114. On May 7, 2000, Matt Espiau, Dr. Yian Chang and Dr. Chan Joshi met regarding testing of lamps. (EX1127).

115. On May 8, 2000, Dr. Chan Joshi and Dr. Yian Chang worked on single antenna coupling, and graphs related to frequency in cavity. (EX1125; EX1152; EX1219).

116. On May 8, 2000, Matt Espiau, Dr. Yian Chang and Dr. Chan Joshi met regarding the science of cavities and equipment needs. (EX1127).

117. On May 9, 2000, Dr. Chan Joshi and Dr. Yian Chang worked on a computer model related to plasma in a resonant cavity, and produced graphs related to frequency in a cavity. (EX1125; EX1152).

118. On May 9, 2000, Dr. Chan Joshi, Dr. Yian Chang, Matt Espiau met with Don Wilson and Charles Guthrie of DRI, where Chang presented convincing HFSS simulations, and they discussed plasma modeling in HFSS, materials, alumina liner insert, and setting up a joint lab. (EX1159).

119. On May 10, 2000, Dr. Chan Joshi evaluated Chang's results for waveguide calculations (HFSS), evaluated temperature profile in the dielectric, performed literature search for microwave plasma lighting. (EX1125; EX1219).

120. On May 12, 2000, Dr. Chan Joshi performed work on cavity dimensions. (EX1125).

121. On May 12, 2000, Dr. Yian Chang performed work on plasma bulb testing, HFSS simulation and experiment in airwave cavity. (EX1126; EX1219).

122. On May 12, 2000, Dr. Chan Joshi received an e-mail from David Turner to Wayne Catlett regarding moving forward with arrangements previously discussed for plasma lamp development, with attached plasma lamp development plan. (EX1161).

123. On May 15, 2000, Dr. Yian Chang created waveguide design drawings using AutoCAD. (EX1126; EX1219).

124. On May 17, 2000, Dr. Chan Joshi worked on obtaining suppliers of dielectric material for the resonator. (EX1125).

125. On May 18, 2000, Dr. Chan Joshi and Matt Espiau received a draft concept design presentation from Turner. (EX2069; EX1127).

126. On May 19, 2000, Dr. Chan Joshi provided status report on dielectric resonator material from various companies. (EX1125).

127. On May 19, 2000, Dr. Yian Chang met with Dr. Chan Joshi, Matt Espiau and David Turner. (EX1126; EX1219).

128. On May 19, 2000, Matt Espiau received a quotation from Channel Microwave Corporation for Coaxial Circulators. (EX1162).

129. On May 21, 2000, Dr. Chan Joshi worked on a cylindrical waveguide, and material procurement. (EX1125).

130. On May 21, 2000, Matt Espiau met with Drs. Chan Joshi and Yian Chang for a science meeting. (EX1127).

131. On May 22, 2000, Dr. Yian Chang worked on HFSS simulation. (EX 1126; EX1219).

132. Turner decided to pull together a more lengthy presentation of the Espiau invention and the development work for presentation to DRI's president, Catlett. (EX1158 ¶¶ 31-32).

133. Turner asked the various people working on the project to provide him materials for the

presentation. (EX1158 ¶¶ 31-32; EX2065).

134. Joshi provided the description of "How does it work" for the May 22 presentation. (EX1158 ¶¶ 31-32; EX2065).

135. Turner asked Wilson and Guthrie, whose assignment had been to make drawings and to deal with vendors, to provide that information. (EX1158 ¶¶ 31-32; EX2065).

136. In the drawings Guthrie subsequently provided Turner for the May 22 presentation, he used the X-band dimensions which Espiau and Chang had been using in the HFSS simulations and testing since at least April 27. (EX2067; EX1126).

137. On May 22, 2000, Turner Engineering Company presented to DRI its "Proprietary and Confidential" Conceptual Design, which supplemented the communication of the presentation of April 20. (EX1158 ¶ 32; EX2070).

138. The May 22 presentation was attended by at least Catlett, Wilson, Charles Guthrie and Sandberg. (EX1158 ¶ 32).

139. The slides Turner presented on May 22, 2000 were clearly labeled "Tenco Proprietary and Confidential," (EX2070).

140. The slides Turner presented on May 22, 2000 were presented as Joshi and Espiau's invention.

141. Joshi, Espiau and Turner repeatedly made clear that their resonant waveguide concept was proprietary to them. (EX1138; EX2070).

142. No one from DRI suggested at the meeting of May 22 that the material presented was not "Tenco Proprietary and Confidential," that the subject matter was not Joshi and Espiau's invention, or that anyone from DRI had made the invention. (EX1158 ¶ 32).

143. The tests and simulations performed by Espiau and Chang continued throughout the

diligence period. (EX1126; EX1127).

144. On May 23, 2000, Dr. Chan Joshi contacted ceramic companies for materials. (EX1125).

145. On the same day, Matt Espiau's attended development meeting with Dr. Yian Chang and Dr. Chan Joshi. (EX1127).

146. From May 23, 2000 to June 1, 2000, Dr. Yian Chang and Dr. Chan Joshi worked on HFSS simulation, including a rectangular design. (EX1126; EX1219).

147. On May 25, 2000, Matt Espiau ordered parts to produce lamp, and contacted Coorstek for material. (EX1127).

148. On May 26, 2000, Dr. Chan Joshi worked on optimizing antenna coupling for steady state plasma. (EX1125).

149. On May 31, 2000, Turner described meeting with realtor for joint lab. (EX2193).

150. On June 2, 2000, Matt Espiau, Drs. Chan Joshi and Yian Chang met with DRI. (EX2195; EX1177).

151. On June 5-6, 2000, Matt Espiau met with Dr. Yian Chang to discuss product. (EX1127).

152. Dr. Joshi did calculations and Chang did HFSS simulations to design a puck shaped resonant waveguide lamp, with a diameter of 3.2 cms. (EX1160 ¶ 32; EX1125, p. 74).

153. Chang made AUTOCAD drawings of the 3.2 cm puck design. (EX1160 ¶¶ 32-33; EX1166).

154. Joshi sent these drawings out for quote from Kyocera on June 6. (EX1125, pp. 88-89; EX1172; EX1160 ¶ 32).

155. Beginning June 6, testing on the materials samples provided by Don Wilson began. (EX1168 ¶ 21; EX1125; EX1127).

156. On June 8, 2000, testing was performed of dielectric material and waveguide, following

meeting with DRI. (EX1125-1127; EX1165; EX1177).

157. On June 9, 2000, Matt Espiau, Dr. Chan Joshi, and Dr. Yian Chang received draft material specification. (EX1167).

158. From June 9, 2000 to July 27, 2000, Matt Espiau, Dr. Chan Joshi, and Dr. Yian Chang performed waveguide testing, HFSS simulation, testing on dielectric puck and analysis of the results. (EX1125-27; EX1177).

159. On June 13, 2000, Espiau met with attorney T. Maceiko. (EX1127).

160. Matt Espiau and Yian Chang began tests on June 18 of an air waveguide to determine the suitability of the available plasma bulb that would continue into July. (EX1168 ¶ 21; EX1126; EX1127).

161. On, June 21, 2000, Espiau, Joshi and Turner met with Wayne Catlett. (EX1127; EX1171).

162. The Espiau inventors sought and received approval from CEO Catlett to place an order for the quoted waveguide samples on June 23, when Don Wilson had not acted for nearly two weeks on Joshi's request that he obtain materials from Kyocera. (EX1172; EX1158 ¶ 41; EX1160 ¶ 36; EX1125, pp. 87-91).

163. At the time of the meeting on June 21, 2000, reflecting the role Wilson and Guthrie had been assigned in the development work, Catlett asked Turner if Wilson and Guthrie were proving to be a "resource" to the Espiau inventors, or whether he should "put them on another program." (EX1158 ¶ 40; EX1171).

164. Catlett informed Turner at the June 21, 2000 meeting that Logical Systems' waveguide approach, meaning David Smoler's idea, had been abandoned by DRI. (EX1171).

165. To the extent the DRI applicants did any work relating to the invention of the Count prior

to Espiau's constructive and actual reduction to practice, it was at the request of and under the direction of Luxim and the Luxim inventors.

166. From approximately June 26, 2000 to July 9, 2000 Dr. Chan Joshi worked on a draft of patent. (EX1031; EX1032; EX1068, p. 100, l. 19 to p. 103, l. 7).

167. On June 28, David Turner ordered additional materials from PM Industries for testing of the variation of dielectric constant with temperature. (EX1158 ¶ 42).

168. Wilson set up a trip for Joshi and Espiau to Coorstek and other suppliers on July 10, 11 and 12. (EX1158 ¶¶ 43-44; EX1168 ¶ 23; EX1160 ¶ 38).

169. On the visit to Coorstek, Joshi and Matt Espiau noticed discarded pieces of alumina grinding material – some puck shaped, some nearly spherical – in a bin. Joshi and Espiau did a quick calculation, based on dimensions they had earlier developed, and determined that with some machining the material could have the dimensions required to form a good resonating dielectric waveguide for the Espiau lamp. (EX1168 ¶ 23; EX1160 ¶ 39).

170. After being told at Coorstek they could take as many pieces of grinding material as they liked, they returned with pieces that would ultimately allow the Espiau inventors to actually reduce their invention to practice on the weekend of August 11-14, 2000. (EX1168 ¶ 23-27; EX1160 ¶ 39-44).

171. On returning from this visit, Turner added a task to the project plan to prototype an alumina waveguide lamp. (EX1158 ¶ 44)

172. The first half-wavelength waveguide drawings with two holes opposite the "blind hole" for the bulb were created on July 14 by Yian Chang, after Dr. Joshi, Matt Espiau and Don Wilson returned from visiting Coorstek. (EX1126, pp. 38-39; EX1160 ¶ 40; EX1168 ¶ 24).

173. On July 14, 2000, Yian Chang designed ten variants of two designs, and simulated them on HFSS. (EX1126, pp. 38-39; EX1160 ¶ 40; EX1168 ¶ 24)

174. Yian Chang drew his July 14, 2000 drawings on AUTOCAD, as he did for all the other drawings he prepared for the team. (EX1168 ¶ 24; EX1160 ¶ 40; EX1180).

175. Dr. Joshi, who had noted during his trip to Coorstek "Let's get them a drawing" (EX1125 p. 105), dated and retained Yian Chang's July 14,2000 drawings (EX1180).

176. The variations in Chang's alumina designs were in the depth of the contact hole, as Espiau wanted to determine what depth would be optimal for coupling. (EX1168 ¶ 24).

177. On July 20, Matt Espiau faxed Chang's drawings of those designs to Don Wilson for Wilson to use in obtaining quotes from Coorstek. (EX1168 ¶ 24).

178. While continuing to carry out simulations and tests, the Espiau inventors, assisted by their attorney Mr. Ted Maceiko, diligently put together a patent application beginning in the last week of June. (EX1031; EX1032; EX1068, p. 100, l. 19 to p. 103, l. 7; EX1125; EX1127; EX1178-1182; EX1191-1196; EX1198-1200; EX1204; EX1168 ¶ 25; EX1160 ¶ 42; Paper 1 at 4).

179. By the filing of that application on July 31, 2000, to which the USPTO associated application number 60/222,028, Espiau constructively reduced its invention to practice. (Paper 1 at 4).

180. David Turner reported for the Espiau inventors in his email to Catlett of August 1, "we developed ten variants on a higher frequency lamp waveguide design using the Alumina material available from Coorstek. We simulated and revised the designs using HFSS, and sent them to Don at DRI." (EX2161).

181. According to both copies of the August 2 quotation by Coorstek (with and without Kathy

Hilfer's handwritten amendments), the quotation responds to a July 27 fax. (EX1197; EX2138).

182. Like it's competitor Kyocera (EX1172), Coorstek responded to DRI's request for quotation in less than a week. (EX1197; EX2138).

183. Coorstek received Yian Chang's July 14, 2000 drawings on July 27 (EX2138; EX1197).

184. The July 27, 2000 fax to which Coorstek responded was from Don Wilson, after he made his notes on Matt Espiau's July 20 fax to him of Chang's drawings. (EX1180; EX2137; EX1197; EX2138; EX1168 ¶ 24).

185. From August 1, 2000 to August 13, 2000, Matt Espiau, Yian Chang and Chan Joshi worked on a waveguide puck, testing the Coorstek materials. (EX1027; EX1026; EX1025; EX1211).

186. On August 2, 2000, David Turner e-mailed Chan Joshi, Matt Espiau, Sheena Brougher and Don Wilson regarding update to schedule, and indicating focus on high frequency waveguide prototype design and demo. (EX1206).

187. Matt Espiau completed making alumina puck waveguide resonator using the Coorstek grinding samples, and actually reduced its invention of the Count to practice on the weekend of August 11-14, 2000. (EX1168 ¶¶ 27-28; EX1160 ¶¶ 43-44).

188. Exhibit 1211 is a narrated video of the Espiau reduction to practice, narrated by Matt Espiau. (EX1211).

189. Chang recorded this work and reduction to practice in his notebook. (EX1126).

190. The lamp tested on the weekend of August 11-14, 2000 had a waveguide body comprising a ceramic dielectric material, alumina, with waveguide outer surfaces. (EX1211; EX1126, pp. 51-53; EX1125, p. 140; EX1168 ¶ 28; EX1160 ¶¶ 43-44).

191. An RF feed was positioned in intimate contact with the dielectric body of the lamp tested on the weekend of August 11-14, 2000. (EX1211; EX1126, pp. 46-53; EX1125, pp. 130-140; EX1168 ¶¶ 27-28; EX1160 ¶¶ 43-44).

192. The lamp tested on the weekend of August 11-14, 2000, operated at the frequency and intensity preselected by Espiau and the frequency (2.45 GHz), intensity (125-135 Watts), body shape (cylinder) and dimensions (1.27 inches diameter) selected by Espiau such that the waveguide resonated in at least one resonant mode having at least one electric field maximum. (EX1211; EX1126, pp. 51-53; EX1125, p. 140)

193. The lamp tested on the weekend of August 11-14, 2000, had an enclosed cavity depending from one wall (the top) and a bulb in the cavity at the location of an electric field maximum during operation. (EX1211; EX1168 ¶ 28; EX1160 ¶ 44).

194. The lamp tested on the weekend of August 11-14, 2000, had a gas/metal halide fill so that when receiving energy from the resonating waveguide it formed light-emitting plasma. (EX1211; EX1168 ¶ 28; EX1160 ¶ 44).

195. Matt Espiau and Yian Chang measured the light output of the tested lamp, the power reflection, resonant frequency, and the Q quality factor. (EX1211; EX1126, pp. 51-53; EX1125, p. 140).

196. They confirmed that the lamp was operating as a dielectric resonant waveguide lamp. (EX1168 ¶ 28).

197. Espiau subsequently demonstrated the working resonant waveguide lamp to Mr. Catlett. Mr. Catlett did not suggest that DRI had ever made or tested such a lamp. (EX1168 ¶ 29).

198. In the present interference, Espiau has been granted the benefit for priority of the filing

date of Provisional Application No. 60/222,028, filed July 31, 2000 (Paper 1, page 4, lines 11-21).

199. The benefit to Espiau for priority of the filing date of Provisional Application No. 60/222,028 operates as constructive reduction to practice of the invention of the Count on its filing date of July 31, 2000.

200. The Espiau inventors were diligent in reducing their invention to practice both constructively and actually.

201. Espiau constructively reduced its invention to practice no later than July 31, 2000.

202. Espiau actually reduced the invention to practice on the weekend of August 11-14, 2000.

203. Espiau conceived the invention of the Count first, on April 14, 200, and diligently worked to reduce it to practice from that day until Espiau's constructive reduction to practice on July 31, 2000 and actual reduction to practice on August 12, 2000.

**Appendix 3.1**

| Comparison of the Count to the Conception by Espiau | |
|---|---|
| **Count** | **Conception by Espiau** |
| 109. A lamp comprising: | |
| (a) a waveguide having a body comprising a ceramic dielectric material of a preselected shape and preselected dimensions, the body having a first side determined by a first waveguide outer surface; | Page 8 of Joshi's notebook (EX1125) dated April 14 shows two cylindrical waveguides and a rectangular waveguide with a dielectric material with a preselected shape and dimensions (though numerical dimensions are not specified). Note that to one of ordinary skill in the art, discussion of a resonant waveguide requires that all three dimensions be preselected in relation to the resonant frequency to obtain the resonant condition. The waveguide body illustrated has a first side determined by a first waveguide outer surface. (EX1183 ¶ 23; EX1125, p. 8; EX1030 ¶¶ 8-14; EX1160 ¶¶ 10-13; EX1168 ¶¶ 8-9). |
| (b) a first feed positioned within and in intimate contact with the waveguide body, adapted to couple energy into the body from a source having an output and operating within at a preselected frequency and intensity, the feed connected to the source output, said frequency and intensity and said body shape and dimensions selected such that the body resonates in at least one resonant mode having at least one electric field maximum; | A feed is shown (indicated by the "100W" input port on the bottom of the waveguide body), positioned within and in intimate contact with the waveguide body. Its function is to couple energy into the body from a source having an output and operating at a preselected frequency and intensity, the feed connected to the source output. Together, the combination of the illustrated waveguide and the suggestion from Mr. Espiau of a resonant cavity indicate that the frequency, intensity, body shape and dimensions are selected such that the body resonates in at least one resonant mode. Because Dr. Joshi recorded Mr. Espiau's suggestion of a resonant cavity, the waveform illustrated on page 8 indicates that the resonant mode has at least one electric field maximum. Dr. Pobanz also recalls discussion of a feed ("e.g., probe or aperture") and "how it could be |

| | |
|---|---|
| | located in the resonator". The discussion included how to couple the feed to the microwave source, and suggestions of possible sources. Furthermore, as illustrated in Dr. Joshi's notebook, Dr. Pobanz recalls that "[i]t was noted that a full-wave resonator would provide two locations of field maxima, one of which would be used as the location of the plasma and the other used as the input port for exciting the resonator, whereas the half-wave resonator would have the advantage of smaller relative size" while providing only one electric field maximum. (EX1183 ¶ 23; EX1125, p. 8; EX1030 ¶¶ 8-14; EX1160 ¶¶ 10-13; EX1168 ¶¶ 8-9). |
| (c) an enclosed first cavity depending from said first surface into the waveguide body; and | The illustration on page 8 of EX1125 shows an open cavity in the top first surface of the waveguide body enclosed by the dielectric material and a cap on top. Dr. Pobanz also recalls that "boring a hole in the ceramic and capping it with a transparent lid such as a quartz disc" was discussed (EX1030 ¶ 11). (EX1183 ¶ 23; EX1125, p. 8; EX1030 ¶¶ 8-14; EX1160 ¶¶ 10-13; EX1168 ¶¶ 8-9). |
| (d) a first bulb positioned in the cavity at a location corresponding to an electric field maximum during operation, the bulb containing a gas-fill which when receiving energy from the resonating waveguide body forms a light-emitting plasma. | A first bulb is positioned in the cavity of (c), positioned at an electric field maximum during operation. The bulb contains a gas fill which forms a light-emitting plasma when receiving energy from the resonating waveguide. Dr. Pobanz corroborates locating the plasma at an electric field maximum during operation of various resonant modes "and also to get the light out" was discussed. (EX1183 ¶ 23; EX1125, p. 8; EX1030 ¶¶ 8-14; EX1160 ¶¶ 10-13; EX1168 ¶¶ 8-9). |

**Appendix 3.2**

| Comparison of the Count to Communication by Espiau to Guthrie | |
|---|---|
| **Count** | **Espiau Presentation of April 20, 2000** |
| 109. A lamp comprising: | |
| (a) a waveguide having a body comprising a ceramic dielectric material of a preselected shape and preselected dimensions, the body having a first side determined by a first waveguide outer surface; | Page 3 of EX1138 refers to a waveguide of rectangular or cylindrical form, with reference to ceramic dielectric material. The presentation would convey to one of ordinary skill in the art that the dimensions of the resonator would be selected to achieve resonance at the desired operating frequency. (EX1183 ¶ 25; EX1168 ¶ 11-12; 1138; 1137). |
| (b) a first feed positioned within and in intimate contact with the waveguide body, adapted to couple energy into the body from a source having an output and operating within at a preselected frequency and intensity, the feed connected to the source output, said frequency and intensity and said body shape and dimensions selected such that the body resonates in at least one resonant mode having at least one electric field maximum; | Pages 4 and 5 of EX1138 refer to antenna to waveguide coupling. One of ordinary skill would understand that the function of the antenna feed is to couple energy into the waveguide body from a source operating at a preselected (design) frequency. The dimensions of the waveguide are selected such that the body will resonate in at least one resonant mode. That a resonant device is being described can be ascertained from the material on pages 2 and 3 of EX1138. (EX1183 ¶ 25; EX1168 ¶ 11-12; 1138; 1137). |
| (c) an enclosed first cavity depending from said first surface into the waveguide body; and | Page 4 of EX1138 describes air breakdown between waveguide and plasma lamp as a possible issue, thus indicating that the plasma bulb is positioned inside the waveguide. (EX1183 ¶ 25; EX1168 ¶ 11-12; 1138; 1137). |

| | |
|---|---|
| (d) a first bulb positioned in the cavity at a location corresponding to an electric field maximum during operation, the bulb containing a gas-fill which when receiving energy from the resonating waveguide body forms a light-emitting plasma. | Page 3 of EX1138 refers to the use of TM waveguide modes to provide efficient coupling to the plasma bulb. It is known that TM waveguide modes have longitudinal electric field, which would provide maximum coupling to a plasma bulb located on the axis of the cylinder. This result applies to both rectangular and cylindrical waveguides. In addition, page 2 of Mr. Turner's notes of the April 20 meeting (EX1137) show a depiction of what appears to be a mode field plot with a maximum in the center, thus indicating that there was a discussion at this meeting of electric field maxima and its relevance to positioning the plasma bulb. These notes also show a sketch of a waveguide for which a bulb could only be positioned axially. (EX1183 ¶ 25; EX1168 ¶ 11-12; 1138; 1137). |

**Appendix 3.3**

| Comparison of the Count to the Actual Reduction to Practice By Espiau | |
|---|---|
| **Count** | **Espiau's Actual Reduction to Practice** |
| 109. A lamp comprising: | |
| (a) a waveguide having a body comprising a ceramic dielectric material of a preselected shape and preselected dimensions, the body having a first side determined by a first waveguide outer surface; | The lamp included a cylindrical waveguide body made of alumina ceramic dielectric material with dimensions 1.27 inches diameter by 0.82 inches height, and a side determined by its outer surface. (EX1211; EX1126, pp. 44-52; EX1125, pp. 121-142; EX1168 ¶¶ 27-28; EX1160 ¶ 44). |
| (b) a first feed positioned within and in intimate contact with the waveguide body, adapted to couple energy into the body from a source having an output and operating at a preselected frequency and intensity, the feed connected to the source output, said frequency and intensity and said body shape and dimensions selected such that the body resonates in at least one resonant mode having at least one electric field maximum; | The lamp included a feed positioned within and in intimate contact with the waveguide body that was adapted to couple energy into the body from a HP 8340A source. (EX1211; EX1126, pp. 46-51). The source had an output and operated at a frequency and intensity that Dr. Joshi, Mr. Espiau and Dr. Chang preselected based on their HFSS analysis and network analyzer studies. (EX1211; EX1126, pp. 44-52). The feed was connected to the source output, and the frequency and intensity and body shape and dimensions were selected such that the body resonated in a resonant mode having at least one electric field maximum. (EX1211; EX1126, pp. 44-52; EX1125, pp. 121-141; EX1127, pp. 8-9; EX1210; EX1168 ¶¶ 27-28; EX1160 ¶ 44). |
| (c) an enclosed first cavity depending from said first surface into the waveguide body; and | The lamp included a cavity depending from the top surface into the waveguide body that was enclosed. (EX1211; EX1126 pp. 44-52; EX1168 ¶¶ 27-28; EX1160 ¶ 44). |

| | |
|---|---|
| (d) a first bulb positioned in the cavity at a location corresponding to an electric field maximum during operation, the bulb containing a gas-fill which when receiving energy from the resonating waveguide body forms a light-emitting plasma. | The lamp included a bulb positioned in the cavity at a location corresponding to an electric field maximum during operation. (EX1211). The bulb contained a gas fill that received energy from the resonating waveguide body and formed a light-emitting plasma. (EX1211; EX1126, pp. 44-52; EX1125, pp. 121-142; EX1168 ¶¶ 27-28; EX1160 ¶ 44). |

**APPENDIX 4**

Diligence of Espiau

| Date | Event | Discussion In Brief |
|---|---|---|
| Friday, April 14, 2000 | Espiau/Joshi: conception of the invention. (*See* EX1125; EX1030).<br><br>Turner: draft of Tenco proposal to Develop a Plasma Lamp Exciter and Waveguide. (*See* EX2151). | p.6, line 4–p.9, line 11;<br>p.15, lines 19-22<br>p.16, lines 8-18 |
| Saturday, April 15, 2000 | Espiau/Joshi: performed work on waveguide and resonant cavity, sought vendor for ceramics. (*See* EX1125). | p.6, lines 4-8<br>p.15, lines 19-22 |
| Sunday, April 16, 2000 | Weekend | p.15, lines 19-22 |
| Monday, April 17, 2000 | Joshi: meeting in Irvine with Jim Legge, Don Wilson and Charles Guthrie of DRI, and generally discussed the integrated dielectric waveguide lamp concept. (*See* EX1125; EX1135). | p.16, lines 19-22 |
| Tuesday, April 18, 2000 | Joshi: preparation for a presentation. Inventor ideas regarding advantages of dielectric waveguide, dielectric waveguide design, problem issues, and poses "critical question" of whether DRI can supply bulbs on time for testing. (*See* EX1125). | p.17, lines 1-4 |
| Wednesday, April 19, 2000 | Joshi: review of three U.S. patents related to lamp technology, prepared slides for presentation. (*See* EX1125). | p.17, lines 1-4 |
| Thursday, April 20, 2000 | Joshi: all day meeting at DRI discussing dielectric resonator for plasma lamps and inductive coil prototype. (*See* EX1125).<br><br>Mullen/Chang/Joshi/Espiau: meeting with DRI. (*See* EX1137).<br><br>Espiau/Joshi: presentation of Dielectric | p.17, lines 1-20; |

| | | |
|---|---|---|
| | Resonator Concept for Plasma Lamps created for DRI by Espiau, Joshi and Turner. (*See* EX1138).<br><br>Mullen: e-mail regarding meeting with DRI. (*See* EX1139). | |
| Friday,<br>April 21, 2000 | Joshi: notes reflect Chang's participation. Espiau, Chang and Joshi discussed HFSS simulations, and coupling. (*See* EX1125). | p.17, line 21-22<br>p.18, line 1-3 |
| Saturday,<br>April 22, 2000 | Weekend | p.17, line 21-22<br>p.18, line 1-3 |
| Sunday,<br>April 23, 2000 | Joshi/Chang/Espiau: worked on HFSS set-up, and discussion of preliminary results with Espiau and Chang. (*See* EX1125).<br><br>Joshi: Technical Note. (*See* EX1152). | p.17, line 21-22<br>p.18, line 1-3 |
| Monday,<br>April 24, 2000 | Espiau/Joshi/Chang/Turner: notes from meeting with Guthrie and Wilson, discussing ceramic material and dimension requirements. (*See* EX1141).<br><br>Joshi: Technical Note. (*See* EX1152). | p.18, lines 4-16 |
| Tuesday,<br>April 25, 2000 | Mullen: email to Turner regarding property information and comparison of two different materials, titania and alumina. (*See* EX1143).<br><br>Joshi: submitted diagram of $TiO_2$ ceramic to Joining Tech Co. for technical assistance. (*See* EX1125).<br><br>Espiau/Joshi/Chang: awaiting materials requested from Guthrie and Wilson.<br><br>Joshi: Technical Note. (*See* EX1152). | p.17, lines 16-20<br>p.18, lines 7-18 |
| Wednesday,<br>April 26, 2000 | Joshi: microwave coupling and inductive heating for mounting sapphire window on ceramic lamp. (*See* EX1125).<br><br>Espiau/Joshi/Guthrie: drawing of Ceramic Test Sample. (*See* EX2154). | p.17, line 21-22<br>p.18, lines 7-18 |

| | | |
|---|---|---|
| | Joshi: e-mail pertaining to notes regarding Monday's meeting of brazing sapphire lens to ceramic lamp body, and suggesting course of action. (*See* EX2153).<br><br>Joshi: Technical Note. (*See* EX1152).<br><br>Espiau/Joshi/Chang: awaiting materials requested from Guthrie and Wilson. | |
| Thursday,<br>April 27, 2000 | Espiau/Joshi/Guthrie: drawing of Ceramic Test Sample. (*See* EX2061).<br><br>Chang/Espiau: plasma bulb testing. (EX1126).<br><br>Espiau/Guthrie: found more suitable amplifier than one located at DRI. (*See* EX1144).<br><br>Joshi: Technical Note. (*See* EX1152).<br><br>Espiau/Joshi/Chang: awaiting materials requested from Guthrie and Wilson. | p.18, lines 1,-2, 7-16<br>p.19, lines 1-5<br>p.17, line 21 – 22 |
| Friday,<br>April 28, 2000 | Joshi: performed work on the set-up for lamp testing.. (*See* EX1125).<br><br>Joshi: copied on email discussing DRI Plasma Lamp Schedule Update, with small change in duration of concept phase, and larger change in laser brazing system. (*See* EX2156).<br><br>Espiau/Joshi/Chang: awaiting materials requested from Guthrie and Wilson. | p.17, line 21-22<br>p.18, line 1-3, 8-16 |
| Saturday,<br>April 29, 2000 | Weekend | p.18, lines 8-16 |
| Sunday,<br>April 30, 2000 | Joshi/Espiau/Chang: Waveguide status meeting discussing design update, exciter structure and microwave sealing concept. (*See* EX1125). | p.17, line 21-22<br>p.18, line 1-3 |
| Monday,<br>May 1, 2000 | Joshi: work regarding temperature coefficient of high dielectric constant materials. (*See* EX1125; EX1219).<br><br>Espiau: meeting with Wilson and Guthrie, discussed technical aspects of selecting dielectric | p.17, line 21-22<br>p.18, line 1-22<br>p.19, lines 11-13, 19-22,<br>p.20, lines 1-3 |

| | | |
|---|---|---|
| | material, with consideration of temperature. (*See* EX1127).<br><br>Chang: worked on HFSS waveguide frequency. (EX1126).<br><br>Joshi: technical meeting with DRI, regarding ceramic seal and thermal gradient. (*See* EX1148).<br>Technical Note. (*See* EX1152).<br><br>Joshi/Espiau: e-mail to Joshi, Espiau, and Turner regarding plasma lamp geometry and drawing. (*See* EX1150; EX1151).<br><br>Espiau/Joshi/Chang: awaiting materials requested from Guthrie and Wilson. | |
| Tuesday,<br>May 2, 2000 | Joshi: worked on selection of waveguide materials. (*See* EX1125). | p.18, lines 4-16 |
| Wednesday,<br>May 3, 2000 | Weekend | p.18, lines 8-16 |
| Thursday,<br>May 4, 2000 | Chang: HFSS simulation, trying different geometries. (*See* EX1126; EX1219).<br><br>Joshi/Espiau: worked on inductive coil lamp testing. (*See* EX1156).<br><br>Espiau/Joshi/Chang: awaiting materials requested from Guthrie and Wilson. | p.17, line 21-22<br>p.18, line 1-3, 8-19<br>p.19, lines 11-13; 19-22,<br>p.20, lines 1-3 |
| Friday,<br>May 5, 2000 | Joshi: worked on wavelength, transmission at the antenna, and resonance. (*See* EX1125).<br><br>Chang/Espiau: testing of DRI lamp setup. (*See* EX1126; EX1127; EX1219).<br><br>Chang/Espiau: graphs with handwritten notes. (*See* EX1155).<br><br>Espiau/Joshi/Chang: awaiting materials requested from Guthrie and Wilson. | p.17, line 21-22<br>p.18, line 1-3, 8-16 |
| Saturday,<br>May 6, 2000 | Chang: HFSS simulation testing. (*See* EX1126; EX1219). | p.19, lines 11-13; 19-22,<br>p.20, lines 1-3 |

| | | |
|---|---|---|
| | Espiau/Joshi: received Turner e-mail regarding dielectric properties of TransTek materials. (*See* EX1157). | p.18, lines 4-16 |
| Sunday, May 7, 2000 | Joshi: work on microwave circuit and plasma. (*See* EX1125).<br><br>Chang: work on analytical equations for waveguide and cavities. (*See* EX1126; EX1219).<br><br>Espiau: meeting with Chang and Joshi, testing of lamp with Chang and Joshi. (*See* EX1127). | p.17, line 21-22<br>p.18, line 1-3 |
| Monday, May 8, 2000 | Joshi/Chang: work on single antenna coupling, and graphs related to frequency in cavity. (*See* EX1125; EX1152; EX1219).<br><br>Espiau: meeting with Chang and Joshi regarding science of cavity and equipment needs. (*See* EX1127).<br><br>Espiau/Joshi/Chang: awaiting materials requested from Guthrie and Wilson. | p.19, lines 11-13; 19-22,<br>p.20, lines 1-3<br>p.18, lines 8-16 |
| Tuesday, May 9, 2000 | Joshi/Chang: work on computer model related to plasma and cavity, and graphs related to frequency in cavity. (*See* EX1125; EX1152).<br><br>Joshi/Espiau/Chang/Turner/Wilson/Guthrie: meeting with DRI (Wilson, Guthrie), where Chang presented convincing HFSS simulations. Discussion regarding plasma modeling in HFSS, materials, alumina liner insert, setting up joint lab. (*See* EX1125; EX1159).<br><br>Espiau/Joshi/Chang: awaiting materials requested from Guthrie and Wilson. | p.19, lines 11-13; 19-22,<br>p.20, lines 1-3<br>p.18, lines 8-16 |
| Wednesday, May 10, 2000 | Joshi/Chang: evaluation of Chang's results for waveguide calculations (HFSS). Temperature profile in the dielectric, literature search for microwave plasma lighting. (*See* EX1125; EX1219).<br><br>Espiau/Joshi/Guthrie: drawing of Wave Guide | p.19, lines 11-13; 19-22,<br>p.20, lines 1-3<br>p.18, lines 7-16 |

| | | |
|---|---|---|
| | Lamp Concept 3. (*See* EX2062, EX2063).<br><br>Espiau/Joshi/Chang: awaiting materials requested from Guthrie and Wilson. | |
| Thursday, May 11, 2000 | Espiau/Joshi/Chang: awaiting materials requested from Guthrie and Wilson. | p.18, lines 8-16 |
| Friday, May 12, 2000 | Joshi: work on cavity dimensions. (*See* EX1125).<br><br>Chang: worked on plasma bulb testing, HFSS simulation and experiment in airwave cavity. (*See* EX1126; EX1219).<br><br>Joshi: e-mail from Turner regarding moving forward with arrangements previously discussed for plasma lamp development, with attached plasma lamp development plan. (*See* EX1161).<br><br>Espiau/Joshi/Chang: awaiting materials requested from Guthrie and Wilson. | p.17, line 21-22<br>p.18, line 1-3, 8-16<br>p.19, lines 11-13; 19-22,<br>p 20, lines 1-3 |
| Saturday, May 13, 2000 | Weekend | p.18, lines 8-16 |
| Sunday, May 14, 2000 | Weekend | p.18, lines 8-16 |
| Monday, May 15, 2000 | Chang: notes on waveguide design drawings using AutoCAD. (*See* EX1126; EX1219). Presentation titled "Plasma Lamp Exciter and Waveguide Development – Conceptual Design" – Discussion Draft. (*See* EX2065).<br><br>Espiau: Meeting with DRI. (*See* EX1127).<br><br>Espiau/Joshi/Chang: awaiting materials requested from Guthrie and Wilson. | p.20, lines 1-6<br>p.18, lines 8-16 |
| Tuesday, May 16, 2000 | Espiau/Joshi: Drawing of Waveguide concept 3 with Heat Sink. (*See* EX2064).<br><br>Espiau/Joshi/Chang: awaiting materials requested from Guthrie and Wilson. | p.18, lines 7-16 |
| Wednesday, | Joshi: worked on obtaining suppliers of resonator | p.18, lines 4-16 |

| | | |
|---|---|---|
| May 17, 2000 | material. (*See* EX1125).<br><br>Espiau/Joshi/Chang: awaiting materials requested from Guthrie and Wilson. | |
| Thursday,<br>May 18, 2000 | Joshi/Espiau: received concept design presentation from Turner. (*See* EX2069).<br><br>Espiau/Joshi/Chang: awaiting materials requested from Guthrie and Wilson. | p.19, lines 6-13<br>p.18, lines 8-16 |
| Friday,<br>May 19, 2000 | Joshi status report on dielectric resonator material from various companies. (*See* EX1125).<br><br>Chang: notes from meeting with Joshi, Espiau and Turner. (*See* EX1126; EX1219).<br><br>Espiau: received quote from Channel Microwave Corporation for Coaxial Circulators. (*See* EX1162).<br><br>Espiau/Joshi/Chang: awaiting materials requested from Guthrie and Wilson. | p.18, lines 4-16<br>p.19, lines 6-13 |
| Saturday,<br>May 20, 2000 | Weekend | p.18, lines 4-16 |
| Sunday,<br>May 21, 2000 | Joshi: work related to cylindrical waveguide, and material procurement. (*See* EX1125).<br><br>Espiau: science meeting with Joshi and Chang. (*See* EX1127). | p.18, lines 1-16<br>p.19, lines 11-13; 19-22,<br>p 20, lines 1-3 |
| Monday,<br>May 22, 2000 | Joshi: notes related to meeting with DRI for conception design review. (*See* EX1125; EX2070).<br><br>Chang: notes reflecting HFSS simulation. (*See* EX1126; EX1219).<br><br>Espiau/Joshi/Chang: awaiting materials requested from Guthrie and Wilson. | p.20, lines 1-3, 8-13<br>p.19, lines 11-13; 19-22,<br>p.18, lines 8-16 |
| Tuesday,<br>May 23, 2000 | Joshi: notes reflect contacting ceramic companies for materials. (*See* EX1125).<br><br>Espiau: development meeting with Chang and | p.18, lines 1-2, 8-22<br>p.19, lines 1-13, 19-22<br>p.17, line 21-22 |

| | | |
|---|---|---|
| | Joshi. (*See* EX1127).<br><br>Chang: notes reflecting HFSS simulation. (*See* EX1126; EX1219).<br><br>Espiau/Joshi/Chang: awaiting materials requested from Guthrie and Wilson. | |
| Wednesday, May 24, 2000 | Chang: notes reflecting HFSS simulation, attempting a cylindrical cavity design. (*See* EX1126; EX1219).<br><br>Espiau/Joshi/Chang: awaiting materials requested from Guthrie and Wilson. | p.19, lines 11-13; 19-22, p. 20, lines 1-3<br>p.18, lines 8-16 |
| Thursday, May 25, 2000 | Espiau: notes regarding ordering of parts to produce lamp. (*See* EX1127).<br><br>Joshi: notes regarding observations of results from rectangular design in HFSS simulations. (*See* EX1125).<br><br>Chang: notes reflecting HFSS simulation. (*See* EX1126; EX1219).<br><br>Espiau/Joshi/Chang: awaiting materials requested from Guthrie and Wilson. | p.18, lines 4-16<br>p.19, lines 11-13; 19-22, p. 20, lines 1-3 |
| Friday, May 26, 2000 | Joshi: notes regarding idea for optimizing antenna coupling for steady state plasma. (*See* EX1125).<br><br>Chang: notes reflecting HFSS simulation. (*See* EX1126; EX1219).<br><br>Espiau/Joshi/Chang: awaiting materials requested from Guthrie and Wilson. | p.17, line 21-22<br>p.18, line 1-3, 8-16<br>p.19, lines 11-13; 19-22, p. 20, lines 1-3 |
| Saturday, May 27, 2000 | Weekend | p.18, lines 8-16 |
| Sunday, May 28, 2000 | Weekend | p.18, lines 8-16 |
| Monday, May 29, 2000 | Memorial Day Holiday | p.18, lines 8-16 |
| Tuesday, May 30, 2000 | Espiau/Joshi/Chang: awaiting materials requested from Guthrie and Wilson. | p.18, lines 8-16 |

| | | |
|---|---|---|
| Wednesday,<br>May 31, 2000 | Turner: Meeting with realtor for joint lab. (*See* EX2193).<br><br>Espiau/Joshi/Chang: awaiting materials requested from Guthrie and Wilson. | p.19, lines 6-13<br>p.18, lines 8-16 |
| Thursday,<br>June 1, 2000 | Espiau/Joshi/Chang: awaiting materials requested from Guthrie and Wilson.<br><br>Chang: HFSS simulation with reduced dielectric constant and re-optimization. (*See* EX1126; EX1177). | p.18, lines 8-16<br>p.19, lines 11-13; 19-22,<br>p. 20, lines 1-3 |
| Friday,<br>June 2, 2000 | Espiau/Joshi/Chang: regular meeting. (*See* EX2195; EX1177).<br><br>Espiau/Joshi/Chang: awaiting materials requested from Guthrie and Wilson. | p.19, lines 11-13; 19-22,<br>p. 20, lines 1-3<br>p.18, lines 8-16 |
| Saturday,<br>June 3, 2000 | Weekend | p.18, lines 8-16 |
| Sunday,<br>June 4, 2000 | Weekend | p.18, lines 8-16 |
| Monday,<br>June 5, 2000 | Espiau: meeting with Chang. (*See* EX1127). | p.19, lines 11-13; 19-22,<br>p. 20, lines 1-3 |
| Tuesday,<br>June 6, 2000 | Chang/Joshi: Joshi drawing of rectangular waveguide and for a circular puck. (*See* EX1166).<br><br>Joshi: notes regarding receipt of samples from Kyocera, and subsequent testing on samples. (*See* EX1125).<br><br>Joshi/Wilson: request quote from Kyocera. (*See* EX1172).<br><br>Espiau: meeting with Joshi. (*See* EX1127). | p.20, lines 3-10 |
| Wednesday,<br>June 7, 2000 | Espiau: notes regarding Tuesday meeting, discussed product in general terms. (*See* EX1127).<br><br>Espiau/Joshi/Chang: awaiting quote from Kyocera. | p.20, lines 3-15 |

| | | |
|---|---|---|
| Thursday,<br>June 8, 2000 | Chang: notes regarding rectangular shaped waveguide. (*See* EX1126; EX1177).<br><br>Espiau: notes regarding meeting with Don and Guthrie where received dielectric material. Tested dielectric material. (*See* EX1127).<br><br>Espiau/Joshi/Chang: e-mail from Turner discussing first dielectric donut test. (*See* EX1165).<br><br>Espiau/Joshi/Chang: awaiting quote from Kyocera. | p.20, lines 8-15<br>p.19, line 19 - p.20, line 2 |
| Friday,<br>June 9, 2000 | Joshi/Espiau/Guthrie: received draft material specification. (*See* EX1167).<br><br>Joshi: received materials quote from Kyocera. (See EX1168).<br><br>Espiau: notes regarding testing of the chamber to be used for argon testing (*See* EX1127). | p.18, lines 4-16<br>p.19, line 19 - p.20, line 2<br>p.20, lines 8-10 |
| Saturday,<br>June 10, 2000 | Espiau: analysis of results from the airline tests. (*See* EX1127). | p.20, lines 8-10 |
| Sunday,<br>June 11, 2000 | Chang: measurement of dimensions and donut experiment. (*See* EX1126; EX1177). | p.20, lines 8-10 |
| Monday,<br>June 12, 2000 | Espiau: notes regarding the coatings for the dielectric puck. (*See* EX1127). | p.20, lines 8-10 |
| Tuesday,<br>June 13, 2000 | Espiau: met with attorney T. Maceiko to discuss patent. (*See* EX1127). | p.21, lines 18-22 |
| Wednesday,<br>June 14, 2000 | Espiau: notes regarding the coatings for the dielectric puck. (*See* EX1127). | p.19, 19-22,<br>p. 20, lines 1-2, 8-10 |
| Thursday,<br>June 15, 2000 | Espiau: notes regarding the coatings for the dielectric puck, possibly using gold. (*See* EX1127).<br><br>Chang: notes reflecting HFSS simulation, with received disks. (*See* EX1126; EX1177). | p.19, lines 19-22<br>p.20, lines 1-2, 8-10 |

| | | |
|---|---|---|
| Friday,<br>June 16, 2000 | Espiau: notes reflecting meeting with Wilson and Guthrie discussion the plating and regarding testing of dielectric at temperature. (*See* EX1127). | p.19, lines 19-22<br>p.20, lines 1-2, 8-10 |
| Saturday,<br>June 17, 2000 | Weekend | p.19, line 19-22<br>p.20, line 1-2, 8-10 |
| Sunday,<br>June 18, 2000 | Joshi: notes regarding optimization of antenna coupling for steady-state operation. (*See* EX1125). | p.19, lines 19-22<br>p.20, lines 1-2, 8-10 |
| Monday,<br>June 19, 2000 | Espiau: set up air waveguide resonator experiment. (*See* EX1127).<br><br>Joshi: notes regarding failure analysis of lamps, and notes regarding collisional damping of R.F. by plasma. (*See* EX1125). | p.19, lines 19-22<br>p.20, lines 1-2, 8-10 |
| Tuesday,<br>June 20, 2000 | Chang: notes regarding air waveguide resonator experiment. (*See* EX1126; EX1177).<br><br>Espiau/Chang: met with Wilson and Guthrie and did a demonstrating on the lamp and recorded with video tape recorder. (*See* EX1127). | p.19, lines 19-22<br>p.20, lines 1-2, 8-10 |
| Wednesday,<br>June 21, 2000 | Espiau/Joshi/Turner: DRI meeting with Wayne Catlett. (*See* EX1127; EX1171). | p.19, lines 19-22<br>p.20, lines 1-2, 8-10 |
| Thursday,<br>June 22, 2000 | Joshi: Turner requesting issue of June 9, 2000 Purchase Order to Kyocera. (*See* EX1172).<br><br>Joshi: notes reflecting measurements taken by Joshi and Espiau regarding optimization of coupling to the plasma bulb. (*See* EX1125).<br><br>Chang: notes regarding air waveguide resonator experiment. (*See* EX1126; EX1177).<br><br>Espiau: notes regarding working with lamp and optimized coupling. (*See* EX1127). | p.18, lines 4-16<br>p.19, lines 19-22<br>p.20, lines 1-2, 8-10 |
| Friday,<br>June 23, 2000 | Espiau/Joshi: Joshi drawing of Dielectric slab (*See* EX1173).<br><br>Joshi/Chang: notes regarding physical | p.19, lines 19-22<br>p.20, lines 1-2, 8-15 |

| | | |
|---|---|---|
| | characteristic of bulb used in lamp. (*See* EX1125).<br><br><u>Chang</u>: notes regarding air waveguide resonator experiment. (*See* EX1126; 1177).<br><br><u>Espiau/Joshi/Chang</u>: awaiting materials from Kyocera. | |
| Saturday,<br>June 24, 2000 | Weekend | p.19, lines 19-22<br>p.20, lines 1-2, 8-15 |
| Sunday,<br>June 25, 2000 | Weekend | p.19, lines 19-22<br>p.20, lines 1-2, 8-15 |
| Monday,<br>June 26, 2000 | <u>Espiau</u>: meeting with Joshi. (*See* EX1127).<br><br><u>Joshi</u>: notes regarding placement of Kyocera order, material properties, and evaluation of patents of electrodeless lamp. (*See* EX1125).<br><br><u>Joshi</u>: E-mail from Turner providing waveguide status update, including experiments regarding resonant cavity, material samples and experiments, and a scheduled meeting at UCLA on Tuesday. (*See* EX2196).<br><br><u>Joshi</u>: Work on draft of patent. (*See* EX1031; EX1032; EX1068, p.100, 1.19 to p.103.1).<br><br><u>Chang</u>: air waveguide experiment. (*See* EX1126; EX1177).<br><br><u>Espiau/Joshi/Chang</u>: awaiting materials from Kyocera. | p.19, lines 19-22<br>p.20, lines 1-2, 8-15 |
| Tuesday,<br>June 27, 2000 | <u>Espiau</u>: meeting with Charles and Don. (*See* EX1127).<br><br><u>Joshi</u>: notes regarding testing on sample of dielectric rod from Superior Ceramics. (*See* EX1125).<br><br><u>Chang</u>: air waveguide experiment. (*See* EX1126; EX1177). | p.19, lines 19-22<br>p.20, lines 1-2, 8-15 |

| | | |
|---|---|---|
| | Espiau/Joshi/Chang: waveguide meeting at UCLA, action items issued. (*See* EX2157).<br><br>Joshi: work on draft of patent. (*See* EX1031; EX1032; EX1068, p.100, 1.19 to p.103.1).<br><br>Espiau/Joshi/Chang: awaiting materials from Kyocera. | |
| Wednesday, June 28, 2000 | Joshi: notes regarding specifications of dielectric materials. (*See* EX1125).<br><br>Espiau/Joshi/Chang: Waveguide meeting at UCLA, action items issued. (*See* EX2157).<br><br>Espiau/Turner: purchase order placed for alumina pieces. (*See* EX1175). Measure of the cavity formed by a high dielectric ceramic. (*See* EX1127).<br><br>Joshi: work on draft of patent. (*See* EX1031; EX1032; EX1068, p.100, 1.19 to p.103.1).<br><br>Chang: notes regarding HFSS simulation. (*See* EX1126; 1177).<br><br>Espiau/Joshi/Chang: awaiting materials from Kyocera. | p.19, lines 19-22<br>p.20, lines 1-2, 8-15 |
| Thursday, June 29, 2000 | Espiau: notes regarding concept proposal. (*See* EX1127).<br><br>Joshi: notes regarding measurements of characteristics of Superior sample. (*See* EX1125). Work on draft of patent. (*See* EX1031; EX1032; EX1068, p.100, 1.19 to p.103.1).<br><br>Espiau: three phase service on circuits. (*See* EX 1176).<br><br>Chang: notes regarding HFSS Simulation. (*See* EX1126; EX1177).<br><br>Espiau/Joshi/Chang: awaiting materials from | p.19, lines 19-22<br>p.20, lines 1-2, 8-15<br>p.21, lines 18-22 |

| | | |
|---|---|---|
| | Kyocera. | |
| Friday,<br>June 30, 2000 | Joshi: notes regarding use of a thin later of alumina to protect BaTiO2 material from thermal stress. (*See* EX1125). Work on draft of patent. (*See* EX1031; EX1032; EX1068, p.100, 1.19 to p.103.1).<br><br>Espiau/Joshi/Chang: awaiting materials from Kyocera. | p.19, lines 19-22<br>p.20, lines 1-2, 8-15<br>p.21, lines 18-22 |
| Saturday,<br>July 1, 2000 | Chang: work on waveguide. (*See* EX1126; EX1204). | p.19, lines 19-22<br>p.20, lines 1-2, 8-15 |
| Sunday,<br>July 2, 2000 | Weekend | p.19, lines 19-22<br>p.20, lines 1-2, 8-15 |
| Monday,<br>July 3, 2000 | Fourth of July Holiday | p.19, lines 19-22<br>p.20, lines 1-2, 8-15 |
| Tuesday,<br>July 4, 2000 | Fourth of July Holiday;<br>Chang: work on waveguide. (*See* EX1126; EX1204). | p.19, lines 19-22<br>p.20, lines 1-2, 8-15 |
| Wednesday,<br>July 5, 2000 | Espiau/Chang/Joshi: science meeting, business meeting, testing of invention. (*See* EX1127).<br><br>Joshi: notes regarding efficiency and results of airwave test. (*See* EX1125).<br><br>Espiau/Joshi/Chang: meeting to discuss the waveguide project, including efficiency of electrical power, materials and testing plan. (*See* EX2158).<br><br>Joshi: work on draft of patent. (*See* EX1031; EX1032; EX1068, p.100, 1.19 to p.103.1).<br><br>Espiau/Joshi/Chang: awaiting materials from Kyocera. | p.19, line 19-22<br>p.20, line 1-2, 8-15<br>p.21, lines 18-22 |
| Thursday,<br>July 6, 2000 | Joshi: alumina testing. (*See* EX1125). Work on draft of patent. (*See* EX1032).<br><br>Chang: work on waveguide. (*See* EX1126; | p.19, lines 19-22<br>p.20, lines 1-2, 8-15<br>p.21, lines 18-22 |

| | | |
|---|---|---|
| | EX1204).<br><br>Espiau/Joshi/Chang: awaiting materials from Kyocera. | |
| Friday,<br>July 7, 2000 | Joshi: notes regarding alumina testing. (*See* EX1125).<br><br>Joshi: work on draft of patent. (*See* EX1031; EX1032; EX1068, p.100, 1.19 to p.103.1).<br><br>Chang: work on waveguide. (*See* EX1126; EX1204).<br><br>Espiau/Joshi/Chang: awaiting materials from Kyocera. | p.19, lines 19-22<br>p.20, lines 1-2, 8-15<br>p.21, lines 18-22 |
| Saturday,<br>July 8, 2000 | Chang: work on waveguide. (*See* EX1126; 1204). | p.19, lines 19-22<br>p.20, lines 1-2, 8-15 |
| Sunday,<br>July 9, 2000 | Espiau/Joshi/Wilson: arrived in Colorado to meet with Coors. (*See* EX1125; EX1127; EX2160).<br><br>Chang: work on lamp system. (*See* EX1126; EX2104).<br><br>Espiau/Joshi/Chang: awaiting materials from Kyocera. | p.20, lines 19-22,<br>p.21, lines 1-5 |
| Monday,<br>July 10, 2000 | Espiau/Joshi/Wilson: visit to material suppliers. (*See* EX2160; EX1125; EX1127).<br><br>Chang: work on lamp system. (*See* EX1126; EX1204).<br><br>Espiau/Joshi/Chang: awaiting materials from Kyocera. | p.20, lines 19-22,<br>p.21, lines 1-5 |
| Tuesday,<br>July 11, 2000 | Espiau/Joshi/Wilson: visit to material suppliers. (*See* EX2160, EX1127).<br><br>Joshi: draft of patent on Integrated Lamp – Waveguide Concept. (*See* EX1032; EX1178).<br><br>Chang: work on lamp system. (*See* EX1126; | p.20, lines 19-22,<br>p.21, lines 1-5 |

| | | |
|---|---|---|
| | EX1204).<br><br>Joshi: integrated Lamp Waveguide Concept papers received from N. Simon. (*See* EX1032).<br><br>Espiau/Joshi/Chang: awaiting materials from Kyocera. | |
| Wednesday, July 12, 2000 | Espiau/Joshi/Wilson: visit to material suppliers. (*See* EX2160, EX1125).<br><br>Espiau/Joshi/Chang: awaiting materials from Kyocera. | p.20, lines 19-22, p.21, lines 1-5 |
| Thursday, July 13, 2000 | Travel regarding visit to material vendors.<br><br>Espiau/Joshi/Chang: circulated patent draft for review by inventors. (*See* EX1178, EX1179).<br><br>Espiau/Joshi/Chang: awaiting materials from Kyocera. | p.20, lines 19-22, p.21, lines 1-5 |
| Friday, July 14, 2000 | Chang: Drawings of IPLDWC drawings. (*See* EX1180).<br><br>Joshi: notes regarding results of airwave test set-up. (*See* EX1125).<br><br>Espiau/Joshi/Chang: awaiting materials from Kyocera. | p.21, lines 6-12<br><br>p.19, lines 19-22<br>p.20, lines 1-2, 8-15 |
| Saturday, July 15, 2000 | Chang: work on waveguide. (*See* EX1126; EX1204). | p.21, lines 6-12 |
| Sunday, July 16, 2000 | Joshi: notes reflecting review of patent disclosure and provided drawings to Chang. (*See* EX1125; EX1181).<br><br>Chang: work on waveguide. (*See* EX1126; EX1204).<br><br>Espiau/Joshi/Chang: worked on patent application. (*See* EX1182). | p.21, lines 6-12, 18-22<br>p.19, lines 19-22<br>p.20, lines 1-2, 8-15 |
| Monday, July 17, 2000 | Espiau/Joshi/Mullen/Joshi: e-mail discussing visits to vendors for ceramic materials, and conclusions resulting from such visits (*See* | p.19, lines 19-22<br>p.20, lines 1-2, 8-15 |

| | | |
|---|---|---|
| | EX2160; EX1125).<br><br>Espiau: repaired lamps and continued to work with lamp. (*See* EX1127).<br><br>Espiau/Joshi/Chang: awaiting materials from Kyocera. | |
| Tuesday,<br>July 18, 2000 | Espiau/Joshi/Chang: work on other projects. | p.19, lines 19-22<br>p.20, lines 1-2, 8-15 |
| Wednesday,<br>July 19, 2000 | Espiau: meeting with Joshi and Chang. (*See* EX1127).<br><br>Espiau/Joshi/Chang: awaiting materials from Kyocera. | p.19, lines 19-22<br>p.20, lines 1-2, 8-15 |
| Thursday,<br>July 20, 2000 | Espiau/Joshi/Guthrie: procurement Control Drawing of Ceramic Housing. (*See* EX2048).<br><br>Espiau/Joshi/Chang: awaiting materials from Kyocera. | p.19, lines 19-22<br>p.20, lines 1-2, 8-15 |
| Friday,<br>July 21, 2000 | Joshi: notes regarding previously issued patents. (*See* EX1125).<br><br>Joshi: awaiting quote from Coorstek. (*See* EX1197). | p.21, lines 18-22 |
| Saturday,<br>July 22, 2000 | Chang: work on patent application. (*See* EX1204). | p.21, lines 18-22 |
| Sunday,<br>July 23, 2000 | Chang: notes regarding HFSS simulation for Transtek, and optimization of dimensions. (*See* EX1126; EX1204). | p.19, lines 11-13; 19-22,<br>p. 20, lines 1-3 |
| Monday,<br>July 24, 2000 | Espiau: meeting with Joshi and Chang. (*See* EX1127).<br><br>Espiau/Chang/Joshi: work on waveguide patent. (*See* EX1191; EX1192; EX1204).<br><br>Chang: work on waveguide. (*See* EX1204).<br><br>Joshi: awaiting quote from Coorstek. (*See* EX1197). | p.19, lines 19-22<br>p.20, lines 1-2, 8-15<br>p.21, lines 18-22 |

| | | |
|---|---|---|
| Tuesday,<br>July 25, 2000 | Joshi: notes regarding quotation from Spectrum Control regarding rectangular waveguides, and notes regarding making a prototype. (*See* EX1125).<br><br>Espiau/Chang/Joshi: work on waveguide patent and drawings. (*See* EX1193; EX1194; EX1204).<br><br>Chang: work on waveguide. (*See* EX1204).<br><br>Joshi: awaiting quote from Coorstek. (*See* EX1197). | p.19, lines 19-22<br>p.20, lines 1-2, 8-15<br>p.21, lines 18-22 |
| Wednesday,<br>July 26, 2000 | Espiau/Chang/Turner: meeting and work on waveguide patent. (*See* EX1195; EX1196).<br><br>Espiau/Chang: meeting and work on waveguide patent. (*See* EX1195).<br><br>Chang: notes regarding HFSS simulation for Transtek, and optimization of dimensions. (*See* EX1126).<br><br>Joshi: awaiting quote from Coorstek. (*See* EX1197). | p.19, lines 19-22<br>p.20, lines 1-2, 8-15<br>p.21, lines 18-22 |
| Thursday,<br>July 27, 2000 | Joshi: Wilson submits request for quote from Coorstek. (*See* EX1197).<br><br>Joshi: notes regarding search for materials that are thermal shock resistant. (*See* EX1125)<br><br>Espiau/Chang/Joshi: drawings added to waveguide patent. (*See* EX1198).<br><br>Chang: notes regarding HFSS simulation for Transtek, and optimization of dimensions. (*See* EX1126).<br><br>Chang: work on patent. (*See* EX1204). | p.19, lines 19-22<br>p.20, lines 1-2, 8-15<br>p.21, lines 18-22 |
| Friday,<br>July 28, 2000 | Joshi: Awaiting quote from Coorstek. (*See* EX1197).<br><br>Espiau/Chang/Joshi: work on waveguide patent. | p.19, lines 19-22<br>p.20, lines 1-2, 8-15<br>p.21, lines 18-22 |

| | | |
|---|---|---|
| | (*See* EX1199). | |
| Saturday,<br>July 29, 2000 | Joshi: awaiting quote from Coorstek. (*See* EX1197)<br><br>Espiau: notes regarding meeting with the Board, discussed proceeding with provisional patent. (*See* EX1127). | p.19, lines 19-22<br>p.20, lines 1-2, 8-15<br>p.21, lines 18-22 |
| Sunday,<br>July 30, 2000 | Joshi: awaiting quote from Coorstek. (*See* EX1197).<br><br>Espiau/Chang/Joshi: work on waveguide patent. (*See* EX1198; EX1199; EX1200; EX1204) | p.19, lines 19-22<br>p.20, lines 1-2, 8-15<br>p.21, lines 18-22 |
| Monday,<br>July 31, 2000 | Joshi: awaiting quote from Coorstek. (*See* EX1197).<br><br>Notes regarding heat testing of Coorstek materials. (*See* EX1125).<br><br>Joshi/Chang: e-mail from Joshi regarding week's progress report, noting that Luxim now has thermally tested materials. (*See* EX1202).<br><br>Espiau: notes regarding revisions to provisional patents, discussed with Don and Charlie regarding waveguide. (*See* EX1127).<br><br>Espiau/Chang/Joshi: filed provisional patent application. (*See* EX1012). | p.19, lines 19-22<br>p.20, lines 1-2, 8-15<br>p.21, lines 18-22 |
| Tuesday,<br>August 1, 2000 | Joshi: awaiting quote from Coorstek. (*See* EX1197). | p.20, lines 8-15<br>p.22, lines 1-22,<br>p.23, lines 1-5 |
| Wednesday,<br>August 2, 2000 | Joshi/Espiau: copied on email to Sheena and Wilson from Turner regarding update to schedule, and indicating focus on high frequency waveguide prototype design and demo. (*See* EX1206).<br><br>Joshi: received quote from Coorstek. (*See* EX1197).<br><br>Espiau: meeting with Joshi and Chang. (*See* | p.20, lines 8-15<br>p.22, lines 1-22,<br>p.23, lines 1-5 |

| | | |
|---|---|---|
| | EX1127). | |
| Thursday,<br>August 3, 2000 | Espiau/Joshi: meeting between inventors. (*See* EX1127). | p.22, lines 1-22,<br>p.23, lines 1-5 |
| Friday,<br>August 4, 2000 | Espiau: notes reflect meeting. (*See* EX1127). | p.22, lines 1-22,<br>p.23, lines 1-5<br>p.27, lines 8-11 |
| Saturday,<br>August 5 ,2000 | Weekend | p.22, lines 1-22,<br>p.23, lines 1-5 |
| Sunday,<br>August 6, 2000 | Weekend | p.22, lines 1-22,<br>p.23, lines 1-5 |
| Monday,<br>August 7, 2000 | Espiau: worked on waveguide. (*See* EX1127). | p.22, lines1-22,<br>p.23, lines1-5 |
| Tuesday,<br>August 8, 2000 | Espiau/Joshi: meeting notes from meeting with Joshi, Turner, Espiau, Guthrie regarding review of samples and new samples. (*See* EX1209).<br><br>Chang: notes regarding HFSS simulation using alumina puck. (*See* EX1126).<br><br>Espiau: notes regarding work on waveguide and puck. (*See* EX1127).<br><br>Joshi: notes regarding alumina puck and testing of puck. (*See* EX1125) | p.22, lines 1-22,<br>p.23, lines 1-5 |
| Wednesday,<br>August 9, 2000 | Espiau: notes regarding work on waveguide. (*See* EX1127).<br><br>Joshi: notes regarding issues related to alumina puck and appropriate resonance frequency. (*See* EX1125). | p.22, lines 1-22,<br>p.23, lines 1-5 |
| Thursday,<br>August 10, 2000 | Espiau: notes regarding work with Chang on coupling issues. (*See* EX1127).<br><br>Joshi: notes regarding testing of material and thermal stability. (*See* EX1125). | p.22, lines 1-22,<br>p.23, lines 1-5 |
| Friday,<br>August 11, 2000 | Espiau: notes regarding testing and fabrication on new pucks. (*See* EX1127). | p.22, lines 1-22,<br>p.23, lines 1-5 |

| | | |
|---|---|---|
| | Joshi: notes regarding new method of coupling the feed, and results from testing. Further testing of material from Coorstek. (*See* EX1125).<br><br>Espiau/Joshi/Chang/Turner: Video of lighting. (*See* EX1211). | |
| Saturday,<br>August 12, 2000 | Espiau/Chang: notes regarding lighting of lamp. (*See* EX1210).<br><br>Video of lighting – Ex. 1211. | p.22, lines 1-22,<br>p.23, lines 1-5 |
| Sunday,<br>August 13, 2000 | Espiau: Notes reflecting actual reduction to practice. (*See* EX1127).<br><br>Espiau/Joshi/Chang/Turner: Video of lighting. (*See* EX1211). | p.22, lines 1-22,<br>p.23, lines 1-5 |

# EXHIBIT O

Mail Stop Interference
P.O. Box 1450
Alexandria Va 22313-1450
Tel: 571-272-4683
Fax: 571-273-0042

Paper: 254
Filed February 7, 2008

UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES

CHARLES **GUTHRIE**, EDMUND SANDBERG,
DONALD WILSON, GREGORY PRIOR, and DAVID SMOLER
Junior Party
(Application 09/818,092),

v.

FREDERICK M. **ESPIAU**, CHANDRASHEKHAR J. JOSHI,
and YIAN CHANG
Senior Party
(Patent 6,737,809).

---

Patent Interference No. 105,393 (SCM)
(Technology Center 2800)

**RECORD OF ORAL HEARING**
**Hearing Held: January 7, 2008**

Before JAMESON LEE, SALLY C. MEDLEY, and JAMES T. MOORE, *Administrative Patent Judges.*

The above-entitled matter came on for hearing on Monday, January 7, 2008, commencing at 1:00 p.m., at The United States Patent and Trademark Office, 600 Dulany Street, Alexandria, Virginia, before Timothy J. Atkinson, Reporter.

APPEARANCES

ON BEHALF OF GUTHRIE:

NICOLA A. PISANO
12265 El Camino Real, Suite 200
San Diego, CA 92130

ON BEHALF OF ESPIAU:

ROBERT MORGAN
DAVID A. BERGAN
1211 Avenue of the Americas
New York, NY 10036-8704
212-596-9064

RICHARD A. NEIFELD, PhD
4813-B Eisenhower Avenue
Alexandria, VA 22304
703-415-0012 EXT. 21

P R O C E E D I N G S

JUDGE MEDLEY: -- Junior Party case, an interference 105,393. Now each side has a total of 20 minutes. You can reserve up to five minutes rebuttal time if you'd like. At this time, I'd like counsel to please introduce yourselves and whom you have brought with you; starting with the junior party.

MR. PISANO: Good morning -- good afternoon, Your Honor. Nick Pisano, Jones Day, on behalf of Ceravision (phonetic sp.) and to the assignee for Junior Party Guthrie, et al. And, today, I have with me the Chairman of Ceravision; Mr. Dan Murphy.

MR. MORGAN: Robert Morgan, Ropes & Gray, on behalf of Espiau and Mr. Neifeld is here today. Also here today is Mr. Espiau;

Matthew Espiau. Next to him is Professor Chan Joshi; the two patentees. And, next to him is Mr. Terry Carney (phonetic sp.) who is outside general counsel for Luxim (phonetic sp.), the real party of interest, Wilson Sonsini (phonetic sp.).

JUDGE MEDLEY: Okay, and who, who else? This gentleman, is he with you too?

MR. MORGAN: This gentleman -- this is the associate in my firm I'm working with.

MR. BERGAN: David Bergan.

MR. MORGAN: I apologize, Mr. Bergan.

JUDGE MEDLEY: And we have some members of the public back here.

MR. PISANO: Yes.

JUDGE MEDLEY: Okay. And, we also have Kristen Mullen with us. She's a patent attorney at the Board. Okay, Junior Party we'd like to begin. Would you like to reserve rebuttal time five minutes?

MR. PISANO: Yes, Your Honor, I would. To start I'd like to hand out some Exhibit Books we exchanged with opposing counsel. May I approach?

JUDGE MOORE: These have been served; right?

MR. PISANO: Yes.

JUDGE MEDLEY: Yes. Do you have one for the record?

MR. PISANO: Yes, I do. This one can be for the record.

JUDGE MEDLEY: Can I have the one for the record or --

MR. PISANO: Oh, sure.

JUDGE MEDLEY: Please. Thank you.

MR. PISANO: Good afternoon. My name is Nick Pisano, counsel for Junior Party Guthrie. A year ago I stood before you and told you the evidence would show that the Junior Party, Guthrie, was the first to conceive and reduce to practice the invention of the count. The voluminous evidence submitted by the parties shows my predication to be true. The evidence also shows that Guthrie communicated the invention of the count to Espiau in the course of the routine assignment. DRI hired Tenco to work on his plasma lamp project and Espiau takes the position which Guthrie believes makes no sense that DRI was going to hire Espiau; pay it $300,000 to develop the technology to implement the plasma lamp of the count and when all was said and done, Tenco would keep the invention to itself and DRI would have no rights.

What the evidence shows is that within days of learning of the invention from Guthrie at the initial April 11th meeting, Espiau decided that to keep it for itself. They did not reveal that intention to Guthrie's employer, DRI, until Espiau had an opportunity to learn all that it could from Guthrie about the invention. And, so there's several entries is Dr. Joshi's notes and Mr. Espiau's notes about, we need to see the bulb, their critical questions about the bulb. We need to see how the power supply works. And, that's all documented, and it's all in the record, and it's all discussed in the briefs. The state --

JUDGE LEE: Well, let me ask you about that, that day -- that April 11th meeting.

MR. PISANO: Yes, sir.

JUDGE LEE: What Mr. Prior sketched on the board, is there any exhibit showing what he put on the board?

MR. PISANO: Your Honor, I think that

Mr. Prior's exhibit is, is, is basically exactly what's shown and on Page 3 of Exhibit 2147, which is what was in Mr. Smoler's notebook. This was an invention that was known. This was the conception of the invention that was known to Prior, Sandberg, and Smoler.

JUDGE LEE: No, well, that's not exactly what I'm asking for. You're saying that's essentially the same as this other one, but is there an exhibit where a declarant says, yes, that is the picture I drew on the board. I want a definitive thing of what he put on the board.

MR. PISANO: The closest we have is to what Mr., Mr. Prior drew on the board would be --

JUDGE LEE: So, there is no picture. Right?

MR. PISANO: There is no picture.

JUDGE LEE: I don't want anything close to it --

MR. PISANO: No, there's no picture.

JUDGE LEE: No one said that, this is what I drew on the board. It's all after the fact. You say, well --

MR. PISANO: That's right.

JUDGE LEE: -- what I drew was close to this.

MR. PISANO: That's right.

JUDGE LEE: That's what you're telling me. Right?

MR. PISANO: Which is, I believe, the case with, with Espiau's evidence as well. There's, there's no evidence of what was, what went on in that meeting. There's very conflicting counts as to what happened.

JUDGE LEE: So, so as I read the testimony, no one actually can confirm the declarations that the word, resonating or resonator was ever said, so --

MR. PISANO: That's right.

JUDGE LEE: -- that means we have to look at the sketch and see if that --

MR. PISANO: That's right.

JUDGE LEE: -- conveys --

MR. PISANO: That's right.

JUDGE LEE: -- a resonating circuit, but we don't know what was on the board, so what are we to do?

MR. PISANO: That's true, Your Honor, what you need to look at is the reasonableness of the fact that the conception documents for Guthrie show a resonator with all of the details spelled out; the lengths, the dimensions, every thing is there.

JUDGE LEE: I understand that, but that doesn't mean it was necessarily was conveyed during the meeting.

MR. PISANO: No -- well, Your Honor, you have Mr. Prior saying that he said it. You have Mr. Pothoven (phonetic sp.) saying that it happened. You have Mr. Cooper confirming that after the fact that that's what was discussed in the meeting, and you have the April 14th meeting -- or the April 14th document from Mr. Turner to Mr. Prior saying, following our meeting at our discussion on April 14 that we're going to go forward with this ceramic wave guide plasma lamp, here's my proposal.

JUDGE LEE: Well, you said Prior --

MR. PISANO: So, that's what you have.

JUDGE LEE: -- Prior -- you said that Prior said that he said it, but when cross-examined, what happened?

MR. PISANO: He -- Mr. Prior said, I -- Mr. Prior was asked, did you use the word resonance, and he said, I don't recall, I don't know, I don't recall. Seven years after the fact, they said, I don't know, I don't recall. That's what everybody said.

JUDGE LEE: Yeah, but that's not a long length of time after his declaration.

MR. PISANO: His declaration, I don't believe, ever says he said the word, resonance. What it says is he described a wave guide that was configured as a resonator, and if you look at Exhibit 2147, which is in -- it's at the last page in this tab here -- 2146, excuse me; nope, 2147. It's the last page in the Exhibit Book; this thing. That is a wave guide configured as a resonator. Whether you call it a resonator or not, it's a resonator. Everybody knew it to be a resonator. Everyone who saw it understood it to be a resonator. When I showed it to Mr. Espiau, he said, oh, that's our resonator.

So, Your Honor, the point -- your, your question is, was there a picture. No, there's no picture precisely of what was disclosed, but what you do have is a complete conception in Espiau's -- excuse me, in Guthrie's possession prior to the meeting. You have the inventor or a co-inventor of that conception present at the meeting. You have the Guthrie people saying, we explained it to Espiau and then you have Espiau supposedly coming up with exactly the same idea. And, depending upon which version of his declaration you believe, although I submit you should believe neither, you have three days later, the recognition that, oh yeah, that thing is a resonator, which then goes into his book as a good idea Mat. But, which is --

JUDGE LEE: Is there any explanation that --

MR. PISANO: -- absolutely disclosed in here.

JUDGE LEE: -- that -- why would people look at that figure and say, oh yes, it's a resonator.

MR. PISANO: Exactly what my point was going to be, Your Honor. And, the answer is that everybody knows that that's a resonator because that is basic engineering knowledge, and so let me go to Page 5 of the Exhibit Book which shows a Training Manual from 1953.

What the Training Manual says -- it shows in Exhibit 115 a simple resonant cavity. And, what a resonant cavity is is a probe 1/4 wave length from one end and then an interple multiple of 1/4 wave lengths to the other end wall. So, that's Exhibit 115. I'm sorry; it's Figure 115 in Exhibit 2104. And, so all you need to have a resonant cavity is what's shown there. And, that's what everybody knows, and that's what everybody knew in 1953 and they knew it in 2000. They know it today.

And, so you'll hear arguments from Espiau that oh well, Smoler said something about placement of the lamp not being critical so that doesn't mean it's a resonator. Well, that doesn't make sense. That's it. As Mr. Prior testified, it doesn't, it doesn't matter where the lamp is. The lamp only -- where you place the lamp will determine how much energy gets put into the bulb. But, whether or not it's a resonator depends only on these, these elements here; which is where the probe is and that the two end walls are closed. And, in that Training Manual it says, note, that a second probe can be added to take energy out of the cavity. That second probe can be a lamp. It says, if then, the input probe is excited a constant signal level, the signal level in the cavity will be a maximum when the cavity resonates. So, there's a good reason to make this thing a resonator because that's when the signal

Interference 105,393

in the cavity will be a maximum. And, then it says, and the energy transferred to the output probe will also be at maximum at resonance. So, back in 1953, everybody knew that if you're going to have a wave guide with two closed ends and a probe 1/4 wave length from one end; A, you have a resonator; B, that's what you're going to want to do because that's going to transfer the maximum energy from the probe to the out-putter. In this case --

JUDGE LEE: But you wouldn't resonate unless you have the thing dimension and configured properly.

MR. PISANO: Absolutely, couldn't agree more. So, if you look at, if you look at Guthrie's conception; turn now to Page 3 of the Exhibit Book. What you have here is the picture from the 3rd page from 2147, which is the drawing that Mr. Smoler made sometime in 1999. And, what you have there is a resonator that's configured with its total length of wave length long. Now, if you go back to Exhibit 5, by the way, or Page 5, you'll see there's a table here. And, the table says what the dimensions have to be in order for this thing to be a resonator; and, so it has the distance from the probe to the end wall of 1/4 wave length. This is the first blue line on, on Page 5 here. Okay? And then it says, so why it has to be --

JUDGE LEE: The probe being the first probe?

MR. PISANO: I'm sorry -- yes. Let me just go, let me just look at, let me just show you Figure 5 here, which says, lambda over four and three lammed are over four. And now, go back to Page 3, and which you see is here's the small hole lambda over four, and then the distance from the probe to the other side wall is 3 lambda over four. Lambda over, lambda over two plus lambda over four which is 3/4 lambda. So, this is identically disclosed as -- this, this is exactly the dimensions for a resonator and --

JUDGE MEDLEY: How is that picture different than what was described in your provisional applications which --

MR. PISANO: This picture was never in the provisional application.

JUDGE MEDLEY: --for which we --

MR. PISANO: But I will show you --

JUDGE MEDLEY: Well, I'm looking at some of your provisional applications; like for example --

MR. PISANO: Right.

JUDGE MEDLEY: -- provisional application --

MR. PISANO: Good, yes.

JUDGE MEDLEY: -- 059 for which you were denied benefit. It seems like that picture looks a lot like --

MR. PISANO: Well, that picture looks like the picture that is in Exhibit 2054, but 2054 is yet a different embodiment of a resonator. So, if you turn to Page 7 of the Exhibit Book, I've put in there that the, the ceramic block that was, it was depicted at Exhibit 2054. And, what you have there is the dimensions now are 1/4 to the probe and then this adds up too so that the total, this is at 5/4 of C. The total length is 3 over 2 C. So, 3 lambda are over 2.

And, if you go back to Exhibit 5 -- Page 5; that's the second blue line in this, in this Training Manual. So, you have lambda over 4 and 5 lambda over 4 for a total length of 3 lambda over 2, and that's exactly what's in the provisional application.

So, the only embodiments that Guthrie ever specified, and there's two of them here in front of you and this is what I know of. They're,

Interference 105,393

they're all resonators. They're all defined as resonators. They don't say the word resonator. Absolutely, we agree resonator doesn't appear.

JUDGE LEE: Let me get back to what was sketched on the board. What's the closest you have to tie what Mr. Prior sketched on the board to one of these "resonators"?

MR. PISANO: The closest we have is is Mr. Pothoven's testimony, Your Honor, and that's mentioned in Guthrie's opening brief, opening party brief.

JUDGE LEE: He doesn't describe the sketch. He concludes that, you know, I -- so-and-so told me about this resonator circuit. He really --

MR. PISANO: No, Mr. Pothoven says he was there. Mr. Coopers says he was told.

JUDGE LEE: Yeah, but he didn't describe the sketch.

MR. PISANO: I'm sorry, I --

JUDGE LEE: I'm looking for some testimony that describes the sketch --

MR. PISANO: Okay.

JUDGE LEE: -- so I can possibly say, yeah, what was put on the board is one of these figures.

MR. PISANO: Okay. Your Honor, I would have to go back and review Mr., Mr. Pothoven's testimony. I do not right now know if he spells out the dimensions, but the point that I would like Your Honor to come away with is that everybody knew in 1953 what a resonator was. I've highlighted two embodiments of resonators. The conception document as to which -- then, there's two parts of the conception document, by the way. One is this figure, but there's also Exhibit 2146 -- excuse me, yeah, 2147.

So, 2147 is the, is this detailed email from December 1999. That spells out exactly what the dimensions are in great detail, and this is again prior to ever meeting with Espiau. This is December 1999. Mr. Russell was also there. Mr. Russell testified that when you, when you power the device or the way that when you configure the device, you want to have vector addition of the, of the, of the waves, which, is basically the definition for resonance. So, and then -- so, if you, if you look, for example, here at --

JUDGE LEE: It seems to me it doesn't really help you unless the sketch also will convey the same configuration and dimensions.

MR. PISANO: Well, Your Honor, Espiau's case for derivation is based on a lot of oral testimony, and what I'm telling, what I'm suggesting to you is that the testimony here was oral as well. Mr. Prior was a co-inventor of this device; this -- it's this description there -- the conception of which is described at Exhibit 2046. He was present at the meeting. He told them when they said, how about a wave guide, he said -- he testified that he said, yeah, here this is it. And then he said anything else. What other words do you recall; none. Well, after seven years he remembers having discussed with them.

Then, if you look at Exhibit 2147, and compare it to the claim, all the elements are there. So, the question that for the board is, is it more likely than not or how likely is it that after having, having no background in plasma lamps at all, Mr. Espiau and Dr. Joshi show up. They show up for the first meeting and instantly they propose the very thing that's disclosed in Guthrie's conception documents at a minimum because even if they say, oh, well this is a transmission wave guide. Absolutely, absolutely all the elements are here, but we don't believe -- but there's more.

Namely, that the dimensions are also specified here, and are specified as the dimensions for a resonator. And, then three days later, with all due respect to Mr. Espiau, he's got a high school degree, he realizes, oh, okay what I was told about was a resonator. And, that's the, that's the April 14th --

JUDGE LEE: What does he mean when most of the participants in the April meeting testify that they don't recall anything said about resonating?

MR. PISANO: No, the question -- oh well, that's, that's in Mr. Morgan's slide. The question is do you recall whether the word resonator was used seven years ago? And the answer was I don't recall whether the word resonator was used seven years ago.

JUDGE LEE: You point to one person, but it seems to me like five or six different people were all there. They all couldn't remember.

MR. PISANO: Well, Your Honor, I suppose that's just an artifact of human nature that not to remember precisely what words were used to describe this device seven years ago. If you asked me what I had said seven years in a conversation, not knowing at the time this was going to become a bone of contention later on, I probably wouldn't remember.

JUDGE MEDLEY: Well, to get back to what Judge Lee was saying earlier though they originally declared that the words were uttered, right?

MR. PISANO: I'm sorry?

JUDGE MEDLEY: They originally declared that the words were uttered. Is that correct?

MR. PISANO: No, they did not.

JUDGE MEDLEY: I thought Pothoven --

MR. PISANO: I don't believe they did. What they said was a device that was described that was configured as a resonator. I believe that's what they said. I believe that's all of what they said. Mr. Morgan made a big point of saying, well, they all say -- they all copy exactly the same language in their declarations. That's because they all had the same recollection, and the recollection was that they described something that was configured as a resonator.

And, here's, here's, here's the important aspect; if you compare nine -- Exhibit 9 which has all the elements spelled out for all the elements of the claim, and then you go compare that to Exhibit 1138, which is this thing, which, according to Espiau, DRI should have known was, DRI or Tenco property because it used the word proprietary. Oh, by the way, there are different versions of this with proprietary in different hands, but, in any event, if you flip through Exhibit 1138, you don't see any drawings. You don't see any dimensions. What you see is a bunch of possible issues. This was the April 20th document by which Espiau supposedly communicated the invention to Guthrie.

JUDGE MEDLEY: But you do see the word resonator.

MR. PISANO: You do see the word resonator, but you see --

JUDGE MEDLEY: And up to that point you never saw that.

MR. PISANO: Well, Your Honor, you see very little else other than the word resonator. That's true, you see the word resonator.

JUDGE MEDLEY: Can we go back to your conception, the 2146, for a moment.

MR. PISANO: I'm sorry, yes, Ma'am.

JUDGE MEDLEY: 2146, I believe, A-19.

MR. PISANO: Yes, Ma'am.

JUDGE MEDLEY: How is that any different than -- as you recall during the preliminary motions, the oral argument you were asked, could this wave guide operate in a non-resonating mode.

MR. PISANO: Right.

JUDGE MEDLEY: And, you said, yes.

MR. PISANO: Right.

JUDGE MEDLEY: So --

MR. PISANO: Well, you know what --

JUDGE MEDLEY: -- if you got a wave guide that can --

MR. PISANO: Yeah, but --

JUDGE MEDLEY: -- operate in a resonating mode --

MR. PISANO: -- but not this one.

JUDGE MEDLEY: -- and a non-resonating mode --

MR. PISANO: Yeah.

JUDGE MEDLEY: -- let me finish my question.

MR. PISANO: Okay.

JUDGE MEDLEY: Then, how do we know that there was, you know, conception. That he appreciated -- that Smoler appreciated --

MR. PISANO: Right.

JUDGE MEDLEY: -- and there was -- there can be no, nunc pro tunc (phonetic sp.), as you know. You had to appreciate that this what he was doing. That it was a resonating wave guide.

MR. PISANO: Well, I think in order, in order to get that understanding, Your Honor, what you need to do is go back and look at the sections of Mr. Prior's testimony and Mr. Smoler's testimony that is, that is discussed in the briefs, but what you cannot do is simply look at the

characterizations of their testimony that's in Espiau's slides. You need to go back to the, the, the fundamental documents.

But, the difference -- the big difference is on the provisional application -- and I don't remember -- there was no drawing like this and there was certainly no drawing that specified the dimensions. There was certainly no document as here that says, for an excitation frequency of 900 MHz. This was his pre-selective frequency. The probe in the lamp should be located .365 from each end. The holes are drilled in the one inch wide face. The distance between the lamp should not be critical, but I recommend a 1/2 wave length. And, the reason why it's not critical, by the way, if it's not critical it doesn't meant that it's not a resonator because where you put the probe doesn't matter to whether it's a resonator, and that's what that Training Manual says. The only point that he's making is depending on where you put the probe or excuse me -- depending on where you put the lamp in the resonator you'll get more or less energy transferred into, into the bulb. And, so that's the difference between the provisional applications didn't specify a frequency. They didn't specify that the dimensions were specified for a specified frequency.

And. so again if you look at Exhibit 2146 which you see is, he has for an operating frequency of 900 MHz, and he computes a cut off frequency of 650 MHz. Now, Espiau will get up and tell you that's all wrong because it wouldn't actually resonate at that frequency because he did his math wrong. Well, if you read Dr. Smoler's declaration, he admits he divided by 9 instead of by 3 and that's the difference -- that's the primary difference.

JUDGE LEE: Mr. Pisano, both Mr. Prior and Mr. Smoler are inventors so I'm more concerned about the corroborating affidavit from, I think, Pothoven -- is that, is that --

MR. PISANO: Yes, Sir.

JUDGE LEE: I don't think I'm all that convinced when he simply says, well, whatever the claim described is what is identical to what these two inventors told me. How, how -- what's your response in, in the face of substantial case law that says conception has, has to be proven for every element in the count? So do you have --

MR. PISANO: Right.

JUDGE LEE: -- a broad-brush testimony from a corroborator that says well, whatever is in these claims is what they described. I don't have any comfort level in believing him as far as each element goes.

MR. PISANO: Well, the comfort you get is not from Mr. Pothoven's testimony because he -- even he after seven years doesn't remember in specific detail. The comfort you ought to get is from 2146 and 2147. That's the drawing. That's the email that goes along and describes the drawing. Absolutely, that's a resonator. Everybody understood the resonator --

JUDGE LEE: Yeah, but those originate from the inventor.

MR. PISANO: I'm sorry?

JUDGE LEE: I'm talking about corroborating evidence.

MR. PISANO: Well, the corroborating --

JUDGE LEE: That's independent of the inventors themselves.

MR. PISANO: Yeah. Well, Your Honor, all we can say is I'll have to take a look at Mr. Pothoven's declaration and I can perhaps --

JUDGE LEE: I can read you it. It's pretty short in the pertinent part. He says, I have read Claims 109 to 110 and 129 --

MR. PISANO: Right.

JUDGE LEE: -- as set forth in Exhibit 2003 and what those claims describe is identical to what Charles Guthrie and Don Wilson described to me --

MR. PISANO: Okay.

JUDGE LEE: -- at ITW's offices in February or March 2000.

MR. PISANO: Well, Your Honor, identical suggests to me that it's identical.

JUDGE LEE: Well, there are multiple claims here. It can't, it can't be identical to all three things.

MR. PISANO: No, I think he's talking about the independent -- he's talking about the count, Your Honor --

JUDGE LEE: Yeah, but --

MR. PISANO: -- because all claims here have been designated as corresponding to the count.

JUDGE LEE: Yeah, but the claims have differences to me. It seems to me he's subjectively threw out some differences and said -- lumped them together. Obviously it can't be identical to all, to three different things.

MR. PISANO: Well, Your Honor --

JUDGE LEE: That's my, that's my concern.

MR. PISANO: Okay. Well, Your Honor --

JUDGE LEE: So, what has he threw out in his mind? I don't know.

Interference 105,393

MR. PISANO: I think what he has in his mind is what is what he understood to be the reason he was making the declaration which is the count that's an issue.

JUDGE LEE: But, we don't know what was his understanding of the claims. We don't know what was his understanding of the description --

MR. PISANO: Right.

JUDGE LEE: -- made by Guthrie's. What we have is his conclusion that whatever is described to me by the claims and whatever is described to me by these two fellows, they're the same. So, it seems to me there's a whole lot of pen waving --

MR. PISANO: Well --

JUDGE LEE: -- and I don't have specifics.

MR. PISANO: Okay. Well, Your Honor, let me, let me ask you to just -- what you need to do is consider the circumstantial evidence then, which is what was known by the Guthrie folks at the time they walked into that meeting on April 11th and then again on April 20th. Now, I've shown you Exhibit 1138 and you said it has the word resonance. Well, that's all it has. It describes that they don't -- it describes the issues.

JUDGE LEE: Well, you're changing the subject now.

MR. PISANO: No, Your Honor. I, I understand your point. I'm afraid I can't -- if, if you want, I don't have Mr. Pothoven here so he can't give you more then he says in his declaration. What his declaration says is, what I saw described is what identical -- what was identical to what I understand to be the claims.

JUDGE LEE: Yeah, which I don't --

MR. PISANO: All of the claims that correspond -- all --

JUDGE LEE: -- we don't know either one. We don't know what was described to him. We don't know what the claims mean to him.

MR. PISANO: Well, Your Honor, the count is, I mean, the, the count corresponds to all the claims, all the claims are designated as corresponding to the count.

JUDGE LEE: No, the count doesn't correspond to anything. The count is the count.

MR. PISANO: Okay. Well, Your Honor, I don't know what more I can do. Mr. Pothoven said what he said. If I had him sitting here perhaps we could elicit further testimony for him, but what I'm asking you to do --

JUDGE LEE: No, I'm saying -- what I'm suggesting to you is it doesn't seem to help your case to have this broad stroked corroboration from Mr. Pothoven.

MR. PISANO: Okay. Well, Your Honor, we did what we can with witnesses' memories who were seven years old. Most of these gentlemen are fairly advanced in age and Guthrie --

JUDGE LEE: Why, why -- I don't know maybe, maybe I shouldn't ask this, but why wasn't he asked on an element by element basis when the case-law is pretty established that you have to account for conception. It says every element of the count.

MR. PISANO: I think because he said it was identical to the subject matter. I thought that was sufficient, and that's what we went with. To call out and say I saw element A, I saw element B, I saw element C, I saw element D. I don't think that adds much more than just saying it was identical to all the elements.

JUDGE LEE: Well, it would mean a whole lot more to me.

MR. PISANO: Okay, Your Honor, excuse me. I don't mean to argue.

JUDGE MEDLEY: Can I ask you a question about your reduction of practice?

MR. PISANO: Yes, Your Honor. Can I just make one point regarding the April 20th meeting, the supposed derivation, very quickly?

JUDGE MEDLEY: Okay.

MR. PISANO: The derivation supposedly -- Espiau's case for derivation relies on this document. When you read through the documents, when you read through the record, you'll see that they didn't know about the bulb. They had not yet conceived of being in intimate contact and what they really knew, what they really, really knew is what shows up in, in Mr. Espiau's 2005 declaration at Page 13. This was a disclosure that was signed April 20th, 2000; the same day as the presentation. What that shows is all these folks knew and it shows darn little. It shows a block. It shows a hole, and it says the thing could be resonant or it couldn't be resonant. So, Your Honor, reduction to practice.

JUDGE MEDLEY: Okay, during the reduction to practice when they -- the device that was lit --

MR. PISANO: Yes.

JUDGE MEDLEY: Was there ever a test or any measurement to make sure that the thing was resonating and that the bulb received the electric --

MR. PISANO: Right.

JUDGE MEDLEY: -- the maximum electric.

MR. PISANO: Well, as for resonance, there's

-- I think there's no dispute that the device that was tested the dimensions were jointly developed by Espiau and Guthrie. So, they got together. It's in their declarations. They got together. They talked about dimensions for resonant devices. The device that was made was the one that was dimensioned in accordance with specific dimensions that were worked out by Guthrie and Espiau together.

Now, Dr. Joshi testified that Mr. Chang was a wonder and he always got his, his, his calculations right. So, the testimony is that they took the device which looked very much like this device. They took the device. They hooked it up. They swept it with an RF generator through a frequency -- you know, through a range of frequencies and the bulb lit up, and not the -- it didn't just glow blue, it burst. You know, it was very bright. Both Mr. Nunes (phonetic sp.) was there, Mr. Bennett was there. They both said they saw spots. They said it was very bright. The --

JUDGE MEDLEY: Had the bulb been lit by, by non-resonating -- if the wave guide had never resonated --

MR. PISANO: Your Honor, I, I don't think that's -- I don't, I don't believe that's possible. I don't think it would work, and I would just go back to that Training Manual that says you're going to transfer maximum energy to the bulb when you resonate. The dimensions were specified so that it resonated. It was hooked-up in a stand through the frequencies. You know, Dr. Gupta (phonetic sp.) said, well, I'm not used what they used. That's right, he wasn't there. How could he tell? But we do know is that you could hook this thing up to, up to a device. You could put a bulb in it. You can power it on. It will, it will be resonant. Now, this one in particular

won't because it's cracked, but this is the one that is most like the one that was actually used to practice.

JUDGE MEDLEY: The one that was actually reduced to practice, was that ever -- pictures ever taken of that one or --

MR. PISANO: No, Your Honor.

JUDGE MEDLEY: -- made part of the evidence.

MR. PISANO: No.

JUDGE MEDLEY: We don't have that one. We just have something that's what they say substantially identical or virtually identical to.

MR. PISANO: Right, this was the one that was made by CoorsTek. That was ordered in July. It was received sometime in September or October. This is substantially the same. Mr. Wilson said that he went to Ceramic Tech to Mr. Gandhi, talked to Mr. Gandhi. Mr. Gandhi made these. Now, Mr. Morgan says or Espiau says, oh well, they didn't even talk to him for the third week. That's not what, that's not what he said. Again, go back, read the testimony. He said the parts were manufactured in the third week of July. He says looking at the drawing that these were made of from, that it was substantially the same, and it mentions this was substantially the same as, as this piece.

JUDGE MOORE: Do we know the, the actual measurements of the purported reduction to practice model. Do we know those actual measurements? And do we know them, do we know the measurements on the document which is the, I guess purported conception document?

MR. PISANO: Right, that's a one-fold --

JUDGE MOORE: Are those proportionate? Do they line-up.

MR. PISANO: Well, this is a one half wave length device. So, this is the device that shows up on 2104. This is the first line. The one that's in the conception document is the first blue line. That's the one wave length. The one that's in the provisional application is 3 lambda over 2. So, the answer to the question is these dimensions were arrived at jointly by Guthrie and Espiau, and these dimensions were for 1/2 wave length.

JUDGE LEE: Counsel, I think I know that you just said that, in your opinion, it's not possible for the light to light up with those dimensions and configurations unless it's, it was resonant. That's what you told us, right.

MR. PISANO: I believe that's the case.

JUDGE LEE: But, you don't have a declaration in the case.

MR. PISANO: I believe --

JUDGE LEE: So, what --

MR. PISANO: I, I believe we --

JUDGE LEE: -- do we have any testimony to that effect?

MR. PISANO: No -- oh, it's not my declaration, it's Mr. Gupta's declaration, and it's Mr., and it's also Mr., Mr. Espiau's testimony. If you look at Page 8 of the Exhibit Book, he was shown this drawing. And, he said, what is that, and he said, now, have you ever seen this page before, Exhibit A-19 of 2147. Answer, I don't know if I've seen this or not. It looks like something we provided to DRI. So what you provide? Oh, we actually did a drawing of what we thought would be a good aluminum resonator. So their inventor is sitting here. He looked at that drawing. He knows it's a resonator. And, the answer to your question --

JUDGE LEE: What we're interested in is, is it possible with those dimensions --

MR. PISANO: That it be anything other than a resonator --

JUDGE LEE: -- to have the light lit up without it being --

MR. PISANO: I think the answer now, I think the answer now, after having another whole year of discovery, after looking at the positions that Espiau is taking, is the answer is this thing is a resonator. It's nothing but a resonator. You don't call it a resonator, but it's a resonator, and similarly, Your Honor, this a shoe. Everyone recognizes it's a shoe, we don't need a book. It doesn't have the word shoe on it, but everybody who sees it knows what it is. So --

JUDGE LEE: Well, if you could answer my simple question simply, I'd appreciate that.

MR. PISANO: Okay, I'm sorry and --

JUDGE LEE: Whose declaration, on what page tells us that with those given dimensions and configurations, if the light lit up it had to be resonating.

MR. PISANO: Dr. Gupta says that. Mr. Smoler says that.

JUDGE MEDLEY: But, Dr. Gupta wasn't there; correct.

MR. PISANO: Doctor -- mister --

JUDGE MEDLEY: He doesn't, he doesn't' have the exact device that was tested. He's just going on what drawings, according to the drawings and I don't know the exhibit number, but the other witnesses said, yes, were substantially the same.

MR. PISANO: Right. Well, they weren't the same.

JUDGE LEE: So, we don't know if it's the same.

MR. PISANO: They weren't exactly the same, because this was made by press and the other one was made by grinding. That is why they were not substantially the same. The dimensions, according to the

witnesses, were the same. The difference is that this was made by CoorsTek. It was made green and it was fired. The one that was made by Mr. Gandhi and Ceramic Tech was a, was a blank that was machined. The difference between, you know, this has a screen non-coating. That had a hand painted coating. Those were the differences. Those were the substantial differences. Those, as far as the witnesses were concerned, were the only differences.

JUDGE LEE: And, he said that given those configurations and dimensions if the light lit up, it had to be resonating?

MR. PISANO: Given the dimensions, it would be a resonator, yes. And, it's because it's not just some dimensions. A year ago I said and told you, you know, if you hooked-up an RF generator to this thing you could get it to resonate, but that's not pre-selected dimensions. These are pre-selected dimensions. They're pre-selected for a specific frequency. Now, they happen to be the wrong frequency because Mr. Smoler is whatever he is, 76 or 82 and he divided by nine instead of three. But, those are the specific --

JUDGE LEE: Why couldn't the light just lit up with much less amplitude with it not being resonating? That's the questions.

MR. PISANO: Well, Your Honor, if we had enough time, we would have remanufactured this and fired it up. We didn't. The answer is that the dimensions were specified to be resonant. They were specified jointly by the parties to be resonant. It worked.

JUDGE LEE: No, it's almost like you have an inherency argument; if it lit up, it had to be resonating. That's, that's the issue. That can you rule it out. Can you rule out the possibility that it lit up, but it was not resonating?

MR. PISANO: I don't believe -- it's, it's not what I believe, it's what the witnesses have testified, Your Honor. I think if you go back and look at the record, they all say, their understanding was this was resonance. If you look at Mr. Prior --

JUDGE LEE: Yeah, but that's, that's -- this is --

MR. PISANO: No, but he says --

JUDGE LEE: -- there's a difference between what I'm asking and what the witness is saying. You don't seem to appreciate it, and I can't, I can't keep asking the same question over and over.

MR. PISANO: Okay, I'm sorry, Your Honor, I mean --

JUDGE MOORE: Let me recast this question then. Is it possible if I shove enough RF energy down the throat of this little thing, I can get that light to light regardless of whether or not it's a resonator?

MR. PISANO: I don't know. I -- whether it will light first or melt, I don't know. And, and, no one had the opportunity to do that test, but the most likely, the most likely thing is it resonated because that's what it was meant to do. And, when it was swept through the frequencies, what happens -- and Joshi could probably testify to this, what you see is the resonance peak in this, in this curve as you sweep through it and that will be the point at which it will light. And, that's, you know, that's what Dr. Gupta said would happen for a thing with this configuration. The parties said it lit. They said it was blindingly bright. They didn't say there was a blue glow. You know all I can -- all Guthrie can do to present to you is the evidence that it has and the evidence is that they plugged it in and it was intended to be resonant. They swept it through the frequencies. It worked. It lit up, and it is of the nature that's shown in this exhibit.

JUDGE LEE: If I'm, if I'm looking at the evidence, the -- you said they swept through the frequency. Was every other variable held constant? They just changed the frequency. Do we know that? Can I find that in the record?

MR. PISANO: I don't think we know. I don't think we know. What we do know is that when you power the device on, what you had was a light that lit up and that is shown at -- hold on a second, Page 13. This is, this is this device before it cracked; lit up bright. That's what we know. You plug it in. It worked. Did they do tests; no. Don't think so. If they did, we don't have a record of it. Now, let me just briefly, I see I'm way over my 20 minutes, but a -- or 15 minutes, but with your indulgence, let me just make one point. And, the point is that Dr. Pozar (phonetic sp.)says this was a transmission wave guide. And, the problem with that theory is it doesn't make any sense, and this Dr. Gupta does say. And, the reason it doesn't make any sense is because in order to be a transmission wave guide, they have this theory that Mr. Smoler was matching the lamp impedance to the wave guide impedance. Now, in order to do that, you have to presuppose that the lamp impedance is the same. It's not.

And, so what you end up with, and this is on Page 11 of the Exhibit Book, what you end up is, as Dr. Gupta says, there's two different impedance values. It can't be a transmission guide in both at both frequencies because the impedance changes and it changes dramatically between when it's not lit and when it's lit. So, Dr. Pozar, first of all, presupposes that there's a single impedance, and then, secondly, he doesn't describe anything in this device that could magically alter the impedance of the wave guide at the wave guide bulb interface. See, that's, that's sort of the whole problem with Espiau's transmission wave

Interference 105,393

guide theory is it can't happen because there's no mechanism there to make that happen. Instead, if you go back to the training Manual, you want to have a resonator, you have a probe, you have the two end-walls fixed. They're all fixed with specific dimensions that are set out in the Training Manual. You fire the puppy up. You put the bulb in and when you move the bulb around, you'll absorb more or less energy, but all the time it's a resonator. And, it's always a resonator, and it's only ever a resonator.

JUDGE MEDLEY: Okay, if you'd like to reserve time, I think your time is up.

MR. PISANO: Okay, Your Honor, would -- I would like to have addressed Mr. Espiau's declaration and some of the other statements, but I'll do that on rebuttal.

MR. MORGAN: May I approach.

JUDGE MEDLEY: Please.

MR. MORGAN: Thank you. Your Honor.

JUDGE MEDLEY: Thank you.

MR. MORGAN: I am prepared to address Guthrie's, so called, conception evidence first. I would like to just make one comment about one of the last subjects discussed. The question was whether you can make one of these things look like it's lit without resonance. And the answer is, yes, you can. In fact, Mr. Espiau testified to that affect, explained that there is a glow that you can get and that's Exhibit 1239 at pages, Page 81, Lines 1 through 10. A glow that you can get, which if you're not sophisticated enough to have not done these things before, which these witnesses who've testified with their declarations have not, looks really bright. In fact, the first time Mr. Espiau saw it, he was mistaken. He discovered later that what he

was seeing was only a glow. It is the gas will glow. It's before you have the plasma that is formed, and that's in the record.

You can also see it, in some extent, we submitted a video of, of the reduction to practice done by Espiau. And, you'll notice that that turns on. That thing is glowing and it looks pretty darn bright, very bright. And, everybody is looking at it saying, wow, it looks bright. And all at once there's just, pop, and it's the whole place goes white. And people -- and just -- and somebody in the background says, wow, or something like that. That's the difference. And, so, yes, very much you could have a bright light, and to Mr. Nunes or Mr. Bennett, who doesn't know these things, it would look very bright, but it's not, not resonant.

JUDGE LEE: So, if, if you were to sweep through the frequencies --

MR. MORGAN: And you --

JUDGE LEE: -- and you have nothing, nothing and nothing, and pow, the light comes on and it goes back off --

MR. MORGAN: And, you think, wow, I'm there.

JUDGE LEE: But, you're saying that would not necessarily --

MR. MORGAN: That's right.

JUDGE LEE: -- be resonance.

MR. MORGAN: That's exactly right.

JUDGE LEE: You would have to take it to the whole other level.

MR. MORGAN: You would have to take it to a whole other level. And, the point is, we have no test. I mean, you can compare the -- what Espiau has in his reduction to practice. They've got notebooks.

They've got recordings. They've got Smith Charts. They actually made determinations and calculations and measurements to ensure they had resonance. That's there. Didn't just look at the darn thing. They, they actually -- they even had a luminous measurement; lumens. I don't know the right word; lumens measuring devices that they used. All of that before they could say to themselves, yes, what we got here is a resonant wave guide creating a plasma, and compare that to what we have from Guthrie; nothing.

JUDGE LEE: Counsel, what is the difference because hearing from Mr. Pisano it seems to me that their approach is, given these dimensions, I can work it out on paper, and if the dimensions and the numbers are right, if you build it and you turn it on, it's going to resonate. Where as, you're saying that's not necessarily true. So, what is the difference?

MR. MORGAN: And, and, and what--

JUDGE LEE: What do you need besides those numerical calculations?

MR. MORGAN: Well, you have to have the power and you do have to have the right frequency. And, the point here is as Mr. Pisano said, they didn't, they didn't start and say here's the frequency as designed for and put that in. They did a sweep and when it lit they said, hey, I'm done. I've got it. That's, that's the point. He says, you know, there's a frequency designed for and there was a size designed for, but as he himself has testified, they didn't just put it in at that frequency and say, hey, this works. They did a sweep and it lit up. And, my point is that as we discovered, you can do that and think you've got something, but you don't.

Now, let me go back a bit, because this does lead into this issue of the, of the conception document, and there's two of them and they ought

to be considered together because one explains the other. And, they are in our book here. Now, we have this, this apparently around December 1999 a drawing and an email describing what it's supposed to be. Okay. Now, what is it? What it is is, in fact, Dr. Pozar lays this out in great detail; explains exactly why, what it is. It's a traveling wave guide, and why is that. There's several reasons; first of all, if you look at it he says what are the various distances he cares about. He cares about the distance of the probe from one end and the light from the other. And, he says what's in the middle isn't critical. Well, when Mr. Pisano says, gee, well you can move those around and who cares. The fact of the matter is, if what's in the middle isn't critical, okay, and you change what's in the middle, you have changed the length; the entire overall length also. As Dr. Pozar says, in fact, it was -- it shows up in very 1950, or whatever it is, manual they have. What's in the middle is critical. What's in the middle is critical if that device is going to resonate, but you don't care about what's in the middle. It's not critical if it's a transmission line wave guide. Why is that? Because in a transmission line wave guide what you do is by setting one end of the probe at 1/4 wave length and at the other end the load at 1/4 wave length, you have guaranteed that you have a uniform field down the links of that transmission line.

What's a uniform field do? In a transmission line it makes good efficient transmission. That's why you do it. What else do you do? And, that's, that's why we, we pointed this out. So, Mr. Smoler says, you know, has to explain why he said that. Well his explanation seemed to change as the case went on. His first explanation was that email, far apart, in a declaration. And, he said, oh, what I really meant was it can be any multiple a half length of a wave length. There's nothing that says that. It's not even

hinted at in any of these materials. That came out of -- I can guess where it came out of, but it certainly didn't come out of any of these things at the time. So then we come up to his deposition asking the same question; different answer. Now, it's all, well, yeah, I admit it didn't have to be to the thousandths of an inch. You talk about hand waving.

The answer changed as the case went on depending upon which seemed to be necessary for the case. Now, the second factor, the second factor that really demonstrates this is traveling wave guide is what he says here, and it's on Number Page 4 of our book. When he says he wants to match the lamp to the wave guide. Now, why do you do that? Dr. Pozar explained that, and it's his sixth declaration. Dr. Pozar explained why you do that. Here's why you do that. Because when you're doing a transmission line wave guide you don't want reflections back and forth. By matching the load impedance and this placates the bulb or lamp to the wave guide impedance and then you have the probe. What that means is you have full, full transfer of energy from the probe to the load. There's no reflection back. That's why you do the matching. Why you do that? That makes it efficient transmission line. But what else does it do? As Dr. Pozar explained, it prohibits precludes cannot have resonance. Why? Because, resonance depends upon a very significant reflection back between the -- back and forth, back and forth between the probe and the, the lamp. That's what resonance requires. You're not going to have any resonance in there if you've matched those impedances, and that's what Smoler was trying to do. And, in fact, he says right here what he wanted to do; well maybe you could change, you could change the frequency in order to get that matching.

Now, ask yourself -- that's, that's right here on Exhibit 2147, the email. Ask yourself if you have supposedly designed something, chosen a so called resonance frequency, as they now say, why in heaven's name would you then say vary the frequency to match the impedance. That's the antithesis. It's not there. This, those are antithetical to each other, and that's carried out further. This is confirmed further in June. In June, Mr. Guthrie ask Mr. Smoler, we're doing some disclosures we'd like you to give us more information about your and more, more parts about your design. And what did Mr. Smoler do? It's right here. He sends in a couple of designs. And, what are they? They are designs to match the lamp to the wave guide. Mr. Pisano said how do you do it? Well, Mr. Smoler certainly thought he could do it, because he said he could do it by changing the frequency and as we all know, frequency impedance is a function of frequency. So, he says, I can do it by changing the frequency. He says that in December of 1999. In June of 2000, he says I can do it by shaping things. What else does this, this drawing of June 27th, 2000 show us; Exhibit 2149.

What it shows us, if you look, he shows two dimensions. What dimensions does he show? The probe to its end; the lamp to its end. The two dimensions that are very important in a transmission line wave guide. What does he not show? He doesn't show the length of the overall wave guide and he most certainly doesn't show that thing he said wasn't critical, which is the distance between the probe and the lamp; confirming once again that what he had in mind, what he was thinking about was a transmission line wave guide. Something he may have been familiar with. And, what that is antithetical and it cannot be a resonant wave guide. That design cannot be. Now --

JUDGE LEE: Counsel, are you saying their conception configures is actually consistent with both a resonating type of invention and also the transmission line?

MR. MORGAN: No, it's -- no it is only consistent with transmission line.

JUDGE LEE: It is only consistent with transmission.

MR. MORGAN: That's right.

MR. MORGAN: Only consistent because of his explanation of it. I've got to -- I'm going to do the impedance matching.

JUDGE LEE: Okay, but let's say you throw out the testimony on impedance matching. You only look at the figure.

MR. MORGAN: Then you still have this question where he says this dimension is not critical. That dimension is critical.

JUDGE LEE: And, you throw that out so the only thing you look at is the figure; the dimensions. Then that's consistent with either one.

MR. MORGAN: That -- it, it possibly could be except his calculations are all wrong --

JUDGE LEE: Depending on what other factors?

MR. MORGAN: Depends on all the other factors that have to go in, then he explains in his email what those factors are. I mean, as, as counsel said, this thing right here is consistent with the resonator, this lectern because if I pick out -- figure out the right frequency I can make it resonate.

JUDGE LEE: So, whatever Mr. Prior had -- would put on the board in the April 11th meeting, it would have had to be accompanied by a lot of explanation and he only put in a partial figure.

MR. MORGAN: That's exactly right, and if you'll notice in our book, we actually put down here what Mr. Prior, his full testimony, so

what he said. All right, and it's -- he was, he was asked exactly what was said and I'm sorry -- I have it right here. He, he was asked, interestingly enough, now Mr. Espiau, I said, made this suggestion at the December 11th meeting, of using a wave guide, and your response was to say, well, we had done something like that. Was anything else said? That's on Page 17. Answer didn't recall anything else was said. And, what's interesting, what's interesting is although lots of folks, you know, if you -- is this even consistent with the drawing he put on the board; no. There was a drawing put on the board. It's Mr. Espiau's drawing. He went up to the board and he made a drawing. And, Mr. Guthrie himself, and that drawing was copied down by Mr. Turner in Mr. Turner's notes at that meeting. Mr. Guthrie himself has even submitted a declaration saying that what was copied down was not according to count and wouldn't work; would not function. So, whoever drew it, we believe is Mr. Espiau who drew it, which is entirely consistent with Mr. Prior's testimony in which he can't remember anything other than, well, I said we had done something, some work like that. Whatever it was, they, themselves say was not the invention. Now, as I said, the testimony of what that invention was has seemed to evolve as the case has gone on. Nobody disputes that if you do the impedance matching, that you can't have it resonant operation.

JUDGE LEE: Was Mr. Pothoven cross-examined with respect to his testimony saying that whatever these two gentlemen described to me is whatever these claims describe?

MR. MORGAN: He -- what he was -- no, that's their burden of proof, but more than that, at one point, I did ask him. I said, when in 2000 -- did, did there come a time in 2000 that you heard the word resonant? You know what his answer was? After April 11th, after April 11th.

JUDGE LEE: In a cross-examination with?

MR. MORGAN: That's right. After, after Espiau was on board. That's the first time that he heard, and it wasn't on April 11th. It was after that that he heard the word resonant. So, he sure didn't hear it before then. He sure didn't hear it by somebody describing something to him before then. That was actually the first time he heard it. Now, as I say the testimony changes. First of all, you know, once, once, once we had pointed out this issue of the impedance matching, then all at once Mr. Smoler is saying, oh well, yes impedance matching. Impedance matching is important, but it's important after you light the lamp. It's not important before you light the lamp. Okay. It's nothing like that in any of these documents.

JUDGE LEE: Oh yeah, I have a question. I wasn't able to get an answer from Mr. Pisano. Maybe you -- let me ask you. They -- I was trying to get at do they have any witnesses that say if the light lit up with this configuration it had to be resonating.

MR. MORGAN: No.

JUDGE LEE: The apparent answer I got from Mr. Pisano was that he has witnesses that say that, but I didn't see any.

MR. MORGAN: I didn't see any either, and in fact, Dr. Gupta himself says, I don't know what with, what frequency they ran at. I don't know what they're doing. I just surmise this is what they must have done. That's, that's the best they've got. They don't have anything else. And. interestingly enough, Your Honor, they don't have Mr. Ed Sandberg.

Mr. Sandberg is the guy who supposedly ran that test. And, he's obviously been available to them because he submitted two declarations for them earlier on, but those declarations, unfortunately are inconsistent

with some of the positions they're taking now in terms of what was tested and when it was tested. Mr. Sandberg is the one person everybody says Sandberg did it. Mr. Sandberg is the one person that haven't put a Declaration in for or any evidence.

Now, as I say it's Mr. Smoler's testimony seemed to evolve. Interestingly, an event was that his deposition which was taken two days before Mr. Smolers', Dr. Joshi made a mistake in an answer. The correct answer was right there in his notebook. He made a mistake in his answer; describing an operation. Two days later, when Mr. Smoler testified, he parroted almost those same words. Then Joshi, Dr. Joshi, shortly thereafter realized his mistake, submitted an errata sheet. And guess what? The very next day, Mr. Smoler says gee I made a mistake and submits an errata sheet. That testimony just continually evolved. Now, I'd like to turn -- actually, let me just point out something; as, as, as Your Honor pointed out, Judge Lee, no mention of resonance. Everybody, everybody they've put in declarations about April 11 saying resonance and when they got asked about it, they all backed off. You would think that if this is a big deal, as if they all thought this is a resonant thing would have said so. Mr. Prior plainly did not say so.

Documents. Not a single DRI or Guthrie document dated prior to the time on April 20th, when Espiau made their presentation and said we want to do it with resonant guide; no discussion of resonance, no disclosure of resonance, not the word, not the concept. It's not there. Now they try to argue, oh well Mr. Catlett (phonetic sp.) took all our papers. That's, that's why we don't have any evidence. Nonsense. I say nonsense, because Guthrie himself testified that they had found numerous boxes of documents and they had used the ones they wanted to use. He testified that he got the contents of his computer hard drive from when he was at DRI. Well,

obviously there's nothing on that hard drive that would help them about resonance.

Mr. Catlett, the very fellow that was supposed to have taken all this stuff, said I didn't take it. I put it in a storage, locked storage. That's Exhibit 2007 they submitted. I put it in a locked storage. The only people or person that had a key was the bankruptcy trustee, and the only people that I know other than the bankruptcy trustee who had access was Mr. Wilson, one of the inventors here -- alleged inventors, and Mr., Mr. Sandberg, and then it was Wilson and Guthrie who brought, bought the personal effects of the company which include that storage locker from bankruptcy trustee. It's not that there were no -- not that they can't find any documents. It's that there are none.

So, let's go to that reduction to practice, and I think we talked about that in some detail. There is no evidence; none whatsoever. How the test was made. What they had. Nobody really did anything any determinations. As I said, our people did Smith Charts and everything else to establish that they were in resonance. They knew you couldn't just look at the darn thing, but they don't have any of that. And, we don't have Sandberg. Now, as to the date that supposedly happened, even if something did happen. What do we have? We've got unsupported attempts -- and I was interested to hear counsel here tell us how difficult it is to remember something after seven years, and yet he submitted declarations by people who purported to know to the day when some test was done. And, what was that based upon? Well, I bought a barbecue in June. That, that's what Mr. Bennett says. It was sometime after that. How's he know he bought a barbecue in June? I don't know. Now, Mr. Nunes, he based it on his mother's death. We remember things like that, but was it one week later,

two weeks later, or three. That is the critical question here. Critical question. This is precisely why this Board and Federal Circuit has said that this kind of testimony cannot carry the day especially when it's so malleable. And it was malleable as the case went on. Guthrie -- Wilson -- that was Mr. Wilson initially testified that he contacted Mr. Gandhi at Ceramic Tech in early July and got parts made in early July.

In fact, by July 8th, they put in their brief they had a ceramic wave guide from Mr. Gandhi they'd painted with silver. Then they took a week or so or ten days to put some soldering and some other stuff on it, and then as of July 17th, supposedly, they tested it in the new building at 646 University; the new building. Not the old building, the new building. But, when Gandhi was deposed, relied on a document that he -- they didn't provide to us, he back-tracked. Gandhi said he didn't make anything until the third week of July. The last day of that is July 21st. That may be somewhat consistent with the fact that the drawing supposedly that Mr. Guthrie claims he did of this thing was July 20th based on the drawing which Espiau faxed to them on July 20th. On July 21st, Miss Brower, who was responsible for keeping the chart -- I don't -- the MS Chart -- I don't know how the official name for it, but everything that has to be done in a project. Her report, weekly report was the lab had not been set up yet where supposedly this test was done. And, there is no schedule for it to be set up. And the lease on 646 didn't begin until September 1st. Did they move in a few days ahead of time? Perhaps, but on July 8th, Mr. Guthrie was designing the lab for 644, not 646. There was no lab. And, finally, contemporaneous documents. Here's the document that plainly Mr. Guthrie conceded would be on his hard drive he had, but didn't give to us. Fortunately, we had gotten a copy way back when. It's a Power Point made

by Wilson and Guthrie on August 4th, 2000. Now, that is some two and a half weeks after this supposed test in reduction to practice. That Power Point purports to tell Mr. Catlett the entire sequence; everything that's happened in this project claiming that they did it all themselves of course. Claiming it all. August 4th. Does that Power Point say anything whatsoever about a test done two and-a-half weeks earlier that the darned thing worked? Nothing. Absolutely not. On August 4th, what Wilson and Guthrie wrote in the Power Point they want to present to their boss to show him what great engineers they were, they cited one test. That was a test done in June by Espiau on an air wave guide. That's what they cited. And, where was the status then of the work by the August 4th when they're writing this? The status was that they're identifying materials for further testing and doing some calculations, which in fact is what Espiau was doing. If they had gone made this great invention -- if they had had this reduction to practice before August 4th, you better believe it would have been in that Power Point. When they worked on it on August 4th, they certainly wouldn't have left it off by saying what are we doing now, we're trying to find the right materials. You can look at Guthrie's Page Number 12, where he tries to -- tried again rewrite the time-line to try to somehow bring their reduction to practice into the right time period before July 31st which is when the Espiau constructive reduction was. Take a look at it. -- completely ignores the fact that Mr. Gandhi testified that he didn't make anything until the third week and they got him doing something the first and second week. Still it just doesn't hang together. Now, counsel referred to the April 20th presentation. April 20th presentation is further corroboration of the invention on April 14th. April 14th's invention by Espiau -- I'd like to turn to that if I may, please. It's April 14th by Espiau is fully documented in

Dr. Joshi's notebook and Dr. Pobanz (phonetic sp.) who was there testified about the various things that were discussed and thought about to corroborate it.

Then what happens on April 20th? April 20th they make a presentation. So this is corroborating because it's going to these other people who had admit that they got this information. And counsel points out some examination of Mr. Espiau, but the interesting point is there are two. The documents that are given that day are two and they went together. One was called a statement of work and one was a more, more technological description of a resonant wave guide lamp, cylindrical and rectangular. And what counsel ignored in trying to examine Mr. Espiau when he said, oh well this one presentation here doesn't say the power, does it. Well didn't have to because the statement of work accompanying it said 125 watts. He says, oh well this, this document here doesn't say the frequency, does it. Didn't have to, the statement of work accompanying it said 1GHz is what we're aiming for. So we have not only the corroboration of the notebook, corroboration of Mr. Pobanz, but the corroboration of what was actually presented then to Guthrie. Now, Guthrie has tried to argue -- make arguments about the bulb. Oh well, Espiau didn't have a bulb. Well the point is that bulbs were available. That was no big deal. He can buy the darn things and easy to get one from the Guthrie people, the DRI people because they said they had some. In fact, they had gotten some from Fusion Lighting.

And the extra goop to put all this bulb nonsense to rest in this interference, when he testified in the Declaration that the state of the art of plasma bulbs was well developed. Nobody needed to invent anything for that. And he was saying that in connection with one of the, one of their

provisionals in trying to explain why he didn't have to, why the provisional didn't have to explain how to make a bulb. So sauce for the goose, sauce for the gander. You don't have to explain how to make a bulb. You don't have to put that into your disclosure because everybody knows how. Now, we have a constructive reduction to practice. Guthrie has no conception, has no clue of reduction to practice. Lacking either one of those, Espiau should prevail. And I believe I would like to -- I have a couple of moments because I on rebuttal. I should have.

JUDGE MEDLEY: Okay. Thank you.

MR. MORGAN: Thank you.

MR. PISANO: Fortunately for Guthrie almost nothing of what Mr. Morgan says is actually present in the record. So, when you look at Mr. -- when you look at Espiau's statements, you look at what's in that book, in their Exhibit Book and you go back and you check the source, you'll see it doesn't say what he says it says. That is, that runs throughout Espiau's case. It is outrageous that they would be charging Guthrie with changing his stories when they signed, when they submit and suppress the declaration that's totally inconsistent with Mr. Espiau's 2007 declaration. He said he described resonance to Guthrie on April 11th and then in 2007 he says oh no, I invented it three days later. You know, it is just mind boggling and again I would ask you to go back. You need to look at the record. The attorney argument is great, but go back and look at the facts. Those are what make a difference.

So with respect to, did the bulb light up, was it really bright? Well, Page 13 of the Exhibit Book is Guthrie's. Page 27 of the Exhibit Book is Espiau's. Look at them yourself. They're both bright. It's not a blue glow as Mr. Morgan was saying which referred to some other embodiment

in any event. The, the, the device is lit up. It's bright. It will give you spots in your eyes if you were standing there; both 13 and 27. With respect to impedance, well this thing about impedance if you have impedance matching it has to be a transmission line. Nobody told Mr. Espiau that before his deposition. Nobody told Dr. Wharmby (phonetic sp.) either. But, we haven't seen Dr. Wharmby for a while. Dr. Wharmby testified at Exhibit 1061 at Page 116, it's always necessary to match the impedance of every power source to the resonant cavity in this type of work irrespective of the electronics that's driving it. It's always necessary. You always have to match the impedance, and that's what Mr. Smoler says. He says you have to match the 50Ω impedance of the probe to the device -- to the power source so you get the power in. Otherwise you're going to send it to the probe. It's going to be reflected right back to the power source. Everybody knows this. Only Dr. Pozar doesn't know this.

If you look at Exhibit 2243, which is Dr. Gupta's declaration, he says throughout that declaration the device that's described, the device that was made could only be a resonator; nothing but. I suggest you go back and look at that. That's just at 6, 7, 8 to 10, 14, the entire declaration describes that. And then Mr. Espiau was asked well do you need impedance matching and he says I ask him what about this, you know, what about this particular device. Would this be a, would this be a resonator? He said it would a poor resonator unless you had impedance matching with the probe. So, I need to match the impedance match the probe to the resonator in order to have an effective resonator? Yes, in my opinion, you would; Exhibit 1239, Page 37.

JUDGE LEE: But isn't that a different matching? You're, you're talking about power supplies --

MR. PISANO: That's the, that's the --

JUDGE LEE: -- versus probe and then you're talking about probe against the cavity.

MR. PISANO: -- that's the only -- no, Your Honor, that's the only impedance you can match. It's not possible to match the other one. There's no way of doing it. Mr. Pozar hasn't explained how to do it, and he -- although he says Mr. Smoler says it, that's not what Mr. Smoler is saying. Mr. Smoler is saying, and he didn't say the distance of the device is not critical, he says the distance form the probe to the lamp is not critical. And that's true because that doesn't make it a resonator. The whole length makes it a resonator. Moving the lamp back and forth will allow you to adjust for the fact that you don't -- you have a hole where the bulb is. And, so you're going to set the peak off a little bit. And, he said he gave several explanations as to why it's not necessary. That's one. Doesn't matter where you put the bulb. That's what Mr. Prior said when he was deposed. He says Mr. Morgan asked him that question. He said but it isn't critical that they be spaced -- that they have that spacing -- the probe and the lamp have that space and Mr. Prior said no, it doesn't make any difference. That only, only affects how much energy goes into the bulb.

So we have Mr. -- so the only impedance matching that could be matched is the, the impedance of the, the, the probe to the wave guide. You can't match this wave guide bulb interface. There's no description how to do it. You couldn't do it, and if you'll go back to the 1953 the only thing everybody knew was that the easiest and the simplest way to do it and the way you would want to make it to confer energy or transfer energy in is for the device to be a resonator.

Now with respect to the reduction to practice video, well there's some issues with it, I unfortunately didn't get to the first time, but, but Mr.

Morgan touched on them. With respect to the conception, and respect to Espiau's conception, Mr. Chang was an inventor. He is an inventor. When Your Honor held the teleconference and said are you going to prove priority by all the inventors. Both parties said yes, but now Espiau says well Mr. Chang wasn't an inventor in that claim, he was other claims. But, there's no evidence of that and as a matter of fact what Mr. Espiau testified is that Mr. Chang invented an intimate contact in the dimensions of the device, but Mr. Chang didn't come into the program until after April 20th. So on April 20th when they made the presentation to Guthrie, and certainly on the 14th, they couldn't have made the whole invention. And, if you go back and look at our reply brief, our opposition brief, you'll see that that's the case.

One of the points that Your Honor should pay attention to is the fact that there's no corroboration, none, for Espiau's case. What they have is they have on witness notes by Mr. Chang, who is deceased. They have on witness notes by Mr. Joshi. They have on witness notes by Mr. Espiau. Now none of them testified that they ever saw the other guy's notebook. And Mr. Turner never testified that he saw any of their notebooks. So you got all of these notebooks running around. Chang's that has no dates on it. And the only people who can testify or try to authenticate those are the other co-inventors or in Mr. Turner's case, an interested party. And so at Page 30 of my Exhibit Book I've cited two cases for you; Lax Industries v. Makitney (phonetic sp.) and Checkpoint Systems. And they basically say if you can't have interested parties testify authenticating the testimony of other interested parties. Basically you need to -- and it's not even a rule of reason. It almost is almost a bright line. They say if you're an interested party you can't really use them to corroborate the other folk's testimony.

And so when you take all of that out, the only witness that Espiau submits any testimony from is Mr. Pobanz. And Mr. Pobanz, which is also discussed in the facts section, was himself the subject of a trade secret suit although not on this matter which was settled in an undisclosed fashion and he refused to talk about it.

The other thing is that with inurement it is -- there is really -- and I didn't hear Mr. Morgan say anything about it because I really don't think they have position. All of this work was contracted for by DRI. All the work was done for DRI. And it should therefore inure to the benefit of DRI, and his main --

JUDGE LEE: Isn't that part of a contractual question for result --

MR. PISANO: Well --

JUDGE LEE: That's an issue for in-house counsel to deal with.

MR. PISANO: Well, no, Your Honor, because it goes to inurement. The question is was the work done. Was this work being done in furtherance of the Guthrie invention? And if you conclude from looking at the drawings and the specified dimensions that that device was a resonator, which you should. And, if you conclude that it's reasonable that at the meeting where Mr. Prior was present he mentioned that device to Espiau, and in fact went forward and signed a second statement of work, the first statement of work was for design study for $20,000. The second statement of work was $375,000 to implement the design. If you believe that, which I submit you should, that, that work flowed from the original design study and that more likely than not,

Mr. Prior who was in the meeting explained his invention to Mr. Espiau which is, which is here, then the work that was being done was being done on behalf of Guthrie; both the work to flush out the dimensions and the actual reduction practice.

JUDGE LEE: I'm not sure I get your argument. Let's say I pay somebody to make an invention for me.

MR. PISANO: Right.

JUDGE LEE: I don't tell them anything. He comes up with the invention. He's fully paid for.

MR. PISANO: Right.

JUDGE LEE: What does that mean? That doesn't make me an inventor. It doesn't make that conception mine.

MR. PISANO: Well it doesn't unless I tell you what the invention is and unless I can prove I had the invention in my possession --

JUDGE LEE: Right, so you --

MR. PISANO: --in my documents.

JUDGE LEE: It's still hinged on your communicating the conception to them.

MR. PISANO: That's true. And the question you have to ask yourself is whether these gentlemen, after one meeting were able to -- how it is that they arrived at exactly what was in Espiau's -- Guthrie's conception documents.

JUDGE LEE: So if --

MR. PISANO: And, and, and --

JUDGE LEE: -- you're able to prove your conception and communication of that conception then whether or not there's inurement later doesn't matter because --

MR. PISANO: Well, if we get into a dispute as to who whether there was an actual reduction to practice or who did what when. I don't think, I think Your Honor that's probably true. I think that, I think that Guthrie can show it had the prior conception. I think they have the contract documents. I think that -- and to the extent Espiau wants to say well you never actually reduced to practice, so we reduced to practice first. If they did, and there's considerable doubt, then it would inure to Guthrie's benefit.

And on the, on the question of what did they reduce to practice and when. The testimony, again, from Guthrie's side -- or sorry from Espiau's side, Page 28, there's this reduction to practice. And this is all carefully, carefully discussed in Guthrie's opposition brief. We take you chapter and verse through each person's testimony. They have Mr. Espiau saying the thing -- so first of all they submitted a video. And the video says, and we provided a transcript, today is August 11th and we're going to show you our lamp lighting, but then you go and you look at the, go and look at the notebooks and well, you know, it didn't work on the 11th. Mr. Espiau, this is Page 28 in the Exhibit Book,

Mr. Espiau says the lamp failed on 11th. He has no entry on the 12th and says it first worked on the 13th.

Dr. Joshi says it didn't work on the 11th. Said he didn't work on it the 12th and the 13th, which is odd because he did the narration for the video. You have Dr. Chang who's notebook pages -- the pages and the dates are missing. And then you have Mr. Turner who said he never saw that lamp lit. He's testified he never saw that lamp. And, on August 17th, after the supposed lighting on August 13th, 11th, 12th, 13th, 14th, whatever. He's telling Mr. Catlett in his note that he's confident the lamp will work; not that it has worked.

Now -- and then finally as also described in the opposition brief, you have this lamp which has the capability to do things that Mr. Espiau testified it couldn't do. So, the whole question of the authenticity of that video is very much in question. Quite honestly, Guthrie submits the authenticity of much of the documentation that was submitted is in question. When you look at Mr. Espiau's 2005 declaration, you cannot reconcile it with his 2007 declaration. Now I know Espiau was trying to do that, but when you read them, don't read his characterizations. Read the two things side-by-side. It can't be done.

JUDGE MEDLEY: Okay, thank, thank you. I think you're up. Do you have any questions?

JUDGE LEE: Just one last one. Again on inurement, let's say that whatever they reduced to practice inures to your benefit, but you're still the junior party so you have actual reduction to practice on the same date it wouldn't help you. You, you haven't proved reduction to practice before their reduction to practice because that same reduction is for their benefit and also for your all benefit. So it would be on the same date.

MR. PISANO: That's right.

JUDGE LEE: So --

MR. PISANO: I, I, I agree. So the answer is -- so the reason for claiming inurement however, is that the conception the documents show prior conception. And so if you're the first to conceive and you simultaneously reduce to practice, Guthrie ought to win.

JUDGE LEE: I'm not getting that.

MR. PISANO: Well, Your Honor, if we both conceive -- if, if, if Guthrie conceived first, Espiau conceived later. Okay. So by March 31st, it's pretty clear that Guthrie knew what it wanted as far as this resonator

Interference 105,393

plasma lamp, this wave guide plasma lamp. That's before Espiau and company ever showed up. They show up. Both parties work diligently, as a matter of fact, they work together. And, then they reduce it to practice. Does, you know, whose reduction to practice is it? Well, if it's both, the one with the earlier conception and reduction to practice, simultaneous reduction to practice ought to win.

JUDGE LEE: What case law is that?

MR. PISANO: I think that's the statute, Your Honor. If you're the first to conceive and the first to reduce to practice, you win.

JUDGE LEE: You're not the first though. That's my point. You have --

MR. PISANO: If you're the first to --

JUDGE LEE: -- simultaneous --

MR. PISANO: Right.

JUDGE LEE: -- actual reduction, so you're not the first to conceive and the first to reduce to practice.

MR. PISANO: Well, Your Honor, I would submit that if there was a simultaneous reduction to practice, but different conception dates, the person with the earlier conception --

JUDGE LEE: That's what you're submission.

MR. PISANO: -- wins.

JUDGE LEE: I ask you --

MR. PISANO: Yes.

JUDGE LEE: -- where's the case law for that?

MR. PISANO: Well, I think, I --

JUDGE LEE: -- you say it's in the statute.

MR. PISANO: That --

JUDGE LEE: -- last time I looked at it, that's not what it says.

MR. PISANO: Well, Your Honor, what the statute calls for diligence and it says if you're diligent --

JUDGE LEE: Yes, but you don't have the diligence first.

MR. PISANO: There's no doubt, Your Honor, that from the time that the two parties began working together on April 11th that both parties were diligent. I mean the, the evidence is clear. And, and it's in the record. It's clear that once the parties signed that statement of work -- well first they met on April 11th and they began working together. They were working on the same subject. So I would submit, Your Honor, that if the reduction of practice is, is -- first of all if there is a reduction of practice, and it's pretty doubtful there is for Espiau, then --

JUDGE LEE: Where's, where's the table of diligence that we normally require for a party who is trying to show diligence.

MR. PISANO: There is not --

JUDGE LEE: There would be an account for your activity for every single day during the critical period.

MR. PISANO: Well the fact that -- the answer, Your Honor, the short answer is that Espiau's diligence inures to Guthrie's benefit. They were hired to do the work for Guthrie. So if they were doing the work to Guthrie -- if I hire you I have the invention. I tell you here go make it. You go off and make it, I would believe, Your Honor that your work under my direction constitutes towards my reduction to practice.

JUDGE LEE: Yeah, but they haven't argued diligence. They haven't argued reasonable diligence as their case for priority.

MR. PISANO: Yes, they have. There's an entire, there's entire, there's pages of it in their appendix.

JUDGE MEDLEY: Isn't the simultaneous reduction to practice -- isn't that after their, they've filed their application, their provisional?

MR. PISANO: Yes, it's -- they filed --

JUDGE MEDLEY: So they would be first.

MR. PISANO: -- their provision on July 31st.

JUDGE MEDLEY: And their actual reduction of practice --

MR. PISANO: -- their, their provisional --

JUDGE MEDLEY: -- was, was in August.

MR. PISANO: Was, was August 11th, 12th, 13th or sometime around there, maybe if you believe it.

JUDGE MEDLEY: So they were first to reduce to practice because they --

MR. PISANO: Well I would say that --

JUDGE MEDLEY: -- a constructive reduction.

MR. PISANO: -- their constructive reduction practice also inures to Guthrie's benefit. Again, they were working on the project for Guthrie. The question is if I hire you and you go out and file a patent application of my invention. Let's say there's no dispute, that I had the earlier conception. You go out and do the work and you file the patent application. Why should that not redound to my benefit? Why, why should that inure to me? I hired you to do the work. It's part, part and parcel. It's a different type of reduction to practice. It's constructive reduction to practice, but I think it's the same.

JUDGE MEDLEY: Okay, thank you.

JUDGE LEE: Where, where in your brief is the section on reasonable diligence?

MR. PISANO: Excuse me?

JUDGE LEE: Where in your priority motion is any argument that you are the first to conceive and the last to reduce to practice, but you have reasonable diligence covering the period?

MR. PISANO: That, that argument is in the alternative, Your Honor. It's in the section where we say that, it's in the section where we say that, that they're work inures to our benefit. That is a section that's in our priority brief that's in Espiau -- Guthrie's priority brief and Espiau has a, Espiau has a diligence. It's Appendix 4 in his, his, his priority and what we've said in the Guthrie paper is that anything that they did inures to Guthrie's benefit. So if there were being diligent, working on the project that they'd been --

JUDGE LEE: Yeah, but it's got to start from your conception date or a date prior to their entering the field. Where's that part of your argument?

MR. PISANO: That is the work that's described in Mr. -- where Mr. Guthrie and Mr. Wilson's declaration and the work that proceeds. That's Exhibit 2147 and 2146.

JUDGE LEE: Where is it described in your priority motion? We can't dig into the record if you don't tell us about it.

MR. PISANO: Your Honor --

JUDGE LEE: Show me, show me the page and line number in your motion --

MR. PISANO: Okay.

JUDGE LEE: -- where you talk about reasonable diligence.

MR. PISANO: Hold on one second. Again -- hold on one second. I misplaced that here. Beginning at Page 22 of Guthrie's Priority

Motion 7, any reduction to practice by Espiau inures to Guthrie's benefit, and what is described in there is basically that it, it describes law of inurement. It describes that Guthrie is in contractual relationship with Temco and BetaDot. Temco and BetaDot were required to sign any rights in the invention --

JUDGE LEE: Can you make the answer short? I just want to know where you argued the case of conception plus continuous reasonable diligence.

MR. PISANO: I would say, Your Honor that is at Pages 22 --

JUDGE LEE: Just read it for me if you can find it right there.

MR. PISANO: Okay. Well, it is -- it begins at Page 22 and it says, the work was done and it describes at April 11th, it describes the meetings.

JUDGE LEE: Where's the word diligence? Where does that even appear on either one of these two pages?

MR. PISANO: Okay, Your Honor. Hold on one second.

JUDGE LEE: Or is it like one of the resonator arguments. Although the word is not said, but somehow it's in here.

MR. PISANO: Well, Your Honor, I guess I would say that it appears at Page 28. I mean, I think that's the summary. There's, there's six pages discussing the contacts between the parties and the work that was done by Guthrie and it says, at the time DRI indebted Temco BetaDot undertook --

JUDGE LEE: Which line? Which page, please, counsel?

MR. PISANO: They had a complete -- to the extent that SPR achieved any reduction of private --

JUDGE LEE: Which line, which page, counsel?

MR. PISANO: I'm sorry, Your Honor, Page 28, Line 8. Beginning at Line 8. It's that argument --

JUDGE LEE: Can you read it, please. I don't, I don't -- I'm not seeing what you're telling me.

MR. PISANO: To the -- yes, Sir. To the extent that Espiau achieved any reduction to practice, either constructive or actual, such reduction to practice was in furtherance of the work contracted for and funded entirely by DRI and inures to DRI's benefit.

JUDGE LEE: And that's the entirety of your argument on conception plus reasonable continuous diligence to reduction to practice?

MR. PISANO: No, Your Honor, that argument -- no, Your Honor, that argument appears at Page 22 and goes on to Page 28. So, you've asked me to find the word diligence, or diligence in that six pages. If you'll bear with me, I will look again.

JUDGE LEE: That's okay. I don't think you, you can give me an answer. I'm not interested in answering it.

MR. PISANO: Thank Your Honor.

JUDGE MEDLEY: Mr. Morgan, you have five minutes, please.

MR. MORGAN: Okay, just a couple of items. Going back to this, this issue about impedance matching, Judge Moore had it exactly right what counsel was talking about is an entirely different subject; impedance matching the probe to the wave guide. Interestingly enough on Slide 9, in which was shown to you earlier and which counsel said he examined Mr. Espiau to say that drawing from December looks like a resonator. Interestingly enough, he then read to Mr. Espiau, the email that went with it. At which point Mr. Espiau said that's not a resonator. That thing won't

resonate, and one of the things he cited was impedance matching issue. Smoler certainly thought you could impedance match the bulb to a wave guide. He testified to it at his deposition, and he gave us two ways of doing it in his documents.

Now, in terms of those cases, in terms of corroboration, that's not what they say. He's trying to take the cases which talk about testimony and turn it into case to somehow talking about documents, required corroborations, and that's never been held. They're authenticated and they stand for what they stand for. I, I guess I cannot let pass the aspersions and maybe their subtle, but aspersions on both Dr. Joshi and Mr. Espiau that somehow how could they come up with this idea. Well, Dr. Joshi is a Maxwell Prize winning professor in plasma physics, and is the head -- was the head at the time of the radio frequency microwave laboratory at UCLA. Mr. Espiau had 13 years working as manager of that laboratory, training in the Army as a RF specialist, and in fact, he wrote the course materials to teach the UCLA students RF and microwave.

Finally, the diligence. There's nothing whatsoever about diligence in the briefing and they can't prove any diligence prior to Espiau's entry into the field. So, given all that, I rest. Thank you.

JUDGE MEDLEY: Thank you.

MR. PISANO: Your Honor, may I make one point? I would suggest, Your Honor, you take a look at Cadilli (phonetic sp.), the Cadilli case at 55 U.S. Pt 2nd 1238, 1248 (BOA 1998) which basically says a party can't corroborate his own documents if there's no independent corroboration.

JUDGE MEDLEY: Okay. Thank you.

(Whereupon, the proceedings concluded at 2:30 p.m. January 7, 2008.)

C E R T I F I C A T E

This is to certify that the attached proceedings before the U.S. Patent and Trademark Office in the matter of:

CHARLES GUTHRIE, EDMUND SANDBERG, DONALD WILSON, GREGORY PRIOR and DAVID SMOLER
Application 09/818,092
Junior Party

v.

FREDERICK M. ESPIAU, CHANDRASHEKHAR J. JOSHI and YIAN CHANG
Patent 6,737,809
Senior Party

PLACE: Alexandria, Virginia
DATE: January 7, 2008
were held as herein appears, and that this is the original transcript thereof.

______________________________
TIMOTHY J. ATKINSON, Reporter
FREE STATE REPORTING, INC.

cc (via e-mail):

Attorney for Guthrie:

Nicola A. Pisano, Esq.
**JONES DAY**
12265 El Camino Real, Suite 200
San Diego, CA 92130
Tel: (858)314-1129
Fax: (858)314-1150
Email: napisano@jonesday.com

Attorney for Espiau:

Richard Neifeld – Lead Counsel
Robert Morgan – Backup Counsel
**NEIFELD IP LAW, PC**
4813-B Eisenhower Avenue
Alexandria, VA 22304
Tel.: (703)415-0012 Lead Counsel
Fax: (703)415-0013
Tel.: (212)596-9133 Backup Counsel
Email : rneifeld@neifeld.com
Email : robert.morgan@ropesgray.com

# EXHIBIT P

BoxInterferences@uspto.gov
Telephone: 571-272-4683

Paper 256
Entered 24 March 2008

UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES

CHARLES **GUTHRIE**, EDMUND SANDBERG,
DONALD WILSON, GREGORY PRIOR, and DAVID SMOLER
Junior Party
(Application 09/818,092),

v.

FREDERICK M. **ESPIAU**, CHANDRASHEKHAR J. JOSHI,
and YIAN CHANG
Senior Party
(Patent 6,737,809).

Patent Interference No. 105,393 (SCM)
(Technology Center 2800)

*Before* LEE, MEDLEY, and MOORE, *Administrative Patent Judges.*

MEDLEY, *Administrative Patent Judge*.

**Decision – Priority – Bd.R. 125(a)**

**A. Statement of the Case**

Guthrie and Espiau each moved for judgment on the basis of priority. Both parties filed motions to exclude evidence from the record. Oral argument was held 7 January 2008[1].

[1] The transcript was entered into the record 7 February 2008 (Paper 254).

For the reasons that follow, we deny Guthrie's priority motion and dismiss as moot Espiau's priority motion. The parties' respective motions to exclude evidence are dismissed.

**B. Issue**

The issue before us is has Guthrie met its burden to sufficiently demonstrate priority of invention and/or derivation of invention?

For the reasons that follow, Guthrie has not met its burden to sufficiently demonstrate priority of invention and/or derivation of invention.

**C. Findings of fact**[2]

1. Guthrie is involved on the basis of application 09/818,092, filed 26 March 2001.

2. Espiau is involved on the basis of patent 6,737,809, granted 18 May 2004, based on application 09/809,718, filed 15 March 2001.

3. At the time of declaration, Guthrie was accorded benefit of several provisional applications (Paper 1 at 4).

4. During the course of events, Espiau Motion 3, to deny Guthrie benefit of all of the provisional applications was granted (Paper 83 at 38-43; rehearing denied Paper 89; Redeclaration Paper 255).

5. Thus, for purposes of the priority phase, Guthrie's earliest constructive reduction to practice date is 26 March 2001, the filing date of Guthrie's involved application.

6. Espiau has been accorded benefit for the purpose of priority of application 60/222,028, filed 31 July 2000.

---

[2] The following findings of fact as well as those contained elsewhere in this opinion are supported by a preponderance of the evidence.

7. Guthrie real party in interest is Ceravision Limited (Paper 10).

8. Espiau real party in interest is Luxim Corporation (Paper 7).

9. The count is claim 109 of Guthrie application 09/818,092 or claim 1 of Espiau patent 6,737,809 or claim 129 of Guthrie application 09/818,092 or claim 32 of Espiau patent 6,737,809 (Paper 1).

10. Guthrie claim 109 is as follows:

A lamp comprising:

(a) a waveguide having a body comprising a ceramic dielectric material of a preselected shape and preselected dimensions, the body having a first side determined by a first waveguide outer surface;

(b) a first feed positioned within and in intimate contact with the waveguide body, adapted to couple energy into the body from a source having an output and operating at a preselected frequency and intensity, the feed connected to the source output, said frequency and intensity and said body shape and dimensions selected such that the body resonates in at least one resonant mode having at least one electric field maximum;

(c) an enclosed first cavity depending from said first surface into the waveguide body; and

(d) a first bulb positioned in the cavity at a location corresponding to an electric field maximum during operation, the bulb containing a gas-fill which when receiving energy from the resonating waveguide body forms a light-emitting plasma.

11. Espiau claim 1 is as follows:

A lamp comprising:

(a) a waveguide having a body comprising a ceramic dielectric material of a preselected shape and preselected dimensions, the body having a first side determined by a first waveguide outer surface;

(b) a first microwave feed positioned within and in intimate contact with the waveguide body, adapted to couple microwave energy into the body from a microwave source having an output and an input and operating within a frequency range from about 0.5 to about 30 GHz at a preselected frequency and intensity, the feed connected to the source output, said frequency and intensity and said body shape and dimensions selected such that the body resonates in at least one resonant mode having at least one electric field maximum;

(c) an enclosed first cavity depending from said first surface into the waveguide body; and

(d) a first bulb positioned in the cavity at a location corresponding to an electric field maximum during operation, the bulb containing a gas-fill which when receiving microwave energy from the resonating waveguide body forms a light-emitting plasma.

12. Guthrie claim 129 is as follows:

A method for producing light comprising the steps of:

(a) coupling energy characterized by a frequency and intensity into a waveguide having a body comprising a ceramic dielectric material of a preselected shape and preselected dimensions, the body having a side determined by an outer waveguide surface and a cavity depending from said surface into the body, said frequency and intensity and said body shape dimensions selected such that the body resonates in at least one resonant mode having at least one electric field maximum;

(b) directing resonant energy into an envelope determined by the cavity and a window, the envelope containing a gas-fill; and

(c) creating a plasma by interacting the resonant energy with the gas-fill, thereby causing emission of light.

13. Espiau claim 32 is as follows:

A method for producing light comprising the steps of:

(a) coupling microwave energy characterized by a frequency and intensity into a waveguide having a body comprising a ceramic dielectric material of a preselected shape and preselected dimensions, the body having a side determined by an outer waveguide surface and a cavity depending from said surface into the body, said frequency and intensity and said body shape and dimensions selected such that the body resonates in at least one resonant mode having at least one electric field maximum;

(b) directing resonant microwave energy into an envelope determined by the cavity and a window, the envelope containing a gas-fill; and

(c) creating a plasma by interacting the resonant energy with the gas-fill, thereby causing emission of light.

14. The claims of the parties are:

| | |
|---|---|
| Guthrie: | 109-131 |
| Espiau: | 1-35 |

15. The claims of the parties which correspond to the count are:

| | |
|---|---|
| Guthrie: | 109-131 |
| Espiau: | 1-35 |

16. The claims of the parties which do not correspond to Count 1, and therefore are not involved in the interference, are:

| | |
|---|---|
| Guthrie: | none |
| Espiau: | none |

*Interpretation of the count*

17.  In the Decision on Rehearing, the Board expressly rejected Guthrie's argument that the count only requires that the devices be capable of operating in a resonant mode (Paper 89 at 8:18-20 to 9:2).

18.  The Board reaffirmed what was explained in the Decision on Motions in denying Guthrie benefit of its provisional applications, by reiterating that the count requires the claimed devices "to be in a state of at least one resonant mode" and to possess "more than an ability to operate in at least one resonant mode" (Paper 89 at 9:28 to 10:1).

19.  Thus, the parties' proof of an actual reduction to practice requires a showing that the device reduced to practice operated in at least one resonant mode, e.g., that the device tested actually resonated.

*Reduction to practice*

20.  Guthrie alleges that it actually reduced the invention to practice during the week of 17 July 2000 (Paper 109 at 16).

21.  Guthrie relies on the testimonies of Wilson (Ex. 2181), Nunes (Ex. 2199), Bennett (Ex. 2186), Guthrie (Ex. 2180), and Gandhi (Ex. 2164) to describe what was constructed and/or tested.

22.  Wilson testified that in early July 2000, he contacted Ceramic Tech., Inc. to make a few samples of a rectangular half-wavelength waveguide (Ex. 2181 ¶ 51).

23.  Wilson further testified that Ceramic Tech. made a small number of half wavelength waveguides using "substantially the same dimensions" set forth on page 2 of Exhibit 2137 (Ex. 2181 ¶ 52).

24.  Wilson further testified that the parts made did not have a layer of

metallization on them and that he and Joe Bennett coated the parts with silver paint (Id.).

25.  Wilson testified that the painted parts looked like the part shown in Exhibit 2041, although the metal layer was not as precise as the one shown in that Exhibit (Id.).

26.  Gandhi, a sales manager at Ceramic Tech., Inc. recalls that "the ceramic parts that CeramicTech machined in the first few weeks of July 2000 looked substantially like the part shown in Exhibit 2041" (Ex. 2164 at ¶ 1, 3 and 4).

27.  Gandhi explained that the "only difference that I see is that the part in Exhibit 2041 appears to have a coating, whereas the parts machined by Ceramic Tech were bare alumina" (Id. ¶ 4).

28.  Gandhi also testified that the overall dimension of the parts shown in the sketch labeled #2 (the second page of Ex. 2137) and a drawing labeled "CTS010" (Ex. 2048) are consistent with his recollection of the size of the part that Ceramic Tech made for DRI in July 2000 (Id. ¶ 5).

29.  Gandhi testified that Wilson came by Ceramic Tech's office with a drawing similar to that shown in Exhibit 2137 (sketch #2), but with not so many variations (Id. ¶ 6).

30.  Bennett testified that Wilson had a small number of waveguides "substantially as shown in Exhibit 2137 (sketch #2)" made in early July 2000 (Ex. 2186 ¶ 8).

31.  Nunes testified that he witnessed the lighting of a plasma lamp "like that shown in Exhibit 2041" during the week of about 17 July 2000 (Ex. 2199 ¶ 3).

32.  Nunes testified that the dimensions for the part shown in Exhibit 2048 are "consistent with my recollection of the size of the part that I saw tested in July

2000 (Id. ¶ 4).

33. The second page of Exhibit 2137 is said to be a sketch that was submitted to another company (Coorstek) in connection with a quotation (Ex. 2181 ¶ 52 and Paper 109 GFF[3] 168) and is as follows:

Page 2 of Exhibit 2137 is described as a sketch that was faxed to Coorstek

34. Exhibit 2041 is said to be a photograph of a half wavelength waveguide, a waveguide that is said to have been delivered to Guthrie after the critical July 30, 2000 date (Ex. 2181, ¶ 60) and is as follows:

[3] GFF denotes Guthrie finding of fact numbered in Guthrie's priority motion.



Exhibit 2041 shows a photograph of a half wavelength ceramic waveguide

35.  Exhibit 2048 is said to be a drawing made by C. Guthrie of a half-wavelength resonator ceramic part (Ex. 2180 ¶ 33) and is as follows:



Exhibit 2048 is described as a drawing made by C. Guthrie of a ceramic part

36. Dr. Gupta testified that based on his inspection of, and calculations for "the Sample" that is shown in Exhibit 2041 and sketch 2 of 2137, that the device depicted in "the Sample" constitutes a physical embodiment of the invention of the Count (Ex. 2182 ¶ 34).

37. Specifically, Gupta testified as follows:

> 31. In addition to the above, I have reviewed page 2 of Exhibit 2137, inspected the half-wavelength waveguide depicted in Exhibit 2041 ("the Sample"), and reviewed the declarations of Joe Bennett (Exhibit 2186) and Dennis Nunes (Exhibit 2199). The Sample is a physical embodiment of the device depicted on page 2 of Exhibit 2137, and is described by Messrs. Bennett and Nunes as substantially the same as that operated during the week of July 17, 2000. The Sample comprises a rectangular block of alumina having a metal layer disposed on its outer surface to form six conducting walls. I measured the outer

dimensions of this device to be approximately as follows: width **w** = 2.75 cm, height **h** = 1.3 cm, and length **d** = 3.4 cm. One of the faces, having dimensions **w** by **d**, can be considered the first face, and is shown in the topmost photograph of Exhibit 2041. There is an aperture located exactly in the middle of the first face, through which the ceramic material in the interior is visible. On the opposite face, which also has dimensions **w** by **d**, there are two smaller apertures filled with solder, which serve as probes that extend into the resonator. The two smaller orifices are disposed 1.7 cm from each other, and approximately 0.85 cm from either end. This opposite face is shown in the bottommost photograph of Exhibit 2041.

32. One of ordinary skill in the art would immediately recognize that the Sample is a rectangular resonator, as it is a section of rectangular waveguide of cross-section **w** by **h**, and having a length **d**, that is shorted at both ends by conducting walls that are a distance of **d** apart. One of ordinary skill in the art also would recognize and understand that the Sample is the classical textbook variety of resonator, discussed in numerous undergraduate textbooks on electromagnetic fields and microwave engineering. As described by Mr. Wilson in Exhibit 2181, the recess in the center of the first face is sufficiently large to accommodate a load, such as a bulb, while the two ports on the reverse side permit the insertion of probes that can be coupled to an RF source.

33. I understand that the Sample is referred to as a “half wavelength” waveguide by the Guthrie inventors because, unlike the ceramic waveguide resonator described on Page A19 of Exhibit 2146 and in Exhibit 2147, in which the resonator length was selected as corresponding to the “full” waveguide wavelength at the nominal resonant frequency (the $TE_{102}$ mode), the Sample was designed to resonate at the dominant mode, i.e., the lowest resonant frequency. As is apparent from Figure 6.6 (reproduced in paragraph 15 above), the dominant mode corresponds to having a resonator length equal to one-half wavelength of the waveguide wavelength at the resonant frequency (the $TE_{101}$ mode). In this resonant mode, the electric field maximum is located at the center of the rectangular block.

> 34. Using the Sample dimensions discussed above (d = 3.4 cm, w = 2.75 cm), a value of the dielectric constant of 9.2, and the recast textbook formula set forth in paragraph 28 above, I compute a resonant frequency of 2.3 GHz, readily achievable with commercially available variable frequency RF sources. Based on my inspection of, and calculations for the Sample shown in Exhibit 2041, I have determined that, except for the missing quartz bulb described by Mr. Wilson in Exhibit 2181, ¶ 52, the device depicted in Exhibit 2041 (and the corresponding part operated during the week of July 17, 2000), unequivocally constitutes a physical embodiment of the invention of the Count. The claim chart set forth below compares the device described by Messrs. Bennett and Nunes as having been operated during the week of July 17, 2000, of which Exhibit 2041 is representative, to the Count.

38. Espiau's involved specification describes that in order for the ceramic waveguide to resonate and maintain resonance, the waveguide must be of a particular dimension in coordination with the dielectric constant of the material used and the particular frequency that is applied to the waveguide:

> The actual dimensions of the waveguide will vary depending upon the microwave operating frequency and the dielectric constant of the waveguide body 104. (Ex. 1007, col. 4:66 to col. 5:2).
>
> And:
>
> Much of the energy absorbed by the plasma eventually appears as heat such that the bulb temperature may approach 1000$^0$C. When the waveguide is also used as a heat sink, as previously described, the dimensions of the waveguide may change due to thermal expansion. If the waveguide expands, the microwave frequency that will resonate within the waveguide changes and resonance is lost. In order for resonance to be maintained, the waveguide must have at least one dimension equal to an integer multiple of the half-wavelength of the microwaves being generated by source 115. (Ex. 1007 col. 9:11-21).

39. Espiau's involved specification also describes that in order to receive the electric field maximum created by the resonance, the bulb must be specifically positioned in the waveguide to receive the maximum:

> In DWIPLs 410, 420, 430, bulb cavities 415, 425, 435, respectively, and feeds 413, 423, and (433, 434), respectively, are preferably positioned with respect to waveguides 417, 427, 437, respectively, at locations where the electric fields are at an operation maximum. (Ex. 1007, col. 7:59-64).

*Testing of the device*

40. Bennett testified that the waveguide plasma lamp was coupled to a variable frequency RF generator and that Sandberg adjusted the frequency to light the bulb (Ex. 2186 ¶ 11).

41. Bennett also testified that he was surprised by the brightness of the light emitted by the plasma lamp and that he saw purple spots for days after the test (Id.).

42. Bennett testified that he has reviewed a photograph labeled Exhibit 2178 which he understands to be a photo taken in 2002 and that the light emitted by the lamp they tested in July 2000 looked the same as shown in the photo (Id. ¶ 12).

43. Nunes testified that during the testing of the device, he recalls Sandberg turned on the RF generator and adjusted the frequency to light the bulb and that the bulb shown as bright as the sun (Ex. 2199 ¶ 5).

44. Nunes declared that he has examined Exhibit 2178 and the plasma lamp shown in that photo is substantially the same as that he witnessed in operation in July 2000 (Id.).

45. Wilson testified that his best recollection was that during the week of July 17, 2000, the assembled waveguide plasma lamp was coupled to the Keltec

variable frequency RF generator and powered on to ignite a plasma in the bulb (Ex. 2181 ¶ 53).

46. C. Guthrie testified that Sandberg showed him an assembled ceramic waveguide resonator and that the lamp gave off a very bright light when powered on (Ex. 2180 ¶ 33).

47. C. Guthrie also testified that the part looked identical to that shown in Exhibit 2041 and the lighted lamp looked identical to a photo shown in Exhibit 2178 which was taken in 2002 (Id.).

48. None of Guthrie's declarants testified that the device operated during the week of 17 July 2000 operated in at least one resonant mode.

49. None of Guthrie's declarants testified that the device operated was tested to determine that the waveguide body resonated in at least one resonant mode having at least one electric field maximum.

50. None of Guthrie's declarants testified that the device was tested to determine if the bulb was ignited by receiving energy from the resonating waveguide body to *form a light-emitting plasma* or *creating a plasma* by interacting the resonant energy with the gas-fill.

51. During oral argument, counsel for Guthrie argued that it was most likely that the constructed waveguide resonated when tested, because that's what it was meant to do (Paper 254 at 27:11-17):

> JUDGE MOORE: Let me recast this question then. Is it possible if I shove enough RF energy down the throat of this little thing, I can get that light to light regardless of whether or not it's a resonator?
>
> MR. PISANO: I don't know. I – whether it will light first or melt, I don't know. And, and no one had the opportunity to do that test, but the most likely, the most likely thing is it resonated because

that's what it was meant to do.

*Derivation*

52. Guthrie alleges that Espiau derived the invention from Guthrie on 11 April 2000 (Paper 109 at 22).

53. On 11 April 2000 a meeting was held that included at least Turner, Espiau, Joshi, Wilson, Prior and Guthrie (Paper 109 at 20).

54. Inventor Prior testified that:

> 16. One purpose of the April 11 meeting at ITW was to introduce David Turner, his company Tenco and Betadot – Matt Espiau and Chan Joshi – to DRI and ITW. During DRI's presentation of its proposed loop-type plasma lamp design, Matt Espiau interrupted to suggest that a waveguide could be used to couple the bulb to the ceramic printed wiring board. I immediately told him that the DRI had already considered and dismissed the use of an air waveguide as too large to be practical in the plasma lamp application. I further told him that DRI had instead developed an embodiment in which a gas-fill or bulb was integrated into a ceramic waveguide configured as a resonator. (Ex. 2185 ¶ 16).

55. Inventor C. Guthrie testified that:

> 6. The purpose of the April 11 meeting at ITW was to introduce David Turner, his company Tenco and Betadot – Matt Espiau and Chan Joshi – to DRI and ITW and discuss the schedule for DRI's ceramic plasma lamp development project. Early on during that meeting, Matt Espiau suggested that a waveguide might be used between the bulb and the ceramic printed wiring board ("PWB"). I recall that Greg Prior immediately told Matt Espiau that the DRI had already developed a version of a ceramic waveguide, configured as a resonator, in which a gas fill or bulb was integrated into the ceramic block. (Ex. 2180 ¶ 6).

56. Inventor Wilson testified that:

> 25. One purpose of the April 11 meeting at ITW was to introduce David Turner, his company Tenco and its consultant Betadot – Matt Espiau and Chan Joshi – to DRI and ITW, and to discuss the schedule for DRI's ceramic plasma lamp, in which a ceramic bulb was coupled to RF electronics disposed on a ceramic printed wiring board ("ceramic PWB"). During the course of the meeting, Matt Espiau suggested that a waveguide structure could be used to couple the ceramic bulb to the ceramic PWB. Greg Prior immediately told him that the DRI had already considered and dismissed the use of an air waveguide as too large to be practical in the plasma lamp application, and instead had developed an embodiment in which a gas-fill or bulb was directly integrated into a ceramic waveguide configured as a resonator. As stated in paragraph 18 of my February 18, 2006 declaration, I suspect that the ceramic waveguide concept was transmitted to Tenco by Jim Legge, although I now appreciate that Greg Prior also may have mentioned it to Turner during a meeting I did not attend. (Ex. 2181 ¶ 25).

57. Guthrie relies on the testimonies of Cooper and Pothoven to corroborate the Guthrie inventors accounting of events that took place during the meeting.

58. However, according to Cooper, he was not present during the alleged communication of the invention and testified that:

> 10. After attending a short introductory session in the ITW conference room to discuss the schedule, and introduce the participants and their qualifications, I left the room to attend to other business. I returned to the conference room a short time later to find that the group had been taken for a tour of ITW's laboratory. I vividly recall being upset that the Tenco visitors were permitted to tour the ITW laboratory because they could have been exposed to a number of ITW's trade secret processes. Afterwards I instructed that the group not be permitted to leave the conference room area, and I continued to go in and out of the meeting as time and my other duties permitted.
>
> 11. After the April 11 meeting had concluded, and the Tenco people had departed, I recall discussing with Greg Prior and Don Wilson their

impressions of the Tenco people and their capability to assist on the ceramic bulb project. They reported to me that, based upon its discussion with Tenco in relation to the RF design, DRI had decided to advance development of a ceramic resonator concept that DRI had begun working on in late 1999. They described that at the meeting Matt Espiau had suggested using a waveguide to couple the ceramic bulb we were working on to the electronics, similar to the ceramic resonator concept I had previously discussed with them. Tenco suggested that using DRI's ceramic resonator design would simplify the RF electronics design. In addition, I understood that since DRI and ITW were already working on sapphire-to-ceramic sealing technology for the ceramic bulb, that technology could be readily applied to sealing a gas-filled cavity in the ceramic resonator design. (Exhibit 2184).

59. Pothoven testified that:

10. Once the meeting had reconvened in the conference room, Don Wilson and Charles Guthrie began explaining the version of the plasma lamp that was to be the focus of development over the next ten to twelve weeks. Shortly after beginning their presentation, Matt Espiau interrupted to suggest that a waveguide could be used to simplify the design.

11. Greg Prior immediately said that DRI had considered and rejected air waveguides, and instead had developed a ceramic-filled resonator plasma lamp design in which the gas-fill was located in a chamber in the ceramic. Greg Prior then sketched out that design for the Tenco people, which was the same design that I had previously discussed with Charles Guthrie and Don Wilson. I recall that it was agreed that the ceramic resonator design would simplify the design of the RF electronics and was favored by Tenco as the easiest design to implement.

60. During oral argument, counsel for Guthrie confirmed that in connection with its priority motion, Guthrie does not direct us to a picture, photo, or drawing of what was sketched by Prior as follows (Paper 254 at 5:6-15):

> JUDGE LEE: No, well, that's not exactly what I'm asking for. You're saying that's essentially the same as this other one, but is there an exhibit where a declarant says, yes, that is the picture I drew on the board. I want a definitive thing of what he put on the board.
>
> MR. PISANO: The closest we have is to what Mr., Mr. Prior drew on the board would be –
>
> JUDGE LEE: So, there is no picture. Right?
>
> MR. PISANO: There is no picture.
>
> JUDGE LEE: I don't want anything close to it –
>
> MR. PISANO: No, there's no picture.

61. During oral argument, counsel for Guthrie represented that when cross examined, none of Guthrie's witnesses recalled that the word resonator was spoken during the 11 April 2000 meeting as follows:

> JUDGE LEE: So, so as I read the testimony, no one actually can confirm the declarations that the word, resonating or resonator was ever said, so –
>
> MR. PISANO: That's right. (Paper 254 at 6:1-4).
>
> And
>
> MR. PISANO: No, the question -- oh well, that's, that's in Mr. Morgan's slide. The question is do you recall whether the word resonator was used seven years ago? And the answer was I don't recall whether the word resonator was used seven years ago.
>
> JUDGE LEE: You point to one person, but it seems to me like five or six different people were all there. They all couldn't remember.

> MR. PISANO: Well, Your Honor, I suppose that's just an artifact of human nature that not to remember precisely what words were used to describe this device seven years ago. If you asked me what I had said seven years in a conversation, not knowing at the time this was going to become a bone of contention later on, I probably wouldn't remember. (Paper 254 at 13:9-19).

**D. Analysis**

Guthrie as the junior party must demonstrate priority of invention by a preponderance of the evidence. Bd. R. 207(a)(2). Guthrie alleges that by the end of March 2000 it conceived of the invention, and on 11 April 2000 communicated its conception to Espiau, e.g., that Espiau derived the invention from Guthrie. Guthrie alleges that it actually reduced the invention to practice sometime during the week of July 17, 2000. Alternatively, Guthrie argues that any reduction to practice made by Espiau inures to Guthrie's benefit.

For the reasons that follow, Guthrie has failed to demonstrate priority of invention by a preponderance of the evidence.

*Reduction to practice*

Priority of invention belongs to the first party to reduce the invention to practice unless the other party can establish that it was the first to conceive the invention and that it exercised reasonable diligence in later reducing the invention to practice. *Eaton v. Evans*, 204 F.3d 1094, 1097 (Fed. Cir. 2000). To establish an actual reduction to practice, it must be established that (1) the party constructed an embodiment or performed a process that met every element of the count and (2) the embodiment or process operated for its intended purpose. *Id*. at 1097. There can be no actual reduction to practice if the constructed embodiment or performed process lacks an element recited in the count or uses an equivalent.

Count 1 is Guthrie claim 109 or Guthrie claim 129 or Espiau claim 1 or Espiau claim 32 (FF 9). In its brief, Guthrie seeks to demonstrate a prior actual reduction to practice with respect to Espiau claim 1 (Paper 109 at 17-19[4]). Accordingly, the focus of our discussion is with respect to Espiau claim 1, which is as follows:

> A lamp comprising:
>
> (a) a waveguide having a body comprising a ceramic dielectric material of a preselected shape and preselected dimensions, the body having a first side determined by a first waveguide outer surface;
>
> (b) a first microwave feed positioned within and in intimate contact with the waveguide body, adapted to couple microwave energy into the body from a microwave source having an output and an input and operating within a frequency range from about 0.5 to about 30 GHz at a preselected frequency and intensity, the feed connected to the source output, said frequency and intensity and said body shape and dimensions selected such that the body

---

[4] Attached to Guthrie's brief is Appendix 3.2 styled "COMPARISON OF GUTHRIE'S REDUCTION TO PRACTICE TO THE COUNT" in which Guthrie compares its proofs with Espiau claim 1. That appendix contains arguments incorporated from Guthrie's priority motion in violation of Bd.R. 106(b)(3) and SO ¶ 106.2. Moreover, the claim chart is not the sort of claim chart that should be attached as an appendix to a motion as required by Bd.R. 121(e). A claim chart is not appropriate for presenting or incorporating arguments as Guthrie has done here. Guthrie's Appendix 3.2 goes beyond what is authorized by the rule, since it contains incorporated arguments. As stated per SO ¶ 106.2, incorporation of arguments by reference amounts to a self-help increase in the length of the brief and a pointless imposition on the Board's time. The Board declines to play archeologist with the record. *DeSilva v. DiLeonardi*, 181 F.3d 865, 866-867 (7th Cir. 1999). Thus, Guthrie's Appendix 3.2 has not been considered in rendering the decision.

resonates in at least one resonant mode having at least one electric field maximum;

(c) an enclosed first cavity depending from said first surface into the waveguide body; and

(d) a first bulb positioned in the cavity at a location corresponding to an electric field maximum during operation, the bulb containing a gas-fill which when receiving microwave energy from the resonating waveguide body forms a light-emitting plasma.

To establish an actual reduction to practice, it must be established that (1) the party constructed an embodiment or performed a process that met every element of the count and (2) the embodiment or process operated for its intended purpose. *Id*. at 1097. Guthrie has failed to satisfy either prong of the two prong requirement for the following reasons.

*Has Guthrie proved that it constructed an embodiment or performed a process that met every element of the count?*

Guthrie alleges that it completed construction and tested an embodiment within the scope of the count sometime during the week of 17 July 2000 (Paper 109 at 19), which is prior to Espiau's accorded benefit date of 31 July 2000 (FF 6). Guthrie does not direct us to a picture, drawing, or photo evidence of what was actually made and tested during the week of July 17, 2000. Rather, Guthrie relies on the testimonies of inventors Wilson (Ex. 2181) and C. Guthrie[5] (Ex. 2180), and noninventors Nunes (Ex. 2199), Bennett (Ex. 2186), and Gandhi (Ex. 2164) who describe what was constructed.

[5] References to "C. Guthrie" are to the inventor Charles Guthrie. References to "Guthrie" are to the junior party in interference.

Guthrie alleges that in early July 2000, inventor Wilson contracted with Ceramic Tech., Inc. to make a few samples of a rectangular waveguide (Paper 109 at 16). Guthrie's declarants essentially testify the same (discussed in detail below) – that the part made was substantially the same as, or consistent with, that which is shown on page 2 of Exhibit 2137 and Exhibit 2048, and that the part looked substantially like that shown in Exhibit 2041 (FFs 23, 25, 26, 28, and 30-32).

Page 2 of Exhibit 2137 is said to be a sketch that was submitted to another company (Coorstek) in connection with a quotation (FF 33). Exhibit 2041 is said to be a photograph of a half wavelength waveguide, a waveguide that is said to have been delivered to Guthrie after the critical July 30, 2000 date (FF 34). Exhibit 2048 is said to be a drawing made by C. Guthrie of a half-wavelength resonator ceramic part (FF 35).

Gandhi, a sales manager at Ceramic Tech., Inc. recalls that "the ceramic parts that CeramicTech machined in the first few weeks of July 2000 looked substantially like the part shown in Exhibit 2041" (FF 26). Gandhi explained that the "only difference that I see is that the part in Exhibit 2041 appears to have a coating, whereas the parts machined by Ceramic Tech were bare alumina" (FF 27). Gandhi further testified that the overall dimension of the parts shown on page 2 of Exhibit 2137 and drawing labeled "CTS010" (Ex. 2048) are consistent with his recollection of the size of the part that Ceramic Tech made for DRI in July 2000 (FF 28). Wilson testified that Ceramic Tech made a small number of half wavelength waveguides using "substantially the same dimensions" set forth on the second page of 2137 (FF 23) and that the parts looked like the part shown in Exhibit 2041 (FF 25).

Bennett testified that Wilson had a small number of waveguides "substantially as shown in Exhibit 2137 (sketch #2)" made in early July 2000 (FF 30).

Nunes testified that the waveguide tested was like that shown in Exhibit 2041 (FF 31) and that the dimensions for the part shown in Exhibit 2048 are consistent with his recollection of the size of the part that was tested (FF 32).

Guthrie relies on the testimony of Dr. Gupta who was said to have examined a device constructed in accordance with page 2 of Exhibit 2137, and as depicted in 2041 ("the Sample") and confirmed by calculations that the device ("the Sample") is a waveguide resonator and when assembled with a DRI bulb constitutes a physical embodiment of the invention of the Count (Paper 109 at 17; FFs 36-37).

It is reiterated that Guthrie does not submit into evidence a picture, drawing, or sketch of the constructed device.  Rather, Guthrie relies on the testimonies of witnesses who essentially testify the same - that the part made in July 2000 was substantially the same as, or consistent with, a photo and/or engineering drawing(s) shown to them.  Dr. Gupta examined the photo and engineering drawing(s) that were shown to the witnesses and a device allegedly constructed in accordance with the photo and/or engineering drawing(s) and concluded that the device met the limitations of the count.

However, Dr. Gupta's testimony is not particularly helpful, since based on the record, we do not know that the device actually constructed in July 2000 was the same as one that was made based on Exhibit 2041 and Exhibit 2137 (e.g., "the Sample").  Dr. Gupta was not there and none of Guthrie's witnesses testify as to the actual dimensions of the device constructed in July 2000.

With respect to the photo depicted in Exhibit 2041, we do not know if dimensions are accounted for; the declarants do not say. Rather, the declarants make statements such as that the dimensions shown in a sketch, a sketch that was not used to make the waveguide (FF 29), are "consistent with" the dimensions they recall; or that the dimensions shown in a sketch are "substantially the same" as the dimensions of the waveguide that was tested.

That a person recalls that the dimensions of something he or she saw some years ago are consistent with or have substantially the same dimensions as something else that is presently before them does not tell us much that is meaningful in the context of the count. The terms "consistent with" and "substantially the same as" are subjective and the declarants do not reveal the standard of measure by which they characterize a photo, picture, or drawing as "consistent with" and "substantially the same as" a mental image they may have of something they saw years ago. We do not know what each declarant has in mind when stating "consistent with" and "substantially the same." It is uncertain what differences are considered unimportant or trivial and thus ignored. The testimony deserves credit only to the extent that the declarants saw something generally similar in appearance to what is shown in the photo, picture, or drawing. The testimony is not sufficiently specific to be of significance in determining precisely the size and configuration of what the declarants had seen in the context of knowing whether a bulb was positioned in a cavity at a location corresponding to an electric field maximum, and that the waveguide was shaped and dimensioned to resonate in at least one resonant mode having at least one electric field maximum as required by the count.

What one person thinks is substantially the same as something else, another

person may not. A paper that measures 8.4x10.9 may be consistent with or substantially the same as a paper that measures 8.5x11, but so may a paper measuring 8x10. That determination is subjective and is in the eye of the beholder. Based on the record we do not know what the witnesses consider to be "substantially the same as" or what is considered to be "consistent with" a set of specific dimensions.

This point is critical, since Espiau claim 1, an alternative of the count, requires that the waveguide be dimensioned "such that the body resonates in at least one resonant mode having at least one electric field maximum" and such that the bulb is positioned in a waveguide cavity at a location corresponding to the electric field maximum during operation. Not all waveguides resonate[6]. A ceramic waveguide must be specifically dimensioned in coordination with the dielectric constant of the material used and the particular frequency that is applied to the ceramic waveguide in order for the waveguide to resonate and maintain resonance (FF 38). Moreover, the placement of the bulb is critical for receiving the electric field maximum created by the resonance (FF 39).

Guthrie has not demonstrated by a preponderance of the evidence that the waveguide that was built and tested during the week of 17 July 2000 - one that had dimensions consistent with or substantially the same as those seen in Exhibit 2137 or Exhibit 2048, whatever dimensions those may be - resulted in a waveguide that would resonate at a specific given frequency with a cavity for a bulb positioned at a location corresponding to an electric field maximum. Based on the evidence that Guthrie has directed us to, we do not know what the dimensions were of the

---

6 U.S. Patent 6,351,070, issued to Jonathan Barry ("Barry"), describes a non-resonant waveguide **4** coupled to a microwave source **2**, to generate a plasma in the

waveguide that was allegedly tested or whether the waveguide cavity for the bulb was positioned to correspond to an electric field maximum. There is insufficient factual basis to support the assertions made by Guthrie through its declarants and therefore, the testimonies of Gandhi, Nunes, Bennett, C. Guthrie and Wilson are accorded little weight. *See Rohm and Haas Co. v. Brotech Corp.*, 127 F.3d 1089, 1092 (Fed. Cir. 1997) (nothing in the Federal Rules of Evidence requires the finder of fact to credit the unsupported assertions of an expert witness).

For all of these reasons, Guthrie has failed to demonstrate by a preponderance of the evidence that it constructed an embodiment that met every element of the count.

*Has Guthrie proved the embodiment worked for its intended purpose?*

No measurements were taken or tests ran to determine if the constructed waveguide that was lit during the week of 17 July 2000 actually resonated, that the bulb formed a light-emitting plasma or that the bulb was positioned at a position according to an electric field maximum created by the waveguide, all required by Espiau claim 1, the alternative of the count that Guthrie seeks to prove. Although witnesses testified that a frequency was applied to the waveguide and that the bulb lit was quite bright (FFs 40-45), the evidence does not foreclose other reasonable explanations of the supposed events that took place. In other words, Guthrie has not directed us to evidence that would support the assertions it makes – that the waveguide that was lit *had to resonate* in order to light the bulb and that the bulb *had to form a plasma* if it were ignited. Such a premise appears to be based on Guthrie's argument that the constructed device was dimensioned and constructed

---

bulb **6** (col. 2:47-54; col. 3:22-23; Fig. 1).

to be a resonator. But as stated above, Guthrie has failed to demonstrate that what was built was a resonator waveguide, e.g., was dimensioned to resonate.

Even if the constructed device was dimensioned to resonate at the appropriate frequency, which we have determined Guthrie has not so demonstrated, something more is required for Guthrie to demonstrate that the tested device worked for its intended purpose. Importantly, Guthrie has not demonstrated that the constructed device actually resonated when operated or that a plasma was formed. As stated earlier in this proceeding, it is not enough that a constructed device is able to operate in a state of at least one resonant mode, the count requires that the device actually be in a state of at least one resonant mode (FF 18). The count requirement goes hand in hand with the legal requirement that the device tested operate for its intended purpose. The intended purpose of the count is for the waveguide to resonate, which in turn forms a plasma and lights a bulb. Based on the record, Guthrie has not demonstrated that the constructed waveguide resonated or that a plasma was formed.

During oral argument, counsel for Guthrie argued that it was most likely that the constructed waveguide resonated when tested, because that's what it was meant to do (FF 51). In lies the problem. Guthrie has not directed us to evidence to rule out other possibilities as to how the bulb was lit. Could the bulb have been lit if the waveguide did not resonate? Could the bulb have been lit without forming a plasma? We do not know the answers to these important questions. Guthrie seems to approach the issue by suggesting that it is all common sense or well within the skilled artisan to understand that if the device was constructed to resonate – it must have resonated since the bulb was lit.

However, our reviewing court has told us, that in a contested case, Board members are not experts and that we should not resort to our own understandings or common sense, where no record evidence is available. To the extent that Guthrie is relying on Board members as persons of ordinary skill in the art such that we should recognize or assume based on common sense that the waveguide assembly must have resonated when operated and that the bulb must have formed a plasma, that argument is rejected.

Board members are not presumed to be persons of ordinary skill in the art and cannot rely on their own experiences or knowledge to fill in where record evidence is lacking. *See Fromson v. Anitec Printing Plates, Inc.*, 132 F.3d 1437, 1448 (Fed. Cir. 1997) (Mayer, C.J., concurring – what follows is a quote) (I “know” what anodization means from my own undergraduate studies and experiments; the concept is not difficult and I need no further education to grasp it. I happen to have a dictionary in my chambers from the era pertinent here, which would confirm my “knowledge” about anodization. ... But, I am neither an expert in the field nor one of ordinary skill in the art despite how much I think I “know” about a process I once studied. Nor do my colleagues on this court or the district court possess such expertise, and even if they did, they would have to defer to the record made in the case.) *See also Compagnie de St. Gobain v. Brenner*, 386 F.2d 985 (D.C. Cir. 1967) (Examiner is not expert; rather examiner performs quasi-judicial function based on record before PTO); *In re Zurko*, 258 F.3d 1379, 1385-86 (Fed. Cir. 2001) (“As an administrative tribunal, the Board clearly has expertise in the subject matter over which it exercises jurisdiction. This expertise may provide sufficient support for conclusions as to peripheral issues. With respect to core factual findings in a determination of patentability, however, the board cannot

simply reach conclusions based on its own understanding or experience - or on its assessment of what would be basic knowledge or common sense. Rather, the Board must point to some concrete evidence in the record in support of these findings."); and *Brand v. Miller*, 487 F3d 862, 869 (Fed. Cir. 2007) ("We therefore hold that, in the context of a contested case, it is impermissible for the Board to base its factual findings on its expertise, rather than on evidence in the record …").

Our decision must be made on the basis of the record that was created by Guthrie. If the evidence fails to persuade, as is the case here, then the showing is inadequate and cannot be supplemented based on our own understandings or common sense.

Lastly, none of the witnesses testify that the source operated within any particular frequency range (FFs 40, 43, and 45). Espiau claim 1 requires that the microwave source operate within a frequency range from about 0.5 to about 30 GHz. Guthrie has failed to sufficiently demonstrate that the actual source applied to the waveguide operated within that frequency range.

For all of these reasons, Guthrie has failed to demonstrate a prior reduction to practice.

*Derivation*

Guthrie alleges that Espiau derived the invention from it. To prove derivation, a party must establish conception of the claimed subject matter and communication of the conception to the opponent. *Price v. Symsek*, 988 F.2d 1187, 1190 (Fed. Cir. 1993). As with conception, corroboration is required to support testimony of the communication. Id. at 1196. *See also Davis v. Reddy*, 620 F.2d 885, 889 (CCPA 1980).

Because Guthrie has failed to sufficiently demonstrate communication of a conception to Espiau, for purposes of this decision, we shall assume without deciding that Guthrie has demonstrated conception of the count by 31 March 2000.

According to Guthrie's priority motion, Digital Reflection, Inc. (DRI)[7] was in the business of making projection television systems. In late 1999, DRI was pursuing various alternatives for light sources for its projection television system. In that pursuit, DRI sought to retain Turner Engineering Co. (Tenco), owned by David Turner, to develop and provide a plasma lamp package (Paper 109 at 1-2). DRI signed an Engineering Services Agreement with Tenco on 4 April 2000 (GFF 61). The Tenco team included at least David Turner, M. Espiau[8] and Joshi. An initial meeting with at least Tenco personal Turner, M. Espiau, and Joshi and DRI personnel Wilson, Prior and C. Guthrie was held on 11 April 2000 (FF 50). It was during that meeting that Guthrie alleges that it communicated conception of the invention of the count to Espiau (Paper 109 at 22).

Per Guthrie's priority motion, during the 11 April 2000 meeting, C. Guthrie and Wilson presented to the group an overview regarding their loop-type plasma lamp[9]. M. Espiau was said to have interrupted the discussion to suggest that a

---

[7] DRI was the initial assignee of the involved Guthrie application. DRI went bankrupt, after which, C. Guthrie and Wilson, two of the Guthrie inventors acquired title to the involved Guthrie application. They then assigned the application to Ceravision, the real party in interest (GFFs 1-4).

[8] References to "M. Espiau" are to the inventor Frederick M. Espiau. References to "Espiau" are to the senior party in interference.

[9] The loop-type RF-driven light source comprises an RF-driven loop disposed around a gas-filled quartz bulb source to deposit energy into the bulb to form a

waveguide structure could be used to couple the ceramic bulb to a ceramic printed wiring board (PWB). Prior allegedly informed M. Espiau that DRI had already considered and rejected the use of an air waveguide as impractical, and instead had conceived of an embodiment in which a gas-fill or bulb was directly integrated into a ceramic waveguide configured as a resonator. Prior then was said to have sketched the ceramic waveguide resonator design, including a ceramic block having a gas cavity located near one end and an RF antenna inserted near the other end (Paper 109 at 21:8-17).

Guthrie does not direct us to a picture, photo, or drawing of what was sketched by Prior (FF 60). No corroborating witness testified as to the specifics of what was sketched by Prior. Guthrie relies on the testimony of witnesses who describe what happened at the 11 April 2000 meeting. Particularly, Guthrie relies on the testimonies of inventors Wilson (Ex. 2181), Guthrie (Ex. 2180), and Prior (Ex. 2185), and non inventors Pothoven (Ex. 2185), and Cooper (Ex. 2184).

In order to prove communication of a conception, the moving party must provide corroborating evidence of the communication. Guthrie relies on the testimonies of Cooper and Pothoven to corroborate the communication. Cooper was not there when the alleged communication of the conception took place. Cooper's recollection is based on what inventors Prior and Wilson told him (FF 58). Such second hand accounting of events must be considered when ascertaining the weight to be given such testimony.

Moreover, Cooper's testimony does not demonstrate that every element of the count was conveyed to Espiau.

---

plasma (GFF 14).

Cooper testified as follows:

> 11. After the April 11 meeting had concluded, and the Tenco people had departed, I recall discussing with Greg Prior and Don Wilson their impressions of the Tenco people and their capability to assist on the ceramic bulb project. They reported to me that, based upon its discussion with Tenco in relation to the RF design, DRI had decided to advance development of a ceramic resonator concept that DRI had begun working on in late 1999. They described that at the meeting Matt Espiau had suggested using a waveguide to couple the ceramic bulb we were working on to the electronics, similar to the ceramic resonator concept I had previously discussed with them. Tenco suggested that using DRI's ceramic resonator design would simplify the RF electronics design. In addition, I understood that since DRI and ITW were already working on sapphire-to-ceramic sealing technology for the ceramic bulb, that technology could be readily applied to sealing a gas-filled cavity in the ceramic resonator design. (Exhibit 2184).

From the above, it is not apparent that DRI's decision to "advance development of a ceramic resonator concept" was made during the meeting, e.g., in the presence of the Espiau inventors. The statement could mean that DRI's decision to "advance development of a ceramic resonator concept" was made during the meeting or after the meeting. If the decision was made during the meeting, pursuing a "ceramic resonator concept" does not tell us much, and certainly does not convey that Guthrie communicated the conception, e.g., every element of the count to Espiau. *See* FFs 9-13 for a listing of the specific elements of each alternative of the count.

Cooper's testimony that Tenco suggested using DRI's "ceramic resonator design" since it would simplify the RF electronics design, also does not sufficiently demonstrate that all of the elements of the count were conveyed to Espiau. *See* FFs

9-13 for a listing of the specific elements of each alternative of the count. Lastly, Cooper's statement that Matt Espiau had suggested using a waveguide to couple a ceramic bulb to the electronics, similar to the ceramic resonator concept Cooper had previously discussed with Wilson and Prior is also not specific enough to support the assertion made. Again, we emphasize that Cooper was not there and his testimony is based on second hand knowledge of what was said. In any event, based on his testimony, the statement does not demonstrate that every element of the count was communicated during the meeting. Cooper testified that there was some discussion regarding a device "similar to the ceramic resonator concept." That statement does not demonstrate that every element of the count was communicated. *See* FFs 9-13 for a listing of the specific elements of each alternative of the count. Even if the term "ceramic resonator concept" were somehow to convey each element of the count, which we determine it does not, we do not know what Cooper means when he says that what was discussed was "similar to" that concept. How is what was discussed similar to the concept? No comparison has been explained or made between what was discussed and the "ceramic resonator concept."

For all of these reasons, we have determined that Cooper's testimony is based on unsupported assertions, to which we accord little or no weight. *See Rohm and Haas Co. v. Brotech Corp.*, 127 F.3d 1089, 1092 (Fed. Cir. 1997) (nothing in the Federal Rules of Evidence requires the finder of fact to credit the unsupported assertions of an expert witness).

Unlike Cooper, Pothoven was there when the alleged communication occurred. Pothoven testified that he is a Director of Ceravision, Guthrie's real party in interest and is therefore an interested party. When an interested party

testifies to corroborate facts, the credibility of the interested party must be considered. *Lacks Industries, Inc. v. McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335, 1350 (Fed. Cir. 2003) ("[There is] a clear requirement that such oral testimony by interested parties must be corroborated by documentary testimony."); and *Checkpoint Systems Inc. v. All-Tag Security S.A.*, 412 F.3d 1331, 1339 (Fed. Cir. 2005) ("Physical, documentary, or circumstantial evidence, or reliable testimony from individuals other than the alleged inventor or an interested party, may corroborate.").

Notwithstanding the fact that Pothoven is an interested party, his testimony does not save the day for Guthrie. Pothoven testified that during the 11 April 2000 meeting, Prior explained that DRI had developed a ceramic-filled resonator plasma lamp design in which the gas-fill was located in a chamber in the ceramic. Pothoven further testified that Prior then sketched out "that design" which was the same design that Prior had previously discussed with Guthrie and Wilson (FF 59).

The sketch is not available and no one testifies as to the specifics of what the sketch showed[10]. To corroborate the assertions made regarding what the sketch conveyed, Guthrie directs attention to Pothoven's testimony. However, Pothoven only testified that the sketch showed the same design that Prior had previously discussed with Guthrie and Wilson (FF 59). We do not know and will not speculate what Pothoven means when he says that the design sketched was the same design that was previously discussed. What was previously discussed? And

---

[10] Although Guthrie directs attention to paragraph 16 of Prior's declaration (Paper 109 at 21:14-16 and GFF 71) to support the assertion that Prior made the sketch, Paragraph 16 of Prior's testimony makes no mention of a sketch.

how was the something that was previously discussed conveyed through the sketch allegedly made by Prior?

Pothoven also testified that during the meeting, and before Prior made the sketch, Prior announced that DRI had developed a ceramic-filled resonator[11] plasma lamp design in which a gas-fill was located in a chamber in ceramic. Guthrie does not explain how Pothoven's testimony to this point conveys that each element of the count was communicated to Espiau as required.  Guthrie does not compare the elements of any alternative of the count to its evidence for purposes of demonstrating communication of the conception.  Each of the apparatus alternatives of the count requires a feed positioned within and in intimate contact with the waveguide body and connected to a source output.  Each of the method alternatives of the count require coupling energy characterized by a frequency and intensity into a waveguide body (FFs 9-13).  Pothoven does not testify, for example, that there was a discussion of any source of power, let alone how such a source of power would be connected to the waveguide as required by the count. Pothoven does not mention a source at all.

Since we do not have a copy of the sketch or testimony as to the specifics of what was sketched, and since no one recalls the specifics of what was communicated to establish that every element of the count was communicated, Guthrie has failed to demonstrate by a preponderance of the evidence that Espiau derived the invention from Guthrie.

---

[11]  Whether Prior actually ever mentioned the word resonator is apparently contested.  During oral argument, counsel for Guthrie represented that when cross examined, none of Guthrie's witnesses recalled that the word resonator was ever spoken during the 11 April 2000 meeting (FF 61).

Lastly, we address Guthrie's argument that Espiau's alleged conception, just three days after the 11 April 2000 meeting is strong circumstantial evidence that Espiau copied or stole the invention from Guthrie (Paper 109 at 22). What went on during the meeting has not been sufficiently established by Guthrie. Guthrie has failed to prove by a preponderance of the evidence that the conception was communicated during the 11 April 2000 meeting. That Espiau alleges a conception date of 14 April 2000 is not necessarily suspect. Other explanations, besides that Espiau derived the invention from Guthrie are equally plausible.

For all of these reasons, Guthrie has failed to sufficiently demonstrate that Espiau derived the invention from Guthrie.

*Inurement*

Guthrie argues that any actual or constructive reduction to practice achieved by Espiau was in furtherance of the work contracted for and funded by DRI, and inures to DRI's benefit (Paper 109 at 28).

"Inurement involves a claim by an inventor that, as a matter of law, the acts of another person should accrue to the benefit of the inventor." *Cooper v. Goldfarb*, 154 F3d 1321, 1331 (Fed. Cir. 1998). To establish inurement, the inventor must show, among other things that the other person was working either explicitly or implicitly at the inventor's request. *Id.* at 1332. Inurement focuses on the nature of the relationship between the inventor and the other party. *Id.*

Moreover, there are three other requirements that must be met to establish inurement: 1) the inventor must have conceived of the invention; (2) the inventor must have had an expectation that the embodiment tested would work for the intended purpose of the invention; (3) the inventor must have submitted the

embodiment for testing for the intended purpose of the invention. *Genetech Inc. v. Chiron Corp.*, 220 F.3d 1345, 1354 (Fed. Cir. 2000).

Because Guthrie has failed to sufficiently demonstrate that the work done by Espiau towards Espiau's reduction to practice (actual or constructive) was for the Guthrie inventors, for purposes of this decision, we assume without deciding that Guthrie has demonstrated conception of the count by 31 March 2000.

According to Guthrie, from 10 April 2000 to mid-July 2000, C. Guthrie and Wilson (DRI folks) met on a weekly basis with M. Espiau, Joshi and Chang (Tenco/Betadot folks) to identify materials for testing, defining additional features of the plasma design and specifying dimensions for waveguide resonators to be used in obtaining quotes from ceramic vendors (Paper 109 at 24:22 to 25:3). Thereafter communications broke down between the Guthrie (DRI) folks and the Espiau (Tenco/Betadot) folks, and apparently unbeknownst to Guthrie, Espiau (Tenco/Betadot) filed their 31 July 2000 provisional application, for which they were granted priority benefit in this interference (Paper 109 at 26:12 to 27:1).

Guthrie argues that Espiau's provisional application should inure to Guthrie's benefit, since the application was in furtherance of the work contracted for and funded by DRI (Paper 109 at 28). Inurement requires direction from the inventors, either explicitly or implicitly, to another party to take some action towards reducing the invention to practice. Guthrie has not directed us to evidence that demonstrates that Espiau filed its provisional application at the direction of the Guthrie inventors or even DRI. Based on the record, relationships broke down. Espiau, believing that it was the inventive entity of the subject matter of the count, filed its provisional application. Espiau did so not as a result of DRI or Guthrie's direction, but on its own accord. The Espiau provisional application names only

Turner, Chang, Joshi and M. Espiau as the inventors. Noticeably absent are any of the Guthrie inventors. The Espiau provisional application does not name DRI as the assignee (Ex. 1012). For these reasons, Guthrie has failed to establish by a preponderance of the evidence that Espiau's constructive reduction to practice inures to Guthrie's benefit.

Guthrie also argues that Espiau's actual reduction to practice inures to Guthrie. When Guthrie filed its priority motion, Guthrie did not know upon which specific arguments and proofs Espiau would rely. Guthrie could not have known, since Espiau's priority motion was not due until after Guthrie filed its priority motion. Yet, in its motion we understand Guthrie to argue that whatever Espiau alleges or argues for its actual reduction to practice in Espiau's yet to be filed motion, inures to Guthrie's benefit (Paper 109 at 28).

Guthrie as the junior party in this interference must demonstrate by a preponderance of the evidence priority of invention. Until that happens, there is no occasion to consider Espiau's priority motion. Guthrie cannot rely on another party's motion to meet its burden. Moreover, ¶ 106.2 of the Standing Order prohibits a moving party from incorporating arguments from one paper into another:

> "Incorporation of arguments by reference amounts to a self-help increase in the length of the brief and a pointless imposition on the Board's time. Each motion, opposition, and reply must make all arguments accessible to readers, rather than ask them to play archeologist with the record. *DeSilva v. DiLeonardi*, 181 F.3d 865, 866-67 (7th Cir 1999).

For this reason alone, Guthrie's actual reduction to practice inurement argument is not considered.

Furthermore, Guthrie has not directed us to evidence that demonstrates that Espiau actually reduced to practice the invention for Guthrie or DRI. As stated above, the relationship between Guthrie (DRI) and Espiau (Tenco/Betadot) disintegrated. Whatever Espiau did after the relationship broke apart was not accomplished per Guthrie's or DRI's direction, but accomplished on its own accord. Guthrie has failed to demonstrate otherwise.

For all of these reasons, Guthrie has failed to demonstrate that Espiau's actual reduction to practice, whatever that may be, inures to Guthrie's benefit.

Guthrie's arguments that Espiau's real party in interest was required to assign to DRI rights to any invention arising from the work performed per a contractual agreement made between DRI and Tenco (Paper 109 at 23:6-9) is of no moment to the priority issue of inurement. The Board decides priority disputes not contractual ones. To the extent that Guthrie believes that Tenco and or the Espiau inventors breached a contractual agreement made with DRI, Guthrie has a remedy per a civil action to pursue breach of contract.

In Guthrie's portion of its brief styled "**F. <u>Espiau's Efforts To Distort The Record Should Be Rejected</u>**" Guthrie argues that Exhibits 2034 and 1107[12] should be excluded and that Exhibit 2181 be accorded full credit (Paper 109 at 29-30). A party seeking to exclude an exhibit must do so per a separate, miscellaneous motion. *See* SO ¶¶ 151 and 155.2. Guthrie filed a separate motion moving to exclude, among other evidence, Exhibits 2034 and 1107 (Paper 230). Guthrie's motion to exclude is addressed below.

---

[12] Guthrie argues that 1007 should be excluded, but we understand Guthrie to mean 1107.

Guthrie fails to articulate what it means when it states that the Board should accord Exhibit 2181 "full credit." Does Guthrie mean that the Board should ignore any prior statements made by Wilson that would contradict any statements made by his declaration set forth in Exhibit 2181? Or does Guthrie mean something beyond that - that the statements made in 2181 be accepted as established facts? We do not know and will not guess. Since Guthrie has failed to articulate a basis for which relief can be granted, Guthrie's request with respect to Exhibit 2181 is denied.

For all of the above stated reasons, Guthrie's priority motion 7 fails to demonstrate, by a preponderance of the evidence, priority of invention and fails to set forth a prima facie entitlement to the relief requested. Accordingly, Espiau Opposition 7 (Paper 220), Guthrie Reply 7 (Paper 225), Espiau Substitute Motion 7 for Priority (Paper 118), Guthrie Opposition 7 (Paper 221), and Espiau Reply 7 (Paper 224) need not and have not been reached.

Guthrie Priority Motion 7 is DENIED.

*Miscellaneous Motions*

Guthrie filed a miscellaneous motion to exclude certain evidence (Paper 230). The voluminous evidence identified in sections A, B, D, E and F of Guthrie's motion that Guthrie seeks to suppress was relied on by Espiau in support of Espiau's Priority Motion 7 (Paper 118), Espiau's Opposition 7 to Guthrie's Priority Motion 7 (Paper 220), and Espiau's Reply Motion 7 (Paper 224). Since Guthrie failed to sufficiently demonstrate priority of invention by a preponderance of the evidence there was no occasion to reach Espiau's priority brief, Espiau's opposition, or Espiau's reply or the evidence identified in sections A, B, D, E and F of Guthrie's motion.

Guthrie also seeks to exclude Exhibit 2035 which, although Guthrie submitted it into evidence, was only apparently relied on in support of Espiau's papers. Since Guthrie failed to sufficiently demonstrate priority of invention by a preponderance of the evidence there was no occasion to reach Espiau's papers or Exhibit 2035.

Guthrie seeks to exclude Exhibit 1107, Exhibit 2034, and Exhibit 2136, which were apparently relied on in support of Espiau's papers and were also relied on in Guthrie's priority motion. As stated above, Espiau's papers were not considered since Guthrie failed to make its case. Moreover, because Guthrie relies on Exhibits 1107, 2034 and 2136 in support of its own motion, Guthrie's request to exclude Exhibits 1107, 2034 and 2136 is dismissed.

Guthrie motion 8 (to exclude evidence) is DISMISSED.

Espiau also filed a miscellaneous motion to exclude Exhibits 2244, 2240 and 2242 and portions of Guthrie's Reply 7 that relies on Exhibit 2244 (Paper 233). Exhibits 2240, 2242, and 2244 were relied on in connection with Guthrie reply. Since Guthrie failed to sufficiently demonstrate priority of invention by a preponderance of the evidence there was no occasion to reach Guthrie's Reply 7 or Exhibits 2240, 2242, and 2244.

Espiau miscellaneous motion 8 is DISMISSED.

**F. Order**

For the reasons given, it is

**ORDERED** that "GUTHRIE PRIORITY MOTION 7" is DENIED;

**FURTHER ORDERED** that "SUBSTITUTE ESPIAU MOTION 7 FOR PRIORITY" is DISMISSED;

**FURTHER ORDERED** that "GUTHRIE MOTION 8 (To Exclude Evidence)" is DISMISSED; and

**FURTHER ORDERED** that "ESPIAU MISCELLANEOUS MOTION 8" is DISMISSED.

/Jameson Lee/ )
JAMESON LEE )
Administrative Patent Judge )
)
)
/Sally C. Medley / ) BOARD OF PATENT
SALLY C. MEDLEY ) APPEALS AND
Administrative Patent Judge ) INTERFERENCES
)
)
/James T. Moore/ )
JAMES T. MOORE )
Administrative Patent Judge )

cc (via e-mail):

Counsel for Guthrie:
Nicola A. Pisano, Esq.
JONES DAY
12265 El Camino Real, Suite 200
San Diego, CA  92130
Tel:   858-314-1129
Fax:   858-314-1150
Email:   napisano@jonesday.com

Counsel for Espiau:
Richard Neifeld, Esq.
Robert Morgan, Esq.
NEIFELD IP LAW, PC
4813-B Eisenhower Avenue
Alexandria, VA  22304
Tel :   703-415-0012
Fax :   703-415-0013
Email :   rneifeld@neifeld.com
Email :   robert.morgan@ropesgray.com

# EXHIBIT Q

UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES

CHARLES GUTHRIE, EDMUND SANDBERG, DONALD WILSON, GREGORY PRIOR, and DAVID SMOLER
Junior Party
(Application 09/818,092)

-v-

FREDERICK M. ESPIAU, CHANDRASHEKHAR J. JOSHI, and YIAN CHANG
Senior Party
(Patent 6,737,809)

Patent Interference No. 105.393 (SCM)

Tuesday, March 21, 2006

The above-entitled matter came on for a telephone conference before ADMINISTRATIVE PATENT JUDGE SALLY C. MEDLEY, pursuant to notice, beginning at 2:20 o'clock p.m., when there were present on behalf of the parties:

APPEARANCES:

On Behalf of Plaintiff:

Nicholas Pisano, Esquire
LUCE, FORWARD, HAMILTON & SCRIPPS LLP
11988 El Camino Real
Suite 200
San Diego, California 92130

On Behalf of the Defendant:

Richard Neifeld, Esquire
Daniel Sachs, Esquire
NEIFELD IP LAW, P.C.
4813-B Eisenhower Avenue
Alexandria, Virginia 22304

CONTENTS

Proceedings..........................Page Three

PROCEEDINGS

JUDGE MEDLEY: Let's start from the beginning so that the court reporter can get everything.

MR. PISANO: Okay. I'll try to streamline my comments, your Honor.

The matter that Guthrie believes ought to be addressed completely is Guthrie's motion 12, motions 12 and 13.

Guthrie motion 12 is directed to giving junior party access to the testimony obtained by Espiau's counsel which we believe is in violation of 37 CFR 10.87. Federal states that an attorney shall not communicate with a party known to be represented by counsel on the subject of the representation without the attorney's authorization.

Notwithstanding the rule, Espiau's counsel -- and I'm talking about Wilson, Sonsini -- attempted to interview all five of the Guthrie inventors regarding the circumstances surrounding the invention set

forth in the Guthrie application, even after this interference was declared.

They further interviewed the patent liaison, Art Berman, and apparently were able to divulge attorney-client communications between the Guthrie inventors and their patent attorney Mr. Hoover.

One of the Guthrie inventors, Mr. Wilson, was paid for his cooperation; like documents were shown to Mr. Sandberg resulting in their preparing declarations which I submitted in response to the order to show cause, as the, quote, Luxim declarations because they were prepared, you know.

I felt under 156 that Guthrie was obligated to submit a significant amount of time to track what had happened there.

Well, the first motion is directed to obtaining access to whatever information Wilson, Sonsini obtained during their conversations or their interactions with the Guthrie inventors.

I don't believe there was any reasonable basis for them to believe they could contact the named parties in this interference when, if they had looked at the online database, they would have seen that all of those inventors were represented by counsel; in particular, me.

So that's the first issue.

The second is, to the extent that --

MR. NEIFELD: Shall we take those one at a time?

MR. PISANO: Well, that's -- let me -- well, yes.

But before you pick that up, let me go to motion 13 which is directed to excluding Espiau counsel participated in what we believe is in violation of 3710.87 or if counsel had had access obtained as a result of the violation.

And this relates directly to Espiau's miscellaneous motion 12 which is to bring in a few of the litigators at the

Wilson, Sonsini firm to participate on a pro hac vice case or basis and deposing the witnesses in the case.

To the extent that the court permits Guthrie to submit a motion and to gain access to the information obtained as a result of the interviews with the Guthrie Inventors and also concludes that there has been a violation of 87, we believe that counsel should be disqualified mainly because -- I do not know whether that includes Mr. Neifeld but if it does, in fact -- representing the senior parties in this matter, for that reason it should be heard and decided before the other preliminary motions.

JUDGE MEDLEY: Do you have enough information now to go forward with the motion?

MR. PISANO: I do.

JUDGE MEDLEY: Okay, because I'm not inclined to allow additional discovery, in general. The board doesn't do that.

So if you have something now, I

don't think -- you know, if I am to authorize such a motion, it may be that your motion would look like, here's what I've got. This is what the basis is, and then after the board takes that into consideration, if at that time they think that they need to delve into it more, then possibly we could do so.

MR. NEIFELD: Which motion exactly do you have in mind, your Honor? His motion to disqualify is contingent.

THE COURT: Upon getting the discovery.

MR. NEIFELD: Correct.

MR. PISANO: Actually, your Honor, I believe we have enough evidence to submit the motion to show that there was a violation of the rule.

If there was, we would ask that, as a result of -- you know, should the board decide that there was a violation of the rule, we would ask that Espiau's counsel produce the rest of the documentation or whatever other

information they collected as a result of that violation.

And then, after reviewing that, we would be permitted -- Guthrie would be permitted to file a motion to disqualify.

At this point, we're not asking for additional discovery. We believe we can bring the motion right now. We believe that the case is pretty straightforward with respect to the rules violation.

We think that, once it's established, we should be entitled to production of the rest of the documents or --

JUDGE MEDLEY: I don't think I understand. You want to disqualify counsel based on the violation, allegedly violation of rule 87; correct? 10-87.

MR. PISANO: That's correct, your Honor.

JUDGE MEDLEY: Well, because what you just said was that you would file miscellaneous motion, that you think you could

do it, but that you would request filing another motion? I didn't follow --

MR. PISANO: I think, your Honor, we could file both at the same time.

JUDGE MEDLEY: Both what?

MR. PISANO: Both motions at the same time.

The motion with respect to production -- you see, the one question -- the reason the motion, the reason motion 13 is contingent is that I do not know to the extent to which Mr. Neifeld has obtained access to the Wilson, Sonsini file.

If he wants to state on the record that he didn't, then we wouldn't bring the motion as to him. But we would bring it as to Wilson, Sonsini.

JUDGE MEDLEY: But why -- they're not even representing the real party or the inventors --

MR. NEIFELD: They're not of record --

JUDGE MEDLEY: Right.

MR. PISANO: They are -- they've been asked --

Well, Espiau's motion 12 is to bring in Wilson, Sonsini to represent Espiau with respect to, on a pro hac vice basis, in this case. So to the extent, you know, they're asking Wilson, Sonsini be brought into the case, I believe that we should be able to disqualify them.

MR. NEIFELD: That would be in opposition to a motion, if you're going to file an opposition, not by a motion to disqualify counsel who is not of record.

JUDGE MEDLEY: Yes, it does seem sort of odd.

MR. NEIFELD: I think, your Honor, maybe I could shed some light on these issues.

JUDGE MEDLEY: Okay.

MR. NEIFELD: I don't know if you have the authority to decide whether to allow people to file motions or not, so I should

raise the following facts.

I have on representation from the WSGR attorneys that, in fact, Mr. Wilson solicited a job or a consulting position from Luxim. And when he did that, he was referred to the WSGR attorneys.

He came to Luxim, the person who initiated this activity. He came to Luxim voluntarily. He set this situation up. He was referred to the WSGR attorneys, and they asked him up front, knowing what the ethical issues were. They asked him whether he was represented. He said no.

They asked him whether he wanted to be represented by counsel. He said no.

They asked him not to disclose information that was confidential. They asked him whether he had an existing NDA in place. He said no.

What I understand he said, besides the facts stated in his witness statements, the ones that Nick is referring to, is that he

was, speaking generically, shafted by Ceravision, had a falling out. He was upset and mad and wanted to spill his guts.

And he said he would bring in the other people that were relevant to the issues. And that was the genesis of this fact pattern that Nick is now relating to you.

This was back in, as I understand it, September or October of last year. I believe the interference wasn't up and running until --

JUDGE MEDLEY: January.

MR. NEIFELD: Yes. So I don't know about these statements Nick made, that WSGR attorneys had contacted the inventors, listed inventors of the Guthrie application, after the interference was declared. That's not something I have any knowledge of.

MR. PISANO: Well, your Honor, I can tell you that on September -- sorry, February 7th, I called Mr. Prior and said, If you receive a contact with the Wilsons --

This was right after learning that most of the other witnesses had been called in or visited or invited in to Wilson, Sonsini's offices to give interviews.

And what Mr. Guthrie had done was, apparently he had gone to Ceravision the middle of 2005 trying to solicit some business for, you know, or a consulting position for use of his expertise. The suggestion that he went in and decided he would, you know, spill his guts, I think that's not what --

JUDGE MEDLEY: What happened -- what has happened since the --

MR. PISANO: That's right. Let me tell you, on February 7th, I called Mr. Prior. I said, If you receive a call from Wilson, Sonsini, please do not respond to it because they shouldn't be contacting you in the first place.

And he said, Well, that's funny. I just had lunch with them today.

So this was well after -- I mean,

this is a pattern of conduct that was begun before the interference was declared but continued well after.

And there is to be no mistake that Wilson, Sonsini knew that my firm was representing the Guthrie inventors because we had sent the letter shortly -- to Luxim -- shortly after the original papers to provoke the interference were filed, saying that we represent, you know, the Guthrie inventors and Ceravision with respect to the application.

So I don't think there is any credible position that they thought or had any basis for, for talking to the inventors, particularly Mr. Prior and Mr. Smoler after the interference was declared.

So what we would like to do, I mean, is basically file a motion to obtain production of the additional information.

And if you would -- if your Honor would prefer that it be now, we'll just file -- you know, we could file a pseudo-motion

asking for that production and for disqualification of counsel, based on what we already know.

I mean, the point is that this is not an opposition to bringing in Wilson, Sonsini. We think there has been a rules violation here. It's pretty blatant, and it ought to be addressed up front so that we know who is going to be representing whom in the matter.

JUDGE MEDLEY: Okay. What do you know about Mr. Neifeld's involvement in any of this?

MR. PISANO: The only thing -- and that's exactly -- that was a contingent aspect of it.

I do not know what Mr. Neifeld's involvement is, other than he has related to me that he does not directly interface with the client, Luxim Corporation, but only does through -- only does so through Wilson, Sonsini, you know, as the intermediary.

So now whether Mr. Neifeld had actual exposure to the information that was obtained by Mr. Kearney I do not know. If he is willing to state on the record that he hasn't, then we can move forward on that one.

But I would still, you know, reserve the right to exclude Wilson, Sonsini from appearing.

JUDGE MEDLEY: Okay. All right.

Mr. Neifeld, can you address his concern?

MR. NEIFELD: Well, the primary concerns are regarding whether there was a violation of the rules, which I believe there was not. The facts are contrary to what Nick has just stated, facts represented to me by attorneys from a reputable law firm, people with lots of experience in IP litigation.

And they're consistent to the extent that his inventors may not have remembered because they weren't significant the questions regarding representation. They've discussed

facts with Wilson, Sonsini attorneys.

I know that the attorneys I've spoken to have categorically stated that they made inquiries and pointed out they represented Luxim and asked whether these people were represented by counsel.

I expect that they didn't recognize the significance of signing a power of attorney on some form to some patent practitioner a year earlier as representation of counsel.

And the question still remains whether that was representation of counsel.

As I understand it, the assignee had revoked all powers of attorney and appointed Nick sometime December of 2004, before the new declarations were signed. So I'm not sure they have any significance.

MR. PISANO: Well, your Honor, the party, the junior parties are the inventors. So the rules are very clear, that the inventor is a party to the interference.

Secondly, I specifically before -- when I saw that Wilson, Sonsini had been ringing up the various Guthrie inventors, I asked them, the first question I asked them is, Did they ask you whether you were represented by counsel.

And in three of the declarations -- I think we submit three declarations in response to our show cause, and at least two of them said, No, they never asked me. So, you know, we obviously have a serious divergence of facts here as to what went on.

But it is just not, in Guthrie's view, credible that Wilson, Sonsini could have believed that it could interview these inventors. It is as if they were completely unaware of 37 CFR 10.87.

JUDGE MEDLEY: Okay. Well, I'm not so concerned about what happened prior to the interference being declared.

So when you're discussing all these meetings that people are having, you know, I

think we're getting -- I'm getting sort of a muddied version of what's going on.

I mean, if they had conversations back in September, October of 2005, that is not a concern here.

MR. PISANO: Well, some of them were as recently as after the interference was declared, though, your Honor. This is after we were actively trying to pull together our case.

JUDGE MEDLEY: And at that time -- well --

MR. NEIFELD: Your Honor, you should note that there's a corresponding UK case going on. And if you look at those papers that Mr. Pisano is referring to, they clearly were not designed for USPTO proceedings.

They were statements designed or obtained, at least as I understand it, to rebut the potential position taken by Ceravision in a UK proceeding. They don't have a jurat statement as required by 18 USC

1001 and 37 CFR 1.63 I believe is the rule.

MR. PISANO: But they would constitute statutory affidavits.

MR. NEIFELD: California law, basically. So it was clear that those were not intended for this proceeding in any case.

MR. PISANO: Your Honor, I still have a fundamental problem with having -- you know, at this point, I think opposing counsel has spent more time with the Guthrie inventors, and some of this occurred after the declaration of the -- after the declaration of interference.

Then, in fact, the Guthrie counsel has been able to obtain, since the interference was declared, and with respect -- the eliciting information from Mr. Berman, Mr. Berman, although he submitted a declaration on behalf of Guthrie with respect to what he did do, admitted that he had prepared and submitted an affidavit and given additional information to Wilson, Sonsini and has refused

to give it to Guthrie.

So there's no practical way for us to understand. And the problem with that is that Mr. Berman was –

(Mr. Neifeld and Mr. Pisano speaking at once.)

MR. NEIFELD: -- what party did he represent?

MR. PISANO: Mr. Berman was the patent liaison, the direct go-between, between the inventors and the attorney. And there is no basis for believing that Guthrie --

(Mr. Neifeld and Mr. Pisano speaking at once.)

MR. PISANO: Excuse me. Mr. Neifeld, excuse me.

MR. NEIFELD: -- work for Ceravision.

MR. PISANO: Mr. Neifeld, excuse me.

Your Honor, Mr. Berman was -- there is no reason for believing that Mr. Berman, who was the direct intermediary between the

patent attorney Mr. Hoover and the Guthrie inventors had any right to waive attorney-client privilege.

MR. NEIFELD: This is to a company that no longer exists. You're right.

MR. PISANO: But inventors still do exist, and they are parties to this interference.

JUDGE MEDLEY: Okay, what is it that you want?

MR. PISANO: I would like to file a motion, your Honor, to -- basically to get the additional evidence that is in Wilson, Sonsini's hands that we believe they obtained in violation of 10.87, so we can submit our affidavits describing what we believe constitutes a violation of 10.87.

If the board believes that there was, then we would ask that you produce those documents or to have Wilson produce those documents.

JUDGE MEDLEY: Okay. What kind of

discovery are we talking about? I mean, what would you have to do to get the information you want?

MR. PISANO: I don't believe at this point I need to take any additional discovery. I already know what inventors have told me, and we can submit it on that basis, your Honor. We don't need any discovery in advance of that motion.

JUDGE MEDLEY: You don't want additional discovery? I'm confused.

MR. NEIFELD: I'm confused, too.

JUDGE MEDLEY: I'm confused.

MR. NEIFELD: You want party Espiau to cough up documents? That's discovery.

MR. PISANO: Yes. Your Honor, what I'm trying --

JUDGE MEDLEY: They're in their possession, documents that are in Espiau's possession?

MR. PISANO: Documents that are in Espiau's possession. And whatever information

they acquired from interviewing the Guthrie inventors, that's what we would like them to cough up.

JUDGE MEDLEY: But you have the Guthrie inventors. Why can't you just ask them? Why do we have to go to the extent that --

MR. NEIFELD: I don't understand. There were these witness statements that you submitted which the inventors gave you and said, This is -- I understand you said in your remarks that, This is what we gave to the Wilson, Sonsini attorneys.

MR. PISANO: That is -- that is what -- I do not know if that's everything they told the Wilson, Sonsini attorneys, your Honor.

JUDGE MEDLEY: So how are you going to find out what they told them?

MR. PISANO: Well, my rationale is that I can prove to you that there was a violation of 10.87, and at that point they

ought to turn over whatever other information they may have obtained in violation of the rule.

MR. NEIFELD: Well, I dispute that there was -- from my knowledge of the facts, from the people I've spoken to, I dispute the conclusion that --

MR. PISANO: That's right.

MR. NEIFELD: -- Mr. Pisano --

MR. PISANO: File an opposition to our motion to have -- you can file an opposition to the motion. I think that's the way to do it.

Your Honor, if you're inclined to give us discovery in this --

(Mr. Neifeld and Mr. Pisano speaking at once.)

MR. NEIFELD: -- the rule that we believe wasn't violated. So if you file a motion, we're just going to say, Well, look, we didn't violate the rules. Here's the facts.

MR. PISANO: Well, then, your Honor can look at the facts. You can look at the assertions of -- and the statements of our witnesses, look at the statements of the Espiau's witnesses, whoever they want to put in. And then you can decide whether there was a violation of the rules or not.

JUDGE MEDLEY: Okay, I'm going to think about it. I'm not going to say one way or the other because we need to get going here.

MR. PISANO: Thank you, your Honor.

JUDGE MEDLEY: All right.

MR. PISANO: Would you want me to -- may I address the rest of the motions on our list, on Guthrie's list?

JUDGE MEDLEY: I'm going to go ahead and move us through these.

Okay, No. 1, your miscellaneous motion to add other patent and applications.

As to the patent, I'm leaning towards authorizing you to file a motion to add that

patent.

As to the application, no, they haven't been examined. We don't know if the claims are patentable.

MR. PISANO: Thank you.

JUDGE MEDLEY: I'm not inclined to do that with respect to the other applications.

As to No. 2 for additional benefits, you earlier filed application which, of course, has been the subject of many things here so far. I would say yes; you'll be authorized to file that.

Your line item No. 3 --

MR. NEIFELD: Is duplicative of motion No. 8.

MR. PISANO: No, your Honor, it's not. May I explain why?

JUDGE MEDLEY: Well, just one minute. Let me get a grip on all these things that are sort of being thrown together, it seems to me.

Okay. Number 3 does seem similar, to me.

MR. PISANO: I can explain to your Honor why it's not.

JUDGE MEDLEY: Okay.

MR. PISANO: May I?

Number 3 is based on derivation from a nonparty third-party -- from a nonparty inventive entity, and it's a derivation under 102(f).

The theory here is that there is a third-party inventive entity that would constitute the Espiau inventors, plus Don Wilson and Charles Guthrie.

And you can find support for, you know, a basis for such a preliminary motion in Kramer versus Ballard, 11 USPQ 1148, concerning patents 1989. And the concept is that the interference is between -- it relates to the inventive entities that are in the interference.

And in Guthrie's view, there are, in

29

fact -- you could say there are three inventive entities. One inventive entity is all of the Guthrie inventors. There are some wave-guide guys. There are some old guys. Together they make up the Guthrie inventive entity.

With respect to Espiau, there is -- you know, they claim to have also invented it. But it's in Guthrie's view, the three Espiau inventors know nothing about bulbs or plasma bulbs. All they knew about was wave guides.

So there is actually a third inventive entity which is the inventor of the Espiau patent, which is, to the extent there is an invention there, that it was separately invented from the Guthrie invention.

And that is the wave-guide bulb from Espiau plus Wilson and Guthrie, who were the bulb guys from DRI.

So that's a third inventive entity. It is not a party in the interference and, therefore, this is not a derivation -- this is

30

not a derivation motion that should await the priority period.

It is a preliminary motion for unpatentability for derivation from this third inventive entity.

And, again, I would cite you to the Kramer versus Ballard case.

MR. NEIFELD: I am definitely confused. Are you saying this is a motion under inventorship or under 102(f)?

MR. PISANO: It's under 102(f).

JUDGE MEDLEY: Okay.

MR. NEIFELD: The motion on page 2, motion No. 8.

MR. PISANO: Motion No 8 is for derivation from the Guthrie inventive entity. It is a different motion.

MR. NEIFELD: You're saying that the subject matter in the interference is not patentable to Wilson and Guthrie but patentable to a different inventive entity, including Espiau and Joshi? Is that motion

31

No. 3?

MR. PISANO: Motion No. 3 is that there are two inventive entities, in Guthrie's view.

One is -- one consists of all of the Guthrie inventors. The second consists of Wilson, Guthrie and the Espiau inventors. That is the inventive entity from which the Espiau application was derived. And that is not something that should be considered in the priority phase.

MR. NEIFELD: We're talking about counts and claims here. Derivation relates to the count; inventorship relates to claims. What exactly --

Your Honor, I'm confused.

JUDGE MEDLEY: I'm with you. I'm confused, too.

Let me just back up and ask you something. Okay?

When we have a proceeding where, let's say we have A-B listed on a patent, and

32

then A comes along and files an application. And he says, Oh, no, and he claims the benefit of the patent.

Oh, no, I should have been the sole inventor. It was a mistake. B should never have been named.

What we do is we set up corresponding count with each claim. A now thinks that he's the sole inventor. He has to prove with respect to each and every single one of the claims that he alone conceived. That's separate from derivation of the invention of the subject matter of an interference.

MR. NEIFELD: The originality claims; right?

JUDGE MEDLEY: Right.

MR. PISANO: Your Honor, let me -- to the extent I was inarticulate, my point is that there is -- is that the invention that was --

There's basically two possible --

for two inventive entities for the count, for the count in this interference. One is the Guthrie inventors. The second is the Espiau inventors but since they knew nothing of the -- and the invention is directed to an integrated wave guide plasma lamp.

Since the Espiau inventors knew nothing of plasma lamps, the only way they could have obtained that information was from the inventive entity that consisted of the Espiau inventors and the two DRI inventors, Wilson and Guthrie.

And, again, I would commend you to read the Kramer versus Ballard case because this is a proper motion for preliminary motions period.

MR. NEIFELD: It seems to me that if you win that motion, that your application is -- you've admitted your application claims are invalid.

MR. PISANO: No, I don't believe so, Rick, because --

Sorry, your Honor.

But I don't believe that's the case because all we're saying is that there are two different inventive entities. Now, as between those two entities, which is all of the Guthrie inventors, or Espiau plus two of the Guthrie inventors, our position is that all of the Guthrie inventors invented the count first.

JUDGE MEDLEY: I'm just not getting it. I'm sorry to be difficult, but if I can't understand, I'm not going to let you file it. I mean, you're not articulating something that I or apparently Mr. Neifeld understands.

MR. NEIFELD: I think I understand that Nick may have a misunderstanding of a relevant point of law. That's as far as I have an understanding.

MR. PISANO: Well, your Honor, I think -- I believe that the case is -- I believe the situation is completely spelled out in Kramer versus Ballard because in that

case, the junior party attempted to show derivation or attempted or moved for unpatentability under 1 or 2(f) on the basis that the count had been invented by some of the junior party's inventors and some of the senior party's inventors.

And the commissioner decided that that was a third inventive entity that was different than either of the parties preferably in the interference, and that that was a proper motion.

MR. NEIFELD: And in which case, both parties lose, Nick, because the inventorship is wrong in both cases.

MR. PISANO: In that case, they did lose. But in our case, I don't believe that -- I don't believe that the Guthrie inventors need to lose because what we're saying here is that the 102(f) derivation consisted of having the Espiau inventors file an application that was properly, you know, to the extent it was patentable to anyone, any of

them, it was patentable to the Espiau inventors, plus Wilson and Guthrie.

Now, that's a different matter than who first invented the invention. And you've got Guthrie's position is that it was all of the Guthrie inventors as opposed to Espiau, plus Wilson and Guthrie.

JUDGE MEDLEY: Well, if you believe that it's the Guthrie inventors, all of the Guthrie inventors that invented the subject matter of the count, why is it that you're filing this motion?

MR. PISANO: Because if the Guthrie inventors invented it, then it goes to the prior -- then it goes to the priority phase of the proceeding, your Honor.

And my understanding is that if we're pointing at the third inventive entity, if that is a motion that is properly heard now during the preliminary motions phase because, basically, the invention is unpatentable to Espiau alone --

JUDGE MEDLEY: No, that's not necessarily true, I mean, that I would take it up now.

MR. NEIFELD: This is clearly a derivation motion, your Honor. I think it should be deferred.

MR. PISANO: Your Honor, I would submit again, if you'd take a look at Kramer versus Ballard 11 USPQ 1148, you'll see that this is a case where they said, no, this is not a priority motion -- priority phase motion. This is a preliminary motions.

JUDGE MEDLEY: But it goes to whether or not Wilson and Guthrie should be added to the Espiau patent.

MR. PISANO: It's not -- it's not a request that they be added. It's a request for a finding that they should have been but weren't.

JUDGE MEDLEY: Right, that they should have been. But it goes to inventorship. It goes to what their

contribution was to the subject matter of the count. Now, all those things are held at bay. They're -- those are the things, the kinds of issues, that come up during priority.

MR. PISANO: Your Honor, again, I would just -- I understand what you're saying. But if you take a look at the Kramer versus Ballard case, you'll see that that is not what happened and that is not what the commissioner said.

JUDGE MEDLEY: Well, I'm not necessarily saying that it's a priority issue. I'm just saying that the declarations, the cross examination, et cetera, that goes to -- it's similar to the same sort of declarations and cross examinations that will happen during the priority phase. Why should --

MR. NEIFELD: It is similar, your Honor.

JUDGE MEDLEY: I'm sorry?

MR. NEIFELD: I'm sorry, your Honor. It's also identical to his motion No. 8.

MR. PISANO: No, your Honor, it's not. I don't know how to explain it more clearly. But No. 8 basically says that the three Espiau inventors took the invention from all five of Guthrie inventors. That's what No. 8 says.

Number 3 says that the three Espiau inventors took the invention from a third party, a nonparty to this interference which was the inventive entity that consisted of the Espiau inventors, plus Wilson and Guthrie.

MR. NEIFELD: But there is not an originality contest. Problem. No one said they all invented together, in the same room identically at the same time when the light bulb went off.

JUDGE MEDLEY: Okay. Well, I'll think about it.

All right. I mean, I understand what you're saying, and I'll think about it. But my inclination is to defer it. Okay?

And No. 3 goes with --

MR. PISANO: Number 4 goes with --

JUDGE MEDLEY: Number 4 goes with No. 3. Okay.

MR. PISANO: Yes, your Honor.

MR. NEIFELD: One more note. Number 4 and No. 9 are also identical.

MR. PISANO: Your Honor, I don't believe they are.

MR. NEIFELD: I'm just looking at what you're asking for. The words are identical.

JUDGE MEDLEY: Okay. All right. Number 5, if you'd please explain.

MR. PISANO: Yes. Number 5, your Honor, is that there was a -- there's something that we're calling the DRI plasma lamp which is in Exhibit 2039 or 2037 that was submitted in connection with the order to show cause.

And that is -- basically, that device was shown to the Espiau inventors, and in their -- in the UK Parliament action, Luxim

has stated that they were shown this device.

That device, we believe -- Guthrie believes basically meets the count.

JUDGE MEDLEY: Okay. Mr. Neifeld, do you have anything to add to that or say about that?

MR. NEIFELD: Well, yes, I think this is a substantive motion that goes to unpatentability under statutory section. Obviously, I disagree with the conclusion that the claims are unpatentable over a deductive couple loop device that doesn't resonate.

We'll get to the issue of the merits of the motion filed.

JUDGE MEDLEY: Okay.

MR. NEIFELD: But it seems to be a motion that's based on a statutory section. The question is just how much does he have to produce and be discovered and cross examined to support this motion.

This also goes to non-self-authenticating evidence, your Honor.

JUDGE MEDLEY: Okay. All right.

MR. NEIFELD: And then the question is what is in his motion No. 6 which relates to motion No. 5.

JUDGE MEDLEY: I'm sorry?

MR. NEIFELD: Well, take a look at motion No. 6 with respect to motion No. 5.

MR. PISANO: Number 6, your Honor, relates -- to the extent, basically it is a request for production of documents between DRI and TENCO/Luxim which became the same company with respect to information it was provided to the Espiau inventors regarding the operation that we've got plasma lamp.

JUDGE MEDLEY: Okay.

MR. PISANO: And so, for example, Luxim put in of record in the UK Parliament proceeding that Mr. Joshi sat down with inventor Sandberg who then went through the operation of this DRI plasma lamp.

JUDGE MEDLEY: Okay. Well, I would be inclined not to allow that discovery. If

you have something that you can go forward with --

MR. NEIFELD: Yeah, it seems like -- yes, 102(a). You should go ahead and present it in a motion and we will respond.

JUDGE MEDLEY: Right.

Can you hold one section, please.

MR. NEIFELD: Sure.

JUDGE MEDLEY: Thank you.

(Whereupon, a short recess was taken.)

JUDGE MEDLEY: Okay, I apologize for that.

MR. NEIFELD: If I understand, your Honor, you were going to decide the motion 5. Motion 6 is a no at this point.

JUDGE MEDLEY: Yes, at this point.

MR. NEIFELD: And No. 5 is he can go ahead if he has the evidence?

JUDGE MEDLEY: Right. He can go ahead with what he has.

MR. NEIFELD: And that's what I

thought would happen because this is, you know, if you have a question of 102(a), well, show us your evidence and we get to respond.

JUDGE MEDLEY: Right. Okay, No. 7, substantive motion for priority, that will be deferred.

The derivation issue I think we beat that into the ground unless, Mr. Neifeld, you have any other questions?

MR. NEIFELD: Just if you could say it's deferred, your Honor.

MR. PISANO: Actually, your Honor, I understand that No. 8 is deferred, and I believe it's a different motion than No. 3.

Number 9 relates to No. 8.

JUDGE MEDLEY: Yes, it's deferred, and we can also have another conference before the priority phase starts, to hash out any other dates with respect to derivation of party invention.

Number 10, what is this?

MR. PISANO: Basically, your Honor,

this was just to have the board taken official notice of the contents of the involved application and patent file histories, though we would submit particular exhibits.

I did note that in the standing order, it said if you want the board to take notice of the involved application and patent file history, you should file a miscellaneous motion for official notice.

JUDGE MEDLEY: Oh, new to me. Could you tell me where that is in the standing order?

MR. PISANO: Yes, actually.

MR. NEIFELD: I don't oppose it, your Honor, so in case that's reason to ask for it.

It is there. I saw it, too.

JUDGE MEDLEY: Okay. I mean, I vaguely remember something about it, but we've changed the standing order a couple of times lately.

MR. NEIFELD: I think it's sort of a

safety valve in case somebody files a big file history and there's pages missing.

I mean, if we can make it a joint motion, I'd be very happy.

JUDGE MEDLEY: All right. So you want to do the same, then?

MR. NEIFELD: Yes, I think if we're going to take official notice, both sides should be entitled to the same break.

JUDGE MEDLEY: Okay. So do either one of you know right off the top of your head what code that is?

MR. NEIFELD: I have a searchable form here. I'll just check.

MR. PISANO: I am looking.

MR. NEIFELD: 152.1.

JUDGE MEDLEY: 152.1, okay. Thank you.

All right. Shall we talk about responsive motions now or do you want to wait?

MR. PISANO: Well, your Honor, there's a couple more substantive in

miscellaneous motions.

JUDGE MEDLEY: Okay.

MR. PISANO: So let me skip No. 11 for the moment.

JUDGE MEDLEY: And 12 and 13. We've talked about that.

MR. PISANO: 12 and 13 we've discussed.

MR. NEIFELD: I'm still not sure what we're deciding with 12 and 13, your Honor. Could you tell us.

JUDGE MEDLEY: I haven't decided.

Okay, No. 14?

MR. PISANO: Would be a substantive -- it's a contingent substantive motion in Guthrie's inventors Espiau patent.

And the reason this was contingent was because the thinking was that we would file a motion No. 3 for unpatentability if the board should decide that the claims were -- that the claims of the Espiau patents were that there was not a deliberate misjoinder of

Wilson and Guthrie, then we would try or consider adding Wilson and Guthrie to the Espiau patent. That's what that is.

JUDGE MEDLEY: Okay, does that have to be done per this proceeding?

In other words, if you're authorized to file your motion 3 and if you are granted that motion for relief, why is it that you couldn't do it at a later time?

MR. NEIFELD: Well, I think the claims would be dead at that point if he wins on all of his motions --

MR. PISANO: Right.

MR. NEIFELD: -- then the Espiau patent will evaporate.

JUDGE MEDLEY: All right.

MR. NEIFELD: My sense at this point is either that's his position -- he has to take one position which is 3 or motion 14.

MR. PISANO: No, your Honor. I note that my motion is contingent, but that you'll see that Mr. Neifeld has a similar motion

that's not contingent in his papers when we get --

Number 15 --

MR. NEIFELD: Do we have a decision on 14?

JUDGE MEDLEY: Yes. I mean, I'm not that inclined to authorize it.

MR. NEIFELD: No? Okay.

JUDGE MEDLEY: Okay, No. 15.

MR. PISANO: Number 15 is a motion to be accorded additional benefit and authorized petition to correct priority under 119(e), though we've discovered -- or at least I discovered as recently as the filing -- preparation of papers in response to the order to show cause, that there were four additional Guthrie applications.

JUDGE MEDLEY: Okay. Now, my question to you is, why do you need the benefit of these dates -- I mean, or these applications? You already have the benefit of several applications spanning essentially the

same dates that these applications were filed.

MR. PISANO: That's right, your Honor. There may be some additional disclosure in these applications that we might choose to rely on.

JUDGE MEDLEY: Okay. And what is the petition to correct priority under 119(e)?

MR. PISANO: In order to make -- in order -- basically, the rules require that under -- that to make a priority claim under 119(e), you should do it within a specified time if your application is filed after November 29th of 2000.

JUDGE MEDLEY: Right.

MR. PISANO: You have to do it during pendency, so this would be a petition commissioner, but we would -- my understanding is I should authorize it with the board before we do it.

JUDGE MEDLEY: Right, right. No, I'm just -- just hear me out.

I've seen this in the other side's promote motions list, too. It's sort of, you know, how does that go to the heart of priority of according someone benefit for the purposes of the count?

I don't think that that's really -- it's sort of a side show that you can do offline. I don't know that that needs to come into the interference proceeding.

In other words, first you need to file your motion to be accorded benefit.

MR. PISANO: Right.

JUDGE MEDLEY: But I don't know that we need to, you know, file these certificates of corrections, for example, in Guthrie or Espiau's patent so that they have 120 benefits --

MR. NEIFELD: Well, your Honor --

JUDGE MEDLEY: Yes?

MR. NEIFELD: -- are you telling me that I'm not authorized to perfect my 120 priority claim?

JUDGE MEDLEY: No, I'm not telling you that. I'm just saying, why do you need it to get benefit, priority benefit, for the purpose of the count.

MR. NEIFELD: These applications don't buy party Guthrie any benefit because they don't provide an earlier benefit date when the application is already on record.

JUDGE MEDLEY: Oh, no. I thought you were asking me why you don't need to perfect your 120 benefit, and I turned it around to ask you why would you.

MR. NEIFELD: So what do we do with motion 15?

JUDGE MEDLEY: Well, I'm going to think about it. I think --

MR. NEIFELD: I have a problem with it, your Honor.

JUDGE MEDLEY: Okay.

MR. NEIFELD: Guthrie now has six applications, I think all filed within one day of another, and our benefit application. And

it's my position those applications not disclose essential elements of the count, limitations upon the count.

And in my motion to redefine, I have to point out for each and every benefit application, in a single motion, why that application does not have essential elements of the count. I'd have to do this for 10 applications now in the same motion.

That's a horrendous burden to have to do that, and that there's no benefit.

JUDGE MEDLEY: Okay. That gives Mr. Pisano a chance to say that there is some benefit, that there might be something --

MR. NEIFELD: One benefit to him is my motion would be horrendously hard to write within the 25-page limit.

JUDGE MEDLEY: Okay. Mr. Pisano, what is it you have to have in these applications?

MR. PISANO: Well, your Honor, there are some -- there is some disclosure with

respect to some of the claims that might be beneficial to have.

But I will -- in all candor, your Honor, and this motion was prompted by Mr. Neifeld's 120 claims which, by the way, he can't perfect under any circumstances under the current statute.

And I basically had the same question which I did not understand why it would buy him any additional benefit to be claiming priority to applications filed after his accorded priority date.

But there may be -- I mean, there may be certain features in here that we may wish to rely upon to show the benefit.

And I think -- or to show some of the features of the claim.

If your Honor -- I mean --

JUDGE MEDLEY: But you can't tell me right now what those features are that's shown in these applications.

MR. PISANO: For example, with

respect to a specific claim as to how the antennae is maintained in contact with the wave guide block, that is described in one of these applications. It's not described in the others.

JUDGE MEDLEY: What claim is that?

MR. PISANO: I believe that's claim 16 of their application, 16 of the Espiau patent.

JUDGE MEDLEY: But that's not part of the count.

MR. PISANO: It is part of the count. Right now, all of the claims of their patent are identified as corresponding to the count.

JUDGE MEDLEY: No, but the count is -- claim 109 of Guthrie claim --

MR. PISANO: I apologize, your Honor. You're right.

JUDGE MEDLEY: So why do you need it? I want to know, if you tell me that you don't have support for any of your existing

benefit files they've giving you benefit for, for your claim 109, for your claim 129. Let's focus on that.

MR. PISANO: No, there's -- my understanding, your Honor, is that there is absolute support in the provisional applications for which benefit is already claimed.

JUDGE MEDLEY: So why file these?

MR. PISANO: As I said, your Honor, this was -- I'm doing so because Mr. Neifeld had requested a similar -- or relief and, if your Honor doesn't see it as being necessary, I'm happy to withdraw the motion.

JUDGE MEDLEY: Okay. I see it unnecessary.

MR. PISANO: Okay. Thank you, your Honor. I hope we'll come to the same conclusion with respect to Mr. Neifeld's motions.

JUDGE MEDLEY: Well, let me just say, now if I -- Espiau's proposed motion to

break down all these conventions, if you will, into several different counts -- four, I believe, Counts II through VI --

Now, if, for example, their count VI is to a claim that you have that you need benefit, of course you can file a responsive motion for benefit of one of these four.

MR. PISANO: All right. Thank you, your Honor.

JUDGE MEDLEY: Okay. All right. What is No. 16? Is there a 112 first paragraph problem?

MR. PISANO: There's a -- I believe there is. I believe there's a 132 problem.

Shortly after the application was filed, Espiau submitted a substitute specification that ran some 20 or 30 pages long, basically rewriting every paragraph of the specification.

And as I have looked through that, I believe that there are circumstances where they have sort of changed more than just the

nuance of the language.

For example, the emphasis on having the electric field maximum present at the bulb cavity appears to have been promoted to the summary in the invention and become a critical element of the patent after they received the first office action.

MR. NEIFELD: But you're not stating -- it wasn't there originally? Just in a different place.

MR. PISANO: Now, it wasn't said to be -- I don't believe it was said to be a critical aspect of the invention, but it is now, as I understand it, the basis for your motion for trying to deprive the Guthrie of benefit of his provisional application.

JUDGE MEDLEY: Okay. Well, you need to be a little bit more specific as to unpatentability of the patent. I mean, is that the general -- what claim are we talking about?

MR. PISANO: We're talking about --

we're talking about the count actually.

JUDGE MEDLEY: I'm sorry?

MR. PISANO: We're talking about the count 109, and we're talking about count one -- I'm sorry, claim one of the Espiau patent.

JUDGE MEDLEY: All right. I would probably authorize that one.

Okay, No. 17.

MR. PISANO: That's just in the realm of responsive motions, your Honor. And at the time I filed this, Mr. Neifeld -- I was not aware of what Mr. Neifeld's basis of his 112 position was.

But if -- this may involve redefining the count. Right now, I don't believe it is.

MR. NEIFELD: Redefining the count is not a responsive motion.

JUDGE MEDLEY: Well, responsive motion, Mr. Pisano, would be, for example, if Espiau was attacking all of your claims, saying they're all unpatentable under 112

first, then to present a claim that would overcome that concern, that still is drawn to the same patentable subject matter.

MR. PISANO: Correct, your Honor. You're correct, your Honor. I misspoke, yes.

JUDGE MEDLEY: Okay. Well, you know, it's sort of hard. I appreciate the parties are trying to be forthright with us about responsive motions. But I also am sympathetic to the parties.

They can't really oversee what sort of responsive motion they will file until they see a party's motion.

So we can have another call, the parties can initiate another call prior to the --

MR. NEIFELD: I just want to be clear, your Honor, that you have more experience than either of us in these types of proceedings. And I have some background. I think Nick has less than I have.

So the fact that we're imprecise in

61

certain motions is understandable. I hope you understand it.

JUDGE MEDLEY: Yes, I do. I guess what I'm just saying is that I'm not going to penalize you for maybe not foreseeing that you would want to add claims in response to a motion that knocks out all your claims.

MR. NEIFELD: So I would like clarification on Nick's motion, proposed motion 16.

You said it's okay, but it still says it's a motion for unpatentability for a deduction of new matter.

Do you want him to restate that? I understand it's supposed to be a motion for unpatentability for lack of support.

MR. PISANO: Yes.

JUDGE MEDLEY: Yes, I want it to be a 112 first paragraph problem -- I mean, presentation.

MR. NEIFELD: And the claims you're attacking, Nick, are not to be identified?

62

MR. PISANO: Right now it's at least claim 1 which corresponds to the count and all the dependant claims.

MR. NEIFELD: Not claim 32? That's the other independent.

JUDGE MEDLEY: That's the method claim that's similar.

MR. PISANO: That's right, not claim 32.

MR. NEIFELD: What would be your rationale for inventor claim 32? I mean, let's get to the issues now.

MR. PISANO: Let's see. Oh, I've got the wrong patent in front of me. I'm sorry. Hold on.

Specifically claim 32 doesn't require -- doesn't specify radio-electric field maxima is located.

MR. NEIFELD: Claim 32 says -- you copy claim 32, so I figured you know what it means in view of your spec. Claim 32, you copied as 129. Claim 32 says --

63

MR. PISANO: Right.

MR. NEIFELD: -- a directing resident microwave energy into an envelope determined by the cavity and the window.

MR. PISANO: That's right. It doesn't say -- I'm sorry?

MR. NEIFELD: What exactly do you think that means?

MR. PISANO: Exactly what it says. It says directing resident microwave energy into an envelope.

And as originally specified in the Espiau application, what that patent originally described was having the bulb proximate to an electric field maximum, not necessarily located identically at the electric field maximum.

JUDGE MEDLEY: Okay. So you are saying that you would not attack claim 32?

MR. PISANO: No, I would not.

JUDGE MEDLEY: Okay, just claim one.

MR. PISANO: Yes.

64

MR. NEIFELD: Your Honor, I have a claim construction issue. Maybe we should discuss it now.

JUDGE MEDLEY: No.

MR. NEIFELD: No? All right.

JUDGE MEDLEY: It will come out in the motions. Okay?

MR. NEIFELD: Okay.

JUDGE MEDLEY: All right. Let's move on to Espiau's revised list.

MR. NEIFELD: All right. Do you want to go down the list and do yes or no, and I'll plead for mercy if you say no.

JUDGE MEDLEY: Okay. Motion 1, motion for judgment that Guthrie's claims aren't valid for failure to name Guthrie inventors. Okay, this seems sort of similar to the 102(f) issue.

MR. NEIFELD: There is one difference, your Honor. Well, there are two differences. One is there is not objective evidence in the record that they got the

inventorship wrong because they filed the provisionals naming our guys as inventors. They're alleging invention disclosures before the provisionals, name our guys as the inventors also.

And there is some evidence which is not yet of record.

But the difference here is I'm not talking about the counts. I'm talking about the claims.

We have other claims, the ones I moved to have taken out. But we see that these claims were not the count, but claims. Our (unintelligible) is still separate claims, also were clearly invented by our guys, and communicated to their guys as indicated by evidence on the record.

So I could simply, as a straight-up motion for, you know, of improper inventorship –

MR. PISANO: Actually, your Honor, we -- I guess I would say that Guthrie sees

the facts exactly the opposite.

The evidence of record shows that the Espiau parties obtained the details of the invention from the Guthrie parties, and that the Espiau inventors were supposedly – well, they were consultants to the DRI.

They were listed on a couple of the provisionals for no particular reason. Subsequently they were dropped when it was clear when it was clear they made no inventive contribution, and I think that that will all come out in the record.

But this motion is basically identical to Guthrie's motion 3.

MR. NEIFELD: Well, I see the difference is being -- objectively it's different, and it's directed to claims, in addition -- independent and dependent claims.

JUDGE MEDLEY: So the claims part of the count –

MR. NEIFELD: No, the claims are not the ones before that are the independent

claims that define the count.

The claims are those claims and dependent claims, the ones identified in my motion No. 7 with those claims which provide, we believe, provide an obvious distinction over the count, separate inventions, but also copied now by Guthrie.

Now, keep in mind, the claims Guthrie filed originally and the claims they filed now are different. They're quite different.

They don't include the core limitations of the count, or a structure that has a defined resident mode in placing the bulb at the maximum of that load.

But be that as it may, there are also additional inventions that our guys – that party Espiau inventors made defined by these claims that are not obvious improvements over the original of the core invention of the resident structure with the gas that turns to a plasma at the e-field maxima in the resident

mode.

MR. PISANO: Guthrie would disagree with that statement. Many of those claims are entirely obvious in view of the --

JUDGE MEDLEY: Okay, well, we don't need to go to the marathon, but I'm just trying to figure out if this motion should be deferred to priority.

MR. NEIFELD: This is a motion that could either benefit from additional discovery or stand on its own.

JUDGE MEDLEY: I'm sorry. I couldn't hear you.

MR. NEIFELD: This is a motion that could either benefit from additional discovery or stand on its own.

JUDGE MEDLEY: Okay.

MR. NEIFELD: You know, if I want to revisit the motion if we get into the priority phase, if the evidence turns out to be more than we expected –

JUDGE MEDLEY: Uh-huh.

MR. NEIFELD: -- but it's clearly not the same thing as what we were discussing earlier.

JUDGE MEDLEY: Okay. Which specific -- please tell me which Guthrie claims. There are two --

MR. NEIFELD: There are two independent claims, one at 32 and also the dependent claims identified in motion 7 which are two.

JUDGE MEDLEY: So it's one and 32 of Guthrie.

MR. NEIFELD: One and 32 of Espiau's.

JUDGE MEDLEY: I'm talking about your motion No. 1 that all Guthrie claims are invalid for failure to name.

MR. NEIFELD: Oh, okay, you want the Guthrie claims. They would be Guthrie claims 109, 129. Looking at my motion 2, it would be Guthrie claim 110, 125, 126, 127 and 128.

JUDGE MEDLEY: And that's all of the

Guthrie involved claims.

MR. NEIFELD: No, there's other Guthrie involved claims, dependent claims in addition to those.

JUDGE MEDLEY: That would not be affected.

MR. NEIFELD: Well, they wouldn't be affected by Espiau and Joshi and company, but they would be affected by the fact that inventorship was invalid.

MR. PISANO: Your Honor, I really don't see how this is any different than our motion 3, Guthrie's motion 3.

Basically, it appears to me he's happy to leave all of the claims, including the claims that correspond to the count, including claims 109. Just -- I just don't see how this is different.

MR. NEIFELD: The difference is that the count is what's at dispute. We're going to determine that eventually.

As to claims and evidence now of

record, you know, we have evidence to show is that is contradictory to the existing inventorship.

JUDGE MEDLEY: Can I ask a silly question.

MR. NEIFELD: Yes.

JUDGE MEDLEY: Okay. Both parties seem to think that -- if you read between the lines on all this, it sounds like these guys worked together.

MR. NEIFELD: Yes. This was Humpty-Dumpty that fell apart, your Honor.

JUDGE MEDLEY: And so now everybody says, No, I should be named on your application. No, I should be named on your patent.

Have the parties tried to get together and resolve this?

MR. NEIFELD: Nick, let me address that for a moment, if you would.

I independently, without any authorization for my client, brought that

issue up with Nick I think it was last Friday. Pointed out what I knew about the pitfalls of settling interferences and the fact that this looked like Humpty-Dumpty that fell apart. And it would make sense to put it back together before everybody lost.

JUDGE MEDLEY: Right.

MR. NEIFELD: It's always a possibility of interference.

And I asked him to, you know, convey that to his client because it was going to be beneficial to me, obviously, or to my client if everybody didn't lose.

I think he took it under advisement. I did talk to my client to initiate the issues of a possibility of a settlement and arranged the same issues.

My client says it's premature. Basically, I think as things stand, my -- and, Nick can correct me if I'm wrong -- my client is moving forward commercially to get funding and Nick's client is not at that stage.

MR. PISANO: Actually, your Honor, again, we disagree as to what the facts are.

I did -- we did have the conversation that Mr. Neifeld mentions. I asked him to ask his client -- to go speak to his client directly and obtain an offer that could be made so that the parties could consider it.

MR. NEIFELD: I have so --

MR. PISANO: We certainly were willing to consider a reasonable offer. But it also is believed that it is actually further ahead, with respect to thinking of commercial embodiment of this product.

So it is certainly willing to consider a reasonable settlement offer, and it has asked for one. But we haven't gotten anything yet.

Now, Mr. Neifeld tells me that his client believes it's premature, and I suppose they --

MR. NEIFELD: I'm under the

obligation -- I'm the senior party, and I had to make the initial --

JUDGE MEDLEY: Right, right.

MR. NEIFELD: -- contact.

I think that if Ceravision would make some kind of proposal, it might get the ball rolling.

MR. PISANO: Your Honor, again, I can tell you a little of the history here.

As I mentioned at the outset, when the request for the interference was filed back in 2004, my partner contacted the EO of Luxim, Mr. McGettigan, and said, You've provoked this interference. We would like to talk to you about settling this case.

And he was told, Forget about it.

And nothing has happened in the intervening two years.

JUDGE MEDLEY: Okay. Well, you know, I don't really want to --

MR. PISANO: I understand.

JUDGE MEDLEY: I don't necessarily

need an exhaustive history. It just struck me as sort of odd, you know, that conceivably both -- if both parties could show that the other inventors, if all of them somehow worked together and should have been named on either one of these involved application of patents, then they both go down.

It just seems sort of odd to me that sometimes you can't see the trees for the forest. That was my only point.

MR. PISANO: I agree, your Honor.

With respect to timing of the motions, apart from the motion with respect to the 1087 issue, Guthrie believes that the most effect, that the parties talk to one another, is to let them to forward with all the preliminary motions so that we can get it all out on the table.

And that probably -- that prospect may very well encourage the parties to engage in settlement whereas if we piecemeal the preliminary motions phase, both parties will

run up large bills. It will be a lot of workload and be an increased workload for the board. And it may eventually settle anyway.

JUDGE MEDLEY: Okay. All right.

Well, let's get back to the matter at hand.

Let's see. No. 2 --

MR. PISANO: I'm sorry, your Honor. With respect to No. 1, are you going to decide the fate of that, along with Guthrie's motion 3?

JUDGE MEDLEY: I'll probably defer it.

MR. PISANO: Thank you, your Honor.

JUDGE MEDLEY: And I'm going to do the same for -- I'm going to be consistent, obviously. I wouldn't --

MR. NEIFELD: Okay, next one -- well, if you defer one, two is the one that looks the most interesting.

I realize that this is a touchy issue. But the evidence that I have, some of

which was listed here, those that, you know, Guthrie admitted that we were the inventors on the application it now relies upon for benefit.

And there's several of those, and several facts that indicate now that there was a known problem with inventorship --

JUDGE MEDLEY: So how is this one different than one?

MR. PISANO: Your Honor, I don't see it as being different than one.

MR. NEIFELD: Of course not. You represent the other side.

But it's different than one because inventorship and knowing that you're naming some -- the wrong party, arguably, specifically the claims that were filed initially, at the time they were filed and the Guthrie involved application do not claim the disclosed preferred embodiment.

And now the claims do. That's the subject matter of the count, particularly the

applications upon which Guthrie relies for benefit -- sorry, the invention disclosures that Nick produced in response to the order to show cause, no records are filed and the corresponding provisional application, both with Espiau and Joshi -- Espiau inventors -- had inventors.

And now in the regular application, follow without the best mode, they do not list Espiau and Joshi.

Claims now as filed go back and claim that best mode, which is for their figures 3 and 5, as disclosed in the specification, placing the gas either in bulb or an envelope, at the location of a resonate mode, defined resonate mode e-field maximum.

MR. PISANO: Your Honor, I think what the objective evidence shows is that it is true that some of these provisional applications, none of which had claims, include Mr. Joshi, Ms. Yes and Mr. Espiau but

the record also shows, based on what was submitted in response to the order to show cause is that the drawings, the particular drawing 1 of the Espiau patent, originated with Mr. Guthrie and was sent to Espiau inventors at their request.

So, and I think the objective evidence --

MR. NEIFELD: I don't --

(Mr. Pisano and Mr. Neifeld speaking at once.)

MR. NEIFELD: -- generally speaking, a singular concept as --

You know, there was a communication from an Espiau inventor to Espiau attorney or Espiau -- probably Espiau manager. I forget which. Just before Guthrie filed its application that said, Hey, they're trying to get me to sign something.

MR. PISANO: Actually, your Honor, that's not correct.

JUDGE MEDLEY: Okay, well, we're

getting sidetracked again here.

MR. PISANO: I understand.

JUDGE MEDLEY: This seems to be similar to me to 102(f) situation, and so I think this motion would be deferred.

Okay, No. 3, so that goes along with No. 2, I take it? And/or No. 1?

MR. NEIFELD: Yes, it's similar to Nick's motion that allows us to salvage things if the parties get back together.

JUDGE MEDLEY: Okay. And then you can do that offline.

MR. NEIFELD: Deferred, 3 is deferred.

JUDGE MEDLEY: I don't know that it's deferred. I may not authorize it, but we can revisit it. Okay? It's a similar sort of thing that we were discussing earlier, that we could maybe do that.

MR. NEIFELD: Well, 1, 2 and 3 is no decision but I can't file it now?

JUDGE MEDLEY: I'm sorry?

MR. NEIFELD: No decision except I'm not authorized to file that motion now.

JUDGE MEDLEY: Right. Okay. Motion to deny Guthrie benefit. I don't need to discuss that. I think that's a fair play in the preliminary motions contest or part of that interference. So I would authorize that one.

Number 5, I would also authorize that one.

MR. PISANO: Your Honor, one point I would make with respect to No. 5 is I don't believe you can authorize it because it's contrary to law.

In particular, let me just read you one section of the MPEP. It states, Under no circumstances can a certificate of correction be employed to correct an applicant's mistake by adding or correcting a priority claim under 35 USC 119(e) for an application filed on or after November 29th of 2000.

And this motion No. 5 says that it

wants to do it under 120. But if you look at 37 CFR 1.78, that provides the implementing regulations for 35 USC -- for the priority claims under 120 and 119.

And 37 1.78(a)(1) through (a)(3) refer to 120 and say -- and specifically address only the claim, you know, how you would go about claiming in a later filed application the priority of an earlier filed nonprovisional or international application.

Sections (a)(4) through (a)(6) of 178 refer to how you go about claiming priority of an earlier filed provisional application.

And the MPEP says -- and in 1481-03 says that you simply can't do it for an application filed after -- after the patent is issued, you simply cannot make a priority claim under 119(e).

So I don't believe that certificate of correction is proper.

Also, they can't get it by reissue

because another section of the MPEP that says, Reissue is not a valid mechanism for adding or correcting a benefit claim under 35 USC 119(e) for a patent that has been granted where the application which became the patent to be reissued was filed on or after November 29th of 2000.

And the Espiau patent, the application of the Espiau patent, was filed on the March 15th of 2001.

So I don't believe that that should be granted because it's futile, but the statute says you can't do it.

JUDGE MEDLEY: Well, it goes back to what I was saying earlier. I mean, I agree that maybe he would have problems under 120.

But we're talking benefit for the purpose of priority.

MR. NEIFELD: Yes.

JUDGE MEDLEY: What do you have to show for that? You have to show -- describe enabled embodiment within the scope of the

count. Do we have to have all the other things and comply with 120? Well, maybe; maybe not.

Stevens versus Tomai may suggest that you do, but I think it's a fair issue, and I think that it should be resolved.

MR. NEIFELD: And that's an easy one, too, because there's one application.

And, you know, the issue is when justice requires it, the capsule of 1.183, and this is a situation where justice requires. You know about this application.

JUDGE MEDLEY: Okay. But I would say that, you know, under 120 you might have a hard, tough sell. I think you need to frame the issue as to whether or not you should be given priority benefit for purposes of this interference.

MR. NEIFELD: I understand, your Honor.

JUDGE MEDLEY: Okay. Number 6, so I would authorize that one.

MR. PISANO: Your Honor --

MR. NEIFELD: Your Honor, just for clarification --

JUDGE MEDLEY: Wait just a second. I think Mr. Pisano has a question.

MR. PISANO: Your Honor, I'm just not sure how this motion differs from Guthrie motion 15, which was the counterpart of this motion.

JUDGE MEDLEY: Well, it's not. I mean, he --

Okay, I see your point. You're saying that he doesn't need these dates because he already has an earlier date.

MR. PISANO: Yes.

JUDGE MEDLEY: Okay. That's true. I forgot about that. I apologize.

So, Mr. Neifeld, why do you need benefit of this application?

MR. NEIFELD: Well, one is the benefit of this application also supports the contention with respect to inventorship and

derivation, possibly ethical conduct.

Keep in mind the fact that some of these applications weren't claimed. We don't -- by Guthrie -- we don't know why they weren't claimed, for example.

There's another 12 applications that came up on the radar screen recently.

But with respect to this application, if we show that we're entitled to benefits of this application and that we're named by party Guthrie by the invention disclosure and it's provisional and not on the regular application, this is now what is being claimed and it's further evidence --

It provides another inference in support of the issue regarding improper inventorship.

MR. PISANO: Well, your Honor, it seems to me they can make that -- he can make that argument. He doesn't need to claim the priority of an application filed after his early recorded priority.

JUDGE MEDLEY: Right. I understand that.

MR. NEIFELD: No, but I'd like you to show benefit to it because benefit shows that the subject matter just defined by the count is disclosed in an enabling manner in the application.

JUDGE MEDLEY: But it goes to the same question that I was asking Mr. Pisano. And to be totally fair to both of you, what is it that you need out of that application that you don't already have?

MR. NEIFELD: An application that shows an application filed by Guthrie and party. It also names Espiau and Joshi.

MR. PISANO: But, your Honor, again -- I mean, sort of what's sauce for the goose is sauce for the gander, it seems to me that --

JUDGE MEDLEY: Well, I just think at this point, like Mr. Pisano, and I apologize for cutting you off but we're sort of running

kind of long on this call.

But that point can be made somewhere else with respect to your 102(f) motion.

If you could tell me that you have to have benefit or you need benefit of this application for purposes of the count, that you don't -- you know, that you need it, then give it your best shot.

But I think you already have an earlier date in this application.

MR. NEIFELD: We do have an earlier date based upon our filed provisional application, your Honor.

JUDGE MEDLEY: Right. And you were granted benefit with respect to that. The other side is not attacking that benefit so I don't see how giving you benefit of this application puts you in a bad position with respect to benefit for purposes of the count.

But if you want to bring up the fact that Joshi and Espiau were named inventors on one of Guthrie's earlier provisional

applications with respect to one of your 102(f) motions, I certainly think that that would be the time and place to do that.

MR. NEIFELD: There are several of these provisional applications, actually.

So this motion is at no?

JUDGE MEDLEY: I would -- yes, unless you can give me good reasons.

MR. NEIFELD: Well, that was my good reason, your Honor.

JUDGE MEDLEY: All right. I'll say no.

MR. NEIFELD: Okay.

JUDGE MEDLEY: All right. Moving on.

MR. NEIFELD: Well, go ahead. You're in charge.

JUDGE MEDLEY: Okay. To dedesignate. You know, I'm getting to the point where I feel like I'm deferring so much, but why does this need to be decided up front? Oftentimes, we even defer, you know, on

priority.

MR. NEIFELD: Well, the motions to dedesignate are core because if you enter a judgment against the claims without the motion being decided, you're entering claims against separately patentable inventions. That would be improper. This is a standard interference motion.

JUDGE MEDLEY: Yes, but dedesignating claims that aren't a part of the count isn't necessarily, you know, getting to where we want to get which is who invented the subject matter of the count?

MR. NEIFELD: If you enter a judgment not based upon priority or some other issue, and these clients are designated as they now are, it dies. Nothing else -- I can't do anything after that. They're gone.

JUDGE MEDLEY: Well, can we defer this to consider it simultaneously with priority?

MR. PISANO: I would suggest we do

that, your Honor, because Mr. Neifeld was complaining about enlarged motions. And he's already asked for -- basically, two motions in motion 6. One is to dedesignate and remove; the other is to set up what I thought was six other interferences. I guess that's motion 7.

But there is a huge amount of paper and cost here, and to the extent we could defer this until the parties have an opportunity to explore settlement, I certainly think that would be worthwhile.

MR. NEIFELD: I don't understand, your Honor, why you would defer motions that don't require discovery. The conventional first page motions, these are not -- this motion is only writing paper arguments based upon the known prior art.

Motion 7 is the one that's us giving the page limits.

JUDGE MEDLEY: Well, I thought that 6 is also -- you know, I don't want to argue with you. I mean, that's -- go to the trial

section's, you know, new method or new way of doing things. Sometimes -- I don't want to put words into my colleague's mouth -- but is to focus on the count. It's to focus on what are the inventions.

I mean, if you have proposed new counts, that's something we consider. We consider accorded benefit, but what affects the scope of the count, existing count.

Now, if you have a bunch of dependent claims that somebody is trying to dedesignate, how does that affect the scope of the count? How does that better prepare the parties to sort of look at it, step back and see what is it that we're ultimately going to be fighting about.

MR. NEIFELD: Well, I actually can answer that, your Honor.

If we have these claims in the interference, if they're out of the interference, that changes the playing field with respect to settlement, particularly in

motion 6, because if those are claims, if they're commercially valuable, the other side is going to recognize and realize that they're going to need a settlement to practice.

Now, if you say that we're going to leave it in the interference and defer that motion until the end, okay, will it be decided before judgment is entered? I doubt it. And that's a bias, a substantive bias against one party.

MR. PISANO: Your Honor, just, again, not to go to the merits of these things, but if you look at some of the claims that Espiau would like to dedesignate, for example, one of them is to dedesignate the claim that relates to wave guide being a sphere.

But then if you look at -- actually two of them. Twenty-one says cylindrical prism; claim 22 says the wave guide is a sphere. But if you look at the specification, it says, well, in figure 1, it's a prism.

However, it could be -- you know, the wave guide may have a cylindrical prism shape, a sphere-like shape or any other shape effective to guide microwave energy.

So these would appear to be, you know, very, very obvious variants of what's disclosed. And I think the answer to your question is, with respect to focus on the count, these -- you know -- I don't think removing these claims --

MR. NEIFELD: I want to make one point in response to Nick's statements. This interference is all about not the shapes but the resident mode that corresponds to those shapes and the boundary conditions.

The fact that we had dielectric air interfaces or dielectric metal interfaces are entirely different beasts. The fact that we have different shapes means the rest of the modes are entirely different depending upon the interface, dielectric -- dielectric or dielectric metal.

That's why this is such a difficult subject matter.

JUDGE MEDLEY: Okay. Well, I'll think about it. I'm not going to say one way or the other as to 6(1).

6(2) sort of seems to go along with 7.

MR. NEIFELD: Seven is the independent -- oh, you were asking about --

JUDGE MEDLEY: 6(2), to undesignate those claims.

MR. NEIFELD: Yes.

JUDGE MEDLEY: But it's for the purpose of having those claims designated to propose new counts.

MR. NEIFELD: Okay, 6 and 7 are similar in that respect.

Did you say that you wanted to defer these motions?

JUDGE MEDLEY: No, as to 6(1) I haven't decided. 6(1) is the one that I would, you know, lean towards deferring.

6(2), the undesignate --

MR. NEIFELD: That's the claim -- my number is 7. I guess you're calling it 6(2).

JUDGE MEDLEY: Well, you have 6 motion and then in parens one, to undesignate.

MR. NEIFELD: I see. Yes.

JUDGE MEDLEY: And then you have to undesignate --

MR. NEIFELD: Oh, yes.

JUDGE MEDLEY: -- other claims. But that's -- the way I interpret that is that is strictly for the purpose of setting those claims up into other counts.

So two, I'm saying 6, part two, that I would be inclined to authorize. But 6(1) I'm thinking of deferring.

MR. NEIFELD: Your Honor, one is defer and two is okay for now.

MR. PISANO: But, your Honor, I guess I'd like you to reconsider that because that -- 6(2) is specifically an example of having -- the example that I gave you having

the prism, having a wave guide be a prism or a sphere or that the specification says that everything -- these are all --

JUDGE MEDLEY: Right, but we're not getting to the merits right now. I'm trying to decide, determine procedurally how to go forward in this interference.

But certainly a party moving to add additional counts and to break out subject matter to different counts, that's fair game. That's something we want to hash out before the party phase.

And then, of course, you've got some merits in your opposition.

MR. NEIFELD: I have a question about that, your Honor. Two questions.

If you can answer them, I mean. One is the motion to dedesignate, motion 6(2) is to set up different counts. And claims in 6(1) we simply -- we thought they were clearly as -- you know, unrelated to the count.

You're telling me to ignore 6(1)

because counts -- we're not redefining the issues that we're shooting at. And 6(2) is -- 6(2) and 7 are basically the same thing. 6(2), 7 are okay because those set up different counts that are at dispute.

JUDGE MEDLEY: Right.

MR. NEIFELD: Okay. My question is, I'm a little confused about language I discussed earlier in claim 32, and I'm not sure whether I'm authorized at this time, but would like to consider whether to suggest a separate count for the apparatus claim and the method claim.

And the reason is because the language for the apparatus claim, the lamp claim, says put the gas directly at the e-field maxima, and the language is, the method claim says less. It says directing resonate microwave energy into an envelope. But the envelope is where the gas is.

But it says directing resonate microwave energy to the gas, and I'm a little

confused by that still as to whether that should be a separate -- is a separate patentable invention.

I'm wondering whether I have the option to do that at this stage, if you're going to grant 6(2).

MR. PISANO: Your Honor, I would suggest that you defer consideration of that until we have an opportunity to bring in some of the other applications because you will see, in the 021 patent that we wish to bring in, it also does not require that the lamp -- that the bulb be present at the e-field maxima.

So I don't believe that that's an essential limitation of the count. And, in fact, it's not in the count because the count is also -- claim 129 also is indicated as corresponding, as being the count.

MR. NEIFELD: Well, with respect to the motions you wanted to bring, is that motion, your Honor, that Nick wanted to bring

to add application to patent deferred or denied?

JUDGE MEDLEY: As to the application, I denied it. But as to the patent, I'm -- you know, I'm going to preview all of those. So, you know, it's not set in stone.

But my tendency would be to authorize him to file a motion to add that patent to the interference.

MR. NEIFELD: I didn't catch that the first time around. My apologies.

JUDGE MEDLEY: Okay, back to Nos. 6 and 7.

It seems to me that these 2320, 21, 25, 27, those are to these different counts that you propose; is that correct?

MR. NEIFELD: That's correct.

JUDGE MEDLEY: Okay. So can we somehow simplify this? Maybe it's the best thing to do is just to address the undesignation.

I'm just trying to think procedurally the best way to do this.

MR. NEIFELD: I can handle it with the motion, just point out what you told us. The numbers here don't correspond to the ultimate motions we're going to file, I presume.

JUDGE MEDLEY: Right. I mean, when you say you may need a 25-page extension, and I'm just trying to figure out why that is so, if you --

MR. NEIFELD: Well, the requirements for the motion to be defined. The requirements in the rules now say that you have to do lots of things including pointing out why the other side should not be entitled to benefit. You have to do that in the same motion.

JUDGE MEDLEY: Right. But you say, given the excess for length of the motion --

MR. NEIFELD: Right.

JUDGE MEDLEY: So you propose to do

all this in one motion?

MR. NEIFELD: Well, you're the one who can tell me what I should or shouldn't do at this point or that I'm authorized to do.

I could have set it up as six or seven separate motions to redefine, but I listed it here for simplicity because it's compact.

But if I list -- if I try to file one motion and meet the burden of proof for all these items, and with respect to the benefit issues, I couldn't do it in the page limit. I probably couldn't do it within 50 pages.

JUDGE MEDLEY: Uh-huh. It seems to me that you'd want to set up each count as each motion.

MR. NEIFELD: Okay. Okay, your Honor.

MR. PISANO: So, your Honor, with respect to No. 7, there's -- is that five additional motions?

JUDGE MEDLEY: Right.

MR. NEIFELD: And --

JUDGE MEDLEY: And then you can address the dedesignation in your 6(2) within those motions.

In other words, don't file a separate motion to dedesignate your claim 2320.

MR. NEIFELD: The dedesignation into the individual motions to redefine.

JUDGE MEDLEY: Right.

MR. NEIFELD: Okay. And 6(1) is out. 6(1) per --

JUDGE MEDLEY: Possibly. I haven't decided, but that's the way I'm leaning.

MR. NEIFELD: Defer, deny or not decided. 6(2) is --

MR. PISANO: Your Honor, I just would submit that, as far as Guthrie is concerned, these -- I guess I would just ask, perhaps you might wish to look at some of these claims before granting Espiau the right

to set these up as patentable, separately patentable inventions because I just don't see how they can be.

They're described as obvious variants in the specification. So I'm just sort of at a loss as to why we need so many additional interferences.

Could you, you know, perhaps just pick two or three and make two or three additional ones? I mean, it's just extremely --

JUDGE MEDLEY: It's not additional interferences. I mean, all be within the same interference.

And let me just address your concerns, okay?

MR. PISANO: Okay.

JUDGE MEDLEY: Just hear me out.

That the Espiau inventors in their own disclosure recognized these as equivalents. And I don't know -- I haven't read it. I don't know exactly what you're

talking about. But that could be knowledge to them.

When you look at a count and you're trying to argue that counts are separately patentable, you have to look at the prior art that was available at the time.

What's disclosed and described in the involved applications and patents are not prior art to each other. That's what the inventors knew.

If they knew that it was obviously to do this, it might have just been their own little secret, so to speak, or something that they knew about.

So that's not necessarily a good defense to say, Oh, these are obvious variations because look at their disclosure. It says that.

And there's a case on point, and I can't think of it right off the top of my head, but it went to interference in fact. The CFT recently ruled on for a similar thing

that, when you're looking at whether or not there's an interference in fact, you don't look necessarily to the specifications on file to determine obviousness with respect to what's being claimed. Okay?

MR. PISANO: All right. Your Honor, then I assume that, once we see his motions, we can file the appropriate number of responsive motions to claim benefit with respect to those counts?

JUDGE MEDLEY: Right.

MR. PISANO: All right. Thank you.

MR. NEIFELD: I believe I have to show you're not entitled to benefit.

JUDGE MEDLEY: I'm sorry? I didn't hear you.

MR. NEIFELD: I believe, your Honor, I have to show in my motion that Nick is not entitled to benefit for those new counts. And in his opposition, he has to address my arguments. That's according to the rules.

JUDGE MEDLEY: Okay. Do the new

rules specify that you have to show that he does have to -- I know the old rules did.

MR. NEIFELD: I believe so, but that was my concern with the page limit. So just a clarification, and we can get to it when we get to responsive motions.

JUDGE MEDLEY: Yes, I can think about it and put it in my order.

MR. NEIFELD: And can I -- I know I've listed counts II through VI. But, like I say, I think I have an issue with respect to claim 32 and claim interpretation.

Am I authorized to consider this and decide whether to file the additional motion to redefine?

JUDGE MEDLEY: I think we need a conference call if you want to do that.

MR. NEIFELD: Okay. So, need conference call.

JUDGE MEDLEY: And if you're going to decide to do that, I advise you to do it quickly because if you try to do that after

motions were filed, I'm likely not going to allow you to file that. Okay?

All right. Number 8 we talked about. Number 9 is deferred. Number 10 --

MR. NEIFELD: Eight is what? I assume 8 is --

JUDGE MEDLEY: Authorized. Eight is authorized.

MR. NEIFELD: Okay, 9, deferred.

JUDGE MEDLEY: Ten, for what we talked about earlier, certificate of correction, that can be done. It doesn't need to be done in this proceeding.

MR. NEIFELD: No.

MR. PISANO: I'm sorry, your Honor. I thought we decided that that was not going to be permitted, and that was motion 5.

JUDGE MEDLEY: Right. I said that can be done outside of the interference. I'm not authorizing it.

MR. PISANO: Thank you.

JUDGE MEDLEY: Okay, No. 11.

MR. NEIFELD: We've already deferred the inequitable conduct motion, your Honor.

JUDGE MEDLEY: Which one was your inequitable conduct motion?

MR. NEIFELD: Motion No. 2, not only failing to name the inventors in his filed applications --

JUDGE MEDLEY: Okay, okay.

MR. PISANO: Is there a difference between that and what claim one was?

MR. NEIFELD: Well, that one is different than improper inventorship.

JUDGE MEDLEY: Right, they are two different things.

MR. PISANO: Well, it's only -- motion one is, I mean, the claims are only invalid if there is deliberate deceptive intent to leave them off.

MR. NEIFELD: No, that's not true.

JUDGE MEDLEY: Okay. Well, at any rate, that's probably going to be deferred.

MR. NEIFELD: So 11 is the --

JUDGE MEDLEY: It goes along with your 2; right? So that would be deferred.

MR. NEIFELD: All right.

JUDGE MEDLEY: It's not necessarily authorized. Now, these things that I'm deferring are not necessarily authorized. We may have to have another conference call to go through everything once the motions period is set up.

Okay, No. 12, now, that gets back to the issue that Mr. Pisano earlier raised.

MR. NEIFELD: Yes, your Honor. It's giving Nick's motion for whatever it is you want to charge us with, charge party Espiau or meet with, that's separate from whether I need help.

I mean, this is a big interference, and the people who know the facts, the experienced litigators, work at Wilson, Sonsini. They're experienced IP patent litigators, Ron Shulman and Terry Kearney, 40 years cumulative experience. And they know

the rules. They know the ethical issues. They know how to talk to witnesses in depositions. They're on the west coast. The client is on the west coast.

I am a, if not a sole practitioner, as close as you can get to that. I've got a small shop with one other patent attorney, a patent agent who is going to go in-house shortly, a patent attorney. And it would be a tremendous burden if I have to go back and forth during the course of the interference to do the examination of witnesses, all of which are on the west coast.

Nick has a big shop. He's got 200 lawyers or so --

MR. PISANO: But only four people who actually do patent law, your Honor.

MR. NEIFELD: So, again, I mean, you know, this is going to be blatantly unfair to prevent me from having assistance from people on the west coast most knowledgeable of the facts and most in touch for the longest period

of time with the client. They're up to speed.

These guys are working on the corresponding bouquet of settlement action, the equivalent of our meeting here, the same facts are operative. They know the facts. They know the people, the clients. They know all the information.

MR. PISANO: But unfortunately, your Honor, I guess my problem is they know them too well.

(Mr. Pisano and Mr. Neifeld speaking at once.)

MR. NEIFELD: -- in opposition, not of a discussion of whether to file a motion. If you think they did something wrong, it's something you should raise in an opposition, not in --

MR. PISANO: Well, we're going to --

MR. NEIFELD: Standard pro hac vice motion, these are routinely granted.

MR. PISANO: Your Honor, I mean, it's evident -- you will see that it's evident

from what happened with respect to Guthrie's motion on 1087, that Mr. Shulman and Mr. Cartenito (sic) are admitted to the patent bar. Either are familiar with the rules and, apparently, they did not know or did not care about 1087.

And it's just, you know, Mr. Neifeld is certainly welcome to obtain assistance from any of a number of other very reputable law firms out on the west coast.

But it is particularly galling to now have, you know, the Wilson, Sonsini folks come into this case when we believe that they've already violated the rules from the get-go.

JUDGE MEDLEY: Okay, I understand the issues. I'm not going to decide right now. I'm going to think about it.

Let's move on. Motion for judgment, the 25-page extension, I don't think you're going to need that, if you break it up, as I suggested.

Motion for judgment based on derivation, that's deferred.

MR. NEIFELD: Which number are you at, your Honor?

JUDGE MEDLEY: I'm sorry?

MR. NEIFELD: Which number are you at?

JUDGE MEDLEY: Number 13, I think we handled by you breaking up your separate counts into separate papers.

Motion for judgment based upon derivation is deferred. Number 15 we don't need to discuss. Number 16, is this written description or enablement? Enabling written description, not sure which it is.

MR. NEIFELD: It is enablement, your Honor.

JUDGE MEDLEY: Okay. Now, this goes to all the claims?

MR. NEIFELD: Yes, your Honor. Like I say, there's an issue of claim interpretation but, yes, your Honor.

JUDGE MEDLEY: Is this -- when would you want to file this?

MR. NEIFELD: In the normal course. This is a straight motion on the facts that are sort of in the record. That is to be first phase.

JUDGE MEDLEY: A threshold issue.

MR. NEIFELD: Yes, it's a threshold issue.

MR. PISANO: I don't actually agree, your Honor, because it really is directed to the very same limitation that my unpatentability motion of the Espiau patent is directed to, namely that this limitation that they're touting was not actually identified as being critical to the invention when they filed it.

And it was only fleshed out when they filed their substitute specification.

JUDGE MEDLEY: Okay. All right. I will authorize this, but I'm not sure if I'll expedite it or not. Likely will not.

Okay?

MR. NEIFELD: Can you reiterate where we stand on what we can do or cannot do?

JUDGE MEDLEY: Yes, I will do that per my order, and you should receive that tomorrow or the next day. Okay?

MR. NEIFELD: Thank you, your Honor.

MR. PISANO: Thank you, your Honor.

JUDGE MEDLEY: All right. Thank you. Goodbye.

JUDGE MEDLEY: All right.

(Whereupon, at 3:40 o'clock p.m., the telephone conference was concluded.)

*****

CERTIFICATE OF REPORTER

I, Josephine C. Casamo, the Verbatim Reporter who was duly sworn to well and truly report the foregoing proceedings, do hereby certify that they are true and correct to the best of my knowledge and ability; and that I have no interest in said proceedings, financial or otherwise, nor through relationship with any of the parties in interest or their counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 23rd day of March 2006.

____________________________

Josephine C. Casamo

Court Reporter

# EXHIBIT R

Paper 86

Mail Stop Interference
P.O. Box 1450
Alexandria Va 22313-1450
Tel: 571-272-9797
Fax: 571-273-0042

Filed 13 March 2007

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES

---

CHARLES **GUTHRIE**, EDMUND SANDBERG,
DONALD WILSON, GREGORY PRIOR, and DAVID SMOLER
Junior Party
(Application 09/818,092),

v.

FREDERICK M. **ESPIAU**, CHANDRASHEKHAR J. JOSHI,
and YIAN CHANG
Senior Party
(Patent 6,737,809).

---

Patent Interference No. 105,393 (SCM)
(Technology Center 2800)

---

**Decision – Interlocutory Motions – Bd.R. 125(b)**

## A. Introduction

On 8 March 2007, a conference call was held involving counsel for the respective parties and the administrative patent judge designated to handle the

interference. The purpose of the call was to set the times for the priority phase of the interference. The motions filed during the first phase of the interference have been decided (Paper 83).

During the conference call, counsel for Guthrie requested leave to file a motion to be accorded the benefit of those provisional applications listed per item 15 of Guthrie's motions list (Paper 26). Also during the call, counsel for Espiau requested leave to file a motion for derivation during the priority phase, despite not having provided notice in its priority statement that derivation was a basis for judgment.

**B. Decision**

*Guthrie's request to file a motion for benefit*

There are typically two phases of an interference – a "preliminary motions phase" and a priority phase.[1] One of the main purposes of the preliminary motions phase is to establish accorded benefit dates. During the preliminary motions phase a party may file a motion seeking to be accorded benefit of an earlier application, or a party may file a motion attacking the benefit accorded an opponent. As a result of a decision of such motions, the dates of the parties become established for the priority phase of the interference. The priority brief of a party need only address the established dates, and not some contingent dates that have yet to be established. This makes for an efficient process and assists in securing the just, speedy, and inexpensive resolution of the interference. Bd.R. 1(b).

1 *See Furukawa Electric North America v. Corning Inc.*, 78 USPQ2d 1070, 1071 fn2 (BPAI 2005) (for an explanation of the two phases of an interference).

At the time the interference was declared, Guthrie was accorded benefit of six provisional applications (Paper 1). Guthrie requested leave to file a motion to be accorded the benefit of four more applications - applications 60/224,061, 60/224,503, 60/224,961 and 60/224,617, none of which did the Guthrie involved application claim the benefit under 35 U.S.C. § 119.[2] Those provisional applications had filing dates that were either the same as or subsequent to the already accorded benefit dates. Thus, facially it was not apparent why Guthrie should be authorized to file a motion to be accorded benefit of even more provisional applications, especially when none of the provisional applications gave Guthrie an earlier date.[3]

During the initial call for setting times to file papers, it became apparent that counsel for Guthrie was of the mistaken impression that Guthrie must move for the benefit of the four provisional applications in order to support the subject matter of every Guthrie claim that corresponds to the count. Benefit is accorded with respect to the count, not claims. Bd.R. 201 and Bd.R. 208(a)(3). Counsel for Guthrie agreed that none of the four provisional applications (60/224,061, 60/224,503, 60/224,961 and 60/224,617) were necessary to support the subject matter of the count, and withdrew Guthrie's request to file such a motion (Exhibit 1069 at 49-56). Thus, Guthrie was not authorized to file a motion seeking the benefit of

---

2 Guthrie improperly filed a petition with the Office of Petitions during the interference seeking 35 U.S.C. §119 benefit of, among others, the four provisional applications. The petition was granted. For purpose of the interference, the effect of the granted petition was stayed (Paper 54).

3 Guthrie was authorized to file, and did file, a motion seeking the benefit of provisional application 60/192,731 (Paper 38). That motion was denied (Paper 83).

60/224,061, 60/224,503, 60/224,961 and 60/224,617 (Paper 27). Guthrie did not request reconsideration of that decision.

In the course of events, Espiau filed a motion attacking the benefit accorded Guthrie. Guthrie opposed the motion. However, Guthrie did not seek to file a responsive motion to be accorded the benefit of any of 60/224,061, 60/224,503, 60/224,961 or 60/224,617. Espiau's motion attacking the benefit accorded Guthrie was granted (Paper 83). Moreover, Guthrie's motion 1, seeking to be accorded benefit of 60/192,731 was denied.

Guthrie now seeks leave to file a motion to be accorded benefit of 60/224,061, 60/224,503, 60/224,961 and 60/224,617. In essence, Guthrie requests reconsideration of the order setting preliminary motions times, or alternatively requests authorization to belatedly file a motion to be accorded benefit of 60/224,061, 60/224,503, 60/224,961 and 60/224,617. A request for rehearing must be filed within fourteen (14) days of the decision. SO 125.1 and Bd.R. 125(c). A late filing will be excused upon a showing of excusable neglect or a Board determination that consideration on the merits would be in the interest of justice. Bd.R. 4(b)(2).

Guthrie was not authorized to file a motion to be accorded benefit of 60/224,061, 60/224,503, 60/224,961 and 60/224,617 (23 March 2006 Order, Paper 27). To the extent that Guthrie requests rehearing of the 23 March 2006 order, such a request comes far too late. Guthrie should have filed a request for reconsideration within fourteen days of that decision, not a year later.

Moreover, Guthrie could have requested leave to file a responsive motion to be accorded benefit of 60/224,061, 60/224,503, 60/224,961 and 60/224,617 for the count once Guthrie had reviewed Espiau's motions attacking the benefit accorded

Guthrie. Guthrie made no such request.

During the 8 March 2007 conference call, counsel for Guthrie argued that (1) Guthrie now believes, in light of the Board's decision, that at least the '503 application is a constructive reduction to practice of the count; and (2) as demonstrated in connection with Guthrie opposition 4, the parties' experts do not dispute that a metal coating as described in the '503 application would make a resonant cavity.

Guthrie opposition 4 is in connection with Espiau's motion 4 for a new count 2. In its opposition, Guthrie argued that if Espiau's count 2 was adopted, then Guthrie should be accorded benefit of, among other applications, the '503 application. Espiau's motion 4 was denied (Paper 83 at 37). Thus, the Board did not then and need not now consider Guthrie's arguments regarding its '503 application as a constructive reduction to practice of Espiau count 2, much less how those same arguments might apply to the current count.

Moreover, it would be unfair at this juncture of the proceeding to give Guthrie the opportunity to file a motion for the benefit of the four provisional applications. The Board has already decided motions regarding the benefit accorded Guthrie. Undoubtedly, some of the same issues raised in those motions would be raised in a motion for benefit of 60/224,061, 60/224,503, 60/224,961 and 60/224,617. It would be unfair to Espiau if Guthrie filed such a motion, since Guthrie could shore up its arguments and change position on issues already decided.

Lastly, counsel for Guthrie did not articulate a reason why Guthrie needs the benefit of any of 60/224,061, 60/224,503, 60/224,961 and 60/224,617. Even if Guthrie was accorded benefit of any of the four provisional applications, Guthrie

would still be the junior party.

For these reasons, it would not be in the interest of justice to authorize Guthrie to file its proposed belated motion all to the detriment of Espiau. Guthrie's request for reconsideration, or alternatively Guthrie's miscellaneous motion seeking leave to belatedly file a motion to be accorded the benefit of 60/224,061, 60/224,503, 60/224,961 and 60/224,617 is denied.

*Espiau's request to amend its priority statement*

Espiau requests leave to file a motion for derivation during the priority phase, despite not having provided notice in its priority statement that derivation was a basis for judgment. In essence, Espiau must amend its priority statement. A correction filed after the time set for filing preliminary statements will only be entered if entry would serve the interests of justice. Bd.R. 120(c).

Espiau notified the Board early on that it wanted to file a motion for derivation (Paper 25 at 6, ¶ 14). Typically, such motions are considered part of a parties' priority case and are deferred until the priority phase of the interference. The Board indicated that "motions on priority issues," e.g., including derivation, were not authorized during the preliminary motions phase (Paper 27 at 3).

Time Period 1 is when a party is to file its priority statement (Paper 27 at 6, ¶ H). A week later, the parties serve a copy of their priority statement upon each opponent. Bd.R. 204(a)(1) states:

> A party may not submit evidence of its priority in addition to its accorded benefit unless it files a statement setting forth *all bases* on which the party intends to establish its entitlement to judgment on priority. (Emphasis added).

Derivation is included in the "all bases" provision of priority. Accordingly, a party seeking to raise derivation must include, in its priority statement, a statement that

the party intends to establish derivation, which should include at least the date of the alleged conception, and the date of the alleged communication of the conception.

Espiau's priority statement does not allege derivation as a base for establishing priority, indicating that Espiau made the decision to not pursue the derivation issue.

During the 8 March 2007 conference call, counsel for Espiau argued that (1) it intended to raise derivation all along, and (2) that Bd.R. 204 does not require setting forth derivation as a base for establishing priority, since derivation is separate from priority.

Counsel for Espiau failed to direct the Board's attention to authority that would support the argument that Bd.R. 204 does not require setting forth derivation as a base for establishing priority, since derivation is separate from priority. Bd.R. 204 states that a party may not submit evidence of its priority in addition to its accorded benefit unless it files a statement setting forth *all bases* on which the party intends to establish its entitlement to judgment on priority. The plain meaning of the section of the rule indicates that there may be more than one way to establish entitlement to judgment on priority. Moreover, the comments to the rules explain that Section 41.204(a) "still requires the party to state the bases on which it believes that it is entitled to relief" and that "[s]uch bases might include an intent to prove derivation … ." Federal Register/Vol. 69, No. 155/Thursday, August 12, 2004/Rules and Regulations, 49993.

Priority statements were filed and served almost a year ago. Espiau has had the advantage of knowing Guthrie's alleged dates for some time now, including Guthrie's alleged dates for derivation. Allowing Espiau to file a correction of its

priority statement based on the facts presented during the conference call would not be in the interest of justice.

In any event, Guthrie is the junior party. Guthrie must demonstrate by a preponderance of the evidence priority of invention. If Guthrie fails to do so, there would be no occasion to even consider Espiau's priority case.

For the reasons stated above, Espiau's request to amend its priority statement is denied.

/Sally C. Medley/
Administrative Patent Judge

cc (via e-mail):

Counsel for **Guthrie**:

npisano@luce.com

Counsel for **Espiau**:

rneifeld@neifeld.com

# EXHIBIT S

Paper 223

Mail Stop Interference
P.O. Box 1450
Alexandria Va 22313-1450
Tel: 571-272-9797
Fax: 571-273-0042

Filed: 20 September 2007

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES

CHARLES **GUTHRIE**, EDMUND SANDBERG,
DONALD WILSON, GREGORY PRIOR, and DAVID SMOLER
Junior Party
(Application 09/818,092),

v.

FREDERICK M. **ESPIAU**, CHANDRASHEKHAR J. JOSHI,
and YIAN CHANG
Senior Party
(Patent 6,737,809).

Patent Interference No. 105,393 (SCM)
(Technology Center 2800)

**Decision – Interlocutory Motions – Bd.R. 125(b)**

**A. Introduction**

A telephone conference call[1] was held on 11 September 2007 at approximately

1 The teleconference call was transcribed (Paper 222).

2:00 p.m., involving:

1. Mr. Pisano and Mr. Worley, counsel for Guthrie,
2. Mr. Neifeld and Mr. Morgan, counsel for Espiau, and
3. Sally Medley, Administrative Patent Judge.

The purpose of the call was for Guthrie to request leave to file a motion for inequitable conduct. For the reasons that follow, the request is denied.

**B. Decision**

Guthrie seeks leave to file a motion for judgment against Espiau based on inequitable conduct. Mr. Pisano explained the bases to be that (1) a recently obtained February 2005 declaration made by Mr. Espiau contradicts Mr. Espiau's July 2007 declaration (Paper 222 at 5:5-10); (2) a recently obtained invention disclosure (Exhibit 1225) names two of the Guthrie inventors and two of the Espiau inventors as the inventors of the count which also contradicts Mr. Espiau's testimony regarding the inventors of the count; and (3) Mr. Espiau's August 17, 2007 testimony contradicts previous testimony regarding where Espiau reduced the invention to practice (Paper 222 at 8:4-9:1-2).

Guthrie apparently has already responded to all three issues in Guthrie's opposition 7 to Espiau's priority motion 7 (Paper 222 at 4:18-20; 21:5-9; Paper 221 at 2-7, 24 and 28-29). Thus, Guthrie has had an opportunity to address these issues. There is no apparent reason to expend resources and expense to consider the same arguments in yet another motion.

Moreover, Mr. Pisano indicated that Guthrie would like to make additional evidence of record, presumably in support of a motion for inequitable conduct (Paper 222 at 19:2-4). However, Guthrie did not identify the additional evidence,

or whether any additional discovery was necessary.[2] Thus, there is uncertainty regarding the scope of the request and the basis for the request. Such uncertainty could lead to unforeseen costs and inefficiencies, adding to this already expensive and lengthy proceeding.

This interference has been complex from the beginning. Many motions have been filed and decided (Paper 83). The interference is now in the priority phase and near completion. Both parties have filed their respective priority motions and oppositions. It is the Board's goal to secure the just, speedy, and inexpensive resolution of interferences. Bd. R. 1(b). Authorizing Guthrie to file a miscellaneous motion based on inequitable conduct at this late juncture would frustrate that goal.

For all of these reasons, Guthrie's request to file a miscellaneous motion for inequitable conduct is denied.

/Sally C. Medley/
Administrative Patent Judge

cc (via e-mail):

rneifeld@neifeld.com
napisano@JonesDay.com

---

2 Additional discovery or a request to take testimony, asserted to be necessary to make out a facially sufficient case will rarely be authorized. SO ¶ 208.7

# EXHIBIT T

Filed on behalf of:
Charles Guthrie, Edmund Sandberg, Donald Wilson, Gregory Prior, and David Smoler
By: Nicola A. Pisano, Esq.
Luce, Forward, Hamilton & Scripps LLP
11988 El Camino Real, Suite 200
San Diego, California 92130

Paper No. __________

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES

---

CHARLES **GUTHRIE**, EDMUND SANDBERG,
DONALD WILSON, GREGORY PRIOR, and DAVID SMOLER
Junior Party
(Application 09/818,092),

v.

FREDERICK M. **ESPIAU**, CHANDRASHEKHAR J. JOSHI,
and YIAN CHANG
Senior Party
(Patent 6,737,809).

---

Patent Interference No. 105,393 (SCM)

---

GUTHRIE OPPOSITION TO ESPIAU MOTION 3

(Re: Benefit Accorded to Guthrie Provisional Applications)

# TABLE OF CONTENTS

**Page**

I. RELIEF REQUESTED ........ 1

**II.** ARGUMENT ........ 1

A. The relevant legal principles ........ 1

1. One of Ordinary Skill in the Art ........ 1

2. Written description ........ 2

3. Enablement ........ 4

B. Espiau's Erroneous Definition Of One Of Ordinary Skill ........ 4

C. The Level of Knowledge of One of Ordinary Skill ........ 6

D. Guthrie's Provisional Applications Comply with § 112, ¶ 1 ........ 8

1. The '731 application ........ 8

2. The '059 application ........ 10

3. The '298 application ........ 13

4. The '257 application ........ 15

5. The '289 application ........ 16

III. CONCLUSION ........ 18

# TABLE OF AUTHORITIES

**Page**

CASES

*Cooper Cameron Corp. v. Kvaerner Oilfield Prods., Inc.*, 291 F.3d 1317, 1322, 62 U.S.P.Q.2d 1846, 1850 (Fed. Cir. 2002) ..... 3

*Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962-963, 1 U.S.P.Q.2d 1196, 1201 (Fed. Cir. 1986) ..... 2

*Eiselstein v. Frank*, 52 F.3d 1035, 1038-1039, 34 U.S.P.Q.2d 1467, 1470 (Fed. Cir. 1995) ..... 3

*Environmental Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 695, 218 U.S.P.Q. 865, 867 (Fed. Cir. 1983) ..... 2

*Graham v. John Deere Co.*, 383 U.S. 1, 17, 148 U.S.P.Q. 459, 467, 15 L. Ed. 2d 545, 86 S. Ct. 684 (1966) ..... 2

*Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384, 231 U.S.P.Q., 81, 94 (Fed. Cir. 1986) ..... 4

*In re Alton*, 76 F.3d 1168, 1171-1172, 37 U.S.P.Q.2d 1578, 1580 (Fed. Cir. 1996) ..... 3

*In re Lukach*, 442 F.2d 967, 969, 169 U.S.P.Q. 795, 796 (C.C.P.A. 1971) ..... 3

*In re Naquin*, 398 F.2d 863, 866, 158 U.S.P.Q. 317, 319 (C.C.P.A. 1968) ..... 2

*In re Wands*, 858 F.2d 731, 737, 8 U.S.P.Q.2d 1400, 1404 (Fed. Cir. 1988) ..... 4

*ISCO Int'l, Inc., v. Conductus, Inc.*, 2003 U.S. Dist. LEXIS 3262, *11 (D. Del., Mar. 6, 2003) ..... 3

*Lindemann Maschinenfabrik v. American Hoist and Derrick*, 730 F.2d 1452, 1463, 221 U.S.P.Q. 481, 489 (Fed. Cir. 1984) ..... 4

*Orthopedic Equipment Co., Inc. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1382, 217 U.S.P.Q. 1281, 1285 (Fed. Cir. 1983) ..... 2

*U.S. v. Telectronics, Inc.*, 857 F.2d 778, 785, 8 U.S.P.Q.2d 1217, 1223 (Fed. Cir. 1988) ..... 4

*Union Oil Co. of Cal. v. Atlantic Richfield Co.*, 208 F.2d 989, 1000, 54 U.S.P.Q.2d 1227, 1235 (Fed. Cir. 2000) ..... 3

*Vas-Cath Inc. v. Gambro, Inc.*, 935 F.2d 1555, 1563, 19 U.S.P.Q.2d 1111, 1116 (Fed. Cir. 1991) ..... 3

RULES

35 U.S.C. § 112 .................................................................................................................. 1, 8, 18

**I. RELIEF REQUESTED**

Senior Party Espiau contends that, contrary to the determinations of both the Patent Examiner and this Board, Junior Party Guthrie et al. ("Guthrie") is not entitled to the benefit of any of the nine provisional applications for which benefit has been accorded in Paper 1 because those provisional applications fail to comply with 35 U.S.C. § 112, ¶ 1. Because Espiau bases its motion on an inappropriate definition of one of ordinary skill, Espiau cannot meet its burden, and Guthrie respectfully requests that Espiau's Motion 3 be denied.

**II. ARGUMENT**

On page 2, line 14 through page 3, line 15 of its Motion 3, Espiau argues that the most Guthrie invented was an "inductive coil lamp." Espiau further argues that Guthrie did not even comprehend the subject matter of its nine provisional applications. Espiau's contentions regarding the "inductive coil lamp" are directly contradicted by the published works of Espiau's own expert, Dr. Wharmby. Espiau's experts' analyses of the written description and enablement provided by the Guthrie provisional applications likewise are insupportable, and are premised on a person of "ordinary skill" who is ignorant of the principles and prior art to which the invention pertains. As discussed below, when assessed in the light of the knowledge of a properly defined person of ordinary skill, the Guthrie provisional applications fully comply with § 112, ¶ 1 and support the Count of this interference.

A. The relevant legal principles

**1. One of Ordinary Skill in the Art**

Compliance with the requirements of Section 112 is assessed from the viewpoint of one of ordinary skill in the relevant art. *Vas-Cath Inc. v. Gambro, Inc.*, 935 F.2d 1555, 1563, 19 U.S.P.Q.2d 1111, 1116 (Fed. Cir. 1991). If the invention involves distinct arts, then the

specification complies with Section 112 if it enables those of ordinary skill in the respective arts to carry out the aspect of the invention relating to their specialty. *In re Naquin*, 398 F.2d 863, 866, 158 U.S.P.Q. 317, 319 (C.C.P.A. 1968).

"One of ordinary skill in the art" is a hypothetical person who is presumed to have knowledge in the field to which the subject matter pertains. He or she is presumed to have knowledge of all references that are sufficiently related to one another and to the pertinent art and to have knowledge of all arts reasonably pertinent to the problem with which the inventor was involved. *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962-963, 1 U.S.P.Q.2d 1196, 1201 (Fed. Cir. 1986).

The level of skill possessed by one of ordinary skill is a question of fact. *Graham v. John Deere Co.*, 383 U.S. 1, 17, 148 U.S.P.Q. 459, 467, 15 L. Ed. 2d 545, 86 S. Ct. 684 (1966); *Environmental Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 695, 218 U.S.P.Q. 865, 867 (Fed. Cir. 1983). The factors that may be considered in determining level of ordinary skill in the art include: (1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field. *Orthopedic Equipment Co., Inc. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1382, 217 U.S.P.Q. 1281, 1285 (Fed. Cir. 1983). Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case. *Environmental Designs, Ltd.*, 713 F.2d at 696-697, 218 U.S.P.Q. at 867.

**2. Written description**

Compliance with the "written description" requirement is met if the specification, including any associated drawings, conveys with reasonable clarity to one of ordinary skill in the

art that the inventor was in possession of the invention of the claimed subject matter at the time the application was filed. *Vas-Cath Inc. v. Gambro, Inc.*, 935 F.2d 1555, 1563, 19 U.S.P.Q.2d 1111, 1116 (Fed. Cir. 1991). Whether the inventor possessed the claimed subject matter is assessed from the knowledge of one of skill in the art. *Pandrol USA, L.P. v Airboss Railway Prods., Inc.*, 424 F.3d 1161, 1165, 76 U.S.P.Q.2d 1524, 1526 (Fed. Cir. 2005). Drawings constitute an adequate description if they describe what is claimed and convey to those of skill in the art that the patentee actually invented what is claimed. *Cooper Cameron Corp. v. Kvaerner Oilfield Prods., Inc.*, 291 F.3d 1317, 1322, 62 U.S.P.Q.2d 1846, 1850 (Fed. Cir. 2002).

Whether a patent specification adequately describes the subject matter claimed is a question of fact and is decided on a case-by-case basis. *In re Alton*, 76 F.3d 1168, 1171-1172, 37 U.S.P.Q.2d 1578, 1580 (Fed. Cir. 1996). In order to meet the adequate written description requirement, the applicant does not have to utilize any particular form of disclosure to describe the subject matter claimed. *Id.* at 1581. The prior application need not describe the claimed subject matter in exactly the same terms as used in the claims, it must simply indicate to persons skilled in the art that as of the earlier date, the applicant invented what is now claimed. *Eiselstein v. Frank*, 52 F.3d 1035, 1038-1039, 34 U.S.P.Q.2d 1467, 1470 (Fed. Cir. 1995); *Union Oil Co. of Cal. v. Atlantic Richfield Co.*, 208 F.2d 989, 1000, 54 U.S.P.Q.2d 1227, 1235 (Fed. Cir. 2000)("the invention claimed does not have to be described in *ipsis verbis* in order to satisfy the written description requirement of Section 112")(citing *In re Lukach*, 442 F.2d 967, 969, 169 U.S.P.Q. 795, 796 (C.C.P.A. 1971)). A patent application may comply with the written description requirement even though it contains errors, provided that the errors are of such a nature that one of ordinary skill in the art would recognize the error. *ISCO Int'l, Inc., v. Conductus, Inc.*, 2003 U.S. Dist. LEXIS 3262, *11 (D. Del., Mar. 6, 2003).

**3. Enablement**

The test for enablement under Section 112 is whether one reasonably skilled in the art could, without undue experimentation, make or use the invention from the disclosures of the application coupled with information known in the art. *U.S. v. Telectronics, Inc.*, 857 F.2d 778, 785, 8 U.S.P.Q.2d 1217, 1223 (Fed. Cir. 1988). A patent may be enabling even though some experimentation is necessary; the amount of experimentation, however, must not be unduly extensive. *Id.*; *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384, 231 U.S.P.Q., 81, 94 (Fed. Cir. 1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1606 (1987). A patent need not teach, and preferably omits, what is well known in the art. *Id.*; *Lindemann Maschinenfabrik v. American Hoist and Derrick*, 730 F.2d 1452, 1463, 221 U.S.P.Q. 481, 489 (Fed. Cir. 1984). Whether undue experimentation is needed is not a single factual determination, but rather requires consideration and weighing of a number of factors set forth in *In re Wands*, 858 F.2d 731, 737, 8 U.S.P.Q.2d 1400, 1404 (Fed. Cir. 1988).

B. Espiau's Erroneous Definition Of One Of Ordinary Skill

Espiau contends that the subject matter of this interference is that of "electrodeless plasma lamps" and submits the sworn testimony of David O. Wharmby, an expert in low-frequency electrodeless plasma lamps. (Fact 135). Guthrie submits that the relevant field of endeavor is RF-driven dielectric resonant cavities and plasma bulbs. (Fact 136). While Dr. Wharmby testified that the subject matter of the involved Guthrie application relates to both electrodeless plasma lamps and microwave devices, he further testified that he has virtually no experience in microwave devices. (Facts 137-148). Dr. Wharmby, standing alone, is not one of "ordinary skill" to which the subject matter of the interference pertains. (Fact 149).

Espiau further submits in support of its motion the declaration of David Pozar, an expert in microwave devices. (Fact 150). Mr. Pozar does not separately identify the requirements for one of ordinary skill in the art in his declaration, Exhibit 1056. (Fact 151). His conclusions as to what he understands Guthrie's '092 application and associated provisional applications to disclose are based upon his "experience and knowledge of microwave engineering theory and practice, as well as [his] experience of 25 years of University teaching in this same field." (Fact 152). Dr. Pozar's views do not meet the legal standard of what one of ordinary skill in the art would have understood from the Guthrie applications in 2000. (Fact 153).

Dr. Pozar's belated attempt in Exhibit 1057 to adopt the definition of ordinary skill provided in Dr. Wharmby's declaration, Exhibit 1040 (Fact 154), is unavailing. Dr. Wharmby's understanding of the level of knowledge of microwave engineering principles possessed by "one of ordinary skill" is not informed by any expertise of Dr. Wharmby, as he has virtually no knowledge of or experience in microwave devices or microwave electrodeless plasma lamps. (Fact 155). Dr. Pozar's reliance on Dr. Wharmby's uninformed definition of one of ordinary skill in the art cannot provide a predicate for Dr. Pozar's agreement with Dr. Wharmby's views, or vice-versa.

Although Dr. Wharmby proposes a plausible definition of one of ordinary skill in the art (Fact 141), his comments regarding how that hypothetical person would have understood the Guthrie applications reflect that his person of ordinary skill would have a much lower level of familiarity with microwave engineering principles, and a more limited understanding of the relevant prior art, than is appropriate for a person of the stated experience. (Fact 156). Because Espiau's expert testimony is not based upon any reasonable or consistent interpretation of the

knowledge of one of ordinary skill, Espiau cannot meet the preponderance of evidence standard required to overturn the Patent Examiner's and this Board's initial determinations.

C. The Level of Knowledge of One of Ordinary Skill

Dr. Gupta, Guthrie's expert witness, has testified that one of ordinary skill would have been familiar with textbooks that teach fundamental principles of microwave engineering, and would have known that such textbooks describe equations for computing the resonant modes of rectangular and cylindrical waveguides. (Fact 157). Dr. Wharmby and Dr. Pozar acknowledged that formulae for computing the resonant modes of a metallized rectangular resonant cavity were readily available in textbooks. (Fact 158). Formulae for computing the resonant modes of cylindrical resonant cavities also were readily available in textbooks, as shown by Exhibit 2119. (Fact 159).

One of ordinary skill would have known of the waveguide equation, equation 11.34 of Exhibit 2108, by which the waveguide wavelength of a cavity of any size can be related to the wavelength of the radiation in an unbounded medium and the cutoff wavelength, and that the waveguide equation could be recast in terms of operating frequency and cut-off frequency. (Facts 160-161). He or she also would have understood that the resonant wavelength of a cavity typically is computed as a multiple of one-half of the waveguide wavelength. (Fact 162).

Dr. Gupta has testified that one of ordinary skill would have understood, in 2000, that the dimensions for, and behavior of, a resonant cavity could be computed using readily available simulation programs, such as the High Frequency Structure Simulator ("HFSS") program available from Agilent Technologies. (Fact 163). One of ordinary skill would have known that without a metal boundary, a dielectric-filled resonant cavity would suffer an unknown degree of energy loss depending upon environmental factors, would be much less amenable to analysis and

have significantly lower efficiency, all as confirmed by Dr. Wharmby and Dr. Pozar. (Fact 164). One of ordinary skill therefore would have needed "a good reason" not to employ a metal boundary on a dielectric-filled waveguide or resonator, and would have considered the use of a metal boundary to be inherently desirable. (Facts 165-166).

Dr. Gupta further testified that one of ordinary skill who was familiar with microwave engineering principles would have recognized a resonant cavity when presented with a drawing of one. (Fact 167). One of ordinary skill would have known that the relationships for specifying various configurations of resonant cavities had been known for more than fifty years. (Fact 168).

One of ordinary skill undertaking to design an electrodeless plasma lamp could reasonably be expected to review the pre-existing prior art in the field. (Fact 169). The parties' experts agree that one of ordinary skill undertaking to design an electrodeless plasma lamp could reasonably have been expected to be familiar with published articles and texts, such as Exhibit 2085 and Exhibit 1039. (Facts 170-172). By reviewing such literature, one of ordinary skill would have had confirmed (or learned) that regulatory concerns over EMI, cost and manufacturability favored designing new electrodeless lamps to operate in the ISM bands (e.g., at least 915 MHz,). (Fact 173). That review also would have shown that, with one exception, the only high-powered electrodeless lamps operating in the ISM bands were microwave discharge lamps of the type described in Exhibits 2080, 2081, 2082, 2083. (Fact 174).

Reviewing the literature would have taught one of ordinary skill that all of the electrodeless prior art lighting systems operating above 100 MHz, including those using a loop antenna, operated by way of microwave discharge plasma. (Fact 175). The sole exception – the "Fusion Bytelight" system described by Dr. Wharmby as being disclosed in Exhibits 1008 and 2084 – required a series resonant circuit between the coil loop and the power supply in order to

operate in an inductively coupled mode, rather than microwave discharge mode. (Fact 176).

As discussed below, Espiau's expert's analyses of the Guthrie applications assume a "person of ordinary skill" who is ignorant of the forgoing basic principles and who would have no knowledge of the relevant prior art, except for the alleged "Fusion Bytelight" system. (Fact 177).

D. Guthrie's Provisional Applications Comply with § 112, ¶ 1

Guthrie's involved '092 application claims the benefit of nine provisional applications. (Fact 178). According to Dr. Gupta. one of ordinary skill would have understood at least each of the '059 application (Exhibit 2049), the '257 application (Exhibit 2050), the '289 application (Exhibit 2051) and the '298 application (Exhibit 2054) to constitute a constructive reduction to practice of the subject matter of Count 1, as shown in the claim charts attached as Appendices 3.1 to 3.4. (Fact 179).

Espiau's Motion 3 provides a summary analysis of Exhibits 2052, 2053, 2055 and 1006 at page 15, line 7 to page 16, line 6 and page 17, line 9 to page 18, line 7. Guthrie agrees with neither Espiau's analyses nor conclusions. However, Guthrie does agree that those disclosures generally are directed to specific manufacturing details and components relevant to the resonant waveguide structures disclosed in Exhibits 2045, 2049, 2050, 2053 or 2054. (Fact 180). Guthrie therefore omits further discussion of Exhibits 2052, 2053, 2055 or 1006 and instead provides detailed explanations below why Exhibits 2045, 2049, 2050, 2053 or 2054 would have been understood by one of ordinary skill to describe and enable the invention of the Count.

**1. The '731 application**

Dr. Gupta has described in Exhibits 2089 and 2105 his reasoning as to why the '731 application (Exhibit 2045) provides a constructive reduction to practice of the Count in his prior

declarations. (Fact 181). As discussed, *supra* at 7, one of ordinary skill would have understood that the electrodeless lamp described in the '731 application should be operated in the ISM bands, and plainly would have understood that the device described in the '731 application would act as a distributed system. (Fact 182). Based upon Dr. Wharmby's publications, one of ordinary skill also would have understood that the device would create a microwave discharge plasma at such frequencies, not an inductively coupled "H-discharge." (Fact 183).

Other than the superficial similarity between the RF coil in Figure 4.12 and the loop described in the Exhibits 1008, 1041 and 2084, there is no basis for one of ordinary skill to have assumed that the Guthrie inventor's were teaching a "Bytelight" type lamp in the '731 application. (Fact 184). The device described in the '731 application nowhere suggests the use of the series resonant circuit, which is an essential element for the device described in Exhibits 1008, 1041 and 2084 to operate in an inductively coupled mode. (Fact 185). For the reasons set forth in Dr. Gupta's declarations, Exhibit 2089 and 2105, one of ordinary skill would have understood the '731 application to both describe and enable the invention of the Count, as shown in the claim chart attached as Appendix 3 to Guthrie's Motion 1. (Fact 181).

Espiau further argues at page 10 of Motion 3, that Guthrie's failure to identify FIGS. 2 and 7 as corresponding to Count 1 in its annotated claim charts is a "recognition" that those embodiments do not support the Count. Espiau cannot rely on Guthrie's submission of annotated claims pursuant to BD.R. 110(b) to support its contention. Bd.R. 110(b) states that "[f]or each involved claim having ***a limitation that is illustrated in a drawing***..., file an annotated copy of the claim indicating in bold fact between braces {} where each limitation is shown in the drawing..." In the '092 application, the "waveguide" is identified by reference numeral "52," while the lamps of FIGS. 1, 2, and 7 are instead referred to as "ceramic housing

20." Guthrie's annotated claim chart does not identify "ceramic housing 20" as a "waveguide" because the '092 application does not ***label*** item 20 a "waveguide." Likewise, that there is no label in the '092 application drawings which corresponds to the express teaching in ¶ [0033] that the dimensions should be selected to provide a resonant structure, does not support an inference that the '092 lacks such a teaching. Guthrie's literal compliance with Bd.R. 110, should not be construed as anything more than a recognition that the drawings in the '092 application disclose the elements of the Count using varied terminology.

Espiau's argument that the Guthrie declarations submitted with the November 2004 request for interference "distinguished the coil driven lamp" also is unavailing. Exhibits 2004 and 2005 state that they were based on such documents as were available in November 2004. (Exhibit 2005, ¶ 9). Those submittals relied upon what was thought to be an actual reduction to practice of the invention of the Count by June 26, 2000. (Exhibit 2004, ¶ 12, Exhibit 2005, ¶ 13). Had that date been established, it would have preceded the July 31, 2000 filing date of the Espiau provisional application, and rendered moot reliance on Guthrie's '731 provisional application, Exhibit 2045. The comments set forth in Exhibits 2004 and 2005 do not support the Espiau's contention that Guthrie's March 2000 plasma lamp designs were not also "waveguides" or "resonant cavities" corresponding to the Count of this interference.

**2. The '059 application**

Espiau's experts contend that one of ordinary skill would not have understood the '059 application to teach the invention of the Count because it does not use the words "resonant waveguide" or "resonance," with or without a metallic coating. (Fact 187). Both base their conclusions on the assumption that the waveform depicted, for example, in Figure 2.1 would have been interpreted by one of ordinary skill to represent the electric field, even though both

acknowledge that such an interpretation would result in the antenna transmitting ***no*** power to the lamp, which would be at an electric field minimum. (Fact 188).

Dr. Gupta testified that the waveform shown, for example, in Figure 2.1 of Exhibit 2049 is used only to place the dimensions in perspective with respect to wavelength, as is common practice in the microwave literature. (Fact 189). He notes that there is no evidence to suggestion that the authors of the '059 application intended the waveform to represent the electric field. (Fact 190). Instead, the most reasonable assumption is that the waveform was intended to show only that the distance C between the lamp and the antennae is one wavelength, and that the distances of each of the lamp and antenna from the ends of the device are one-quarter wavelength. (Fact 191).

When so interpreted, one of ordinary skill would have understood that Figure 2.1 depicts a resonant cavity similar to that shown in Figure 115 of Exhibit 2104, in which the antenna is placed one-quarter wavelength from one end and 5/4 wavelength from the other (the device of line 4 of the table on page 82 of Exhibit 2104). (Fact 192). Given this proper interpretation, one of ordinary skill further would have recognized that the antenna and lamp are positioned at the electric field maxima. (Fact 193). One of ordinary skill, based upon even a cursory review of Exhibit 2049, would have concluded that it discloses a resonant cavity. (Fact 194).

Dr. Wharmby (Exhibit 1040, ¶ 23) and Dr. Pozar (Exhibit 1056, ¶ 13) argue that the stepped design of the embodiments of Figures 2.1 and 2.3 and mention of impedance matching would have been interpreted by one of ordinary skill as teaching that the devices constitute transmission lines, not resonant cavities. (Fact 195). Dr. Gupta observes there may be some impedance matching benefit to providing an irregularly shaped cavity, e.g., to accommodate variations in the RF source. (Fact 196). In Dr. Gupta's opinion, that suggestion does not detract

from the plain teaching of resonance that one of ordinary skill would have appreciated from the relative lengths depicted in Figures 2.1 and 2.2, any more than the suggestion in the Espiau '809 patent to use irregularly shaped waveguides (Exhibit 1007 at col. 4, lines 60-66) would have been understood to teach transmission lines. (Fact 197).

Espiau's experts further opine that one of ordinary skill would not have understood the '059 application to provide any guidance on how to make the invention described in the '059 application. (Fact 198). That conclusion is inconsistent with Dr. Pozar's testimony that numerical simulation tools were widely available in 2000. (Fact 199). Computing resonant modes for the devices depicted in the '059 application would have presented no greater problem than computing the resonant modes for the irregularly-shaped resonant cavities described, but not depicted, in the '809 patent. (Fact 200). Moreover, for the design depicted in Figure 2.3, the resonant modes of cylindrical resonators were well known, and equations describing the behavior of such devices were described in standard textbooks, such as Exhibit 2119. (Fact 201).

Finally, Dr. Wharmby suggests that use of the term "cut off frequency" in the '059 application would have taught that the devices are waveguides, not resonant cavities. (Fact 202). One of ordinary skill would have been familiar with the waveguide equation, and would have recognized that equation, which is used to compute the resonant wavelength of a cavity, is dependent upon the cut off frequency, as shown in Exhibit 2108. (Fact 203). Notably, Dr. Pozar, Espiau's microwave expert, makes no similar criticism of the '059 application. (Fact 204). Dr. Gupta concludes that one of ordinary skill would not have understood the mention of the cut off frequency in the '059 application to suggest that the device was other than a resonant cavity, as taught in the drawings. (Fact 205).

For the foregoing reasons, Espiau's contentions should be rejected. One of ordinary skill would have understood the '059 application to both describe and enable the invention of the Count, as shown in the claim chart attached as Appendix 3.1. (Fact 206).

**3. The '298 application**

Espiau's contentions regarding Exhibit 2054 are essentially the same as for the '059 application: Dr. Wharmby concludes that it does not mention a "resonant waveguide" notwithstanding that it expressly refers to the device as a "cavity" (Exhibit 1061, ¶ 29); does not disclose how the dimensions of the device should be calculated (Exhibit 1061, ¶ 30); and uses the term "cut off frequency" (Exhibit 1061, ¶ 31). (Facts 207-208). Dr. Pozar concludes that the waveguide is not being used as a cavity because the Guthrie inventors used the free-space wavelength formula, rather than the waveguide wavelength formula (Exhibit 1056, ¶¶ 23-27); because in his view the '298 application discloses a nonsensical electric field waveform (Exhibit 1056, ¶ 28); and does not provide any guidance as to how to dimension the device depicted in Figure 3.1 (Exhibit 1056, ¶ 29). (Fact 209).

Espiau's experts' analyses of the disclosure of the '298 application are incorrect for the same reasons discussed above with respect to the '059 application. (Fact 210). Both Dr. Wharmby and Dr. Pozar attribute a nonsensical interpretation to the waveform shown in Figure 3.1; their conclusions from thereon are erroneous. (Fact 211). One of ordinary skill would have, without delay, realized that the waveform depicted in Figure 3.1 of Exhibit 2054 is intended to show that the distance C between the lamp and the antennae is one wavelength, and that the distances of each of the lamp and antenna from the ends of the device are one-quarter wavelength. (Fact 212). One of ordinary skill thus would have understood that the waveform ***does not represent the electric field***. (Fact 213). When so interpreted, one of ordinary skill

would have understood that Figure 3.1 shows a resonant cavity similar to that shown of Exhibit 2104, in which the antenna and lamp are located at the electric field maxima. (Fact 214).

The '298 application discusses the use of a WR975 waveguide to energize a plasma lamp, and by a series of simplified calculations using the wavelength in an unbounded medium, attempts to show the effects of using increasingly higher dielectric constants in reducing the size of the device, which it refers to as a "ceramic cavity." (Fact 215). Dr. Gupta stated that, at microwave frquencies, the terms "cavity" and "resonator" are used interchangeably, so it is surprising that Espiau's experts would conclude that the cavity disclosed in the '298 application is anything ***other*** than a resonant cavity. (Fact 216).

Espiau argues at page 14 that the calculations set forth in the '298 patent are almost all incorrect. (Fact 217). The purpose of the calculations in Section 4 of the '298 application is to show the effect of increasing dielectric constant in reducing the resonator dimensions, it is thus essentially immaterial whether the unbounded medium wavelength formula or the more rigorous waveguide wavelength formula is used. (Fact 218). Even using the simplified formula, the conclusion stated in the '298 application is correct, *viz.*, that increasing the dielectric constant permits the overall dimensions of the cavity to be reduced. (Fact 219). The simplified calculations performed in the '298 application while not rigorously mathematically correct, demonstrate the correctness of the basic insight expressed in the '298 application. (Fact 220).

Espiau's contention that one of ordinary skill would not have understood how to make the invention described in the '298 application is refuted by Dr. Pozar's testimony that numerical simulation tools were widely available in 2000. (Fact 221). As explained by Dr. Gupta, because numerical simulation tools were readily available, computing the resonant modes for the device depicted in the '298 application would have been straightforward. (Fact 222). In addition, both

Dr. Wharmby and Dr. Pozar testified to the advantages of using metal boundaries on a dielectric resonator, and that the formula for metallized rectangular prism resonators were available in standard microwave texts. (Fact 223). One of ordinary skill plainly would have known how to build the device depicted in Figure 3.1, without undue experimentation. (Fact 224).

For the foregoing reasons, Dr. Gupta concludes that one of ordinary skill would have understood the '298 application to both describe and enable the invention of the Count, as shown in the claim chart attached as Appendix 3.2. (Fact 225).

**4. The '257 application**

While Espiau dismisses the '257 application (Exhibit 2050) as concerned merely with making a hermetic seal for a lamp body, that application actually discloses a great deal more. (Fact 226). Figure 7.1 of the '257 application depicts a ceramic waveguide having a co-fired alumina liner, sapphire window and antenna. (Fact 227). If one of ordinary skill were to assume in the '257 application the dimensions of the lamp and antenna placement taught in the contemporaneously filed '059 application, one of ordinary skill would have readily understood that the '257 application discloses a resonant cavity in accordance with the Count. (Fact 228). Even without the teaching of the '059 application, one of ordinary skill would have been familiar with the prior art, such as Exhibits 1039 and Exhibits 2080-2083, and would have understood that the device in Figure 7.1 of the '257 application likewise should be configured as a resonant cavity. (Fact 229).

Alternatively, given the device depicted in Figure 7.1, one of ordinary skill would have been able to very quickly deduce that the dielectric body should be able to store energy, not just transmit it, in order to attain energy levels sufficiently high to ignite a plasma. (Fact 230). Dr. Joshi's testimony with respect to his notes, Exhibit 2115, show that he had concluded that a

resonant cavity was required shortly after he began analyzing the concept of a dielectric waveguide electrodeless lamp using standard equations for power density. (Fact 231). Inasmuch as Dr. Joshi was not in 2000 one of ordinary skill in the art, it is plain that one of ordinary skill would quickly arrive at a resonant cavity configuration for the device depicted in Figure 7.1 of the '257 application, using only textbook equations, and without inventive insight or undue experimentation. (Fact 232).

For the foregoing reasons, Dr. Gupta concludes that one of ordinary skill would have understood the '298 application to both describe and enable the invention of the Count, as shown in the claim chart attached as Appendix 3.3. (Fact 233).

**5. The '289 application**

Dr. Wharmby's reasons for concluding that Exhibit 2051 does not disclose anything but a waveguide are based upon his interpretation that the application: does not mention a "resonant waveguide" or "resonance" (Exhibit 1061, ¶ 39); does not disclose how the dimensions of the device should be calculated (Exhibit 1061, ¶¶ 40-41); and uses the term "cut off frequency" (Exhibit 1061, ¶ 42). (Fact 234). Dr. Pozar takes issue with the statements in the '289 application that the waveguide will "focus" "essentially all of the R.F. energy generated by the electronic circuit into the lamp" and "captures essentially all of the R.F. energy thus suppressing the emission of RMI" (Exhibit 1056, ¶¶ 17-18). (Fact 235). Dr. Pozar also states that Figure 8.1 does not provide any guidance as to how to dimension the device. (Exhibit 1056, ¶ 19). (Fact 236).

The '289 application discloses a cylindrical resonator similar to that depicted in Figure 2.3 of the '059 application, and one of ordinary skill would have recognized it as such whether or not the '289 application specifically uses the word "resonance" or "resonant waveguide." (Fact

237). Whereas Dr. Pozar interprets the statements about "focusing" and "capturing" the RF energy in the '289 application as merely demonstrating that "these guys [the Guthrie inventors] don't know what their doing" (*see*, e.g., Exhibit 1063 at page 125, lines 12-16), Dr. Gupta interprets those passages as in fact indicating the waveguide functions as a resonant cavity. (Fact 238).

In particular, Dr. Gupta interprets the statement that the waveguide "focuses" the RF energy into the lamp as meaning it "directs" the energy into the lamp in the sense that word is used in element (b) of Espiau claim 32. (Fact 239). He further interprets the statement that the device "captures" the RF energy as suggesting that the energy is stored within the device, and thus functions as a resonant cavity. (Fact 240). Dr. Gupta states that Dr. Pozar's conclusions reflect a hypertechnical interpretation of the language of the '289 application that would not have occurred to one of ordinary skill. (Fact 241).

Dr. Gupta observes that Dr. Wharmby's analysis of the disclosure of the '289 application is flawed for the same reasons discussed above with respect to the '059 application. (Fact 242). In particular, Dr. Gupta interprets the above-described language as teaching that the device should function as a resonant cavity. (Fact 243). Thus, whether the word "resonant" explicitly appears in the text of the '289 application is immaterial. (Fact 244). One of ordinary skill would have had no difficulty in determining the dimensions for an electrodeless lamp operating at an ISM band frequency using well known numerical simulation tools, such as HFSS. (Fact 245).

Moreover, formulae for computing the resonant modes of cylindrical resonators were readily available in text books well before August 2000, such as Exhibit 2119. (Fact 246). Those familiar with microwave devices would have recognized the usefulness of the cut-off frequency when computing the resonant wavelength of a cavity. (Fact 247). This is confirmed

by Dr. Joshi's testimony regarding the use of such formulae (including the cut-off frequency) in his notes within a day of beginning his consideration of dielectric waveguides. (Fact 248). Dr. Wharmby's analysis of the '289 application therefore is no more persuasive or correct than his analysis of the '059 application. (Fact 249).

For the foregoing reasons, Dr. Gupta concludes that one of ordinary skill would have understood the '289 application to both describe and enable the invention of the Count, as shown in the claim chart attached as Appendix 3.4. (Fact 250).

## III. CONCLUSION

For the reasons set forth above, Guthrie respectfully submits that Espiau's analysis of the written description and enablement of the Guthrie provisional applications is flawed because it is premised upon an erroneous view of the knowledge of one of ordinary skill in the art. Guthrie's provisional applications each fully comply with § 112, ¶ 1 when assessed from the viewpoint of one of ordinary skill in the art, and support the Count in interference. Accordingly, Guthrie respectfully requests that Espiau's Motion 3 be denied.

DATED: July 18, 2006

Respectfully submitted,

LUCE, FORWARD, HAMILTON & SCRIPPS LLP

By: /Nicola A. Pisano#34,408/

Nicola A. Pisano
Attorneys for Junior Party Guthrie et al.

**APPENDIX 1**

**Exhibits to Guthrie Opposition to Espiau Motion 3**

| Exhibit No. | Description |
|---|---|
| 1006 | Image File Wrapper for 60234415 filed 9-21-2000 |
| 1007 | USP 6,737,809 Issued From 09/809,718 to Espiau |
| 1008 | USP 6137237 to MacLennan |
| 1037 | Pozar Declaration |
| 1039 | Wharmby Chapter 11 from Lamps & Lighting, 4th Ed. |
| 1040 | Wharmby Declaration |
| 1041 | U.S. Patent No. 6,310,443 |
| 1045 | Espiau Office Action 2 November 2002 |
| 1056 | Espiau Declaration of David M. Pozar (handwritten signature) |
| 1057 | Espiau Second Declaration of David M. Pozar |
| 1058 | Espiau Second Declaration of David O. Wharmby |
| 1061 | Wharmby Deposition Transcript |
| 1063 | Pozar Deposition Transcript |
| 2004 | Declaration of Edmund Sandberg executed November 19, 2004 |
| 2005 | Declaration of Gregory Prior executed November 22, 2004 |
| 2033 | U.S. patent application Serial No. 09/818,092 |
| 2045 | U.S. provisional patent application Serial No. 60/192,731 |
| 2049 | Provisional Application 60/224,059 |
| 2050 | Provisional Application 60/224,257 |
| 2051 | Provisional Application 60/224,289 |

| | |
|---|---|
| 2052 | Provisional Application 60/224,290 |
| 2053 | Provisional Application 60/224,291 |
| 2054 | Provisional Application 60/224,298 |
| 2055 | Provisional application 60/224,866 |
| 2061 | SPL002 Engineering Drawing |
| 2080 | U.S. Patent No. 4,954,755 |
| 2081 | U.S. Patent No. 4,975,625 |
| 2082 | U.S. Patent No. 5,594,303 |
| 2083 | U.S. Patent No. 5,448,135 |
| 2084 | International Publication No. WO 99/36940 |
| 2085 | D.O. Wharmby, "Electrodeless lamps for lighting: a review", IEE Proceedings - A, Vol. 140, No. 6, November 1993, pages 465-473 |
| 2089 | Declaration of Madhu S. Gupta, Ph.D. |
| 2104 | TM 11-673, June 1953, cover page and pages 81-91 |
| 2105 | Second Declaration of Madhu S. Gupta, Ph.D. |
| 2108 | Excerpt from Electricity & Magnetism by Bleaney & Bleaney |
| 2115 | Dr. Joshi's laboratory notebook entries |
| 2119 | Om P. Gandhi, "Microwave Engineering and Applications", pages 247-250 |
| 2120 | Third Declaration of Madhu S. Gupta, Ph.D. |

**APPENDIX 2**

**STATEMENT OF MATERIAL FACTS**

1. Count 1 has been defined as Claim 109 of Guthrie 09/818,092 application or Claim 1 of Espiau 6,737,809 patent ("'809 patent") or Claim 129 of Guthrie 09/818,092 application or Claim 32 of Espiau 6,737,809 patent. (Paper 1, p. 3, ll. 23-30).

**ADMITTED.**

2. Claim 109 of Guthrie 09/818,092 application recites:

"109. (New) A lamp comprising:
(a) a waveguide having a body comprising a ceramic dielectric material of a preselected shape and preselected dimensions, the body having a first side determined by a first waveguide outer surface;
(b) a first feed positioned within and in intimate contact with the waveguide body, adapted to couple energy into the body from a source having an output and operating at a preselected frequency and intensity, the feed connected to the source output, said frequency and intensity and said body shape and dimensions selected such that the body resonates in at least one resonant mode having at least one electric field maximum; (c) an enclosed first cavity depending from said first surface into the waveguide body; and
(d) a first bulb positioned in the cavity at a location corresponding to an electric field maximum during operation, the bulb containing a gas-fill which when receiving energy from the resonating waveguide body forms a light-emitting plasma."

(EX 2003, p. 2).

**ADMITTED.**

3. Claim 129 of Guthrie 09/818,092 application recites:

129. (New) A method for producing light comprising the steps of:

(a) coupling energy characterized by a frequency and intensity into a waveguide having a body comprising a ceramic dielectric material of a preselected shape and preselected dimensions, the body having a side determined by an outer waveguide surface and a cavity depending from said surface into the body, said frequency and intensity and said body shape and dimensions selected such that the body resonates in at least one resonant mode having at least one electric field maximum;
(b) directing resonant energy into an envelope determined by the cavity and a window, the envelope containing a gas-fill; and

(c) creating a plasma by interacting the resonant energy with the gas-fill, thereby causing emission of light.

(EX 2003, pp. 4-5)

**ADMITTED.**

4. Espiau has Proposed Count 2, identically worded to dependent Claim 2 of Espiau 6,737,809 patent. (Espiau List Of Proposed Motions, p. 3, ll. 15-18).

**ADMITTED.**

5. Claim 2 of Espiau '809 patent recites: "The lamp of claim 1, wherein the waveguide has an outer coating of a metallic metal." (EX 2046, col. 10, ll. 47-48).

**ADMITTED.**

6. For Count 1, Guthrie has been accorded the benefit of the following Provisional Applications:

60/224,05 9 filed 9 August 2000 (EX 2049)

60/224,298 filed 10 August 2000 (EX 2054)

60/224,290 filed 10 August 2000 (EX 2052)

60/224,29 1 filed 10 August 2000 (EX 2053)

60/224,257 filed 10 August 2000 (EX 2050)

60/224,289 filed 10 August 2000 (EX 2051)

60/224,866 filed ll August 2000 (EX 2055)

60/234,4 15 filed 21 September 2000 (EX 1006).

(Paper 1, p. 4, ll. 12-19).

**ADMITTED.**

7. Guthrie has asserted that it is entitled to the benefit of Provisional Application 60/192,731

filed 27 March 2000 (EX 2045) for Count 1. (Guthrie Response To Order To Show Cause, p. 6, ll. 8-13).

**ADMITTED.**

8. Dr. David Wharmby is a well regarded expert in electrode-less plasma lamps. (EX 1040, ¶¶ (1-5).

**OPPONENT IS UNABLE TO ADMIT OR DENY.**

9. Dr. Wharmby has a Ph.D. in physics. (EX 1040, ¶ 1).

**OPPONENT IS UNABLE TO ADMIT OR DENY.**

10. Dr. Wharmby has over 30 years of experience in the lighting industry, including as Chief Scientist at Thorn Lighting, GE Lighting, UK, and SLI Lighting, UK. (EX 1040, ¶¶ 1-5).

**OPPONENT IS UNABLE TO ADMIT OR DENY.**

11. The "field" to which the subject matters of the Espiau '809 patent and Guthrie '092 application relate is electrode-less plasma lamps. (EX 1040, ¶ 6).

**DENIED.**

12. A person of "ordinary skill" in the field of electrode-less plasma lamps in about 2000 would have an undergraduate degree in science related to this subject matter, such as physics or electrical engineering, coupled with at least two years experience of a practical nature in lamp science and technology that would most likely occur in an industrial laboratory. (EX 1040 ¶ 7).

**DENIED.**

13. The person of ordinary skill would have a basic understanding of microwave engineering principles, but would require guidance from the disclosures to construct the subject matters of the Counts in this proceeding. (EX 1040 ¶ 7).

**DENIED.**

14. The guidance a person of ordinary skill would require to construct the subject matters of the Counts is not provided by the Guthrie Provisional Applications and the '092 Patent Application. (EX 1040, ¶ 7).

**DENIED.**

15. An inductive coil plasma lamp is what Guthrie described to Espiau on April 11, 2000. (EX 1034, ¶ 5).

**DENIED.**

16. Espiau' s invention was the inventive integrated resonant waveguide and plasma lamp inventions of the Original Count and Proposed Count, described in Espiau's Provisional Application 60/222,028 filed July 31, 2000 (EX 1012), in Espiau's Non-Provisional Application 09/809,718 filed March 15, 2001 (EX 1041) and in Espiau's U.S. Patent 6,737,809 B2, issued May 18, 2004 (EX 2046). (EX 1034).

**DENIED.**

17. Espiau disclosed their inventions to Guthrie. (EX 1034, ¶¶ 6, 8, 9).

**DENIED.**

18. Guthrie's Provisionals do not show that Guthrie was in possession of inventions having at least the following elements of the Counts:

(1) "said frequency and intensity, and said body shape and dimensions selected such that the body resonates in at least one resonant mode having at least one electric field maximum" (Count 1; Proposed Count 2);

(2) "the bulb containing a gas-fill which when receiving energy from the resonating waveguide body forms a light-emitting plasma" (Count 1; Proposed Count 2);

(3) "the waveguide has an outer coating of a metallic material" (Proposed Count 2).

(EX 1037, ¶¶ 32-37; EX 1040, ¶¶ 8, 20, 21).

**DENIED.**

19. In addition, none of the Guthrie Provisionals shows Guthrie was in possession of the following limitation of Guthrie Claim 109 and Espiau Claim 1:

(4) "The first bulb positioned in the cavity at a location corresponding to an electric field maximum during operation." EX 1037, ¶¶ 32-37; EX 1040, ¶¶ 8, 20, 21.

**DENIED.**

20. The '809 patent states "as used herein, the term 'waveguide' generally refers to any device having a characteristic and purpose of at least partially confining electromagnetic energy." (EX 2046, col. 3, ll. 50-52).

**ADMITTED.**

21. This is accomplished using the material boundaries and shape of a three dimensional structure. EX 1040, ¶ 9.

**ADMITTED.**

22. The '809 patent repeatedly describes waveguide resonators that include a dielectric and for which the frequency, body shape and dimensions are selected such that the body resonates in at least one resonant mode having at least one electric field maximum. (EX 1040, ¶ 9).

**ADMITTED.**

23. In the Original and Proposed Counts, the waveguide is the body that resonates and it is the energy of these fields within the waveguide body which is the resonant energy. (EX 1040, ¶ 11; EX 1037, ¶ 8).

**ADMITTED.**

24. In a resonating waveguide a standing wave is reflected within the walls of the waveguide. (EX 1040, ¶ 10; EX 1037, ¶ 6).

**ADMITTED.**

25. A resonating waveguide should be distinguished from a waveguide which is not resonating, but is merely used as a transmission line. (EX 1040, ¶ 10; EX 1037, ¶6).

**LEGAL CONCLUSION, NOT A FACT**

26. A resonating waveguide should be distinguished from a "lumped circuit" electrical circuit which, due to inductances and capacitances in the circuit may produce a resonating current or voltage in the circuit. (EX 1040, ¶ 10; EX 1037, ¶ 6).

**LEGAL CONCLUSION, NOT A FACT**

27. Guthrie's Provisional Application 60/192,731 ("'731 Provisional") refers to a number of aspects of arc lamps and plasma lamps. (EX 1040, ¶ 45; EX 1037, ¶ 10).

**ADMITTED.**

28. The plasma lamps discussed and pictured in paragraphs 4.12 and 4.21 and Figures 4.12 and 4.21 are inductively driven by a coil. (EX 2045, pp. 5, 7 and corresponding figures).

**DENIED.**

29. Inductive coil plasma lamps have nothing to do with the resonant waveguide lamp of the original and proposed Counts. (EX 2045; EX 1040, ¶¶ 46-48; EX 1037, ¶ 10).

**ADMITTED.**

30. The '731 Provisional contains no mention or other disclosure of a waveguide. (EX 2045; EX 1040, ¶¶ 21, 48-49; EX 1037, ¶ 10).

**DENIED.**

31. The '731 Provisional contains no mention or other disclosure of a resonant waveguide. (EX 2045; EX 1040, ¶ 21, 48-49; EX 1037, ¶ 10).

**DENIED.**

32. The '731 Provisional contains no mention or other disclosure of an E-field maximum.

(EX 2045; EX 1040, ¶¶ 21, 48-49).

**DENIED.**

33. The ‘731 Provisional contains no mention or other disclosure of metal coating. (EX 2045; EX 1040, ¶¶ 21, 48-49).

**DENIED.**

34. The inductive coil driven lamp of the ‘731 Provisional paragraphs 4.12 and 4.21 and corresponding figures 4.12 and 4.21 is a different device that operates on different principles than a resonating waveguide. (EX 1040, ¶¶ 6, 48; EX 1037, ¶ 10).

**DENIED.**

35. The supposed invention of the ‘731 Provisional is integrating the inductive coil around the lamp in a ceramic lamp enclosure. (EX 2045, p. 5).

**DENIED.**

36. The plasma lamp described in paragraphs 4.12 and 4.21 and figures 4.12 and 4.21 of the ‘731 Provisional has no relationship to waveguides. (EX 1040, ¶¶ 6, 48; EX 1037, ¶ 10).

**DENIED.**

37. The plasma lamp disclosed in paragraphs 4.12 and 4.21 and figures 4.12 and 4.21 of the ‘731 Provisional would lead one to an inductively coupled structure, not to a resonating waveguide structure. (EX 1040, ¶¶ 6, 48; EX 1037, ¶ 10).

**DENIED.**

38. Instead of disclosing any of the inventions of the Original Count and Proposed Count, the plasma lamp disclosed in paragraphs 4.12 and 4.21 and Figures 4.12 and 4.21 of the ‘731 Provisional would lead one of ordinary skill away from those inventions. (EX 1040, ¶¶ 6, 48; EX 1037, ¶ 10).

**DENIED.**

39. The ‘731 Provisional would not tell a person that they should use a resonant waveguide or how to do so. (EX 1040, ¶ 50).

**DENIED.**

40. Guthrie did not rely on disclosure of this same inductive coil lamp in Figures 2 and 7 of Guthrie’s Non-Provisional Application 09/818,092 (“‘092 Application”) as support for Count 1 in seeking to have the Interference declared. (EX 2003, Appendix A).

**ADMITTED.**

41. In their Annotated Claims filed in this Interference, Guthrie does not identify the inductive coil lamp of Figures 2 and 7 as having a “waveguide”, “pre-selected shapes or dimensions, the body having a first side determined by a waveguide”, or that the first feed is “positional within and in intimate contact with the waveguide”, or that the first cavity is “depending from the first surface into the waveguide.” (Guthrie Annotated Claims Under 37 CFR 41.110(B), p. 2).

**ADMITTED.**

42. In their Annotated Claims filed in this Interference, Guthrie also did not identify either Figures 2 or 7 for Claim 109 (Espiau Proposed Count 2), “wherein the waveguide has an outer coating of metallic material.” (Guthrie Annotated Claims Under 37 CFR41.110(B), p.3).

**ADMITTED.**

43. Guthrie cites nothing in the ‘092 Application for the requirement that “said frequency and intensity and said body shape and dimensions selected such that the body resonates in at least one electric field maximum.” (Guthrie Annotated Claims Under 37 CFR 41.110(B) p. 2).

**DENIED.**

44. During prosecution of the ‘092 Application, Guthrie distinguished an inductive coil plasma lamp in the prior art, similar to that of the ‘731 Provisional, on the grounds that it was not a resonant waveguide. (EX 1042, p. 15).

**DENIED.**

45. Two of the Guthrie inventors, in declarations seeking to have this Interference declared, distinguished their inductive coil driven lamp as different from a “plasma lamp system based on waveguide principles.” (EX 2004 ¶¶ 5-6; EX 2005 ¶¶ 5-6; Paper No. 3, p. 5, 1. 21 to p. 6, 1. 4).

**DENIED.**

46. The evidence described above in ¶¶ 40-45 demonstrates that Guthrie knew as recently as February 21, 2006 that their inductive coil device is not the subject matter of Count 1.

**DENIED.**

47. The evidence described above in ¶¶ 40-45 demonstrates that Guthrie recognized the very real differences between the inductive coil drive lamp of the ‘731 Provisional and the inventions of the original and proposed Counts.

**DENIED.**

48. The ‘731 Provisional demonstrates that Guthrie did not have possession of any of the inventions of the Counts. (EX 1040, ¶ 21; EX 1037, ¶¶ 10, 37).

**DENIED.**

49. There is nothing in the ‘731 Provisional to teach one of ordinary skill that one should even try to practice the inventions of the Counts, much less anything to teach how that could be done without undue experimentation. (EX 1040, ¶ 50).

**DENIED.**

50. The ‘731 Provisional does not enable any of the inventions of the Original Count or the

Proposed Count. (EX 1040, ¶ 50).

**DENIED.**

51. Guthrie's Provisional Application 60/224,059 ("'059 Provisional") makes no mention or other disclosure of resonance or a resonating waveguide. (EX 2049, EX 1040, ¶¶ 21-23; EX 1037, ¶¶ 11, 14, 36, 37).

**DENIED.**

52. The '059 Provisional makes no mention or other disclosure of a metal coating. (EX 2049, EX 1040, ¶¶ 21-23; EX 1037, ¶¶ 11, 14, 36, 37).

**DENIED.**

53. The '059 Provisional is directed not to a resonating waveguide, but to a waveguide used as a transmission line to transfer power from a source to a lamp via traveling waves. (EX 1040, ¶¶ 23, 24; EX 1037, ¶¶ 11, 13, 14).

**DENIED.**

54. The '059 Provisional states that the invention:

"• Improves impedance matching as the lamp warms to its operating temperature.

• Provides a wider bandwidth for the R.F. Field, allowing the lamp to be self-tuning."

(EX 2049, p. 1).

**ADMITTED.**

55. The supposed advantages quoted in ¶ 54 above are repeated at paragraphs 4.1 and 4.2 of the '059 Provisional. (EX 2049, p. 2).

**ADMITTED.**

56. Both supposed "advantages" are advantages relating to a waveguide transmission line

using traveling waves, not to a resonating waveguide. (EX 1040, ¶¶ 23, 24; EX 1037, ¶¶ 13, 14).

**DENIED.**

57. Providing a wider bandwidth would not enable "self-tuning." (EX 1037, ¶ 12).

**DENIED.**

58. Figures 2.1 and 2.2 of the '059 Provisional are shown below:

(EX 2049).

**ADMITTED.**

59. Both Figures 2.1 and 2.2 of the '059 Provisional show the antenna and lamp located at what appear to be E-field minima, not maxima. (EX 1040, ¶ 24; EX l037, ¶ 14).

**DENIED.**

60. Placed at an E-field minimum, the lamp would not receive power for ignition or operation. (EX 1040, ¶ 24; EX 1037, ¶ 14).

**ADMITTED.**

61. The field distribution shown in Figures 2.1 and 2.2 of the '059 Provisional is that for a transmission waveguide with the ends not shorted and thus without a metallized coating. (EX 1040, ¶ 24; EX 1037, ¶ 36).

**DENIED.**

62. The waveguide shown in Figures 2.1 and 2.2 of the '059 Provisional is a traveling wave transmission line waveguide, not a resonating waveguide. (EX 1040, ¶¶ 23, 24; EX 1037, ¶ ¶ 11, 13, 14).

**DENIED.**

63. In showing a traveling wave transmission line waveguide, Figures 2.1 and 2.2 of the '059 Provisional are consistent with the bullet points quoted above in ¶ 54. (EX 1040, ¶¶ 23, 24; EX 1037, ¶¶ 11, 13, 14).

**DENIED.**

64. Finally, in each of Figures 2.1-2.3, the dimensions A, B, C, E and F are said to be "dependent on the operating frequency, the waveguide cut-off frequency and the dielectric constant of the ceramic materials." (EX 1040, ¶ 25; EX 1037, ¶ 15).

**ADMITTED.**

65. There is no specification of what this dependency is or what the design objective is for that dependency. (EX 1040, ¶ 25; EX 1037, ¶ 15).

**DENIED.**

66. The '059 Provisional, like the '731 Provisional, demonstrates that Guthrie was not in possession of any of the inventions of Original Count 1 or Proposed Count 2. (EX 1040, ¶¶ 21, 27; EX 1037, ¶ 37).

**DENIED.**

67. The '059 Provisional provides no teaching that one should even try to practice any of those inventions. (EX 1040, ¶¶ 21, 27).

**DENIED.**

68. Guthrie Provisional Application 60/224,298 ("'298 Provisional") makes no mention or

disclosure of resonance or a resonating waveguide. (EX 2054; EX 1040, ¶¶ 21, 28; EX 1037, ¶ 22).

**DENIED.**

69. The calculation of frequency and dimensions in paragraphs 3 and 4 of the ‘298 Provisional would not provide a resonating waveguide. (EX 2054, pp. 1-2; EX 1037, ¶¶ 23-27).

**DENIED.**

70. The waveguide of the ‘298 Provisional is used as a transmission line, not as a resonating waveguide. (EX 1040, ¶ 28; EX 1037, ¶ 22).

**DENIED.**

71. As with the ‘059 Provisional, Figure 3.1 of the ‘298 Provisional shows the antenna and lamp located at null points (minima), not maxima. (EX 1040, ¶ 28; EX 1037, ¶ 28).

**DENIED.**

72. The field represented in Figure 3.1 of the ‘298 Provisional shows that the waveguide does not have shorted ends, is open ended, and accordingly, does not have a metallized coating. (EX 1040, ¶ 28; EX 1037, ¶¶ 28, 36).

**DENIED.**

73. The ‘298 Provisional includes several calculations related to basic waveguide concepts. (EX 2054, pp. 1-2).

**ADMITTED.**

74. Almost all the calculations in the ‘298 Provisional related to basic waveguide concepts are incorrect. (EX 1037, ¶ 23-27).

**DENIED.**

75. None of the calculations in the ‘298 Provisional related to basic waveguide concepts

would provide a resonating waveguide. (EX 1037, ¶¶ 23-27).

**DENIED.**

76. As with the '059 Provisional (EX 2049), the statement made in Fig. 3.1 of the '298 Provisional concerning the dependency of frequency and dimensions does not specify how these are to be determined or the design goal. (EX 1037, ¶ 29).

**DENIED.**

77. The '298 Provisional establishes that Guthrie did not have possession of the subject matters of the original and proposed Counts. (EX 1040, ¶¶ 10, 29; EX 1037, ¶ 37).

**DENIED.**

78. Nothing in the '298 Provisional teaches one of ordinary skill in the art to even attempt to practice any of the inventions of the Original Count and Proposed Count, much less teach how to do so without undue experimentation. (EX 1040; ¶ 29).

**DENIED.**

79. Guthrie Provisional Application 60/224,291 ("'291 Provisional") describes a method to "seal the window to the ceramic enclosure" of an electrode-less plasma lamp. (EX 2053, p. 1-2).

**ADMITTED.**

80. The '291 Provisional contains no mention or disclosure of a waveguide. (EX 1040, ¶ ¶ 10, 21, 32; EX 1037, ¶ ¶ 21, 36).

**DENIED.**

81. The '291 Provisional contains no mention or disclosure of resonance or a resonating waveguide. (EX 1040, ¶¶ 10, 21, 32; EX 1037, ¶¶ 21, 36).

**DENIED.**

82. The '291 Provisional contains no mention or disclosure of an E-field maximum. (EX

1040, ¶¶ 10, 21, 32; EX 1037, ¶¶ 21, 36).

**DENIED.**

83. The ‘291 Provisional contains no mention or disclosure of a metallized coating on the enclosure. (EX 1040, ¶¶ 10, 21, 32; EX 1037, ¶¶ 21, 36).

**DENIED.**

84. The ‘291 Provisional does not show that Guthrie was in possession of the inventions of Count 1 or Proposed Count 2. (EX 1040, ¶¶ 21, 33; EX 1037, ¶ 37).

**DENIED.**

85. The ‘291 Provisional does not enable a person of ordinary skill to practice either of those Counts because it does not teach anyone to even try to practice them, much less teach how to practice them without undue experimentation. (EX 1040, ¶ 33).

**DENIED.**

86. The ‘290 Provisional illustrates the inductive coil plasma lamp of the March 27, 2000 ‘731 Provisional, showing two possible arrangements of the lamp, lamp holder and circuit board, and replacing quartz with ceramic and sapphire. (EX 2052).

**DENIED.**

87. The ‘290 Provisional does not mention or disclose anything about a waveguide. (EX 1040, ¶¶ 21, 30; EX 1037, ¶¶ 20, 33-36).

**DENIED.**

88. The ‘290 Provisional does not mention or disclose anything about resonance. (EX 1040, ¶¶ 21, 30; EX 1037, ¶¶ 20, 33-36).

**DENIED.**

89. The ‘290 Provisional does not mention or disclose anything about a resonating

waveguide. (EX 1040, ¶¶ 21, 30; EX 1037, ¶¶ 20, 33-36).

**DENIED.**

90. The ‘290 Provisional does not mention or disclose anything about an E-field maximum. (EX 1040, ¶¶ 21, 30; EX 1037, ¶¶ 20, 33-36).

**DENIED.**

91. The ‘290 Provisional does not mention or disclose anything about a metallized coating on a waveguide. (EX 1040, ¶¶ 21, 30; EX 1037, ¶¶ 20, 33-36).

**DENIED.**

92. The ‘290 Provisional does not show that Guthrie had possession of the subject matter of either Original Count 1 or Proposed Count 2. (EX 1040, ¶¶ 21, 31; EX 1037, ¶¶ ( 20, 37).

**DENIED.**

93. The ‘290 Provisional does not provide any reason one of skill in the art would try, much less succeed without undue experimentation, to practice any of the inventions of the Counts. (EX 1040, ¶¶ (21, 31).

**DENIED.**

94. Guthrie Provisional Application 60/224,257 (“‘257 Provisional”) relates to depositing a hermetic material such as $AL_2$ O3 ceramic onto the inside of a lamp chamber formed in a waveguide. (EX 2050).

**ADMITTED.**

95. The ‘257 Provisional makes no mention or disclosure of resonance. (EX 1040, ¶¶ 21, 34; EX 1037, ¶¶ 16, 33-36).

**DENIED.**

96. The ‘257 Provisional makes no mention or disclosure of a resonating waveguide. (EX

1040, ¶¶ 21, 34; EX 1037, ¶¶ 16, 33-36).

**DENIED.**

97. The '257 Provisional makes no mention or disclosure of an E-field maximum. (EX 1040, ¶¶ 21, 34; EX 1037, ¶¶ 16, 33-36).

**DENIED.**

98. The '257 Provisional makes no mention or disclosure of a metallized coating on the waveguide. (EX 1040, ¶¶ 21, 34; EX 1037, ¶¶ 16, 33-36).

**DENIED.**

99. The '257 Provisional does not show that Guthrie had possession of any of the inventions of the Counts. (EX 1040, ¶¶ 21, 35; EX 1037, ¶ 37).

**DENIED.**

100. The '257 Provisional does not teach one of ordinary skill to even try to make the inventions of the Counts, much less teach how to do so without undue experimentation. (EX 1040, ¶ 35).

**DENIED.**

101. Guthrie Provisional Application 60/224,289 ("'289 Provisional") does not mention or otherwise disclose a resonating waveguide. (EX 2051, EX 1040, ¶¶ 21, 36; EX 1037, ¶¶ 17, 18, 33-36).

**DENIED.**

102. The '289 Provisional does not mention or otherwise disclose an E-field maximum. (EX 2051, EX 1040, ¶¶ 21, 36; EX 1037, ¶¶ 17, 18, 33-36).

**DENIED.**

103. The '289 Provisional does not mention or otherwise disclose a metallized coating on a

waveguide. (EX 2051, EX 1040, ¶¶ 21, 36; EX 1037, ¶¶ 17, 18, 33-36).

**DENIED.**

104. While paragraph 4 and the notes to Figure 8.1 of the ‘289 Provisional refer to dimensions depending variously on operating frequency, waveguide cut-off frequency and dielectric constant, there is no suggestion of how or why they are so dependant or what the goal of that dependence might be. (EX 1040, ¶ 37; EX 1037, ¶ 19).

**DENIED.**

105. The ‘289 Provisional demonstrates that Guthrie was not in possession of the subject matters of either Original Count 1 or Proposed Count 2. (EX 1040, ¶¶ 21, 40; EX 1037, ¶ 37).

**DENIED.**

106. The ‘289 Provisional teaches no one about the subject matters of either Original Count 1 or Proposed Count 2, even to try to practice those subject matters, and necessarily, therefore, does not enable one of skill to practice any of those subject matters without undue experimentation. (EX 1040, ¶¶ 21, 40).

**DENIED.**

107. Guthrie Provisional Application 60/224,866 (“‘866 Provisional”) describes using an MgO coating “to protect the interior of a metal halide electrode-less lamp that is embedded within a waveguide structure.” (EX 2055, p. 1).

**ADMITTED.**

108. The ‘866 Provisional does not mention or otherwise disclose anything about resonance or a resonating waveguide. (EX 1040, ¶¶ 21, 41; EX 1037, ¶¶ 30, 33-36).

**DENIED.**

109. The ‘866 Provisional does not mention or otherwise disclose anything about an E-field

maximum. (EX 1040, ¶¶ 21, 41; EX 1037, ¶¶ 30, 33-36).

**DENIED.**

110. The ‘866 Provisional does not mention or otherwise disclose anything about a metallized coating on the waveguide. (EX 1040, ¶¶ 21, 41; EX 1037, ¶¶ 30, 33-36).

**DENIED.**

111. The ‘866 Provisional does not show Guthrie to have been in possession of the subject matters of either Original Count 1 or Proposed Count 2. (EX 1040, ¶¶ 21, 42; EX 1037, ¶ 37).

**DENIED.**

112. The ‘866 Provisional does not teach one of skill in the art to even try to practice any of those subject matters, much less enable one to do so without undue experimentation. (EX 1040, ¶¶ 21, 42).

**DENIED.**

113. Guthrie Provisional Application 60/234,415 (“‘415 Provisional”) relates to a process for achieving a “very tight” fit of an electrode-less metal halide plasma bulb “in a ceramic wave-guide material.” (EX 1006, p. 1).

**DENIED.**

114. The ‘415 Provisional does not mention or disclose resonance or a resonating waveguide. (EX 1040, ¶¶ 21, 43; EX 1037, ¶¶ 31, 33-36).

**DENIED.**

115. The ‘415 Provisional does not mention or disclose an E-field maximum. (EX 1040, ¶¶ 21, 43; EX 1037, ¶¶ 31, 33-36).

**DENIED.**

116. The ‘415 Provisional does not mention or disclose a metallized coating on the waveguide.

(EX 1040, ¶¶ 21, 43; EX 1037, ¶¶ 31, 33-36).

**DENIED.**

117. The ‘415 Provisional does not mention or disclose any indication how the device is to operate. (EX 1040, ¶¶ 21, 43; EX 1037, ¶¶ 31, 33-36).

**DENIED.**

118. The ‘415 Provisional does not disclose that Guthrie had possession of any of the inventions of the Counts. (EX 1040, ¶¶ 21, 44; EX 1037, ¶ 37).

**DENIED.**

119. The ‘415 Provisional does not teach one of ordinary skill in the art to even try to practice any of the inventions of the Counts, much less teach how to do so without undue experimentation. (EX 1040, ¶¶ 21, 44).

**DENIED.**

**The Guthrie Provisional Applications Fail Under 35 U.S.C. § 112(1)**

120. As set out above in ¶¶ 15-119, none of the Guthrie Provisionals demonstrates that Guthrie had possession of the subject matters of Original Count 1.

**DENIED.**

121. As set out above in ¶¶ 15-119, none of the Guthrie Provisionals teaches one of ordinary skill in the art to even try to practice the subject matters of Original Count 1, much less how to do so without undue experimentation.

**DENIED.**

122. The evidence described above in ¶¶ 15-121 demonstrates that none of the Guthrie Provisionals is a constructive reduction to practice of the subject matter of Original Count 1.

**DENIED.**

123. As set out above in ¶¶ 15-119, none of the Guthrie Provisionals demonstrates that Guthrie had possession of the subject matters of Proposed Count 2.

**DENIED.**

124. As set out above in ¶¶ 15-119, none of the Guthrie Provisionals teaches one of ordinary skill in the art to even try to practice the subject matters of Proposed Count 2, much less how to do so without undue experimentation.

**DENIED.**

125. The evidence described above in ¶¶ 15-124 demonstrates that none of the Guthrie Provisionals is a constructive reduction to practice of the subject matter of or Proposed Count 2.

**DENIED.**

126. The evidence described above in ¶¶ 15-l25 demonstrates that each of the Guthrie Provisionals fails to comply with 35 U.S.C. § 112(1).

**DENIED.**

127. As a group, the Guthrie Provisionals all lack any mention or disclosure of resonance, a resonating waveguide, a resonating electric field maximum and a metallic coating on the waveguide. (EX 1040, ¶ 21; EX 1037, ¶¶ 33-36).

**DENIED.**

128. As a group, the Guthrie Provisionals demonstrate that Guthrie was not in possession of the subject matter of Original Count 1. (EX 1040, ¶ 21; EX 1037, ¶¶ 33-37).

**DENIED.**

129. As a group, the Guthrie Provisionals do not enable the subject matter of Original Count 1. (EX 1040, ¶ 21).

**DENIED.**

130. The evidence discussed above in ¶¶ 15-129 demonstrates that considered separately or together, the Guthrie Provisionals are not a constructive reduction to practice of Original Count 1.

**DENIED.**

131. As a group, the Guthrie Provisionals demonstrate that Guthrie was not in possession of the subject matter of Proposed Count 2. (EX 1040, ¶ 21; EX 1037, ¶¶ 33-3 7).

**DENIED.**

132. As a group, the Guthrie Provisionals do not enable the subject matter of Proposed Count 2. (EX 1040, ¶ 21).

**DENIED.**

133. The evidence discussed above in ¶¶ 15-132 demonstrates that considered separately or together, the Guthrie Provisionals are not a constructive reduction to practice of Proposed Count 2.

**DENIED.**

134. The evidence described above in ¶¶ 15-133 demonstrates that as a group, all of the Guthrie Provisionals fail to comply with 35 U.S.C. § 112(1).

**DENIED.**

* * *

**GUTHRIE'S ADDITIONAL FACTS RELEVANT TO ESPIAU MOTION 3**

135. Espiau submits in support of its motions the sworn testimony of David O. Wharmby, an expert in low-frequency (<20 MHz) electrodeless plasma lamps. (Exs. 1040, 1058).

136.    Dr. Gupta, Guthrie's expert witness, has testified that the field to which the subject matter of this interference pertains is RF-driven dielectric resonant cavities and plasma bulbs.  (Ex. 2089, ¶ 18).

137.    Dr. Wharmby has never taught a course in microwave engineering.  (Ex. 1061, page 19, lines 21-23).

138.    Other than with respect to his work as a university student more than forty years ago, Dr. Wharmby has never designed a microwave system.  (Ex. 1061, page 21, lines 11-14).

139.    Dr. Wharmby has never designed a microwave discharge lamp.  (Ex. 1061, page 21, lines 11-14).

140.    None of Dr. Wharmby's 13 U.S. patents relate to microwave discharge plasma lamps nor does any include a microwave waveguide or resonant cavity.  (Ex. 1061, page 27, line 18 to page 28, line 8).

141.    Dr. Wharmby has testified that a person of ordinary skill in the field of electrodeless plasma lamps around the year 2000 would:

> ... have had an undergraduate degree in science related to that subject matter such as physics or electrical engineering.  This would have been coupled with at least two years of experience of a practical nature in lamp science and technology that most likely would occur in an industrial laboratory.  Such a person would have had a basic understanding of microwave engineering principles.

(Ex. 1040, ¶ 7).

142.    Dr. Wharmby was non-committal as to whether one of ordinary skill required a degree in microwave engineering to constitute one of ordinary skill with respect to subject matter pertaining to the field of microwave devices.  (Ex. 1061, page 37, line 25 to page 41, line 24).

143.    Dr. Wharmby acknowledged that if a patent spans two technical fields, there may be an obligation for a person of ordinary skill in one of the fields to consult someone who is of ordinary skill in the other field. (Ex. 1061, page 51, lines 10-19).

144. Dr. Wharmby acknowledged that Dr. Pozar was more knowledgeable than he regarding microwave devices. (Ex. 1061, page 139, lines 24-25).

145. Dr. Wharmby did not attempt to consult with anyone more knowledgeable than he with respect to arriving at the conclusions set forth in his declaration, Ex. 1040. (Ex. 1061, page 53, lines 17-25).

146. Dr. Wharmby testified that, at the time he prepared his declaration (Ex. 1040), he had no knowledge of Dr. Pozar. (Ex. 1061, page 54, lines 2-8).

147. Dr. Wharmby testified that the subject matter of the published Guthrie application, Ex. 2033, relates to both the fields of electrodeless plasma lamps and the field of microwave devices. (Ex. 1061, page 51, line 25 to page 52, line 6).

148. Notwithstanding his lack of experience in designing microwave devices and plasma lamps, Dr. Wharmby identifies himself as one of at least ordinary skill in the art to which the subject matter of the interference pertains. (Ex. 1040 at ¶ 54, lines 15-18).

149. Dr. Wharmby, standing alone, is not one of "ordinary skill" to which the subject matter of the interference pertains. (Facts 137-148).

150. Espiau also cites in support of its Motion 2 the sworn testimony of David M. Pozar, an expert in microwave electronics. (Exs. 1037, 1056, 1057).

151. Mr. Pozar does not separately identify the requirements for one of ordinary skill in the art in his declaration, Ex. 1056. (Ex. 1063, page 29, lines 3-5).

152. Dr. Pozar's understanding of Guthrie's involved application and associated provisional applications are based entirely upon his "experience and knowledge of microwave engineering theory and practice, as well as [his] experience of 25 years of University teaching in this same field." (Ex. 1056, ¶¶ 37, 38)

153. Dr. Pozar's views do not refer to, and shed no light on, what one of ordinary skill in the art would have understood from Guthrie's involved application or provisional applications in 2000. (Ex. 1056, *passim*).

154. Dr. Pozar in his second declaration, Ex. 1057, adopts the definition of ordinary skill provided in Dr. Wharmby's declaration, Ex. 1040. (Ex. 1057, ¶¶ 6, 7).

155. Dr. Wharmby's definition of the level of knowledge of microwave engineering principles possessed by "one of ordinary skill in the art" of the subject matter of this interference is not informed by any expertise of Dr. Wharmby or consultation with Dr. Pozar. (Facts 137-149).

156. Dr. Wharmby's comments regarding how that hypothetical person would have understood the Guthrie applications reflect a lower level of familiarity with microwave engineering principles, and a more limited understanding of the relevant prior art, than is appropriate for a person of the stated experience in the field of microwave devices. (Ex. 2120, ¶ 9).

157. One of ordinary skill in the art, at the time the Guthrie applications were filed, would have been familiar with textbooks that teach fundamental principles of microwave engineering, and know that such textbooks describe equations for computing the resonant frequencies of rectangular and cylindrical waveguides. (Ex. 2120, ¶ 14).

158. Dr. Wharmby and Dr. Pozar both acknowledged that formulae for computing the resonant modes of a metallized rectangular resonant cavity were readily available in textbooks. See Exhibit 1061 at page 108, lines 3-8; Exhibit 1063 at page 87, lines 13-23; Ex. 2120, ¶ 14.

159. Formulae for computing the resonant modes of cylindrical resonant cavities also were readily available in textbooks, as exemplified by pages 247-250 of the textbook entitled "Microwave Engineering and Applications" by Om Gandhi. (Ex. 2120, ¶ 14; Exhibit 2119).

160. One of ordinary skill would have been known of the waveguide equation, such as equation 11.34 of Ex. 2108, by which the waveguide wavelength of a cavity of any size can be related to the wavelength of the radiation in an unbounded medium and the cutoff wavelength. (Ex. 2120, ¶ 15).

161. One of ordinary skill would have known that the waveguide equation also can be expressed in operating frequency and cut-off frequency, rather than wavelengths. (Ex. 2120, ¶ 15).

162. One of ordinary skill also would have understood that the resonant wavelength of a cavity is computed as a multiple of one-half of the waveguide wavelength. (Ex. 2120, ¶ 15).

163. One of ordinary skill also would have understood that the dimensions for, and behavior of, a resonant cavity may be computed using readily available simulation programs, such as the High Frequency Structure Simulator ("HFSS") program available from Agilent Technologies. (Ex. 2120, ¶ 16).

164. One of ordinary skill would have understood that without a metal outer boundary, a dielectric-filled resonant cavity (and even a dielectric waveguide) will suffer an unknown degree of energy loss through the sides of the device depending upon environmental factors, would be much less amenable to analysis and have significantly lower efficiency, as confirmed by the testimony of both Dr. Wharmby and Dr. Pozar. See, Exhibit 1061 at page 109, line 5 to page 110, Exhibit 1063 at page 82, line 24 to page 83, line 12; Ex. 2120, ¶ 16.

165. One of ordinary skill would have needed "a good reason" not to employ a metal boundary on a dielectric-filled waveguide or resonator. (Ex. 2120, ¶ 16).

166. Given the knowledge that one of ordinary skill would have had regarding the benefits of employing a metal boundary on a dielectric resonator, he or she would have considered the use

of a metal boundary to be inherently desirable. (Ex. 2120, ¶ 16).

167. One of ordinary skill who was familiar with microwave engineering principles would have recognized a resonant cavity when presented with a drawing of one. (Ex. 2120, ¶ 17).

168. One of ordinary skill would have known that the relationships for specifying various configurations of resonant cavities had been known for more than fifty years, as are illustrated, for example, at page 82 of Exhibit 2104. (Ex. 2120, ¶ 17).

169. One of ordinary skill undertaking to design an electrodeless plasma lamp could reasonably be expected to review the pre-existing prior art in the field. (Ex. 2120, ¶ 18).

170. Dr. Wharmby testified that one of ordinary skill should have been familiar with his book chapter on electrodeless plasma lamps, Ex. 1039, or his review article, Ex. 2085. Ex. 1061, page 42, line 17 to page 43, line 1; page 49, lines 8-14.

171. Dr. Wharmby also testified that he would have expected one of ordinary skill to familiarize themselves with at least some of the prior art in electrodeless lamps. Ex. 1061, page 49, lines 2-7.

172. One of ordinary skill undertaking to design an electrodeless plasma lamp therefore could reasonably be expected to have reviewed published articles and texts, such as Exhibit 2085 and Exhibit 1039. See, Exhibit 1061 at page 1061, line 42 to page 43, line 11.

173. One of ordinary skill reviewing the literature would have had confirmed (or learned) that due to regulatory concerns over EMI, cost and manufacturability, it would have been desirable to design the electrodeless lamp of the Count to operate in one of the ISM bands of 915 MHz, 2.45 GhZ or 5.9 GHz, as suggested at page 472 of Ex. 2085. See Exhibit 1061, page 55, line 18 to page 58, line 6. (Ex. 2120, ¶ 19).

174. One of ordinary skill reviewing the literature would have had confirmed (or learned) that,

with one exception, the only high-powered electrodeless lamps operating in the ISM band were microwave discharge lamps of the type described in Exhibits 2080, 2081, 2082, 2083. See, Chapter 11.5 of Exhibit 1039; Exhibit 1061, page 86, lines 14-18; Ex. 2120, ¶ 20.

175. One of ordinary skill reviewing the literature would have had confirmed (or learned) that all of the electrodeless prior art lighting systems operating above 100 MHz, including those using a loop antenna, operated by way of microwave discharge. See Exhibit 1061, page 78, lines 6-18; page 81, lines 13-21; Ex. 2120, ¶¶ 19, 21.

176. The sole exception – the "Fusion Bytelight" system described by Dr. Wharmby as being disclosed in Exhibits 1008 and 2084 – required a series resonant circuit between the coil loop and the power supply in order to operate in an inductively coupled mode, rather than microwave discharge mode. See Exhibit 1061, page 67, lines 23 to page 68, line 3; Ex. 2120, ¶ 21.

177. Espiau's expert's analyses of the Guthrie applications assume a person of ordinary skill who is ignorant of the foregoing principles of, and prior art. (Ex. 2120, ¶¶ 22, 33).

178. Guthrie's involved application U.S. patent application Serial No. 09/818,092 ("the '092 application") was filed March 26, 2001, claiming the benefit of nine provisional applications: U.S. provisional patent application Serial Nos. 60/192,731, filed Mar. 27, 2000 (Ex. 2045); 60/224,059, filed Aug. 9, 2000 (Ex. 2049); 60/224,257, filed Aug. 10, 2000 (Ex. 2050); 60/224,289, filed Aug. 10, 2000 (Ex. 2051); 60/224,290, filed Aug. 10, 2000 (Ex. 2052); 60/224,291, filed Aug. 10, 2000 (Ex. 2053); 60/224,298, filed Aug. 10, 2000 (Ex. 2054); 60/224,866, filed Aug. 11, 2000 (Ex. 2055); and 60/234,415, filed Sep. 21, 2000. (Ex. 1006). (Ex. 2033).

179. According to Dr. Gupta. one of ordinary skill would have understood each of the Guthrie '092 application, and at least each of Guthrie U.S. provisional patent application Serial Nos.

60/224,059 (“the ‘059 application”)(Exhibit 2049), 60/224,257 (“the ‘257 application”)(Exhibit 2050), 60/224,289 (“the ‘289 application”)(Exhibit 2051) and 60/224,298 (“the ‘298 application”)(Exhibit 2054), constitutes a constructive reduction to practice of the subject matter of Count 1, as shown in the claim charts attached as Appendices 3.1-3.4. (Ex. 2120, ¶ 12).

180. The disclosures of Exhibits 2052, 2053, 2055 and 1006 generally are directed to specific manufacturing details and components relevant to the resonant waveguide structures disclosed in Exhibits 2045, 2049, 2050, 2053 or 2054. (Ex. 2120, ¶ 71).

181. Dr. Gupta has described his reasoning as to why the ‘731 application (Ex. 2045) provides a constructive reduction to practice of the Count in his prior declarations, Exhibits 2089 and 2105. (Ex. 2120, ¶ 38).

182. One of ordinary skill would have understood that the electrodeless lamp described in the ‘731 application should be operated in the ISM band and would have understood that the device described in the ‘731 application would act as a distributed system. (Facts 234-235).

183. One of ordinary skill also would have understood that the device would operate to create a microwave discharge plasma at those frequencies, not an inductively coupled “H-discharge.” (Facts 174-175).

184. Other than the superficial similarity between the RF coil in Figure 4.12 and the loop described in the Exhibits 1008, 1041 and 2084, there is no basis for one of ordinary skill to have assumed that the Guthrie inventor’s were teaching an inductively coupled lamp in the ‘731 application. (Ex. 2120, ¶ 40).

185. The device described in the ‘731 application nowhere suggests the use of the series resonant circuit, which is an essential element for the device described in Exhibits 1008, 1041 and 2084 to operate in an inductively coupled mode. (Ex. 2120, ¶ 40).

186. The prior art, including Ex. 1041 and Ex. 2085, would have taught one of ordinary skill that the device of Figure 4.12 would not have operated in an inductively coupled mode. (Fact __, Ex. 2120, ¶ 40).

187. Espiau's experts contend that one of ordinary skill would not have understood the '059 application to teach the invention of the Count because it does not use the words "resonant waveguide" or "resonance," with or without a metallic coating. (Ex. 2120, ¶ 44).

188. Espiau's experts both base their conclusions on the assumption that the waveform depicted, for example, in Figure 2.1 would have been interpreted by one of ordinary skill to represent the electric field, even though both acknowledge that such an interpretation would result in the antenna transmitting ***no*** power to the lamp, which would be at an electric field minimum. (Ex. 2120, ¶ 44).

189. Dr. Gupta testified that the waveform shown, for example, in Figure 2.1 of Ex. 2049 is used only to place the dimensions in perspective with respect to wavelength, as is common practice in the microwave literature. (Ex. 2120, ¶ 45).

190. Dr. Gupta notes that there is no evidence to suggest that the authors of the '059 application intended the waveform to represent the electric field. (Ex. 2120, ¶ 45).

191. Instead, the most reasonable assumption is that the waveform was intended to show only that the distance C between the lamp and the antennae is one wavelength, and that the distances of each of the lamp and antenna from the ends of the device are one-quarter wavelength.. (Ex. 2120, ¶ 45).

192. When so interpreted, one of ordinary skill would have understood that Figure 2.1 depicts a resonant cavity similar to that shown in Figure 115 of Exhibit 2104, in which the antenna is placed one-quarter wavelength from one end and 5/4 wavelength from the other (the device of

line 4 of the table on page 82 of Exhibit 2104). (Ex. 2120, ¶ 45).

193. Given the proper interpretation of the waveform in Figure 2.1, one of ordinary skill further would have recognized that the antenna and lamp are positioned at the electric field maxima. (Ex. 2120, ¶ 45).

194. One of ordinary skill, based upon even a cursory review of Ex. 2049, would have concluded that it discloses a resonant cavity. (Ex. 2120, ¶ 45).

195. Dr. Wharmby (¶ 25) and Dr. Pozar (¶ 15) argue that the stepped design of the embodiments of Figures 2.1 and 2.3 and mention of impedance matching would have been interpreted by one of ordinary skill as teaching that the devices constitute transmission lines, not resonant cavities. (Ex. 2120, ¶ 48).

196. Dr. Gupta states there may be some impedance matching benefit to providing an irregularly shaped cavity, e.g., to accommodate variations in the RF source. (Ex. 2120, ¶ 48).

197. The suggestion of potential benefit with respect to impedance matching does not detract from the plain teaching of resonance that one of ordinary skill would have appreciated from the relative lengths depicted in Figures 2.1 and 2.2, any more than the suggestion in the Espiau '809 patent to use irregularly shaped waveguides (Ex. 1007 at col. 4, lines 60-66) would have been understood to teach transmission lines. (Ex. 2120, ¶ 48).

198. Espiau's experts further opine that one of ordinary skill would not have understood the '059 application to provide any guidance as to make the invention described in the '059 application. (Ex. 2120, ¶ 46).

199. Espiau's experts' conclusion is inconsistent with Dr. Pozar's testimony that numerical simulation tools were widely available in 2000. (Ex. 2120, ¶ 46).

200. Computing resonant modes for the devices depicted in the '059 application would have

presented no greater problem than computing the resonant modes for the irregularly-shaped resonant cavities described, but not depicted, in the ‘809 patent. (Ex. 2120, ¶ 46).

201. For the cylindrical resonator design depicted in Figure 2.3, the resonant modes of cylindrical resonators were well known, and equations describing the behavior of such devices are described in standard textbooks, such as Exhibit 2119. (Ex. 2120, ¶ 46).

202. Dr. Wharmby suggests that use of the term “cut off frequency” in the ‘059 application would have taught the devices are waveguides, but not resonant cavities. (Ex. 2120, ¶ 47).

203. One of ordinary skill would have been familiar with the waveguide equation, and would have recognized that equation, which is used to compute the resonant wavelength of a cavity, is dependent upon the cut off frequency, as shown in Exhibit 2108. (Ex. 2120, ¶ 47).

204. Dr. Pozar, Espiau’s microwave expert, makes no similar criticism of the ‘059 application. (Ex. 2120, ¶ 47).

205. One of ordinary skill would not have understood the mention of the cut off frequency in the ‘059 application to suggest that the device was other than a resonant cavity, as taught in the drawings. (Ex. 2120, ¶ 47).

206. One of ordinary skill would have understood the ‘059 application to both describe and enable the invention of the Count, as shown in the claim chart attached as Appendix 3.1. (Ex. 2120, ¶ 49).

207. Espiau’s contentions regarding Exhibit 2054 are essentially the same as for the ‘059 application. (Ex. 2120, ¶ 66).

208. Dr. Wharmby concludes that it does not mention a “resonant waveguide” notwithstanding that it expressly refers to the device as a “cavity” (Exhibit 1061, ¶ 29); does not disclose how the dimensions of the device should be calculated (Exhibit 1061, ¶ 30); and uses the term “cut off

frequency" (Exhibit 1061, ¶ 31).

209. Dr. Pozar concludes that waveguide is not being used as a cavity because the Guthrie inventors used the free-space wavelength formula, rather than the guide wavelength formula (Exhibit 1056, ¶¶ 23-27), and because in his view the '298 application discloses a nonsensical electric field waveform (Exhibit 1056, ¶ 28) and does not provide any guidance as to how to dimension the device depicted in Figure 3.1 (Exhibit 1056, ¶ 29).

210. Espiau's experts' analyses of the disclosure of the '298 application are incorrect for the same reasons discussed above with respect to the '059 application. (Ex. 2120, ¶ 66).

211. Both Dr. Wharmby and Dr. Pozar attribute a nonsensical interpretation to the waveform shown in Figure 3.1; their conclusions from thereon are erroneous. (Ex. 2120, ¶ 66).

212. One of ordinary skill would, without delay, realize that the waveform depicted in Figure 3.1 of Ex. 2054 is intended to show that the distance C between the lamp and the antennae is one wavelength, and that the distances of each of the lamp and antenna from the ends of the device are one-quarter wavelength. (Ex. 2120, ¶ 66).

213. One of ordinary skill thus would have understood that the waveform ***does not represent the electric field***. (Ex. 2120, ¶ 66).

214. When interpreted properly, one of ordinary skill would have understood that Figure 3.1 shows a resonant cavity similar to that shown of Exhibit 2104, in which the antenna and lamp are located at the electric field maxima. (Ex. 2120, ¶ 66).

215. The '298 application discusses the use of a WR975 waveguide to energize a plasma lamp, and by a series of simplified calculations using the wavelength in an unbounded medium, attempts to show the effects of using increasingly higher dielectric constants in reducing the size of the device, which it refers to as a "ceramic cavity." (Ex. 2120, ¶ 64).

216. At microwave frequencies, the terms “cavity” and “resonator” are used interchangeably, so it is surprising that Espiau’s experts would conclude that the cavity disclosed in the ‘298 application is anything ***other*** than a resonant cavity. (Ex. 2120, ¶ 64).

217. Espiau argues at page 14 that the calculations set forth in the ‘298 patent are almost all incorrect. (Ex. 2120, ¶ 65).

218. The purpose of the calculations in Section 4 of the ‘298 application is to show the effect of increasing dielectric constant in reducing the resonator dimensions, it is thus essentially immaterial whether the unbounded medium wavelength formula or the more rigorous waveguide wavelength formula is used. (Ex. 2120, ¶ 65).

219. Even using the simplified formula, the conclusion stated in the ‘298 application is correct, *viz.*, that increasing the dielectric constant permits the overall dimensions of the cavity to be reduced. (Ex. 2120, ¶ 65).

220. The simplified calculations performed in the ‘298 application, while not rigorously mathematically correct, demonstrate the correctness of the basic insight expressed in the ‘298 application. (Ex. 2120, ¶ 65).

221. Espiau’s contention that one of ordinary skill would not have understood how to make the invention described in the ‘298 application is refuted by Dr. Pozar’s testimony that numerical simulation tools were widely available in 2000. (Ex. 2120, ¶ 67).

222. Because numerical simulation tools were readily available, computing the resonant modes for the device depicted in the ‘298 application would have been straightforward. (Ex. 2120, ¶ 67).

223. Both Dr. Wharmby and Dr. Pozar testified to the advantages of using metal boundaries on a dielectric resonator, and that the formula for metallized rectangular prism resonators were

available in any standard microwave text. (Ex. 2120, ¶ 67).

224. One of ordinary skill plainly would have known how to build the device depicted in Figure 3.1, without undue experimentation. (Ex. 2120, ¶ 67).

225. Dr. Gupta concludes that one of ordinary skill would have understood the ‘298 application to both describe and enable the invention of the Count, as shown in the claim chart attached as Appendix 3.2. (Ex. 2120, ¶ 69).

226. While Espiau dismisses the ‘257 application (Ex. 2050) as concerned merely with making a hermetic seal for a lamp body, that application actually discloses a great deal more.

227. (Ex. 2120, ¶¶ 51, 52, 55).

228. Figure 7.1 of the ‘257 application depicts a ceramic waveguide having a co-fired alumina liner, sapphire window and antenna. (Ex. 2120, ¶ 55).

229. If one of ordinary skill were to assume in the ‘257 application the dimensions of the lamp and antenna placement taught in the contemporaneously filed ‘059 application, one of ordinary skill would have readily understood that the ‘257 application discloses a resonant cavity in accordance with the Count. (Ex. 2120, ¶ 52).

230. Even without the teaching of the ‘059 application, one of ordinary skill would have been familiar with the prior art, such as Exhibits 1039 and Exhibits 2080-2083, and would have understood that the device in Figure 7.1 of the ‘257 application likewise should be configured as a resonant cavity. (Ex. 2120, ¶ 52).

231. Alternatively, given the device depicted in Figure 7.1, one of ordinary skill would have been able to very quickly deduce that the dielectric body should be able to store energy, not just transmit it, in order to attain energy levels sufficiently high to ignite a plasma. (Ex. 2120, ¶ 53).

232. Dr. Joshi’s testimony with respect to his notes, Exhibit 2115, show that he had concluded

that a resonant cavity was required shortly after he began analyzing the concept of a dielectric waveguide electrodeless lamp using standard equations for power density. (Ex. 2120, ¶ 53).

233. Inasmuch as Dr. Joshi was not in 2000 one of ordinary skill in the art, it is plain that one of ordinary skill would quickly arrive at a resonant cavity configuration for the device depicted in Figure 7.1 of the '257 application, using only textbook equations, and without inventive insight or undue experimentation. (Ex. 2120, ¶¶ 54, 55).

234. Dr. Gupta concludes that one of ordinary skill would have understood the '298 application to both describe and enable the invention of the Count, as shown in the claim chart attached as Appendix 3.3. (Ex. 2120, ¶ 69).

235. Dr. Wharmby's reasons for concluding that Ex. 2051 does not disclose anything but a waveguide are based upon his interpretation that the application: does not mention a "resonant waveguide" or "resonance" (Exhibit 1061, ¶ 39); does not disclose how the dimensions of the device should be calculated (Exhibit 1061, ¶¶ 40-41); and uses the term "cut off frequency" (Exhibit 1061, ¶ 42). (Ex. 2120, ¶ 57).

236. Dr. Pozar takes issue with the statements in the '289 application that the waveguide will "focus" "essentially all of the R.F. energy generated by the electronic circuit into the lamp" and "captures essentially all of the R.F. energy thus suppressing the emission of RMI" (Exhibit 1056, ¶¶ 17-18). (Ex. 2120, ¶ 57).

237. Dr. Pozar also states that Figure 8.1 does not provide any guidance as to how to dimension the device. (Exhibit 1056, ¶ 19).

238. The '289 application discloses a cylindrical resonator similar to that depicted in Figure 2.3 of the '059 application, and one of ordinary skill would have recognized it as such whether or not the '289 application specifically uses the word "resonance" or "resonant waveguide." (Ex.

2120, ¶ 58).

239. Whereas Dr. Pozar interprets the statements about "focusing" and "capturing" the RF energy in the '289 application as merely demonstrating that "these guys [the Guthrie inventors] don't know what their doing" (*see*, e.g., Ex. 1063 at page 125, lines 12-16), Dr. Gupta interprets those passages as in fact indicating the waveguide functions as a resonant cavity. (Ex. 2120, ¶ 58).

240. Dr. Gupta interprets the statement that the waveguide "focuses" the RF energy into the lamp as meaning it "directs" the energy into the lamp in the sense that word is used in element (b) of Espiau claim 32. (Ex. 2120, ¶ 58).

241. Dr. Gupta further interprets the statement that the device "captures" the RF energy as suggesting that the energy is stored within the device, and thus functions as a resonant cavity. (Ex. 2120, ¶ 58).

242. Dr. Pozar's conclusions reflect a hypertechnical interpretation of the language of the '289 application that would not have occurred to one of ordinary skill. (Ex. 2120, ¶ 58).

243. Dr. Gupta observes that Dr. Wharmby's analysis of the disclosure of the '289 application is flawed for the same reasons discussed above with respect to the '059 application. (Ex. 2120, ¶ 59).

244. Dr. Gupta interprets the above-described language as teaching that the device should function as a resonant cavity. (Ex. 2120, ¶ 59).

245. Whether the word "resonant" explicitly appears in the text of the '289 application is immaterial. (Ex. 2120, ¶ 59).

246. One of ordinary skill would have had no difficulty in determining the dimensions for an electrodeless lamp operating at an ISM band frequency using well known numerical simulation

tools, such as HFSS. (Ex. 2120, ¶ 59).

247. Formulae for computing the resonant modes of cylindrical resonators were readily available in text books well before August 2000, such as Exhibit 2119. (Ex. 2120, ¶ 60).

248. Those familiar with microwave devices would have recognized the usefulness of the cut-off frequency when computing the resonant wavelength of a cavity. (Ex. 2120, ¶ 60).

249. Dr. Joshi's testimony confirm his use of such formulae (including the cut-off frequency) within a day of beginning his consideration of dielectric waveguides. (Ex. 2120, ¶ 60).

250. Dr. Wharmby's analysis of the '289 application therefore is no more persuasive or correct than his analysis of the '059 application. (Ex. 2120, ¶ 60).

251. One of ordinary skill would have understood the '289 application to both describe and enable the invention of the Count, as shown in the claim chart attached as Appendix 3.4. (Ex. 2120, ¶ 61).

**APPENDIX 3.1**

| (Claim 1 of the '809 patent) | Disclosure of the '059 application |
|---|---|
| 1. A lamp comprising: | The '059 application describes a lamp. |
| (a) a waveguide having a body comprising a ceramic dielectric material of a preselected shape and preselected dimensions, the body having a first side determined by a first waveguide outer surface; | The '059 application describes a ceramic body (see, e.g., Note 1 to Figure 2.1), having a preselected shape and preselected dimensions (see, e.g., Note 2 to Figure 2.1), the body having a first side determined by a first waveguide outer surface. |
| (b) a first microwave feed positioned within and in intimate contact with the waveguide body, adapted to couple microwave energy into the body from a microwave source having an output and an input and operating within a frequency range from about 0.5 to about 30 GHz at a preselected frequency and intensity, the feed connected to the source output, said frequency and intensity and said body shape and dimensions selected such that the body resonates in at least one resonant mode having at least one electric field maximum; | The '059 application describes an antenna within and in intimate contact with the ceramic body, and adapted to couple microwave energy into the ceramic body. As would have been known from the prior art, the microwave source should operate in one of the ISM bands (> 915 MHz) for regulatory, manufacturability and cost and reasons. As would have been understood by one of ordinary skill from the dimensions taught in Figures 2.1-2.3, the body resonates in at least one resonant mode with the antenna and lamp located one-quarter wavelength from the ends of the |

| | |
|---|---|
| | cavity, at the electric field maxima. |
| (c) an enclosed first cavity depending from said first surface into the waveguide body; and | The '059 application discloses a lamp depending from the first waveguide surface. One of ordinary skill would have understood that a covering for the lamp is inherently required to prevent the metal halide and gas fill from escaping. |
| (d) a first bulb positioned in the cavity at a location corresponding to an electric field maximum during operation, the bulb containing a gas-fill which when receiving microwave energy from the resonating waveguide body forms a light-emitting plasma. | The '059 application discloses that the lamp includes a metal halide that is excited to form a plasma, which one of ordinary skill would have understood to require a metal halide and a gas-fill. The bulb is explicitly mentioned in paragraph 4.2 of the '059 application. |

**APPENDIX 3.2**

| **(Claim 1 of the '809 patent)** | **Disclosure of the '298 application** |
|---|---|
| 1. A lamp comprising: | The '298 application describes a lamp. |
| (a) a waveguide having a body comprising a ceramic dielectric material of a preselected shape and preselected dimensions, the body having a first side determined by a first waveguide outer surface; | The '298 application describes a waveguide body formed of a ceramic material (*see* Note 1 in Figure 3.1), having a preselected shape and preselected dimensions (See Note 2, Figure 3.1, as would be computed using textbook formulae or available simulation programs), the body having a first side determined by a first waveguide outer surface. |
| (b) a first microwave feed positioned within and in intimate contact with the waveguide body, adapted to couple microwave energy into the body from a microwave source having an output and an input and operating within a frequency range from about 0.5 to about 30 GHz at a preselected frequency and intensity, the feed connected to the source output, said frequency and intensity and said body shape and dimensions selected such that the body resonates in at least one resonant mode having at least one electric field maximum; | The '298 application describes an antenna within and in intimate contact with the waveguide body, and adapted to couple microwave energy into the body. As would have been known from the prior art, the microwave source should operate in one of the ISM bands (> 915 MHz) for regulatory, manufacturability and cost and reasons. One of ordinary skill would have understood that selecting the length of the dielectric body to be 1-1/2 times the wavelength to suggest resonant mode operation, and placement of the antenna |

| | |
|---|---|
| | and lamp at one-quarter wavelength from the ends of body show coupling to the electric field at its maxima. |
| (c) an enclosed first cavity depending from said first surface into the waveguide body; and | The '298 application discloses a cavity depending from the first waveguide surface. |
| (d) a first bulb positioned in the cavity at a location corresponding to an electric field maximum during operation, the bulb containing a gas-fill which when receiving microwave energy from the resonating waveguide body forms a light-emitting plasma. | The '298 application discloses a metal halide and gas filled lamp that is embedded within the waveguide structure (see Section 2 at page 1). |

**APPENDIX 3.3**

| **(Claim 1 of the '809 patent)** | **Disclosure of the '257 application** |
|---|---|
| 1. A lamp comprising: | The '257 application describes a lamp. |
| (a) a waveguide having a body comprising a ceramic dielectric material of a preselected shape and preselected dimensions, the body having a first side determined by a first waveguide outer surface; | The '257 application describes a waveguide body formed of a high dielectric material that can be co-fired with alumina, thereby suggesting that the waveguide comprises a ceramic material (*see* Section 4 at page 2), having a preselected shape and preselected dimensions as exemplified by the dimensions shown in Figure 7.1, the body having a first side determined by a first waveguide outer surface. |
| (b) a first microwave feed positioned within and in intimate contact with the waveguide body, adapted to couple microwave energy into the body from a microwave source having an output and an input and operating within a frequency range from about 0.5 to about 30 GHz at a preselected frequency and intensity, the feed connected to the source output, said frequency and intensity and said body shape and dimensions selected such that the body | The '257 application describes an antenna within and in intimate contact with the waveguide body, and adapted to couple microwave energy into the body. As would have been known from the prior art, the microwave source should operate in one of the ISM bands (> 915 MHz) for regulatory, manufacturability and cost and reasons. As described by Dr. Wharmby in Section 11..5 of his book chapter (Exhibit 1039), the use of |

| | |
|---|---|
| resonates in at least one resonant mode having at least one electric field maximum; | cavities for obtaining high fields was established in the prior art, and one of ordinary skill would have appreciated, as did Dr. Joshi immediately upon beginning work, the need to have the body resonate in at least one resonant mode. |
| (c) an enclosed first cavity depending from said first surface into the waveguide body; and | The '257 application discloses a cavity depending from the first waveguide surface. |
| (d) a first bulb positioned in the cavity at a location corresponding to an electric field maximum during operation, the bulb containing a gas-fill which when receiving microwave energy from the resonating waveguide body forms a light-emitting plasma. | The '257 application discloses that the lamp includes a metal halide and gas fill enclosed with in a bulb comprising an alumina liner and having a sapphire window. (*See* Section 3 at page 1 and Figure 7.1) |

**APPENDIX 3.4**

| **(Claim 1 of the '809 patent)** | **Disclosure of the '289 application** |
|---|---|
| 1. A lamp comprising: | The '289 application describes a lamp. |
| (a) a waveguide having a body comprising a ceramic dielectric material of a preselected shape and preselected dimensions, the body having a first side determined by a first waveguide outer surface; | The '289 application describes a waveguide body formed of a ceramic material (*see* Note 1 in Figure 8.1), having a preselected shape and preselected dimensions (See Note 2, Figure 8.1, as would be computed using textbook formulae or available simulation programs), the body having a first side determined by a first waveguide outer surface. |
| (b) a first microwave feed positioned within and in intimate contact with the waveguide body, adapted to couple microwave energy into the body from a microwave source having an output and an input and operating within a frequency range from about 0.5 to about 30 GHz at a preselected frequency and intensity, the feed connected to the source output, said frequency and intensity and said body shape and dimensions selected such that the body resonates in at least one resonant mode having at least one electric field maximum; | The '289 application describes an antenna within and in intimate contact with the waveguide body, and adapted to couple microwave energy into the body. As would have been known from the prior art, the microwave source should operate in one of the ISM bands (> 915 MHz) for regulatory, manufacturability and cost and reasons. As stated in the Section 4 of the '289 application, the waveguide "captures" the RF energy and "focuses" (i.e., directs) that energy to the lamp. |

| | |
|---|---|
| (c) an enclosed first cavity depending from said first surface into the waveguide body; and | The ‘289 application discloses a cavity depending from the first waveguide surface. |
| (d) a first bulb positioned in the cavity at a location corresponding to an electric field maximum during operation, the bulb containing a gas-fill which when receiving microwave energy from the resonating waveguide body forms a light-emitting plasma. | The ‘289 application discloses a metal halide and gas filled bulb disposed in the cavity (see Section 4 at page 3). |

# EXHIBIT U

UNITED STATES PATENT AND TRADEMARK OFFICE

----------------------------

BEFORE THE BOARD OF PATENT APPEALS

AND INTERFERENCES

(Administrative Patent Judge Sally C. Medley)

CHARLES GUTHRIE, EDMUND SANDBERG,

DONALD WILSON, GREGORY PRIOR, and DAVID SMOLER

Junior Party

(Application 09/818,092)

v.

FREDERICK M. ESPIAU, CHANDRASHEKHAR J. JOSHI,

and YIAN CHIANG

Senior Party

(Patent 6,737,809)

-------

Patent Interference 105,393 (SCM)

(Technology Center 2800)

ESPIAU CLAIMS

V I R G I N I A:

----------------------------------x

CHARLES GUTHRIE, EDMUND SANDBERG, :
DONALD WILSON, GREGORY PRIOR, and :
DAVID SMOLER, :
Junior Party, :
(Application 09/818,092) :
v. :
FREDERICK M. ESPIAU, :
CHANDRASHEKHAR J. JOSHI, and :
YIAN CHIANG, :
Senior Party. :
(Patent 6,737,809) :

Tuesday, September 11, 2007

The above-entitled teleconference call came on for hearing before the Honorable Sally C. Medley, in and for the United States Patent and Trademark Office, before the Board of Patent Appeals and Interferences, at 2:00 p.m.

A P P E A R A N C E S:

ON BEHALF OF THE SENIOR PARTY:

RICHARD NEIFELD, ESQUIRE

ROBERT MORGAN, ESQUIRE

ON BEHALF OF THE JUNIOR PARTY:

NICK PISANO, ESQUIRE

REGIS WORLEY, ESQUIRE

P R O C E E D I N G S

67e589b6-4698-4b18-8264-900c1ad2da17

MR. PISANO: Good morning, Your Honor. This is Nick Pisano from Jones Day. I have Regis Worley with me on the line.

MR. MORGAN: Robert Morgan with Mr. Bergen from Gray.

MR. NEIFELD: Rick Neifeld.

THE COURT: Mr. Pisano, I understand you want to file a late motion?

MR. PISANO: Well, Your Honor, yes. It would be a motion -- actually, the call was for three purposes. One was to request authorization to file a motion for judgment on the grounds of inequitable conduct, which came to light in Mr. Espiau's deposition on August 17, 2007. He mentioned during his deposition that there was another declaration, which Mr. Morgan produced on August 21, 2007, and after looking at those two documents side by side and comparing them, which, in fact, we do a little bit of in Guthrie's opposition at Page 2, Line 9 through Page 7, Line 13, Guthrie concludes there's a fairly good prima facie case of inequitable conduct here.

THE COURT: Based on what? Normally, when I

67e589b6-4698-4b18-8264-900c1ad2da17

think of inequitable conduct, there's a reference that one of the parties left out during prosecution of an application. Is that what we're talking about?

MR. PISANO: Well, there's actually three separate bases for this motion. This first is that Mr. Espiau had a declaration that he signed in February 2005 that was prepared by the Wilson, Cissini firm that, in my view, or Guthrie's view, entirely contradicts his declaration that he signed in July of 2007 that was filed with Espiau's priority motion.

For example, Mr. Espiau says in 2005 declaration that he told Guthrie about residents at the April 11 meeting, but in 2007, he said he didn't invent it for three days later.

As another example, he says that, at the April 11 meeting, which was the key first meeting between the Guthrie inventors and the Espiau inventors -- he said no one from DRI described any plasma lamps at all, and in his July 2007 declaration, he goes into detail about various -- or about the inductive coil loop plasma lamp that he claims that DRI described to him, and there are other additional

67e589b6-4698-4b18-8264-900c1ad2da17

very stark contrasts between Mr. Espiau's original declaration and his second declaration, that the facts are mutually exclusive. With all of the communications and discussions we've had, even with the Board about previous Wilson, Cissini declarations, I can't comprehend how Wilson, Cissini did not believe that this was a declaration that needed to be made of record, and, in fact, it hints or strongly suggests an intent to defraud the Board; and as I said, if you look in Guthrie's opposition, for purposes of attacking Mr. Espiau's credibility, we've compared and contrasted those two declarations.

The second basis is that, in Mr. Espiau's deposition, again, on August 17, he testified that Espiau had no idea how to make the bulb that they claim in their application as an element of account, and they claim they eventually reduced the practice, and it appears to Guthrie that, even if Espiau, if they had a second independent later-in-time invention, Mr. Wilson would necessarily need to be part of that inventive entity; and, also, in connection with Espiau's priority motion, they've produced

67e589b6-4698-4b18-8264-900c1ad2da17

Mr. Espiau's notebook that refers to a discussion between himself and Dr. Joshi (ph) where they say that Guthrie and Wilson have told them that they prepared an invention disclosure, and Espiau produced that invention disclosure, and I believe it's marked as Exhibit 25, and none of that information was provided to the patent office, so there's an example of a document that probably, in Guthrie's view, should have been provided to the patent office because it goes directly to the inventorship of the invention, and, yet, it was withheld.

THE COURT: What document is that?

MR. PISANO: Exhibit 1225.

THE COURT: There's a notebook?

MR. PISANO: There is a notebook entry, but Exhibit 1225 is an invention disclosure that purports to name two of the Guthrie inventors and two of the Espiau inventors as the inventors of the invention of account.

THE COURT: What as the date on that?

MR. PISANO: The date on it was June 22, 2000. There is a date on it of June 22, 2000. It was

67e589b6-4698-4b18-8264-900c1ad2da17

reflected in Espiau's notebook as having been provided around June -- it's very early June of 2000, June 6 to June 8.

The third ground would be one that the fellow circuit has set out in a case called U-Lead Systems (ph) versus Lex Computer & Management. That's 69 U.S., PQ 2nd, 1097 Fed. Circuit 2003, and that was followed -- an example of application of that is Daimler Chrysler versus Hughley Advanced Technologies, 68 U.S. PQ 2nd, 1450 Southern District of California, 2003, where, basically, in claiming -- improperly claiming the wrong inventive entity status can lead to a holding of unenforceability of the patent.

So the basis for that is, again, that Mr. Espiau's deposition, or, rather, I should say, in Espiau's priority motion, they submit a video relating to their alleged reduction of practice, and the testimony up until Mr. Espiau's deposition was that that work had been done in his basement. Well, Mr. Espiau made it perfectly clear that he could not have fired up anything in his basement, because he didn't have the power to do it. He didn't have -- the

67e589b6-4698-4b18-8264-900c1ad2da17

electrical line wasn't even installed yet, and he identified that the work had been done at UCLA.

THE COURT: Well, doesn't this all go to the credibility of the witness? Inequitable conduct, I'm thinking these depositions, we're talking about the 17 that contradicts -- allegedly contradicts the February 2005 declaration. This is all after the Espiau patent issued, right?

MR. PISANO: No. The work at --

THE COURT: I'm not talking about the 1225 IDS document. I'm talking about you said one ground would be that the declaration, Espiau's 2005 declaration, contradicts Espiau's August 2007 deposition.

MR. PISANO: Yes, that's correct. And the reason why I'm raising that is that there's a case called Precision Instruments Manufacturing Company versus Automotive Maintenance Machinery Company. It is a Supreme Court case in 1945. It's reported as 65 U.S. PQ 133, and, basically, that's a case in which the short view of the facts are that the one party had an invention misappropriated from it, and the

67e589b6-4698-4b18-8264-900c1ad2da17

application was filed by the other party. An interference was declared between those two -- the applications belonging to those two parties. The parties settled the -- during the course of the investigation in the course of the interference, the first owner, Automotive, had a very firm belief that the party who filed the second application had committed perjury in connection with declarations prepared and filed in the interference. Automotive agreed with Precision to settle the case and did not bring the allegedly perjured testimony to the Board's attention. Later on, the parties -- after the settlement was concluded, Automotive took the application that belonged to the party who had been claimed -- accused of perjury allowed that to issue as a patent and tried to assert it, and what happened was the Supreme Court struck down the patent on the grounds that Automotive knew about the perjury or had good grounds to know about the perjury and did not cite it to the patent office, so in its holding, the Supreme Court said the following: "It is clear that Automotive knew and suppressed facts that at the very

67e589b6-4698-4b18-8264-900c1ad2da17

least should have been brought in some way to the attention of the patent office, especially when it became evident that the interference proceedings would no longer continue, or would continue no longer. Those who have applications pending with the patent office or parties to the patent office proceedings have an uncompromising duty to report to it all facts concerning possible fraud or inequitableness underlying the application in issue. This duty is not excused by reasonable doubt as to sufficiency of the proof of the inequitable conduct, nor by resort to independent legal advice. Public interest demands that all facts relevant to such matters be submitted formally or informally to the patent office, which then can pass upon the sufficiency of the evidence," and if you'll bear with me one second more, the court continued, "Instead of pursuing interference proceedings approving the fact that Zimmerman's claims had priority over those asserted by Larson. Automotive chose to enter into an outside settlement with Larson, Precision, and Snap-on, whereby Larson conceded priority. Outside settlements of

67e589b6-4698-4b18-8264-900c1ad2da17

interference proceedings are ordinarily illegal, but, whereas here, the settlement is grounded upon knowledge or reasonable belief of perjury, which is not revealed with the patent office or to any other public representative, the settlement lacks that equitable nature, which entitles it to be enforced and protected in a course of equity."

So the reason, Your Honor, that I believe that Guthrie needs to make this information of record is only part of it is discussed in its opposition going to the credibility, and I'm concerned that, even if the parties were subsequently settled, that without making these facts of record somewhere in the interference, there's going -- down the line, the patents would be open to a challenge.

THE COURT: You want to file one miscellaneous motion based on inequitable conduct?

MR. PISANO: Yes, ma'am.

THE COURT: Based on fraud? I would think, inequitable conduct, there's intent to withhold something from the patent office during the pendency of the application, and all this came out after, and I

67e589b6-4698-4b18-8264-900c1ad2da17

heard what you said about your case, the Supreme Court case.

MR. PISANO: There, what happened was that Larson had submitted perjurious statements with respect to his priority statement. They were completely false, and he later admitted they were false.

Now, I don't think our case is as extreme, but, clearly, in view of Precision Instruments, I don't think that either party, even if they were of a mind to settle, would not want to make this information of record.

THE COURT: Are the parties settling the interference?

MR. MORGAN: Your Honor, this is Bob Morgan. I find this is absolutely outrageous, because before Mr. Pisano filed his papers last week, in which he specifically raised the issue of inequitable conduct, his client called our client and said you need to settle before we drop this bomb on you, so to now cite Precision Manufacturing, saying that's why he's doing what he's doing, is just the opposite. He's, in fact,

67e589b6-4698-4b18-8264-900c1ad2da17

trying to do what Precision Manufacturing said you don't do.

Let's go a little further. The priority is going to have to be decided regardless of these motions. That's clear, citing (indiscernible) 59 U.S. PQ 2nd, 1190. Frankly, it said the habit of charging inequitable conduct becomes absolute (indiscernible).

Let me just walk through, if I can, the grounds we're talking about here. UCLA, supposedly, it is that somehow or other, UCLA -- Guthrie believes UCLA somehow has some rights to this patent. Obviously, we don't agree. UCLA hasn't made any claims or rights to the patent. Guthrie says, no, UCLA has some rights; and, therefore, Espiau was not supposed to be able to claim small entity status. Well, that's just absolutely nonsense. First of all, UCLA hasn't made and claims, and it doesn't have any rights, and beyond that, (indiscernible) 37 CFR 5127(a), UCLA is a small entity in any event because it's a nonprofit university.

Well, if we're going to get into that, then, we might start getting into sanctions with threats

67e589b6-4698-4b18-8264-900c1ad2da17

that Mr. Pisano made to Mr. Joshi to threaten him about losing his tenure.

Secondly --

MR. PISANO: I'd be happy --

MR. MORGAN: Let me finish. Secondly, as far a naming Wilson as the inventor, I want to make it clear that that so-called disclosure was prepared by Guthrie and Wilson, not by Espiau. As far as Espiau is concerned, it had nothing to do with Espiau, and it was not in any way, shape, or form appropriate or proper.

What this interference is about is who is the inventor of various aspects of it, and that's what's going to be decided by the Board when it comes to priority.

Now, both sides have argued derivation. Are we now in a situation where we're going to throw in inequitable conduct claims at each other with respect to derivation? Because if that's where we are, then, we're both going to have to do it. That's just nonsense.

This disclosure that's written up, it wasn't

67e589b6-4698-4b18-8264-900c1ad2da17

IDS, Your Honor. It was just a writeup of a supposed invention. Obviously, Mr. Wilson wrote it. He knew it existed. He knew he had given it to us, so there's nothing new about this, so why it comes up now makes no sense. It's not relevant. In fact, if anything, it shows that Guthrie and Wilson didn't have the invention, so there's no reason for us to submit anything on inequitable conduct.

As far as the Espiau's declaration concerned, no one hid anything. Espiau freely testified that he'd done that declaration, and we freely gave it to Mr. Pisano as soon as I could get it. It was provided to Guthrie's counsel. He, in fact, goes into great detail with it and submits it in connection with his filings.

So this plea that, gee, I have to do this because of Precision Manufacturing is absolute nonsense. Basically, he's trying to turn this thing into a three-ring circus and trying to do it while we're trying to prepare our reply brief.

What I find fascinating is the second declaration, which he now says is the problem, is

67e589b6-4698-4b18-8264-900c1ad2da17

entirely consistent in the parts he talked about, with the testimony of Guthrie's own witnesses about what happened on April 11, so, basically, he's saying inequitable conduct because Mr. Espiau, after going through the documents, came up with the same testimony consistent with the Guthrie people, so where that becomes inequitable conduct is beyond me.

If the Board is going to permit this kind of motion, this kind of three-ring circus, we're going to have to rethink our tactics. We have tried to go forward with this thing on the merits, without throwing rocks at people, without trying to sling mud at people, trying to conduct the priority in a way so that the Board can make a correct and fair determination of this priority. If this is going become a three-ring circus, then, it's going to become a three-ring circus, and we're going to have to raise issues about claiming false statements and declarations that the Guthrie people made. We cross-examined and established for the Board what the truth was.

Where this goes, I don't know and why

67e589b6-4698-4b18-8264-900c1ad2da17

Mr. Pisano is raising it, I don't know, other than, perhaps he's concerned he's not going to win the interference, but we certainly oppose at this time turning this thing into a three-ring circus.

MR. PISANO: May I briefly respond to Mr. Morgan's comments?

THE COURT: I'll let you respond, and I'll get a copy of the transcript and make a decision.

MR. PISANO: With respect to dropping the bomb, I honestly don't know what Mr. Morgan's talking about. I believe my client was referring to the fact that they were trying to get -- their thought was that the parties would try to settle the case -- I think the bomb was the opposition motions that were filed, and I think the parties' thought, at least my client's thought, was that they had known about Precision Instruments for a bit now, and their point was to try to come to some agreement if there were going to be settlement discussions, to try to come to some agreement with them, some way to put this information before the Board. That didn't happen, and the opposition motions were filed, so I think that the

evidence of inequitable conduct is already of record, but the relief that's being sought is not, and there's additional evidence, which we would like to make of record.

With respect to the UCLA rights, Guthrie's position is not that UCLA has any rights, but that DRI is the one that sponsored the research at UCLA, and I did not threaten Dr. Joshi. What I pointed out to Dr. Joshi is that he had submitted a letter to the university folks there at UCLA saying that he received a $10,000 gift with no strings attached for something he apparently took a half-hour to work on, whereas Mr. Turner at Temco (ph) and Luxum (ph), the guy who founded Luxum, has been demanding that DRI send a $10,000 gift to UCLA to cover some of the costs of working on the DRI project at UCLA, so our position is that, to the extent anyone did any work at UCLA, it was sponsored by DRI, and as to Mr. Joshi and what the effects would be on his tenure, if UCLA would make a determination, I really asked him a question, and he told me there would be no consequences, so I assume that's not a problem.

67e589b6-4698-4b18-8264-900c1ad2da17

With respect to naming Wilson, I mean, that was a draft of a provisional application that will eventually filed, not in that form, but, later, the title and some of the substance of that was later filed as a provisional application, I believe, but the point is that it was in Espiau's hands, which, certainly, no one -- certainly, Mr. Wilson had not mentioned, and it was evidence of an alleged separate inventive entity that was in Espiau's hands.

Now, if it was no problem, it simply should have been submitted, but it wasn't, so those are my comments on Precision Instruments. I agree. I'm not a big fan of inequitable conduct, but I have to say, Your Honor, after having the conversation with you on the phone with Mr. Morgan demanding that they produce other declarations, for that to then pop up, for this new Espiau declaration to pop up two weeks later and Mr. Morgan at the deposition said he didn't know anything about it, I find a bit shocking, and I'm not trying to gild the Lilly here. I'm genuinely concerned about that, and as far as it being consistent with the other witness' testimony, well, it

67e589b6-4698-4b18-8264-900c1ad2da17

appears as though the July 2007 declaration was written to now mesh with the Guthrie's inventor's testimony, but it's completely contradicted by Mr. Espiau's own prior assigned declaration from February 2005, and, Your Honor, I would ask you only to look at Pages 2 through 6 -- 2 through 7 of Espiau's opposition, where we layout side by side what he said in February 2000 and what he said in July 2007. He said they didn't say anything. He identifies a completely different device as to the one he tested. They submitted evidence saying they tested the DRI lamp. Well, he identifies a completely different lamp, which he saw for the first time in June, whereas his own notebook, which was subsequently produced, said they tested a different lamp back in May, or whenever it was. Both of these declarations were prepared by Wilson, Cissini. You heard me complain about the fact that the Wilson, Cissini declarations were not even declarations, unsworn statements taken by the Guthrie inventors. If we're going to talk about three-ring circus, that's what turned this into a three-ring circus, that and the

67e589b6-4698-4b18-8264-900c1ad2da17

fact that Espiau has conflicting contradictory declarations that were prepared by his own counsel. That's what causes us the problem. If Mr. Morgan believes he has a basis for inequitable conduct, you know, Your Honor, he chose not to bring it. I assume there's not much to it. If he feels there is, you know, then, I'll let you make that decision, but I would please ask you to go back and look at the opposition brief and Guthrie's Opposition 7 of those pages that I cited, and if you look at that and Precision Instruments and you conclude there's no obligation of the parties to make it of record, then, I guess we'll have to deal with it.

MR. MORGAN: Your Honor, we're going to respond to that diatribe in the brief and deal with that clearly.

THE COURT: You're going to reply?

MR. MORGAN: I'll reply, absolutely. It is a diatribe that frankly angers me.

THE COURT: Inequitable conduct is within the discretion of the Board, and we don't generally entertain it unless it's very clear it would resolve

67e589b6-4698-4b18-8264-900c1ad2da17

issues. I'm leaning towards not allowing this, but I would like to get a copy of the transcript, and I will write up a decision.

MR. PISANO: Your Honor, I have one other or two other brief items. One is that, in its opposition motion, Espiau has added -- from Page 4, Line 15, through Page 10, Line 12, they basically restated or stated for the first time the facts and arguments in support of its priority of invention, its invention story, and when we had the conversation to strike their attack on the Guthrie inventors out of their priority brief, Espiau asked whether it could supplement its brief before it filed the substitute, and you told them no, and, now, it's Guthrie's concern that, in its reply, it now needs to basically duplicate again its opposition to Espiau's priority motion in its reply, so I was going to ask Your Honor to take a look at Page 4, Line 15, through Page 10, Line 12, of Espiau 's Opposition 7 and take a look at facts No. 246 to 266, 268 through 329, and ask you to exercise your discretion whether to strike those, or we'll just respond again, and you'll have a very large

67e589b6-4698-4b18-8264-900c1ad2da17

fact section in the reply brief that will reproduce all of the fact statements that were in Guthrie's opposition, so I would ask you to consider that.

The last item was only to advise you -- and I don't know if we need to. I wasn't sure, but understanding Order 8.2, the Board's Order, standing Order 8.2, Guthrie will be filing some continuation applications from its 092 application, and I was unclear whether we needed your -- it appeared to me that we needed to alert you that that was going to happen. I don't know whether we need to do that before or after we filed them, but I figured better safe than sorry.

THE COURT: Just file a paper with the Board, serve the other side as to when you're filing them, if you have the application number or --

MR. MORGAN: Your Honor, if I may respond briefly with respect to the brief?

THE COURT: Okay.

MR. MORGAN: As you see, on Page 4, what Guthrie did is, Pages 19 through 28 of this brief, it laid out what it presents as being the history of the

67e589b6-4698-4b18-8264-900c1ad2da17

relationship between the parties, and it did so for the purposes of trying to prove its (indiscernible) case. What we did in our brief is lay out the answer to that. In fact, we say that what we're talking about is Pages 19 through 28 of the brief, and we, in fact, in our pages, track through what Guthrie would said. It's chronological, and we're responding to them. That's exactly what we're doing. I could cite the pages Guthrie was responding to. Basically, they start on our Page 4, starting at their Page 20, and walks through 20, 21, all the way up to 28, essentially, responding to what he says was the relationship and who did what, who made what drawings, who did what designs, and we explain our view as to who did those things. It's entirely responsive to what Guthrie had, and he doesn't have to come back and do another however many pages because he's already done it.

THE COURT: I'm going to look at it, but I'm inclined not to strike at this point. The parties have to make their case in their briefs.

MR. MORGAN: Thank you, Your Honor.

67e589b6-4698-4b18-8264-900c1ad2da17

MR. PISANO: We'll just reproduce our facts in the opposition in our reply.

THE COURT: So I answered -- your third question was with respect to file a paper, letting me and the other side know what the application numbers are or the filing dates.

MR. MORGAN: Yes, ma'am.

MR. PISANO: Yes, ma'am.

THE COURT: Thank you.

(Whereupon, at 2:30 p.m., the teleconference in the aforesaid matter was concluded.)

CERTIFICATE OF REPORTER

67e589b6-4698-4b18-8264-900c1ad2da17

I, TONI R. DeSENZE, the stenographic reporter who was duly sworn to well and truly report the foregoing proceedings, do hereby certify that the transcript of said proceedings is true and correct to the best of my knowledge and ability, and that I have no interest in said proceedings, financial or otherwise, nor through relationship with any of the parties in interest or their counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 8th day of March 2007.

TONI R. DeSENZE, Reporter

Reg. No. 122748

67e589b6-4698-4b18-8264-900c1ad2da17

# EXHIBIT V

UNITED STATES PATENT AND TRADEMARK OFFICE

---------------------------

BEFORE THE BOARD OF PATENT APPEALS

AND INTERFERENCES

(Administrative Patent Judge Sally C. Medley)

CHARLES GUTHRIE, EDMUND SANDBERG,

DONALD WILSON, GREGORY PRIOR, and DAVID SMOLER

Junior Party

(Application 09/818,092)

v.

FREDERICK M. ESPIAU, CHANDRASHEKHAR J. JOSHI,

and YIAN CHIANG

Senior Party

(Patent 6,737,809)

-------

Patent Interference 105,393 (SCM)

(Technology Center 2800)

ESPIAU CLAIMS

EXHIBIT 2225

efed0437-88c9-458b-ae93-bd241ce6da5e

V I R G I N I A:

-----------------------------------x

CHARLES GUTHRIE, EDMUND SANDBERG, :
DONALD WILSON, GREGORY PRIOR, and :
DAVID SMOLER, :
Junior Party, :
(Application 09/818,092) :
v. :
FREDERICK M. ESPIAU, :
CHANDRASHEKHAR J. JOSHI, and :
YIAN CHIANG, :
Senior Party. :
(Patent 6,737,809) :

The above-entitled conference call came on for hearing before the Honorable Sally C. Medley, in and for the United States Patent and Trademark Office, before the Board of Patent Appeals and Interferences, at 2:00 p.m.

efed0437-88c9-458b-ae93-bd241ce6da5e

A P P E A R A N C E S:

ON BEHALF OF THE SENIOR PARTY:

RICHARD NEIFELD, ESQUIRE
ROBERT HALL, ESQUIRE
ROBERT MORGAN, ESQUIRE

ON BEHALF OF THE JUNIOR PARTY:

NICK PISANO, ESQUIRE

efed0437-88c9-458b-ae93-bd241ce6da5e

P R O C E E D I N G S

THE COURT: You received my Order dated February 27th setting up further what I wanted to discuss during this call. It appears the case will go on.

I first want to discuss any settlement discussions that the parties have had.

MR. MORGAN: I spoke with my client last night, and I also actually can confirm this with Mr. Pisano. The parties are in discussions. They are ongoing, and my understanding from Mr. Pisano is that a proposal should be coming from his clients to my clients shortly.

MR. PISANO: That's correct, Your Honor. I probably will come out early next week.

THE COURT: Okay. Are these serious negotiations, or do the parties have a feel for whether or not this will settle?

MR. PISANO: At least from Survision's (ph) point of view, they're being taken in earnest, and, certainly from Luxon's (ph) point of view, there are serious negotiations.

efed0437-88c9-458b-ae93-bd241ce6da5e

THE COURT: All right. Let's move one. I'll go ahead and discuss the times and what issues will be raised by way of motion so the parties, you can certainly see what I have that I've proposed. Specifically, I was thinking that both parties furnish their priority statements. We'll put on a 102(g) priority motion and that Guthrie also alleges derivation, and that SPL's motion to undesignate some of its claims.

MR. MORGAN: If I may, Your Honor, Espiau also has a derivation motion, Motion 14.

THE COURT: Well, you have it in your proposed motion's list, but you didn't put it in your priority statement, so the Board assumed that you had dropped that motion at issue.

If you look at Rule 204, it says that a party may not submit evidence of its priority in addition to the Court unless there's a policy statement setting forth all of the bases on which the party is to establish its entitlement to judgment on priority. The Board interprets that to mean that's your party statement to include derivation if you're

efed0437-88c9-458b-ae93-bd241ce6da5e

going to prove it, so you have to allege it in your priority statement.

MR. MORGAN: But this is a substantive issue, Your Honor, because she's addressed it for RESPL. All vehicles for priority means priority in the law clearly distinguishes between priority and derivation.

THE COURT: Derivation is based on some of the underlying principals of 102(g).

MR. MORGAN: If the Board thinks that was supposed to be in the filing, that would be fair, but the way I read the rules, it's not required. I certainly didn't mean to drop that basis for relief.

MR. PISANO: It should have been fairly apparent from our papers right from the start that derivation was an issue you were raising.

THE COURT: Right. Well, I've had it happen, though, that they -- derivation's raised in the motion's list, and it's not raised in the priority statement, and the parties simply don't have the evidence or have decided to drop the issue, so you can see where the Board is coming from. We prepare it,

efed0437-88c9-458b-ae93-bd241ce6da5e

and we think, okay, you're telling us that's not an issue.

MR. MORGAN: Well, that wasn't the case, Your Honor.

THE COURT: Okay. Well, the other side has listed on their priority statement derivation, and they've also given a date, so I don't know fair really it is to let you augment or substitute a priority statement at this time.

Do the parties have any objection regarding the priority SPL files with their priority motion, derivation, the issue of derivation?

MR. PISANO: Well, Your Honor, before I answer your question, perhaps, I could propose the one additional motion that Party Guthrie would like to file, and, perhaps, we can arrange some sort of agreement.

But, Your Honor, with respect to the motion, the results of the preliminary motion, one of the outcomes was to supply Guthrie's ability to claim to benefit any of its priority applications -- provisional applications -- excuse me.

efed0437-88c9-458b-ae93-bd241ce6da5e

And one of the motions that Guthrie had requested was to be accorded to benefit of four additional provisional applications. That was Guthrie's Motion 15, and during the June teleconference last year, or March -- I forget -- during the teleconference last year, Your Honor pointed out that, because none of those applications provided an earlier benefit date, then, the provisional applications to which benefit had already been granted, that you didn't authorize the motion, so, in particular, Mr. Neifeld argued that these applications don't buy party Guthrie any benefit because they don't provide an earlier benefit date than the applications that are already on record, and I believe Your Honor denied our ability to claim the additional benefit from four of those applications.

One of those applications, Provisional Application 60224503, certainly discloses a metal covered ceramic device, which necessarily would have to operate as a resident cavity, and meet all of the limitations of the claim; so I guess, Your Honor, my proposal would be I would be happy to permit Espiau to

efed0437-88c9-458b-ae93-bd241ce6da5e

file its derivation motion if they would permit Guthrie to file its motion to be accorded the benefit of several of the provisional applications, which previously was unable to file a motion on.

THE COURT: Tell me the name -- of the number again of that one.

MR. PISANO: It was originally Motion 15.

THE COURT: And the application?

MR. PISANO: The application, there were four applications listed. 60224503 is one of them. That discloses the metal covered device. 60224061 discloses the spring mechanism for holding the RF antenna in contact with the ceramic. And there were two others. They related to heat sense, 60224961 and 60224617. These were set out in Guthrie's proposed Motion 15.

THE COURT: Right. But you knew all along that they were attacking your accorded benefit, so if that was a concern of yours, you could have alerted me to that, but there was always a possibility that you didn't have -- that their motion would be granted with respect to your existing benefit.

efed0437-88c9-458b-ae93-bd241ce6da5e

MR. PISANO: Well, Your Honor --

THE COURT: This is a new fact that would, in essence, authorize you to file a belated motion.

MR. PISANO: Well, Your Honor, the motion, we had asked to file Motion 15 originally, and the argument during the previous teleconference was that we should not be permitted to file it because it didn't provide an earlier date to any of the provisional applications as to which benefit had already been accorded, and at the time that we had the teleconference, I had no reason to suspect that the Board would strike Guthrie's claim to all of its provisional applications, which has since turned out to be the case, so we asked to be accorded the benefit. You said no, and we didn't file the motion, but it appears that, where we are now, it would be, you know -- since those --

THE COURT: It's sort of late in the game. You can appreciate where the Board stands. Certainly, you could have had a conference call with me after you looked at the motions and said, hey, we need to file a responsive motion or take a look at this again. You

efed0437-88c9-458b-ae93-bd241ce6da5e

could have filed a request for reconsideration once the Board said that you were not authorized to do that, so it's coming kind of late. The fact that you lost on that is not really good cause to file, I think, that motion or the request to file that motion.

MR. PISANO: Well, Your Honor --

THE COURT: And when we asked during oral argument if there was still a basis, you said, oh, yes, we can still go forward on priority; we don't need the provisional application. We sort of gave you a big hint there, too. Things might not be looking good for you, so you've had several opportunities, and I'm just now hearing from you.

MR. PISANO: I apologize, Your Honor. Certainly, it was not my intention. During the oral argument, I understood that there was attack on some of the provisional applications. I didn't think it would be sustained as to all, and, admittedly, I can readily admit that, at the time of the hearing, I had not focused on the 503 application, although I think that it's discussed in one of the opposition motions that was filed by Guthrie, but I don't know that the

efed0437-88c9-458b-ae93-bd241ce6da5e

Board actually got to it.

So, certainly, the argument was there. I think this related to -- the 503, in particular, related to the metal covering, and, right now, I don't recall in your Order whether you actually got to consider the oppositions filed on that.

THE COURT: We granted the Senior Party SPL's motions, and, certainly, we would have had to have taken a look at the opposition; so can you tell me specifically what opposition you're referring to?

MR. PISANO: It was, I believe, in the opposition that was directed to having -- the opposition to having the claims directed -- hold on one second. Your Honor.

MR. MORGAN: While Mr. Pisano's looking for that, I was just looking through the transcript of the discussion of motions, and on Page 21, Mr. Pisano withdrew the motion, if I'm reading it right, not that you necessarily denied it. He withdrew it.

MR. PISANO: I don't see that, Bob, on Page 52. Your Honor, excuse me, but I was quoting Mr. Neifeld from Page 52. I don't believe I withdrew

efed0437-88c9-458b-ae93-bd241ce6da5e

it, but I would have to look at Page 21.

And to answer your question, I believe that Guthrie filed an opposition to the metal coating that's in -- that's set out in Claim 2, and I'm looking for your Order right now. I don't know whether you actually --

THE COURT: That was maybe opposition to their motion for a new count.

MR. PISANO: Yes.

THE COURT: Okay. Yeah, we wouldn't have gotten to that because we denied their motion based on, I believe, without looking at your opposition --

MR. PISANO: That's where we discussed the 503 and how we also had a metal --

THE COURT: If you had said in your opposition of their attack against your applications -- maybe we have it here, but that would have been an appropriate response to the motion, which you failed to file; so I ask Mr. Morgan you're talking about the transcript of the March 21st conference call we had?

MR. MORGAN: Yes, Your Honor.

efed0437-88c9-458b-ae93-bd241ce6da5e

THE COURT: Page 21?

MR. MORGAN: It's my Page 21. I believe it's talking about 15. Actually I think it's 56. I'm sorry. It's Page 56. My printout is not consistent, but it's Page 56, and Mr. Pisano says, okay, thank you, I hope it will come in the second inclusion, and I'm happy to withdraw the motion.

MR. PISANO: That, Your Honor, was based on the fact that Your Honor had pointed out that, since it wasn't going to provide Guthrie with an earlier filing date, any of the provisionals that were already in record, that it was basically an unnecessary motion.

So I guess, Your Honor, to sum up my response would be, certainly, it seems to me that, perhaps, Espiau is asking to amend its priority statement, and thereby include a derivation count, and I'm asking, if Your Honor would be willing to consider it, I will be willing to permit them to do that, but I would like the opportunity to have the Board consider the disclosure of the 503 as providing a basis for Count I.

efed0437-88c9-458b-ae93-bd241ce6da5e

THE COURT: I don't know that they should be netted together wedded together.

MR. PISANO: Well, that was by proposal, Your Honor.

THE COURT: They're two separate issues. They all along were alleging derivation, and, then, they dropped the ball with their priority statement, but you had multiple opportunities. This is the first time they're hearing that the Board is interpreting their dropping the ball or their not raising it. You've mad multiple opportunities to bring that to the Board's attention.

The 503 is now -- the feature that was lacking at all the other applications, and that's sort of unfair, because, now, you've got the advantage of how the Board has interpreted the evidence and how we ruled on that, and I don't know that that would best address the motion.

MR. PISANO: Your Honor, I guess my observation is that I did not appreciate that, when we filed the opposition to Espiau's -- I think it was -- Motion 2, their motion with respect to adding the new

efed0437-88c9-458b-ae93-bd241ce6da5e

count. I did not appreciate that the Board will not actually be considering the evidence and the position that discusses the 503 application, and how that meets all limitations of that Count 2. I did not appreciate that would not be considered, so I apologize, but I thought we did try to bring that to the Board's attention. We did file it in our opposition, and I thought that would have been a sufficient place for it to be considered. Yet --

THE COURT: You needed the 503 in support of their proposed Count 2, not necessarily for Count 1.

MR. PISANO: Well, that's true, but 502 also clearly shows -- I think part of the reason the Board arrived at the decision it did with respect to the provisionals is there was some dispute as to what the evidence showed as to whether it was a resident cavity, and some of the experts could disagree that putting the metal coating makes the wave guide resident cavity, so it actually was a very -- it was a very material provisional application.

THE COURT: Let's move on. I don't want to beat that to death. I have an idea I won't authorize

efed0437-88c9-458b-ae93-bd241ce6da5e

that motion, but I'll take a look and think about it, okay?

MR. PISANO: I'd appreciate that.

THE COURT: I'll also think about what I'm going to do about the derivation issue that they would like to raise.

MR. NEIFELD: Your Honor, on that issue, I was going back and looking at the rules while we were talking, and Rule 204, Notice of Basis for a Lease specifies the requirements of the priority statement in one section, and they list a bunch of motions for the basis of relief in another section.

The priority statement requirements had nothing do with derivation under that rule. They're specifically listed to dates of conception, property conception (indiscernible) practice, and a date on which diligence began. There's nothing here about your requirements for showing statements regarding derivation.

THE COURT: I think we interpreted it that way, and it may seem like it's a gotcha, so I'm sympathetic to that, okay?

efed0437-88c9-458b-ae93-bd241ce6da5e

MR. NEIFELD: The rule is what is the basis for relief? One section is a priority statement. Another section are motions in which we include a derivation motion. Frankly, I don't think we did anything wrong, and, perhaps, the Board should look at the rule and look at what it actually says. The requirements are to show the elements for proof of clarity, period.

THE COURT: Okay. Let me ask you: If I also allowed you to file a derivation motion -- this is to both parties -- I would want those papers submitted with the priority proof, too. In other words, I would want one motion covering both 102(g) and derivation, but I just want to get feedback on that.

MR. MORGAN: That will be fine.

THE COURT: Mr. Pisano?

MR. PISANO: Your Honor --

THE COURT: According to the standing Order, you get more pages anyway with Priority 3's, so I think it would be best to consolidate into one brief.

MR. PISANO: That's fine, Your Honor. Just

efed0437-88c9-458b-ae93-bd241ce6da5e

if you were to look at it, Guthrie opposition to Motion 4, I don't believe the Board considered, but it discusses in detail the final three applications, provisional applications.

THE COURT: Okay. So do you still want to undesignate 16, 22, 26, 28, 29, 30, 31, and 35?

MR. PISANO: Yes, Your Honor.

THE COURT: Are those all of the claims?

MR. PISANO: Yes.

THE COURT: That's still fair play.

MR. PISANO: Your Honor, do you want a responsive motion, then, to be accorded the benefit the additional priority application with respect to the claim, which Espiau wishes to designate?

THE COURT: Say that again, please.

MR. PISANO: Would it be a responsive motion, then, to be accorded the benefit of additional claims -- or additional provisional applications as to which Espiau wishes to dedesignate certain claims.

THE COURT: No, because the two are unrelated. You wouldn't necessarily have -- I can't even think of a time when you would have a responsive

efed0437-88c9-458b-ae93-bd241ce6da5e

motion to someone else's undesignating claims unless it had to do with something with, perhaps, wanting to make the claims and as having a separate account, which I wouldn't be inclined to do at this point in the game.

MR. PISANO: Thank you.

THE COURT: I don't have anything further.

MR. NEIFELD: The question came up at our discussions as to when an issue is preserved for appeal, and I know we had this conversation at the recent bar meeting with some of the APJs, and you were there regarding that issue. Do you want to clarify your understanding on that point?

THE COURT: My understanding is, when judgment, the time running after judgment. Is that what you're asking me?

MR. NEIFELD: I'm asking about the motion's lists, the list of motions that are not authorized.

MR. MORGAN: If I may, I think we're just talking about preserving any initiatives with respect to your decision on summary motions, Your Honor. It's after final judgment they're merged into that, and

efed0437-88c9-458b-ae93-bd241ce6da5e

any (indiscernible).

THE COURT: You're asking something different than Mr. Neifeld asked. Are you talking about the actual decision on motions or the decision to not authorize certain motions?

MR. MORGAN: I'm sorry, Mr. Neifeld. I may have been unclear in my discussions with you. I'm concerned -- more concerned at the moment with the decision on motions.

THE COURT: The decision on motions, that's appealable once you have a judgment entered.

MR. MORGAN: That's fine. Thank you very much.

THE COURT: Then, the decision to not authorize certain motions, certainly, those listed in the first go-around, you waived that. You know now that I said certain ones were deferred. We can all look back at the transcript for further discussion, and I'm not authoring unless -- well --

MR. MORGAN: That's fine. We understand that.

THE COURT: Okay. So 102 cites inventorship

efed0437-88c9-458b-ae93-bd241ce6da5e

disputes just seem to be all side shows. Both parties in their statements allege based on the named inventors of the respective Guthrie Espiau involves application and patents that there is a basis for going forward with priority, so it doesn't seem necessary, then, to delve into patentability based on inventorship type issues.

MR. MORGAN: That's. Understood Your Honor that's fine.

MR. PISANO: Just out of an abundance of caution in following on Mr. Morgan's question. The request for rehearing on the decision on the preliminary motions needs to be filed within 14 days of the decision?

THE COURT: That's right.

MR. PISANO: Does that request need to be authorized?

THE COURT: No. Just one other question just to make sure that both parties have it listed in their priority statements the named inventors on their respective applications patents, but that's the way I'm interpreting it. It's the named inventors that

efed0437-88c9-458b-ae93-bd241ce6da5e

allege priority inventions; is that correct?

MR. PISANO: Yes, Your Honor.

THE COURT: All right. I don't have anything further. It may be a few days before you get an Order from me, but, roughly, like I said in my last Order, we'll have -- the end of this phase will end approximately eight months from that date, which will be in February; so it will give you the six weeks up front, but the other times might be compressed somewhat, okay? So approximately six weeks from now, the Guthrie motion will be due. All right.

MR. MORGAN: Thank you.

THE COURT: Thank you.

MR. PISANO: Thank you, Your Honor.

(Whereupon, at 2:20 p.m., the teleconference in the aforesaid matter was concluded.)

efed0437-88c9-458b-ae93-bd241ce6da5e

CERTIFICATE OF REPORTER

I, TONI R. DeSENZE, the stenographic reporter who was duly sworn to well and truly report the foregoing proceedings, do hereby certify that the transcript of said proceedings is true and correct to the best of my knowledge and ability, and that I have no interest in said proceedings, financial or otherwise, nor through relationship with any of the parties in interest or their counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 8th day of March 2007.

_________________________________________

TONI R. DeSENZE, Reporter

efed0437-88c9-458b-ae93-bd241ce6da5e